UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 17-MD-02773-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE**<br><br>Re: Dkt. No. 110 |

Plaintiffs Sarah Key, Andrew Westley, Terese Russell, and Carra Abernathy (collectively, "Plaintiffs") bring a putative class action against Defendant Qualcomm Incorporated ("Qualcomm"). Before the Court is Qualcomm's motion to dismiss and/or strike Plaintiffs' Consolidated Class Action Complaint ("CCAC"). ECF No. 110 ("Mot."). Having considered the parties' submissions, the relevant law, and the record in this case, the Court hereby GRANTS in part and DENIES in part the motion to dismiss and/or strike.

## I.    BACKGROUND

### A.    Factual Background

This case involves allegations similar to those made in *FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, and requires understanding the complicated interaction between cellular

communications standards, standard essential patents ("SEPs"), and the market for baseband processors, or "modem chips." The Court begins by discussing cellular communications standards and modem chips generally. Then, the Court discusses Qualcomm's cellular communications SEPs and Qualcomm's participation in the markets for modem chips. Next, the Court discusses Plaintiffs' allegations that Qualcomm has used its SEPs and its modem chips monopoly to harm competition in certain modem chips markets. Finally, the Court discusses Plaintiffs' allegations that Qualcomm's conduct has caused them harm by raising the prices paid for products containing modem chips.

### 1. Cellular Technology and the Baseband Processor Industry Generally

#### i. Cellphone Networks

Cellular communications depend on widely distributed networks that implement cellular communications standards. ECF No. 94 (Consolidated Class Action Complaint or "CCAC") ¶ 32. Cellular communications standards have evolved over four "generations." *Id.* ¶ 34. "First-generation cellular communications standards were developed in the 1980s. These standards support analog transmissions of voice calls." *FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2017 WL 2774406, at *1 (N.D. Cal. June 26, 2017).

Second-generation ("2G") cellular communications were developed in the early 1990s. CCAC ¶ 35. 2G cellular communications standards support digital transmissions of voice calls. *Id.* The leading 2G standards are the Global System for Mobile Communications standard ("GSM") and second generation Code Division Multiple Access standard ("2G-CDMA"). *Id.* AT&T and T-Mobile chose to operate GSM networks. By contrast, Verizon and Sprint operate 2G-CDMA networks. *Id.*

In the late 1990s, third-generation ("3G") cellular communications standards were introduced. *Id.* ¶ 36. The leading 3G standards are the Universal Mobile Telecommunications System ("UMTS") and third-generation CDMA ("3G-CDMA") standards. *Id.* Network operators that deployed 2G GSM networks, such as AT&T and T-Mobile, transitioned to 3G UMTS networks. By contrast, network operators that deployed 2G-CDMA networks, such as Verizon

and Sprint, transitioned to 3G-CDMA networks.  *Id.*

In late 2009, fourth-generation ("4G") cellular communications standards were introduced.  *Id.* ¶ 37.  These standards support substantially higher data-transmission speeds than 3G standards.  *Id.*  The leading 4G standard is Long-Term Evolution ("LTE").  *Id.*  Most major network operators worldwide have deployed LTE.  *Id.*

### ii.  Standard Essential Patents

Cellular communications standards, such as CDMA and LTE standards, are adopted by standards setting organizations ("SSOs").  *Id.* ¶ 33.  SSOs that adopt cellular telecommunications standards include the European Telecommunication Standards Institute ("ETSI"), the Telecommunications Industry Association ("TIA"), and the International Telecommunications Union ("ITU").  *Id.* ¶ 34.

In setting a cellular communications standard, SSOs often include technology in the cellular communications standard that is patented.  Patents that cover technology that is incorporated into a standard are known as "standard essential patents" ("SEPs").  *Id.* ¶ 33.

Importantly, before incorporating a technology into a standard, SSOs "require participants to publicly disclose any claimed SEPs and promise to license [SEPs] to anyone who practices the standard on a royalty-free or [fair, reasonable, and non-discriminatory ('FRAND')] basis."  *Id.* ¶ 44.  "Absent [such] safeguards, SEP holders could abuse the standard-setting process via 'patent hold-up,' which happens 'when the holder of a[n] [SEP] demands excessive royalties after companies are locked into using a standard.'"  *Id.* ¶ 42 (citation omitted).

### iii.  Baseband Processors

In order to communicate with a cellular communications network, a cellphone handset ("handset") must contain a semiconductor device known as a baseband processor, or "modem chip."  *Id.* ¶ 32.  More specifically, in order to communicate with a *particular* cellphone network, the handset must contain a modem chip that complies with the cellular communications standards that the particular cellphone network supports.  *Id.*  For example, a handset that contains a modem chip that complies only with UMTS standards cannot communicate with a cellular network that

uses 3G-CDMA standards. "Multi-mode" modem chips can comply with more than one cellular communications standard. *Id.*

To be used on a network that deploys LTE—the leading 4G standard used by major cellular network operators—the handset must ordinarily contain a modem chip that complies with LTE standards and is also "backward compatible" with 2G and 3G standards. *Id.* ¶ 40. This is because network operators have "continued to use the prior standards" and "have not yet replaced their 2G and 3G infrastructure with the new 4G infrastructure." *Id.* Accordingly, most manufacturers "must purchase multimode chips in order to make [handsets] that can function on the major U.S. wireless networks." *Id.*

### iv. Cellular Handset Tiers and Smartphones

Cellular handsets are produced by original equipment manufacturers ("OEMs") such as Apple and Samsung. *Id.* ¶¶ 1–2, 38. Since the late 2000s, the market for handsets with advanced computing capability, such as smartphones and tablets, has "grown tremendously." *Id.* ¶¶ 2–3.

Competition in the manufacturing and sale of handsets has developed over time into "tiers": premium, mid, and low. *Id.* ¶ 38. "Premium"-tier smartphones include brands such as Apple's iPhone and Samsung's Galaxy-S. *Id.* Premium smartphones are of particular importance to OEMs because they "tend to have higher prices and margins than lower-tier products and are important for branding." *Id.*

Among the cellular communications standards discussed above, "LTE functionality, including its high data transmission speed, is central to modern [handsets], as consumers increasingly use them to transmit large volumes of data." *Id.* ¶ 39. Specifically, LTE allows for the transmission of large volumes of data, which has grown increasingly more important than cellular voice traffic. *Id.*

### 2. Qualcomm's Participation in the Modem Chip Market

Qualcomm is the leading supplier of modem chips worldwide. *Id.* ¶ 7. In particular, Qualcomm is dominant in the supply of two types of modem chips: (1) modem chips that comply with CDMA standards ("CDMA modem chips"); and (2) modem chips for use in premium tier

4

handsets, which comply with advanced LTE standards ("premium-LTE modem chips"). *Id.*

### i. CDMA Chips

First, Qualcomm has been particularly dominant in the supply of CDMA modem chips. *Id.* ¶¶ 56–57. As set forth above, major carriers such as Verizon and Sprint have deployed CDMA networks. *Id.* ¶ 35. OEMs that wish to manufacture handsets to operate on CDMA networks such as Verizon and Sprint must use modem chips that comply with CDMA standards.

Qualcomm is the dominant supplier of CDMA modem chips. From 2001 through 2015, Qualcomm's worldwide share of CDMA modem chips exceeded 80%. *Id.* ¶ 56. At the time of the CCAC, it was also estimated that "Qualcomm's worldwide share of the CDMA [modem] chip market for 2016 [was] likely to exceed or at least meet its historically greater than 80% share of the market." *Id.*

Qualcomm faces "limited competition for the supply of CDMA" modem chips. *Id.* ¶ 57. In the past ten years, "the only supplier of CDMA [modem chips] other than Qualcomm was Via Technologies," a Taiwanese company. *Id.* However, Via Technologies has focused its sales on the lower-tier handset market, rather than the premium market. *Id.* This is partly because Via Technologies has not offered multi-mode modem chips "that combine CDMA functionality with UMTS or LTE functionality." *Id.* In 2015, Intel Corporation ("Intel") acquired Via Technology's CDMA modem chip business. *Id.* However, Intel "has not yet commercialized a [modem] chip that integrates Via [Technology]'s CDMA technology" with "Intel's [own] multi-mode [modem chip] technologies." *Id.*

Another Taiwanese company, MediaTek Inc. ("MediaTek"), licensed technology from Via Technologies in late 2013 and began to offer CDMA modem chips in 2015. *Id.* However, MediaTek has not offered multi-mode CDMA modem chips that are "suitable for use in flagship handsets." *Id.* Overall, MediaTek's sale of CDMA modem processors has been small. *Id.*

### ii. Premium-LTE Modem Chips

As discussed above, most cellular network operators have deployed LTE networks. *Id.* ¶ 58. This includes major U.S. cellular network operators such as Verizon, AT&T, T-Mobile, and

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

Sprint. *Id.*

LTE functionality has continually advanced since the first LTE network was introduced in 2010. *Id.* These advances have allowed for progressively faster data speeds. *Id.* Accordingly, as LTE technology has progressed, "[modem] chip manufacturers have added advanced features." *Id.* For premium tier handsets, OEMs typically require modem chips with "advanced LTE functionality" that support advanced data download and upload speeds, in addition to other functions. *Id.* For an OEM designing and manufacturing a premium tier handset, a modem chip that supports only earlier LTE technology is not a substitute for a modem chip that supports advanced LTE standards. *Id.* Accordingly, just as OEMs produce handsets in "tiers," competition among LTE modem chip manufacturers also occurs in tiers. *Id.* ¶ 59.

Qualcomm has consistently been the dominant supplier of premium LTE modem chips. *Id.* ¶ 60. From 2012 through 2014, Qualcomm's annual worldwide share of premium LTE modem chip sales exceeded 80%. *Id.* Although Qualcomm's worldwide share dipped to 69% in 2015, its worldwide share for 2016 "remained at the dominant levels it [had] since 2012." *Id.*

Qualcomm faces limited competition in the premium LTE modem chip market. *Id.* ¶ 61. Indeed, Qualcomm's "only competitor in the LTE modem chip market is Intel." *Id.* Intel has begun to supply a portion of Apple's modem chip requirements for the iPhone 7, *id.* ¶ 108, but for many years "Qualcomm effectively blocked Apple from using Intel as a [modem] chip supplier," *id.* ¶ 61.

### 3. Qualcomm's Cellular Communications SEPs

In addition to supplying modem chips to OEMs, Qualcomm also has several patents that have been declared essential to cellular communications standards. *Id.* ¶¶ 44, 49.

Qualcomm has participated in the cellular standard setting process through SSOs such as ETSI, TIA, and Alliance for Telecommunications Industry Solutions ("ATIS"). *See id.* ¶ 49. "Qualcomm was a leading developer and proponent of 2G-CDMA standards. Qualcomm has a correspondingly high share of all patents declared essential to 2G-CDMA standards. Qualcomm also participated in 3G standard setting, though to a less significant degree." *FTC v. Qualcomm*,

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

2017 WL 2774406, at *4 (citations and internal quotation marks omitted). Qualcomm "had a smaller share of SEPs related to the UMTS and 3G-CDMA standard than its share of the 2G-CDMA SEPs." CCAC ¶ 36. Qualcomm's share of SEPs in LTE standards "is much lower" than Qualcomm's share of CDMA SEPs. *Id.* ¶ 37. Qualcomm's share of LTE SEPs "is roughly equivalent to that of other industry competitors." *Id.* "One study of declared LTE SEPs found that Qualcomm had a 13% share of 'highly novel' essential LTE patents, compared to 19% for Nokia and 12% for both Ericcson and Samsung." *Id.*

Qualcomm has committed "to ETSI, TIA, [ATIS], and other SSOs that it w[ill] license its cellular SEPs" on FRAND terms. *Id.* ¶ 49. "Qualcomm is thus required to license its cellular SEPs on FRAND terms to [handset] OEMs, as well as competing [modem] chip suppliers." *Id.* ¶ 51. In practice, however, Qualcomm licenses its SEPs to OEMs, but Qualcomm "refuses" to license its SEPs to competing modem chip manufacturers. *Id.* ¶ 64.

