# Exhibit 39

**MUNGER, TOLLES & OLSON LLP**

1155 F STREET N.W.
SEVENTH FLOOR
WASHINGTON, D.C. 20004-1361
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 683-3702

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

July 20, 2017

Writer's Direct Contact
(202) 220-1101
(213) 683-4007 FAX
Donald.Verrilli@mto.com

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112-A
Washington, DC  20436

     Re:    *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof*, Docket No. 3235

Dear Secretary Barton:

    On behalf of Intel Corporation in the above-referenced proceeding, enclosed please find our client's Public Interest Statement.

    If you have any questions, please do not hesitate to give me a call.

    Respectfully submitted,

    /s/ Donald B. Verrilli, Jr.

    Donald B. Verrilli, Jr.

Enclosure

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MOBILE ELECTRONIC DEVICES AND RADIO FREQUENCY AND PROCESSING COMPONENTS THEREOF** | Docket No. 3235 |

## INTEL CORPORATION'S STATEMENT ON THE PUBLIC INTEREST

Donald B. Verrilli, Jr.
Chad I. Golder
Sarah G. Boyce
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W.
Washington, D.C. 20004
Telephone: (202) 220-1100

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105
Telephone: (415) 512-4000

Kimberly Schmitt
INTEL CORPORATION
2200 Mission College Blvd.
Santa Clara, CA 95054
Telephone: (408) 653-9574

*Counsel for Intel Corporation*

Intel Corporation ("Intel") respectfully responds to the Commission's solicitation of comments on any public-interest issues raised by the Complaint and the Section 210.8(b) Statement filed by Qualcomm Inc. ("Qualcomm").  *See* 82 Fed. Reg. 32,199 (July 12, 2017).

Intel is Qualcomm's only remaining competitor in the merchant market for premium LTE baseband processor modems ("modems").  Intel has invested billions of dollars to develop next-generation advanced modems and technologies to improve the performance and functionality of modern smartphones and cellular communications.  Qualcomm now seeks exclusion of allegedly infringing Apple mobile electronic products that include a modem made by Intel, so that they can be "replace[d]" by allegedly infringing Apple products that "use a Qualcomm brand baseband processor modem," Complainant's Initial Statement on the Public Interest at 4.  Thus, Qualcomm did ***not*** initiate this investigation to stop the alleged infringement of its patent rights; rather, its complaint is a transparent effort to stave off lawful competition from Qualcomm's only remaining rival.  This twisted use of the Commission's process is just the latest in a long line of anticompetitive strategies that Qualcomm has used to quash incipient and potential competitors and avoid competition on the merits.  And although those strategies have sometimes been subtle or complex, Qualcomm's latest complaint could not be more blatant in its anticompetitive aims.

Like Qualcomm's other anticompetitive conduct, an exclusion order would cause significant harm to the public interest—and, specifically, to the interests identified in the statutory public-interest factors in Section 337(d)(1) of the Tariff Act.  *See* 19 U.S.C. § 1337(d)(1).  The vital public interest in restraining Qualcomm from shutting Intel out of the market for premium LTE modems led the Federal Trade Commission ("FTC"), after an extended investigation, to bring an action in district court to stop Qualcomm's anticompetitive conduct.  *See* Complaint, *FTC v. Qualcomm Inc.*, No. 5:17-cv-220 (N.D. Cal. Jan. 17, 2017).  The allegations of the FTC's Complaint are striking and unmistakable—and fully consistent with Intel's experience as a target of Qualcomm's anticompetitive conduct.

If the Commission entertains Qualcomm's complaint, it should do so with full awareness of Qualcomm's abusive practices and the risks to the public interest from the exclusion order Qualcomm seeks.  Accordingly, if the Commission elects to institute an investigation, Intel respectfully requests that the Commission delegate the public-interest question to an ALJ for development of an evidentiary record that takes the full measure of Qualcomm's long history of anticompetitive conduct and the strong public interest in refusing an exclusion order here.

**I.     Background**

As the Commission is aware, for at least the last twenty years, Qualcomm has been the dominant supplier of baseband processor modems.  Between 2012 and September 2015, Qualcomm's annual share of the worldwide premium LTE modem market exceeded 80 percent.  Order Denying Motion To Dismiss ("Koh Order") at 7, *FTC v. Qualcomm Inc.*, No. 5:17-cv-220 (N.D. Cal. June 26, 2017).