In licensing its SEPs to OEMs, Qualcomm collects a royalty rate of approximately 5% of the value of the net selling price of the handset. *Id.* ¶ 13. For example, if an OEM sells a handset that is priced at $600, Qualcomm will collect a $30 royalty for each sale. Among SEP holders, Qualcomm garners an outsized share of licensing revenues paid by OEMs, and OEMs pay Qualcomm far more in royalties than OEMs pay other SEP licensors, even those with comparable portfolios of cellular SEPs. *Id.* Indeed, an analysis conducted by Qualcomm in 2015 showed that revenues from Qualcomm's licensing program were "'equivalent in size to the sum of ~12 companies with a form of technology licensing,' including leading cellular SEP licensors such as Ericsson, Nokia, and Interdigital." *Id.*

### 4. Qualcomm's Alleged Anticompetitive Conduct

Plaintiffs allege that Qualcomm uses its dominance in the supply of CDMA and premium-LTE modem chips to skew SEP licensing negotiations toward outcomes that benefit Qualcomm and harm Qualcomm's modem chip competitors. *Id.* ¶ 51. Plaintiffs allege that Qualcomm does this through a course of conduct that includes three primary practices: (i) a "no license-no chips" policy; (ii) Qualcomm's refusal to license its SEPs to competing modem chip manufacturers; and

7

(iii) Qualcomm's exclusive dealing arrangements with Apple. *Id.* ¶ 52.

### i. "No License-No Chips"

As discussed above, Qualcomm's FRAND commitments "require[] [Qualcomm] to license its cellular SEPs on FRAND terms to [handset] OEMs, as well as competing chip suppliers." *Id.* ¶ 51. Nonetheless, Qualcomm refuses to license its SEPs to competing modem chip manufacturers. Thus, competing modem chip manufacturers cannot sell to OEMs modem chips "that convey the right to Qualcomm's cellular SEPs." *Id.* ¶ 71. Instead, Qualcomm licenses its SEPs to only OEMs who make and sell handsets. *Id.* ¶ 8a. In licensing its SEPs to OEMs, Plaintiffs allege that "Qualcomm conditions OEMs' access to [Qualcomm's modem] chips on [OEMs'] accepting a separate license to Qualcomm's cellular SEPs on Qualcomm's preferred terms." *Id.* ¶ 73. Essentially, unless OEMs agree to take out a separate SEP licensing agreement with Qualcomm on Qualcomm's preferred terms that covers all of the handsets that the OEM sells, Qualcomm will not supply the OEM with any Qualcomm modem chips. *Id.* Plaintiffs call this practice Qualcomm's "no license-no chips" policy. *Id.*

Plaintiffs allege that Qualcomm's conduct is unique among modem chip suppliers and suppliers of other cellular-equipment components. *Id.* ¶ 84. "Other component suppliers rely on component sales to convey their intellectual property rights to OEM customers, rather than selling the components and also entering into a separate intellectual property license." *Id.* When a supplier sells a component, such as a modem chip, to an OEM, that sale, under the doctrine of patent exhaustion, ordinarily terminates any right of the supplier under patent law to control any further use or sale of the component. *Id.* "Thus, a supplier's sale of a component to an OEM would already exhaust their patent rights, obviating the need—and making it unlawful—to require a separate patent license." *Id.*

Plaintiffs further allege that Qualcomm's "no license-no chips" policy stifles the normal process of negotiating the royalty rates of Qualcomm's FRAND-encumbered SEPs. OEMs have a number of grounds to "attack Qualcomm's royalty demands in court as being non-FRAND." *Id.* ¶ 82. For example, OEMs could argue that Qualcomm's royalties: (1) "do not reflect the value

8

contributed by its patented inventions," (2) are much higher than those "charged by other SEP licensors with similar technical contributions," (3) constitute "a percentage of the [entire handset's] price," and (4) "do[] not account for the value of any cross-licensed patents." *Id.* However, Plaintiffs allege that OEMs do not challenge Qualcomm's royalty terms because of Qualcomm's "no license-no chips" policy. *Id.* ¶ 95. Losing access to Qualcomm's modem chips would be a substantial loss to OEMs given Qualcomm's "dominance in CDMA and premium LTE [modem] chips." *Id.* ¶ 94.

Thus, "[t]o maintain access to Qualcomm's [modem] chips, OEMs have been coerced into accepting royalty and other license terms that they would not otherwise accept." *Id.* ¶ 95. Specifically, OEMs pay Qualcomm royalties that "do not reflect OEMs' assessments of patent royalties that a court or neutral arbiter would deem reasonable, including in light of Qualcomm's FRAND commitments." *Id.* "Instead, the royalties reflect Qualcomm's dominant position in the [modem] chip markets, and include the added increment that OEMs pay to Qualcomm to avoid disruption of [modem chip] supply." *Id.*

Plaintiffs call this "added increment"—the incremental above-FRAND royalty that OEMs pay Qualcomm—a "surcharge." *Id.* ¶ 95. This "surcharge" raises an OEM's cost of purchasing any *modem chip* because OEMs consider the "all-in" cost of a modem chip as consisting of two components: (i) the nominal price of the modem chip itself, and (ii) "any patent royalties the OEM must pay to use that [modem] chip in a [handset]." *Id.* ¶ 76. Qualcomm's "surcharge" raises the latter component—the patent royalties to use the modem chip in the handset—for every modem chip that an OEM buys, including the modem chips made by Qualcomm's competitors. *Id.* ¶ 77. "By raising OEMs' all-in cost of using competitors' chips, Qualcomm's conduct has diminished OEMs' demand for such processors, reduced competitors' sales and margins, and diminished competitors' ability and incentive to invest and innovate." *Id.* ¶ 140. Moreover, "Qualcomm has also limited competitors' ability to discipline the all-in prices that Qualcomm charges for [modem chips]." *Id.* ¶ 78. "Th[e] inflated all-in modem cost is ultimately passed onto consumers of [handsets] like Plaintiffs." *Id.* ¶ 95.

In addition, Plaintiffs allege that "Qualcomm can discriminate in its royalties" by "offer[ing] OEMs incentive payments to discount Qualcomm's above-FRAND royalties if an OEM uses Qualcomm's chips as opposed to those of a competitor." *Id.* ¶ 80. Qualcomm can do so based on its accumulation of funds from charging the surcharge. *Id.* ¶ 79. In other words, "the surcharge is a means to extract a higher price for Qualcomm's own chips without being undercut by competing chip manufacturers." *Id.* In this way, the revenue that Qualcomm earns from its surcharge "comes back to Qualcomm as a form of profit and maintains Qualcomm's chip monopoly." *Id.*

### ii. Qualcomm's Refusal to License its SEPs to Chip Competitors

As discussed briefly above, Plaintiffs allege that Qualcomm refuses to license its FRAND-encumbered SEPs to competing modem chip manufacturers. Rather, Qualcomm licenses its SEPs only to OEMs who manufacture handsets. *Id.* ¶ 8a. This, according to Plaintiffs, is in violation of Qualcomm's FRAND commitments, which "require[] [Qualcomm] to license its cellular SEPs on FRAND terms to [handset] OEMs, as well as competing chip suppliers." *Id.* ¶ 51. Although several of Qualcomm's competitors, including Intel and Samsung, have requested SEP licenses from Qualcomm, "Qualcomm has simply refused to offer *any* licenses to potential competitor [modem] chip manufacturers." *Id.* ¶ 64.

According to Plaintiffs, if Qualcomm licensed its modem chip competitors—as opposed to only OEMs—Qualcomm would not be able to use the threat of a disruption in supply of its modem chips to induce OEMs to agree to Qualcomm's preferred royalty terms. *Id.* ¶ 77. This is because, unlike OEMs who depend on Qualcomm for modem chip supply, competing modem chip manufacturers do not need modem chips from Qualcomm. *Id.* However, because Qualcomm does not license its competitors, competitors cannot offer competitive pricing and are therefore unable to "discipline the all-in prices that Qualcomm charges for" modem chips. *Id.* ¶ 78. Again, "[t]he revenue from Qualcomm's surcharge comes back to Qualcomm as a form of profit and maintains Qualcomm's chip monopoly." *Id.* ¶ 79.

### iii. Qualcomm's Exclusive Deals with Apple

In addition to Qualcomm's "no license-no chips" policy and Qualcomm's refusal to license its SEPs to its competitors, Plaintiffs further allege that Qualcomm has entered exclusive deals with Apple. *Id.* ¶ 105.

"Apple is a particularly important OEM from the perspective of a nascent [modem chip] supplier." *Id.* ¶ 107. Specifically, "Apple sells large volumes of premium handsets that require premium LTE" modem chips which "command higher prices" than lower-tier modem chips. *Id.* ¶ 107a. Moreover, Apple provides additional benefits to chip suppliers because modem chip suppliers for Apple learn from Apple's engineer teams, achieve "technical validation" by meeting Apple's complicated technical requirements, and "can field-test [their modem chips] through global launches." *Id.* ¶ 107b–d.

Plaintiffs allege that Apple has entered into *de facto* exclusive agreements with Qualcomm to use only Qualcomm's modem chips in Apple's flagship products. *Id.* ¶ 105. Specifically, Apple "repeatedly engaged in negotiations with Qualcomm concerning the excessive royalties Qualcomm charged such contract manufacturers to license its SEPs." *Id.* ¶ 97. Apple entered into agreements with Qualcomm in 2007, 2009, 2011, and 2013.