Whatever the source of Qualcomm's past success, in recent years Qualcomm has maintained its modem monopoly through a host of anticompetitive practices—not through the merits of its products or the strength of its innovation.  *See* Koh Order 8–15 (describing these anticompetitive practices in detail); Brief of *Amicus Curiae* Intel Corporation in Support of Plaintiff's Opposition to Defendant's Motion To Dismiss ("Intel Br.") at 3–6, *FTC v. Qualcomm Inc.*, No. No. 5:17-cv-220 (N.D. Cal. May 12, 2017) (same).

*First*, the heart of Qualcomm's anticompetitive scheme is its "no-license-no-chips" policy. Qualcomm holds and licenses patents that it claims are essential to practice certain cellular industry standards. Unlike any of the hundreds of other firms that supply components to cellular handset or tablet manufacturers (also known as "original equipment manufacturers" or "OEMs"), Qualcomm refuses to sell its components (modems) to an OEM unless the OEM agrees to "take out a separate [patent] licensing agreement with Qualcomm on Qualcomm's preferred terms." Koh Order 9. One such term is a requirement that an OEM pay Qualcomm exorbitant royalty rates for every cellular handset and tablet it sells, regardless of whether the product contains a Qualcomm modem. *Id.*

The success of this policy turns on Qualcomm's powerful leverage as an incumbent chipset monopolist. Ordinarily, a prospective patent licensee that disagrees with a licensor's demands could resort to the courts or another neutral arbiter on questions of infringement, validity, and technical merit justifying a royalty rate—or negotiate a reasonable royalty by credibly threatening such litigation. But Qualcomm's customers have no such recourse because Qualcomm answers any opposition with threats to disrupt the OEM's supply of Qualcomm modems. Intel Br. 4–5. Because technical and supply constraints prevent OEMs from completely abandoning Qualcomm, they must acquiesce in Qualcomm's license terms, lest they find themselves unable to make their products. Qualcomm exploits this leverage to impose elevated costs on OEMs that purchase modems from anyone other than Qualcomm, Koh Order 10–11, 20–24, 31–33, ultimately reinforcing Qualcomm's dominance in modems, Intel Br. 7–13.

*Second*, Qualcomm refuses to license its declared standard-essential patents to its competitors. Koh Order 20; Intel Br. 13. This refusal breaches the licensing commitments that Qualcomm made to standard-setting organizations as a condition of standardizing the technology that Qualcomm claims is covered by its patents. Qualcomm declared that it would license those patents on fair, reasonable, and non-discriminatory terms. But Qualcomm has failed to keep that promise, making it impossible for its competitors (such as Intel) to offer OEMs fully licensed competing devices (such as the modems Intel sells). Koh Order 20–21. This, in turn, leaves OEMs with no way to avoid the predations of Qualcomm's no-license-no-chips policy.

*Third*, Qualcomm has entered exclusive supply arrangements with Apple, whereby Qualcomm offers Apple relief from Qualcomm's exorbitant royalty rates in exchange for promises that Apple will use Qualcomm modems exclusively. Koh Order 13–15. From 2011 to 2016, these arrangements foreclosed rivals like Intel from competing for Apple's vital business. *Id.* at 15; *see also* Intel Br. 6, 19–21 (explaining that, because of Qualcomm's exclusive supply arrangements, Intel "(i) lost sales and margin, (ii) missed out on critical opportunities to collaborate with Apple and cellular providers and thus to obtain development feedback, and (iii) lacked the marketplace credibility that a supply contract with Apple would have bestowed"). Intel only recently gained a foothold, when Apple declined to agree to another exclusive supply arrangement with Qualcomm and instead signed a contract with Intel for supply of a portion of Apple's modem needs for the iPhone 7.

Apple's decision to resist Qualcomm's anticompetitive behavior is the leading edge of a growing resistance to Qualcomm and its interlocking web of abusive practices—as reflected in the significant public and private legal scrutiny that those practices are drawing. In the United States, Qualcomm is currently fighting a multi-billion-dollar lawsuit brought by Apple and the extraordinary enforcement action brought by the FTC, both of which rightly accuse Qualcomm

of antitrust violations.  Not coincidentally, Qualcomm has targeted Apple here in retribution for daring to contract with Qualcomm's only remaining competitor and for bringing a lawsuit to challenge Qualcomm's anticompetitive conduct.  Additionally, Qualcomm "has faced or is facing investigations, and in some instances fines, from the Korea Fair Trade Commission, Japan Fair Trade Commission, China's National Development and Reform Commission, and the European Commission, in addition to the Taiwan Fair Trade Commission."  Koh Order 50 n.8.