In 2007, "Qualcomm agreed to give Apple a rebate of all royalties Qualcomm received" from Apple that were "over a specified per-[handset] cap." *Id.* ¶ 99. In return, Apple had to agree not to incorporate a prospective fourth-generation standard that was opposed by Qualcomm but championed by Intel, its competitor. *Id.*

In 2009, Qualcomm and Apple entered into an agreement "address[ing] the process by which Qualcomm supplied chips and associated software to Apple." *Id.* ¶ 100. Under the agreement, "Apple's ability to sue Qualcomm for patent infringement concerning Qualcomm [modem] chips" was restricted. *Id.* Additionally, Qualcomm "capp[ed] its liability for the failure to supply" and "reserv[ed] for itself the ability to terminate its obligation to supply [modem] chips to Apple's contract manufacturers." *Id.*

In 2011, Qualcomm entered into an agreement with Apple through which "Qualcomm agreed to make substantial incentive payments to Apple if Apple agreed to exclusively use

11

Qualcomm chips in all new iPhone and iPad models." *Id.* ¶ 101. If Apple launched a new handset with a non-Qualcomm modem chip, "Apple would forfeit all of these incentive payments." *Id.* The agreement also provided that "Apple could not initiate any action or litigation against Qualcomm for intellectual property infringement." *Id.*

In 2013, Qualcomm entered into an agreement with Apple that modified and extended the term of the exclusivity arrangement set forth in the companies' 2011 agreement. *Id.* ¶ 102. Under the 2013 agreement, Qualcomm agreed to rebate to Apple royalties that Qualcomm collected in excess of a modified per-handset cap. *Id.* ¶ 103. Qualcomm's agreement to do this was subject to a new condition: "Apple could neither initiate nor induce others to initiate litigation based on Qualcomm's failure to offer licenses on FRAND terms." *Id.* ¶ 102. Further, "Qualcomm also agreed to make separate substantial incentive payments to Apple so long as Apple exclusively sourced chips from Qualcomm." *Id.* If, during the period of the agreement, Apple launched a new handset with a non-Qualcomm modem chip, Apple would forfeit past and future incentive payments. *Id.*

According to Plaintiffs, "Qualcomm's 2011 and 2013 agreements with Apple were, and were intended by Qualcomm to be, *de facto* exclusive deals that were as effective as express purchase requirements that essentially foreclosed Qualcomm's competitors from gaining [modem chip] business at Apple." *Id.* ¶ 105. Although Apple had "an interest in developing and working with additional suppliers of [modem chips]," the "large penalties that Apple would face" from Qualcomm if it chose to source chips from another supplier "prevented Apple from using alternative suppliers" during the effective exclusivity period under the agreements. *Id.* ¶ 105a–b; *see also id.* ¶ 108 (alleging penalties are sufficiently large that they effectively prevent other modem chip manufacturers from competing with Qualcomm to gain business from Apple).

As a result of Qualcomm's exclusive dealing arrangements with Apple, Apple sourced modem chips exclusively from Qualcomm for all iPad and iPhone products that Apple launched from October 2011 until September 2016. *Id.* ¶ 106. Qualcomm's exclusive agreements with Apple "excluded competition from other chip suppliers and harmed competition." *Id.* ¶ 107.

12

These exclusive agreements "also prevented Qualcomm's competitors from attaining the[] benefits" of working with Apple "and foreclosed a substantial share of the market for premium LTE chips." *Id.* ¶ 108.

### 5. Plaintiffs' Alleged Injury

Plaintiffs assert that Qualcomm's conduct caused them injury. According to Plaintiffs, "Qualcomm used its" practices to "coerce acceptance of [above]-FRAND licensing rates and terms for its SEPs." *Id.* ¶ 145. As noted above, this raises the "all-in" price of every modem chip because OEMs must pay a surcharge to Qualcomm "to ensure continued access to Qualcomm's modem chips supply." *Id.* "The artificially inflated all-in cost for modem chips in turn resulted in increases for the price of [handsets] that use those [modem] chips." *Id.*

Plaintiffs further allege that the surcharge was "passed down the distribution chain from the modem chips purchasers to Plaintiffs" who purchase "the [handsets] containing such [modem] chips." *Id.* ¶ 146. In other words, Qualcomm's surcharge was "passed on" to Plaintiffs through OEMs, distributors, and retailers and "can be directly traced through a straightforward distribution chain." *Id.* OEMs, distributors, and retailers cannot "readily absorb the [surcharge] Qualcomm charges for its modem chips" because they are "generally subject to vigorous price competition" and "generally operate on thin margins." *Id.* ¶ 152. "The inflated all-in cost of a modem chip raises the prices consumers pay for [handsets] incorporating modem chips." *Id.* ¶ 128.

Qualcomm's royalty rates are generally based on "a percentage of the wholesale price of" the entire handset, rather than the modem chip. *Id.* ¶ 148. Plaintiffs allege that, in this way, Qualcomm "directly distorted and increased the price of the [handsets] paid by Plaintiffs." *Id.* ¶ 147. By "us[ing] a royalty base that is the price of the [handset] as a whole," Qualcomm targeted the effect of its conduct "at the [handsets] as a whole rather than merely their components." *Id.* ¶ 148. Therefore, according to Plaintiffs, "[t]he [handset] product market is inextricably intertwined with the CDMA and premium-LTE [modem] chip markets." *Id.* ¶ 129.

### B. Procedural History

In a separate action initiated on January 17, 2017, FTC sued Qualcomm in this Court,

13

alleging that Qualcomm's course of conduct violated § 5 of the FTCA. *FTC v. Qualcomm*, 2017 WL 2774406, at *7. Subsequently, a number of lawsuits were filed by consumers against Qualcomm. These lawsuits generally alleged that Qualcomm's conduct violated state and federal antitrust and consumer protection laws.

In early 2017, Plaintiffs in several lawsuits moved to centralize pretrial proceedings in a single judicial district. 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."). On April 6, 2017, the Judicial Panel on Multidistrict Litigation issued a transfer order selecting the undersigned judge as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict litigation ("MDL") arising out of Qualcomm's allegedly anticompetitive conduct. *See* ECF No. 1 at 1–3.[1]

On May 11, 2017, the Court held a hearing to appoint interim lead Plaintiffs' counsel. ECF No. 27. Following this hearing, the Court issued an order appointing interim Plaintiffs' Steering Committee and co-lead Plaintiffs' counsel. ECF No. 31. At a case management conference on May 25, 2017, the Court ordered the interim Plaintiffs' Steering Committee to file a consolidated amended complaint by June 26, 2017. ECF No. 36. In an order dated June 7, 2017, the Court granted a stipulation to extend the deadline to July 11, 2017 to file a consolidated amended complaint. ECF No. 63. Plaintiffs then filed the instant Consolidated Class Action Complaint ("CCAC") on July 11, 2017. ECF No. 94. The CCAC asserts two federal statutory claims and two California statutory claims. *Id.*

On August 11, 2017, Qualcomm moved to dismiss and/or strike the CCAC. ECF No. 110 ("Mot."). On September 25, 2017, Plaintiffs opposed Qualcomm's motion, ECF No. 129 ("Opp."), and filed a request for judicial notice in connection with the opposition, ECF No. 129-1. On October 17, 2017, Qualcomm filed its reply. ECF No. 153 ("Reply").

---

[1] Apple's action against Qualcomm was excluded from the MDL because Apple's contract with Qualcomm has a forum selection clause, which requires the case to be tried in the Southern District of California. ECF No. 1 at 2 n.3. Moreover, although Apple raises similar antitrust claims, it also asserts unique contract and patent claims against Qualcomm. ECF No. 1 at 2.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Under Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, a court need not accept as true allegations contradicted by judicially noticeable facts, *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and a "court may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into one for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 (9th Cir. 2011). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B.    Leave to Amend

If the Court concludes that a motion to dismiss should be granted, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citation omitted). Nonetheless, a district court may deny leave to amend a complaint due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

15

amendment, [and] futility of amendment." *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

### III.    REQUEST FOR JUDICIAL NOTICE

The Court first addresses Plaintiffs' request for judicial notice. ECF No. 129-1. The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records, including judgments and other publicly filed documents, are proper subjects of judicial notice. *See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) ("[Courts] may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a filed complaint as a public record).

However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record . . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute." (internal quotation marks omitted)), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Plaintiffs request judicial notice of the following documents:

Ex. 1: Excerpts of transcript from Motion Hearing in *Apple Inc. v. Qualcomm Inc.*, S.D. Cal. Case No. 17-CV-00108, Dkt. No. 122;

Ex. 2: Redacted First Amended Complaint, *Apple Inc. v. Qualcomm Inc.*, S.D. Cal. Case No. 17-CV-00108, Dkt. No. 83;

Ex. 3: Order re Class Certification, *In re Microsoft I-V Cases*, S.F. Super. Ct. Case No. CJC-00-004106;

Ex. 4: Complaints, *In re Microsoft I-V Cases*, S.F. Super. Ct. Case No. CJC-00-004106;

Ex. 5: Second Amended Class Action Complaint, *In re Optical Disk Drive Antitrust Litigation*,

The Court concludes that all of these documents are proper subjects of judicial notice. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (holding that a court "may take judicial notice of court filings and other matters of public record."). In Qualcomm's reply, Qualcomm objects to judicial notice of Exhibit 2 because Apple's allegations are subject to reasonable dispute. Reply at 8 n.8. However, as discussed above, a court may take judicial notice of a document without taking judicial notice of reasonably disputed facts contained in the document. *See Lee*, 250 F.3d at 689 ("A court may take judicial notice of matters of public record . . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute."). Thus, the Court GRANTS Plaintiffs' request for judicial notice of Exhibits 1 through 5, "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Id.* at 690. Because Qualcomm disputes facts contained within Exhibit 2, the Court does not take judicial notice of any facts in that document. The Court next turns to address the substance of Defendants' motion to dismiss the CCAC.

## IV. DISCUSSION

The CCAC asserts two federal statutory claims and two California statutory claims. Specifically, the CCAC asserts (1) a claim under the California Cartwright Act, (2) a claim under § 1 of the federal Sherman Act, (3) a claim under § 2 of the federal Sherman Act, and (4) a claim under the California Unfair Competition Law ("UCL").

Qualcomm moves to dismiss Plaintiffs' CCAC in its entirety. First, Qualcomm argues that none of Plaintiffs' claims may proceed because Plaintiffs have not established that Qualcomm's conduct caused them any antitrust injury. Next, Qualcomm contends that Plaintiffs have not established that they have Article III standing to assert their claims related to Qualcomm's agreements with Apple. Finally, Qualcomm raises particular objections to each of Plaintiffs' causes of action.

The Court first considers Qualcomm's arguments regarding antitrust injury, then considers Qualcomm's contentions regarding Article III standing as to Qualcomm's agreements with Apple,

17

and last considers Qualcomm's challenges to each of Plaintiffs' causes of action in turn.

## A. Antitrust Injury

Qualcomm first moves to dismiss the CCAC in its entirety because, according to Qualcomm, Plaintiffs have sustained injuries too remote to confer statutory standing to sue for antitrust violations. To have standing to bring a federal antitrust claim, a plaintiff must allege antitrust injury, that is, "loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). In general, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999).

The parties dispute whether California's Cartwright Act, like the federal Clayton Act, requires Plaintiffs to meet the "market participant" test. Qualcomm asserts that California courts have followed the federal courts in interpreting the Cartwright Act to impose a "market participant" requirement. *See* Mot. at 7–8; Reply at 3 n.1. Plaintiffs counter that the California Supreme Court has held that federal law is at most instructive in construing California's law and that the Cartwright Act was meant to confer standing on indirect purchasers to bring antitrust suits. *See* Opp. at 5–7. The Court need not resolve this dispute because, even assuming that California law requires participation in the market, as discussed below, Plaintiffs have adequately pled that they are market participants.

Qualcomm raises two primary arguments for why Plaintiffs have failed to allege market participation for antitrust injury. First, Qualcomm contends that Plaintiffs are neither consumers nor competitors in the modem chip market and therefore have not suffered their injuries in the market where competition is being restrained. Second, Qualcomm contends that Plaintiffs' allegations are virtually identical to those found insufficient to state a claim in *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009), and *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015). The Court addresses each of these arguments in turn.