## II.  Qualcomm's Complaint

Against this backdrop, Qualcomm asks the Commission for an exclusion order that would, in practical effect, bar Intel premium LTE modems from entering the United States, once again reinforcing Qualcomm's dominance in the premium LTE modem merchant market for reasons having nothing to do with the merits of its product offering.

The Commission should make no mistake:  Qualcomm's Complaint attempts to accomplish something quite different from the ordinary vindication of patent rights.  Qualcomm's goal is not to exclude supposedly *infringing products* from the United States.  Instead, its primary goal is to exclude *Intel modems* from the United States, while giving free passage to allegedly infringing Apple products that incorporate a Qualcomm modem.  This strategy is especially evident in Qualcomm's assertion of some patents that have nothing to do with Intel's modems—for example, one on graphics processing that would be infringed (or not infringed) regardless of whether Apple uses an Intel or Qualcomm modem.  *See, e.g.*, Complaint Ex. 15 (charting the '936 patent against Apple's A10 GPU).  Apple simply happens to be the only OEM purchasing premium LTE modems in quantity from someone other than Qualcomm.

In other words, Qualcomm now seeks to use the Commission's process to maintain its modem monopoly and perpetuate its broader anticompetitive scheme.  Its complaint is a brazen attempt to outflank the earlier-filed judicial and regulatory proceedings brought by the FTC, foreign regulators, and Qualcomm's customers—all aimed at putting a stop to that scheme.  Apple's decision to break free of exclusive supply agreements with Qualcomm is likewise no aid to competition if Qualcomm can stymie Apple (and cow other OEMs) with an exclusion order.  Qualcomm's complaint shows that the means matter not, so long as the end is the same: a premium LTE modem merchant market in which Qualcomm is the sole supplier.

## III.  An Exclusion Order Would Be Antithetical to the Public Interest

Because an exclusion order's impact would extend beyond Apple handsets and tablets, the Commission should consider the effect that excluding Intel premium LTE modems from the United States would have on the public interest.  Because other parties are likely to address the effect on the public interest of excluding Apple handsets, this statement focuses primarily on the effect of excluding Intel modems—the only device that competes with Qualcomm's modems in the United States merchant market for premium LTE modems.  An exclusion order barring Intel modems from the United States would threaten deep and lasting harm to the public interest.  *See* 19 U.S.C. § 1337(d)(1); *see also* Intel Br. 4–6 (describing the harm Qualcomm's unlawful practices cause OEMs, other modem manufacturers, and consumers).

***Competitive Conditions in the U.S. Economy.***  An exclusion order would severely damage competitive conditions in the United States economy by reinforcing Qualcomm's hold on the premium LTE modem merchant market.  Such an order would have anticompetitive consequences that mirror those of Qualcomm's unlawful sales and licensing policies.

3

Most obviously, an exclusion order would fence Intel, Qualcomm's only remaining competitor, out of the premium LTE market for reasons unrelated to the merits of its products. Such an order would cause harm to competitive conditions because it would outright eliminate competition. Certainly, the Commission's orders inherently affect competitive conditions when they exclude products from the United States market; such is the price of protecting a patentee from infringement. But Qualcomm's request is of a different order because it proposes to substitute one infringing product (an Apple product with an Intel modem) with another (a functionally equivalent Apple product with a Qualcomm modem).[*] In short, the exclusion order that Qualcomm seeks is far more likely to injure competitive conditions than it is to reduce the supposed infringement Qualcomm complains of.

Moreover, if Qualcomm can successfully exclude Apple products that use non-Qualcomm modems, it would send a strong signal to other OEMs about the risks of defying Qualcomm. These OEMs would predictably refrain from looking to competing vendors like Intel because they cannot afford the business disruption and costs associated with Qualcomm retribution. And a return to a premium LTE merchant market with only one modem vendor (Qualcomm) would, in turn, lead to the very supply-stream dependence that is Qualcomm's lifeblood: The more dependent OEMs are on Qualcomm's modems, the more power Qualcomm has to hold OEMs hostage to its demands around patent licensing, exclusivity, and other commercial terms. Qualcomm can, for example, continue to skew licensing negotiations for its declared standard-essential patents and charge exorbitant royalty rates, and OEMs may have no choice but to yield to Qualcomm's demands.