18

United States District Court
Northern District of California

### 1. Plaintiffs Have Adequately Pled Market Participation

Plaintiffs allege that as a result of Qualcomm's conduct, they have suffered injury by paying supra-competitive prices for handsets. Opp. at 9. Qualcomm argues that Plaintiffs' allegations are insufficient to establish antitrust injury because Plaintiffs' injury does not occur in the market where competition is being constrained. Mot. at 7. Qualcomm stresses that Plaintiffs are not consumers or competitors in the modem chips market but instead are indirect purchasers who buy handsets containing modem chips from OEMs, like Apple, or distributors and retailers later in the supply chain. Mot. at 7–8. For the reasons discussed below, taking the allegations in the CCAC as true and "draw[ing] all reasonable inferences in favor of" Plaintiffs—as the Court must on a motion to dismiss, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (internal quotation marks omitted)—the Court agrees with Plaintiffs that Plaintiffs have plausibly alleged antitrust injury in the form of supra-competitive prices for handsets.

Contrary to Qualcomm's suggestion, Plaintiffs' status as indirect purchasers is not determinative as to whether they have established antitrust injury. Under the market participation requirement, "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt.*, 190 F.3d at 1057. However, even indirect purchasers may suffer antitrust injury because "it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Id.* at 1057–58. In other words, the question whether a plaintiff has suffered antitrust injury looks to the closeness of the connection between the alleged anticompetitive behavior and the claimed injury to ensure that the injury is of the type the antitrust laws were designed to prevent. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982). Thus, a party has antitrust standing if "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict." *Id.* at 484.

Here, Plaintiffs plausibly allege that the artificially inflated price of handsets is inextricably intertwined with the injury that Qualcomm sought to inflict. As Plaintiffs explain in their CCAC,

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

the combined effect of three specific circumstances demonstrate that the market for handset

products—in which Plaintiffs participate—is "inextricably intertwined" with the market for

CDMA and premium-LTE modem chips. *Id.* ¶ 129. First, Qualcomm is able to use its dominance

in the modem chip market to "extract anticompetitive licensing terms for its SEPs." *Id.* Second,

Qualcomm's royalty rate is calculated "as a percentage of the wholesale price of the [entire

handset] rather than the [modem] chip." *Id.* Third, Qualcomm's royalties "directly inflate[] the

modem chip prices" and thereby "inflate[] . . . the price of the [handset] purchased by consumers

like Plaintiffs." *Id.*

First, Plaintiffs detail Qualcomm's practices that permit Qualcomm to use its monopoly

power to distort SEP licensing negotiations and induce OEMs to pay above-FRAND royalties.

Like FTC, Plaintiffs identify three primary practices that coerce OEMs to accept above-FRAND

licensing rates and terms: (i) Qualcomm's "no license-no chips" policy; (ii) Qualcomm's refusal to

license its SEPs to competing modem chip manufacturers; and (iii) Qualcomm's exclusive dealing

arrangements with Apple. *Id.* ¶¶ 52, 145. The Court offers a brief overview of the practices and

their effect on the market.

Under Qualcomm's "no license-no chips" policy, Qualcomm will not sell modem chips to

OEMs unless OEMs agree to take out a separate SEP licensing agreement with Qualcomm on

Qualcomm's preferred terms that covers all of the handsets that the OEM sells. *Id.* ¶ 73. An

important component of Qualcomm's conduct, Plaintiffs contend, is that Qualcomm refuses to

license its competitors in the modem chips market, *id.* ¶ 8a, even though Qualcomm's FRAND

commitments require Qualcomm to license its competitors, *id.* ¶ 51. Thus, competing modem

chip manufacturers cannot sell to OEMs modem chips "that convey the right to Qualcomm's

cellular SEPs." *Id.* ¶ 71. This difference in licensing is important because, unlike OEMs who

depend on Qualcomm for modem chip supply, competing modem chip manufacturers do not need

modem chips from Qualcomm. OEMs must necessarily buy some modem chips from Qualcomm

because Qualcomm owns approximately 80% of the market for CDMA modem chips and

approximately 80% of the market for premium-LTE modem chips. *Id.* ¶¶ 56, 60. Thus, "[t]o

20

maintain access to Qualcomm's [modem] chips, OEMs have been coerced into accepting royalty and other license terms that they would not otherwise accept." *Id.* ¶ 95. Specifically, OEMs pay royalties that "reflect Qualcomm's dominant position in the [modem] chip markets" and include a surcharge "to avoid disruption of [modem chip] supply." *Id.*

According to Plaintiffs, Qualcomm's refusal to license to competitors and exclusive dealing arrangements with Apple also allow Qualcomm to continue to leverage a surcharge from OEMs. As to the refusal to license, Plaintiffs allege that because Qualcomm does not license its competitors, competitors cannot offer competitive pricing and are therefore unable to "discipline the all-in prices that Qualcomm charges for" modem chips. *Id.* ¶ 78. Thus, "[t]he revenue from Qualcomm's surcharge comes back to Qualcomm as a form of profit and maintains Qualcomm's chip monopoly." *Id.* ¶ 79. With regard to Qualcomm's dealings with Apple, Plaintiffs allege that Qualcomm "used its market power as leverage to make Apple accept unreasonable and anticompetitive licensing terms" and rates. *Id.* ¶ 104. The penalties for breaking the agreements with Qualcomm were so large that Apple could not work with non-Qualcomm modem chip manufacturers during the effective exclusivity period, but instead sourced modem chips exclusively from Qualcomm for all iPad and iPhone products that Apple launched from October 2011 until September 2016. *Id.* ¶¶ 105–06, 108. Plaintiffs therefore allege that Qualcomm uses its dominant position in the modem chip markets to extract a surcharge to license its SEPs. *Id.* ¶ 129.

Second, Plaintiffs allege that Qualcomm's royalty rate is directly tied to the handset market in which Plaintiffs participate. Specifically, Qualcomm calculates its royalty "as a percentage of the wholesale price of the [entire handset] rather than the [modem] chip." *Id.* ¶ 129. By basing the royalty rate on the wholesale price of the handset, "[t]he effect of Qualcomm's anticompetitive conduct . . . is targeted at the [handsets] as a whole rather than merely [the handset's] components." *Id.* ¶ 148. Qualcomm's recognition that the price of handsets sold to consumers should drive its licensing royalty rates bolsters the plausibility of the closeness of the connection between Qualcomm's alleged misconduct and the Plaintiffs' injuries. Moreover, that practice

suggests that "Qualcomm's anticompetitive acts . . . directly distorted and increased the price of the [handsets] paid by Plaintiffs." *Id.* ¶ 147. Plaintiffs allege that "[t]he surcharge resulting from Qualcomm's anticompetitive conduct results in an increased cost for the [handset] as a whole, which is directly passed on to the consumer." *Id.* ¶ 152.

Third, and finally, Plaintiffs explain that Qualcomm's practices increase the price that OEMs pay for modem chips and that those costs are passed down to consumers like Plaintiffs. The above-FRAND royalty that Qualcomm collects on every handset affects the market for modem chips because OEMs consider the "all-in" cost of a modem chip as consisting of two components: (i) the nominal price of the modem chip itself and (ii) patent royalties to Qualcomm to use the modem chip in a handset. *Id.* ¶ 76. As Plaintiffs allege, Qualcomm's practices increase the second component of the "all-in" price for every modem chip that an OEM buys, including the modem chips made by Qualcomm's competitors. *Id.* ¶ 77. Thus, for every modem chip that an OEM buys, the OEM must pay a surcharge on that modem chip that does not reflect the value of Qualcomm's FRAND-encumbered SEPs, but rather reflects Qualcomm's modem chips monopoly. *Id.* ¶ 95. OEMs are forced to pay the surcharge to "ensure continued access to Qualcomm's modem chips supply," *id.* ¶¶ 127, 145; maintaining such access is important because Qualcomm's share of the CDMA and premium-LTE modem chips market is significant, *id.* ¶ 94.

Qualcomm's surcharge affects the ultimate price paid by consumers like Plaintiffs because the cost of modem chips substantially influences the retail price that OEMs, retailers, and distributors charge for a handset. *Id.* ¶ 150. Modem chips have no "independent free-standing use," but must be incorporated into a handset to "serve any purpose." *Id.* ¶ 2. As such, modem chips and handsets containing those modem chips are "stages of a single market supply chain" whereby "[i]ncreases in the price of modem chips lead directly to price increases at the OEM and retail levels for [handsets]." *Id.* Consumers like Plaintiffs therefore drive demand in the modem chips market. *Id.* Moreover, the "all-in" cost of modem chips "make[s] up a substantial portion of the cost of manufacturing" handsets. *Id.* ¶ 150. Therefore, "[t]he retail price of a [handset] is determined in substantial part by" the all-in costs of modem chips. *Id.*

United States District Court
Northern District of California

According to the CCAC, Plaintiffs at the end of the supply chain are injured when they purchase handsets containing modem chips because the handsets have been priced to account for the surcharge on the modem chips. *Id.* ¶ 151; *see also id.* ¶ 139 ("Qualcomm's anticompetitive practices have . . . increased consumer prices."). The passing on of costs either occurs "directly" when Plaintiffs purchase from OEMS or occurs "through distributors and retailers." *Id.* ¶¶ 146, 151. Plaintiffs who purchased from OEMs, such as Apple, are "impacted . . . directly" by Qualcomm's agreements because Plaintiffs purchased from OEMs "subject to" those agreements. *Id.* ¶ 149. Nevertheless, Plaintiffs assert that all categories of Plaintiffs have been injured by supra-competitive pricing because Qualcomm's "surcharge" has been "passed down the distribution chain from the modem chip purchasers to Plaintiffs." *Id.* ¶ 146.

More specifically, Plaintiffs allege that the nature of the industry explains why these costs must be passed on to consumers. In particular, Plaintiffs describe that OEMs, distributors, and retailers are "generally subject to vigorous price competition" and "generally operate on thin margins." *Id.* ¶ 152. This means that OEMs, distributors, and retailers cannot "readily absorb the anticompetitive rates Qualcomm charges for its modem chips" and, therefore, the "corresponding price increases at all levels of the distribution chain." *Id.* Thus, the surcharge passed on to Plaintiffs "can be directly traced through a straightforward distribution chain" back to Qualcomm. *Id.* ¶ 146. Qualcomm cites no authority to support its argument that at this stage of the proceedings, Plaintiffs cannot provide allegations about the usual operation of the industry but must instead identify by name specific intermediaries that pass on royalties. Reply at 7. In sum, taking Plaintiffs' allegations as true and reading the CCAC as a whole, Plaintiffs have adequately alleged that their injuries in the handset market are inextricably linked to the injuries that Qualcomm's anticompetitive behavior inflicts in the modem chip market.[2]

---

[2] In reply, Qualcomm states that the CCAC does not "clarify whether Plaintiffs allege the overcharge occurs in the alleged market for [modem] chips, or in some other intellectual property market that is not identified or [pled]." Reply at 5. Therefore, Qualcomm argues, "Plaintiffs cannot purport to participate in the relevant market(s) if they have not identified them." *Id.* At this stage of the proceedings, as detailed above, Plaintiffs have adequately pled that their injuries are inextricably intertwined with the injuries that Qualcomm sought to inflict. Defining the

23

Other cases have reached a similar conclusion. "Multiple opinions have weighed an allegation of 'inextricably linked' markets for component and finished-product markets and found that it satisfied [the] market-participation requirement, even for indirect purchasers." *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *12. For example, in *In re Lithium Ion Batteries Antitrust Litig.*, the court held that consumers of batteries and battery products had "plausibly pled" that the markets for battery cells, batteries, and battery products are "inextricably intertwined." *Id.* at *13. The court relied on allegations that "Plaintiffs purchased batteries and battery products with cells allegedly traceable to defendants," and that the retail price of the battery products is substantially determined by the cost of the battery cell because the cell comprises a "substantial component cost" and each level of the distribution chain is "subject to vigorous price competition and thin net margins." *Id.* Plaintiffs' allegations here are virtually indistinguishable. Similar allegations have been deemed sufficient to establish antitrust injury at the pleading stage. *See In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1002 (E.D. Mich. 2014) (finding antitrust injury where complaint alleged that markets for components and finished products were "inextricably intertwined," the components "remain[ed] identifiable, discrete physical products, unchanged by the manufacturing process," and the components' "prices c[ould] be traced through the chain of distribution"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023–24 (N.D. Cal. 2010) (finding market participation sufficiently alleged where complaint asserted that markets for components and finished products were "inextricably interlinked" and their prices "directly correlated"); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1154 (N.D. Cal. 2009) (finding antitrust injury where complaint alleged that the component and finished-product markets were "inextricably intertwined" with "inherent cross-elasticity of demand between the two").