An exclusion order also would have a powerful deterrent effect on cellular carriers, whose support and cooperation is key to successful competition against Qualcomm. Intel optimizes its modems to work with certain carrier networks, a benefit that requires significant coordination with those carriers (and with Apple as the OEM). If the carriers have reason to suspect that Intel's modems will not succeed, they have less incentive to offer that vital cooperation. With an exclusion order, then, Qualcomm can manipulate both its OEM customers and cellular carriers into undermining competitive conditions and bolstering its unlawful monopoly—achieving the very result that the FTC's suit seeks to remedy.

***Production of Like or Directly Competitive Articles in the United States.***  The dearth of "like or directly competitive articles in the United States," 19 U.S.C. § 1337(d)(1), also counsels against an exclusion order. As discussed above, Qualcomm is the only company currently producing an alternative to the Intel modems that would be excluded under the order it seeks. Thus, although OEMs purportedly could "ramp up production" and replace any excluded Apple handsets and tablets, *see* Complainant's Initial Statement on the Public Interest at 4, Qualcomm's

---

[*] Qualcomm does not suggest that it targets Intel because the asserted patents are generally licensed or exhausted, but are not licensed or exhausted with regard to Apple products using Intel modems. Qualcomm has, of course, already collected massive royalties on Apple products—now the subject of dispute between Qualcomm and the contract manufacturers of Apple's products. *See Qualcomm Inc. v. Compal Elecs., Inc.*, No. 3:17-cv-1010 (S.D. Cal.). If the asserted patents are actually licensed under the agreements at issue in that dispute, then different—but equally serious—public-interest questions would arise from Qualcomm's decision to invoke this Commission's process when a parallel contract action is already underway.

anticompetitive practices make it all but certain that no company but Qualcomm could fill the modem void.

This would do nothing to encourage domestic production of modems because Qualcomm relies on overseas fabrication of its modems (and would surely do so to meet "ramp[ed] up production" needs). Moreover, excluding Intel modems could harm long-term domestic investment. Historically, the demand for improved cellular communications technology has attracted massive and continuing investments in research and development of higher-performance standards. But along the way, Qualcomm's practices have led competitors to sell off or shutter their modem businesses. *See* Intel Br. 5–6. Intel, among others, has invested in developing next-generation standards, motivated in part by the desire to be a leader in sales of the modems that practice those standards. More broadly, Intel has invested in the United States throughout its nearly 50 years of leadership in the American high-tech industry. Today, Intel is investing billions of dollars in United States research and development and manufacturing, and it employs over 50,000 people in the United States. Having played a pioneering role in creating the modern computing industry, Intel is now helping to drive computing technologies in new fields. An order effectively excluding all Intel modems from the United States thus has the potential to undermine the case for Intel's investment in modems in the United States in the future, injuring American innovation and productivity.

*U.S. Consumers.*  An exclusion order would harm United States consumers by perpetuating Qualcomm's unlawful monopoly. When a monopolist retains its monopoly for reasons unrelated to the merits of its product, consumers suffer. For example, an exclusion order would allow Qualcomm to continue overcharging its OEM customers. Those costs inevitably harm consumers by raising the price of handsets and tablets, forcing OEMs to compromise other features, or reducing the availability of those products.

Worse yet, because competition drives innovation, an exclusion order barring Apple products that use non-Qualcomm modems would stifle future innovation. Potential competitors in the premium LTE modem market already face enormous entry costs, due to barriers like Qualcomm's no-license-no-chips policy and its exclusive supply arrangements. Qualcomm's success before the Commission would create another powerful disincentive.

Absent competitors willing to innovate, customers are deprived of a meaningful choice when selecting a modem. When it comes to cellular phones and tablets, Qualcomm's anticompetitive tactics have meant that consumers who wish to purchase a premium product that operates on the LTE network have few choices but to buy a Qualcomm modem—the only real alternatives are the latest Apple handsets with Intel modems, and a modest number of Samsung handsets and tablets using Samsung's own modems. An exclusion order would reinforce that lack of consumer choice at the very moment when challenges across the globe by public and private plaintiffs alike seek to end Qualcomm's unmerited dominance by opening up the modem merchant market to lawful competition.

### IV.   Conclusion

For the foregoing reasons, the Commission should decline to institute an investigation, or if it elects to institute an investigation, it should delegate the public-interest question to an ALJ for development of an evidentiary record.

Dated: July 20, 2017                                     Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.
Chad I. Golder
Sarah G. Boyce
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W.
Washington, D.C. 20004
Telephone: (202) 220-1100

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105
Telephone: (415) 512-4000

Kimberly Schmitt
INTEL CORPORATION
2200 Mission College Blvd.
Santa Clara, CA 95054
Telephone: (408) 653-9574

*Counsel for Intel Corporation*