In sum, taking the CCAC's allegations as true and making reasonable inferences in

appropriate market raises factual questions that are better resolved a later stage of the proceedings. *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420-YGR, 2014 WL 4955377, at *14 (N.D. Cal. Oct. 2, 2014).

Plaintiffs' favor, the CCAC adequately alleges that Plaintiffs suffered antitrust injury because they participate in the market where competition is being constrained.

### 2. *Lorenzo* and *Feitelson* Are Distinguishable from this Case

Next, Qualcomm contends that Plaintiffs' claims must be dismissed because Plaintiffs' allegations are indistinguishable from the allegations found insufficient to plausibly plead an antitrust injury in *Lorenzo* and *Feitelson*. Mot. at 8–10. The Court disagrees with Qualcomm because Plaintiffs' allegations here provide more detail connecting Qualcomm's conduct to the injury that Plaintiffs suffered. The Court discusses *Lorenzo* and *Feitelson* in turn.

#### a. *Lorenzo*

In *Lorenzo*, the plaintiff challenged the same conduct at issue in this case, but provided significantly less detail about how Qualcomm's behavior affected the market and injured the plaintiff. Specifically, the plaintiff asserted Clayton and Cartwright Act claims alleging that Qualcomm violated its FRAND obligations, charged supra-competitive royalties by requiring both OEMs and handset manufacturers to obtain licenses, and offered discounts to OEMs that purchased modem chips exclusively from Qualcomm. *Lorenzo*, 603 F. Supp. 2d at 1295–96. The plaintiff's sole allegation of injury was that OEMs suffer direct harm in the form of a surcharge and that OEMs pass on those costs to handset manufacturers who pass those costs on to retailers who pass those costs on to the plaintiff. *Id.* at 1296.

In concluding that the plaintiff had not adequately pled antitrust injury, the court identified two central and related deficiencies. First, the plaintiff's injury was passed through "three levels of the supply chain"—from OEMs to handset manufacturers to retailers to the plaintiff. *Id.* at 1301. Second, Qualcomm's license covered "only a component of the technology" in the modem chip, which is ultimately built into the handset that the consumer plaintiff purchases. *Id.* Without more details to connect the injury to the plaintiff, the court found the allegations lacking because the plaintiff's injury is "passed on through the supply chain such that [the] [p]laintiff's injury also must be disaggregated from a multitude of other manufacturing and component factors." *Id.* The court explained that "[t]he Complaint does not allege facts to support a finding that [the] [p]laintiff

United States District Court
Northern District of California

and Qualcomm had a direct relationship, that Qualcomm's anticompetitive conduct proximately caused [the] [p]laintiff's injury, that [the] [p]laintiff is a direct victim of Qualcomm's anticompetitive conduct, or that [the] [p]laintiff is the 'necessary means' by which Qualcomm carried out its anticompetitive licensing scheme." *Id.* Therefore, the court concluded that the plaintiff "fail[ed] to allege sufficient facts to support a finding that [the] [p]laintiff's alleged injury [was] inextricably intertwined with Qualcomm's unlawful conduct." *Id.*

Plaintiffs' allegations in the instant case are more detailed in ways that cure the deficiencies identified in *Lorenzo*. While Plaintiffs allege that Qualcomm's surcharge is passed down through a distribution chain, Plaintiffs also provide allegations about why the surcharge cannot be absorbed at any level but must be passed on to consumers. In particular, Plaintiffs describe that all levels of the supply chain—OEMs, distributors, and retailers—face price competition and operate on thin margins. *Id.* ¶ 152. In that environment, OEMs, distributors, and retailers have no means to "readily absorb the anticompetitive rates Qualcomm charges for its modem chips"; instead, actors "at all levels of the distribution chain" must increase their prices to account for Qualcomm's surcharge. *Id.* Furthermore, Plaintiffs allege that they fall at different points along the supply chain: some are three levels removed, but others are only one level away, purchasing directly from OEMs, like Apple. *Id.* ¶¶ 146, 151.

Plaintiffs also explain how Qualcomm's surcharge is passed down to them even though Qualcomm's licenses cover only a portion of the technology in the modem chips. As Plaintiffs recite, OEMs consider the "all-in" cost of a modem chip, which includes the nominal price of the modem chip itself plus any royalties to use the modem chip in a handset. *Id.* ¶ 76. Qualcomm's surcharge raises OEMs' patent royalties for every modem chip that an OEM buys, whether the modem chip is made by Qualcomm or one of Qualcomm's modem chip competitors. *Id.* ¶ 77. Further, Plaintiffs allege that the final retail price of a handset is "determined in substantial part" by the all-in cost of the modem chips because that cost forms a "substantial portion" of the cost to manufacture headsets. *Id.* ¶ 150. Indeed, the sole purpose of modem chips is to operate in handsets, so modem chips and handsets lie along one "market supply chain" so that increasing

United States District Court
Northern District of California

modem chip price "lead[s] directly to price increases at the OEM and retail levels for [handsets]." *Id.* ¶ 2.

Finally, Plaintiffs include an additional, significant facet of Qualcomm's conduct beyond the allegations in *Lorenzo* that bolsters the plausibility of "inextricably intertwined" injuries. Notably, Plaintiffs allege that Qualcomm's royalty base is the wholesale price of the entire handset, not the modem chip. *Id.* ¶ 129. Tying the royalty rate to the wholesale price of the handset suggests that Qualcomm's conduct "target[s]" the handsets as a whole "rather than merely [the handset's] components." *Id.* ¶ 148. As described more fully above, the likely effect is that Qualcomm's surcharge "directly distorted and increased the price of the [handsets] paid by Plaintiffs." *Id.* ¶¶ 147, 152. Unlike the plaintiff in *Lorenzo*, Plaintiffs plausibly allege that their injuries in purchasing handsets are "inextricably intertwined" with the injuries Qualcomm sought to inflict in the modem chip market. Having found *Lorenzo* distinguishable, the Court turns to Qualcomm's contention that *Feitelson* is indistinguishable.

### b. *Feitelson*

*Feitselson* is also distinguishable because the plaintiffs' complaint in that case suffered from many of the same infirmities as the complaint in *Lorenzo*. There, the plaintiffs alleged that Google entered into agreements with OEMs that limited the default mobile search engine options on Android to Google's own products. *Feitelson*, 80 F. Supp. 3d at 1023–25. Under the plaintiffs' theory, that setup cut off available subsidies from search engine competitors and drove up the price of Android phones for consumers. *Id.* The court found that the plaintiffs' allegations of "antitrust injury in the form of supracompetitive pricing in Android phones" were insufficiently connected to Google's challenged conduct. *Id.* at 1028. The court first explained that the plaintiffs' injuries did not occur in the same market as Google's challenged conduct. *Id.* Nor could the court determine that the plaintiffs' injury was "sufficiently close to the alleged anticompetitive conduct" or that the plaintiffs' injuries were "inextricably intertwined" with the injuries sought to be inflicted, in particular because the "[p]laintiffs elide[d] allegations concerning the number of supply chain levels between OEMs . . . and end consumers like [the] [p]laintiffs."

27

*Id.*[3]

For many of the same reasons identified above, Plaintiffs' allegations go far beyond the allegations in *Feitelson*. Although Plaintiffs also suffered injury in another market, Plaintiffs do not merely declare injury. Plaintiffs connect the injuries suffered to Qualcomm's conduct. Unlike the plaintiffs in *Feitelson*, Plaintiffs do not "elide allegations concerning the number of supply chain levels between OEMs . . . and end consumers," like Plaintiffs. Instead, Plaintiffs provide their position in the supply chain and describe why Qualcomm's surcharge is passed down through the chain of distribution to Plaintiffs. *Id.* ¶¶ 76–77, 146, 150–51. Moreover, as noted above, Plaintiffs allege that Qualcomm's royalty rate is based on the wholesale price of the entire handset, rather than the modem chip, further reinforcing Plaintiffs' allegation that the effect of Qualcomm's conduct is "targeted at" the handset market. *Id.* ¶ 148. In contrast to *Feitelson*, Plaintiffs' allegations provide a sufficient basis to conclude that Plaintiffs' injuries were "sufficiently close to [Qualcomm's] alleged anticompetitive conduct" and were "inextricably intertwined" with the injuries sought to be inflicted by Qualcomm.

Accordingly, the Court DENIES Qualcomm's motion to dismiss Plaintiffs' CCAC for failure to plead antitrust injury.

## B. Article III Standing

Qualcomm moves to dismiss Plaintiffs' claims to the extent they rely on Qualcomm's agreements with Apple because, according to Qualcomm, Plaintiffs lack Article III standing to sue with respect to those claims. Article III standing to sue requires that (1) the plaintiff suffered an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "'fairly traceable' to the challenged conduct"; and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking

---

[3] Qualcomm also makes a brief reference to *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1141 (N.D. Cal. 2008), which Qualcomm argues "invoked a very similar line of reasoning" as *Feitelson*. Mot. at 10. *DRAM* provides no stronger basis for concluding the allegations here are insufficient.

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

federal jurisdiction bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of litigation." *Id.* at 561. At the pleading stage, "[g]eneral allegations" of injury may suffice. *Id.*

Qualcomm contends that Plaintiffs lack Article III standing because Plaintiffs cannot establish "injury in fact." Specifically, Qualcomm asserts that Plaintiffs have not alleged any harm from Qualcomm's exclusive dealings with Apple because Plaintiffs admit that Qualcomm's agreements included rebates to Apple. According to Qualcomm, such rebates "would *lower* prices for finished [handsets] and therefore *benefit*, not harm, Plaintiffs." Mot. at 13.

The Court disagrees with Qualcomm. Qualcomm focuses on one aspect of Plaintiffs' theory of the exclusivity arrangement without acknowledging the overall nature of the arrangement. This mode of analysis is improper because antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Here, Plaintiffs have specifically alleged that the "rebates reduced but did not eliminate Apple's overpayment of [above-FRAND] royalties to Qualcomm." CCAC ¶ 103. Plaintiffs also plead that "[e]ven accounting for such rebates," Apple's royalty payments to Qualcomm were "significantly greater" than royalty payments for similar SEPs and above Qualcomm's FRAND obligations. *Id.* In other words, Qualcomm's offering of partial rebates to Apple does not negate Plaintiffs' theory that Qualcomm's exclusive dealing arrangement with Apple led to a surcharge that had to be borne by consumers like Plaintiffs.

Plaintiffs' allegations as to the rebates also fit within the broader scheme of misconduct that Plaintiffs have alleged. According to the CCAC, Qualcomm conditioned its award of rebates to Apple on Apple's agreeing to "exclusively source[] chips from Qualcomm" and to refrain from challenging "Qualcomm's failure to offer licenses on FRAND terms." *Id.* ¶ 102. These agreements "essentially foreclosed Qualcomm's competitors from gaining chipset business at Apple" and "prevented Qualcomm's competitors from attaining the[] benefits" of working with Apple. *Id.* ¶¶ 105, 108. Moreover, the overall impact of the exclusive dealing arrangement was to

"limit[] competitors' ability to discipline the all-in prices that Qualcomm charges" for modem chips. *Id.* ¶ 78. Indeed, the Court found sufficient FTC's similar allegations that "Qualcomm's exclusive dealing arrangements with Apple significantly limited the opportunities for other chip manufacturers to enter into or remain in the market for premium LTE chips," thereby "alleg[ing] substantial foreclosure in the market for premium LTE modem chips." *FTC v. Qualcomm*, 2017 WL 2774406, at *24 (internal quotation marks and alterations omitted); *see also* CCAC ¶ 108 (alleging that Qualcomm's agreements "foreclosed a substantial share of the market for premium LTE chips").

Qualcomm's sole cited authority, *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 914 (9th Cir. 2015), is not to the contrary. There, Netflix subscribers contended that Walmart's transfer of its online DVD subscriber business to Netflix had resulted in higher prices for consumers. *Id.* at 918. Examining the record at summary judgment, the Ninth Circuit concluded that the subscribers had not raised a genuine issue of material fact as to whether they suffered an injury-in-fact. *Id.* at 922. The Ninth Circuit explained that the "undisputed record belie[d]" the subscribers' assertion that "if Walmart remained in the market, Netflix would have reduced its prices." *Id.* Specifically, there was evidence that Walmart's online DVD-rental business was unsuccessful, that Netflix had not lowered its prices in the time that Walmart was in the market, and that none of Walmart's online rental competitors (including Netflix) perceived Walmart as a threat. *Id.* at 922–23. Under those facts, the subscribers could not show that they had suffered an injury-in-fact in the form of paying higher prices. *Id.* at 924.

Here, Qualcomm does not identify any factual allegation or fact in the record that contradicts Plaintiffs' non-speculative assertion that Qualcomm's exclusive dealing with Apple resulted in higher prices for handsets. As noted above, Plaintiffs allege that Qualcomm's rebates to Apple constitute one piece of the overall alleged unlawful behavior. Those rebates served as an incentive "to ensure [that] Apple would continue to use Qualcomm's chips and that Qualcomm could continue its 'no[ ]license-no[ ]chips' policy." CCAC ¶ 97. As a result, Apple could not use alternative suppliers and so was forced to source modem chips exclusively from Qualcomm for all

iPad and iPhone products launched from October 2011 until September 2016. *Id.* ¶¶ 105a–b, 106. Apple was forced to "accept [Qualcomm's] unreasonable and anticompetitive licensing terms" and, as discussed more fully in § IV.A.1 above, the surcharge was passed on to consumers like Plaintiffs. *Id.* ¶¶ 104, 156. Plaintiffs have sufficiently pled injury-in-fact stemming from Qualcomm's agreements with Apple.

Accordingly, the Court DENIES Qualcomm's motion to dismiss for lack of Article III standing Plaintiffs' claims to the extent those claims rely on Qualcomm's agreements with Apple.

## C.     Cartwright Act

Plaintiffs allege in Count One a California state antitrust claim under the Cartwright Act, Cal. Bus. & Professions Code § 16700 *et seq.* The Cartwright Act proscribes "a combination of capital, skill or acts by two or more persons" for an unlawful purpose. Cal. Bus. & Prof. Code § 16720. The California Court of Appeal has noted the "broad class of persons and injuries which the Cartwright Act intends to cover." *Cellular Plus, Inc. v. Superior Court*, 18 Cal. Rptr. 2d 308, 312 (Ct. App. 1993).

Qualcomm seeks to dismiss Plaintiffs' Cartwright Act claim for failure to state a claim or, alternatively, moves to strike Plaintiffs' nationwide class allegations under the Cartwright Act. First, Qualcomm argues that Plaintiffs' pleadings are insufficient because the allegations cover only single-firm conduct and not "a combination . . . by two or more persons." Second, Qualcomm argues that the Cartwright Act presents an irreconcilable conflict with certain states' antitrust laws and so cannot be applied to class members who are residents of those states. The Court addresses each of these arguments in turn.

### 1.     Single-Firm Conduct Under the Cartwright Act

Qualcomm argues that Plaintiffs fail to state a claim under the Cartwright Act because Plaintiffs' allegations "relate to [non-actionable] single-firm conduct rather than any 'combination.'" Mot. at 14. The Cartwright Act proscribes "a combination of capital, skill or acts by two or more persons" for an unlawful purpose. Cal. Bus. & Prof. Code § 16720. By its terms, the Act does not cover "wrongful conduct on the part of a single entity." *Bondi v. Jewels by*

*Edwar, Ltd.*, 73 Cal. Rptr. 494, 498 (Ct. App. 1968). Thus, "a manufacturer's announcement of a resale price policy and its refusal to deal with dealers who do not comply coupled with the dealers' voluntary acquiescence in the policy does not constitute . . . an unlawful combination as a matter of law." *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175, 182 (Ct. App. 2001). However, the "'combination' necessary to support an antitrust action can be found where a supplier or producer, by coercive conduct, imposes restraints to which distributors involuntarily adhere." *Kolling v. Dow Jones & Co.*, 187 Cal. Rptr. 797, 805 (Ct. App. 1982).

Qualcomm asserts that Plaintiffs challenge only unilateral conduct by Qualcomm, namely, Qualcomm's decisions related to licensing policies, terms, and partners. Mot. at 15. In Qualcomm's view, that conclusion is not changed by the fact that OEMs acquiesce in licensing agreements with Qualcomm. Mot. at 15–16. Qualcomm also argues that Plaintiffs cannot consistently plead single-firm monopolization under § 2 of the Sherman Act and a combination under the Cartwright Act. Mot. at 14. Plaintiffs respond that OEMs have not simply assented to Qualcomm's terms, but instead have been coerced into entering trade-restraining license agreements by Qualcomm's threat to withhold chips. Opp. at 16.

For the reasons discussed below, taking the allegations in the CCAC as true and "draw[ing] all reasonable inferences in favor of" Plaintiffs—as the Court must on a motion to dismiss, *Knevelbaard*, 232 F.3d at 984 (internal quotation marks omitted)—the Court agrees with Plaintiffs that Plaintiffs have adequately alleged that Qualcomm's agreements with OEMs qualify as a combination under the Cartwright Act. The Court first addresses the adequacy of Plaintiffs' allegations that Qualcomm coerced Apple and other OEMs to enter unlawful agreements. The Court then addresses Qualcomm's argument that Plaintiffs cannot plead single-firm monopolization under § 2 of the Sherman Act and a combination under the Cartwright Act.

### a. Plaintiffs Adequately Plead Coercion by Qualcomm in Entering Agreements with Apple and Other OEMs

Qualcomm's dealings with Apple provide a concrete example of Qualcomm pressuring OEMs into unlawful agreements. Plaintiffs allege that Qualcomm "coerced Apple into exclusive

dealing arrangements." CCAC ¶ 173. Although Apple wanted to work with and source modem chip from suppliers other than Qualcomm, Apple was unable to do so because the penalties under the 2011 and 2013 agreements were too excessive. *Id.* ¶¶ 105a–b, 108. Indeed, Apple itself stated that "Qualcomm's actions deterred Apple from switching to Intel's or other potential competitors' [modem chips]." *Id.* ¶ 104. Under the 2011 agreement, Apple could not sue Qualcomm for intellectual property infringement. *Id.* ¶ 101. The 2013 agreement, which modified the 2011 agreement, added that Apple could not challenge (or induce others to challenge) Qualcomm's failure to offer licenses on FRAND terms. *Id.* ¶ 102. Both the 2011 and 2013 also had mechanisms by which Apple would forfeit payments that it had received from Qualcomm if Apple launched a new handset with a non-Qualcomm modem chip. *Id.* ¶¶ 101–02. At least the 2013 agreement required forfeiture of both past and future incentive payments. *Id.* ¶ 102. According to Plaintiffs, Qualcomm was able to force these agreements on Apple because of Qualcomm's superior market power: Qualcomm "used its market power as leverage to make Apple accept unreasonable and anticompetitive licensing terms." *Id.* ¶ 104.

The facts alleged demonstrate that Qualcomm's actions led to exclusivity and effectively shut Qualcomm's competitors out of the market. From October 2011 through September 2016, Apple sourced modem chips exclusively from Qualcomm for all iPad and iPhone products. *Id.* ¶ 106. Moreover, Qualcomm's exclusive agreements with Apple "excluded competition from other [modem] chip suppliers and harmed competition" and "foreclosed a substantial share of the market for premium LTE [modem] chips." *Id.* ¶¶ 107–08. Thus, Plaintiffs have adequately alleged that Qualcomm coerced Apple into entering agreements that had an anticompetitive effect on the market.

Plaintiffs have similarly provided sufficient allegations that Qualcomm coerced other OEMs into entering agreements that had an anticompetitive effect on the market.[4] Plaintiffs allege

---

[4] Although California courts require "a 'high degree of particularity' in the pleading of Cartwright Act violations," *Freeman v. San Diego Ass'n of Realtors*, 91 Cal. Rptr. 2d 534, 553 (Ct. App. 1999), Qualcomm cites no authority to establish that Plaintiffs "must identify by name . . . particular OEMs or agreements." Mot. at 15 n.5.

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

that Qualcomm "successfully executed a scheme to pressure OEMs to adhere to unreasonable and supra-competitive licensing terms by threatening to withhold chip supply" and that Qualcomm "agreed to pay rebates or funds in exchange for OEMs acquiescing to Qualcomm's coercive terms." *Id.* ¶ 173. In particular, Qualcomm licenses its SEPs only to OEMs who make and sell handsets, not to competing modem chip manufacturers. *Id.* ¶ 8a. Thus, in order to receive modem chips from Qualcomm—the dominant supplier of both CDMA and LTE modem chips, *id.* ¶¶ 56, 60—OEMs must purchase from Qualcomm directly. *See id.* ¶ 71 (explaining that Qualcomm's arrangement makes it impossible for competing modem chip manufacturers to sell modem chips "that convey the right to Qualcomm's cellular SEPs"). In licensing its SEPs to OEMs, "Qualcomm conditions OEMs' access to [Qualcomm's modem] chips on [OEMs'] accepting a separate license to Qualcomm's cellular SEPs on Qualcomm's preferred terms." *Id.* ¶ 73. Unless OEMs agree to take out a separate SEP licensing agreement with Qualcomm on Qualcomm's preferred terms that covers all of the handsets that the OEM sells, Qualcomm will not supply the OEM with any Qualcomm modem chips. *Id.*

As Plaintiffs allege, OEMs have little choice but to accept Qualcomm's licensing terms because Qualcomm's "no license-no chips" policy "threatens to disrupt OEMs' [modem] chip supply." *Id.* ¶ 175; *id.* ¶ 95 (stating that OEMs pay the surcharge to "avoid disruption of [modem chip] supply"). In this way, "OEMs have been coerced into accepting royalty and other license terms that they would not otherwise accept" to ensure continued access to Qualcomm's modem chips. *Id.* ¶ 95. Specifically, OEMs pay Qualcomm royalties that "do not reflect OEMs' assessments of [reasonable] patent royalties" but instead "reflect Qualcomm's dominant position in the [modem] chip markets." *Id.* In sum, OEMs involuntarily accede to Qualcomm's surcharge to avoid disruption of OEMs' modem chip supply.

Qualcomm's offering of rebates to OEMs reinforces the coercive nature of its interactions. As explained above, Qualcomm "offer[s] OEMs incentive payments to discount Qualcomm's above-FRAND royalties if an OEM uses Qualcomm's chips as opposed to those of a competitor." *Id.* ¶ 80. As the CCAC states, Qualcomm is able to offer such incentive payments precisely

34

because it levies the surcharge. *Id.* Qualcomm's competitors are unable to offer the same incentive payments. *Id.* Therefore, by charging a surcharge on all modem chips but offering a discount if an OEM uses Qualcomm chips, Qualcomm makes money off the surcharge while inducing OEMs to use Qualcomm's chips. *Id.* To obtain the benefit of Qualcomm's incentive pay, OEMs must use Qualcomm's chips and accede to its licensing terms. Plaintiffs have adequately alleged that Qualcomm violated the Cartwright Act by using coercive conduct to impose unlawful restraints to which OEMs involuntarily adhere.

The facts of *Chavez*, 113 Cal. Rptr. 2d 175, further demonstrate why Plaintiffs' allegations here are sufficient to state a claim. In that case, the California Court of Appeal recognized that "[a]n unlawful combination arises . . . if the manufacturer . . . seek[s] communication of a dealer's acquiescence or agreement to secure the dealer's compliance, such as by means of coercion, and the dealer so communicates." *Id.* at 182 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 n.9, 765 n.10 (1984)).[5] The question was whether the facts alleged were sufficient to meet that standard. *Id.* On that point, the court found that the plaintiff's allegations that the defendant refused to deal with dealers who did not comply with a resale price policy and used "other unspecified 'threats, coercion, intimidation and boycott' to cause the dealers to comply" were insufficient to show coercion. *Id.* at 182–83. Plaintiffs' allegations here are significantly more detailed. Plaintiffs do not allege that Qualcomm simply communicated a policy and refused to deal with OEMs who would not comply. Rather, Plaintiffs allege that Qualcomm employed its superior market power and threatened to withhold chips if OEMs did not agree to Qualcomm's licensing terms. Plaintiffs' allegations specify the threats and explain why coercion was effective. Plaintiffs' pleadings are sufficient to establish that Qualcomm pressured OEMs into adhering to

---

[5] Qualcomm suggests in passing that there is a question whether the coerced combination doctrine "even still exists" after the United States Supreme Court's decision in *Monsanto*. Mot. at 16 & n.6 (citing *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986)). However, *Chavez* reaffirms the vitality of the coerced combination doctrine after *Monsanto* and cites to *Monsanto* as supporting authority. Whereas the Court's decision in *Monsanto* focuses on the evidence necessary to infer a price-fixing agreement, 465 U.S. at 763–64, here the existence of agreements between Qualcomm and OEMs is not in dispute.

anticompetitive contracts, thus creating an unlawful combination under the Cartwright Act.

### b. Plaintiffs' Sherman Act and Cartwright Act Claims Are Not Inconsistent

Qualcomm separately contends that Plaintiffs' claim that the "very same conduct" is unlawful as single-firm monopolization under § 2 of the Sherman Act and a combination under the Cartwright Act is "inconsistent pleading." Mot. at 14. Qualcomm cites no authority holding that such claims cannot be pled together. Indeed, Qualcomm's argument appears to rest on its mistaken assumption that the Cartwright Act requires that the accused actors "mutually decided to enter into a common scheme to achieve some unlawful purpose." Mot. at 15. However, as detailed above, an unlawful combination may exist under the Cartwright Act when "a supplier or producer, by coercive conduct, imposes restraints to which distributors involuntarily adhere." *Kolling*, 187 Cal. Rptr. at 805. Thus, there is no perceived inconsistency between Plaintiffs' allegations that Qualcomm both "executed a scheme to pressure OEMs to adhere to unreasonable and supra-competitive licensing terms" and "abused its monopoly power in the relevant [modem] chips markets to force OEMs into licenses with unfair and unreasonable terms." CCAC ¶¶ 173, 205. This case is not like *In re Optical Disk Drive Antitrust Litigation*, which involved an actual contradiction because the complaint at issue simultaneously claimed that certain actors were both "co-conspirators" and "victims" of an alleged bid-rigging. *See* No. 10-MD-02143-RS, 2011 WL 3894376, at *6 (N.D. Cal. Aug. 3, 2011). Thus, the Court rejects Qualcomm's contention that Plaintiffs cannot plead both a Sherman Act § 2 claim and a Cartwright Act claim in these circumstances.

Accordingly, the Court DENIES Qualcomm's motion to dismiss Plaintiffs' Cartwright Act claim for failure to state a claim.

### 2. Conflict Between the Cartwright Act and Other States' Antitrust Laws

Qualcomm next argues that "Plaintiffs' Cartwright Act claim also fails to the extent it purports to cover class members who purchased devices in states that . . . d[o] not authorize indirect purchasers to seek damages under state law." Mot. at 17. According to Qualcomm, under

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

1  *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012), each foreign state has an

2  interest in applying its law to transactions within its borders. Mot. at 20. Thus, "if California law

3  were applied to [a nationwide] class, foreign states would be impaired in their ability to calibrate

4  liability to foster commerce." *Mazza*, 666 F.3d at 593.

5       This Court has ordinarily "declined to apply *Mazza* at the motion to dismiss stage to strike

6  nationwide class allegations." *Zapata Fonseca v. Goya Foods Inc.*, No. 16-CV-02559-LHK, 2016

7  WL 4698942, at *3 (N.D. Cal. Sept. 8, 2016). However, the Court has been reluctant to proceed

8  without "the sort of detailed choice-of-law analysis that guided the Ninth Circuit in *Mazza*."

9  *Brazil v. Dole Food Co., Inc.*, No. 12-CV-01831-LHK, 2013 WL 5312418, at *11 (N.D. Cal. Sept.

10  23, 2013). Here, the parties offer briefing on the choice-of-law question, and neither party asserts

11  that the answer hinges on any disputed factual questions. *See In re Graphics Processing Units*

12  *Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) (recognizing the "merit in disposing

13  of [a conflict-of-laws] issue at an early stage of the litigation, particularly where the issue of

14  whether the different state's laws conflict will not change significantly as th[e] action

15  progresses"). In light of the parties' agreement that this issue should be resolved now, the Court

16  will determine whether application of California law to a nationwide class is appropriate for

17  Plaintiffs' Cartwright Act claim.

18       A court must ensure that the certification of a nationwide class under the laws of a single

19  state comports with due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985).

20  "Under California's choice of law rules, the class action proponent bears the initial burden to show

21  that California has significant contact or significant aggregation of contacts to the claims of each

22  class member." *Mazza*, 666 F.3d at 589 (citation and internal quotation marks omitted). "Once

23  the class action proponent makes this showing, the burden shifts to the other side to demonstrate

24  that foreign law, rather than California law, should apply to class claims." *Id.* at 590 (citation and

25  internal quotation marks omitted).

26       "[A]nticompetitive conduct by a defendant within a state that is related to a plaintiff's

27  alleged injuries and is not 'slight and casual' establishes a 'significant aggregation of contacts,

28

creating state interests.'" *AT & T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1113 (9th Cir. 2013) (footnote and citation omitted). Qualcomm does not dispute that Plaintiffs have sufficiently alleged that California has a constitutionally sufficient aggregation of contacts to the claims of each putative class member in this case. The Court agrees, as Qualcomm's principal place of business is in California, Qualcomm made business decisions related to its anticompetitive conduct in California, and Qualcomm negotiated the licenses at issue in California. CCAC ¶ 168; Opp. at 23. Accordingly, the Court finds that Plaintiffs have met their initial burden. "California has a constitutionally sufficient aggregation of contacts to the claims of each putative class member in this case," and application of California law here poses no constitutional concerns. *Mazza*, 666 F.3d at 590; *see also In re Yahoo Mail Litig.*, 308 F.R.D. 577, 602 (N.D. Cal. 2015) (concluding application of California law was constitutionally permissible where defendant's corporate headquarters were in California, the defendant's executive decision makers were largely in California, and the processes at issue were developed and directed in California); *Clothesrigger, Inc. v. GTE Corp.*, 236 Cal. Rptr. 605, 613 (Ct. App. 1987) (finding application of California law was constitutionally permissible where defendant's principal offices were in California and the allegedly fraudulent misrepresentations emanated from California).

Because the Court is satisfied that Plaintiffs have adequately alleged that California has sufficient contacts with the proposed class claims, the burden is on Qualcomm to show "that foreign law, rather than California law, should apply." *Mazza*, 666 F.3d at 590 (citation omitted). California law may be applied on a classwide basis only if "the interests of other states are not found to outweigh California's interest in having its law applied." *Id.* (quoting *Wash. Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1082 (Cal. 2001)). To determine whether the interests of other states outweigh California's interest, courts administer the following three-step government interest test. The court must first determine whether the law of the other states is materially different from California law. *Id.* at 590. Second, if there are differences, the court determines whether the other state has an interest in having its law applied to decide whether a true conflict exists. *Id.* at 591–92. Third, if another state has an interest, the court determines which state's

38

1   interest would be most impaired if its policy were subordinated to the law of another state. *Id.* at

2   593.

### a. Material Differences in State Law

4          The Court finds that Qualcomm has met its burden on the first step of California's choice-

5   of-law analysis. Plaintiffs concede, as they must, that there are material differences between

6   California's Cartwright Act and the antitrust statutes of certain other states. Specifically, some

7   states would not allow suits for damages by indirect purchasers, like Plaintiffs, to proceed at all.

8   Opp. at 20. This difference is material, as its application would "spell the difference between the

9   success and failure of a claim." *Mazza*, 666 F.3d at 591.

### b. Other States' Interests

11          As for step two, the Court finds that while California has an interest in applying its law,

12   other states have no interest in applying their laws to the current dispute. California's interest is

13   clear. The California Supreme Court has held that the "primary concern" of the Cartwright Act is

14   "the elimination of restraints of trade and impairments of the free market." *Clayworth v. Pfizer,*

15   *Inc.*, 233 P.3d 1066, 1083 (Cal. 2010). The mechanism of enforcing that commitment and

16   deterring anticompetitive behavior is to allow private rights of action for treble damages. *Id.*

17   Here, California has an interest in allowing this suit to proceed to address Qualcomm's unlawful

18   business activities in California and deter such anticompetitive conduct perpetuated by a resident

19   California corporation.

20          In contrast, the other states have no interest in applying their law to prevent this lawsuit

21   from going forward. As noted above, the state laws at issue prohibit indirect purchasers from

22   seeking damages for antitrust violations. These laws are designed to protect businesses and other

23   actors from excessive antitrust liability by limiting suits for damages to those brought by direct

24   purchasers. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208, 212 (1990) (explaining that

25   the rule barring monetary recovery by indirect purchasers serves the purposes of "eliminat[ing]

26   multiple recoveries" and "eliminat[ing] the complications of apportioning overcharges between

27   direct and indirect purchasers").

28

Case No. 17-MD-02773-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

The other states' interest in preventing excessive antitrust recovery for defendants is not implicated in the present case, where the sole defendant is a California resident. The California Supreme Court has recognized that in enacting liability limits, a state has an "interest in protecting resident defendants from excessive financial burdens." *Hurtado v. Superior Court*, 522 P.2d 666, 672 (Cal. 1974). When the state "has no defendant residents to protect," the state also "has no interest in denying full recovery to its residents injured by [out-of-state] defendants." *Id.* at 670. Here, Qualcomm is the only defendant and is a resident of California, not one of the states that would forbid a damages suit to proceed. Thus, the other states have no interest in disallowing the suit to proceed against Qualcomm. *See Munguia v. Bekins Van Lines, LLC*, No. 11-CV-01134-LJO, 2012 WL 5198480, at *10 (E.D. Cal. Oct. 19, 2012) (explaining that "a jurisdiction's only interest in having its [stricter] damages limitation rules applied is to protect its resident defendants from excessive financial burdens or exaggerated claims"); *Pecover v. Elec. Arts Inc.*, No. 08-CV-02820-VRW, 2010 WL 8742757, at *20 (N.D. Cal. Dec. 21, 2010) ("[I]n cases involving [California] resident defendants, foreign states do not have a legitimate interest in limiting the amount of recovery for nonresident plaintiffs under California law."). Indeed, applying other states' laws to bar recovery here would paradoxically disadvantage the other states' own citizens for injuries caused by a California defendant's unlawful activities that took place primarily in California. In such a circumstance, "California's more favorable laws may properly apply to benefit nonresident plaintiffs." *Clothesrigger*, 236 Cal. Rptr. at 610.

In fact, one of Qualcomm's principal authorities relies on the same resident–nonresident distinction discussed above. In *In re Lithium Ion Batteries Antitrust Litigation*, like here, the indirect purchaser plaintiffs asked the court to certify a nationwide class under the Cartwright Act even though the class would encompass states that would prohibit such a suit for damages from proceeding. No. 13-MD-02420-YGR, 2017 WL 1391491, at *14 (N.D. Cal. Apr. 12, 2017). The court concluded that a nationwide class would be improper because three of the defendants were based in New Jersey whose law barred indirect purchaser damages suits. *Id.* The court reasoned that where states bar indirect purchasers from seeking damages, "'it is too much of a stretch to

40

employ California law as an end run around the limitations those states have elected to impose on standing' to protect its resident businesses." *Id.* (quoting *In re Optical Disk Drive Antitrust Litig.*, No. 10-MD-02143-RS, 2016 WL 467444, at *12 (N.D. Cal. Feb. 8, 2016)); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-01827-SI, 2013 WL 4175253, at *2 (N.D. Cal. July 11, 2013) (concluding that Texas law prohibiting indirect purchaser suits should apply to Texas defendants). Qualcomm's own authority supports the conclusion that the other states have no legitimate interest in applying their law to this dispute.[6]

*Mazza* is not to the contrary. In *Mazza*, the Ninth Circuit examined whether California's consumer protection laws could properly be applied to automobile sales that took place in 44 different states. 666 F.3d at 589, 592. In concluding that other states had an interest in applying their consumer protection laws to the transactions at hand, the Ninth Circuit explained that each state has an interest in regulating the interactions of resident consumers and out-of-state businesses within the state by setting requirements like scienter and remedies. *Id.* at 591–92. In this way, the states could properly calibrate liability to protect consumers while attracting business. *Id.* at 592–93. *Mazza* therefore followed the principle that "[e]very state has an interest in having its law applied to its *resident claimants*." *Id.* at 591–92 (emphasis added) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001)). The same interests are not implicated by the state laws at issue in this case. No resident claims the benefit of non-California law here because those state laws do not seek to protect consumers by governing their interactions with businesses. Instead, the laws at issue limit which actors may bring antitrust damages actions to the benefit of the state's resident defendants.

Qualcomm has not met its burden of showing that the other states have an interest in having their laws applied. Thus, the Court need not address which state's interest would be most

---

[6] Qualcomm's remaining authorities either do not contemplate or do not provide full discussion of the significance of the defendant's state of residence. *See In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1067 (S.D. Cal. 2017); *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *22 (N.D. Cal. Jan. 19, 2017); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1027–28.

impaired if its policy were subordinated to the law of another state. The Court "find[s] California law applicable without proceeding to the third step in the analysis." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010) (citation omitted). Accordingly, the Court DENIES Qualcomm's motion to strike Plaintiffs' nationwide class allegations.

**D.      Clayton and Sherman Acts**

Plaintiffs allege in Counts Two and Three claims for violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. "Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits [e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "Section 2 of the Sherman Act makes it unlawful for a firm to 'monopolize.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001). In the *FTC v. Qualcomm* case, the Court concluded that FTC stated a claim against Qualcomm for violations of both §§ 1 and 2 of the Sherman Act. *See* 2017 WL 2774406, at *18, *23, *25.

Here, Qualcomm does not dispute that, like FTC, Plaintiffs adequately allege that Qualcomm engaged in anticompetitive conduct in violation of §§ 1 and 2 of the Sherman Act. Instead, Qualcomm asserts that Plaintiffs' Sherman Act claims for damages cannot proceed because Plaintiffs are indirect purchasers who cannot seek damages under § 4 of the Clayton Act.

Section 4 of the Clayton Act provides a private right of action for damages to "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). As the United States Supreme Court has explained, that language does not allow indirect purchasers to bring suits for money damages, even if the indirect purchasers suffered an injury in the form of an overcharge passed on from direct purchasers. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 730 (1977). In other words, "[t]he Supreme Court has interpreted [§ 4 of the Clayton Act] narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits." *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120 (9th Cir. 2008).

Plaintiffs do not dispute that they qualify as indirect purchasers because they do not

42

1    purchase modem chips directly from Qualcomm but rather purchase handsets containing modem

2    chips from OEMs, like Apple, or retailers later in the supply chain.  Opp. at 25.  However,

3    Plaintiffs contend that insofar as they purchased directly from Apple, they can maintain their claim

4    for damages as indirect purchasers based on the Ninth Circuit's statement that "indirect purchasers

5    can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier

6    over the antitrust violation."  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145–46

7    (9th Cir. 2003).  For several reasons, the exception articulated by the Ninth Circuit does not apply

8    in this case.

9            First, Plaintiffs' argument rests on the premise that *Freeman* created a new freestanding

10   exception to *Illinois Brick*'s bar against indirect purchasers.  *See* Opp. at 25.  That premise is

11   incorrect: *Freeman* does not purport to create a new exception.  In using the "realistic possibility"

12   formulation, *Freeman* cited to *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th

13   Cir. 1980), where the Ninth Circuit applied two recognized exceptions to the *Illinois Brick* rule,

14   namely, when direct purchasers are controlled by or accused of conspiring with the defendant.

15   *Freeman*'s discussion tracks those two exceptions, concluding that the exceptions are inapplicable

16   because "[t]he [defendant] associations own [the direct purchaser] Sandicor[,] [t]hey appoint its

17   board of directors, and they are accused of conspiring with it."  322 F.3d at 1146.  Indeed,

18   *Freeman* clarifies that "*Royal Printing* applies because the associations own Sandicor."  *Id.* at

19   1146 n.12.  Subsequent Ninth Circuit authority has confirmed that whether *Freeman* fashioned a

20   new exception is at best "unclear" because "standing existed in *Freeman* based on the control or

21   co-conspirator exceptions."  *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 & n.3 (9th Cir.

22   2012).  In particular, the broad interpretation of *Freeman* conflicts with the United States Supreme

23   Court's downplaying of the concern that "direct purchasers sometimes may refrain from bringing

24   a treble-damages suit for fear of disrupting relations with their suppliers."  *Ill. Brick*, 431 U.S. at

25   746.  Without the freestanding exception in *Freeman*, Plaintiffs' claims fail because they do not

26   assert that either the control or co-conspirator exception is appropriately invoked in this case.

27           Second, even assuming that *Freeman* creates a new exception, *see In re ATM*, 686 F.3d at

28
     Case No. 17-MD-02773-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND/OR STRIKE

749, Plaintiffs cannot claim benefit to the exception in this case. *Freeman* posits that "indirect purchasers can sue for damages if there is *no realistic possibility* that the direct purchaser will sue its supplier over the antitrust violation." 322 F.3d at 1145–46 (emphasis added). Reflecting the "limited" nature of the exceptions, courts have applied the exceptions narrowly, allowing damages suits to proceed, for example, when customers or sellers "own or control the direct purchaser" or when the indirect purchaser "establishes a price-fixing conspiracy between the manufacturer and the middleman." *In re ATM*, 686 F.3d at 749 (citation omitted). This case does not present the same "realistic possibility" that the direct purchaser will not bring suit for antitrust violations. To the contrary, Apple has already sued Qualcomm for largely the same conduct, including a claim under § 2 of the Sherman Act. CCAC ¶ 16. Apple's suit for antitrust violations undercuts Plaintiffs' unsupported argument that there is "no realistic possibility that [Apple] will sue [Qualcomm] over the antitrust violation." *Freeman*, 322 F.3d at 1145–46. Accordingly, the Court GRANTS Qualcomm's motion to dismiss the Sherman Act claims to the extent those claims seek damages.

Plaintiffs do not contest the applicability of *Illinois Brick* and cannot establish that an exception applies. Thus, they cannot bring a damages claim under § 1 or § 2 of the Sherman Act as a matter of law. The Court finds that granting Plaintiffs leave to amend their Sherman Act damages claims would be futile, and the Court grants Qualcomm's motion to dismiss the Sherman Act claims to the extent those claims seek damages with prejudice. *See Leadsinger*, 512 F.3d at 532 (holding that leave to amend is proper when amendment is not futile).

**E.    UCL**

Qualcomm argues that Plaintiffs' UCL claims should be dismissed if the Court concludes that Plaintiffs have not shown antitrust injury or should be stricken to the extent that the Court concludes that Plaintiffs' nationwide class allegations should be stricken. *See* Mot. at 21. As explained in § IV.A above, Plaintiffs have adequately pled antitrust injury. As explained in § IV.C.2 above, Plaintiffs' nationwide class allegations should not be stricken. Therefore, the Court DENIES Qualcomm's motion to dismiss and/or strike Plaintiffs' UCL claim.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Qualcomm's motion to dismiss and/or strike. Specifically, the Court rules as follows:

- The Court DENIES Qualcomm's motion to dismiss Plaintiffs' CCAC for lack of antitrust injury.
- The Court DENIES Qualcomm's motion to dismiss for lack of Article III standing Plaintiffs' claims to the extent those claims rely on Qualcomm's agreements with Apple.
- The Court DENIES Qualcomm's motion to dismiss Plaintiffs' Cartwright Act claim for failure to state a claim.
- The Court DENIES Qualcomm's motion to strike Plaintiffs' nationwide class allegations.
- The Court GRANTS WITH PREJUDICE Qualcomm's motion to dismiss Plaintiffs' Sherman Act claims to the extent those claims seek damages.
- The Court DENIES Qualcomm's motion to dismiss Plaintiffs' UCL claim.

**IT IS SO ORDERED.**

Dated: November 10, 2017

_Lucy H. Koh_
LUCY H. KOH
United States District Judge