UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: QUALCOMM ANTITRUST
LITIGATION

Case No. 17-md-2773-LHK

DECLARATION OF DR. KENNETH
FLAMM

Highly Confidential—Attorneys' Eyes Only

## Table of Contents

I.    INTRODUCTION ............................................................................................................... 1

    A.   Experience and Qualifications ............................................................................ 1
    B.   Assignment ........................................................................................................ 5
    C.   Summary of Conclusions and Report Roadmap ................................................ 6

II.   COMMON METHODS EXIST TO DETERMINE RELEVANT MARKETS AND WHETHER QUALCOMM'S
MONOPOLY POWER WOULD HAVE CREATED ABILITY TO EXTRACT AN ELEVATED SUPRA-FRAND ROYALTY FOR
ITS STANDARD ESSENTIAL PATENTS ......................................................................................... 9

    A.   Summary of the Monopoly Power Assignment ................................................... 9
    B.   Evolution of Cellular Network Technology ....................................................... 10
    C.   Lower Costs Due to Economies of Scale in Phone Development Drive OEMs to Create Devices that with Little
Modification Can Be Used on Multiple Network Technologies ................................... 15
    D.   Baseband Processor Background and the Economics of Baseband Processor Development ........................... 18
    E.   Common Evidence Can Establish or Refute Plaintiff Allegations That Qualcomm Had Significant Monopoly
Power in the Market for CDMA Baseband Processors ............................................... 21
    F.   Common Evidence Can Establish or Refute Plaintiff Allegations That Qualcomm Had Significant Monopoly
Power in the Market for Premium LTE Baseband Processors .................................... 30
    G.   Likely Effects of Qualcomm's Monopoly Power and Business Practices ........................ 34

III.  PASS-THROUGH OF OVERCHARGES TO THE CLASS ................................................ 40

    A.   Overview of Pricing and Competition in a Differentiated Products Industry ................. 40
    B.   Overview of Pass-Through Theory and Evidence ................................................ 61
        1.   Economic Theory Suggests Impact on Indirect Purchasers .......................... 61
        2.   Empirical Studies in the Economics Literature Provide Broad Support for Pass-Through of Changes in
Industry-Wide Costs ...................................................................................... 69
    C.   The Qualcomm Royalty Was a Significant Component Cost of Cellular Phones that, According to Qualcomm's
Own Documents, Raised the Actual Prices of Cellular Phones ................................ 75
        1.   The Qualcomm royalty was a universally known component cost in the cellular phone industry .......... 75
        2.   Documentary Evidence Shows Qualcomm knew its Royalty elevated Device Prices ....................... 82
        3.   Cellular Phone Manufacturers testified that the Qualcomm royalty raised the price of cellular phones
and limited the ability of manufacturers to increase quality. ........................... 86
    D.   The Qualcomm royalty component cost inflated the total costs for cellular phone manufacturers and
therefore reduced the quality of features that OEMs could otherwise have included in the device. ................. 91
        1.   In general, OEMs passed through rapidly declining component costs during the relevant period through
decreases in the quality-adjusted prices of cellular phones .......................... 92
        2.   Cellular Phone Manufacturers and Wireless Operators carefully consider even minor costs. .............. 108
        3.   Cellular Phone Manufacturers remove features from their devices in order to reduce total component
costs for cellular phones ................................................................................ 119
        4.   Qualcomm's own documents illustrate how cellular phone manufacturers would have chosen higher
quality components in the but-for world. ......................................................... 127
    E.   Reseller pricing strategies would not alter the pass-through of the Qualcomm royalty component cost in the
form of higher quality-adjusted prices for cellular phones ........................................ 139
        1.   The use of rebates and other promotional pricing mechanisms do not alter the pass-through of costs
139
        2.   Carrier subsidization pricing strategies do not stop carriers from passing through costs ..................... 140
    F.   Hedonic Price Regressions Are a Standard Econometric Method ............................... 147
    G.   Hedonic Pass-Through Models Demonstrate Damage .......................................... 150
    H.   My Estimation Methods Provide a Common Methodology for Estimating Class-Wide Damages ............... 151
        1.   My Basic Estimation Model ............................................................................ 151
        2.   My Model Provides a Common Method to Measure Pass-Through ..................... 154

Highly Confidential—Attorneys' Eyes Only

I.   Empirical Studies Show Cost Shifts are Consistently Passed Through to Quality-Adjusted Prices by OEMs and Throughout the Distribution Chain..................................................................................154
    1.   Contract Manufacturers ..............................................................................156
    2.   OEM Pass-Through ......................................................................................161
    3.   Carrier Pass-Through ...................................................................................162
    4.   Distributor Pass-Through.............................................................................167
    5.   Retailer Pass-Through..................................................................................167

IV.  CHANNEL-WEIGHTED PASS-THROUGH.......................................................................170

V.   DAMAGES TO CLASS MEMBERS ...............................................................................176

## I. INTRODUCTION

### A. Experience and Qualifications

1. My name is Kenneth Flamm. I am an economist specializing in applied microeconomics. I have conducted extensive research on the economics of technological and industrial competition in the semiconductor, computer, communications, and electronics industries. I have published numerous articles and books on these subjects. My curriculum vitae is attached as **Exhibit 1**.

2. I have served as Professor and Dean Rusk Chair at the University of Texas at Austin since 1998. I teach graduate students and undertake research in the areas listed above as part of my duties at the University of Texas at Austin. Prior to my current position, I was a Senior Fellow at the Brookings Institution, a nonprofit research institution in Washington, D.C., doing research in these same areas. I wrote five books and numerous articles on the economics of the computer, semiconductor, and telecommunications industries while at Brookings in the 1980s and 1990s. I also served as a senior official in the U.S. Department of Defense ("Defense Department") from 1993 to 1995, where I had primary responsibility for dual-use technology policy (i.e., all policies affecting the investment in, and use of, technologies with both military and commercial applications, particularly computers, semiconductors, and software) and international programs (i.e., all defense research, development, and procurement programs undertaken by the Defense Department and its private contractors, in collaboration with foreign governments and foreign industries).

3. During the time I was at the Defense Department, the availability of flat panel displays for use in military systems was perceived as a potential problem for the Defense

Department. I supervised the work of a federal inter-agency task force on flat panel displays

that examined that issue. That task force issued a report in 1994 which concluded that more

suppliers and greater competition were needed within the industry in order to assure timely

and reasonably priced access to flat panel displays for Defense Department users.[1] That report

(dubbed the "Flamm Report" at the time in both the industry and trade press) articulated

concerns about a high degree of concentration among existing flat panel display suppliers that

"could potentially create the basis for the exercise of monopoly power" and possibly facilitate

supplier refusal to supply flat panel displays for the Defense Department.[2]

      4.     Price-fixing litigation filed by both the Department of Justice and private

plaintiffs against TFT-LCD producers after 2006,[3] and subsequent guilty pleas and verdicts

against these producers, support the validity of the concerns voiced by the task force that I

directed in 1994. The Flamm Report also included detailed analysis and modeling of supply and

demand for flat panel displays.

      5.     Since coming to the University of Texas, I have continued my study of the

economics of the semiconductor, computer, telecommunications, and internet service

---

[1] Flat Drive Display Task Force, U.S. Department of Defense, *Building U.S. Capabilities in Flat Panel Displays*, (Washington: U.S. Department of Defense), October 1994 (the "Flamm Report").

[2] Flamm Report, 1994, pp. IV-6,7; VII-1,2.

[3] See In re TFT-LCD (Flat Panel) Antitrust Litig., Case No. 3:07-md-01827-SI; *United States of America v. Sharp Corp.*, Case No. 3:08-cr-00802-SI; *United States of America v. LG Display Co., Ltd. and LG Display America, Inc.*, Case No. 3:08-cr-00803-SI; *United States of America v. Chunghwa Picture Tubes, Ltd.*, Case No. 3:08-cr-00804-SI; *United States of America v. Chung*, Case No. 3:09-cr-00044-SI; *United States of America v. Lin*, Case No. 3:09-cr-00045-SI; *United States of America v. AU Optronics Corp.*, Case No. 3:09-cr-00110-SI; *United States of America v. Hitachi Displays Ltd.*, Case No. 3:09-cr-00247-SI; *United States of America v. Someya*, Case No. 3:09-cr-00329-EXE; *United States of America v. Epson Imaging Devices Corp.*, Case No. 3:09-cr-00854-SI; *United States of America v. Chei Mei Optoelectronics Corp.*, Case No. 3:09-cr-01166-SI; *United States of America v. Yang*, Case No. 3:10-cr-00355-SI; *United States of America v. Hannstar Display Corp.*, Case No. 3:10-cr-00498-SI; *United States of America v. Huang*, Case No. 3:10-cr-00579-SI; *United States of America v. Wang*, Case No. 3:10-cr-0756-SI; and *United States of America v. Joe*, Case No. 3:11-cr-00019-EXE.

industries and their supplier industries and have written many articles and consulted on matters related to the economics of these industries.

6.    I have served on numerous national and international panels and advisory bodies concerned with research, science, and technology issues affecting high technology industries in general, and the computer and electronics industries in particular. I have served as an expert consultant to international and government entities (the International Monetary Fund, the Federal Communications Commission, the World Bank, the U.S. Department of Justice ("DOJ"), the Defense Department, the U.S. Congress's Office of Technology Assessment, and the Congressional Research Service) and have testified before various committees and subcommittees of the U.S. Congress on these issues. I have worked as a consultant on the computer and electronics industries for the National Research Council ("NRC"), a nonprofit organization created to provide unbiased technical advice to U.S. government agencies; the Semiconductor Industry Association, the trade association for the U.S. semiconductor industry; and SEMATECH, a nonprofit research consortium formed by major semiconductor producers. I also have served on numerous NRC advisory panels and committees, including its Science, Technology, and Economic Policy Board, its Committee on the Future of Supercomputing, its Committee on the National Defense Stockpile, and its Committee on the Rationale and Goals of the U.S. Civil Space Program. Finally, I have also served as a member of expert advisory committees to the National Science Foundation, the Defense Department, the Federal Networking Advisory Committee, and NATO.

7.    I occasionally work as a consultant on economic issues, including the economics of industrial and technological competition, for private clients (primarily Fortune 500 companies), either providing strategic advice to be used as an input to internal business

decisions or serving as an expert witness/advisor in litigation-related matters. Private firms in the computer and electronics industries with which I have worked include IBM, Digital Equipment Corporation (acquired by Compaq, in turn acquired by Hewlett Packard), AMD, AT&T, Dell Computer, eMachines (acquired by Gateway, in turn acquired by Acer), Fujitsu, Kingston Technology, Micron Technology, Texas Instruments, Hyundai Electronics (the corporate predecessor of SK Hynix), Sybase, Autodesk, Advanced MP, Soitec, and others. Government clients that have utilized me in this expert witness/advisor capacity include the Antitrust Division of the DOJ as well as antitrust bureaus within the offices of the Attorney General of numerous state governments.

8.      My professional experience in all the areas referenced above, with the named entities as well as generally through my research, informs my judgments in this report. My scientific publications in these areas, for the most part externally reviewed for scientific merit by other experts prior to publication as articles or books, and my public service on relevant advisory panels and groups are listed in **Exhibit 1**. I also attach a list of my testimony in the last four years. See **Exhibit 2**.

9.      My involvement in this litigation began in late summer 2017. My compensation for time spent on this matter is currently $800 per hour. This compensation does not depend on the opinions and conclusions I reach or the result of this lawsuit. I have been assisted in my analysis by staff at Christensen Associates, who have worked on this matter under my supervision and direction. My analysis of this matter is continuing, and I reserve the right to supplement and revise my opinions as additional information becomes available to me. **Exhibit 3** lists the materials I have relied upon in preparing this report.

10.    I have been undertaking research and publishing books, articles, and reports on the semiconductor, computer, and telecommunications industries for approximately 35 years. I have written or edited seven peer-reviewed books and over a dozen peer-reviewed articles on economic issues in the semiconductor, computer, and telecommunications industries over this period. I think it is fair to say that I have deep economic expertise on the economics of this particular market and industrial competition in the semiconductor, computer, and telecommunications industries that long predates this litigation. The analysis and opinions found in this report is based on this experience and expertise, as well as documents, testimony, and analysis reviewed over the period this litigation has been before this Court.

## B.  Assignment

11.    I have been retained by counsel on behalf of various U.S. consumers ("plaintiffs"), on behalf of themselves and all others similarly situated (the "class"), to provide my opinion regarding the definition of the relevant markets applicable to the analysis of the business practices of Qualcomm Incorporated ("Qualcomm") that are subject to plaintiffs' complaint.[4] I have further been asked to provide my opinion as to whether Qualcomm possesses monopoly power[5] in any of those relevant markets. For the purposes of this class certification report, I have been instructed by counsel to describe methods and data I could employ to develop my opinions on these matters.

---

[4] Plaintiffs' First Amended Consolidated Class Action Complaint and Demand for Jury Trial, 6/13/2018.
[5] "Economists use both 'market power' and 'monopoly power' to refer to the power of a single firm or group of firms to price profitably above marginal cost." See https://www.justice.gov/atr/monopoly-power-and-market-power-antitrust-law.

12.    I have also been asked by Plaintiffs' counsel to assume that absent Qualcomm's alleged anticompetitive behavior Qualcomm would have charged device makers a substantially lower FRAND royalty for a license to Qualcomm's portfolio of patents relevant to the operation and functioning of mobile telecommunications devices and services.[6]

13.    I have been asked to provide an analysis of whether common evidence would be available to show how the overcharge levied by Qualcomm would have affected the price and performance characteristics of mobile devices sold by mobile device hardware OEMs to mobile communications service providers, distributors, and retailers, and how those price and performance characteristics would in turn be reflected in the price and performance of mobile devices purchased by final consumers, the indirect purchasers making up the plaintiff class in this litigation.

**C.  Summary of Conclusions and Report Roadmap**

14.    The specific questions this report analyzes are (1) whether Qualcomm has monopoly power as a supplier of baseband processors and (2) whether common methods and evidence are available to test whether a supra-FRAND royalty on Qualcomm's cellular phone SEP portfolio would have been passed on to the proposed indirect purchaser class, and to estimate the consequent economic harm to this class. I find that such common methods and evidence do exist.

15.    The presentation of my analysis follows this outline:

- **Analysis of the baseband processor market and Qualcomm's monopoly power.**
  Common methods exist to determine relevant markets, Qualcomm's monopoly power in those markets, and Qualcomm's ability to elevate its royalty for its cellular phone SEP

---

[6] My understanding is that this assumption is consistent with expert opinions and reports of Michael Lasinski and Einer Elhauge but I have not reviewed these reports.

portfolio through its exercise of monopoly power in baseband processors, and its business practices.

- **The concept of competition between firms in both price and quality dimensions.** I provide a summary of the economic theory of monopolistic competition, which holds in differentiated product markets in which firms compete on both price and quality. I discuss in detail the concept of quality-adjusted prices, a commonly used economic methodology that adjusts changes in nominal prices for changes in the quality characteristics of products, using the coefficients from a hedonic price regression. The coefficients from the hedonic price regression are used to estimate a quality-adjusted price relevant to consumers.

- **Overview of pass-through theory and evidence.** I provide a summary of the economic theory that is the basis for the analysis of pass-through. I summarize related empirical findings presented in the academic literature, emphasizing studies of the impact of taxes on consumer prices.

- **Documentary evidence showing that the Qualcomm royalty was considered by cellular phone producers to be a component cost, one that elevated quality-adjusted prices for cellular phones.** I review extensive evidence in the record that Qualcomm and cellular phone manufacturers viewed the Qualcomm royalty as a significant component cost that was known during the design and manufacture of cellular phones. I also document that Qualcomm was aware of the impact its royalty had on product prices.

- **OEMs passed through declines in component costs by lowering the quality-adjusted prices of devices.** I show how during the relevant period, the design and manufacture of cellular phones took place in an extraordinarily dynamic marketplace, with declining component costs resulting in dramatic improvements in phone quality and rapid declines in quality-adjusted retail prices.

- **The elevated, supra-FRAND Qualcomm royalty cost would have prevented OEMs from further improving the quality of other components and thus would have increased quality-adjusted prices relative to what they would have been in a but-for world with royalties limited to lower FRAND levels.** I review the process used by OEMs to design and manufacture phones, which includes a process of considering their total overall costs and making decisions about what quality (and thus expense) of purchased components was to be included in device designs, based on that total cost. I show how common evidence exists that should allow plaintiffs to ascertain whether during the relevant period, the design and manufacture of cellular phones took place in a highly competitive marketplace, with declining component costs resulting in dramatic improvements in phone quality and rapid declines in quality-adjusted retail prices. I examine whether substantial evidence exists that would permit evaluation of the question of whether OEMs chose not to include higher quality features that were available in the market, in order to limit their total overall cost. I review deposition testimony from OEMs relevant to the issue of whether the alleged Qualcomm supra-FRAND royalty increased their costs and thus limited their ability to reduce the quality-

adjusted prices for cellular phones. I examine the availability of examples of significant quality improvements that were available to OEMs, and desirable to consumers, for less than the alleged excess of the Qualcomm royalty over FRAND royalty rates. I find that substantial evidence exists, and should allow plaintiffs to analyze these questions in a determinative fashion.

- **Retail and carrier pricing of relevant devices would not have prevented pass-through.** I explain why retail pricing strategies and carriers' sales of phones at discounted prices do not prevent pass-through of supra-FRAND royalty costs into quality-adjusted prices.

- **Economics provides accepted methods for evaluating quality-adjusted prices in the mobile phone market.** I describe hedonic theory, the analytical framework I use to estimate pass-through. Hedonic price theory is used to measure prices for complex, differentiated high-tech goods subject to continuous and rapid technological progress. These methods are commonly used by economists in both academia and industry, government statistical agencies, mobile device industry participants, and even Qualcomm itself to understand and model the evolution of quality-adjusted prices for mobile devices. There is a long history of hedonic price methods being used in courtroom litigation to evaluate economic injury caused by quality change, dating back to at least the 1980's.[7]

- **Hedonic methods are available to identify the economic harm caused by supra-FRAND royalty payments.** I demonstrate that these same well understood and accepted economic methods can be used to estimate the alleged economic harm inflicted on mobile communications device purchasers by a supra-FRAND royalty charged on its cellular phone SEP portfolio by Qualcomm.

16.    To close my report, I show the feasibility of an empirical application of these methods and present examples of pass-through rates that I have calculated using transactional data produced in this case by a wide array of some of the most important industry participants from every level of the distribution chain. I then present examples of models that can be used to estimate damages using these estimated pass-through rates and detailed information on industry sales. Based on this exemplary analysis, I show how common methods and evidence

---

[7] R. B. Palmquist and V. K. Smith, "The Use of Hedonic Property Value Techniques for Policy and Litigation," in T. Tietenberg and H. Folmer, Eds., *The International Yearbook of Environmental and Resource Economics 2002/2003: A Survey of Current Issues*, (E. Elgar), 2002, p. 140.

can be used with these exemplary models to estimate damages to consumers. My prototype exemplary calculations suggest damages to consumers in the neighborhood of $4.99 billion.

## II.   COMMON METHODS EXIST TO DETERMINE RELEVANT MARKETS AND WHETHER QUALCOMM'S MONOPOLY POWER WOULD HAVE CREATED ABILITY TO EXTRACT AN ELEVATED SUPRA-FRAND ROYALTY FOR ITS STANDARD ESSENTIAL PATENTS

### A.   Summary of the Monopoly Power Assignment

17.   I understand that Plaintiffs allege Qualcomm has refused to license its standard essential patents (SEPs) to competing chipset makers, and that it additionally practices a policy pursuant to which a chipset customer must take and maintain a license to Qualcomm's cellular phone SEP portfolio in order to purchase chipsets from Qualcomm (the "no license no chips" policy). I understand Plaintiffs to further allege that Qualcomm's "no license no chips" policy and its refusal to license, in conjunction with an exclusive dealing arrangement with Apple, has reduced demand for competitors' chipsets and has allowed Qualcomm to achieve and maintain monopoly power in the market for CDMA baseband processors (or "chipsets") and premium LTE baseband processors.

18.   Plaintiffs have asked me to provide my opinion regarding (1) the existence of relevant product markets applicable to an analysis of Qualcomm's business practices, (2) whether evidence that Qualcomm possesses monopoly power in any such markets exists, and (3) the likely effects of Qualcomm's business practices in such markets. They have additionally asked me, for the purposes of this class certification report, to explain some of the evidence and methods that could be employed in an expert economic analysis of these issues were the plaintiff class to be certified by this court.

**B.   Evolution of Cellular Network Technology**

19.   In 2010, just prior to the beginning of the class period, the worldwide mobile cellular telephone industry had two evolving families of competing digital cellular telephone network standards in use. See **Figure 1**. All these systems were digital—they encoded analog sound signals as a stream of binary (0 or 1) digital bits, transmitted them over a radio frequency cellular transmission system, then reassembled them at the receiving end into a reconstructed analog sound signal. In addition to voice, these systems could also be used to transmit and receive digital information, such as the packets of data that were used on the internet and the Worldwide Web. These second generation "2G" systems were initially adopted in the late 1990s, just as internet use began growing exponentially. Wireless cellular telephone use quickly became a common consumer interface to the internet. The use of mobile cell phones for voice, texts, and internet access soon became the norm in the early 2000s. All these applications converted information into a stream of digital information that could be transmitted and received on the go by cell phone users using radio frequency signals.

20.   The wireless digital 2G systems adopted in the 1990s by major national telephone service providers were divided into one standard (GSM) used in Europe and much of the rest of the world, a Japan-only standard, and two systems used in the U.S., making use of a technology called time division multiple access (TDMA), which spread user data across shared radio frequency communications bands that had been divided into time slices. These time division systems shared limited information-carrying capacity in available radio frequency bands among many simultaneous users.

Figure 1



Source: https://www.pcmag.com/encyclopedia/term/54257/wcdma, viewed 7/3/2018.

21.    In the U.S., which in the 1990s was the most deregulated large scale telecommunications market in the world, Qualcomm was able to convince regulators and network operators to permit use of a different, alternative technology for sharing the limited information-carrying capacity of radio frequency bands—code division multiple access (CDMA). Qualcomm's founders had originally worked on developing elements of this technology for secure military applications in the 1970s, 1980s, and early 1990s,[8] and Qualcomm successfully

---

[8] U.S. military research in the 1960s and 1970s had utilized the CDMA concept, which was deployed in the GPS satellite navigation system. *See* "Part 1: The Origins of GPS, and the Pioneers Who Launched the System," *GPS World*, May 1, 2010, available at http://gpsworld.com/origins-gps-part-1/. Deployment of the GPS system began in the late 1970s. See also "Part 2: The Origins of GPS, Fighting to Survive," *GPS World*, June 1, 2010, available at http://gpsworld.com/origins-gps-part-2-fighting-survive/. For a history of Qualcomm and its founders' links to US military research, *see* D. Mock, *The Qualcomm Equation: How a Fledgling Telecom Company Forged a New Path to*

transitioned the technology into the commercial world. This technology encoded user communications by combining their digital data with unique codes, and the coded data then distributed and transmitted across all available radio frequency channels. The technology proved successful in the U.S., and was also adopted in Asia, including Korea, Japan, and later, China. A later variant of the technology ("2.5G") improved data speeds.

22.     By 2010, a third generation of cellular phone technology had been developed and deployed. The 2G GSM technology evolved into a faster technology incorporating CDMA techniques known as WCDMA (wideband CDMA) that remained backwards compatible with the earlier 2G GSM technology.[9] Initially, 3G WCDMA was used for data, with 3G voice support gradually added to existing GSM networks. (WCDMA was the key element of the 3G successor to GSM, which is called UMTS, for Universal Mobile Telecommunications System.)

23.     Qualcomm also developed a faster 3G technology standard ("CDMA2000," or "3G CDMA" or "C2K") that was backwards compatible with its original 1990s 2G CDMA technology standard. As was the case with WCDMA, the faster technology was initially used for data, and support for reliable voice calls gradually deployed on existing CDMA networks by their operators as they upgraded to 3G. Continued development of both competing 3G technologies (CDMA2000 and WCDMA) enabled ever faster data rates over time.

---

*Big Profits and Market,* (2005: AMACOM). In its early years, over half of Qualcomm's revenues came from government contracts on military and space projects. Mock, 2005, p. 32. Qualcomm's entry into the Chinese market in the 1990s was based on the sale of its CDMA technology to the People's Liberation Army, for use in secure military communications in the field. Mock, 2005, p. 194.

[9] Much WCDMA development work was undertaken by Japan's public communications enterprise, NTT Docomo. NTT Docomo launched the first WCDMA network deployment in 2001. *See* D. Saugstrup and A. Henten, "3G Standards: the battle between WCDMA and CDMA2000," *Info*, vol. 8, no. 4, 2006, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.611.9497&rep=rep1&type=pdf; A. M. Seybold, "Wireless Lessons From Japan," *Forbes*, May 22, 2002, available at https://www.forbes.com/2002/05/22/0522soapbox.html#23e4aa246fcf.

24.    In the United States, since the early 2000s, the cellular communications market has been a roughly even split between the two families of 3G standards. Verizon and Sprint (and mobile virtual network operators (MVNOs), which lease capacity from the physical network owners) utilized the 2G CDMA and 3G CDMA2000 standards, while AT&T and T-Mobile (and their associated MVNOs) used 2G GSM and 3G WCDMA technology.

25.    For carriers, there is no possibility of substituting between the 3G CDMA2000 and 3G WCDMA technology because their deployed networks were built to support only one of the two incompatible standards. In the U.S. alone, Verizon and Sprint invested more than $57 billion in their CDMA based networks over the decade from 2000 to 2010.[10]

26.    In the first decade of the 2000s, a fourth and even faster generation of mobile cellular technology was developed by numerous contributors, codified by a standard setting umbrella organization known as 3GPP ("3rd Generation Partnership Project"),[11] and by 2011 had started to be deployed by cellular network operators in the U.S. This standard is known as Long Term Evolution ("LTE," "4G", and "4G LTE" terms will be used synonymously in this report). The LTE standard unified both major competing 3G standards. At the writing of this report, effectively all cellular network standards are being unified, globally, into this single interoperable world system: 4G LTE. While the frequencies used by the system will vary across

---

[10] In 2009, Verizon indicated that "[s]ince 2000, the company has invested…more than $50 billion across the nation to expand and enhances its voice and data network." *See* https://www.verizon.com/about/news/vzw/2009/08/pr2009-08-24 (accessed 6/28/2018). In 2006, Sprint reported that it had "spent more than $7 billion in capital expenditures in 2006, most of which was invested to enhance its wireless and wireline networks nationwide…This year, Sprint will invest more than $7 billion to further enhance its powerful networks and expand mobile broadband coverage." *See* http://newsroom.sprint.com/sprint-powers-up-wireless-coverage-capacity-to-networks-in-minnesota.htm (accessed 6/28/2018).

[11] The seven "partners" are national and international telecommunications standards organizations and technical groups.

nations, the underlying technology has a common standard set of interfaces, enabling increased mobility and interoperable communications systems in the globalized world of the 21st century.

27.     As was the case with 3G systems, however, 4G networks were deployed gradually and incrementally as add-ons or upgrades to existing network infrastructure. As was also the case with previous network generations, backwards compatibility with the previous generations of network infrastructure was required to make and place voice calls ubiquitously. While there is a voice service standard defined for 4G LTE (voice over LTE or "VoLTE"), it is still in the process of being deployed. ███████████████████████████████████████

████████████████████████████ [12] but compatibility with the existing 3G network standards was still required for voice. ███████████████████████████████████

███████████████████████████████████████████████████

███ [13]

28.     Thus, with the existing network infrastructure, even its operators, and the consumers owning 4G LTE devices operating on real 4G LTE networks, are "locked in" to the existing "legacy" 3G CDMA2000 and 3G WCDMA standards, until some future time when deployment of VoLTE is truly ubiquitous, in order to guarantee the ability to make voice calls. [14]

---

[12] █████████████████████████████████████████████████████████████████████, on pages ███████████████████████████████████

[13] Qualcomm appears to have begun shipping chipsets supporting 4G LTE voice services around 2014. https://www.qualcomm.com/news/releases/2014/07/08/qualcomm-announces-first-large-scale-commercial-volte-launch-japan. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[14] Or even upload or download data when in areas where 3G networks have not yet been upgraded to 4G data.

**C. Lower Costs Due to Economies of Scale in Phone Development Drive OEMs to Create Devices that with Little Modification Can Be Used on Multiple Network Technologies**

29.   Much of the content of a mobile device design, hardware, and software can function in tandem with baseband processors compatible with either of these two technical standard families, CDMA2000 and WCDMA. Development costs for a new mobile device are largely fixed costs.[15] These development costs do not vary with the volume of devices ultimately sold. This creates large economies of scale, with development costs per unit sold declining continuously with volumes of devices sold. See **Table 1**, which illustrates the potential benefit to OEMs of developing products that can be used on networks using either communications standard. The more units an OEM can sell of a particular design, the lower the per unit development costs are.

---

[15] *See*, for example, https://courses.lumenlearning.com/microeconomics/chapter/fixed-and-variable-costs/: "Fixed costs are expenditures that do not change regardless of the level of production, at least not in the short term. Whether you produce a lot or a little, the fixed costs are the same….for example, …research and development costs to develop new products…." Viewed June 15, 2018. "Strictly speaking, a product's fixed development costs are not relevant to how it is priced because they are sunk (already incurred and not recoverable) before the product reaches the market. But a company incurs R&D costs in expectation of a product's likely price, and on average, it must cover those fixed costs if it is to continue to develop new products." Congress of the United States, Congressional Budget Office, *Research and Development in the Pharmaceutical Industry*, October 2006, p. 4, available at https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/76xx/doc7615/10-02-drugr-d.pdf. One published 2011 "industry insider" estimate for the engineering cost of developing a new hardware model was $30 million. See https://www.techradar.com/news/phone-and-communications/mobile-phones/who-s-making-money-from-your-smartphone-992247.

**Table 1: Fixed Development Costs Can be Spread Across More Units When Designed for Both Cellular Technology Standards**

| Fixed development cost | | | | | | $30,000,000 |
|---|---|---|---|---|---|---|
| **Units sold** | | | **Unit development cost** | | | |
| **CDMA** | **GSM** | **Total** | **CDMA** | **GSM** | **CDMA+GSM** | |
| 980,000 | 1,820,000 | 2,800,000 | $31 | $16 | $11 | |
| 1,470,000 | 2,730,000 | 4,200,000 | $20 | $11 | $7 | |
| 1,960,000 | 3,640,000 | 5,600,000 | $15 | $8 | $5 | |
| 2,450,000 | 4,550,000 | 7,000,000 | $12 | $7 | $4 | |
| 2,940,000 | 5,460,000 | 8,400,000 | $10 | $5 | $4 | |
| 3,430,000 | 6,370,000 | 9,800,000 | $9 | $5 | $3 | |
| 3,920,000 | 7,280,000 | 11,200,000 | $8 | $4 | $3 | |
| 4,410,000 | 8,190,000 | 12,600,000 | $7 | $4 | $2 | |
| 4,900,000 | 9,100,000 | 14,000,000 | $6 | $3 | $2 | |
| 5,390,000 | 10,010,000 | 15,400,000 | $6 | $3 | $2 | |



Note: illustration based on $30 million in fixed development costs reported at https://www.techradar.com/news/phone-and-communications/mobile-phones/who-s-making-money-from-your-smartphone-992247.

30.     Scale economies make it profitable to develop variants of new device models

that support both standards by spreading fixed development costs over more sales. As a

consequence, OEMs and ODMs[16] who developed new mobile devices effectively develop them

using hardware with software stacks[17] that can, with as little additional modification or

customization as possible, be deployed on both kinds of networks.



.[18]

31.    By 2011 the marketing of phones had started its shift towards global campaigns

by OEMs. In global campaigns the marketed names of phones are constant across multiple

carriers, within a country and across countries. These marketed phone names, such as Samsung

Galaxy S, are used even when little modifications and customizations are done. [19]  The OEMs

desire the marketed performance and features of these phones to be similar across carriers

---

[16] OEMs are "original equipment manufacturers" who design products for sale under their brand. OEMs include Apple and Samsung. ODMs are "original design manufacturers." ODMs manufacture electronic devices for OEMs to sell with the OEMs' branding. "Electronics manufacturing services" (EMSs) are related entities that also manufacture and distribute electronic devices and component assemblies for OEMs. ODMs and EMSs may more generally be referred to as contract manufacturers (CMs).

[17] Software stack refers to "A set of programs that work together to produce a result; typically an operating system and its applications. For example, a smartphone software stack comprises the operating system along with the phone app, Web browser and other basic applications." The applications processor and baseband processor in a smartphone typically have distinct software stacks. https://www.pcmag.com/encyclopedia/term/51702/software-stack, viewed June 6, 2018; https://www.usenix.org/system/files/conference/woot12/woot12-final24.pdf; https://books.google.com/books?id=rkS7BQAAQBAJ&pg=PA32&lpg=PA32&dq=%22baseband+processor%22+%22software+stack%22&source=bl&ots=KWLa62Oqug&sig=Ysv3RHJT7RMlh40xkCfruul8WcM&hl=en&sa=X&ved=0ahUKEwigjtH6n4TcAhVKuVkKHf4IDBYQ6AEIhAEwDw#v=onepage&q=%22baseband%20processor%22%20%22software%20stack%22&f=false; https://sec.sipsik.net/gsm/baseband/gsm_phone_anatomy.pdf; https://depositonce.tu-berlin.de/bitstream/11303/3423/1/Dokument_51.pdf.

[18] *See for example,* 

The iPhone 4S supports 3G CDMA2000 or 3G WCDMA.

[19] Elizabeth Woyke, "Samsung Bets on Smartphone Success," June 30, 2010, at https://www.forbes.com/2010/06/29/smartphones-galaxys-android-technology-wireless-samsung.html#427253fa300e.

within a country.[20] Thus, an OEM's phone sold by Verizon for use on its 3G CDMA2000 based network and sold by AT&T for use on its 3G WCDMA based network will tend to have as many similar components as possible as to exhibit similar performance, as well as to lower design costs. The desire for similar performance and features results in a tendency to use the same suppliers in the design for both phone variants destined for 3G CDMA2000 compatible and 3G WCDMA compatible networks even when the primary data service used is to be 4G LTE.

**D.  Baseband Processor Background and the Economics of Baseband Processor Development**

32.    A baseband processor is the critical component in phones that handles cellular communications with wireless carriers' networks.[21] Baseband processors are sometimes referred to as modems. Baseband processors may be sold with complementary peripheral integrated circuits or they may be sold tightly integrated such that the baseband and its peripheral components are in fact a single inseparable unit. Additionally, the baseband processor may be a part of a System-On-Chip ["SoC"] that provides a range of functionality for a cellular phone. Qualcomm has sold standalone baseband processors and their associated peripheral integrated circuits and also SoCs that integrate the baseband processor functionality. A hypothetical phone without baseband processor functionality would be unable to make calls and would not have the ability to send or receive data when outside the presence of a Wi-Fi access point, such as home router.

---

[20] Or even worldwide.

[21] https://www.pcmag.com/encyclopedia/term/66949/baseband-processor. "A chip in a smartphone or tablet that handles the cellular transmission. The baseband processor converts the data to a signal that can be used to modulate the carrier frequency for transmission and vice versa. That signal is handed off to the RF processor, which may also be part of the baseband chip."

33.     Baseband processor vendors create "optimized-and-tested drivers for the GPU, modem [baseband processor], and other important parts of the SoC, and ... then provide that updated software as part of a generic board support package (BSP) distributed to phone makers [OEMs]."[22] These BSP packages contain optimizations for a baseband processor's use with a cellular phone's operating system, such as Apple's iOS and Google's Android. The OEMs then customize phones, using these BSP, based on their own and the wireless carriers' requirements.[23]

34.     The research, development, and engineering required for a new baseband processor design is very costly, and requires firms to achieve economies of scale in order to survive in the industry. ██████████████████

██████████████████████████████████████

██████████████████[24]██████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████[25]██████████████

██████████████████████████████████████

██████████████████████[26]██████████████

[22] Andrew Cunningham, "Why Isn't Your Old Phone Getting Nougat? There's Blame Enough to Go Around," at https://arstechnica.com/gadgets/2016/08/why-isnt-your-old-phone-getting-nougat-theres-blame-enough-to-go-around/.

[23] Iliyan Malchev, "Here Comes Treble: A Modular Base for Android," May 12, 2017, at https://android-developers.googleblog.com/2017/05/here-comes-treble-modular-base-for.html.

[24] ██████████████████████████████████████

[25] ██████████████████████████████

[26] ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████.[27] Clearly, obtaining economies of

scale is required to be a baseband processor vendor and the fixed R&D and engineering costs

are a significant barrier to entry.

35.    A baseband vendor achieves economies of scale through commonality between

its baseband processors, allowing research and development costs to be spread across as many

units as possible. This can result in a particular baseband processor having functionality

supporting multiple standards, such as including 3G CDMA200 and 3G WCDMA within the same

baseband processor. █████████████████████████████

███████[28] Qualcomm, and the industry in general, calls a baseband processor that supports

multiple standards a "multimode" baseband processor.[29] █████████████████████

---

[27] ████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
  ████████████████████████████████████

[28] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

[29] "All Modems Are Not Created Equal," October 23, 2014 at
https://www.qualcomm.com/news/onq/2014/10/23/all-multimode-modems-are-not-created-equal. In their
illustrative video Qualcomm calls a baseband processor supporting 2G GSM (predecessor to 3G WCDMA), 3G HSPA
(3G WCDMA), 3G TD-SCDMA, 4G LTE TDD, and 4G LTE FDD as a five-mode multimode modem [baseband
processor].

█████████████████████████████████ [30] ██████████████████████████████

████████████████████████████ [31]

**E. Common Evidence Can Establish or Refute Plaintiff Allegations That Qualcomm Had Significant Monopoly Power in the Market for CDMA Baseband Processors**

36.   **CDMA Market Definition**. Plaintiffs allege that technical standards implemented in deployed network infrastructure, globally, make the market for CDMA-compatible baseband processors a relevant antitrust market. The existence of relevant markets is a question generally raised in the context of merger/acquisition. In such a context, the relevant market is the smallest set of products produced by the merging firms in which a hypothetical monopolist would be able to profitably raise prices by a small but significant amount relative to a pre-merger observed benchmark price. An analysis of the ability of a hypothetical monopolist to raise prices by this amount is commonly called a "SSNIP" test.[32]

37.   We have a fundamentally different situation in this litigation. The monopolist is not a hypothetical--it is alleged to be the real "as is" world. In this case, the "competitive" but-for scenario is the hypothetical. In this "competitive" but-for scenario Qualcomm would not have allegedly used its CDMA baseband processor monopoly power, the consequent advantages it enjoyed in the highest performance premium LTE market, and its business



[32] SSNIP stands for Small but Significant Non-transitory Increase in Price.

practices as leverage to elevate its royalty rate on its cellular phone SEP portfolio. My understanding is that the but-for, competitive world is a world in which Qualcomm would not threaten to withhold input supplies and engage in other alleged proscribed conduct in order to elevate royalty rates for its cellular phone SEP portfolio, and thus extend its baseband processor monopoly power into another market. In this hypothetical competitive world, Qualcomm would get a FRAND royalty rate, and pricing and conditions for access to Qualcomm-supplied baseband processors would be entirely independent from negotiations over royalties on a license to its cellular phone SEP portfolio.

38.   **Common evidence from CDMA market shares**. One approach to measuring market or monopoly power that would be common to the class is to look at market share, and indexes of concentration based on market share. Indeed, the Department of Justice historically has taken a market share exceeding 2/3 as presumptive (but rebuttable) evidence of monopoly power.[33] ████████████████████████████████████████████████

---

[33] "Notwithstanding that a high share of the relevant market does not always mean that monopoly power exists, a high market share is one of the most important factors in the Department's examination of whether a firm has, or has a dangerous probability of obtaining, monopoly power. A high share indicates that it is appropriate to examine other relevant factors. In this regard, if a firm has maintained a market share in excess of two-thirds for a significant period and market conditions (for example, barriers to entry) are such that the firm's market share is unlikely to be eroded in the near future, the Department believes that such evidence ordinarily should establish a rebuttable presumption that the firm possesses monopoly power. This approach is consistent with the case law." U.S. Department of Justice, *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act*, 2008, Chapter 2, p. 23. Note that this report was withdrawn in 2009 for excessive hesitancy in confronting the problem of single firm monopoly power. "Varney said that while there is no question that Section 2 cases present unique challenges, the report advocated hesitancy in the face of potential abuses by monopoly firms. She said that implicit in this overly cautious approach is the notion that most unilateral conduct is driven by efficiency and that monopoly markets are generally self-correcting. 'The recent developments in the marketplace should make it clear that we can no longer rely upon the marketplace alone to ensure that competition and consumers will be protected,' Varney added." *See* press release at https://www.justice.gov/opa/pr/justice-department-withdraws-report-antitrust-monopoly-law.
As I noted earlier very large and fixed baseband processor research, development, and engineering costs, and a need for sustained sales in order to support further development and research, are barriers to entry.

Highly Confidential—Attorneys' Eyes Only



**Table 2: Worldwide CDMA Market Shares for Use in Phones**



39.     Another standard measure of market concentration used to assess the likely

impact of mergers is the Herfindahl-Hirschman Index (HHI). This index too can be calculated as



common evidence of significant economic impact. **Table 2** above also illustrates how HHI could be computed, ███████████████████████████████████ The HHI for CDMA baseband processors exceeded 8,800 throughout the class period. According to the most recent guidance of the U.S. Department of Justice, an HHI exceeding 2,500 is considered "highly concentrated," and mergers that add an additional 200 points to this (much) lower number "are presumed likely to enhance monopoly power under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission."[36]

40.    **Common evidence from direct measures of monopoly power for the CDMA market.** Another feasible method of establishing empirically that the global market for CDMA-compatible baseband processors is a relevant antitrust market would be to determine that Qualcomm already had raised prices by a significant amount for these products relative to a more competitive benchmark price. To the extent that Qualcomm has monopoly power, the mark-up on these products would likely be larger than those markets where it does not. But higher prices alone are insufficient for establishing monopoly power because some products have higher costs and costs may vary with quantity sold as large orders spread fixed costs across a larger number of units. To account for these effects, we estimate a marginal cost and from this calculate a Lerner index. The Lerner Index is a normalization of the profit margin that allows for comparison of monopoly power across different types of products. Comparison of pricing and profitability to a competitive yardstick is a well-established empirical method in

---

[36] See https://www.justice.gov/atr/herfindahl-hirschman-index.

antitrust analysis.[37] ███████████████████████████████████

███████

41.   I illustrate how this might be done using data ██████████████████

████████████████████████████████████████████████████████

███████████████████   In the analysis of these data, a regression is needed to partition the

observed costs for these transactions into a marginal cost component, which is used in the

calculation of the Lerner Index, and the fixed cost component. At the level of the individual

baseband chip model, I first fit a simple linear cost model using a regression model of quarterly

cost:

$$Cost_{ijt} = F_{ij} + c_i \, Q_{ijt}$$

where $Cost_{ijt}$   is quarterly cost for chip model i, sold to OEM customer j, during quarter t,

$Q_{ijt}$   is quarterly units sold for chip model i, OEM customer j, during quarter t,

$F_{ij}$   is quarterly fixed cost for chip model i, customer j, (recognizing that customer-specific hardware and software customization typically accompanies a baseband processor sale),

$c_i$   can then be interpreted as marginal cost for that chip.

42.   This is a standard linear model used in the applied microeconomics and

industrial organization literature to model costs in an industry or product sector with increasing

returns to scale related to fixed costs.[38]

---

[37] See J. McCrary and D. L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, vol. 3, no. 1, 2014; H. Hovenkamp, "A Primer on Antitrust Damages," 2011, available at https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=2848&context=faculty_scholarship; A. M. Doose, "Methods for calculating cartel damages: A survey," available at https://www.econstor.eu/bitstream/10419/91492/1/775867004.pdf. See *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166.

[38] L. M. B. Cabral, *Introduction to Industrial Organization*, 2nd Ed., (Cambridge: MIT Press), 2017, chaps. 5, 8, and 10.

43.    If we then take average sales price $Price_{ijt}$ for that customer, then calculate $(Price_{ijt} - c_i)/Price_{ijt}$, we have constructed an estimate of the variable profit margin for that quarter's sales of that chip model to that customer. We then average these values across customers for particular categories of products, here CDMA and WCDMA chips.[39] This measure is known as the *Lerner index* and provides an estimate of the variable profit margin for those products, which is a standard and direct measure of a firm's monopoly power in that market.[40]

44.    In this case, we are interested in the question of whether the Lerner index for the product market in which Qualcomm is alleged to possess monopoly power, CDMA-compatible baseband processors, was significantly greater than the Lerner index for a substantially similar product market in which Qualcomm, despite still having significant market share, has considerably more competitors and has comparatively less monopoly power—in this case WCDMA-compatible baseband processors. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[39] Individual transactions are weighted in this average by total revenue. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[40] See for example, Cabral, Chapter 10. It is easily shown that weighting individual customer-product margins by their revenue share in some product line or segment yields an estimate of the variable profit margin, or Lerner index, for that product line or segment. Averages of these chip model-specific marginal costs are consistent estimates of the chip population average, and approach the true population average marginal cost as sample size increases; see Jeffrey M. Wooldridge. "Fixed-Effects and Related Estimators for Correlated Random-Coefficient and Treatment-Effect Panel Data Models", *Review of Economics and Statistics*, 87(2) (2005) pp. 385-390. A similar argument would hold for the market Lerner index, which is a weighted average of individual model estimated marginal costs.

████████████████████████████████████████████████████[41]).

We also know that consumers are generally indifferent to the network technological standard

selected by their network services provider, as long as the functional network performance of

the device meets their demands.[42] Comparison of 3G or 4G CDMA-compatible and WCDMA-

compatible processors is a good benchmark comparison for evaluating monopoly power in the

market for one product, relative to the other.

     45.    The data used for this analysis comes from ██████████████[43]



     46.    To illustrate how this data allows us to compare the Lerner Index between CDMA

and WCDMA, **Table 3** calculates empirical Lerner indexes for six categories of processors which

correspond to different technical standards, ████████████████████████████

---

[41] ███████████████████████████████████████████
████████████████████████████████████████

[42] For example, on one website discussing the differences between the two different types of networks, one author notes that "When consumers think about mobile network providers, their primary concern is with regards to coverage, quality, support, pricing, and other factors but when you pick a network carrier, you also make the choice between a GSM network or a CDMA network, at least in the US." *See* Ankit Banerjee, "GSM vs CDMA What's the Difference," February 26, 2018 at https://www.androidauthority.com/gsm-vs-cdma-689328/ (accessed 6/28/2018).

[43] ███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████



**Table 3: Lerner Indexes for 3G and 4G**



Notes: Cluster robust standard errors are calculated using a revenue-weighted regression of individual chip model Lerner coefficients on binary indicator variables for inclusion in each of the above groups, which produces coefficient estimates that are mathematically identical to revenue-weighted average Lerner coefficients.

47.     For the multimode buckets, it is unclear what the Lerner index represents, since they are a mix of chips sold for use with CDMA, for use with WCDMA, and for use with both standards, truly multimode. █████████████████████████████████████████ But, for the "pure" CDMA and WCDMA chip models, which were only sold to customers for use with one standard or the other, we can make a direct comparison of the Lerner indexes, and learn

something about the differential in Qualcomm's monopoly power between the two. The difference between these empirical Lerner indexes can be directly interpreted as the difference in average profit margins, expressed as a fraction of chip revenues.

48.   **Table 4** shows the calculated CDMA "premium" (which can be interpreted as monopoly "rents") for 3G and 4G baseband processor chips, expressed as a share of chip price. The differential is substantial, amounting to almost 20 percent of price for both generations of chips, suggesting significant monopoly power over this period, and consistent with allegations of monopoly power made by the plaintiffs. This 20 percent is in addition to any monopoly power Qualcomm has in WCDMA, particularly in 4G WCDMA.

49.   We can easily calculate standard errors for these Lerner indexes using a linear regression model. The estimated CDMA premium is highly statistically significant for both 3G and 4G chip models.

**Table 4: Test of Statistical Significance for Differences Between Lerner Indexes**

| Indexes | Difference in Coefficients | Std. Err. | t | P>|t| |
|---|---|---|---|---|
| 3G CDMA − 3G WCDMA | ■ | ■ | ■ | ■ |
| 4G CDMA − 4G WCDMA | ■ | ■ | ■ | ■ |

50.   This is also consistent with testimony of ███████████████████████





51.  ██████████████████████████[45]████████████████████████████
████████████████████████████ No documents I have reviewed ever mention a "WCDMA adder."

52.  **Common evidence from documents and testimony for the CDMA market.** A substantial corpus of documents and testimony has been produced in this litigation, and many of these documents and testimony speak directly to the issue of monopoly power. ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████[46]

**F.  Common Evidence Can Establish or Refute Plaintiff Allegations That Qualcomm Had Significant Monopoly Power in the Market for Premium LTE Baseband Processors**

53.  **Premium LTE Market Definition.** Premium LTE baseband processors are those baseband processors used in smart phones. ████████████████████████████████

---

[44] ███████████████████████████████████████
[45] ████████████████████████████████████████████████
████████████████████████
[46] ███████████████████████████████████████████



54.    **Common evidence.** Common evidence of the same type as just reviewed can also establish or refute the plaintiffs' allegations that Qualcomm exercised monopoly power in the market for premium LTE baseband processors. ████████████████████

████████████████████████████████████████████

████████████████████████████████████ [49]

55.    As discussed above, evidence from market shares is a common approach to analyzing monopoly power. ████████████████████████

████████████████████████ [50]



**Table 5: Premium LTE Market Shares**



|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **Firm** | | | | | | | |

Sources: Worldwide market shares of Premium LTE for use in phones as determined by

56.   **Table 5** above shows the results of this analysis, and is consistent with the plaintiffs' allegations of significant monopoly power.

**Table 5** also shows the results of an analysis of HHIs in the market for baseband chips used in high end phones, and again lends support to plaintiff allegations. The HHI for premium LTE processors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮r. As discussed above, according to the U.S. Department of Justice, an HHI exceeding 2,500 is considered "highly concentrated."

57.   Qualcomm's baseband processor chipset data also can be used to support or reject the assertion that Qualcomm has substantial monopoly power in LTE chipsets going into premium phones.

██████████████████████████████████████████████████████████

████████████████████████████████████

58.    **Table 6** tests whether there is a statistically significant difference between Lerner coefficients for 4G LTE WCDMA chipsets sold into the premium tier and LTE WCDMA chipsets sold into the high/mid and low/feature tiers.[51] As can be seen, there is a large and statistically significant difference between Lerner coefficients in premium vs. the other two cell phone market segments. This is additional common evidence that can be used to corroborate what the other information reviewed suggests about the extent of Qualcomm's monopoly power in the premium LTE chipset market.

**Table 6: Test of Statistical Significance for Difference Between Lerner Indexes**

| Indexes | Difference in Coefficients | Std. Err. | t | P>\|t\| |
|---|---|---|---|---|
| 4G WCDMA Premium - 4G WCDMA Low/Feature | ██ | ██ | ██ | ██ |
| 4G WCDMA Premium - 4G WCDMA High/Mid | ██ | ██ | ██ | ██ |

59.    Finally, Qualcomm's monopoly power in premium LTE would be reinforced by any technical advantages of its chipsets in achieving the highest possible 3GPP-defined data rates at the leading edge of LTE capabilities. Technical comparisons of competing 4G LTE chipsets that I have reviewed show that ████████████████████████████████████████ ████████████████████████████████████████████[52] This would reinforce its monopoly power in the premium 4G LTE market segment. Documents and studies available

---

[51] Classification of chips into MDM, low/feature, high/mid, and premium based on ██████████████ ████████████

[52] See ████████████████████████

to the plaintiffs should allow them to explore this aspect of its monopoly power in greater detail.

### G.   Likely Effects of Qualcomm's Monopoly Power and Business Practices

60.    I understand that Plaintiffs have alleged that Qualcomm uses certain practices to achieve and maintain monopoly power in these markets, and as leverage to elevate the royalty it receives for granting license to its cellular phone SEP portfolio. I have been asked to provide my opinion on the likely effect of those practices.

61.    Qualcomm's refusal to license its standards essential patents (SEPS) to competing chipset makers is an exercise of monopoly power that hinders competition by imposing a barrier to entry, and maintains Qualcomm's high royalties for its cellular phone SEP portfolio.

62.    If Qualcomm's competitors could get a license from Qualcomm, their baseband processors would face less litigation risk and would likely experience increased sales to OEMs. With increased sales, economies of scale are more likely to be achieved, spreading the large fixed costs of development over the larger number of units sold, and support the sustained research and development investment necessary to survive as a baseband processor vendor. This would have decreased Qualcomm's monopoly power in both the CDMA and the premium LTE markets.

63.    In addition, Qualcomm chose to not license its cellular phone SEP portfolio to protect its large stream of royalty payments. For ███████████████████████

███████████████████████████████████████

███████████████ [53] Moreover, ████████████████████████

████████████ [54] ██████████████████████████████

█████████████████████████████████████████

██████████████████████████ [55] ████████████████████

██████████████████████



64.   The reason Qualcomm refused to license other chip manufacturers was clearly

that Qualcomm did not want to hurt its ability to impose high royalties on device OEMs. ████





"57

58

65.    Qualcomm's practice of a policy pursuant to which a chipset customer must take and maintain a license to Qualcomm's cellular phone SEP portfolio in order to purchase chipsets from Qualcomm (the "no license no chips" policy) has the effect of elevating its royalty. As discussed above, Qualcomm has significant CDMA monopoly power. Because of this, an OEM who wishes to sell CDMA-compatible phones to carriers such as Verizon and Sprint, or in the many other geographic areas in the world with extensive 3G CDMA2000 networks, it must take a license with Qualcomm in order to secure CDMA baseband processors to make those sales. For carriers such as Verizon and Sprint, there is no possibility of substituting between the 3G CDMA2000 and 3G WCDMA technology because of the sunk, incompatible investment in their deployed networks, and the slow pace of deployment of VoLTE. In the U.S. alone, Verizon and Sprint have invested more than $57 billion in their CDMA based networks over the decade from 2000 to 2010. This lack of substitution enhances Qualcomm's ability to exploit this policy, effectively extending its monopoly power in chipsets into an elevated royalty rate.

---

57

58



Highly Confidential—Attorneys' Eyes Only      36

66. 

[59] Similarly,

[60]

67.    Qualcomm used its monopoly power and its "no license no chips" policy to obtain elevated royalty rates. As

[1]

68.   This requirement to sign a separate license to use a chip purchased from the same entity is unique to Qualcomm.



69.   Qualcomm's exclusive dealing arrangement with Apple reduced its competitors' baseband processor sales. [63] As noted above in my discussion of the economics of baseband processor development, having high volumes of sales to achieve economies of scale is essential, in order to spread the large fixed costs of development and amortize investments in research necessary to succeed as a baseband chip vendor. Qualcomm's exclusive dealing would have likely served to deny those economies of scale to its competitors and would have allowed Qualcomm to maintain its monopoly power in both the CDMA and the premium LTE baseband processor markets.



70.     Qualcomm's alleged exercise of its monopoly power through these practices would have likely elevated Qualcomm's royalty on CDMA, WCMDA, and LTE phones.[64]

71.     Common methods and evidence can establish or refute allegations that Qualcomm has monopoly power in the markets for CDMA and premium LTE baseband processors. The analytical methods I have reviewed can provide statistical evidence of the presence and exercise of substantial monopoly power. Structural evidence in form of high market shares and very high concentration indexes will be available for analysis by plaintiff experts. Behavioral evidence is available in the form of margin analysis (Lerner indexes) and their statistical analysis, as well as documents and testimony directly relevant to the exercise of monopoly power in the CDMA and premium LTE baseband processor markets.

---

[64] It is my understanding the elevated royalties are applicable to CDMA (CDMAone and CDMA2000), UMTS(WCDMA), and LTE (premium LTE and non-premium LTE).

III.     PASS-THROUGH OF OVERCHARGES TO THE CLASS

A.  Overview of Pricing and Competition in a Differentiated Products Industry

72.    Since the 1930s, economists have been successfully modeling competition in markets where products do not fit the standard assumptions of perfect competition—large numbers of producers competing ruthlessly against one another in selling a single, perfectly homogeneous product. Instead, economics has recognized that there are many markets in which intense competition takes the form of producers differentiating their products from those offered by other producers. Yet because these products are close substitutes for one another, these industries can still be highly competitive, with prices for these products driven by competition to levels that can approach their average cost of production, similar to the situation in a perfectly competitive industry. This model is known as monopolistic competition.[65]

73.    A high degree of product differentiation characterizes the market for mobile telecommunication devices. Broadly speaking, the competing mobile phones have differences in design, functionality, and service plan characteristics.

74.    Different operating systems distinguish the two main branches of mobile phones offered to consumers. Apple phones have the iOS operating system created by Apple. Apple is the monopoly provider of Apple phones. The other branch is based on the Android operating

---

[65] As one prominent industrial organization textbook puts it, "The monopolistic competition model suggests that perfect competition is best thought of as an approximation. It is true that very few industries, if any, satisfy the extreme assumptions of the perfect competition model, in particular the assumption of product homogeneity. However, if the product is approximately homogeneous, then outcomes are approximately like those of perfect competition. In fact, as the degree of product differentiation decreases, the residual demand faced by each firm becomes flatter and flatter, and the point at which price equals average cost (long-run equilibrium) becomes closer and closer to the point where price equals marginal cost, as in the perfect competition model." L. M. B. Cabral, *Introduction to Industrial Organization*, 2nd Ed., (Cambridge: MIT Press), 2017, p. 81.

system whose baseline development is done by Google and further customized by phone OEMs. In contrast to Apple's iOS, the base Android system is open source and free (though Google has proprietary apps which ship with versions of Android that it markets).

75.     Substantial competition exists in the market for mobile phones. Apple phones compete with the Android phones but Apple maintains significant monopoly power because of its patented and copyright-protected operating system. Apple has price-setting ability over its phones because of this product differentiation. Because Apple has substantial monopoly power, it is able to maintain a price substantially above its average cost (i.e., make monopoly profits).

76.     Android phones compete with the Apple phones. As already mentioned, the operating system is a major difference. Some people are "Apple people," others are "Android people," and others do not have a strong preference. Beyond the operating system, phones differ by design and functionality. There is also considerable competition among phones within the Android category through product differentiation. Product differentiation gives the individual firms selling Android phones some price-setting ability, but the competition among the Android OEMs limits the monopoly power of the individual firms so that the price is much closer to average cost for these firms (i.e., these firms are expected to make only normal profits). That is, the Android category of phones is probably best viewed as monopolistically competitive.

77.     The textbook definition of product differentiation is "[t]he existence of characteristics that make similar goods less than perfect substitutes."[66] Product differentiation

---

[66] Paul A. Samuelson and William D. Nordhaus, *Economics*, 13th Edition, McGraw-Hill, New York 1989, p. 980.

is the central feature that distinguishes virtually all industries from the theoretical cases of pure

monopoly and perfect competition. It was this real-world observation that motivated Edward

Chamberlin to develop the theory of monopolistic competition as "the interplay of monopolistic

and competitive forces." Professor Chamberlin expanded on the meaning of product

differentiation:

> A general class of product is differentiated if any significant basis
> exists for distinguishing the goods (or services) of one seller from
> those of another. Such a basis may be real or fancied, so long as it
> is of any importance whatever to buyers, and leads to a
> preference for one variety of the product over another. [67]

78.     Professor Chamberlin directly connects product differentiation to product

quality, bringing product quality to the forefront of market analysis and adding another

dimension to the seller's calculus.

> Here the broad sense in which the word 'product' is used must
> constantly be held in mind (footnote omitted). Its 'variation' may
> refer to an alteration in the quality of the product itself—technical
> changes, a new design, or better materials; it may mean a new
> package or container; it may mean more prompt or courteous
> service, a different way of doing business, or perhaps a different
> location. In some cases an alteration is specific and definite—the
> adoption of a new design for instance. In others, as a change in
> the quality of service, it may be gradual, perhaps unconscious.[68]

79.     Quality change is not a side note, but instead is at the core of the market

equilibrium process. That is, market equilibrium involves adjustment of both price and quality.

---

[67] Edward H. Chamberlin, *The Theory of Monopolistic Competition*, Harvard University Press, Cambridge, 5th
edition, 1947, p. 56.
[68] Ibid, pp. 71-72.

> Where both prices and 'products' [quality] may be varied,
> complete equilibrium must involve stability with respect to both.
> … *Price adjustments are, in fact, but one phase, and often a
> relatively unimportant phase, of the whole competitive process.*[69]

Industry idiosyncrasies determine the mix of price and quality adjustment in the market equilibrium process, with a greater degree of product differentiation suggesting a larger role for quality adjustment in the market equilibrium process.

80.     On the buyers' side of the market, consumers make decisions about a product based upon both the price and product characteristics ("quality"). Consumers buy more at lower prices and at higher quality.[70] This means that consumers are willing to pay more for higher quality than for lower quality, other things the same.

81.     On the sellers' side of the market, the seller's cost is a function of output quantity and quality. The seller's cost function has the typical properties that increasing quantity increases cost (i.e., marginal cost of output is positive at all quality levels) and that increasing the quality increases cost (i.e., marginal cost of quality is positive at all quantity levels).

82.     Product differentiation gives each seller some price-setting ability. That is, each firm is a monopolist for its own product but may nevertheless face competition from an array of other differentiated products. This is stated succinctly by Chamberlin:

> With differentiation appears monopoly, and as it proceeds further
> the element of monopoly becomes greater. Where there is any
> degree of differentiation whatever, each seller has an absolute

---

[69] Ibid, p. 73, emphasis added.
[70] This is the first law of demand. The second law of demand also applies. Namely, buyers experience diminishing returns with respect to both quantity and quality consumption.

monopoly of his own product, but is subject to the competition of more or less imperfect substitutes.[71]

83.    To maximize profit, the seller balances these demand and supply forces to choose the price and product quality. That is, "[i]t [the 'product'], as well as price, will be chosen with reference to rendering the profits of the seller at a maximum."[72] This optimization implies two basic conditions relating to the choice of price and quality:

1.  Marginal revenue = marginal cost of output
2.  Marginal revenue product of quality = the marginal cost of quality

where the "marginal revenue product of quality" is the price of the good times the marginal demand generated from changing quality and the "marginal cost of quality" is the direct cost of changing quality plus the cost impact caused by the quality induced change in consumption.

84.    In response to a cost increase, the seller adjusts price or quality, or both, to reestablish the conditions for profit maximization. After a supply restriction and the resulting new equilibrium, the good will be sold at a higher price or be of a lower quality, or both. Chamberlin clearly saw that quality was part of the seller's arsenal in adapting to changing market conditions, including the possibility of decreasing quality.

> The result will depend on circumstances. Just as a seller may, under monopolistic competition, gain by raising his price and selling less as well as by lowering his price and selling more, so he may gain by deteriorating his product as well as by improving it.[73]

85.    It is the custom in many markets to use certain nominal prices, such as prices that end in 99 cents or at $9 (e.g., $6.99 for cough medicine, $79 for an entry-level phone). The

---

[71] Chamberlin, Op. cit., p. 9.
[72] Ibid, p. 72.
[73] Ibid, p. 73, fn 2.

extent of use of this type of nominal pricing strategy varies across industries: they reflect the idiosyncrasies of the product and industry and not a market failure. Chamberlin explicitly noted the custom of certain nominal prices arising from industry particulars, not market failures.

> The seller may, in fact, adjust both together, or either one separately, depending upon circumstances. If his price is set by custom or imposed upon him by trade practice or (if a retailer) by the manufacturer, he is free to vary only his 'product.' On the other hand, if his product is set by its very nature or by a previous decision, then the only variable in fact is his price. If both may be varied, the equilibrium adjustment must involve both.[74]

> The entrepreneur may be regarded as accepting a price generally prevalent, one established by tradition or trade practice, or one determined upon by an earlier decision, and to which his customers have become habituated. He now chooses his 'product' – or whatever phases of it are subject to variation. If he is setting out initially upon his venture, he is free to choose all phases of the product, even such more or less permanent attributes of it as his place of doing business, if he is a retailer, or his trademark, if he is a manufacturer.[75]

86.     Cost targets are the natural complement to products that a merchant knows will be sold in certain price tiers and to certain market segments. A merchant selling products at an array of price tiers likely asks wholesale suppliers for the best possible products at an array of corresponding cost targets. Competition among the wholesale suppliers results in the highest quality product being produced for a cost target. Likewise, competition among merchants for customers and sales makes the difference between the nominal price and cost targets minimal. In competitive retail markets this margin will just generate normal economic returns for the seller.

---

[74] Ibid, p. 75.
[75] Ibid, p. 78.

87.    It is a fundamental economic conclusion that monopoly power harms consumers via higher prices, lower quality products, or both. That is, the adverse impacts of restricting supply are passed through the supply chain along two channels—price increases and quality decreases. Likewise, as the economic theory I discuss below indicates, sellers in monopolistically competitive industries will pass through industry-wide cost increases as higher prices and lower quality, because survival offers no alternative.

88.    The impact occurring through the price channel is distributed along the stages of supply chain, depending upon how much of the cost increase is passed through between each stage. The impact occurring through reductions in product quality, however, falls largely, if not entirely, on the ultimate consumer. The design decisions that determine quality occur at production. Once produced, the chosen quality is embodied in the product and thus fully passed through to the end user.

89.    Considerable documentary evidence presented below indicates price and cost targets are common customs in the sale and manufacture of mobile phones. There is also substantial documentary evidence that cost targets are achieved by quality choice decisions at the design stage, which are irreversible once the phone is produced. Thus, with price and cost targets, the economic impact of an anticompetitive cost increase is manifested as reduced quality, and this embodied or "baked-in" quality impact gets passed through *in toto* to the end-use consumer.

90.    The work of Chamberlin and others in the 1920s and 1930s made clear that real-world industries were characterized by product differentiation and that quality might be equally, if not more, important than price in the market equilibrium process. The theory of monopolistic competition was immediately accepted as a realistic representation of modern

industry, and that acceptance continues today. "The monopolistic competition model describes many important features of American capitalism."[76] It was automobiles, cigarettes and grocery stores in Professor Chamberlin's day. Today it is automobiles and high-tech electronics like computers and mobile phones that are described as highly-differentiated, monopolistically competitive with product quality being a key variable of that competition process.

> Product quality is an increasingly important part of product differentiation today. Goods differ in their characteristics as well as their prices. Most personal computers can run on the same software, and there are many manufacturers. Yet the personal computer industry is a monopolistically competitive industry, because computers differ in speed, size, memory, repair services, and ancillaries like CDs, DVDs, Internet connections, and sound systems.[77]

91.    Not surprisingly, in the same period that Chamberlin and others were developing models of imperfect competition that recognized the role of product differentiation and product quality, pioneering research into methods of adjusting prices for quality differences was undertaken. Over the last ninety years, this branch of economic research has produced rigorous, and now well-established, methodologies to adjust price for quality changes.

92.    Before describing the methodologies, several sets of examples will illustrate the concept of a quality-adjusted price. These examples are stylized—they are representative of actual experiences and observations.

93.    **Table 7** presents the first set of stylized examples, which involves coffee, ice cream, and grape juice—goods closer to the commodity end of the product differentiation

---

[76] Paul A. Samuelson and William D. Nordhaus, *Economics*, 13th Edition, McGraw-Hill, New York 1989, p. 612.
[77] Paul A. Samuelson and William D. Nordhaus, *Economics*, 19th Edition, (Indian Edition: Tata McGraw Hill), 2010, p. 213.

spectrum. In 2015, a bag of coffee beans was priced at $9.99. The bag had 2 pounds of beans. In 2018, a bag of coffee beans is still at the $9.99 nominal price, but now only contains 24 ounces of beans. The 2018 quality-adjusted price (adjusted to 2015 quality) is $13.32.

**Table 7: Quality-Adjusted Prices for Near-Commodities**

|  | 2015 Price | 2015 Size | 2018 Price | 2018 Size | 2018 Adjusted Price |
|---|---|---|---|---|---|
| Bag of Coffee | $9.99 | 32 oz | $9.99 | 24 oz | $13.32 per 32 oz |
| Carton of Ice Cream | $4.99 | Half gallon | $3.99 | 1.5 quarts | $5.32 per half gallon |
| Bottle of Grape Juice | $3.99 | Half gallon | $3.99 | 3 quarts | $2.66 per half gallon |

Ice cream presents a similar stylized example. In 2015, a carton of premium ice cream was priced at $4.99. The carton size was a half-gallon. In 2018, a carton of premium ice cream is now priced at a lower nominal price, $3.99, but the carton size is only 1.5 quarts. The 2018 quality-adjusted price (adjusted to 2015 quality) is $5.32. Grape juice is the third example. In 2015, the 64-ounce bottle was priced at $3.99. In 2018, the nominal price remains the same, but now the product is a 96-ounce bottle with a label that says "50% more free." Perhaps this change reflected some combination of increasing inventories, decreasing costs, lessening demand, or other changing market conditions. The $3.99 nominal price is maintained, but the market nevertheless adjusted by reducing the quality-adjusted price to the consumer.

94.    The use of particular nominal prices may be prevalent in some industries, less of a custom in others, and perhaps not used at all in yet others. The coffee, ice cream, and grape juice examples show that the use of particular nominal prices does not prevent quality-adjusted prices from being impacted by changing market conditions.

95.    A quantity reduction is, of course, the simplest design change leading to quality reduction. Adjusting the price is a transparent calculation. However, as one turns away from

basic commodities to industries with a higher degree of product differentiation, the dimensions of quality increase. **Table 8** presents stylized examples for markets with highly differentiated products. A sedan (think Honda Accord, Toyota Camry, etc.) with the "standard package" was priced around $20,000 in 2010. Today, the price for that level car with the standard package might be about $25,000. However, the performance, safety features and fuel efficiency (along with many other quality dimensions) are different in 2018 than in 2010. If the hedonic methods (discussed below) used by the government estimate these improvements to raise market value by $5,000, then adjusting the 2018 price by removing the quality change value results in a 2018 quality-adjusted price of $20,000. Thus, in this example, the quality-adjusted price of the sedan did not change between 2010 and 2018.

**Table 8: Quality-Adjusted Prices for Highly Differentiated Products**

|  | **2010 Price** | **2018 Price** | **2018 Improved Quality Dimensions** | **2018 Quality-Adjusted Price** |
|---|---|---|---|---|
| Passenger Automobile | $20,000 | $25,000 | Performance, safety, efficiency | $20,000 |
| Laptop Personal Computer | $1,000 | $500 | Speed, functionality, weight | $200 |
| Mobile Phone | $500 | $350 | Design, functionality | $150 |

96.    Likewise, consider a laptop computer that was priced around $1,000 in 2010. In this example, that class of computer is now priced around $500. But this class of computer is nonetheless of much higher quality (faster, lighter, more functionality, etc.) in 2018 than it was in 2010. Adjusting the 2018 price by removing the value of this quality change makes the 2018 quality-adjusted price just $200. That is, the implicit price in 2018 of a computer with 2010 quality has decreased by 80 percent.

97.     Moving toward the case at hand, mobile phones have also had considerable changes in price and quality over the past several years. In the stylized example, the class of phone that sold for $500 in 2010 sells for $350 today. But this class of phone has also improved in quality. Adjusting for the increase in quality by removing the quality change value from the 2018 price makes the 2018 quality-adjusted price $150. That is, in this example the implicit price of a 2018 phone with 2010 quality has decreased by 70 percent.

98.     These two sets of stylized examples illustrate changing market conditions being transmitted to consumers through price and quality adjustments. That is, quality-adjusted prices facing consumers change as market conditions change.

99.     In modern markets for complex high-tech products—like those for mobile phones—there are typically many characteristics of the product that can be chosen by a producer in order to differentiate its products, and these characteristics can affect both consumer demand and producer costs. How can we take these into account when we analyze a market equilibrium price in markets for such differentiated products?

100.    The framework economists have used to examine this question since the 1930s is called the hedonic price model. A survey article written in the early part of the current century covering use of hedonic models in environmental litigation characterizes the hedonic model as follows:

> The hedonic price model is one of the most widely accepted methods for estimating the monetary trade-offs for quality attributes of private goods and spatially delineated environmental amenities. This framework maintains that the prices of closely related heterogeneous goods are associated with measures of the attributes distinguishing those goods. A visit to the Bureau of Labor Statistics' (BLS) website confirms the widespread use of this logic in evaluating the prices for everything, from different hairdryers to diverse camcorders or DVD players (footnote

omitted). Hedonic price functions are a part of the routine quality adjustment practices of the BLS in developing cost-of-living indexes such as the Consumer Price Index.

The hedonic method has enjoyed wide acceptance in environmental applications as well...[78]

101. This survey article also notes that these well-established hedonic price methods have been used in both private and public environmental litigation, since at least the late 1960s and early 1970s:

Hedonic price functions have occurred in economics for at least 70 years. Most observers credit Waugh [1929] as the first to introduce them in his Ph.D. thesis research on methods to adjust the prices of various vegetables (for example, asparagus, tomatoes and hothouse cucumbers) for those characteristics that were presumed to be related to quality. Their role in price indexes became more widely appreciated through the 1959 Stigler Commission that included in its subsequently published report Griliches' [1961] proposal to use hedonic price indexes to adjust for quality change.

It took some time before this approach would be used to measure the role of positive and negative site attributes for residential locations through property markets. In the mid-1960s, before the existence of the US Environmental Protection Agency and before major federal environmental legislation, research on using property values to reveal the willingness to pay for air quality was under way, funded by federal agencies. The Division of Air Pollution in the US Public Health Service supported a research effort on the costs of air pollution headed by Ronald Ridker with the assistance of several other economists...[79]

102. Palmquist and Smith, in their survey, note that hedonic methods are most successful looking backward, in providing evidence of the historical monetary value to

---

[78] R. B. Palmquist and V. K. Smith, "The Use of Hedonic Property Value Techniques for Policy and Litigation," in T. Tietenberg and H. Folmer, Eds., *The International Yearbook of Environmental and Resource Economics 2002/2003: A Survey of Current Issues*, (E. Elgar), 2002, p. 116.

[79] Palmquist and Smith, *op. cit.* (footnotes omitted), p. 117.

consumers of changes in environmental quality, rather than predicting the future impact of prospective changes for policy purposes. As they put it, "Hedonic analyses have had more success in litigation. Property values change in response to an environmental problem because people are willing to pay to avoid the problem. Judges and juries are more convinced when people actually pay to avoid environmental disamenities or experience losses when they are discovered. The tangible evidence of an effect on people and their property has been convincing in litigation."[80]

103.  Similarly, hedonic price methods have become the standard tool of choice for applied microeconomists (like myself) interested in the determinants of market prices for high tech goods with rapid rates of product innovation, like computers, communications equipment, software, and semiconductors.[81] Just as hedonic environmental studies can, for example, determine the concrete effects of proximity to a toxic spill on market values for property, a hedonic study of prices for a high tech good can determine the impact of better—or worse—quality characteristics on the market value of a product. This is a well-established economic method, and a common method that would be available to evaluate the alleged harm to purchasers of phones in the proposed class. Indeed, ███████████████████████████
███████████████████████████████████████████████████████[82]

104.  One particularly useful and well accepted formulation of the hedonic price equation that could be used to evaluate damages to members of the proposed class was laid

---

[80] Ibid, p. 153.
[81] A.M. Aizcorbe, *A Practical Guide to Price Index and Hedonic Techniques*, (Oxford: Oxford University Press), 2014, contains an excellent bibliography of such studies.
[82] See, ███████████████████████████████████████████
███████████████████████████████████████████████████████

out by Pakes in a frequently cited 2003 article.[83] Pakes points out that the hedonic price function is the sum of an expression containing unit cost, and an expression for the profit margin (the difference between price and unit cost), both of which are functions of product characteristics.[84] Since highly confidential data on unit costs is almost never revealed publicly by producers, most of the published literature on hedonic functions simply estimates price as a function of the product characteristics, with the combined effect of any characteristic working through both the supply sides (cost) and the demand sides (which determines profit margins on a given configuration of characteristics for a product) of the market. Fortunately, detailed and common data on product level costs have been produced in this litigation. Using these data, regressions can demonstrate how a decline in quality-adjusted price—either through lower price or increased quality—was passed on to the consumer. Importantly, whether a product declined in price, improved in quality, or a combination of the two, my analysis shows the pass-through effects of the decline in quality-adjusted price on a class-wide basis.

105.   My hedonic price-cost (pass-through) regressions measure the extent to which changes in component costs for cellular phones would be passed through the distribution chain in the form of changes to the quality-adjusted prices that consumers pay. Changes to quality-adjusted prices are a combination of changes in nominal prices and changes in the quality of components making up a device. That is, a pass-through rate of 75% implies that a $13.33 decrease in the cost of producing some given combination of product characteristics will lead to a decrease of $10 in the price of a cellular phone with that fixed set of characteristics, with the

---

[83] A. Pakes, "A Reconsideration of Hedonic Price Indices with an Application to PC's," *American Economic Review*, vol. 93, no. 5, 2003.
[84] If unit cost is also an argument in the function giving the markup, then a pass-through of cost into price that is greater or less than one is possible.

$3.33 balance (of the $13.33 decrease) collected by the seller in the form of an increased profit

margin on that device. The same logic applies in reverse to cost increases also.

106.   Since the characteristics of the cellular phone have not changed, its quality has

not changed, and this $10 decrease in nominal price is also a $10 decline in quality-adjusted

price. But the hypothetical "but-for" world $10 decline in price for the combination of

characteristics (driven by the reduction of $13.33 in royalty cost in the "but-for" world of

FRAND) could also manifest in a consumer choosing to pay the same, higher "as-is" world price

for a device with better features in the "but-for" world. The hedonic price-cost regression does

not tell us which combination of these occurred. Instead the pass-through rate is an estimate of

the extent to which a cost change would have led to a corresponding adjustment in the market

price of cellular phones with given features, that is, a decrease in quality-adjusted price in the

"but-for" world of FRAND royalties on Qualcomm's cellular phone SEP portfolio.

107.   Because the characteristics of the cellular phones purchased by a consumer in

the "but-for" world might change in response to a decrease in price for given features, we are

motivated to ask how we can measure what the loss to consumers from not living in the but-for

world, where they would have the choice of either buying the phone they actually purchased in

the "as is" world for a now cheaper but-for world price, and pocketing the difference to spend

on other goods or services, or instead buying a better device, now also available for less in the

"but-for" FRAND world. The economics literature on price indexes defines a concept called the

"cost of living index" (COLI) which allows one to measure a lower bound on the economic harm

to consumers from being removed from a hypothetical, lower-priced (for any combination of

cellular phone characteristics) but-for world, and transplanted instead to the higher-priced as-is

world they actually lived in.

Highly Confidential—Attorneys' Eyes Only      54

108.  An excellent and highly understandable summary of the COLI concept is provided

in Aizcorbe (2014):

> A "true" Cost of Living Index is defined as the amount of money
> one would have to give a consumer to make him indifferent
> between optimizing under two alternative sets of prices. The
> thought experiment involves comparing two scenarios. In the first
> scenario, one assumes that the actual purchases in the base
> period, say, were optimally chosen (the result of maximizing
> utility subject to a budget constraint that used the base period
> prices). The second scenario, the counterfactual, considers what
> the consumers optimal choice would have been under the current
> period (counterfactual) prices. If one could observe the utilities
> associated with these choices, one could calculate the dollar value
> of the utility differences in the actual and counterfactual choices.
> The result would be the true COLI. However, one never observes
> the optimal choice under the counterfactual and, so, one cannot
> directly measure the COLI.[85]

Aizcorbe continues:

> In the price index literature, the approach is to construct indexes
> that provide bounds to the true COLI. The logic for deriving these
> bounds…is that one can calculate the cost of purchasing the base
> period bundle at the counterfactual prices (the numerator of the
> Laspeyres [price index]). Because the bundles are the same, if
> tastes are not changed, then the associated utilities will be the
> same. If the base period bundle were, in fact, the optimal choice
> under the counterfactual prices, then the dollar difference in the
> two scenarios would give the compensation the consumer would
> need to buy the same bundle with counterfactual prices and the
> COLI. However, it is entirely possible that the consumer's optimal
> choice in the counterfactual would be a different bundle that
> gives him more utility than buying the base period bundle. If so,
> he will not need as much compensation as pricing the same
> bundle would suggest…That is, the numerator of the Laspeyres—
> where the base period bundle is priced at the current period

---

[85] Aizcorbe, 2014, pp. 21-22.

prices—is too large. Thus the Laspeyres—where the base period bundle is priced at the current period prices is too large…

The gap between the true COLI and the Laspeyres index is called *substitution bias* and it measures the extent to which the Laspeyres fails to take into account of consumers substituting toward goods [or in our case, phone characteristics] with lower relative prices. A similar argument holds for the Paasche index as a lower bound to the true COLI.[86]

109.   In our case, the relative prices of phone characteristics (the coefficients of phone characteristics in our hedonic price function, discussed below) are unchanged in a but-for FRAND world where royalty cost changes, but nothing else does, and all phone prices, are lower, for any choice of characteristics. If we take the hypothetical but-for FRAND world as our base, and we ask how much compensation would have to be paid to get a consumer to move to the supra-FRAND (as-is) world, we would then need a positive amount of compensation to induce that consumer to move to the higher-priced as-is world (just as an employee might demand a higher salary if they were asked to willingly move to a more expensive city). In this case, the as-is "bundle" of phone characteristics (quality) would be the numerator in a so-called Paasche price index, and we would have a (positive) lower bound on the true COLI.

110.   In this situation, the increase in price for the as-is supra-FRAND phone relative to what the same phone would sell for in the but-for FRAND world is a **lower bound** on what a consumer living in the but-for world would need to receive in order to be induced to willingly move to the more expensive, as-is supra-FRAND world.

111.   Thus, economic theory tells us that the difference between the lower but-for price of the as-is cellular phone with the characteristics the consumer actually purchased in the

---

[86] Aizcorbe, 2014.

as-is world, and the actual, higher, as-is price for that cellular phone, is a lower bound on the

economic injury a consumer would have suffered from being forcibly ejected from the

hypothetical but-for world of FRAND royalties and instead relocated in the as-is world of supra-

FRAND royalties.

112.   Put in more intuitive terms, a consumer would have been able to purchase their

as-is cellular phone for less in the but-for FRAND world, and giving them the amount they

would have saved is a lower bound on their economic injury from being forced to leave the but-

for FRAND world and live in the as-is supra-FRAND world.

113.   However, many consumers in the lower-priced but-for FRAND world would likely

have chosen to purchase a higher quality phone (one that would have been priced at a higher

price in the as-is world than the one that they actually purchased), when available to them at a

lower but-for-world price. Because we are not taking this additional improvement in their

welfare in the but-for world into account in our calculation of how much we would have to give

them to get them to leave, the savings on the price of the as-is phone in the always lower-

priced but-for FRAND world is a lower bound on the injury to consumers from being forcibly

displaced into the as-is supra-FRAND world.

114.   It is important to note that to the extent that the royalty cost in the supra-

FRAND world is passed through by the cellular phone manufacturer in the form of quality

reduction, then this portion of the effect of supra-FRAND royalty elevation on quality-adjusted

price is "baked-in" at the OEM-level regardless of the downstream pricing strategies that are

used by resellers such as wireless carriers. (In the hypothetical but-for world, given whatever

price is set for a device by the OEM for sales to downstream buyers, we are assuming that OEM

prices are passed through at each stage in the distribution chain exactly as they would have

been in the as-is world.) That is, for any phone sold for any specific price by the OEM in the as-is world, in the but-for world a higher quality phone is sold at for the same as-is price at every point further down the distribution change, and the consumer at the end of that chain receives a higher quality product—at a lower quality-adjusted price--even if nominal prices at every point in the distribution chain are exactly the same in both as-is and but-for worlds.

115.   Common evidence I review below shows that device manufacturers come up with the most attractive possible combinations of phone characteristics that can be profitably sold by the OEMs at various price tiers. To the extent that Qualcomm's supra-FRAND royalty diminished the designed-in quality of phones sold at any given price, the economic impact of that injury was transmitted *in toto* from the initial design decision, to final purchasers at the end of the distribution chain in an essentially automatic fashion.

116.   Hedonic methods common to the proposed class can establish a lower bound on the value of this designed-in, "baked in" quality injury. Intuitively, as previously remarked, if the actual "as is" product characteristics had been chosen in the "but-for" world, the estimated hedonic pass-through equation allows us to predict how much lower the market price of the "as-is" product would have been in the "but-for" world of a FRAND royalty, and this provides a lower bound on the injury to consumer.

117.   **Figure 2** illustrates how a hedonic model uses these concepts to estimate a quality-adjusted price. The red line shows the relation between product quality and market prices generated by an underlying hedonic model like the one I estimate later in this report,[87]

---

[87] That is, price = [a + b*non-quality-related cost] + c*quality characteristic. The pass-through rate is measured by b in this equation. For illustration, I assume b=.75, so the net effect of a $13.33 decline in royalty cost is to lower the bracketed intercept term by $10. Coefficient c captures the effect of the quality characteristic on price working through both cost and markup, i.e., is equal to b*(cost of quality characteristics) +d.

and the green line the relation between product price and quality that would be observed in the but-for world after a uniform decline in costs, unrelated to quality, that affects all product models. The vertical distance between the lines corresponds to the change in quality-adjusted price. ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ 88

**Figure 2: Decline in Quality-Adjusted Price with a $13.33 Royalty Reduction, 75% Pass-Through Assumed**



Source: quality_adjusted_price_figure_ns_nt.html

118.   All the points on the red line reflect the initial level of quality-adjusted price prior to the cost decline, while the points on the green line reflect the quality-adjusted price after the cost decline. We use a single measure of quality ranging from 1 to 20, which we might think of as gigabytes of memory. All other features of the product are assumed to be identical, and the vertical difference between the lines measures the impact on quality-adjusted product price from a $13.33 cost decline, assuming a pass-through rate of 75%. The effects of the cost decline induced by the cut in royalty are assumed to be independent of quality-levels.

119.   Note that if price levels were fixed at actual levels observed initially, product quality levels observed in the market place would have increased by 2 at every such fixed price. Alternatively, if product quality levels had been fixed, prices would have declined by $10 for every observed quality level. Finally, changes in price and quality could have occurred simultaneously, as in the diagonal line drawn in black (price decline by $5, and quality increasing by 1). Any of the possible movements from points on the red to green lines reflect a quality-adjusted price decline of $10.

120.   This figure illustrates the fact that phone purchasers would have been able to purchase products with characteristics similar to the as-is product in the but-for world for a lower but-for price, and could have simply pocketed the monetary savings on market price for the as-is phone. However, at least some consumers might have preferred to buy a phone at the "as-is" price point and get the "but-for" superior quality phone, instead of buying the as-is phone at a lower price. For this reason, the monetary savings on the market price of the "as-is" phone in the "but-for" world is a lower bound on the value of the economic injury to purchasers.

Highly Confidential—Attorneys' Eyes Only        60

**B.   Overview of Pass-Through Theory and Evidence**

   **1.      Economic Theory Suggests Impact on Indirect Purchasers**

   121.   In this section, I summarize the economic theory used to evaluate how cost increases for an input used in the production of a finished good are passed through to final purchasers of the finished good. I conclude that as a general matter, regardless of the mode of competition in the finished good-producing industry (perfect competition, or widely accepted and utilized models of imperfect competition), economic theory predicts increases in the prices of the finished goods. Indirect purchasers would therefore have experienced tangible and significant harm through an elevation in quality-adjusted prices that resulted from Qualcomm's objectionable use of its monopoly power in baseband chipsets to impose non-FRAND royalty rates for its cellular phone SEP portfolio.

   122.   There are four distinct strands of economics literature that address the issue of how producer prices behave as input prices change. The public finance literature discusses the effect on the price of a manufacturer's finished product were a tax or subsidy (lump sum, specific, or proportional, ad valorem) to be imposed on it.[89] This literature is especially relevant, as the Qualcomm royalty functions much the same way as an industry-wide tax assessed on the wholesale sales prices of every OEM. The academic literature suggests that industry-wide costs are typically more likely to be passed through than OEM specific costs.[90] As I summarize below,

---

[89] *See*, *e.g.*, C. Hepburn, et. al., "Emissions Trading with Profit-Neutral Permit Allocations," *Journal of Public Economics*, vol. 98 (2013), pp. 85-99; J. Poterba, "Retail Price Reactions to Changes in State and Local Sales Taxes," *National Tax Journal*, vol. 49, no. 2, (1996), pp. 165-176; R. Sullivan and D. Dutkowsky, "The Effect of Cigarette Taxation on Prices: An Empirical Analysis Using Local-Level Data," *Public Finance Review* vol. 40, no.6 (2012): 687-711.

[90] Muehlegger and Sweeney find the more widespread a cost change, the higher the pass-through rate in response. Erich Muehlegger and Richard Sweeney, "Pass-Through of Input Cost Shocks under Imperfect Competition: Evidence from the U.S. Fracking Boom." November 2017. According to these authors, "indirect shocks affecting a subset of firms may result in very different observed price responses than shocks affecting an

empirical studies of taxes generally show that a large share of taxes are passed through to the end consumer.

123.   In addition to public finance literature, the international trade literature studies how changes in exchange rates and their consequent effects on imported input costs would affect domestic prices.[91] The applied microeconomics literature examines how input prices affect product prices. For example, studies have been done on how changes in the minimum wage have affected restaurant prices, and how agricultural product price changes have affected the prices of processed food products that use these inputs.[92] Finally, a literature in industrial organization considers how to measure pass-through of harm to consumers from an upstream cartel's elevation of the price of an input, to downstream consumers of a finished product utilizing the price-fixed input.[93]

---

entire industry" (p. 2) They conclude, "We find that while refineries have little ability to pass on idiosyncratic cost shocks, shared cost changes have increasingly larger impacts, culminating in slightly greater than full pass-through for an industry-wide shock" (p. 25). Orley Ashenfelter, David Ashmore, Jonathan B. Baker, and Signe-Mary McKernan, Identifying the Firm-Specific Cost Pass-Through Rate, 1998. These authors note that the tax pass-through literature is concerned with industry-wide pass-through and "The majority of these studies report pass-through rates slightly in excess of 100% (usually based on estimating linear pricing equations)" p. 3.

[91] *See, e.g.*, Anne Gron and Deborah L. Swenson, "Incomplete Exchange-Rate Pass-Through and Imperfect Competition: The Effect of Local Production," *The American Economic Review*, vol. 86, no. 2, Papers and Proceedings of the Hundredth and Eighth Annual Meeting of the American Economic Association San Francisco, CA, January 5-7, 1996. (May 1996) and Anne Gron and Deborah L. Swenson, "Cost Pass-Through in the U.S. Automobile Market," *The Review of Economics and Statistics*, vol. 82, no. 2. (May 2000), Michael Knetter, "International Comparisons of Pricing-to-Market Behavior," *The American Economic Review*, vol. 83, no. 4, pp. 73-86 (1993), and Jose Manuel Campa and Linda S. Goldberg, "Exchange Rate Pass-Through Into Import Prices," *Review of Economics & Statistics*, November 2005.g

[92] *See e.g.*, D. Aaronson, "Price Pass-Through and the Minimum Wage," *Review of Economics and Statistics* 83.1 (2001): 158-169 and Kim Donghun, and Ronald W. Cotterill, "Cost Pass Through in Differentiated Product Markets: The Case of U.S. Processed Cheese," *The Journal of Industrial Economics* 56, no. 1 (2008), pp. 32-48.

[93] *See, e.g.*, J. Boone, and W. Müller, "The Distribution of Harm in Price Fixing Cases," *International Journal of Industrial Organization*, 2012, pp. 265-276 and references cited therein. The literature also includes empirical studies of how cartel-organized price increases for an input affected prices for products making use of that input: *see e.g.*, John Connor, "Forensic Economics: An Introduction with Special Emphasis on Price Fixing," Working Paper, Purdue University, West Lafayette, IN, March 2007, Ronald W. Cotterill, "Estimation of Cost Pass Through to Michigan Consumers in the ADM Price Fixing Case." University of Connecticut, Food Marketing Policy Center,

124.   The theoretical framework for analyzing pass-through starts with the basic tools used by economists to understand economic behavior: market structure, supply, and demand. Starting here, the conclusion of all the different strands of economics literature is that as a general matter, prices of finished products increase as the result of an increase in an input price. In a perfectly competitive finished product industry, the only two exceptions to this rule would be when an industry faces a perfectly elastic demand for its products (*i.e.*, where demand would immediately drop to zero in the face of any price increase whatsoever), or when supply is perfectly inelastic (i.e., even a very large increase in price is incapable of stimulating additional supply of a product).[94] Both of these scenarios are considered by economists as non-existent in the real world, although these extreme scenarios illustrate by contrast the general logic that changes in input costs will be passed through in changes to prices.[95]

125.   With imperfect competition, firms by definition[96] face downward-sloping demand curves for their products, ruling out one of the exceptional theoretical circumstances (price-taking, perfectly elastic demand—product demands dropping to zero in response to the tiniest of price increases) that might result in no impact on consumers with perfect competition. Discussions of pass-through with imperfect competition in the literature do not even consider the other theoretical circumstance (resulting in zero pass-through with perfect

---

Research Report 25148 (1998), and N. de Roos, (2006). "Examining Models of Collusion: The Market for Lysine," *International Journal of Industrial Organization*, 24(6).

[94] *See e.g.*, Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, vol. 128, no. 2, pp. 269-360 (Dec. 1979).

[95] *See* Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, vol. 128, no. 2. (Dec. 1979) in this point. Ronald W. Cotterill, Leonard Egan, and William Buckhold. "Beyond Illinois Brick: The Law and Economics of Cost Pass Through in the ADM Price Fixing Case," *Review of Industrial Organization*, 18(1), pp. 45-52, February 2001, implicitly dismiss the issue of a perfectly inelastic supply as implausible, since they do not even mention it.

[96] Since perfect competition means that firms take their output price as fixed, perfectly competitive firms perceive a demand curve that is horizontal, rather than downward sloping.

competition), a perfectly price-inelastic (fixed and completely unresponsive to price) supply of the input to the finished product industry, for a very simple reason—there is no "supply curve" under imperfect competition. Instead, with imperfect competition, firms make profit-maximizing output or pricing decisions, conditional on their expectations about industry demand and production or pricing by other producers.

126.   One very general framework that has been widely used in the current economics literature to analyze the effect of changes in upstream industry prices on downstream (upstream products are inputs to the downstream) industry prices makes only minimal assumptions about firms' cost and demand curves.[97] It assumes (again, very generally) only that the downstream industry equilibrium is a Nash equilibrium in the actions of the firms in the industry.[98]

127.   Different modes of competition are represented in this model using a parameter θ (whose value measures the effect of a firm's action on total industry output relative to the

---

[97] The assumptions it does make are that incremental cost for an additional unit of output is greater than zero, and that this incremental cost is non-decreasing as total production increases. Also, total production cost for any fixed level of output is assumed to not decline as the input price is raised. Finally, incremental cost is assumed to not decline as any input price is raised, ceteris paribus, and at least one firm's incremental cost must increase with an increase in the price of the input in question. These would generally be considered non-controversial and widely accepted assumptions. The firms in this model are not assumed to be identical in size or production cost structure. On the demand side, it is assumed only that demand curves are downward-sloping (quantity demanded by consumers increases at least a tiny bit if price is lowered sufficiently) and that the profit maximization problem of firms is well-defined.
*See* J. Boone and W. Müller, "The Distribution of Harm in Price-Fixing Cases," *International Journal of Industrial Organization*, vol. 30 (2012), p. 267. Essentially the same model is used in C. Hepburn, et. al., "Emissions Trading with Profit-Neutral Permit Allocation," *Journal of Public Economics*, vol. 98 (2013), pp. 85-99.
[98] "Nash Equilibrium" is a very general game theory equilibrium concept that is widely accepted and used in economics. Its inventor, John Nash, received the Nobel prize in Economics for this contribution, and inspired the film "A Beautiful Mind." As described by Jean Tirole, "Nash equilibrium is the basic solution concept in game theory. A set of actions is in Nash equilibrium if, given the actions of its rivals, a firm cannot increase its own profit by choosing an action other than its equilibrium action." *The Theory of Industrial Organization.* 1988, Massachusetts Institute of Technology, p. 206.

firm's output.) With perfect or Bertrand (a form of oligopolistic) competition $\theta = 0$. With

Cournot (another form of oligopolistic) competition $\theta = 1$. With perfect collusion (maximizing

collective joint profits for all firms in the industry), $\theta = N$, where N is the number of firms in the

industry. Generally, $\theta$ can be thought of as a parameter whose value depicts a spectrum of

modes of perfect and imperfect competition studied by economists, bookended by perfect

competition at one extreme, and perfect collusion at the other.[99]

128.   In this very general model, which subsumes a large variety of the models

commonly used by economists to study imperfect competition, increases in the price of an

input always lead to an increase in the price of the product downstream.[100] Thus, in the most

general of circumstances, using widely accepted and utilized economic models of imperfect

competition, economic theory tells us to expect at least some degree of positive impact on

downstream prices (like those for mobile devices) due to elevated input prices. The primary

question at hand then, is not the qualitative fact of impact, but the quantitative empirical

measure of the extent of harm from that impact.

129.   Three lessons emerge from the literature on pass-through. First, as a theoretical

matter, in a perfectly competitive industry (a very large number of sellers, no one of which has

any power to set prices) the incremental change in product price will be less than or equal to

100 percent of an incremental change in product cost, and generally equal to 100 percent if

marginal costs are constant (supply is perfectly elastic) or if industry demand is perfectly

---

[99] The assumptions in this basic model as set out above assume homogeneous products being sold within the industry; Boone and Müller (2012) also show how similar results can be obtained with differentiated products.
[100] Boone and Müller (2012) show that an increase in the price of an input always leads to some decline in downstream industry output in their very general model. Since demand curves are downward-sloping functions of price, this means that price will be unambiguously elevated.

inelastic (fixed). With a 100 percent rate, prices will rise or fall by exactly the amount of the

input cost increase (or decrease). Since empirical research suggests that most industries have

long-run supply elasticities that are approximately perfectly elastic, the change in price in the

cases where industries are well described by the assumption of perfect competition should be

close to 100 percent of the change in cost.[101]

130.   Second, in a monopoly (a single seller in the market), the increase in price can be

more or less than 100 percent of the change in cost, and depends critically on the curvature of

the demand curve.[102] With monopoly and a linear demand curve, price change must always be

less than 100 percent; with a constant elasticity demand curve, the price change will always

exceed 100 percent of cost.[103]

131.   Third, markets with imperfect competition (multiple sellers, non-perfect

competition), can have pass-through rates of greater or less than 100 percent depending on

curvature of demand curves.[104] Some economists have argued that firms in imperfectly

competitive industries "undertake nonprice strategies that shape demand curves into distinctly

non-linear forms to ensure that pass through is 100% or greater."[105] Firms in industries with a

high degree of competition in selling branded, differentiated products, in particular (as is the

---

[101] *See* Harris and Sullivan, 1979, pp. 291-293 for this argument, and references to documentation of the empirical assertions.

[102] Note that if an input is used in fixed proportions to output, a fixed tax per unit output is equivalent to an increase in unit variable cost.

[103] *See* Ronald W. Cotterill, Leonard Egan, and William Buckhold. "Beyond Illinois Brick: The Law and Economics of Cost Pass Through in the ADM Price Fixing Case," *Review of Industrial Organization*, 18(1), pp. 45-52, February 2001.

[104] The key parameter is the elasticity of the price elasticity of demand, the degree to which the price elasticity of demand changes as prices increase. *See*, e.g., Cotterill, Egan, and Buckold, 2001; Theon van Dijk and Frank Verboven, "Quantification of Damages," ABA Publications in Antitrust, 2005; Hepburn et. al., 2013, pp. 2331-2348.

[105] *See* Cotterill, Egan, and Buckold, 2001. Cited nonprice strategies include advertising and product differentiation (p. 52).

case with the mobile device and electronics industries), may increase prices by amounts

exceeding, equaling, or falling short of 100 percent of a cost change.[106]

132.   It is undisputed that overshifting (i.e., increasing prices by more than 100

percent of a change in the cost of production) is possible in markets with many suppliers of

differentiated products and easy entry and exit, an environment known as monopolistic

competition. Overshifting would be expected in industries where firms produce differentiated

products in monopolistically competitive conditions, and face economies of scale—that is,

where their average cost of producing a product declines with level of output.

133.   There have been many studies of the price for smartphones, most of which use

the hedonic methods that I employ below.[107] These and other empirical studies often have

---

[106] *See*, *e.g.*, Simon P. Anderson, André´ de Palma, Brent Kreider, "Tax Incidence in Differentiated Product Oligopoly," *Journal of Public Economics* 81, pp. 173-192 (2001).

[107] Wook Joon Kim, "Analyzing the characteristic determinants of smartphone post-paid pricing in South Korea 2010-2015," Korea Information Society Development Institute, ICT Statistics Center, August 15, 2015. Chiraz Karamti and Nejib Haouech, "Introducing Hedonic Quality Adjustment in the Official Price Statistics: Evidence from the Tunisian Smartphones Market," Conference Paper, Conference: 61st ISI World Statistics Congress (WSC), At Marrakech, Morocco, January 2018. Rodrigo de Santi and Claudio R. Lucindam "Hedonic Analysis of Cell Phones Sold with Post-Paid Service Plans in Brazil, *Revista de Administração de Empresas* 52(4), pp. 435-447, August 2012. James Wells and Ainslie Restieaux, "Review of Hedonic Quality Adjustment in UK Consumer Price Statistics and Internationally," Office for National Statistics. José A. Montenegro and José L. Torres, "Consumer Preferences and Implicit Prices of Smartphone Characteristics," Málaga Economic Theory Research Center Working Papers, WP 2016-4, November 2016. U.S. Bureau of Labor Statistics, "Measuring Price Change in the CPI: Telephone Hardware, Calculators, and Other Consumer Information Items," Fact Sheets, last updated May 10, 2018. Erica L. Groshen, Brian C. Moyer, Ana M. Aizcorbe, Ralph Bradley, and David M. Friedman, "How Government Statistics Adjust for Potential Biases from Quality Change and New Goods in an Age of Digital Technologies: A View from the Trenches," *Journal of Economic Perspectives*, vol. 31, no. 2, Spring 2017, pp. 187–210. FEDS Notes, December 5, 2016. Anna Król, "An Investigation of Hedonic Methods Applicability to Analyzing Prices of Various Groups of Durable Goods," *Econometrics* (49) 2015, pp. 33-44. Marta Dziechciarz-Duda and Anna Król, "The Analysis of Consumers' Preferences with the Application of Multivariate Models: Hedonic Regression and Multidimensional Scaling," Kit Scientific Publishing, vol. 2, no. 1, 2017. Zheng-Sheng Lin and Chih-Cheng Chen, "An Analysis of the Economic Value of Mobile Phone in Taiwan, *Journal of Asia Pacific Business Innovation & Technology Management*, 003 (2013), pp. 077-084. Ralf Dewenter, Justus Haucap, Ricardo Luther, and Peter Rötzel, "Hedonic Prices in the German Market for Mobile Phones," *Telecommunications Policy* 31 (2007) pp. 4-13. Naoki Watanabe, Ryo Nakajima, and Rakanori Ida, "Quality-Adjusted Prices of Japanese Mobile Phone Handsets and Carriers' Strategies," *Review of Industrial Organization* 36(4), pp. 391-412, June 2010. Arja Kinnunen, "Hedonic Method is Practicable in CPI Compilation, Statistics Finland, Paper for the 4th International Conference of the Ottawa Group,

---

characterized consumer electronics industries[108] (CE), which includes cellular phones, as fitting the description of a monopolistically competitive industry.[109] For this reason, it would not be surprising to find that the impact of a royalty overcharge on phone prices for at least certain OEMs could be greater than 100 percent of the cost increase, in the market conditions that prevail for most, if not all, types of mass market computer and consumer electronics equipment.

134.   In short, while some degree of elevation in prices for finished goods would generally be the predicted impact of inflated royalty payments, the extent to which pass-through into finished good prices fell short of, or exceeded, 100 percent is fundamentally an empirical issue.

135.   Therefore, economic theory predicts that at least a portion of the Qualcomm royalty would increase the quality-adjusted price of cellular phones—and consequent harm to

---

Washington, 1998. Ryo Nakajima, Naoki Watanabe, and Takanori Ida, "Quality Adjusted Prices of Mobile Phone Handsets and Careers' Product Strategies: The Japanese Case," October 28, 2008. Bank of Japan, Research and Statistics Department, "Reestimation Result of Hedonic Regression Model in the Corporate Goods Price Index — Smartphones," April 2017. Bank of Japan, Research and Statistics Department, "Reestimation Result of Hedonic Regression Model in the Corporate Goods Price Index — Smartphones," April 2018. Paul D. Chwelos, Ernst R. Berndt, and Iain M. Cockburn, Faster, Smaller, Cheaper: An Hedonic Price Analysis of PDAs, NBER Working Paper 10746, September 2004.

[108] "Consumer electronics (CE) refers to any electronic devices designed to be purchased and used by end users or consumers for daily and non-commercial/professional purposes" Consumer electronics is a broad category of products that includes cell phones and computers, but also encompasses electronic products such as televisions, DVD players, and refrigerators (https://www.techopedia.com/definition/757/consumer-electronics-ce, viewed May 31, 2018). These products frequently can be connected to the Internet.

[109] See for example, R. L. Feenstra, "New Evidence on the Gains from Trade," *Review of World Economics/Weltwirtschaftliches Archiv*, December 2006; Feenstra, *Product Variety and the Gains from International Trade*, chap. 2, (Cambridge: MIT Press, 2010; A. Waxell and J. Jansson, "Sound Affects: Competing with Quality in the Swedish hi-fi Industry," *Industry and Innovation*, 20(4), 2013; J. L. Burrow and A. R. Fowler, *Marketing*, 4th Ed., Cengage, 2016, p. 81. See
https://books.google.com/books?id=WmOOBAAAQBAJ&pg=PT96&lpg=PT96&dq=%22consumer+electronics%22+%22monopolistic+competition%22&source=bl&ots=JGG9rgdpjN&sig=WefFMUazGxzrvS4Y-acnrX9idtQ&hl=en&sa=X&ved=0ahUKEwj75u3yjujbAhXCxFkKHQdiBwA4ChDoAQhBMAQ#v=onepage&q=%22consumer%20electronics%22%20%22monopolistic%20competition%22&f=false

consumers would be the predicted outcome of successful extraction of a supra-FRAND royalty. Therefore, if Qualcomm's royalty rate was elevated above the FRAND rate, then harm to consumers would be expected based on the theoretical economic literature.

### 2. Empirical Studies in the Economics Literature Provide Broad Support for Pass-Through of Changes in Industry-Wide Costs

136.   Economists have repeatedly done empirical studies on the precise extent of pass-through of costs in numerous industries. I will focus my review of the relevant literature on empirical studies of the extent to which industry-wide taxes are passed through, as the Qualcomm royalty that is assessed on the net sales price of OEM devices functions in the same way as an industry-wide tax.[110] Each of these studies have found that changes in taxation rates result in at least partial pass-through in the form of increased prices.

137.   Analyzing the pass-through of cigarette taxes, Sullivan and Dutkowsky (2012) conclude that a $1 increase in the state excise tax will increase cigarette prices by $1.10 to $1.14 and that a $1 increase in a city or county level excise tax will increase prices by $1.07. Sullivan and Dutkowsky report similar findings for both premium and generic cigarette brands. Sullivan and Dutkowsky also summarize the relevant literature—which generally concludes that cigarette taxes are passed through in the form of increased prices, although some studies find pass-through rates below 100% (undershifting) and other studies find pass-through rates above 100% (overshifting):

> Ashenfelter and Sullivan (1987) find that excise tax increases do not consistently lead to increased cigarette prices. The results of Sumner and Ward (1981); Harding, Leibtag, and Lovenheim (2010); and Chiou and Muehlegger (2010) indicate that prices are

---

[110] I understand that ███████████████████████████████████████████████████████

undershifted to consumers, that is, prices do not go up by the full amount of the cigarette tax. Sumner and Wolgenant (1985) and DeCicca, Kenkel, and Liu (2010) generally find that taxes are fully shifted to consumers; that is, prices go up by the exact amount of the tax, although some estimates from the latter study point to undershifting. On the other hand, Barzel (1976), Johnson (1978), Harris (1987), Coats (1995), Keeler et al. (1996), and Hanson and Sullivan (2009) find evidence of overshifting; that is, prices to consumers go up by more than the amount of the cigarette tax. Delipalla and O'Donnell's (2001) study with cross-country data yields mixed results, with some evidence pointing to overshifting and other findings indicating that undershifting [less than 100% pass-through] occurs.[111]

138.   In the thorough literature review by Sullivan and Dutkowsky, only one study, Ashenfelter and Sullivan (1987), did not find pass-through. However, turning to the actual 1987 Ashenfelter and Sullivan study, these authors note in their conclusion that "One explanation for these anomalies that we have investigated thoroughly attributes them to measurement error. Indeed, more careful measurement does tend to confirm that tax increases *are* typically associated with price increases and, to a lesser extent, sales decreases."[112]

139.   Besley and Rosen (1999) performed an empirical study of the extent to which differences in the tax rates of various U.S. cities affect the price of various commodities while controlling for other factors, such as costs, that also affect prices. Besley and Rosen used quarterly price indices for 12 different types of retail products in 155 different U.S. cities. The retail products were one pound of bananas, a 24-oz. loaf of bread, a Big Mac Quarter Pounder with Cheese, a three pound can of Crisco, one dozen large Grade A eggs, 200 count pack of

---

[111] R. Sullivan and D. Dutkowsky, "The Effect of Cigarette Taxation on Prices: An Empirical Analysis Using Local-Level Data," *Public Finance Review* vol. 40, no.6 (2012), p. 688.
[112] Orley Ashenfelter and Daniel Sullivan, "Nonparametric Tests of the Market Structure: An Application to the Cigarette Industry, *Journal of Industrial Economics,* vol. 35, no. 4 (June 1987), pp. 483-498 at pp. 496-497, emphasis in original.

Kleenex facial tissues, a ½ gallon carton of milk, the Monopoly board game, an 11 oz. bottle of shampoo, one liter of Coke, spin balances for two tires, and a three pack of underwear. Besley and Rosen find pass-through of taxes for each of the products that they examine and for certain commodities, "taxes are overshifted – a ten cent increase in the revenue extracted from the sale of these commodities leads to an increase in their prices of more than a dime."[113]

140.  Karp and Perloff (1989) studied the rate at which a 15 percent tax on Japanese television sales was passed through to consumers.[114] Televisions have a high degree of branding and product differentiation, but display a substantial amount of competition across producers and a degree of substitutability across brands. Karp and Perloff examined this oligopolistic market estimating the rate at which this tax was passed through to purchasers. Karp and Perloff found that overshifting of the 15% tax had occurred. They estimated that it was passed through to consumers at a rate of 118.8% for color televisions and 104.0% for black and white televisions.

141.  Poterba (1996) studies the rates at which retail prices in the United States change in response to changes in state and local tax rates.[115] Poterba analyzes two data sets: (1) a 30-year panel data set from 1947 to 1977 on the prices of men's and women's clothes and personnel items for eight different cities; and (2) a 15-year panel data set on clothing prices in thirteen cities between 1925 and 1939. Poterba estimated product-specific pass-through rates between 84 and 133 percent in response to tax changes for the first data set and a pass-

---

[113] Timothy J. Besley and Harvey S. Rosen, "Sales Taxes and Prices: An Empirical Analysis," *National Tax Journal*, vol. 52, no. 2 (June 1999), pp. 157-178 at 175.
[114] Larry S. Karp and Jeffrey M. Perloff, "Estimating Market Structure and Tax Incidence: The Japanese Television Market," *Journal of Industrial Economics* vol. 37, no. 3 (March 1989) pp. 225-239.
[115] James Poterba, "Retail Price Reactions to Changes in State and Local Sales Taxes," *National Tax Journal*, Vol. 49(2) (June 1996), pp. 165-176 at https://ntanet.org/NTJ/49/2/ntj-v49n02p165-76-retail-price-reactions-changes.pdf?v=%CE%B1.

through rate average of 61 percent for the second data set. Poterba also noted that prior studies of product-specific sales taxes had frequently found high rates of pass-through:

> there have been other analyses of how product-specific excise taxes affect consumer prices. Due's (1954) study of the 1954 reduction in federal excise taxes on electrical appliances suggested that retail prices fell by more than the price cut (overshifting). Browlee and Perry (1967) and Woodard and Spiegelman (1967) studied the 1965 reduction in federal excise taxes and found that most manufacturers reduced prices by the full amount of the excise tax reduction, although they present some examples of less-than-complete forward shifting. Harris (1987) analyzed the change in cigarette prices that coincided with the 1983 increase in the federal cigarette excise tax and found evidence of significant overshifting."[116]

Professor Poterba concluded that "This paper presents evidence that broadly supports the view that retail sales taxes are fully forward shifted, raising consumer prices by the amount of the tax increase."[117]

142.   Analyzing the pass-through of alcohol taxes on prices, Kenkel (2005) summarizes his findings: "This study of the Alaskan tax hike provides evidence that alcohol taxes are more than fully passed through to beverage prices. The general pattern of results is consistent with the limited evidence from earlier studies. In addition, this study provides the first evidence that taxes are over-shifted in both on-premise and off-premise establishments, and that the pass-through patterns are similar across most popular brands of beer, wine, and spirits."[118]

---

[116] James Poterba, "Retail Price Reactions to Changes in State and Local Sales Taxes," *National Tax Journal*, Vol. 49(2) (June 1996), pp. 165-176, 166.
[117] James Poterba, "Retail Price Reactions to Changes in State and Local Sales Taxes," *National Tax Journal*, Vol. 49(2) (June 1996), pp. 165-176, 173.
[118] Donald S. Kenkel, "Are Alcohol Tax Hikes Fully Passed Through to Prices? Evidence from Alaska." *American Economic Review*, 95(2) (2005), pp. 273-277, at 276.

143. Doyle and Samphantharak (2006), in a National Bureau of Economic Research working paper, studied temporary tax suspensions by Indiana and Illinois of their 5% sales taxes on gasoline. Indiana and Illinois suspended the taxes for 120 days and 6 months respectively.[119] They note that the predicted effect is ambiguous because the gasoline market it is imperfectly competitive as it is spatially-differentiated. The authors found that 70% of the tax cut was passed through to consumers in the form of decreased prices even though the tax cut was temporary and supply for gasoline is considered to be inelastic.

144. Delipalla and O'Donnell (2001), studied the extent to which changes in cigarette taxes were passed through in various European countries. Delipalla and O'Donnell found examples of both overshifting and undershifting. In one set of Northern European countries with similar market structures and cigarette quality, the authors found that changes in taxes were shifted at rates of 72 and 92% respectively depending on whether the tax was assessed on an ad valorem or specific basis. In a second set of Southern European countries the authors found that taxes were overshifted, at rates of 147% and 216% depending on whether the tax was assessed on an ad valorem or specific basis. The authors noted that the higher overshifting in the Southern European countries was consistent with the structure of those markets, which featured a fewer number of firms and thus implied less competitive behavior. The authors also reviewed theoretical literature that notes that an increase in ad valorem taxes (i.e. taxes assessed based on a % of the sales price) will serve as a disincentive to improve quality where

---

[119] J. Doyle and K. Samphantharak, "$2.00 Gas! Studying the Effects of a Gas Tax Moratorium", *NBER Working Paper* 12266 (2006).

that quality is reflected in price and "is likely to lead to a reduction in quality and consequently, a price rise lower than the amount of the tax increase."[120]

145.   Carare and Danninger (2008), in an International Monetary Fund Working Paper, studied an increase in the standard value added tax rate in Germany from 16% to 19% that was applied to all goods in Germany.[121] The authors found a total pass-through percentage of around 73%.

146.   Pless and Van Benthem (2017) studied the extent to which industry-wide solar subsidies in California were passed through to purchasers of solar systems.[122] The authors found that the subsidies were passed through at a rate of 86 percent to consumers who purchased solar systems and found that there was overshifting in the passthrough of solar subsidies to consumers who leased, finding a passthrough rate of 165 percent for this type of consumer. The authors note that this is the first study of passthrough rates in markets where consumers lease rather than purchase the good upon which passthrough is being measured. The authors also outline a theoretical model in which overshifting is a sign of market power.

---

[120] Sophia Delipalla and Owen O'Donnell "Estimating Tax Incidence, Market Power and Market Conduct: The European Cigarette Industry," *International Journal of Industrial Organization,* 19 (2001) pp. 885–908, at p. 893.
[121] A. Carare and S. Danninger, "Inflation Smoothing and the Modest Effect of VAT in Germany," International Monetary Fund (IMF), Working Paper no. WP/08/175, 2008.
[122] Jacquelyn Pless and Arthur Van Benthem, "The Surprising Pass-through of Solar Subsidies," Discussion Paper Series DP11908, March 14, 2017 at https://cepr.org/sites/default/files/FreeDP_19_March.pdf

**C.  The Qualcomm Royalty Was a Significant Component Cost of Cellular Phones that, According to Qualcomm's Own Documents, Raised the Actual Prices of Cellular Phones**

**1.      The Qualcomm royalty was a universally known component cost in the cellular phone industry**

147.   The Qualcomm royalty was a known and significant component cost in the cellular phone industry. Qualcomm, OEMs, and wireless carriers ███████████ each included the Qualcomm royalty in their calculations of the total costs of cellular phones.





150. ████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████ See **Figure 3**.

**Figure 3:** 



Source: ███████████████

151. ████████████████████████████████

████████████████████████████████████████

████████████





152.  In fact, ████████████████████████████████████████████

153.  ████████████████████████████████████



154.

155.



156. ████████████████████████████████████

157. ██████████████████████████████████, as

included in **Figure 4**.

**Figure 4:** ███████████████████



Source: ████████████

158.   Sophisticated large purchasers of cellular phones also understood that the

Qualcomm royalty was a known cost of manufacturing cellular phones. For example, ██████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████   See **Figure 5**.

Highly Confidential—Attorneys' Eyes Only      81

**Figure 5:** 



Source: 

### 2. Documentary Evidence Shows Qualcomm knew its Royalty elevated Device Prices

159.   Consistent with empirical studies finding that changes in the tax rates on an input would lead to price changes in the price of a final product, documentary evidence shows that Qualcomm itself understood that its high royalty rates were passed through to consumers in the form of elevated phone prices.

160.



[133]

"[134]

161.

[135]

[136] Contract

manufacturers avoided being stuck with costs they could not pass through to customers in this very competitive marketplace, as would happen when the exact same phones were available for $5.00 less per unit.

162.   The relationship of competition and pass-through in non-U.S. markets is reflected in



137.

163.

138

164.  In 

165.  In the same

Elsewhere,

3.      **Cellular Phone Manufacturers testified that the Qualcomm royalty raised the price of cellular phones and limited the ability of manufacturers to increase quality.**

166.   Numerous witnesses from relevant device manufacturers testified regarding the effect that the Qualcomm royalty component cost has on the quality-adjusted prices of cellular phones.





169.



170. 



171.  Similarly, 

172.

147



173. 



**D. The Qualcomm royalty component cost inflated the total costs for cellular phone manufacturers and therefore reduced the quality of features that OEMs could otherwise have included in the device.**

175.  As discussed above, the Qualcomm royalty was one of the component costs for

cellular phones. I understand that the reports of Einar Elhauge and Michael Lasinski, show that

in the but for world where Qualcomm's anticompetitive activity had not occurred, the

---

Qualcomm royalty cost would have been significantly lower. As set forth above, documentary

evidence from Qualcomm and cellular phone manufacturers show that one method for OEMs

to pass on the royalty component cost was by increasing the price of the cellular phones. In

addition, ███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ During the relevant period, costs for key cellular

components such as the display and the camera, were rapidly declining. Because of intense

competition in the cellular industry, OEMs responded to these component cost changes by

lowering the quality-adjusted prices of devices throughout the period in the actual world—each

year, consumers got more value for their dollar by purchasing a better phone for less money. In

the but for world where OEMs paid a far lower Qualcomm royalty component cost, they would

have been able to improve the quality and competitiveness of the other components of cellular

phones at a faster rate while still selling devices for the same nominal price.

1.    **In general, OEMs passed through rapidly declining component costs during the relevant period through decreases in the quality-adjusted prices of cellular phones**

176.  The industry for cellular phones is extremely competitive with manufacturers

competing on both prices and features.[151] ███████████████████████

---

[151] *For example*, Eva Dou and Min-Jeong Lee, "Smartphone Makers Hit by Rising Competition," *The Wall Street Journal,* July 7, 2013: "Samsung Electronics Co.'s weaker-than-expected earnings guidance for its second quarter and tepid results from HTC Corp. show that high-end smartphone makers are starting to see growth taper amid intense competition and cheaper devices flooding the market." Aaron Pressman, *Fortune,* September 5, 2017: "Apple will unveil its newest iPhones in one week, and possibly an upgraded smartwatch, as well. But the rest of



New products are constantly improving, leading an industry observer to write, "With technology evolving so rapidly, manufacturers are packing as much as they can into these phones until they almost seem like mobile computers."[153] Similarly,

177.   OEM witnesses testified about how they closely monitored competitors and adjusted product quality in response.

the industry has been trying to anticipate Apple's moves with new phones and watches of their own. And the competition is bringing more useful new features to consumers than ever."

[152]

[153] Moutaz Shideed, "Wireless Telecommunications Carriers," at http://www.sbdcnet.org/small-business-research-reports/wireless-telecommunications-carriers, undated. Viewed June 3, 2018.

[154]



155

178.



179.  Indeed, ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████[157]█████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████"[158]; and ███████████

███████████████████████████████████████████

███████████████████████[159]

180.  Competition drives quality improvement because higher quality cellular

components are valued by consumers, as confirmed by █████████████████ See

**Figure 6**. ████████████████████████████████████

████████████████████████████████████████████

---

[156] █████████████████████████████
[157] ████████████████████████
[158] ██████████████████
[159] ████████████████

█████ "160 ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ 161



Source: ████████████████████

181.   This documentary evidence of competition between manufacturers driving

quality improvements is corroborated by extensive empirical evidence that quality-adjusted

prices of mobile phones declined steadily over the class period as component costs fell and

---



manufacturers improved quality. For example, while it includes non-cellular phones and other items, the Bureau of Labor Statistics price index for "telephone hardware, calculators, and other consumer information items" declined 7 percent per year between 2011 and 2017.[162]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████ "[163] Analysis of prices must account for these quality changes. ████████████

██████



.[164]

████████████████████████████████████████████████

████████████████████████████████████.[165] I estimate quality-adjusted prices by

---

[162] Series CUUR0000SEEE04, Telephone hardware, calculators, and other consumer information items in U.S. city average, all urban consumers, not seasonally adjusted, https://www.bls.gov/data/. See SeriesReport-20180530045315_3c9195_Edited.xlsx. According the BLS, "[t]he index for telephone hardware, calculators, and other consumer information items reflects price changes for a wide variety of telecommunications items. The sample breakdown for this category is approximately 50 percent cell phones and 50 percent other items within the category. Within cell phones, approximately 90 percent are smartphones, with the remainder composed of feature or basic phones (https://www.bls.gov/cpi/factsheets/telephone-hardware.htm, May 30, 2018)."

[163] ████████████████████████████████████████

[164] ████████████████████████████████████████

[165] ████████████████████████████████████████

using a matched model price index for phones in the ███████████████████████ [166]

These phones show annual quality-adjusted price declines of 22% between 2010 and 2017, implying that a phone that cost a retail customer $400 in 2010 would only have cost $57 by the end of 2017. I graph the matched model price index I calculate for retail sales in **Figure 7**.

**Figure 7: Fisher Price Index for Retailer Prices**



Source: ███████████████████████████████████
███████████████████████████

---

[166] For the calculation of the retailer price index, I include phones in retailer data identified as prepaid phones, unlocked phones, and other phones that were not associated postpaid plan sales.

182.   These price trends were enabled by reductions in phone input costs. An

exemplary analysis of the cost trends of major components used in ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████ See

**Figure 8**.

**Figure 8: Fisher Cost Index for** ████████████████



Notes: Figure depicts the Fisher Index ██████████████████████████
████████████████████████████

183.   Qualcomm ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

[REDACTED] [167]

[REDACTED]

[REDACTED]

184.   In other words, the impact of quality improvement on smartphone prices over this period was roughly the same magnitude as the decline in the average nominal price of a handset. Consumers bought handsets that were 30% cheaper at the end of this period than its beginning. Taking into account the new features that became available in the latter part of this time period, however (that is, controlling for these new phone characteristics), the decline in handset prices was twice as great. That is, a handset with 2010 features would have been 60% cheaper at the end of the period.

185.   Thus, two things happened in the smartphone market. A larger share of consumers shifted their mobile phone purchases, on average, to phones with cheaper nominal (money) prices as prices came down. But this shift was also driven by the fact that these cheaper phones had better performance characteristics than phones previously sold at much higher prices. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[167] [REDACTED]

[REDACTED]

Highly Confidential—Attorneys' Eyes Only



186.  The competition in the mobile phone industry during the period drove the

reduction in quality-adjusted prices set forth above.[169] This "pace of innovation" is illustrated in

■■■■■■■■■■■■■■ as presented in **Figure 9** below. ■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

_____

[168] ■■■■■■■■■■■■■■■■■■■■■■■■
■

[169] For example, ■■■■■■■■■■■■■■

**Figure 9**



Source: ███████████

187. █████████████████████████████████

████████████████████████████████████

███████████████ **Figures 10-13**. █████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

Highly Confidential—Attorneys' Eyes Only      102

188. 

**Figure 10:** 

Source:

Highly Confidential—Attorneys' Eyes Only      104

**Figure 11:** 



Source:

**Figure 12:** 

Source:

**Figure 13:** 



Source:

189.   The decline in quality-adjusted prices meant that by the end of the relevant period, consumers could buy a phone with better features for a lower price than at the beginning of the period. For example, the iPhone 4 released in 2010 had an initial retail price of $599 when purchased through AT&T without a service contract. Today, a consumer can purchase an unlocked entry-level smartphone, such as the Moto G6, with vastly superior features (including a bigger, better screen, a higher megapixel camera, more memory storage, and a bigger battery) for only $249, as shown in **Table 9** below.

**Table 9: Price-Adjusted Phone Quality Has Improved Over Time**

|  | iPhone 4 (2010) | Moto G6 (2018) |
| --- | --- | --- |
| No Contract Price | $599 | $249 |
| Screen Size | 3.5 inches | 5.7 inches |
| Screen Resolution | 640x960 pixels | 1080x2160 pixels |
| Pixel Density | 326 ppi | 424 ppi |
| Primary Camera | 5 megapixels | 12 megapixels |
| Secondary Camera | 0.3 megapixels | 8 megapixels |
| Built-in Storage | 16 GB | 32 GB |
| System Memory | 0.5 GB RAM | 3 GB RAM |
| Battery Capacity | 1420 mAh | 3000 mAh |

Sources:
iPhone 4 initial price: https://www.lifewire.com/cost-of-an-iphone-4-579993, viewed 6/28/2018.
Moto G6 current price: https://www.techradar.com/news/phone-and-communications/mobile-phones/best-cheap-smartphones-payg-mobiles-compared-1314718, viewed 6/28/2018.
Characteristics: https://www.phonearena.com/phones/Apple-iPhone-4_id4586;
https://www.phonearena.com/phones/Motorola-Moto-G6_id10788, viewed 6/28/2018.

**2.      Cellular Phone Manufacturers and Wireless Operators carefully consider even minor costs.**

190.   OEMs carefully evaluate the cost of producing various phone configurations.

██████████████████

███████████████████████████



This process is further exemplified by ███████████████████████
███████████████████████████████████████████████[172] In
this document, ███████████████████████████████████████████
███████████████████████████████████████
███████████████[173]

191. ███████████████████████████████████████████

███████████████████████

███████████████████████████



192.

193. 

194. Qualcomm itself used cost goals in its own designs setting costs for chipsets that allowed it to achieve certain margins. ███████████████████████████

████████████████████████████████████s.[177]█████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████████

---

[176] █████████████████████████████████

[177] QNDCAL04730223_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY, slides 25-30.

████████████████████████████████████████████████████

████████████████████████████████ [178]

195.   OEMs also receive cost goals from wireless carriers, who issue regular guides to manufacturers that describe the features carriers would like to provide in handsets targeted to different consumer segments in particular tiers or "price bands." ████████████████

████████████████████████████████████████████████████

██████ .[179] In response to these RFPs, cellular phone OEMs offer configurations that best achieve the reseller's feature preferences while also trying to meet the reseller's cost goal. The cost goal (that is, the price charged by the OEM to the reseller) is designed to allow the reseller to make an adequate profit on the sale—which for carriers is evaluated in terms of the sale of phones and services, while simultaneously maintaining an adequate profit margin for the OEM. Thus, the OEM will likely have two cost targets to meet, the reseller's price to final buyers, designed to allow the reseller to make its required profit margin, and the OEM's own internal cost, which must be low enough to allow it to make an adequate profit.

196.   Each of the four wireless carriers also set cost targets for phones at particular tiers that they expected cellular phone manufacturers to meet. ████████████████

████████████████████████████████████████████████

**Figure 14**, ██████████████████████████████████████████

████████████████████████████████████

---

[178] ██████████████████████████████████████
[179] See, for example, ██████████████████████████

**Figure 14:** ████████████████████████████████



Source: █████████████████████████

197. ████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

███████████████████████████████████ 80

198. Consistent with the ongoing decrease in quality-adjusted prices for cellular phones outlined above, ███████████████████████████████████

██████████████████████████████████████

**Exhibit 4,** ██████████████████████████████████

---

180 ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ [181] This

demonstrates the central importance to carriers of continually improving device quality and

shows the product quality characteristics that OEMs would strive to maximize at various price

tiers.

199.  **Tables 10-12** show ████████████████████████████████

███████████████████████████████████████

**Table 10:** ██████████████████████████████████████████



Sources/Notes:



MP. See, e.g., https://www.androidpit.com/smartphone-displays-explained,
http://orientdisplay.com/pdf/Resolution%20Guide.pdf,
https://www.phonescoop.com/glossary/term.php?gid=124, viewed 7/3/2018.
Screen resolution is the number of pixels on the length or width dimension, whichever is smaller. "HVGA" listed as

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

---

[181] ██████████████████████████████████████████████

**Table 11:** ████████████████████████████████



Sources/Notes:

https://www.androidpit.com/smartphone-displays-explained,
http://orientdisplay.com/pdf/Resolution%20Guide.pdf,
https://www.phonescoop.com/glossary/term.php?gid=124, viewed 7/3/2018.

**Table 12:** ████████████████████████████

Sources/Notes:

ee, e.g., https://www.androidpit.com/smartphone-displays-explained, viewed 7/3/2018.

200.  **Figure 15** gives ███████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ [182]

**Figure 15:** ███████████████████████████████



Source: █████████████

201.  ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

───────────────────────

[182] ████████████████████████████████████████████
██████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████ [83]

202.   █████████████████████████████████████████

██████████████████████   See **Figure 16**.

**Figure 16:** ████████████████████████████



Source: ██████████████

203.   ████████████████████████████████████████

███████████████████████████████████████████████

---

[183] ████████████████

██████████████████████████████████████████████████ See

**Figure 17**.

**Figure 17:** ████████████████████████████████



Source: ████████

204.  As set forth in **Figure 18**, ████████████████████████



███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████.[184]

---

[184]████████████

**Figure 18:** 



Source:

### 3.      Cellular Phone Manufacturers remove features from their devices in order to reduce total component costs for cellular phones

205.  As set forth above, cellular manufacturers and resellers strived throughout the relevant period to improve the quality, and thus competitive position of their devices in the market. At the same time, cellular manufacturers make their phones to sell to different market segments that feature different price bands. OEMs have to choose a combination of features that will allow them to profitably sell the device at that price band –

[185] As discussed above, device manufacturers rigorously

---

[185]

analyze total costs for devices sold at particular price tiers. In addition, the major U.S. mobile

telecommunications service providers also set cost goals for the devices that they purchase

from device manufacturers. The result of this process is that OEMs incorporate the most

economically competitive set of features being incorporated into phone models that are sold at

particular price bands while reducing the quality of features in order to meet cost goals and

ensure devices at particular product tiers can be profitably sold.

206.



207.

presented in **Figure 19**.

███████████████████████████████████████

██████████████████████████████████

Figure 19: ██████████████████████



Source: ██████████████████████████

208.   █████████████████████████████

█████████████████████████████████████

████████

█████████████████████████████████████

███████████████████████

██████████████████████████████████████



209.

210.

**Figure 20**,

Including

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

**Figure 20:** ████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Source: ████████████████

211.   ███████████████████████████████████

███████████████████████████████████████

████████████████████████████████ is presented in **Figure 21**.

**Figure 21:** ███████████████



Source: ███████████████

212.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████"189 █████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

───────────────────────

189 ███████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ 190

213.  OEMs also removed features in response to the cost goals set by wireless

carriers. █████████████████████████████████████

█████████████████████████████████



214. █████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████

████████████████████████



215. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [194]

216.   The interplay between the total costs for phones sold to wireless carriers and

feature sets is further shown by █████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████. [195] ████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ [196] ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ [197]

4.     **Qualcomm's own documents illustrate how cellular phone manufacturers would have chosen higher quality components in the but-for world**

217.   ███████████████████████████████████████████

██████████████████████████████████████████████████████

[194] ██████████████████████████
[195] ████████████████████████████████.
[196] ████████████████████
[197] █████████████████████████



218. ███████████████████████████████████████

███████████████████████████████████████████

219. ██████████████████████████████████████ is consistent with the

intense competition in the phone marketplace, which meant that OEMs sought to pack as many

desirable features as possible into each handset designed to be sold at a particular price tier. As

discussed in detail above, the consequence in the *but-for* world of a decline in the royalty rate would be a decrease in the quality-adjusted price of affected devices.

220.   OEMs and carriers worked to maximize product quality because of the value that consumers placed on phone characteristics. ████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████ is presented as **Exhibit 5**. ██████████████████████████████████████████████ ████████████████████████

221.   An OEM that improved the quality of a device in the but-for world through the cost savings available from a lower Qualcomm royalty component cost would be making their device more attractive to consumers. ████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ as shown in **Figure 22**.

Highly Confidential—Attorneys' Eyes Only

**Figure 22:** ███████████████████████████



Source: ████████████████

222.  In this context, one can look at ████████████████████

███████████████████████████████ See **Figure 23**. This figure ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ Using a but-for FRAND royalty rate of 0.85% instead, I

calculate that the elevated royalty amount is $9.78 for the mid-tier phone and $14.77 for the

high-tier phone. These overcharges represent the 5th largest input cost for each phone,

███████████████████████████████

**Figure 23:** 

Source:
Notes: The FRAND rate is assumed to be 0.85%.

223. ████████████████████ we can see that at the FRAND rate, an OEM

building the mid-tier phone would save $9.78, which it could have used to improve the LCD

screen and camera to high-tier levels.

█████████████████████████████. Without the $9.78 supra-FRAND royalty

payment, competition with other OEMs would have resulted in lower quality-adjusted prices,

including through the use of higher quality components.

224.  For example, ██████████████████ **Figure 22**, discussed above, █████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████ See **Figure 24**. ████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

**Figure 24:** ███████████████████████████████████████████



Source ████████████████

225.  In **Table 13**, I analyze ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████[200] In Panel C, I use the

coefficients from the cost equation to estimate the incremental cost of improving phones. I

multiply incremental improvements in characteristic values from █████████████ by the

corresponding coefficient from the cost equation. This gives the additional cost of improving a

feature from one level to the next (these values can be added to get cost changes for feature

---

[200] I conduct this exercise for illustration. My actual pass-through model and results are presented below. As is evident here, the coefficients between these regressions are related in a predictable way. That is, subtracting the cost equation coefficients from the price equation coefficients gives, roughly, the pass-through coefficients. This relationship is implied by the model I describe at greater length below.

changes spanning multiple steps). These values are comparable ███████████████████

███████████████████████████████ in the preceding **Figure 22** ████████████

████████

226.  Using this table, one can estimate █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ See **Table 13.**

Highly Confidential—Attorneys' Eyes Only

**Table 13: Demonstration of Cost of Improving Characteristics Using** ████████████████
████



Source: see ████████████████ in my backup.

227. ████████████████████████████████████████████████

████████ In **Table 14**, I compare ████████████████████████████████████



**Table 14: Average Feature Quality for** ▮▮▮▮▮

228.  In **Figure 25**, I graph the ▮▮▮▮▮

**Figure 25: Improving Quality Within Price Bands with Stable Costs Demonstrates OEMs Adjust Quality**





Notes: ████████████████████████████████████████████
████████████████ See ████████████████████ in my backup.

229. ████████████████████████████ may have come up with

substantially different phones with a lower Qualcomm royalty component cost that would have

improved sales at various price tiers. Such phones could have had lower quality in some

features and better qualities in others, but the market value of the combination of inputs would

have been higher, as captured in the relationships estimated in the hedonic model.

 presented in **Exhibit 5**, ████████████████████████

████████████████████████████████████████████████

████████████████████████ But an understanding of industry pricing relationships

(identified by economists using hedonic pricing models) and BOM reports would be the primary

tools needed by these experts.

Highly Confidential—Attorneys' Eyes Only      138

230.   This illustration is not much different than the optimization exercise that

████████████████████████████████ The difference emphasized here, and consistent with

the actual deposition testimony of OEM employees, is that OEMs also evaluate the cost of

adding features in relation to overall product costs and engage in a process of optimizing the

quality that they can profitably include in devices sold at various price tiers.

**E.   Reseller pricing strategies would not alter the pass-through of the Qualcomm royalty component cost in the form of higher quality-adjusted prices for cellular phones**

**1.      The use of rebates and other promotional pricing mechanisms do not alter the pass-through of costs**

231.   Resellers use a variety of marketing practices to drive sales.[201] These strategies

include pricing practices such as everyday low price, HiLo, focal point pricing, loss leader, door

buster, bundling, discounts, promotions, rebates, discount codes, gift card promotions, group

discounts, in-store sales, or free or reduced shipping.[202]

232.   A key point to keep in mind with such practices is that they would have occurred

in the *but-for* world as well. For example, observed prices do not reflect post-sale rebates, and

any rebates claimed by customers would have been off of prices elevated by the Qualcomm

royalty overcharge. Rebates and other promotions affecting sale price would have occurred in

*but-for* world as well, but would have been taken from a lower *but-for* quality-adjusted price.

These types of discounts from the price do not affect my estimated pass-through rates.[203]

---

[201] The discussion in this section does not include carriers' "subsidization" of handsets with the sale of service plans. The subsidy model is discussed below.

[202] See, for example, https://www.accountingtools.com/articles/2017/5/16/pricing-strategies; https://www.accountingtools.com/articles/2017/5/16/high-low-pricing; https://www.mbaskool.com/business-concepts/marketing-and-strategy-terms/3391-every-day-low-prices-edlp.html.

[203] Since such discounts would be captured in the idiosyncratic error term of my statistical model.

233.  Variation in price across outlets and customers is normal even for highly homogeneous products sold in near-perfectly competitive markets, and does not obstruct determination of a *but-for* price using the *but-for* construct used to determine injury and estimate damages. Discounts, bundled pricing, rebates, price matching, differences in customer bargaining behavior, loss leader marketing strategies, daily discounting strategies, and other potential sources of price differences are features of the market that carry over intact into the *but-for* world, where quality-adjusted prices for cellular phones are unaffected by Qualcomm's anticompetitive conduct that produced an overcharge on the royalty component cost. These factors are expressed as idiosyncratic differences from a mean price that would exist both in the presence of anticompetitive activity in the real world, and in the *but-for* world. The only difference, in the absence of a supra-FRAND royalty, is that the mean quality-adjusted price for cellular phones, on top of which the idiosyncratic deviations are layered, is lower in the *but-for* world

### 2.    Carrier subsidization pricing strategies do not stop carriers from passing through costs

234.  Carriers, or affiliated retailers, purchase phones for resale to consumers. Because these phones are typically branded and "locked" to a particular carrier's network, they are often sold at substantial discounts, or even given away for free, when bundled with a service plan. Even when they are not bundled with a service plan, locking the phone to a carrier's network creates a significant switching cost for consumers considering the use of another brand of mobile services, and an incentive for the carrier (or affiliated retailer) to

subsidize[204] the phone's price to the final consumer. One website observes, "Before you set your mind on unlocking your phone, you'll need to keep in mind that doing so isn't a fast process by any stretch of the imagination. Unlocking your phone can take several phone calls and hours of work."[205] Carriers also have conditions that consumers must meet before unlocking phones,[206] including time restrictions for phones that have been paid for up front with prepaid services: "terms require carriers to unlock a phone paid in full, or a prepaid phone in service for a year."[207] Because unlocking a phone can be a challenge, Digital Trends observes that third party unlocking services have emerged that will assist in getting unlocking codes from carriers, with prices that "range anywhere from a few dollars to around $54."[208]

235.   The cost to consumers of switching service providers helps reduce carrier "churn rates,"[209] and makes customer acquisition fundamentally important for carriers. Consequently, a great variety of discounts, installment payment plans, "free" give-aways, and other financial

---

[204] Sprint described subsidized phones as cases when it "paid the manufacturer full price of the phone but sold or gave it to you or allowed a partner like Best Buy or Radio Shack to sell or give it to you for less than it cost from the manufacturer." https://community.sprint.com/t5/Account-Billing-Payments/SOLUTION-What-is-the-Subsidized-phone-charge/ta-p/957525, viewed July 1, 2018.

[205] "How to unlock a phone on every carrier: Free yourself! How to unlock a phone from the icy hands of your wireless carrier," https://www.digitaltrends.com/mobile/how-to-unlock-a-phone-on-every-carrier/, viewed June 9, 2018.

[206] According to the current FCC web site, unlocking is voluntary, and subject to carrier conditions: https://www.fcc.gov/general/cell-phone-unlocking.

[207] "How to unlock a phone on every carrier: Free yourself! How to unlock a phone from the icy hands of your wireless carrier," https://www.digitaltrends.com/mobile/how-to-unlock-a-phone-on-every-carrier/2/, viewed June 9, 2018. Specific policies for unlocking phones vary slightly by carrier. See, for AT&T, https://www.att.com/esupport/article.html#!/wireless/KM1008728; for Sprint, https://www.sprint.com/en/legal/unlocking-your-sprint-device.html; for T-Mobile, https://support.t-mobile.com/docs/DOC-1588; for Verizon, https://www.verizon.com/about/consumer-safety/device-unlocking-policy.

[208] "How to unlock a phone on every carrier: Free yourself! How to unlock a phone from the icy hands of your wireless carrier," https://www.digitaltrends.com/mobile/how-to-unlock-a-phone-on-every-carrier/2/, viewed June 9, 2018.

[209] "The average monthly churn rate of wireless carriers refers to the average percentage of subscribers that cease to use the company's services per month." https://www.statista.com/statistics/283511/average-monthly-churn-rate-top-wireless-carriers-us/, viewed June 9, 2018.

Highly Confidential—Attorneys' Eyes Only      141

incentives are deployed by service providers to acquire customers for their network services. In principle, a carrier should be willing to sell a phone at a subsidized price as long as they can expect to recoup the subsidy through later purchases of network services.

236.   The practice of wireless carriers selling mobile devices at discounted prices might seem to call into question the pass-through of costs to such customers. In fact, carriers clearly explain that they recover device costs by charging a higher price for phone service, even to those who initially receive their phones for "free."[210] As recently observed by the industry market research firm, Strategy Analytics, "Since the 1990s, U.S. carriers, like Sprint, have been

_____

[210] The approaches mobile carriers have taken in pricing mobile devices during the class period can be broken down into four basic strategies. The first is the term contract model, the standard practice in the industry until at least 2013: "Until 2013, most postpaid subscribers signed a two-year service contract in return for receiving a significant upfront discount on the price of a handset, with service providers recovering the balance of the handset cost over the course of the contract through the higher monthly fees charged for mobile service." Federal Communications Commission, Annual Report and Analysis of the Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Eighteenth Report, December 23, 2015 (FCC 2015 Report), ¶73. Second, carriers have also offered month-to-month service, either prepaid or postpaid, without any term commitment but requiring customers to either bring their own mobile device or purchase one through the carrier at the full retail price: In 2010, AT&T stated that it "offers month to month postpaid service, with no term commitment and no ETF, and customers are free to bring their own compatible devices to AT&T's network, or purchase a new device from AT&T at the 'no commitment' price." (Letter from Robert W. Quinn, Jr., Esq., Senior Vice President-Federal Regulatory, AT&T Services, Inc., dated Feb. 23, 2010 in CG Docket No. 09-158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.) Likewise, in 2010, Sprint offered "a basic month-to-month postpaid plan whereby a customer may purchase a phone at the full retail price, without a term service agreement or ETF provision." (Letter from Vonya B. McCann, Esq., Senior Vice President, Government Affairs, Sprint Nextel Corporation, dated Feb. 23, 2010 in CG Docket No. 09-158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.) Third, it has recently become standard practice to allow customers to finance their device under an Equipment Installment Plan (EIP): By 2014, all carriers "structured customer incentives to encourage the adoption of EIPs." Federal Communications Commission, Annual Report and Analysis of the Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Seventeenth Report, December 18, 2014 (FCC 2014 Report), ¶131.) The discounts in price of non-subsidized, non-contract plans typically ranged "from $10 to $25 per month, relative to traditional contract plans with handset subsidies, depending on what data tier customers choose." (FCC 2014 Report, ¶140.) Finally, some carriers now lease mobile devices to customers, typically the latest premium models: In 2014, Sprint offered the first handset leasing program for the latest iPhone and T-Mobile followed suit in June 2015. (FCC 2015 Report, ¶83.)

locking down their smartphones to ensure they recoup their subsidy costs, using the industry's traditional 'subsidy' model."[211]

237.   A prominent method used by carriers at the beginning of the class period to recover device costs, early termination fees (ETFs), created incentives for customers to pay a high monthly rate throughout the contract term, or else effectively forced customers to pay off the full price of the device if they opted out of the term contract. Explanations of the mobile device carriers themselves confirm this understanding. In the context of an FCC investigation of ETFs, they each explained the economics of their term contract service plans in formal submissions to the FCC. The FCC summarized their statements thus: "ETFs allow them to subsidize handset purchases — including purchases of smartphones — for customers; and that wireless providers normally recover those subsidies over the life of a contract, but cannot do so when a customer ends a contract early."[212]

238.   Specifically, Verizon stated: "The overwhelming majority of Verizon Wireless customers, however, choose to commit to a term contract because they see great value in acquiring state-of-the-art wireless devices at heavily discounted prices. In exchange, consumers sign a contract that commits them to a term of service **that pays for the device** (and other costs) over time."[213] Even now, Verizon explains to its customers that its policies for unlocking prepaid devices is linked to subsidies: "Our 4G Phone-in-a-Box phones may only be used with

---

[211] Linda Sui, "Apple Will Overtake BLU in U.S. 'Unlocked' Smartphone Market," September 22, 2015, p. 3. LGEMU_0000403155-162, at 157.

[212] Federal Communications Commission, Annual Report and Analysis of the Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Fifteenth Report, June 27, 2011 (FCC 2011 Report), ¶250

[213] Letter from Kathleen Grillo, Senior Vice President, Federal Regulatory Affairs, Verizon, dated Dec. 18, 2009 in CG Docket No. 09-158 to Ruth Milkman, Chief, Wireless Telecommunications Bureau, and Mark Stone, Acting Chief, Consumer and Government Affairs Bureau, FCC. [emphasis added]

Verizon Prepaid service for 1 year from original activation date or until payments in the amount specified on the back of the Phone-in-a-Box package are added to the Prepaid account. This is to partially offset the subsidy we provide to make our 4G Phone-in-the-Box Prepaid phones more affordable to customers."[214]

239.   Likewise, Sprint explained: "The upfront discounts, the ETF, competitive monthly pricing and number of months in the contract term are all elements of the pricing structure. For instance, if Sprint did not subsidize handset devices, and sold them to customers at cost or for a profit, other elements of the pricing structure would likely change."[215] In fact, Sprint has since restructured its device and plan pricing to accommodate customers who want to own their devices outright, explaining its "Subsidized phone charge" to current customers who have opted to purchase subsidized phones with plans:

> If you were required to sign a new 2 yr contract in order to receive the phone (even a phone that is $0 up front), that phone purchase is considered subsidized. Sprint paid the manufacturer full price of the phone but sold or gave it to you or allowed a partner like Best Buy or Radio Shack to sell or give it to you for less than it cost from the manufacturer. This is known as subsidizing a device purchase.

> Newer Sprint rate plans like Unlimited Freedom are drastically less expensive because they're built around only the cost of voice, text and data services. This is because, unlike older plans, there's no portion built in for the cost of the phone. As a result, these plans pair best when customers lease their phones or purchase outright for full MSRP.

> If a customer purchases (or receives the phone for $0 at the point of activation) with a two agreement [sic], while on a newer rate

---

[214] See, https://www.verizon.com/about/print/912339, viewed June 9, 2018.
[215] Letter from Vonya B. McCann, Esq., Senior Vice President, Government Affairs, Sprint Nextel Corporation, dated Feb. 23, 2010 in CG Docket No. 09-158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.

plan like the Unlimited Freedom or Cut You Bill In Half, there is a $25 subsidized device fee applied to each line with a subsidized device as well as an Early Termination Fee if the contract terms are not fulfilled.

Unless you are paying the actual MSRP of the phone with no discounts and no 2 yr agreement, you're buying a discounted or subsidized phone. Look for words like 'instant discount' or 'with two year agreement' as an indicator that phone purchase is subsidized by Sprint and therefore subject to the $25/line fee.[216]

240.   Describing its ETFs, AT&T indicated: "ETFs make [the] bargain—bundled discounts in exchange for term commitments—more efficient by giving consumers an option to reduce their contractual obligations while providing carriers with enough predictability to make it reasonable to discount device prices in exchange for a service commitment."[217]

241.   T-Mobile's less specific statement about ETFs was also consistent with this understanding: "wireless carriers incur significant expenses to attract customers, and to activate and provide services to them. Carriers recover these costs and earn profits for their businesses through revenues agreed to under the customer's service contract."[218]

242.   It would therefore be misleading to consider the nominal price charged for a mobile device in isolation when it is heavily discounted and bundled with a term contract. As surely as "there is no such thing as a free lunch," there is no such thing as a free phone. The mobile device and mobile service are instead most helpfully analyzed together as a bundle, paid

---

[216] https://community.sprint.com/t5/Account-Billing-Payments/SOLUTION-What-is-the-Subsidized-phone-charge/ta-p/957525, viewed June 8, 2018.

[217] Letter from Robert W. Quinn, Jr., Esq., Senior Vice President-Federal Regulatory, AT&T Services, Inc., dated Feb. 23, 2010 in CG Docket No. 09-158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.

[218] Letter from Thomas J. Sugrue, Vice President, Government Affairs, T-Mobile, dated Feb. 23, 2010 in CG Docket No. 09158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.

for with a combination of an up-front payment and monthly payments over the contract term.[219]

243.   The decrease in monthly service plan charges (and elimination of ETFs) when each carrier transitioned to equipment installment plans (EIPs)—or the difference when they offer both options concurrently—further confirms that term contract monthly charges effectively included monthly device payments to recoup the carrier's up-front discount. As Analysts at Moffett Nathanson Research put it:[220]

> Equipment installment plans replace the traditional handset subsidy with a more transparent separation between the equipment and service components of a wireless offering. The underlying economics are not terribly different, and the monthly cost to the consumer is about the same either way.

244.   Of course, some consumers manage to get better deals than others on the price of their phone, taking into account discounts and the particulars of different bundles. But these same differences among consumers would also exist in the hypothetical but-for world of FRAND royalties on Qualcomm's cellular phone SEP portfolio. The discounts from carrier and retailer procurement cost—passing through into final prices—would be the same as in the "as-

---

[219] Just as in the case of unbundled mobile device sales, carriers' overall profit margins on some customers will be higher than on others. Some will get special discounts on phone service, for example. But there is no reason to think any of these varying customers were not harmed by Qualcomm's conduct. The variation in prices and margins surely would have existed but-for Qualcomm's conduct just as it did in the actual world. So, for example, T-Mobile's 2010 statement that "the amount of the discount on any particular handset may vary" does not present any special challenge to assessing pass-through beyond the typical variation in discounts in any market. (Letter from Thomas J. Sugrue, Vice President, Government Affairs, T-Mobile, dated Feb. 23, 2010 in CG Docket No. 09158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.)
[220] MoffettNathan Research: "U.S. Wireless: Removing the Rose-Colored Glasses," June 18, 2014., *cited in* FCC 2015 Report, ¶26, footnote 57.

is" world, but the phone would have a lower quality-adjusted price overall through a combination of decreased price and improved quality.

**F.   Hedonic Price Regressions Are a Standard Econometric Method**

245.   As cited above, Qualcomm experts Nevo and Willig use a hedonic price function to estimate quality-adjusted prices. This is a standard method used by economists, and government statisticians, to measure prices for differentiated high tech goods like cell phones, which have many rapidly changing dimensions of quality and are sold for only short periods of time. The hedonic approach measures the relationship between product characteristics and product prices. Economists at the German Statistical Office summarized the widespread acceptance of this method by economists and the governments they sometimes work for as follows:

> When calculating price indexes, central importance is attached to how quality changes to observed goods can be taken into account. The objective of official price statistics is to measure what we call 'pure' price changes, i.e. price movements purged of the adulterating influence of quality change. Hedonic methods, as they are now known, are special techniques for quality adjustment that have recently been incorporated into official German price statistics. They particularly lend themselves to technological goods which are subject to rapid progress and cannot be observed over a long period with the quality remaining unchanged. For hedonic quality adjustment, a good is conceptually broken down into quality features and then the influence of these features on the price is determined using regression analysis. In this way, those price changes that result only from qualitative changes to certain features can be mathematically separated from pure price changes and eliminated.

> The United States has played a pioneering role in introducing hedonic methods into national price statistics, implementing a hedonic price index for computers in the mid-1980s. Hedonic methods have since been applied to many more products in the

USA, such as housing rent since 1987, clothing since 1991, multi-family homes since 1993, digital phone systems since 1997 and television sets since 1999.[221]

246.  This method is widely accepted and used by economists and statisticians. Many government statistical and economic agencies responsible for measuring national income accounts use the hedonic method to measure quality-adjusted price for high tech products. The U.S. government's estimates of GDP, for example, use computer price indexes making use of quality adjustments from a hedonic regression model in measuring U.S. national income, as do national income accounts for other OECD countries. Two of the economists responsible for the U.S. national income accounts note that hedonic regression methods work well in that they track changes in quality-adjusted prices measured using other established methods:

> There is evidence that a 'well constructed' matched model index for rapidly changing high-tech goods could yield a price index that adequately controls for quality differences and that this price index is consistent with a quality-adjusted price index constructed using hedonic methods. Aizcorbe, Corrado, and Doms (2003) constructed price indexes for microprocessors using high frequency disaggregated data on models whose characteristics were constant over time and found that their matched model price indexes were remarkably close to those constructed using hedonic methods (table 2). Similar results were reported in Aizcorbe, Corrado, and Doms (2000) for personal computers. Silver and Heravi (2001, 2002) report similar findings using scanner data for washing machines and televisions. However, given that we often do not have the abundant data necessary to construct such a matched model price index, then the hedonic price index is the practical approach for measuring prices of

---

[221] *See* S. Linz and G. Eckert, "Introducing Hedonic Methods in Price Statistics," available at https://www.destatis.de/EN/FactsFigures/NationalEconomyEnvironment/Prices/HedonicPC.pdf?__blob=publicationFile, p. 1.

rapidly changing goods or goods that by nature are
heterogeneous (e.g. custom software or homes).[222]

247.  The Bureau of Labor Statistics also uses hedonic regression methods to estimate

U.S. consumer and producer price indexes. A vast academic research literature, including

studies I have authored, use hedonic methods to measure quality-adjusted price for computers

and other high-tech products. The use of a quality-adjusted price to analyze changes in pricing

for cell phones and mobile devices is standard in the economics literature and government

statistics.[223]

---

[222] D. Wasshausen and B. R. Moulton, "The Role of Hedonic Methods in Measuring Real GDP in the United States," (2006) *available at* http://www.bea.gov/papers/pdf/hedonicGDP.pdf, pp. 97-112, at p. 103. Note the authors compared the hedonic methods for products with high frequency data.

[223] Wook Joon Kim, "Analyzing the characteristic determinants of smartphone post-paid pricing in South Korea 2010-2015," Korea Information Society Development Institute, ICT Statistics Center, August 15, 2015. Chiraz Karamti and Nejib Haouech, "Introducing Hedonic Quality Adjustment in the Official Price Statistics: Evidence from the Tunisian Smartphones Market," Conference Paper, Conference: 61st ISI World Statistics Congress (WSC), At Marrakech, Morocco, January 2018. Rodrigo de Santi and Claudio R. Lucindam "Hedonic Analysis of Cell Phones Sold with Post-Paid Service Plans in Brazil, *Revista de Administração de Empresas* 52(4), pp. 435-447, August 2012. James Wells and Ainslie Restieaux, "Review of Hedonic Quality Adjustment in UK Consumer Price Statistics and Internationally," Office for National Statistics. José A. Montenegro and José L. Torres, "Consumer Preferences and Implicit Prices of Smartphone Characteristics," Málaga Economic Theory Research Center Working Papers, WP 2016-4, November 2016. U.S. Bureau of Labor Statistics, "Measuring Price Change in the CPI: Telephone Hardware, Calculators, and Other Consumer Information Items," Fact Sheets, last updated May 10, 2018. Erica L. Groshen, Brian C. Moyer, Ana M. Aizcorbe, Ralph Bradley, and David M. Friedman, "How Government Statistics Adjust for Potential Biases from Quality Change and New Goods in an Age of Digital Technologies: A View from the Trenches," *Journal of Economic Perspectives*, vol. 31, no. 2, Spring 2017, pp. 187–210. Anna Król, "An Investigation of Hedonic Methods Applicability to Analyzing Prices of Various Groups of Durable Goods," *Econometrics* (49) 2015, pp. 33-44. Marta Dziechciarz-Duda and Anna Król, "The Analysis of Consumers' Preferences with the Application of Multivariate Models: Hedonic Regression and Multidimensional Scaling," Kit Scientific Publishing, vol. 2, no. 1, 2017. Zheng-Sheng Lin and Chih-Cheng Chen, "An Analysis of the Economic Value of Mobile Phone in Taiwan, *Journal of Asia Pacific Business Innovation & Technology Management*, 003 (2013), pp. 077-084. Ralf Dewenter, Justus Haucap, Ricardo Luther, and Peter Rötzel, "Hedonic Prices in the German Market for Mobile Phones," *Telecommunications Policy* 31 (2007) pp. 4-13. Naoki Watanabe, Ryo Nakajima, and Rakanori Ida, "Quality-Adjusted Prices of Japanese Mobile Phone Handsets and Carriers' Strategies," *Review of Industrial Organization* 36(4), pp. 391-412, June 2010. Arja Kinnunen, "Hedonic Method is Practicable in CPI Compilation, Statistics Finland, Paper for the 4th International Conference of the Ottawa Group, Washington, 1998. Ryo Nakajima, Naoki Watanabe, and Takanori Ida, "Quality Adjusted Prices of Mobile Phone Handsets and Careers' Product Strategies: The Japanese Case," October 28, 2008. Bank of Japan, Research and Statistics Department, "Reestimation Result of Hedonic Regression Model in the Corporate Goods Price Index — Smartphones," April 2017. Bank of Japan, Research and Statistics Department, "Reestimation Result of Hedonic Regression Model in the Corporate Goods Price Index — Smartphones," April 2018. Paul D. Chwelos, Ernst R. Berndt, and Iain M.

### G.  Hedonic Pass-Through Models Demonstrate Damage

248.   As discussed in detail above, a supra-FRAND royalty, raising component costs for cellular phones, injured final consumers by raising quality-adjusted prices. The injury from an elevated nominal price in the actual world compared to a lower nominal price in the but-for world is self-evident. Impact from decreased quality is no less evident, flowing through automatically to the final purchaser. The quality portion of the injury is "baked in" to the product when designed and sold by the OEM, as it starts through the distribution chain.

249.   The key economic question is whether we can evaluate the economic value to the final consumer of the higher quality of the phones they would have purchased—at whatever prices they actually purchased phones in the as-is world—in a but-for world of FRAND royalties. Certainly, this injury would be substantial.[224]

250.   As discussed above, if we take the as-is phone design, and ask at what price that very same as-is phone design would be sold by OEMs in a but-for world of lower FRAND royalties, the estimated difference in OEM cost will be a lower bound on the market value  of the superior features that would be obtained in a phone sold by the OEM for the same price in the but-for world.

251.   I proceed by first analyzing how one can determine how OEM costs affect OEM product prices. I then establish how methods exist to establish the relationship between OEM product prices, and the prices paid by consumers. I conclude by showing how one might

---

Cockburn, Faster, Smaller, Cheaper: An Hedonic Price Analysis of PDAs, NBER Working Paper 10746, September 2004.

[224] ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

estimate a lower bound on consumer losses from Qualcomm's alleged imposition of supra-FRAND royalties on OEMs.

## H.  My Estimation Methods Provide a Common Methodology for Estimating Class-Wide Damages

252.  In this section, I present the statistical framework I use to measure the pass-through of overcharges to purchasers of cellular phones. As described above, economic theory generally predicts that prices of final goods made with a supra-FRAND royalty would be higher than in the "but for" scenario without the overcharge.

### 1.    My Basic Estimation Model

253.  My basic analysis uses a hedonic price function, which is a reduced form equation determining average equilibrium market price conditional on product characteristics. We write the hedonic price function using the following general equation[225]

(1)
$$Price = Markup(Z, D) + UnitCost(Z, C) + v$$

where Z is a vector of characteristics, D is a vector of product demand shifters, and C is a vector of product cost shifters. Typically, published empirical analysis uses linear functions to model the price impacts of Z, C, and D.

254.  Based on this framework, my basic statistical model of purchaser price takes the following form

(2)
$$Price_{it} = a_0 + a_1 * Cost_{it} + a_2 * Z_i + a_3 * Trend + v_{it}$$

---

[225] A. Pakes, "A Reconsideration of Hedonic Price Indexes with An Application To PC's," *American Economic Review*, vol. 93, no. 5, pp. 1578-1614 (2003).

where $Price_{it}$ represents the price of product $i$ in period $t$. Prices are modeled as a linear function of the product's unit cost, $Cost_{it}$. Pass-through is measured by the coefficient on the cost variable, represented by $a_1$. The pass-through model also controls for detailed product characteristics for product $i$ that affect its pricing ($Z_i$); the effect of aggregate industry factors on prices are captured using a time trend variable;[226] and a random disturbance affecting price for product $i$ at time $t$ ($v_{it}$). For carrier models, I also include control variables for the provided service contract information.

255.  Economic theory holds that it is the incremental cost of the product that is a determinant of product price.[227] The cost variable I use is the best available measure of total variable cost. For Apple, this measure is total material costs. For other OEMs, the cost variable is typically based on cost of goods sold.[228] ███████████████████████████

███████████████████████████████████████████████████████.[229]

256.  ███████████████████████████████,[230] my model controls for the following characteristics:

- Operating system

---

[226] Given that the number of individual SKUs or models available for estimation can be small, the number of variables included can significantly affect the model degrees of freedom and the precision of estimates. I have performed one-sided hypothesis tests at the 10% significance level to determine the statistical significance of pass-through estimates, see my backup.

[227] For example, Barro makes clear that initially, and whenever prices are set, marginal costs are one of the primary determinants of price. Robert J. Barro, "A Theory of Monopolistic Price Adjustment," *Review of Economic Studies* (January 1972), 39(1), pp. 18-19.

[228] ASUS's cost is calculated from total cost & quantity. HTC identifies its cost as cost of goods sold. I use LG's variable cost field. Motorola's cost is calculated from total cost of sales and units. Samsung's cost field is CGS cost.

[229] ███████████████████████████████████████████████

███████████████████████████████████████████████████████

[230] ███████████████████████████████████████████████████████

Highly Confidential—Attorneys' Eyes Only        152

- OEM
- Data speed
- Battery storage capacity
- Storage
- Design weight
- Screen size
- Camera megapixels
- MHz speed
- Download speed

257.  At each level of the supply chain, my regression models use the prices and costs from the first period a product is observed. For OEMs, these capture the prices set with carriers as they negotiate the phone configurations to be offered in retail locations, or, in the case of Apple, the price it selected for the features it included in phones to be offered in its stores and through other resellers. For carriers and retailers, using prices and costs from the first period shows the pass-through of their initial procurement costs into initial sales prices.[231]

258.  In the hypothetical but-for world, we are assuming that prices and costs evolve over time exactly as they did in the as-is world, after initial launch of the phone. The pass-through of higher costs into lower quality at the phone design and initial launch stage drives our lower bound estimates of the loss to final purchasers:  in the but-for world, as-is quality phones would be available at lower but-for prices, while higher quality but-for phones would be available at the observed as-is prices.

259.  As previously remarked, the decline in but-for price for the as-is quality phone is a lower bound on the loss to consumers from being forced to move from the hypothetical but-

---

[231] Baked in overcharges must be identified using cross-sectional price variation, which requires using the hedonic framework presented here.

for FRAND world to the as-is supra-FRAND world. Pass-through of the lower quality (relative to the FRAND but-for world) phone to every final purchaser would be automatic, "baked in" to the phone as it passed through the distribution system. Quality-adjusted prices would have been lower in the but-for world at every point in the distribution chain, and the loss from moving from that but-for world to the as-is world is underestimated by using the quality-adjusted price increase (relative to the but-for world) for an as-is world phone to estimate the value of a consumer's loss.

### 2.     My Model Provides a Common Method to Measure Pass-Through

260.   Equation (2) provides a common method to measure pass-through. I estimate pass-through rates for phones controlling for detailed product characteristics. My analysis includes vendors representing substantially all stages of the distribution chain. I use the same base model to estimate pass-through rates for contract manufacturers, OEMs, wireless carriers, distributors, online retailers, and brick-and-mortar retailers.

### I.   Empirical Studies Show Cost Shifts are Consistently Passed Through to Quality-Adjusted Prices by OEMs and Throughout the Distribution Chain

261.   Using data produced in this litigation on phone prices and costs matched with product characteristics from industry sources, I have performed multiple studies that show how differences in phone costs are passed-through into quality-adjusted prices.[232] ███████

███████████████████████████████████████████████████████████ ,

---

[232] For a summary of the data sources used in my analysis, please see the Data Appendix. Observations with price-cost ratio greater than five or less than one fifth are excluded from regressions with the following exceptions AT&T, U.S. Cellular, T-Mobile, Sprint, and Verizon. For Verizon, the screen is applied to observations that are not associated with a two-year contract. Since we are interested in the baked-in pass-through, we drop handsets that have sales at the beginning of the company data set.



.[235] I also estimate pass-through for a major cell phone distributor and a contract manufacturer.

262.  **Table 15** summarizes the average pass-through rates for each major segment of the cellular product supply chain. These pass-through rates are based on data from 19 third parties providing data in this litigation. These individual rates, when weighted together by



supply channel volume of sales, imply that 87.4% of defendant's overcharges were passed through to consumers. Below, I provide a detailed description of my analysis and results.

**Table 15: Pass-Through Summary by Segment**

|  | **Pass-through (%)** |
|---|---|
| **CM/ODM** | **104.2%** |
| **OEMs** | **106.2%** |
| **Carriers** | **76.9%** |
| **Carriers via Retail** | **91.2%** |
| **Distributor** | **89.1%** |
| **Retail: Prepaid / Unlocked** | **98.5%** |
| **Retail: Postpaid** | **101.3%** |

Sources: see **Tables 16, 17, 19, 20,** and **22**.

### 1.      Contract Manufacturers

263.   Contract manufacturers[236] (CMs) are typically "cost-plus" businesses,[237] implying they fully pass-through costs to their customers. Discussions in annual reports submitted to the

---

[236] Contract manufacturing is the "Production of goods by one firm, under the label or brand of another firm. Contract manufacturers provide such service to several (even competing) firms based on their own or the customers' designs, formulas, and/or specifications. Also called private label manufacturing." See, http://www.businessdictionary.com/definition/contract-manufacturing.html, viewed June 26, 2018.

[237] "Cost plus pricing is a cost-based method for setting the prices of goods and services. Under this approach, you add together the direct material cost, direct labor cost, and overhead costs for a product, and add to it a markup percentage (to create a profit margin) in order to derive the price of the product. Cost plus pricing can also be used within a customer contract, where the customer reimburses the seller for all costs incurred and also pays a negotiated profit in addition to the costs incurred." See, https://www.accountingtools.com/articles/2017/5/16/cost-plus-pricing, viewed June 26, 2018.

Highly Confidential—Attorneys' Eyes Only

SEC by North American ODMs/EMSs[238] help illustrate the pass-through of costs for firms

manufacturing products for OEMs. Celestica,[239] a North American EMS/ODM, illustrates in its

SEC filings that it passed costs on to its customers:

> To minimize the risk associated with inventory, we primarily order materials and components only to the extent necessary to satisfy existing customer orders and forecasts covered by the applicable customer contract terms and conditions. We have implemented specific inventory management strategies with certain suppliers, such as "supplier managed inventory" (pulling inventory at the production line on an as-needed basis) and on-site stocking programs. Our initiatives in Lean and Six Sigma also focus on eliminating excess inventory throughout the supply chain. *In providing electronics manufacturing services to our customers, we are largely protected from the risk of fluctuations in inventory costs, as these costs are generally passed through to customers.*[240]

264. Celestica also reports that it typically "require[s] the customer to purchase

unused inventory that we have purchased to fulfill that customer's forecasted manufacturing

demand."[241]

---

[238] Wistron, a company that assembles Apple products, describes itself as an ODM. See, https://www.wistron.com/CMS/Page/169, viewed June 28, 2018. In consumer electronics manufacturing, ODMs/EMSs are similar entities to CMs in that ODMs/EMSs make devices and electronics assemblies for OEMs. ODMs are "original design manufacturers" that design and manufacture electronic devices for OEMs to sell with the OEMs' branding. EMSs, or "electronics manufacturing services," are related entities that also manufacture and distribute electronic devices and component assemblies for OEMs.
[239] Celestica describes itself as "A leader in design, manufacturing, hardware platform and supply chain solutions, Celestica brings global expertise and insight at every stage of product development – from the drawing board to full-scale production and after-market services." https://www.celestica.com/about-us/who-we-are, viewed June 26, 2018. Celestica does not produce cell phones, though it does produce electronic equipment for the telecommunications industry, see, https://www.celestica.com/our-expertise/markets/communications.
[240] Celestica Form 20-F, 2011, p. 24. Emphasis added.
[241] Celestica Form 20-F, 2011, p. 22.

265.   Sanmina,[242] a Fortune 500 ODM/EMS, also describes practices that indicate a 100 percent pass-through business model, explaining in 2017 that it typically "procure[s] inventory based on specific customer orders and forecasts."[243] Sanmina further explained that "the customer typically remains liable for the cost of the materials and components we have ordered to meet the customer's production forecast but which are not used…"[244] These annual reports support the conclusion that contract manufacturers would typically pass-through all costs.

266.   Testimony and evidence produced in this litigation also support the conclusion that contract manufacturers fully pass through their costs.



---

[242] Sanmina describes itself as, "…[making] some of the most complex and innovative optical, electronic and mechanical products in the world. Recognized as a technology leader, Sanmina provides end-to-end design, manufacturing and logistics solutions, delivering superior quality and support to Original Equipment Manufacturers (OEMs) primarily in the communications networks, computing and storage, medical, defense and aerospace, industrial and semiconductor, multimedia, automotive and clean technology sectors." See, http://www.sanmina.com/company-profile/. Like Celestica, Sanmina does not produce cell phones, but does produce electronic equipment for the communications industry, See, http://www.sanmina.com/industries-contract-electronics-manufacturing/communications-networks-products-systems/products/.
[243] Sanmina 2017 10-K Report, p. 31.
[244] Sanmina 2017 10-K Report, p. 15.

Highly Confidential—Attorneys' Eyes Only



Consequently, a repo and a reverse repo represent the same transaction but from different perspectives:
From the seller's perspective, the transaction is a repo: a spot sale followed by a forward (re)purchase

269. 

270.

From the buyer's perspective, the transaction is a reverse repo: a spot purchase followed by a forward (re)sale."
https://help.sap.com/doc/020fda531198434de10000000a174cb4/3.6/en-US/4fae531918073359e10000000a421937.html, viewed June 28, 2018.



[251] See the Data Appendix for a description of ODM data.

**Table 16: Contract Manufacturer Pass-Through Summary**

Sources/Notes:
See hedonic_regression.do in my backup.
Coefficient stars indicate statistical significance: one star (*) indicates significance at the 10% level, two stars (**) at the 5% level, and three stars (***) at the 1% level.

### 2.    OEM Pass-Through

271.   I use data from six major OEMs to measure the pass-through rate for the OEM link of the supply channel. The OEMs are Apple, ASUS, HTC, LG, Motorola, and Samsung. I estimate the pass-through rate using data sets that are combined across OEMs, which improves the statistical reliability of estimates. This is a common approach. For instance, Qualcomm experts Nevo and Willig average phone prices across retailers and carriers and pool these prices across countries in their hedonic price models.[252] I estimate and rely on a single pass-through rate using the combined data, but I also estimate a model that identifies OEM-specific pass-through rates.[253] Estimates are presented in **Table 17**.[**254**]

---

[252]

[253] In this model, I interact cost with OEM dummy variables.
[254] See hedonic_regression.do in my backup.

**Table 17: OEM Pass-Through Summary**

|  | Pass-Through Rate | Statistical Results | | |
|---|---|---|---|---|
|  |  | Coefficient | Standard Error | Observations |
| **Pooled** | 106.2% | 1.062*** | 0.047 | 1,079 |
| **Apple** | 174.6% | 1.746*** | 0.219 | 1,079 |
| **Asus** | 96.1% | 0.961*** | 0.175 | 1,079 |
| **HTC** | 96.6% | 0.966*** | 0.120 | 1,079 |
| **LG** | 95.2% | 0.952*** | 0.086 | 1,079 |
| **Motorola** | 89.6% | 0.896*** | 0.265 | 1,079 |
| **Samsung** | 109.9% | 1.099*** | 0.040 | 1,079 |

Sources/Notes:
See hedonic_regression.do in my backup.
Coefficient stars indicate statistical significance: one star (*) indicates significance at the 10% level, two stars (**) at the 5% level, and three stars (***) at the 1% level.

### 3.     Carrier Pass-Through

272.   I use data from each of the 4 major U.S. carriers to measure the pass-through rate for the carrier link of the supply channel.[255] In addition, I estimate pass-through for U.S. Cellular, a regional carrier.

273.   As I discuss above, carriers use discounts, installment payment plans, "free" give-aways, and other financial incentives to acquire customers for their network services. Carriers want to minimize churn rates and increase average revenue per user (ARPU)[256] by selling phones locked to their networks and by signing customers to contracts and additional services. In principle, a carrier should be willing to sell a phone at a subsidized price as long as they can expect to recoup the subsidy through later purchases of network services. Carrier regression

---

[255] For a description of the data provided by each carrier, see the Data Appendix.
[256] "Average revenue per user or average revenue per unit (ARPU) is an expression of the income generated by a typical subscriber or device per unit time in a telecommunications network. The ARPU provides an indication of the effectiveness with which revenue-generating potential is exploited." See, https://searchtelecom.techtarget.com/definition/average-revenue-per-user, viewed June 27, 2018.

Highly Confidential—Attorneys' Eyes Only

models start with the same base model of phone characteristics used in models for other links in the supply chain, and they also include variables to control for the relationship of contracts and services to phone prices.[257] When available, ARPU (or a related measure) is included as a control variable, as it provides an additional characteristic for phone sales bundled with long term contracts.

274.   Using transaction-level data, my AT&T pass-through model controls for phone characteristics and adds control variables for contract type, plan type, and a monthly recurring charge differential. These characteristics were identified using the earliest billing records associated with the handset. Contract type includes phones sold with service contracts and those sold without service contracts. Plans are controlled for using 19 plan types, including Nation Talk, Family Talk, Mobile Share, Cricket, and Prepaid arrangements. Some plans, such as Mobile Share, can include a phone where price is below cost if an individual signed a service contract; however, these contracts came with higher monthly recurring charges than a no contract plan. In these cases, a monthly recurring charge differential was populated with the differential in monthly charge between a service contract and a no contract arrangement for the lowest tier of plan. "Wholesale" records, representing phones sold through national retailers, are excluded from my model measuring pass-through from carrier to final purchaser. I estimate a pass-through rate for wholesale records to use in the corresponding supply channel.

275.   Sprint provided quarterly data on ARPU and plan usage (e.g. minutes and megabytes) specific to a phone, so my Sprint pass-through model controls for these

---

[257] Due to differences in the format in which carrier data were provided, restrictions placed on the use of T-Mobile data, and the services sold by carriers, I have not combined carrier data. The statistical reliability of pass-through estimation could be improved by combining data.

characteristics of the phone service bundled with their handsets. Aside from the records provided for Sprint's "Boost" and "Virgin" prepaid brands, the average phone price information provided in this quarterly data is generally unreliable. As a result, I use price history information provided separately to determine the prices to consumers purchasing handsets via their "subsidy," lease, or installment billing purchase methods. Because certain prices were only available to particular customers or via particular channels (e.g. "corporate liability only" or "upgrade only"), I include controls for the various types of prices in my model. Phone models with multiple storage options are omitted from my analysis due to Sprint's failure to provide any cost information specific to storage variant, which generally vary substantially in price. Due to the resulting limited availability of complete observations with reliable measures of price, cost, and phone service characteristics, I include the earliest available observation for each given combination of phone and purchase type as long as it occurred during the first four full quarters that phone was available.

276. The data used for T-Mobile analysis are transactional. For my T-Mobile pass-through model, I control for 1,697 plans initially associated with each phone in addition to my base model. My model measuring pass-through to final purchasers uses phone sales with a listed channel type of "Direct," which excludes phones sold through indirect channels such as national retailers. I also measure a pass-through rate for indirect sales to apply in the corresponding supply channel.

277. I use transaction-level data for Verizon. Verizon did not provide transactional information on wireless plans or contract types. However, Verizon did provide national retail pricing information by the following contract types: two-year contract, device installments plans, full retail price, and phones with prepaid service. These prices are updated in roughly

one-month intervals. National retail pricing sheets also included information about promotions

and discounts. The national retail pricing sheets allowed me to identify the contract type and

promotions in the transactional data, which I control for in addition to phone characteristics.

The Verizon transactional data also indicated whether the purchase was associated with a

service plan, which I also control for in my model.

278.   I use transaction-level data for U.S. Cellular. In this model, I control for the plan

characteristics that could be inferred from a plan description field provided in the data: the

monthly recurring charge; minutes, messages, and data included with the plan, including

whether the data provided was throttled after a certain number of megabytes; and whether

the plan was prepaid or postpaid. Where U.S. Cellular provided data on the trade-in value of a

trade in phone, this was added to the nominal price of the phone to generate a net price. In

addition, when information on gift cards included with the purchase of a phone is present, the

cash value of these gift cards is subtracted from the nominal price in the calculation of the net

price used as the dependent variable in my model.

279.   In **Table 18**, I present my carrier pass-through estimates.[258]

---

[258] See verizon.do in my backup for the Verizon pass-through estimates. I also drop trade-in phone transactions.

**Table 18: Wireless Carrier Pass-Through Summary**

**1. Service Contract and No Service Contract**

| | Pass-Through | Statistical Results | | | |
|---|---|---|---|---|---|
| | Rate | Coefficient | Standard | Clusters | Observations |
| **AT&T** | 71.9% | 0.719*** | 0.087 | 516 | 13,664,267 |
| **T-Mobile** | 76.5% | 0.765*** | 0.063 | 292 | 6,301,618 |
| **Sprint** | 57.7% | 0.577*** | 0.079 | 69 | 160 |
| **U.S. Cellular** | 79.6% | 0.796*** | 0.098 | 235 | 282,145 |
| **Verizon** | 89.9% | 0.899*** | 0.034 | 191 | 5,098,281 |

**2. Service Contract**

| | Pass-Through | Statistical Results | | | |
|---|---|---|---|---|---|
| | Rate | Coeff | Std Err | Clusters | Obs |
| **AT&T** | 93.5% | 0.935*** | 0.069 | 392 | 3,364,812 |
| **Sprint** | 43.0% | 0.430*** | 0.066 | 54 | 59 |
| **U.S. Cellular** | 43.5% | 0.435** | 0.198 | 219 | 117,433 |
| **Verizon** | 90.3% | 0.903*** | 0.065 | 148 | 2,179,197 |

**3. No Service Contract**

| | Pass-Through | Statistical Results | | | |
|---|---|---|---|---|---|
| | Rate | Coeff | Std Err | Clusters | Obs |
| **AT&T** | 66.2% | 0.662*** | 0.092 | 511 | 10,299,455 |
| **Sprint** | 75.6% | 0.756*** | 0.119 | 49 | 101 |
| **U.S. Cellular** | 89.2% | 0.892*** | 0.081 | 232 | 164,712 |
| **Verizon** | 94.6% | 0.946*** | 0.049 | 167 | 2,889,754 |

**4. Indirect Sales**

| | Pass-Through | Statistical Results | | | |
|---|---|---|---|---|---|
| | Rate | Coeff | Std Err | Clusters | Obs |
| **AT&T** | 89.3% | 0.893*** | 0.035 | 493 | 5,565,237 |
| **T-Mobile** | 95.3% | 0.953*** | 0.028 | 226 | 571,416 |

Sources/Notes:
See 5_analysis_ATT.do, 2_Regression_tmo.do, analysis_Sprint.do, analysis_uscellular.do, and verizon.do in my backup.
Coefficient stars indicate statistical significance: one star (*) indicates significance at the 10% level, two stars (**) at the 5% level, and three stars (***) at the 1% level.

*Highly Confidential—Attorneys' Eyes Only*

####     4.     Distributor Pass-Through

280.   I estimate distributor pass-through using data from Brightstar,[259] a major

distributor of phones. This pass-through estimate is presented in **Table 19**.

**Table 19: Distributor Pass-Through Summary**

| | Pass-Through Rate | Statistical Results | | |
| | | Standard | | |
| | | Coefficient | Error | Observations |
|---|---|---|---|---|
| **Brightstar** | 89.1% | 0.891*** | 0.028 | 879 |

Sources/Notes:
See hedonic_regression.do in my backup.
Coefficient stars indicate statistical significance: one star (*) indicates significance at the 10% level, two stars (**)
at the 5% level, and three stars (***) at the 1% level.

####     5.     Retailer Pass-Through

281.   I use data provided by 6 major retailers to estimate retailer pass-through.[260]

Retail outlets sell mobile devices that fall into one of three categories. Retailers sell carrier-

locked phones bundled with (typically, very small amounts of "starter") prepaid minutes,

unlocked devices which customers typically can activate with the carrier of their choice, or

carrier-locked phones sold in conjunction with carrier plans. I estimate retailer pass-through

rates for each of these categories. The pass-through estimate for prepaid and unlocked phones

is estimated using data pooled across retailers. These estimates are presented in **Table 20**.

282.   For phones sold in conjunction with a carrier plan, Target provided its point of

sale revenue received from customers for the phone they purchased. Target also provided

---

[259] See the Data Appendix for a description of Brightstar's data. Brightstar is the only distributor to produce usable
data in this case. As other distributors provide data, they will be pooled with Brightstar to estimate pass-through.
[260] See the Data Appendix for a description of retailer data. Retailer data are combined to improve the reliability of
pass-through estimation.

information on the plan the customer chose and the commissions Target received from carriers for the sale of the phone and plan. To model pass-through to Target's customers, I use the sum of Target's point of sale revenue and its feature commission[261] to measure price. My model includes phone characteristics, control variables for the plan type, other commissions Target received for the sale, contract length, gift cards, and an indicator variable for carrier financing. Retail pass-through estimates are presented in **Table 20**.

---

[261] Letter from Craig S. Coleman to Rio S. Pierce, Esq., May 23, 2018. Target explains, "'Feature commissions' apply when customers agree to purchase phones using carrier financing. When carriers finance the purchase of the customer's phone, the customer pays as little as nothing to Target at the point of sale, with the carrier paying Target the transactional price of the device." While the customer does not pay the feature commission, carrier financing generally means that customers are obligated to pay the full price of the phone. The feature commission and the amount collected at the point of sale reflects the full price of the phone. I also drop negative commissions.

**Table 20: Retailer Pass-Through Summary**

**1. Prepaid or Unlocked**

| | Pass-Through | Statistical Results | | |
| | | Standard | | |
| | Rate | Coefficient | Error | Observations |
|---|---|---|---|---|
| **Pooled** | 98.5% | 0.985*** | 0.020 | 3,713 |
| **Amazon** | 94.9% | 0.949*** | 0.019 | 3,713 |
| **Best Buy** | 98.9% | 0.989*** | 0.023 | 3,713 |
| **Frys** | 99.7% | 0.997*** | 0.016 | 3,713 |
| **Newegg** | 100.1% | 1.001*** | 0.028 | 3,713 |
| **Walmart** | 126.7% | 1.267*** | 0.038 | 3,713 |

**2. Prepaid Only**

| | Pass-Through | Statistical Results | | |
| | | Standard | | |
| | Rate | Coefficient | Error | Observations |
|---|---|---|---|---|
| **Pooled** | 96.7% | 0.967*** | 0.041 | 305 |
| **Amazon** | 103.9% | 1.039*** | 0.044 | 305 |
| **Best Buy** | 94.1% | 0.941*** | 0.042 | 305 |

**3. Unlocked Only**

| | Pass-Through | Statistical Results | | |
| | | Standard | | |
| | Rate | Coefficient | Error | Observations |
|---|---|---|---|---|
| **Pooled** | 98.4% | 0.984*** | 0.021 | 3,408 |
| **Amazon** | 94.8% | 0.948*** | 0.020 | 3,408 |
| **Best Buy** | 98.9% | 0.989*** | 0.024 | 3,408 |
| **Frys** | 100.0% | 1.000*** | 0.017 | 3,408 |
| **Newegg** | 100.0% | 1.000*** | 0.029 | 3,408 |
| **Walmart** | 126.6% | 1.266*** | 0.037 | 3,408 |

**4. Postpaid**

| | Pass-Through | Statistical Results | | |
| | | Standard | | |
| | Rate | Coefficient | Error | Observations |
|---|---|---|---|---|
| **Target** | 101.3% | 1.013*** | 0.026 | 260,948 |

Sources/Notes:
See hedonic_regression.do and target_postpaid.do in my backup.
Coefficient stars indicate statistical significance: one star (*) indicates significance at the 10% level, two stars (**) at the 5% level, and three stars (***) at the 1% level.

## IV. CHANNEL-WEIGHTED PASS-THROUGH

283.   Class products are sold through different sales channels on their way to end users. In this section, I calculate the share of commerce going through each of 18 primary sales channels, presented in **Table 21**. For example, a phone manufactured by Samsung (an OEM) may be sold by Samsung to Verizon (a carrier), and then by Verizon to an end user. In **Table 21**, this sales channel would be captured by "OEM-->Carrier-->End User." As I explain below, these channel commerce shares along with the pass-through rates presented above are used to calculate the impact of Qualcomm's overcharge.

**Table 21: Shares by Channel Segment**

<u>Individual Segment Commerce Shares</u>

1. Manufacturing Channel Shares

|  |  |
|---|---|
| A. Share of OEM Own | 65.7% |
| B. Share of Manufacturing outsourced to CM/ODM | 34.3% |

2. OEM Sales Shares

|  |  |
|---|---|
| C. Direct Sales | 9.1% |
| D. Indirect Sales | 90.9% |

3. Distributor Shares

|  |  |
|---|---|
| E. Distributor | 46.4% |
| F. No Distributor | 53.6% |

4. Indirect Channel to End Purchaser Shares

|  | All | Postpaid | Prepaid | Unlocked |
|---|---|---|---|---|
| G. Carrier | 70.9% |  |  |  |
| H. Distributor | 0.2% |  |  |  |
| I. Retail | 28.9% | 18.5% | 5.8% | 4.5% |

<u>Shares by sales channel</u>
**Non-Retail Sales Channels**

|  |  |
|---|---|
| OEM-->End Purchaser | 5.9% |
| CM-->OEM-->End Purchaser | 3.1% |
| OEM-->Carrier-->End Purchaser | 42.4% |
| CM-->OEM-->Carrier-->End Purchaser | 22.1% |
| OEM-->Distributor-->End Purchaser | 0.14% |
| CM-->OEM-->Distributor-->End Purchaser | 0.07% |

**Retail Channel: Unlocked**

|  |  |
|---|---|
| OEM--> Unlocked Retail-->End Purchaser | 1.5% |
| CM-->OEM--> Unlocked Retail-->End Purchaser | 0.8% |
| OEM-->Distributor--> Unlocked Retail-->End Purchaser | 1.3% |
| CM-->OEM-->Distributor--> Unlocked Retail-->End Purchaser | 0.7% |

**Retail Channel: Prepaid**

|  |  |
|---|---|
| OEM-->Carrier--> Prepaid Retail-->End Purchaser | 1.8% |
| CM-->OEM-->Carrier--> Prepaid Retail-->End Purchaser | 1.0% |
| OEM-->Carrier-->Distributor--> Prepaid Retail-->End Purchaser | 1.6% |
| CM-->OEM-->Carrier-->Distributor--> Prepaid Retail-->End Purchaser | 0.8% |

**Retail Channel: Postpaid**

|  |  |
|---|---|
| OEM-->Carrier--> Postpaid Retail-->End Purchaser | 5.9% |
| CM-->OEM-->Carrier-->Postpaid Retail-->End Purchaser | 3.1% |
| OEM-->Carrier-->Distributor-->Postpaid Retail-->End Purchaser | 5.1% |
| CM-->OEM-->Carrier-->Distributor-->Postpaid Retail-->End Purchaser | 2.7% |

|  |  |
|---|---|
|  | 100.0% |

Sources:
1. See **Exhibit 6**.
2. See **Exhibit 7**.
3. For calculation, see file bestbuy_distributor.do
4. See **Exhibit 7**.
5. See **Exhibit 8**.

Highly Confidential—Attorneys' Eyes Only      171

284.   Manufacturing channel shares are based on Strategy Analytics data indicating

the handset manufacturing source—either made by the OEM itself (insourcing) or made by a

contract manufacturer (CM) or original design manufacturer (ODM) (outsourcing). **Table 21**

shows the relative shares of volume (based on unit shipments) made by OEMs versus

outsourced to contract manufacturers.

285.   All contract manufacturer sales go to an OEM. This OEM commerce is divided

between direct sales and indirect sales based on Strategy Analytics data. Direct sales, 9.1% of

total handset sales, are unit sales sold directly to end users by the handset OEM either via its

website or in vendor-owned or co-owned stores. Indirect sales, the remaining 90.9%, are

calculated as the combination of all other sales channel categories.

286.   The distributor share represents sales from entities such as Brightstar to other

resellers, such as retailers like Best Buy. I use a proxy measure for the market share of the

indirect sales commerce sold through distributors. I use the share of unlocked and prepaid

phone revenue associated with distributors in Best Buy's "supplier name" field.[262]

287.   As with the direct channel, the indirect channels shares are calculated using

Strategy Analytics handset channel data. Indirect sales are organized into three categories:

Carrier (the network operators such as AT&T and Verizon); Retail (such as mass merchandizers,

electronics retailers, and independent retailers, including both brick-and-mortar stores and

retailers); and distributors (sales to end users by entities such as value-added resellers and

distributors). Carrier sales comprise 70.9% of the indirect sales to end purchasers. Value-added

resellers and distributors comprise a very small share of the indirect sales to end purchasers.

---

[262] See bestbuy_distributor.do.

Using the Strategy Analytics data, I subdivide the retail commerce share of indirect sales (28.9%) into three pools—sales to postpaid end purchasers (those who purchase handsets with a postpaid service plan), sales of prepaid phones, and sales of unlocked phones. Postpaid handset retail sales comprise 18.5% of indirect sales to end purchasers, while prepaid retail comprises 5.8% and unlocked retail sales comprise 4.5% of indirect sales to end purchasers.

288.   The "Shares by sales channel" section of **Table 21** uses the individual segment commerce shares to calculate the total share of handset commerce sold through each of the specified sales channels.

289.   Cumulative pass-through rates for each distribution channel are calculated as the product of the pass-through rates at each segment of the distribution channel. These calculations are presented in **Table 22.** Pass-through estimates for each segment are presented above, with the carrier revenue weighted average pass-through rate used for the carrier segment. The pass-through rates for OEMs and Retailer-Handsets Prepaid / Unlocked use a pooled estimate from the regression models for calculation of the overall pass-through rate; however, I also provide the revenue weighted average rates for both categories for illustrative purposes. The ODM and distributor channels are based on the data of a single source and thus no pooling or weighting is applicable.

**Table 22: Pass-Through and Weights by Channel**



Sources and Notes:
(A). See **Tables 16-20**.



290. Overall pass-through is computed as the commerce weighted average of the channel pass-through rates, with the commerce weights provided by the calculations in **Table 21**. The calculation is presented in **Table 23.** The resulting channel-weighted pass-through rate is 87.4%. This overall pass-through rate is used to estimate damages to end purchasers due to Qualcomm's overcharge.

**Table 23: Calculation of Overall Channel-Weighted Pass-Through**

| | CM | OEM | Carrier | Distributor | Retail | Total pass-through rate[2] | Weight[3] |
|---|---|---|---|---|---|---|---|
| | | | Pass-through rates by sales channel segment[1] | | | | |
| **Non-Retail Sales Channels to End Purchasr** | | | | | | | |
| OEM-->End Purchaser | | 106.2% | | | | 100.0% | 5.95% |
| CM-->OEM-->End Purchaser | | 106.2% | | | | 100.0% | 3.10% |
| OEM-->Carrier-->End Purchaser | | 106.2% | 76.9% | | | 81.7% | 42.37% |
| CM-->OEM-->Carrier-->End Purchaser | | 106.2% | 76.9% | | | 85.1% | 22.11% |
| OEM-->Distributor-->End Purchaser | | 106.2% | | 89.1% | | 94.6% | 0.14% |
| CM-->OEM-->Distributor-->End Purchaser | | 106.2% | | 89.1% | | 98.6% | 0.07% |
| **Retail Channel: Unlocked** | | | | | | | |
| OEM--> Unlocked Retail-->End Purchaser | | 106.2% | | | 98.5% | 100.0% | 1.46% |
| CM-->OEM--> Unlocked Retail-->End Purchaser | | 106.2% | | | 98.5% | 100.0% | 0.76% |
| OEM-->Distributor--> Unlocked Retail-->End Purchaser | | 106.2% | | 89.1% | 98.5% | 93.2% | 1.26% |
| CM-->OEM-->Distributor--> Unlocked Retail-->End Purchaser | | 106.2% | | 89.1% | 98.5% | 97.1% | 0.66% |
| **Retail Channel: Prepaid** | | | | | | | |
| OEM-->Carrier--> Prepaid Retail-->End Purchaser | | 106.2% | 91.2% | | 98.5% | 95.4% | 1.85% |
| CM-->OEM-->Carrier--> Prepaid Retail-->End Purchaser | | 106.2% | 91.2% | | 98.5% | 99.4% | 0.96% |
| OEM-->Carrier-->Distributor--> Prepaid Retail-->End Purchaser | | 106.2% | 91.2% | 89.1% | 98.5% | 85.0% | 1.60% |
| CM-->OEM-->Carrier-->Distributor--> Prepaid Retail-->End Purchaser | | 106.2% | 91.2% | 89.1% | 98.5% | 88.5% | 0.84% |
| **Retail Channel: Postpaid** | | | | | | | |
| OEM-->Carrier-->Postpaid Retail-->End Purchaser | | 106.2% | 91.2% | | 101.3% | 98.1% | 5.93% |
| CM-->OEM-->Carrier-->Postpaid Retail-->End Purchaser | | 106.2% | 91.2% | | 101.3% | 100.0% | 3.10% |
| OEM-->Carrier-->Distributor-->Postpaid Retail-->End Purchaser | | 106.2% | 91.2% | 89.1% | 101.3% | 87.4% | 5.14% |
| CM-->OEM-->Carrier-->Distributor-->Postpaid Retail-->End Purchaser | | 106.2% | 91.2% | 89.1% | 101.3% | 91.0% | 2.68% |
| **Average** | | | | | | 94.2% | 100.0% |
| **Weighted average** | | | | | | 87.4% | |

Sources and Notes:
1. See **Tables 16-20 and Table 22.**
2. The total pass-through rate for each channel equals the product of the pass-through rates for each segment of the channel capped at 100%. For example, the total pass-through rate for the last channel for Handsets equals the **CM rate (▇▇▇▇) x OEM rate (106.2%) x Carrier rate (91.2%) x Distributor rate (89.1%) x Postpaid Retail rate (101.3%) =91.0%.**
3. The weight for each channel is the share of total revenue that flows through that channel, which equals the product of the revenue shares that flow through each segment of the channel. **See Table 21**.

# V.   DAMAGES TO CLASS MEMBERS

291.   If one applies the weighted average pass-through as demonstrated using these exemplary methods (87.4%) to measure damages on a class-wide, common basis to the total supra-FRAND royalty payments as calculated by Michael Lasinski ($5.71 billion), the result is an estimate lower bound on damages to the indirect purchaser class in the amount of $4.99 billion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 5th day of July, 2018 at Austin, Texas.

DR. KENNETH FLAMM

**DATA APPENDIX**

1.      Data were provided by third parties in a variety of formats. These data were cleaned, standardized, and when feasible combined by link in the supply chain.

2.      Data cleaning steps generally applied to each data set included exclusion of observations with missing, negative, or zero price, cost, or quantity observations, except in the case of devices sold with carrier service contracts. For these, zero-price observations were retained. For non-carrier data sets, individual price and cost observations were excluded from the calculation of quantity-weighted averages if their values exceeded five times the median value or were less than one fifth of the median value. Screens were also implemented to exclude non-phone and non-tablet products, such as watches and cases. Products were excluded if they were used, refurbished, or pre-owned.

3.      Non-carrier data used in pass-through analysis were processed and combined by link in the supply chain. OEM data were processed to the quarterly level, corresponding to the reporting level of ██████████████████. For the distributor and retailer links in the supply chain, data were processed to the monthly level. Carrier data are typically analyzed at the transactional level. ████████████████████████████████████████. Due to reporting differences, carrier data were not combined.

4.      Model descriptions provided in these data sets were used to link to phone characteristics scraped from the following industry websites: PhoneArena.com, PhoneScoop.com, and GSMArena.com. The process of identifying and matching phone characteristics to phones was both an automated and manual process. Identifying phone

Highly Confidential—Attorneys' Eyes Only

characteristics included reviewing and editing the output of algorithms that matched device descriptions from pass-through data sets to website device descriptions. Characteristics information from these websites was manually supplemented from additional sources including OEM websites, carrier websites, retailer websites, general web searches, and proprietary databases compiled by industry data aggregators, as produced by parties in this litigation.[1]

## A. OEMs

### 1. Apple

5. Apple is a consumer electronics OEM.[2] ███████████████████



---

[1] For example, see "████████████████████████████████████" Other sources include cnet.com, phonemore.com, phonesranking.com, gsmarc.com, comparecellular.com, mobilemspk.net, gsmchoice.com, gadgets.ndtv.com, pcmag.com, samsung.com, asus.com, verizonwireless.com, sprint.com, uscellular.com, amazon.com, and ebay.com.
[2] https://www.apple.com/sitemap/, viewed June 25, 2018.

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ . ████████

███████████████████████████ .[5] ████████████

████████████████████████████████████████ .[6]

### 1. ASUS

6.      "ASUS is a Taiwan-based, multinational computer hardware and consumer electronics company...."[7] ███████████████████████████████

████████████████████████████████████████████

████████████████ .[8] The provided ASUS data were used to calculate quarterly average prices and costs, which are used in pass-through estimation.[9]

### 2. HTC

7.      HTC is a mobile device OEM.[10] ██████████████████████

████████████████████████████████████████

---

[5] ████████████████████████████████████████████████
██████████████████████████████

[6] See 1_apple_price_read.do, 2_apple_boms_read.do, 3_apple_costpub_read.do, 4_apple_ModelMapCreate.do, 5_apple_model_cross_section.do, 6_apple_model_panel.do, 6b_apple_internalname_panel.do, and 6c_apple_interalname_prodctlist.do for details of this process.
[7] https://www.asus.com/About_ASUS/Company-Introduction, viewed June 24, 2018.
[8] ████████████████████████████████████████████████

[9] See 0.Read_ASUS.do and 1.Data_ASUS.do for details of this process.
[10] https://www.htc.com/us/about/, viewed June 24, 2018.

█████████████████.[11] █████████████████████████████████

████[12] The data used in pass-through analysis matches annual average cost of goods sold by

model and year to quarterly quantity weighted prices derived from transactional files.[13]

### 3.   LG

8.      LG is a manufacturer of consumer electronics, mobile communications, and

home appliances.[14] ████████████████████████████████

█████████████████████████████████████████████

████████████████████████.[15] These data were used to calculate

quarterly quantity weighted unit net sales and quarterly quantity weighted unit variable costs

for cellular products.[16]

### 4.   Motorola

9.      Motorola is a mobile device OEM.[17] ██████████████████

████████████████████████████████████████████

██████████████████████████.[18] These fields were used to calculate

average revenue and average costs by model and period.[19]

---

[11] ██████████████████████████████████████████

█[12] ████████████████████████████████.

[13] See 0.Read_HTC.do and 1.Data_HTC.do for details of this process.

[14] http://www.lg.com/global/investor-relations/company-info, viewed June 24, 2018.

[15] ████████████████████

[16] See 0.Des_LG.do and 1.Read_LG.do for details of this process.

[17] https://www.motorola.com/us/about, viewed June 24, 2018.

[18] ███████████████████

[19] █████████████████████████████████ See 0.Read_Motorola.do and

1.Data_Motorola.do for details of this process.

### 5.    Samsung

10.    Samsung is an OEM in the areas of consumer electronics, IT and mobile

communications, and device solutions.[20] ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████.[21] These data were used to calculate

quarterly quantity-weighted average prices and costs by product.[22]

## B.    ODMs

### 1.    Wistron

11.    Wistron is a manufacturer of wireless communication products including home,

mobile, automotive, and enterprise applications.[23] ████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[24] These

data were used to calculate monthly quantity-weighted average prices and costs.[25]

---

[20] https://www.samsung.com/us/aboutsamsung/home/, viewed June 30, 2018.

[21] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[22] See 1_Read_Samsung_sales.do, 2_Standardize_Samsung_sales.do, and 3_Write_model_list.do for details of this process.

[23] https://www.wistron.com/CMS/Page/175, viewed June 29, 2018.

[24] ████

[25] See 0.Read_wistron.do and 1.Data_wistron.do for details of this process.

C.      Carriers

1.      **AT&T**

12.      AT&T is one of the world's largest multinational telecommunications companies and a major provider of mobile telephone services in the U.S.[26] ███████████████

████████████████████████████████████████████████████████████

████████████████.[27] ███████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████[28] ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████.[29] ████████████████████████████████████████.[30]

2.      **Sprint**

13.      Sprint is a telecommunications company in the U.S. that provides wireless and internet service.[31] ████████████████████████████████████████████

████████████████████.[32] ████████████████████████████████████

---

[26] https://www.att.com/, viewed July 4, 2018.

[27] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[28] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[29] ████████████████████████████████████████████████████████████

[30] IMEI is a 15 digit code that uniquely identifies a cellular device. See 1a_encode_ATT.do, 1b_collapse_ATT.do, 2_read_sale_details.do, 3_merge_ATT.do, and 4_phonechars_ATT.do for details of this process.

[31] https://www.sprint.com, viewed July 4, 2018.

[32] ████████████████████████.

███████████████████████████████████████████████████████. To calculate ARPU and average usage statistics, I divide the totals by an estimate of the average number of subscribers during the quarter. Prices and unit costs are also constructed by dividing device revenue or total cost by the total device sales in a given quarter. To mitigate measurement error from using this estimated number of average subscribers,[33] I require the number of subscribers to be greater than 50. Likewise, I restrict my analysis to quarters with greater than 50 device sales, because the revenue and cost associated with a sale may not always be tallied in the same quarter in which the sale is counted.[34]

14.    ████████████████████████████████████

██████████████████████████████████████.  ████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████[35]  ████████████

███████████████████████████████████████.[36]  ████████████████████

████████████████████████████████████████[37]

---

[33] ███████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████.

[34] To avoid cases in which sales are concentrated towards the end of the quarter, increasing the chances of revenue and units being counted in different quarters, I also restrict my analysis to observations for which the phone was available during the full quarter.

[35] See clean_cost.do for details of the imputation.

[36] ████████████████████████████████████.

[37] See read_Sprint.do, write_Sprint_model_list.do, read_prices_sprint.do, merge_prices_Other.do, merge_prices_IB.do, merge_prices_Lease.do, clean_cost.do, and merge_chars.do for details of this process.

### 2.    T-Mobile

15.     T-Mobile is a multinational telecommunications company that provides wireless voice, messaging, and data services in the U.S.[38]



### 3.    U.S. Cellular

15.     U.S. Cellular is a regional telecommunications company.[41]

---

[38] https://www.t-mobile.com/, viewed July 4, 2018.
[39] ████████████████████████████████████████

[40] See 1_monthly_payment_plans.do and 2_Regression_tmo.do for details of this process.
[41] https://www.uscellular.com/, viewed July 4, 2018.
[42] ████████████████████████████████████████
[43] ████████████████████████████████████████
[44] ████████████████████████████████████████

4.      **Verizon**

16.      Verizon is a multinational telecommunications company that offers wireless

products and services throughout the U.S.[45] 

---

[45] https://www.verizonwireless.com/, viewed July 4, 2018.

[48] See 0.Read_Verizon.do, 1.Read_Prices_Verizon.do, and 2.Data_Verizon.do for details of this process.

**D.      Distributors**

**1.      Brightstar**

17.      Brightstar is a mobile device distributor.[49] 

.[50]

[51]

.[52]  Accordingly, analysis is restricted to certain order types.[53] In

addition, I apply a screen to drop SKUs with an average price or cost (over all observations) less

than $5 or greater than $5000. This screen is used to exclude non-device products or data

entries that are likely to reflect fees from delivery or other services rather than cellular devices

owned by Brightstar.[54]

**E.      Retailers**

**1.      Amazon**

18.      Amazon is an online retailer.[55]

---

[49] https://www.brightstar.com/newsroom/, viewed June 24, 2018.

[50]

[51] See read_brightstar.do for details of this process.

[52]

[53]

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[56] ███████████████

████████████████████████████. Using Amazon's sales, monthly average prices and cost of

goods sold were calculated for use in pass-through analysis.[57]

2.    **Best Buy**

19.    Best Buy is a multi-channel retailer, selling consumer electronics online and at

brick & mortar locations.[58] ██████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████.[59] ███████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[60] Best Buy's data were used

to calculate monthly quantity weighted average prices and costs by SKU for prepaid and

unlocked phones and tablets.[61] ████████████████████████████████████

---

[54] This screen drops observations representing 4.5% of the total by quantity. Nearly all the observations affected by this screen are for average price and/or cost values less than $5.
[55] https://www.aboutamazon.com/, viewed June 24, 2018.
[56] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████
[57] See 0.DescriptionsAmazon.do and 1.ReadAmazon.do for details of this process.
[58] https://corporate.bestbuy.com/about-best-buy/, viewed June 24, 2018.
[59] ████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████,█████████
████████████████████████████████████████████████████████████████
[60] See, bestbuy_distributor.do.
[61] See 1_read_best_buy.do and 2_clean_best_buy.do.

███████████████████████████████████████████████

██████████████████████████████.

### 2.    Fry's

20.    Fry's is a regional multi-channel seller of consumer electronics.[62] ████████

████████████████████████████████████████████████

███████████████████████████████[63] Fry's provided little guidance on their

data. Revenues, costs, and quantity were identified through data review. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ ████████████████████████████████

███████████████[64] ██████████████████████████████

███████████████ █████████████████████████████████

████████████████████████████ ████████████████████

██████████████████████████.[65]

### 4.    Newegg

22.    Newegg is a leading North American "tech-focused e-retailer."[66] ████████

████████████████████████████████████████████████

---

[62] https://www.frys.com/, viewed June 25, 2018.

[63] ███████████████████████████████████████████████.

[64] See, https://www.metropcs.com/content/metro/en/desktop/metro/press/company-fact-sheet.html and https://www.boostmobile.com/why-boost/prepaid.html.

[65] See 0.Frys_Descriptions.do and 1.Read_Frys.do for more details on this process.

[66] https://www.newegg.com/Info/AboutUs.aspx, viewed July 4, 2018.

Highly Confidential—Attorneys' Eyes Only      12

██████████████████████████,[67] ████████████████████████

████████████████████████.[68] These files were combined and used to

calculate monthly quantity weighted average prices and costs.[69] ████████████

██████████████████████

### 3.    Target

23.    Target is a large national retailer, selling consumer electronics both online and in

stores.[70] ██████████████████████████████████

████████████████████████████.[71] ████████████████

████████████████████████.[72] █████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████.[73] I use this information to determine the transactional

price for carrier financed phones.[74]

---

[67] ██████████████████████████
[68] ██████████████████████
[69] See newegg.do for details of this process.
[70] https://www.target.com, viewed July 3, 2018.
[71] ██████████████████.
[72] ████████████████████████████████████████
████████████████████████████████████.
[73] ████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
[74] See 1_read_target.do for details of this process.

**4.      Walmart**

24.      Walmart is a large, U.S.-based multinational, multi-channel retailer.[75] ███████

██████████████████████████████████████████████████████████

████████████████████.[76] ██████████████████████████████████

██████████████████████████████████████████████████

███████████.[77]

# CURRICULUM VITAE

## KENNETH S. FLAMM

CURRENT
POSITION        Professor and Dean Rusk Chair, University of Texas at Austin.

Fields of specialization: economic analysis of innovation in high technology industries; science and technology policy; international economics; technology modeling; applied econometrics; the computer, semiconductor, and internet industries; defense economics.

CURRENT
RESEARCH        Determinants of innovation in semiconductors, computers, and telecommunications; economics of Internet use and deployment; the economic analysis of R&D, technology, and technology policy.

PREVIOUS
POSITIONS       1995 to 1998, Senior Fellow, The Brookings Institution

1994 to 1995, Special Assistant to the Deputy Secretary of Defense (Dual Use Technology Policy) and Principal Deputy Assistant Secretary of Defense (Economic Security)

1993 to 1994, Acting Assistant Secretary of Defense (Economic Security), Principal Deputy Assistant Secretary of Defense and Special Assistant to the Under Secretary (Dual Use Technology Policy and International Programs)

1990 to 1998, Adjunct Professor, Department of Economics, The George Washington University.

1987 to 1993, Senior Fellow, The Brookings Institution.

1979 to 1987, Research Associate, The Brookings Institution.

1984 to 1989, Professorial Lecturer, Department of Economics, The George Washington University.

1979 to 1985, Assistant Professor, Department of Economics, University of Massachusetts, Amherst.

1979, Instructor of Economics, Clark University.

1978, Teaching Assistant, microeconomics, M.I.T.

Highly Confidential—Attorneys' Eyes Only

1978, Economic Advisor, Directorate of Income Policy, Ministry of Finance and Public Credit, Mexico.

1977-78, Associate Professor, Department of Economics, Instituto Tecnologico Autonomo de Mexico.

1976, Teaching Assistant, econometrics, M.I.T.

1975-76, Research Assistant, World Oil Model, Energy Laboratory, M.I.T.

EDUCATION    Ph.D., Economics Massachusetts Institute of Technology, 1979
A.B. (Honors), Economics, Stanford University, 1973

HONORS
and AWARDS   Danforth Graduate Fellowship (selected 1973)
Phi Beta Kappa (elected Junior year, 1972)
National Merit Scholar (selected 1969).
Myers Prize for Best Honors Thesis in Economics, Stanford University, (1973)
U.S. Department of Defense, Distinguished Public Service Medal, (awarded by Secretary of Defense, 1995)

MEMBERSHIPS

Senior Research Fellow, IC$^2$ Institute, The University of Texas at Austin.

Board on Science, Technology, and Economic Policy, National Research Council

Chair, Committee on Intangible Assets: Measuring and Enhancing Their Contribution to Corporate Value and Economic Growth, National Research Council

Vice Chair, Committee on Comparative Innovation Policy: Best Practice in National Technology Programs, National Research Council

Committee on the Rationale and Goals of the U.S. Civil Space Program, National Research Council

Committee on the Future of Supercomputing, National Academy of Sciences, Computer Science and Technology Board

Highly Confidential—Attorneys' Eyes Only

Committee on Capitalizing on Science, Technology, and Innovation: An Assessment of the Small Business Innovation Program, National Academy of Sciences.

Steering Group on Measuring and Sustaining the New Economy, National Research Council

Chair, NATO Science Committee Panel for Science and Technology Policy and Organization.

Economics of Innovation and New Technology, Editorial Board.

Federal Networking Council Advisory Committee.

National Research Council Steering Group on Government-Industry Partnerships.

National Research Council Steering Group on Measuring and Sustaining the New Economy.

Roundtable on the Geo Economics of Military Preparedness, Council on Foreign Relations.

Study Group on Consolidation, Downsizing, and Conversion in the U.S. Military Industrial Base, Council on Foreign Relations.

Study Group on American Commercial Diplomacy in Asia, Council on Foreign Relations.

Study Group on Defense Industry Globalization, Conversion, and the Arms Trade, Council on Foreign Relations.

Study Group on Consolidation, Downsizing, and Conversion in the U.S. Military Industrial Base, Council on Foreign Relations.

Advisory Committee, Center for Innovation Policy Research, Budapest, Hungary.

Defense Science Board Task Force on International Arms Cooperation.

Defense Science Board 1995 Summer Study.

Advisory Panel on Information Technology and Research, Advisory Panel on Multinational Firms and the U.S. Technology Base, Office of Technology Assessment, U.S. Congress.

Highly Confidential—Attorneys' Eyes Only

Panel on the Federal Role in the Commercialization of Technology, National Research Council.

Expert Advisory Panel, National Science Board Committee on Industrial Support for R&D.

National Science Foundation Advisory Committee on Data and Policy Analysis.

Expert Working Party on High Performance Computers and Communications, Organization for Economic Cooperation and Development.

Co-chair, Task Force on the Federal Role in Commercialization of New Technology; Member, Trade and Investment Advisory Committee, Council on Competitiveness.

Referee:
Science; Quarterly Journal of Economics; Journal of Industrial Economics; Rand Journal of Economics; Review of Economics and Statistics; International Economic Journal; Research Policy; Journal of Development Economics; Journal of International Economics; Science; Growth and Change; International Organization; World Development, Telecommunications Policy, Structural Change and Economic Dynamics.

Consultant (Public Sector):
National Academy of Science; World Bank, Development Research, Industry Departments; U.S. Congress, Office of Technology Assessment; Latin American Economic System; Organization for Economic Cooperation and Development; U.S. Agency for International Development; U.S. Department of Justice; U.S. Department of Defense; Mexico, Ministry of Finance; International Growth Centre; Australia, Department of Communications.

Testimony before U.S. Congress, including Joint Economic Committee; Senate Governmental Affairs Committee; House Committee on Space, Science and Technology; House Subcommittee on Telecommunications; House Armed Services Committee; House Appropriations Committee; U.S. International Trade Commission; U.S. Department of Commerce; Federal Accounting Standards Advisory Board; Superior Court, San Francisco, California; Federal Courts: Eastern District of Pennsylvania, Western District of Texas, Eastern District of Texas, Northern District of California.

PERSONAL
DATA                Born: Rio de Janeiro, Brazil
                    Citizenship:  United States

Highly Confidential—Attorneys' Eyes Only

|  | Complete fluency in Spanish; reading knowledge of French, Italian, Portuguese; elementary Japanese. |
|---|---|
| GRANTS AS PRINCIPAL, CO-PRINCIPAL INVESTIGA-TOR, LAST 15 YEARS | Texas Connects Coalition & Technology for All, "Digital Inclusion," 2012-2013 |
|  | National Science Foundation, "Modeling Pharmaceutical Innovation Pipelines," 2010-2012 |
|  | National Science Foundation, "Modeling Innovation Chains Using Case-Based Econometrics: Nano-electronics and Biotechnology Applications," 2008-2012 |
|  | Congressional Research Service, Library of Congress, "Winning the Globalization Game: How Countries Compete in the 21st Century," 2007-2008 |
|  | "Semiconductor Industry Economics," Kauffman Foundation, 2006-2008. |
|  | Congressional Research Service, Library of Congress, "Changing Modes of Defense Procurement: Implications for Pricing and Innovation in the US Defense Industry," 2005-2006. |
|  | National Science Foundation, "Internet Use in the Americas," 2004-2006. |
|  | Ford Foundation, Hewlett Foundation, "An Experiment in Cooperative Policy Research: Normalizing Inter-American Relations with Cuba," 2003-2006. |
|  | Congressional Research Service, Library of Congress, "Broadband Policy in Comparative International Perspective," 2004-2005. |
|  | Rockefeller Foundation, "Researching the Economic Implications of Fair Use," 2002-2004. |
|  | Congressional Research Service, Library of Congress, "Exploring the Digital Divide: Regional Differences in Patterns of Internet Use in the United States," 2003-2004. |
|  | SEMATECH International, "Improving Semiconductor Industry Models," 2002-2003. |
|  | Congressional Research Services, Library of Congress, "Internet Use in Developing and Industrializing Countries," 2002-2003. |

Highly Confidential—Attorneys' Eyes Only

Pew Internet and American Life Project, "Determinants of Internet Use by US Households," 2002-2003.

PUBLICATIONS

Books:

(with S. Nagaoka, M. Kondo, and C. Wessner, Ed)., 21st Century Innovation Systems for Japan and the United States: Lessons from a Decade of Change, (Washington: National Academies Press), 2009.

(with others), Committee on the Rationale and Goals of the U.S. Civil Space Program), America's Future in Space: Aligning the Civil Space Program with National Needs, (Washington: National Academies Press), 2009.

(with others), Committee on the National Defense Stockpile, National Research Council, Managing Materials for a 21st Century Military, (Washington: National Academies Press), 2007.

(with others), Committee on the Future of Supercomputing, National Research Council, Getting Up to Speed: The Future of Supercomputing, (Washington: National Academies Press), 2004.

Mismanaged Trade? Strategic Policy and the Semiconductor Industry, (Washington: Brookings Institution), 1996.

Changing the Rules:  Technological Change, International Competition and Regulation in Communications, (with Robert Crandall, ed.), (Washington: Brookings Institution), 1989.

Creating the Computer: Government, Industry, and High Technology, (Washington: Brookings Institution), 1988.

Targeting the Computer:  Government Support and International Competition, (Washington: Brookings Institution), 1987.

(with J. Grunwald), The Global Factory: Foreign Assembly in  International Trade, (Washington: Brookings Institution), 1985.

(with M. Bishop and R. Davenport), A Definitional Study of the  Private Sector in Guyana, (Georgetown, Guyana:  USAID), 1982.

Highly Confidential—Attorneys' Eyes Only

Articles:

"Has Moore's Law Been Repealed? Empirical Analysis of Innovation in Semiconductors," in C. Corrado, J. Miranda, J. Haskel, and D. Sichel, Ed., Measuring and Accounting for Innovation in the 21st Century, (NBER and U. of Chicago), forthcoming, 2019.

"Has Moore's Law Been Repealed? An Economist's Perspective," Computing in Science and Engineering, vol. 19, no. 2, March/April 2017, (Washington: IEEE Computer Society),  2017.

(with P. Mudliar and S. Strover),  "Outside Looking In: Shaping Access and Use of PCCs," in G. Marsden and J. May, Ed., Proceedings of the Sixth International Conference on Information and Communications Technologies and Development: Notes - Volume 2, (New York: Association for Computing Machinery), 2014.

"Measuring Disconnectedness: Understanding US. Broadband Unavailability," in R. Taylor and A. Schejter, Ed., Beyond Broadband Access, (New York: Fordham University Press), 2013.

"Economic Impacts of International R&D Coordination: SEMATECH and the International Technology Roadmap," in Nagaoka, et. al., 21st Century Innovation Systems for Japan and the United States, (Washington: National Academies Press), 2009.

(with S. Nagaoka), "The Chrysanthemum Meets the Eagle—The Coevolution of Innovation Policies in Japan and the United States," in Nagaoka, et. al., 21st Century Innovation Systems for Japan and the United States, (Washington: National Academies Press), 2009.

(with A. Aizcorbe and A. Kurshid), "The Role of Semiconductor Inputs in IT Hardware Price Declines," in E. Berndt, Ed., Hard to Measure Goods and Services—Essays in Honor of Zvi Griliches, (Chicago and National Bureau of Economic Research), 2008.

(with A. Chaudhuri), "An analysis of the determinants of broadband access" Telecommunications Policy, Volume 31, Issues 6-7, July-August 2007.

(with Q. Zhong and A. Chaudhuri), "Issues in Internet Governance," in S. Park, Ed., Strategies and Policies in Digital Convergence, (Harrisburg, PA: Idea Group), 2007.

(with A. Chaudhuri and Associates) "The Internet, the Government, and E-Governance," in P. Hernon, Ed., Comparative Perspectives on E-Government: Serving Today and Building for Tomorrow, (Boston: Scarecrow Press), 2006.

Highly Confidential—Attorneys' Eyes Only

(with A. Chaudhuri) "Is A Computer Worth a Thousand Books? Internet Access and the Changing Role of Public Libraries," <u>Review of Policy Research</u>, vol. 23, no. 1, 2006.

(with A. Chaudhuri and J. Horrigan) "An Analysis of the Determinants of Internet Demand," <u>Telecommunications Policy</u>, vol. 29, nos. 9-10, 2005.

"Post-Cold War Policy and the U.S. Defense Industrial Base," in <u>The Bridge</u> (National Academy of Engineering), vol. 35, no. 1, 2005.

"Moore's Law and the Economics of Semiconductor Price Trends," in D.W. Jorgenson and C.W. Wessner, Ed., <u>Productivity and Cyclicality in Semiconductors: Trends, Implications, and Questions,</u>" (Washington: National Research Council), 2004.

"The New Economy in Historical Perspective: Evolution of Digital Technology," in <u>New Economy Handbook</u>, (Academic Press), 2003.

"SEMATECH Evolving: A New Model for Global Industrial R&D Coordination," <u>IEEE Design and Test of Computers</u>, November-December 2003 (invited submission).

"Microelectronics Innovation: Understanding Moore's Law and Semiconductor Price Trends," <u>International Journal of Technology, Policy, and Management</u>, vol. 3, no. 2, 2003.

(with Qifei Wang), "The Impact of SEMATECH on U.S. Semiconductor Industry R&D," C. W. Wessner, Ed., <u>Regional and National Programs to Support the Semiconductor Industry,</u> (Washington: National Academy of Sciences), 2003.

"Microprocessors and Computers: The Phenomenon of Price Decline," in D.W. Jorgenson and C. W. Wessner, Ed., <u>Measuring and Sustaining the New Economy</u>, (Washington: National Academy of Sciences), 2002.

"The Federal Partnership with Industry in U.S. Computer Research: History and Recent Concerns," in C. W. Wessner, Ed., <u>Capitalizing on New Needs and Opportunities: Government-Industry Partnerships in Biotechnology and Information Technologies,</u> (Washington: National Academy of Sciences), 2001.

"From Endgame to N-Game: Competition vs. Economies of Scale in the Military Aircraft Industry," <u>Chicago Policy Review</u>, vol. 3, no. 1, 1999 (invited submission).

"Digital Convergence?" in Eisenach and Lenard, Ed., <u>Competition,</u>

Highly Confidential—Attorneys' Eyes Only

Innovation, and the Microsoft Monopoly: Antitrust in the Digital Marketplace, (Boston: Kluwer Academic Publishers), 1999.

The Policy Context for Military Aerospace Offsets," in C. Wessner Ed., Trends and Challenges in aerospace Offsets, (Washington: National Academy Press), 1999.

Redesigning the Defense Industrial Base," in A. Markusen and S. Costigan, Arming the Future: A Defense Industry for the 21st Century, (New York: Council on Foreign Relations), 1999.

"U.S. Defense Industry Consolidation in the 1990s," in Susman and O'Keefe,Ed., The Defense Industry in the Post-Cold War Era, (Oxford, U.K.: Pergamon), 1998.

"Policy Issues in Aerospace Offsets," in Charles Wessner and Alan W. Wolff, Ed., Policy Issues in Aerospace Offsets, (Washington: National Academy Press), 1997.

"Technical Progress and Coinvention in Computing and in the Use of Computers: Comment," Brookings Papers on Economic Activity, Microeconomics 1996, (Washington: Brookings Institution), 1997.

(with J.E. Nolan, J.D. Steinbruner, S.E. Miller, D. Mussington, W.J. Perry, and A.B. Carter), "The Imperatives for Cooperation," in J.E. Nolan, Ed., Global Engagement, (Washington: Brookings Institution), 1994.

"Semiconductor Dependency and Strategic Trade Policy," Brookings Papers On Economic Activity, Microeconomics, 1993, no.1, (Washington: Brookings Institution), 1993.

"The Computer Industry in Advanced Industrial Economies," in B. Willenius, Ed., Electronics Industry Development, (Washington: The World Bank), 1993.

"Measurement of DRAM Prices: Technology and Market Structure," in M. Foss, M. Manser, and A. Young, Ed., Prices and Their Measurement, Proceedings of a Conference of the National Bureau of Economic Research and the Conference on Income and Wealth, (Chicago: University of Chicago Press and NBER, 1993).

"Forward Pricing vs. Fair Value: An Analytical Assessment of Dumping in DRAMs," in T. Ito and A. Krueger, Ed., Trade and Protectionism, (Chicago: University of Chicago Press and NBER, 1993).

"Coping With Strategic Competition in Semiconductors: The EC Model as an International Framework," in M. Humbert, Ed., The Impact of Globalisation on Europe's Firms and Industries, (London and New York: Pinter), 1993.

Strategic Arguments for Semiconductor Trade Policy, Review of Industrial Organization, vol. 7, 1992.

"Semiconductors," in Gary Hufbauer, Ed., Europe 1992: An American Perspective, (Brookings Institution, May 1990).

"Robotics Technology" in H. Soesastro and M. Pangistu, Eds., Technological Challenge in the Asian Pacific Economy, (Boston: Allen and Unwin, 1990).

"Industrial Research and Corporate Restructuring: An Overview of Some Issues," in National Academy of Science, Corporate Research and Development, (National Academy Press, 1990).

"Technological Advance and Costs:  Computers Versus Communications," in Crandall and Flamm, Eds., Changing the Rules:Technological Change, International Competition, and Regulation  in Communications, (Washington: Brookings Institution),1989.

"Rationalizing Technology Investment,"(with Thomas McNaugher), in John Steinbruner, Ed., Restructuring American Foreign Policy, (Washington: Brookings Institution, November 1988).

The Changing Pattern of Industrial Robot Use," in R. Cyert and D. Mowery,Eds., Studies in Technological Change, Employment and Policy, (Ballinger), 1988

"The Transfer of Advanced Technology:  Recent Trends and Implication for Mexico," Mexican Studies, vol. 2, no. 2, Summer 1986.

"Comments on Gil Diaz and Trebat," in P. Musgrave, Ed., Mexico  and the United States: Studies in Economic Interaction, (Boulder:  Westview Press, 1985).

"The Volatility of Offshore Investment," in Journal of  Development Economics, vol. 16, 1984.

"Technology Policy in International Perspective," in Policies for  Industrial Growth in a Competitive World, Joint Economic Committee, Sub-committee on Economic Goals an Intergovernmental Relations, U.S. Congress, April 1984.

Highly Confidential—Attorneys' Eyes Only

In Progress:

"Measuring Moore's Law: Evidence From Price, Cost, and Quality Indexes,"
National Bureau of Economic Research Working Paper 24553, April 2018,
available at SSRN: http://ssrn.com/abstract=2245440, presented at 5th IMF
Statistical Forum, Washington, D.C., November 2017; currently under
revision, available at
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3170772 .

(with C. Herrera) "Price and Quality Change in U.S. Broadband Service
Markets," presented at TPRC45, Arlington, Virginia, September 2017,
currently under revision, available at
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2944384 .

"Has Moore's Law Been Repealed? Empirical Analysis of Innovation in
Semiconductors," presented at NBER/CRIW Conference on Measuring and
Accounting for Innovation in the 21st Century," Georgetown University,
March 10-11, 2017; previous versions were "The End of Moore's Law: An
Economic Perspective," presented at the Computing Beyond 2025 Summit
Conference, Argonne National Laboratory, August 15, 2016; currently under
revision.

"The End of Moore's Law: An Economic Perspective," presented at the
Computing Beyond 2025 Summit Conference, Argonne National Laboratory,
August 15, 2016.

(with S. Strover and Y. Sang), "Public Computing Centers: Beyond
'Public' and 'Computing',"presented at Telecommunications Policy
Research Conference, September 2013, Arlington, VA, available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2241173.

"Federal Subsidies and Broadband Competition," presented at TPRC 43,
Arlington, VA, September 2015, available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2587353 ; previous
versions presented at NBER Summer Institute 2013 Economics of IT and
Digitization Workshop, Cambridge, MA, July 2013, available at
http://conference.nber.org/confer/2013/SI2013/PRIT/Flamm.pdf;
"Connectedness and Competition: Determinants of Service Provision in U.S.
Broadband Markets," presented at Telecommunications Policy Research
Conference, September 2011, Arlington, VA, available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1985791.

"A Tale of Two Standards: Patent Pools and Innovation in the Optical Disk
Drive Industry," National Bureau of Economic Research Working Paper
18931, March 2013, available at SSRN: http://ssrn.com/abstract=2245440,
currently under revision.

Highly Confidential—Attorneys' Eyes Only

"Correlates of Quality Improvement in U.S. Broadband Service," presented at TPRC 42, the 42nd Research Conference on Communication, Information, and Internet Policy, Arlington, VA, September 2014, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2418746 ; previous versions are "Dynamics of Change in Service Quality on US Broadband Networks: An Exploratory Study," presented at NBER Summer Institute Workshop on the Economics of IT and Digitization, July 2012; Telecommunications Policy Research Conference, September 2012, Arlington, VA, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2031220; currently under revision.

"Causes and Economic Consequences of Diminishing Rates of Technical Innovation in the Semiconductor and Computer Industries," presented at APPAM Fall Research Conference, Albuquerque, NM, November 6, 2014, https://appam.confex.com/appam/2014/webprogram/Paper9969.html; previous version was "The Microeconomics of Microprocessor Innovation," presented at NBER Summer Institute- Productivity Potpourri Workshop, July 2007, available at http://users.nber.org/~confer/2007/si2007/PRB/flamm.pdf ; currently under revision.

Other Publications and Reports:

(with M. Naaman) "Sub-Regressions In Antitrust Class Cert. Can Be Unreliable," Law360, December 17, 2014, available at http://www.law360.com/articles/604821/sub-regressions-in-antitrustclass-cert-can-be-unreliable .

"Coping with Globalization in Semiconductors," World Politics Review, June 15, 2010, available at http://www.worldpoliticsreview.com/articles/5795/coping-with-globalization-in-semiconductors .

(with S. Nagaoka), "The Chrysanthemum Meets the Eagle," Issues in Science and Technology, Fall 2007.

(with A. Friedlander, J. Horrigan, and W. Lehr), Measuring Broadband: Improving Communications Policymaking through Better Data Collection, The Pew Internet and American Life Project, Washington, 2007.

"Moore's Law and the Economics of Leading Edge Semiconductors," Hitotsubashi University Institute for Innovation Research Working Paper WP#05-05, December 2004.

(with F. Weingarten) "The Economics of Fair Use and the Public Domain," Report Submitted to the Rockefeller Foundation, May 2004.

Highly Confidential—Attorneys' Eyes Only

"New Economy Lite," in <u>Issues in Science and Technology</u>, Winter 2003

(with A. Aizcorbe and A. Kurshid),"The Role of Semiconductor Inputs in IT Hardware Price Decline: Computers vs. Communications," Federal Reserve Finance and Economics Discussion Paper 2002-37, (Washington: Board of Governors, The Federal Reserve Board), August, 2002.

"Failures of Defense Industrial Policy Reform and Likely Consequences for the Bush Defense Build-up," commissioned by Council on Foreign Relations, (March, 2002) available at http://www.cfr.org/public/GeoEcon_Military/index.html.

"U.S. Defense Industry in the Post-Cold War: Economic Pressures and Security Dilemmas," in Judith Reppy, Ed. <u>The Place of Defense Industry in National Systems of Innovation</u>, Occasional Paper #25, Cornell University Peace Studies Program, (Ithaca, NY: Cornell University Peace Studies Program), April 2000.

"Shaping science policy," <u>Issues in Science and Technology</u>, vol. XVI, No. 3, Spring 2000.

"Are New Global Rules Needed for High-Tech?", in A. Teich, S. Nelson, C. McEnaney, and S. Lita, Ed., <u>AAAS Science and Technology Policy Yearbook 2000</u>, (Washington: American Association for the Advancement of Science), 2000.

"Capital Markets and New Technologies: Introduction," in Charles  W. Wessner, Ed., <u>The Advanced Technology Program, Challenges and Opportunities</u>, (Washington: National Academy Press), 1999.

"Discussion of The Government as Venture Capitalist," in Charles W. Wessner, Ed., <u>SBIR, Challenges and Opportunities</u>, (Washington: National Academy Press), 1999.

"Discussion of Technology Transfer and the National Laboratories," in Charles W. Wessner, Ed., <u>Industry-Laboratory Partnerships, A Review of the Sandia Science and Technology Park Initiative</u>, (Washington: National Research Council), 1999.

"R&D in the Framework of the New Transatlantic Agenda," in Charles W. Wessner, Ed., <u>New Vistas in Transatlantic Science and Technology Cooperation</u>, (Washington: National Research Council), 1999<u>.</u>

(with E. Lincoln), "Reinvigorating APEC," in <u>The International Economy</u>,Vol.XII, No. 1, January-February 1998.

Highly Confidential—Attorneys' Eyes Only

"An Economic Strategy to Control Arms Proliferation," <u>Issues in Science and Technology</u>, Vol. XIV, No.2, Winter 1997-1998.

More for Less: The Economic Impact of Semiconductors, (San Jose: Semiconductor Industry Association),  December 1997.

(with E. Lincoln), <u>Time to Reinvent APEC</u>, Brookings Policy Brief No. 26,(Washington: Brookings Institution), November 1997.

<u>Deciphering the Cryptography Debate</u>, Brookings Policy Brief No. 21, (Washington: Brookings Institution), July 1997.

"Japan's New Semiconductor Technology Programs," Asia Technology Information Program Report No. ATIP 96.091, Tokyo, November 1996.

"FPD Sourcing Solution 'On Horizon'," <u>New Technology Week</u>, November 25, 1996.

<u>International Armaments Cooperation in an Era of Coalition Security</u>, (with others), Task Force on International Armaments Cooperation, Defense Science Board, Office of the Undersecretary of Defense (Acquisition and Technology), (Washington: Department of Defense), August, 1996.

<u>Assessment of DoD Source Code Export Practices</u>, (with others), Task Force on International Armaments Cooperation, Defense Science Board, Office of the Undersecretary of Defense (Acquisition and Technology), (Washington: Department of Defense), August, 1996.

"Semiconductors and Managed Trade," <u>The Brookings Review</u>, Summer1996.

"Controlling the Uncontrollable: Reforming U.S. Export Controls on Computers," <u>The Brookings Review</u>, Winter 1996.

"In Defense of the Flat-Panel Display Initiative," <u>Issues in Science and Technology</u>, Spring 1995.

"Flat-Panel Displays: Catalyzing a U.S. Industry," <u>Issues in Science and Technology</u>, Fall 1994.

"Rules of the Game are Changing—Again." <u>Think</u>, No. 2, Spring 1991.

"Making New Rules: High-Tech Trade Friction and the Semiconductor Industry," <u>Brookings Review</u>, Spring 1991.

Highly Confidential—Attorneys' Eyes Only

"Review: Martin Campbell-Kelly, ICL: A Business and Technical History," Annals of the History of Computing, vol. 13, no. 1, 1991.

"Cooperation and Competition in the Global Computer Industry," prepared for the OECD, Directorate for Science and Industry, Paris, 1991.

"A Global View of Competition," Issues in Science and Technology, vol. 7, no. 2, Winter 1990-91.

"Patterns of Growth in the International Electronics Industry:  Implications for Sectoral Strategy in Developing Countries," report for the World Bank, 1990.

"Strategic Aspects of Semiconductor Trade Policy," Research Institute of International Trade and Industry Working Paper No. 90-DOF-7, Ministry of International Trade and Industry, Japan, January 1990.

"Semiconductors and Pseudoscience," Issues in Science and Technology, vol. 6, no. 3, Spring 1990.

"The Computer Industry in Industrialized Economies: Lessons for the Newly Industrializing," World Bank, Industry and Energy Department Working Paper, Industry Series Paper No. 8, February 1989.

"Politics and Policy in the International Semiconductor Industry," in SEMI Twelfth Annual Information Services Seminar, (Mountain View: Semiconductor Equipment and Materials Institute), 1989.

"International Differences in Industrial Robot Use: Trends, Puzzles, and Possible Implications for Developing Countries," World Bank, Development Research Department Discussion Paper DRD185, July1986.

Highly Confidential—Attorneys' Eyes Only

Exhibit 2

**Testimony at trial and deposition within last 4 years**
A: Antitrust; P: Patents and IP; T: Trade

*Optical Disk Drive Antitrust Litigation, (N.D. Cal. 2010)*
Retained by indirect purchaser plaintiffs, provided expert advice, wrote reports, testified at deposition. (A)

*State of Oregon v. AU Optronics Corporation et. al., (N.D. Cal. 2010)*
Retained by Oregon Attorney General, provided expert advice, testified at deposition. (A)

*Skold and Dossantos v. Intel Corporation, Hewlett Packard Company and Does 1-50, (California, Santa Clara County Superior Court, 2005)*
Retained by counsel for plaintiffs, provided expert advice, testified at deposition. (A)

*State of Washington vs. A.U. Optronics et. al., (Washington, King County Superior Court, 2010)*
Retained by Washington Attorney General, provided expert advice, wrote report, testified at deposition. (A)

*State of Illinois vs. A. U. Optronics et. al., (Illinois, Cook County Circuit Court, 2010)*
Retained by Illinois Attorney General, provided expert advice, wrote reports, testified at deposition. (A)

*In the Matter of Certain Silicon-On-Insulator Wafers, (U.S. International Trade Commission Investigation No. 337-TA-3083, 2015)*
Retained by counsel for Soitec, provided expert advice, wrote reports, testified at deposition. (P, T)

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

**Depositions & Filings**

Deposition of Aaron Schafer, February 28, 2018
Deposition of Aaron Schafer, Vol. 2, March 1, 2018
Deposition of Aichatou Evans, March 15, 2018
Deposition of Alexander Straub, 3/30/2016
Deposition of Chris Efstathiou, February 13, 2018
Deposition of Cristiano Amon, 9/22/16
Deposition of Cristiano Amon, March 13, 2018
Deposition of Dana Hayter, January 31, 2018
Deposition & Exhibits of David Nash, March 29, 2018
Deposition of Deepu Talla, March 23, 2018
Deposition of Eric Reifschneider, August 31, 2016
Deposition of Fabian Gonell, September 9, 2016
Deposition of Hojin Kang, February 28, 2018
Deposition of Hojin Kang, March 1, 2018
Deposition of Injung Lee, Vol 2, March 15, 2018
Deposition of Isabel Mahe, March 9, 2018
Deposition of James Lederer, January 24, 2018
Deposition of Jeff Altman, Vol. 2, June 1, 2018
Deposition of Jeff Williams, March 15, 2018
Deposition of Jeffrey E Williams, September 16, 2016
Deposition of Jian Xin Ding, Volume 1, March 12, 2018
Deposition of Jian Xin Ding, Volume 2, March 12, 2018
Deposition of John Kalkman, February 15, 2018
Deposition of Keith Kressin, Vol 2, February 8, 2018
Deposition of Kun Qian, Volume II, February 9, 2018
Deposition of Kun Quin, Vol I, February 8, 2018
Deposition of Li Qiang Wang, March 15, 2018
Deposition of Marvin Blecker, Vol. III, February 27, 2018
Deposition of Sanjay Mehta, March 7, 2018, pp. 58-59.
Deposition of Shen Nan, March 30, 2018
Deposition of Thomas Lindner, March 23, 2018
Deposition & Exhibits of Todd Madderom, March 16, 2018
Deposition of Todd Madderom, March 9, 2016,
Deposition of Tony Blevins, January 28, 2016
Deposition of Tony Blevins, Volume II, March 14, 2018
Deposition of Wanlin Yu, June 16, 2016
Deposition of William Bernard Wyatt IV, January 16, 2018
Plaintiffs' First Amended Consolidated Class Action Complaint and Demand for Jury Trial, June 13, 2018.
Qualcomm Incorporated's Objections and Supplemental Responses to Apple Inc.'s Special Interrogatory Nos. 9 and 13, March 30, 2018, p. 8.

**Other Documents**

A. Carare and S. Danninger, "Inflation Smoothing and the Modest Effect of VAT in Germany," International Monetary Fund (IMF), Working Paper no. WP/08/175, 2008

A. Pakes, "A Reconsideration of Hedonic Price Indexes with An Application To PC's," American Economic Review, vol. 93, no. 5, pp. 1578-1614 (2003)

EXHIBIT 3-1

Highly Confidential—Attorneys' Eyes Only

# Exhibit 3: Documents Relied Upon

A. Waxell and J. Jansson, "Sound Affects: Competing with Quality in the Swedish hi-fi Industry," Industry and Innovation, 20(4), 2013

A.M. Aizcorbe, A Practical Guide to Price Index and Hedonic Techniques, (Oxford: Oxford University Press), 2014
Aaron Pressman, "Apple's Next iPhone Is Already Facing a Stronger Field From Samsung, LG, and Sony," Fortune, September 5, 2017

Anna Król, "An Investigation of Hedonic Methods Applicability to Analyzing Prices of Various Groups of Durable Goods," Econometrics (49) 2015, pp. 33-44

Anne Gron and Deborah L. Swenson, "Cost Pass-Through in the U.S. Automobile Market," The Review of Economics and Statistics, vol. 82, no. 2. (May 2000)

Anne Gron and Deborah L. Swenson, "Incomplete Exchange-Rate Pass-Through and Imperfect Competition: The Effect of Local Production," The American Economic Review, vol. 86, no. 2, Papers and Proceedings of the Hundredth and Eighth Annual Meeting of the American Economic Association San Francisco, CA, January 5-7, 1996. (May 1996)

Arja Kinnunen, "Hedonic Method is Practicable in CPI Compilation, Statistics Finland, Paper for the 4th International Conference of the Ottawa Group, Washington, 1998

Orley Ashenfelter and Daniel Sullivan, "Nonparametric Tests of the Market Structure: An Application to the Cigarette Industry, Journal of Industrial Economics, vol. 35, no. 4, June 1987, pp. 483-498

Bank of Japan, Research and Statistics Department, "Reestimation Result of Hedonic Regression Model in the Corporate Goods Price Index — Smartphones," April 2017

Bank of Japan, Research and Statistics Department, "Reestimation Result of Hedonic Regression Model in the Corporate Goods Price Index — Smartphones," April 2018

C. Hepburn, et. al., "Emissions Trading with Profit-Neutral Permit Allocation," Journal of Public Economics, vol. 98 (2013), pp. 85-99.

Celestica Form 20-F, 2011

Chiraz Karamti and Nejib Haouech, "Introducing Hedonic Quality Adjustment in the Official Price Statistics: Evidence from the Tunisian Smartphones Market," Conference Paper, Conference: 61st ISI World Statistics Congress (WSC), At Marrakech, Morocco, January 2018

D. Aaronson, "Price Pass-Through and the Minimum Wage," Review of Economics and Statistics 83.1 (2001): 158-169

D. Mock, The Qualcomm Equation: How a Fledgling Telecom Company Forged a New Path to Big Profits and Market, (2005: AMACOM)

Donald S. Kenkel, 2005. "Are Alcohol Tax Hikes Fully Passed Through to Prices? Evidence from Alaska." American Economic Review, 95(2), pp. 273-277

Doyle, J. and Samphantharak, K. (2006), "$2.00 Gas! Studying the Effects of a Gas Tax Moratorium", NBER Working Paper 12266

Edward H. Chamberlin, The Theory of Monopolistic Competition, Harvard University Press, Cambridge, 5th edition, 1947

EXHIBIT 3-2

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

Erica L. Groshen, Brian C. Moyer, Ana M. Aizcorbe, Ralph Bradley, and David M. Friedman, "How Government Statistics Adjust for Potential Biases from Quality Change and New Goods in an Age of Digital Technologies: A View from the Trenches," Journal of Economic Perspectives, vol. 31, no. 2, Spring 2017, pp. 187–210

Erich Muehlegger and Richard Sweeney, "Pass-Through of Input Cost Shocks under Imperfect Competition: Evidence from the U.S. Fracking Boom." November 2017

Eva Dou and Min-Jeong Lee, "Smartphone Makers Hit by Rising Competition," The Wall Street Journal, July 7, 2013

Federal Communications Commission, Annual Report and Analysis of the Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Eighteenth Report, December 23, 2015

Federal Communications Commission, Annual Report and Analysis of the Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Fifteenth Report, June 27, 2011

Federal Communications Commission, Annual Report and Analysis of the Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services, Seventeenth Report, December 18, 2014

Feenstra, Product Variety and the Gains from International Trade, chap. 2, (Cambridge: MIT Press, 2010
Flat Drive Display Task Force, U.S. Department of Defense, Building U.S. Capabilities in Flat Drive Displays, (Washington: U.S. Department of Defense), October 1994

Global mobile Suppliers Association, "LET, 5G and 3GPP loT Chipsets: Status Update," November 2017

J. Boone, and W. Müller, "The Distribution of Harm in Price Fixing Cases," International Journal of Industrial Organization, 2012, pp. 265-276

J. McCrary and D.L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," Journal of Econometric Methods, vol. 3, no.1, 2014

J. Poterba, "Retail Price Reactions to Changes in State and Local Sales Taxes," National Tax Journal, vol. 49, no. 2, (1996) pp. 165-76 at https://ntanet.org/NTJ/49/2/ntj-v49n02p165-76-retail-price-reactions-changes.pdf?v=%CE%B1

James Wells and Ainslie Restieaux, "Review of Hedonic Quality Adjustment in UK Consumer Price Statistics and Internationally," Office for National Statistics

Jeffrey M. Wooldridge, "Fixed-Effects and Related Estimators for Correlated Random-Coefficient and Treatment-Effect Panel Data Models," *The Review of Economics and Statistics*, vol. 87, no. 2 (May, 2005), pp. 385-390

John Connor, "Forensic Economics: An Introduction with Special Emphasis on Price Fixing," Working Paper, Purdue University, West Lafayette, IN, March 2007

José A. Montenegro and José L. Torres, "Consumer Preferences and Implicit Prices of Smartphone Characteristics," Málaga Economic Theory Research Center Working Papers, WP 2016-4, November 2016

Jose Manuel Campa and Linda S. Goldberg, "Exchange Rate Pass-Through Into Import Prices," Review of Economics & Statistics, November 2005

Kim Donghun, and Ronald W. Cotterill. "Cost Pass Through in Differentiated Product Markets: The Case of U.S. Processed Cheese," The Journal of Industrial Economics 56, no. 1 (2008), pp. 32-48.

EXHIBIT 3-3

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

L. M. B. Cabral, Introduction to Industrial Organization, 2nd Ed., (Cambridge: MIT Press), 2017

Larry S. Karp and Jeffrey M. Perloff, "Estimating Market Structure and Tax Incidence: The Japanese Television Market," Journal of Industrial Economics 37, no. 3 (March 1989) pp. 225-239.

Letter from Kathleen Grillo, Senior Vice President, Federal Regulatory Affairs, Verizon, dated Dec. 18, 2009 in CG Docket No. 09-158 to Ruth Milkman, Chief, Wireless Telecommunications Bureau, and Mark Stone, Acting Chief, Consumer and Government Affairs Bureau, FCC

Letter from Robert W. Quinn, Jr., Esq., Senior Vice President-Federal Regulatory, AT&T Services, Inc., dated Feb. 23, 2010 in CG Docket No. 09-158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC

Letter from Thomas J. Sugrue, Vice President, Government Affairs, T-Mobile, dated Feb. 23, 2010 in CG Docket No. 09158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC.

Letter from Vonya B. McCann, Esq., Senior Vice President, Government Affairs, Sprint Nextel Corporation, dated Feb. 23, 2010 in CG Docket No. 09-158 to Joel Gurin, Chief, Consumer and Government Affairs Bureau, and Ruth Milkman, Chief, Wireless Telecommunications Bureau, FCC

Marta Dziechciarz-Duda and Anna Król, "The Analysis of Consumers' Preferences with the Application of Multivariate Models: Hedonic Regression and Multidimensional Scaling," Kit Scientific Publishing, vol. 2, no. 1, 2017

Memorandum of Intel Corporation Regarding Qualcomm's Anticompetitive SEP Licensing Practices submitted to the Federal Trade Commission, File No. 141-0199 (Oct. 24, 2016)

Michael M. Knetter, "International Comparisons of Pricing-to-Market Behavior," American Economic Review 83, no. 4, (1993) pp. 73-86.

Moffett Nathan Research: "U.S. Wireless: Removing the Rose-Colored Glasses," June 18, 2014., cited in FCC 2015 Report

Moutaz Shideed, http://www.sbdcnet.org/small-business-research-reports/wireless-telecommunications-carriers, undated. Viewed June 3, 2018

N. de Roos, (2006). "Examining Models of Collusion: The Market for Lysine," International Journal of Industrial Organization, 24(6)

Naoki Watanabe, Ryo Nakajima, and Rakanori Ida, "Quality-Adjusted Prices of Japanese Mobile Phone Handsets and Carriers' Strategies," Review of Industrial Organization 36(4), pp. 391-412, June 2010

Orley Ashenfelter, David Ashmore, Jonathan B. Baker, and Signe-Mary McKernan, Identifying the Firm-Specific Cost Pass-Through Rate, 1998

Paul A. Samuelson and William D. Nordhaus, Economics, 13th Edition, McGraw-Hill, New York 1989

Paul A. Samuelson and William D. Nordhaus, Economics, 19th Edition, (Indian Edition: Tata McGraw Hill), 2010

Paul D. Chwelos, Ernst R. Berndt, and Iain M. Cockburn, Faster, Smaller, Cheaper: An Hedonic Price Analysis of PDAs, NBER Working Paper 10746, September 2004

EXHIBIT 3-4

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

Qualcomm, "Submission Regarding Patent Exhaustion Law and Qualcomm's Agreements with Modem Chip Manufacturers," Mar. 4, 2016, p. 1.

R. B. Palmquist and V.K. Smith, "The Use of Hedonic Property Value Techniques for Policy and Litigation," in T. Tietenberg and H. Folmer, Eds., The International Yearbook of Environmental and Resource Economics 2002/2003: A Survey of Current Issues, (E. ELgar), 2002

R. Sullivan and D. Dutkowsky, "The Effect of Cigarette Taxation on Prices: An Empirical Analysis Using Local-Level Data," Public Finance Review vol. 40, no.6 (2012): 687-711.

R.L. Feenstra, "New Evidence on the Gains from Trade," Review of World Economics/Weltwirtschaftliches Archiv, December 2006

Ralf Dewenter, Justus Haucap, Ricardo Luther, and Peter Rötzel, "Hedonic Prices in the German Market for Mobile Phones," Telecommunications Policy 31 (2007) pp. 4-13

Response to Commission Article 18(3) Request for Information Adopted on 10 July 2013, 12/2/13

Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," University of Pennsylvania Law Review, vol. 128, no. 2, pp. 269-360 (Dec. 1979)

Robert J. Barro, "A Theory of Monopolistic Price Adjustment," Review of Economic Studies (January 1972), 39(1), pp. 18-19.

Rodrigo de Santi and Claudio R. Lucindam "Hedonic Analysis of Cell Phones Sold with Post-Paid Service Plans in Brazil, Revista de Administração de Empresas 52(4), pp. 435-447, August 2012

Ronald W. Cotterill, "Estimation of Cost Pass Through to Michigan Consumers in the ADM Price Fixing Case." University of Connecticut, Food Marketing Policy Center, Research Report 25148 (1998)

Ronald W. Cotterill, Leonard Egan, and William Buckhold. "Beyond Illinois Brick: The Law and Economics of Cost Pass Through in the ADM Price Fixing Case," Review of Industrial Organization, 18(1), pp. 45-52, February 2001

Ryo Nakajima, Naoki Watanabe, and Takanori Ida, "Quality Adjusted Prices of Mobile Phone Handsets and Careers' Product Strategies: The Japanese Case," October 28, 2008

Sanmina 2017 10-K Report

Simon P. Anderson, André de Palma, Brent Kreider, "Tax Incidence in Differentiated Product Oligopoly," Journal of Public Economics 81, pp. 173-192 (2001)

Sophia Delipalla and Owen O'Donnell "Estimating Tax Incidence, Market Power and Market Conduct: The European Cigarette Industry," International Journal of Industrial Organization, 19 (2001) pp. 885–908

The Theory of Industrial Organization. 1988, Massachusetts Institute of Technology.

Theon van Dijk and Frank Verboven, "Quantification of Damages," ABA Publications in Antitrust, 2005

Timothy J. Besley and Harvey S. Rosen, "Sales Taxes and Prices: An Empirical Analysis," National Tax Journal, vol. 52, no. 2 (June 1999), ppl 157-178

U.S. Bureau of Labor Statistics, "Measuring Price Change in the CPI: Telephone Hardware, Calculators, and Other Consumer Information Items," Fact Sheets, last updated May 10, 2018

EXHIBIT 3-5

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

U.S. Department of Justice, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act, 2008, Chapter 2, p. 23.

Wook Joon Kim, "Analyzing the characteristic determinants of smartphone post-paid pricing in South Korea 2010-2015," Korea Information Society Development Institute, ICT Statistics Center, August 15, 2015

Zheng-Sheng Lin and Chih-Cheng Chen, "An Analysis of the Economic Value of Mobile Phone in Taiwan, Journal of Asia Pacific Business Innovation & Technology Management, 003 (2013), pp. 077-084

**Websites**

"All Modems Are Not Created Equal," October 23, 2014 at
https://www.qualcomm.com/news/onq/2014/10/23/all-multimode-modems-are-not-created-equal

"Fracking, Oil Prices, and the Pass-Through of Input Costs," NBER Digest, March 2018 at
http://www.nber.org/digest/mar18/mar18.pdf

"Part 1: The Origins of GPS, and the Pioneers Who Launched the System," GPS World, May 1, 2010, available at
http://gpsworld.com/origins-gps-part-1/

"Part 2: The Origins of GPS, Fighting to Survive," GPS World, June 1, 2010, available at
http://gpsworld.com/origins-gps-part-2-fighting-survive/

A.M. Seybold, "Wireless Lessons From Japan," Forbes, May 22, 2002, available at
https://www.forbes.com/2002/05/22/0522soapbox.html#23e4aa246fcf .

Andrew Cunningham, "Why Isn't Your Old Phone Getting Nougat? There's Blame Enough to Go Around," at
https://arstechnica.com/gadgets/2016/08/why-isnt-your-old-phone-getting-nougat-theres-blame-enough-to-go-around/

Ankit Banerjee, "GSM vs CDMA - What's the Difference," February 26, 2018 at
https://www.androidauthority.com/gsm-vs-cdma-689328/ (accessed 6/28/2018).

D. Saugstrup and A. Henten, "3G Standards: the battle between WCDMA and CDMA2000," Info, vol. 8, no. 4, 2006, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.611.9497&rep=rep1&type=pdf

D. Wasshausen and B. R. Moulton, "The Role of Hedonic Methods in Measuring Real GDP in the United States," (2006) at http://www.bea.gov/papers/pdf/hedonicGDP.pdf

Elizabeth Woyke, "Samsung Bets on Smartphone Success,"June 30, 2010, at
https://www.forbes.com/2010/06/29/smartphones-galaxys-android-technology-wireless-samsung.html#427253fa300e

http://newsroom.sprint.com/sprint-powers-up-wireless-coverage-capacity-to-networks-in-minnesota.htm (accessed 6/28/2018).

http://www.businessdictionary.com/definition/contract-manufacturing.html

http://www.sanmina.com/company-profile/

http://www.sanmina.com/industries-contract-electronics-manufacturing/communications-networks-products-systems/products/.

EXHIBIT 3-6

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://community.sprint.com/t5/Account-Billing-Payments/SOLUTION-What-is-the-Subsidized-phone-charge/ta-p/957525

https://community.sprint.com/t5/Account-Billing-Payments/SOLUTION-What-is-the-Subsidized-phone-charge/ta-p/957525

https://conjoint.online/guides/what-is-conjoint-analysis/

https://courses.lumenlearning.com/microeconomics/chapter/fixed-and-variable-costs/, viewed June 15, 2018.

https://help.sap.com/doc/020fda531198434de10000000a174cb4/3.6/en-US/4fae531918073359e10000000a421937.html

https://searchtelecom.techtarget.com/definition/average-revenue-per-user

https://support.t-mobile.com/docs/DOC-1588

https://www.accountingtools.com/articles/2017/5/16/cost-plus-pricing

https://www.accountingtools.com/articles/2017/5/16/high-low-pricing

https://www.accountingtools.com/articles/2017/5/16/pricing-strategies

https://www.bls.gov/cpi/factsheets/telephone-hardware.htm

https://www.bls.gov/data/

https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/76xx/doc7615/10-02-drugr-d.pdf

https://www.celestica.com/about-us/who-we-are

https://www.celestica.com/our-expertise/markets/communications

https://www.digitaltrends.com/mobile/how-to-unlock-a-phone-on-every-carrier/

https://www.att.com/esupport/article.html#!/wireless/KM1008728

https://www.fcc.gov/general/cell-phone-unlocking.

https://www.justice.gov/atr/herfindahl-hirschman-index

https://www.justice.gov/atr/monopoly-power-and-market-power-antitrust-law

https://www.justice.gov/opa/pr/justice-department-withdraws-report-antitrust-monopoly-law

https://www.mbaskool.com/business-concepts/marketing-and-strategy-terms/3391-every-day-low-prices-edlp.html

https://www.pcmag.com/encyclopedia/term/51702/software-stack, viewed June 6, 2018.

https://www.pcmag.com/encyclopedia/term/66949/baseband-processor

EXHIBIT 3-7

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.qualcomm.com/news/releases/2014/07/08/qualcomm-announces-first-large-scale-commercial-volte-launch-japan.

https://www.sprint.com/en/legal/unlocking-your-sprint-device.html
https://www.statista.com/statistics/283511/average-monthly-churn-rate-top-wireless-carriers-us/

https://www.techopedia.com/definition/757/consumer-electronics-ce, viewed May 31, 2018

https://techradar.com/news/phone-and-communications/mobile-phones/who-s-making-money-from-your-smartphone-992247

https://www.verizon.com/about/consumer-safety/device-unlocking-policy

https://www.verizon.com/about/news/vzw/2009/08/pr2009-08-24 (accessed 6/28/2018)

https://www.verizon.com/about/print/912339

https://www.wistron.com/CMS/Page/169

A.M. Doose, "Methods for calculating cartel damages: A survey," available at
https://www.econstor.eu/bitstream/10419/91492/1/775867004.pdf

H. Hovenkamp, "A Primer on Antitrust Damages," 2011, available at
https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=2848&context=faculty_scholarship

Iliyan Malchev, "Here Comes Treble: A Modular Base for Android," May 12, 2017, at https://android-developers.googleblog.com/2017/05/here-comes-treble-modular-base-for.html

J. L. Burrow and A.R. Fowler, Marketing, 4th Ed., Cengage, 2016, p. 81. See
https://books.google.com/books?id=WmOOBAAAQBAJ&pg=PT96&lpg=PT96&dq=%22consumer+electronics%22+%22monopolistic+competition%22&source=bl&ots=JGG9rgdpjN&sig=WefFMUazGxzrvS4Y-acnrX9idtQ&hl=en&sa=X&ved=0ahUKEwj75u3yjujbAhXCxFkKHQdiBwA4ChDoAQhBMAQ#v=onepage&q=%22consumer%20electronics%22%20%22monopolistic%20competition%22&f=false

Jacquelyn Pless and Arthur Van Benthem, "The Surprising Pass-through of Solar Subsidies," Discussion Paper Series DP11908, March 14, 2017 at https://cepr.org/sites/default/files/FreeDP_19_March.pdf

S. Linz and G. Eckert, "Introducing Hedonic Methods in Price Statistics," at
https://www.destatis.de/EN/FactsFigures/NationalEconomyEnvironment/Prices/HedonicPC.pdf?__blob=publicationFile

https://www.usenix.org/system/files/conference/woot12/woot12-final24.pdf

https://books.google.com/books?id=rkS7BQAAQBAJ&pg=PA32&lpg=PA32&dq=%22baseband+processor%22+%22software+stack%22&source=bl&ots=KWLa62Oqug&sig=Ysv3RHJT7RMlh40xkCfruul8WcM&hl=en&sa=X&ved=0ahUKEwigjtH6n4TcAhVKuVkKHf4IDBYQ6AElhAEwDw#v=onepage&q=%22baseband%20processor%22%20%22software%20stack%22&f=false

https://sec.sipsik.net/gsm/baseband/gsm_phone_anatomy.pdf

https://depositonce.tu-berlin.de/bitstream/11303/3423/1/Dokument_51.pdf

EXHIBIT 3-8

Highly Confidential—Attorneys' Eyes Only

# Exhibit 3: Documents Relied Upon

**Correspondence**

Letter from Barnes & Thornburg to Benjamin Siegel: Subpoena Issued to Brightstar US Inc., April 30, 2018
Letter from Faegre Baker Daniels to Rio S. Pierce: Target Subpoena Response, May 23, 2018

**Bates Number Documents**

BCG00004386-4400
Budget_Annual Chipset Model_FY2012_Q2017MDL1_03031298_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES
ONLY.xlsx through Budget_Annual Chipset Model_FY2013_Q2017MDL1_03031303_HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY.xlsx,
Chipset Model_FY2012_Q2017MDL1_03118922_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsb
Chipset Model_FY2015_Q2017MDL1_03118923_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsb
Chipset Model_FY2016_Q2014FTC03885150_CONFIDENTIAL.xlsx
Chipset Model_FY2016_Q2017MDL1_03118924_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.xlsb
Chipset Model_FY2016-17_QNDCAL01097907.xlsb
Chipset Model_FY2017_QNDCAL04960855.xlsx
FTC-APPLE-0000104-0000116
FTC-PROD-0021856-FTC-PROD-0021891
NVIDA-USFTC00013326-13334
NVIDIA-00173745
NVIDIA-00174509

**Amazon**
AMZ-QCS-000001
AMZ-QCS-003459
AMZ-QCS-003595

**Apple**
APL-QC_123433206-240
APL-QC_13103515 - APPLE HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
APL-QC-FTC_16290093-102
APL-QC-FTC_16508211-212
APL-QC-FTC_19996915
APL-QC-FTC_19996917
APL-QC-FTC_19996918
APL-QC-FTC_19996920
APL-QC-FTC_19996921
APL-QC-FTC_19996923
APL-QC-FTC_19996924
APL-QC-FTC_19996925
APL-QC-FTC_19996926
APL-QC-FTC_19996928
APL-QC-FTC_19996929
APL-QC-FTC_19996930
APL-QC-FTC_19996931
APL-QC-FTC_19996932
APL-QC-FTC_19996933
APL-QC-FTC_19996934
APL-QC-FTC_19996935
APL-QC-FTC_19996936
APL-QC-FTC_19996937
APL-QC-FTC_19996938

EXHIBIT 3-9

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

APL-QC-FTC_19996939
APL-QC-FTC_19996940
APL-QC-FTC_19996941
APL-QC-FTC_19996942
APL-QC-FTC_19996943
APL-QC-FTC_19996944
APL-QC-FTC_19996945
APL-QC-FTC_19996946
APL-QC-FTC_19996947
APL-QC-FTC_19996948
APL-QC-FTC_19996949
APL-QC-FTC_19996861
APL-QC-FTC_19996862
APL-QC-FTC_19996864
APL-QC-FTC_19996866
APL-QC-FTC_19996867
APL-QC-FTC_19996869
APL-QC-FTC_19996871
APL-QC-FTC_19996872
APL-QC-FTC_19996874
APL-QC-FTC_19996876
APL-QC-FTC_19996878
APL-QC-FTC_19996879
APL-QC-FTC_19996881
APL-QC-FTC_19996883
APL-QC-FTC_19996886
APL-QC-FTC_19996887
APL-QC-FTC_19996889
APL-QC-FTC_19996891
APL-QC-FTC_19996893
APL-QC-FTC_19996895
APL-QC-FTC_19996896
APL-QC-FTC_19996897
APL-QC-FTC_19996898
APL-QC-FTC_19996899
APL-QC-FTC_19996900
APL-QC-FTC_19996901
APL-QC-FTC_19996902
APL-QC-FTC_19996903
APL-QC-FTC_19996904
APL-QC-FTC_19996905
APL-QC-FTC_19996950
APL-QC-FTC_19996951
APL-QC-FTC_19996952
APL-QC-FTC_19996953
APL-QC-FTC_19996955
APL-QC-FTC_19996960
APL-QC-FTC_19996961
APL-QC-FTC_19996962
APL-QC-FTC_19996963
APL-QC-FTC_19996964
APL-QC-FTC_19996965
APL-QC-FTC_19996966

EXHIBIT 3-10

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

APL-QC-FTC_19996967
APL-QC-FTC_19996825
APL-QC-FTC_19996836
APL-QC-FTC_19996847
APL-QC-FTC_19996974
APL-QC-FTC_19996975
APL-QC-FTC_19996985
APL-QC-FTC_19996986
APL-QC-FTC_19996987
APL-QC-FTC_19996988
APL-QC-FTC_19996989
APL-QC-FTC_19996990
APL-QC-FTC_19996991
APL-QC-FTC_19996992
APL-QC-FTC_19996993
APL-QC-FTC_19996994
APL-QC-FTC_19996995
APL-QC-FTC_19996996
APL-QC-FTC_19996997
APL-QC-FTC_19996998
APL-QC-FTC_19996999
APL-QC-FTC_19997000
APL-QC-FTC_19997001
APL-QC-FTC_19997002
APL-QC-FTC_19997003
APL-QC-FTC_19996980
APL-QC-FTC_19996981
APL-QC-FTC_19996983
APL-QC-FTC_21959937-949
APL-QC-FTC_22183177
APL-QC-FTC_22582536-537

**ASUS**
Highly Confidential ACI Sales  Data_2011-2016Q1_Summary.xlsx
Highly Confidential ACI Sales  Data_2016Q2-2017Q3_Summary.xlsx

**A&T**
ATT Prd_Desc Index-AT&T HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY.XLSX
Sales_Details_IMEI_handsets AT&T HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY.csv
Sales_Details_IMEI_tablets AT&T HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY.csv
201101_revenue_by_imei.txt
201102_revenue_by_imei.txt
201103_revenue_by_imei.txt
201104_revenue_by_imei.txt
201105_revenue_by_imei.txt
201106_revenue_by_imei.txt
201107_revenue_by_imei.txt
201108_revenue_by_imei.txt
201109_revenue_by_imei.txt
201110_revenue_by_imei.txt
201111_revenue_by_imei.txt
201112_revenue_by_imei.txt
201201_revenue_by_imei.txt

EXHIBIT 3-11

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

201202_revenue_by_imei.txt
201203_revenue_by_imei.txt
201204_revenue_by_imei.txt
201205_revenue_by_imei.txt
201206_revenue_by_imei.txt
201207_revenue_by_imei.txt
201208_revenue_by_imei.txt
201209_revenue_by_imei.txt
201210_revenue_by_imei.txt
201211_revenue_by_imei.txt
201212_revenue_by_imei.txt
201301_revenue_by_imei.txt
201302_revenue_by_imei.txt
201303_revenue_by_imei.txt
201304_revenue_by_imei.txt
201305_revenue_by_imei.txt
201306_revenue_by_imei.txt
201307_revenue_by_imei.txt
201308_revenue_by_imei.txt
201309_revenue_by_imei.txt
201310_revenue_by_imei.txt
201311_revenue_by_imei.txt
201312_revenue_by_imei.txt
201401_revenue_by_imei.txt
201402_revenue_by_imei.txt
201403_revenue_by_imei.txt
201404_revenue_by_imei.txt
201405_revenue_by_imei.txt
201406_revenue_by_imei.txt
201407_revenue_by_imei.txt
201408_revenue_by_imei.txt
201409_revenue_by_imei.txt
201410_revenue_by_imei.txt
201411_revenue_by_imei.txt
201412_revenue_by_imei.txt
201501_revenue_by_imei.txt
201502_revenue_by_imei.txt
201503_revenue_by_imei.txt
201504_revenue_by_imei.txt
201505_revenue_by_imei.txt
201506_revenue_by_imei.txt
201507_revenue_by_imei.txt
201508_revenue_by_imei.txt
201509_revenue_by_imei.txt
201510_revenue_by_imei.txt
201511_revenue_by_imei.txt
201512_revenue_by_imei.txt
201601_revenue_by_imei.txt
201602_revenue_by_imei.txt
201603_revenue_by_imei.txt
201604_revenue_by_imei.txt
201605_revenue_by_imei.txt
201606_revenue_by_imei.txt

EXHIBIT 3-12

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

201607_revenue_by_imei.txt
201608_revenue_by_imei.txt
201609_revenue_by_imei.txt
201610_revenue_by_imei.txt
201611_revenue_by_imei.txt
201612_revenue_by_imei.txt
201701_revenue_by_imei.txt
201702_revenue_by_imei.txt
201703_revenue_by_imei.txt
201704_revenue_by_imei.txt
201705_revenue_by_imei.txt
201706_revenue_by_imei.txt
201707_revenue_by_imei.txt
201708_revenue_by_imei.txt
201709_revenue_by_imei.txt
201710_revenue_by_imei.txt
201711_revenue_by_imei.txt
201712_revenue_by_imei.txt
ATT-0000003
ATT-0045468_16H1 RFP FBT FINAL 150309 4RY.XLSX
ATT-0048255
ATT-0058562
ATT-0060883
ATT-0060883
ATT-0062995
ATT-0065757

**Best Buy**
975_EDW_Purchase_Order_Data.txt
975_RMS_Purchase_Order_Data_2004.txt
975_RMS_Purchase_Order_Data_2005.txt
975_RMS_Purchase_Order_Data_2006.txt
975_RMS_Purchase_Order_Data_2007.txt
975_RMS_Purchase_Order_Data_2008.txt
975_RMS_Purchase_Order_Data_2009.txt
975_RMS_Purchase_Order_Data_2010.txt
975_RMS_Purchase_Order_Data_2011.txt
975_RMS_Purchase_Order_Data_2012.txt
975_RMS_Purchase_Order_Data_2013.txt
975_RMS_Purchase_Order_Data_2014.txt
975_RMS_Purchase_Order_Data_2015.txt
975_RMS_Purchase_Order_Data_2016.txt
975_RMS_Purchase_Order_Data_2017.txt
DSC_EXT000057946.txt
DSC_EXT000057947.xlsx
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2004.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2005.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2006.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2007.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2008.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2009.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2010.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2011.txt

EXHIBIT 3-13

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2012.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2013.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2014.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2015.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2016.txt
HIGHLY CONFIDENTIAL ATTYS EYES ONLY 976_EDW_Sales_Transaction_Data_2017.txt

**Brightstar**
BRIGHTSTAR_000003
BRIGHTSTAR_000004
BRIGHTSTAR_000005
BRIGHTSTAR_000006
Letter from Vincent P. Schmeltz III to Benjamin J. Siegel, April 30, 2018
Letter to B. Siegel (4-30-18).pdf

**Channels**
APL-QC_13103515
LGEMU_0000574622
LGEMU_0000575128
MOTO-QUALSUB-01201758
MTK_00412652
Q2014FTCBB00102241
QAPPCMSD01222785
QAPPCMSD08873031
QAPPCMSD08951409
QAPPCMSD09005670
QAPPCMSD03391719
SFT-0980629
SFT-0991377

**Frys**
Phone-List.txt
phone-mp.txt
PhoneSales.txt

**HTC**
HTCQC_FTC00009336
HTCQC_FTC00009343
HTC Product Names and Consumer Names.xlsx

**LG**
LGEMU_000001017
LGEMU_0000313697- LGEMU_0000313711
LGEMU_0000403155-162
LGEMU_0000574622
LGEMU_0000574622_M
LGEMU_0000575128

**Motorola**
MOTO-QUAL-00889213
MOTO-QUAL-01600634
MOTO-QUALSUB-01178505
MOTO-QUALSUB-01201758

EXHIBIT 3-14

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

MOTO-QUALSUB-02567736

**Newegg**
Leg Data (2010).xlsx
Leg Data.xlsx
Newegg Cost Breakdown.xlsx

**Qualcomm**
QNDCAL01097907
QNDCAL03348301
QNDCAL03632813-984
QNDCAL04206607_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.pptx
QNDCAL04730223_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
QNDCAL04800958
QNDCAL04800958
QNDCAL04809633
QNDCAL04812514
QNDCAL04812520
QNDCAL04812522
QNDCAL04837274
QNDCAL04837274_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY_2016-02-18 Pricing SteerCo Update Final.pptx
QNDCAL04878267
QNDCAL04878268
QNDCAL04878269
QNDCAL04878270
QNDCAL04878271
QNDCAL04878272
QNDCAL04878273
QNDCAL04960855
QNDCAL04960857
QNDCAL04960858
QNDCAL04960859
QNDCAL04960860
QNDCAL04960861
QNDCAL04960862
QNDCAL04960863
QNDCAL04960864
QNDCAL04960865
QNDCAL04960866
QNDCAL04960867
QNDCAL04960868
QNDCAL04960869
QNDCAL04960870
QNDCAL04960871
QNDCAL05090031
QNDCAL05090543
QNDCAL05853684
Q2014FTC_3DP_00001128-175
Q2014FTC02118761-762
Q2014FTC03400026-28
Q2014FTC03584364
Q2014FTC03666113
Q2014FTC03819409-418

EXHIBIT 3-15

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

Q2014FTC03822567-571
Q2014FTC03837191-19
Q2014FTC03885150
Q2014FTC03960509-510
Q2014FTC04098374-471
Q2014FTC04233963
Q2014FTC04613093-3097
Q2014FTC04842228-229
Q2014FTCBB00102241_CONFIDENTIAL
Q2017MDL1_01160701-702
Q2017MDL1_01192641
Q2017MDL1_01192650
Q2017MDL1_01850309-310
Q2017MDL1_03031298
Q2017MDL1_03031299
Q2017MDL1_03031303
Q2017MDL1_03031300
Q2017MDL1_03031301
Q2017MDL1_03031302
Q2017MDL1_03031492
Q2017MDL1_03031496
Q2017MDL1_03031501
Q2017MDL1_03031506
Q2017MDL1_03118922
Q2017MDL1_03118923
Q2017MDL1_03118924
Q2017MDL1_03367253-337
Q2017MDL1_03367339-385
QAPPCMSD00440142
QAPPCMSD02394191
QAPPCMSD02697595
QAPPCMSD03467160
QAPPCMSD07064774_QAPPCMSD_028_QTL Foxconn Updated Draft Report 3.02.2017_with ALL Attachments &
Schedules.pdf

**Samsung**
SFT-0030124_Translation.001-017
SFT-0980629_HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER
SFT-3628024
SFT-3426235
SFT-3569663
SFT-3710495
SFT-3377119
SFT-3558110
SFT-3582116
SFT-3605381
SFT-3605345
SFT-3767861
SFT-1619606
SFT-1619525
SFT-1622534
SFT-1621089
SFT-1619186

EXHIBIT 3-16

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

SFT-1619996
SFT-1620049
SFT-1586357
SFT-1581961
SFT-1586858
SFT-1640208
SFT-1564075
SFT-1564245
SFT-1564586
SFT-1564911
SFT-1565249
SFT-1565372
SFT-1565811
SFT-1566166
SFT-1566771
SFT-1567370
SFT-18181289
SFT-18181290
SFT-18181291
SFT-18181292
SFT-18181293
SFT-18181294
SFT-18181295
SFT-18181297
SFT-18181299
SFT-18181300

**Sprint**
SPR 000000556
SPR 000000557
SPR 000000558
SPR 000000559
SPR 000000560
SPR 000000561
SPR 000000562
SPR000011598-620
SPR 000011732

**Target**
TARGET00001556
Letter from Craig S. Coleman to Rio Pierce, May 23, 2018
2015-05-23 Craig Coleman letter to Rio Pierce.pdf

**T-Mobile**
tmo-qual0033320_hiconf-oaeo-td_base_20171130.txt
tmo-qual0033321_hiconf-oaeo-td_base_20171231.txt
tmo-qual0033322_hiconf-oaeo-td_base_20180131.txt
tmo-qual0033323_hiconf-oaeo-td_base_20180228.txt
tmo-qual0033332_hiconf-oaeo-td_mso_legal_qualcomm.csv
tmo-qual0033333_hiconf-oaeo-td_base_20140131.txt
tmo-qual0033334_hiconf-oaeo-td_base_20140228.txt
tmo-qual0033335_hiconf-oaeo-td_base_20140331.txt
tmo-qual0033336_hiconf-oaeo-td_base_20140430.txt

EXHIBIT 3-17

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

tmo-qual0033337_hiconf-oaeo-td_base_20140531.txt
tmo-qual0033338_hiconf-oaeo-td_base_20140630.txt
tmo-qual0033339_hiconf-oaeo-td_base_20140731.txt
tmo-qual0033340_hiconf-oaeo-td_base_20140831.txt
tmo-qual0033341_hiconf-oaeo-td_base_20140930.txt
tmo-qual0033342_hiconf-oaeo-td_base_20141031.txt
tmo-qual0033343_hiconf-oaeo-td_base_20141130.txt
tmo-qual0033344_hiconf-oaeo-td_base_20141231.txt
tmo-qual0033345_hiconf-oaeo-td_base_20150131.txt
tmo-qual0033346_hiconf-oaeo-td_base_20150228.txt
tmo-qual0033347_hiconf-oaeo-td_base_20150331.txt
tmo-qual0033348_hiconf-oaeo-td_base_20150430.txt
tmo-qual0033349_hiconf-oaeo-td_base_20150531.txt
tmo-qual0033350_hiconf-oaeo-td_base_20150630.txt
tmo-qual0033351_hiconf-oaeo-td_base_20150731.txt
tmo-qual0033352_hiconf-oaeo-td_base_20150831.txt
tmo-qual0033353_hiconf-oaeo-td_base_20150930.txt
tmo-qual0033354_hiconf-oaeo-td_base_20151031.txt
tmo-qual0033355_hiconf-oaeo-td_base_20151130.txt
tmo-qual0033356_hiconf-oaeo-td_base_20151231.txt
tmo-qual0033357_hiconf-oaeo-td_base_20160131.txt
tmo-qual0033358_hiconf-oaeo-td_base_20160229.txt
tmo-qual0033359_hiconf-oaeo-td_base_20160331.txt
tmo-qual0033360_hiconf-oaeo-td_base_20160430.txt
tmo-qual0033361_hiconf-oaeo-td_base_20160531.txt
tmo-qual0033362_hiconf-oaeo-td_base_20160630.txt
tmo-qual0033363_hiconf-oaeo-td_base_20160731.txt
tmo-qual0033364_hiconf-oaeo-td_base_20160831.txt
tmo-qual0033365_hiconf-oaeo-td_base_20160930.txt
tmo-qual0033366_hiconf-oaeo-td_base_20161031.txt
tmo-qual0033367_hiconf-oaeo-td_base_20161130.txt
tmo-qual0033368_hiconf-oaeo-td_base_20161231.txt
tmo-qual0033369_hiconf-oaeo-td_base_20170131.txt
tmo-qual0033370_hiconf-oaeo-td_base_20170228.txt
tmo-qual0033371_hiconf-oaeo-td_base_20170331.txt
tmo-qual0033372_hiconf-oaeo-td_base_20170430.txt
tmo-qual0033373_hiconf-oaeo-td_base_20170531.txt
tmo-qual0033374_hiconf-oaeo-td_base_20170630.txt
tmo-qual0033375_hiconf-oaeo-td_base_20170731.txt
tmo-qual0033376_hiconf-oaeo-td_base_20170831.txt
tmo-qual0033377_hiconf-oaeo-td_base_20170930.txt
tmo-qual0033378_hiconf-oaeo-td_base_20171031.txt
tmo-qual0033379_hiconf-oaeo-td_base_20171130.txt
tmo-qual0033380_hiconf-oaeo-td_base_20171231.txt
tmo-qual0033381_hiconf-oaeo-td_base_20180131.txt
tmo-qual0033382_hiconf-oaeo-td_base_20180228.txt

**US Cellular**

Lgl_uscc_2011a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2011b (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2012a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2012b (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2013a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT

EXHIBIT 3-18

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

Lgl_uscc_2013b (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2014a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2015a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2015b (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2016a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2016b (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2017a (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
Lgl_uscc_2017b (rev) _ HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.TXT
US Cellular_Web Site List for Plan Characteristics.docx
USCC0003338.jpg
USCC0003339.jpg
USCC0003340.jpg
USCC0003341.jpg
USCC0003342.jpg
USCC0003343.jpg
USCC0003344.jpg
USCC0003345.jpg
USCC0003346.jpg
USCC0003347.jpg
USCC0003348.jpg
USCC0003349.jpg
USCC0003350.jpg
USCC0003351.jpg
USCC0003352.jpg
USCC0003353.jpg
USCC0003354.jpg
USCC0003355.jpg
USCC0003356.jpg
USCC0003357.jpg
USCC0003358.jpg
USCC0003359.jpg
USCC0003360.jpg
USCC0003361.jpg
USCC0003362.jpg
USCC0003363.jpg
USCC0003364.jpg
USCC0003365.jpg
USCC0003366.jpg
USCC0003367.jpg
USCC0003368.jpg
USCC0003369.jpg
USCC0003370.jpg
USCC0003371.jpg
USCC0003372.jpg
USCC0003373.jpg
USCC0003374.jpg
USCC0003375.jpg
USCC0003376.jpg
USCC0003377.jpg
USCC0003378.jpg
USCC0003379.jpg
USCC0003380.jpg
USCC0003381.jpg

EXHIBIT 3-19

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

USCC0003382.jpg
USCC0003383.jpg
USCC0003384.jpg
USCC0003385.jpg
USCC0003386.jpg
USCC0003387.jpg
USCC0003388.jpg
USCC0003389.jpg
USCC0003390.jpg
USCC0003391.jpg
USCC0003392.jpg
USCC0003393.jpg
USCC0003394.jpg
USCC0003395.jpg
USCC0003396.jpg
USCC0003397.jpg
USCC0003398.jpg
USCC0003399.jpg
USCC0003400.jpg
USCC0003401.jpg
USCC0003402.jpg
USCC0003403.jpg
USCC0003404.jpg
USCC0003405.jpg
USCC0003406.jpg
USCC0003407.jpg
USCC0003408.jpg
USCC0003409.jpg
USCC0003410.jpg
USCC0003411.jpg
USCC0003412.jpg
USCC0003413.jpg
USCC0003414.jpg
USCC0003415.jpg
USCC0003416.jpg
USCC0003417.jpg
USCC0003418.jpg
USCC0003419.jpg
USCC0003420.jpg
USCC0003421.jpg
USCC0003422.jpg
USCC0003423.jpg
USCC0003424.jpg
USCC0003425.jpg
USCC0003426.jpg
USCC0003427.jpg
USCC0003428.jpg
USCC0003429.jpg
USCC0003430.jpg
USCC0003431.jpg
USCC0003432.jpg
USCC0003433.jpg
USCC0003434.jpg

EXHIBIT 3-20

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003435.jpg
USCC0003436.jpg
USCC0003437.jpg
USCC0003438.jpg
USCC0003439.jpg
USCC0003440.jpg
USCC0003441.jpg
USCC0003442.jpg
USCC0003443.jpg
USCC0003444.jpg
USCC0003445.jpg
USCC0003446.jpg
USCC0003447.jpg
USCC0003448.jpg
USCC0003449.jpg
USCC0003450.jpg
USCC0003451.jpg
USCC0003452.jpg
USCC0003453.jpg
USCC0003454.jpg
USCC0003455.jpg
USCC0003456.jpg
USCC0003457.jpg
USCC0003458.jpg
USCC0003459.jpg
USCC0003460.jpg
USCC0003461.jpg
USCC0003462.jpg
USCC0003463.jpg
USCC0003464.jpg
USCC0003465.jpg
USCC0003466.jpg
USCC0003467.jpg
USCC0003468.jpg
USCC0003469.jpg
USCC0003470.jpg
USCC0003471.jpg
USCC0003472.jpg
USCC0003473.jpg
USCC0003474.jpg
USCC0003475.jpg
USCC0003476.jpg
USCC0003477.jpg
USCC0003478.jpg
USCC0003479.jpg
USCC0003480.jpg
USCC0003481.jpg
USCC0003482.jpg
USCC0003483.jpg
USCC0003484.jpg
USCC0003485.jpg
USCC0003486.jpg
USCC0003487.jpg

EXHIBIT 3-21

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003488.jpg
USCC0003489.jpg
USCC0003490.jpg
USCC0003491.jpg
USCC0003492.jpg
USCC0003493.jpg
USCC0003494.jpg
USCC0003495.jpg
USCC0003496.jpg
USCC0003497.jpg
USCC0003498.jpg
USCC0003499.jpg
USCC0003500.jpg
USCC0003501.jpg
USCC0003502.jpg
USCC0003503.jpg
USCC0003504.jpg
USCC0003505.jpg
USCC0003506.jpg
USCC0003507.jpg
USCC0003508.jpg
USCC0003509.jpg
USCC0003510.jpg
USCC0003511.jpg
USCC0003512.jpg
USCC0003513.jpg
USCC0003514.jpg
USCC0003515.jpg
USCC0003516.jpg
USCC0003517.jpg
USCC0003518.jpg
USCC0003519.jpg
USCC0003520.jpg
USCC0003521.jpg
USCC0003522.jpg
USCC0003523.jpg
USCC0003524.jpg
USCC0003525.jpg
USCC0003526.jpg
USCC0003527.jpg
USCC0003528.jpg
USCC0003529.jpg
USCC0003530.jpg
USCC0003531.jpg
USCC0003532.jpg
USCC0003533.jpg
USCC0003534.jpg
USCC0003535.jpg
USCC0003536.jpg
USCC0003537.jpg
USCC0003538.jpg
USCC0003539.jpg
USCC0003540.jpg

EXHIBIT 3-22

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

USCC0003541.jpg
USCC0003542.jpg
USCC0003543.jpg
USCC0003544.jpg
USCC0003545.jpg
USCC0003546.jpg
USCC0003547.jpg
USCC0003548.jpg
USCC0003549.jpg
USCC0003550.jpg
USCC0003551.jpg
USCC0003552.jpg
USCC0003553.jpg
USCC0003554.jpg
USCC0003555.jpg
USCC0003556.jpg
USCC0003557.jpg
USCC0003558.jpg
USCC0003559.jpg
USCC0003560.jpg
USCC0003561.jpg
USCC0003562.jpg
USCC0003563.jpg
USCC0003564.jpg
USCC0003565.jpg
USCC0003566.jpg
USCC0003567.jpg
USCC0003568.jpg
USCC0003569.jpg
USCC0003570.jpg
USCC0003571.jpg
USCC0003572.jpg
USCC0003573.jpg
USCC0003574.jpg
USCC0003575.jpg
USCC0003576.jpg
USCC0003577.jpg
USCC0003578.jpg
USCC0003579.jpg
USCC0003580.jpg
USCC0003581.jpg
USCC0003582.jpg
USCC0003583.jpg
USCC0003584.jpg
USCC0003585.jpg
USCC0003586.jpg
USCC0003587.jpg
USCC0003588.jpg
USCC0003589.jpg
USCC0003590.jpg
USCC0003591.jpg
USCC0003592.jpg
USCC0003593.jpg

EXHIBIT 3-23

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

USCC0003594.jpg
USCC0003595.jpg
USCC0003596.jpg
USCC0003597.jpg
USCC0003598.jpg
USCC0003599.jpg
USCC0003600.jpg
USCC0003601.jpg
USCC0003602.jpg
USCC0003603.jpg
USCC0003604.jpg
USCC0003605.jpg
USCC0003606.jpg
USCC0003607.jpg
USCC0003608.jpg
USCC0003609.jpg
USCC0003610.jpg
USCC0003611.jpg
USCC0003612.jpg
USCC0003613.jpg
USCC0003614.jpg
USCC0003615.jpg
USCC0003616.jpg
USCC0003617.jpg
USCC0003618.jpg
USCC0003619.jpg
USCC0003620.jpg
USCC0003621.jpg
USCC0003622.jpg
USCC0003623.jpg
USCC0003624.jpg
USCC0003625.jpg
USCC0003626.jpg
USCC0003627.jpg
USCC0003628.jpg
USCC0003629.jpg
USCC0003630.jpg
USCC0003631.jpg
USCC0003632.jpg
USCC0003633.jpg
USCC0003634.jpg
USCC0003635.jpg
USCC0003636.jpg
USCC0003637.jpg
USCC0003638.jpg
USCC0003639.jpg
USCC0003640.jpg
USCC0003641.jpg
USCC0003642.jpg
USCC0003643.jpg
USCC0003644.jpg
USCC0003645.jpg
USCC0003646.jpg

EXHIBIT 3-24

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003647.jpg
USCC0003648.jpg
USCC0003649.jpg
USCC0003650.jpg
USCC0003651.jpg
USCC0003652.jpg
USCC0003653.jpg
USCC0003654.jpg
USCC0003655.jpg
USCC0003656.jpg
USCC0003657.jpg
USCC0003658.jpg
USCC0003659.jpg
USCC0003660.jpg
USCC0003661.jpg
USCC0003662.jpg
USCC0003663.jpg
USCC0003664.jpg
USCC0003665.jpg
USCC0003666.jpg
USCC0003667.jpg
USCC0003668.jpg
USCC0003669.jpg
USCC0003670.jpg
USCC0003671.jpg
USCC0003672.jpg
USCC0003673.jpg
USCC0003674.jpg
USCC0003675.jpg
USCC0003676.jpg
USCC0003677.jpg
USCC0003678.jpg
USCC0003679.jpg
USCC0003680.jpg
USCC0003681.jpg
USCC0003682.jpg
USCC0003683.jpg
USCC0003684.jpg
USCC0003685.jpg
USCC0003686.jpg
USCC0003687.jpg
USCC0003688.jpg
USCC0003689.jpg
USCC0003690.jpg
USCC0003691.jpg
USCC0003692.jpg
USCC0003693.jpg
USCC0003694.jpg
USCC0003695.jpg
USCC0003696.jpg
USCC0003697.jpg
USCC0003698.jpg
USCC0003699.jpg

EXHIBIT 3-25

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

USCC0003700.jpg
USCC0003701.jpg
USCC0003702.jpg
USCC0003703.jpg
USCC0003704.jpg
USCC0003705.jpg
USCC0003706.jpg
USCC0003707.jpg
USCC0003708.jpg
USCC0003709.jpg
USCC0003710.jpg
USCC0003711.jpg
USCC0003712.jpg
USCC0003713.jpg
USCC0003714.jpg
USCC0003715.jpg
USCC0003716.jpg
USCC0003717.jpg
USCC0003718.jpg
USCC0003719.jpg
USCC0003720.jpg
USCC0003721.jpg
USCC0003722.jpg
USCC0003723.jpg
USCC0003724.jpg
USCC0003725.jpg
USCC0003726.jpg
USCC0003727.jpg
USCC0003728.jpg
USCC0003729.jpg
USCC0003730.jpg
USCC0003731.jpg
USCC0003732.jpg
USCC0003733.jpg
USCC0003734.jpg
USCC0003735.jpg
USCC0003736.jpg
USCC0003737.jpg
USCC0003738.jpg
USCC0003739.jpg
USCC0003740.jpg
USCC0003741.jpg
USCC0003742.jpg
USCC0003743.jpg
USCC0003744.jpg
USCC0003745.jpg
USCC0003746.jpg
USCC0003747.jpg
USCC0003748.jpg
USCC0003749.jpg
USCC0003750.jpg
USCC0003751.jpg
USCC0003752.jpg

EXHIBIT 3-26

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003753.jpg
USCC0003754.jpg
USCC0003755.jpg
USCC0003756.jpg
USCC0003757.jpg
USCC0003758.jpg
USCC0003759.jpg
USCC0003760.jpg
USCC0003761.jpg
USCC0003762.jpg
USCC0003763.jpg
USCC0003764.jpg
USCC0003765.jpg
USCC0003766.jpg
USCC0003767.jpg
USCC0003768.jpg
USCC0003769.jpg
USCC0003770.jpg
USCC0003771.jpg
USCC0003772.jpg
USCC0003773.jpg
USCC0003774.jpg
USCC0003775.jpg
USCC0003776.jpg
USCC0003777.jpg
USCC0003778.jpg
USCC0003779.jpg
USCC0003780.jpg
USCC0003781.jpg
USCC0003782.jpg
USCC0003783.jpg
USCC0003784.jpg
USCC0003785.jpg
USCC0003786.jpg
USCC0003787.jpg
USCC0003788.jpg
USCC0003789.jpg
USCC0003790.jpg
USCC0003791.jpg
USCC0003792.jpg
USCC0003793.jpg
USCC0003794.jpg
USCC0003795.jpg
USCC0003796.jpg
USCC0003797.jpg
USCC0003798.jpg
USCC0003799.jpg
USCC0003800.jpg
USCC0003801.jpg
USCC0003802.jpg
USCC0003803.jpg
USCC0003804.jpg
USCC0003805.jpg

EXHIBIT 3-27

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003806.jpg
USCC0003807.jpg
USCC0003808.jpg
USCC0003809.jpg
USCC0003810.jpg
USCC0003811.jpg
USCC0003812.jpg
USCC0003813.jpg
USCC0003814.jpg
USCC0003815.jpg
USCC0003816.jpg
USCC0003817.jpg
USCC0003818.jpg
USCC0003819.jpg
USCC0003820.jpg
USCC0003821.jpg
USCC0003822.jpg
USCC0003823.jpg
USCC0003824.jpg
USCC0003825.jpg
USCC0003826.jpg
USCC0003827.jpg
USCC0003828.jpg
USCC0003829.jpg
USCC0003830.jpg
USCC0003831.jpg
USCC0003832.jpg
USCC0003833.jpg
USCC0003834.jpg
USCC0003835.jpg
USCC0003836.jpg
USCC0003837.jpg
USCC0003838.jpg
USCC0003839.jpg
USCC0003840.jpg
USCC0003841.jpg
USCC0003842.jpg
USCC0003843.jpg
USCC0003844.jpg
USCC0003845.jpg
USCC0003846.jpg
USCC0003847.jpg
USCC0003848.jpg
USCC0003849.jpg
USCC0003850.jpg
USCC0003851.jpg
USCC0003852.jpg
USCC0003853.jpg
USCC0003854.jpg
USCC0003855.jpg
USCC0003856.jpg
USCC0003857.jpg
USCC0003858.jpg

EXHIBIT 3-28

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003859.jpg
USCC0003860.jpg
USCC0003861.jpg
USCC0003862.jpg
USCC0003863.jpg
USCC0003864.jpg
USCC0003865.jpg
USCC0003866.jpg
USCC0003867.jpg
USCC0003868.jpg
USCC0003869.jpg
USCC0003870.jpg
USCC0003871.jpg
USCC0003872.jpg
USCC0003873.jpg
USCC0003874.jpg
USCC0003875.jpg
USCC0003876.jpg
USCC0003877.jpg
USCC0003878.jpg
USCC0003879.jpg
USCC0003880.jpg
USCC0003881.jpg
USCC0003882.jpg
USCC0003883.jpg
USCC0003884.jpg
USCC0003885.jpg
USCC0003886.jpg
USCC0003887.jpg
USCC0003888.jpg
USCC0003889.jpg
USCC0003890.jpg
USCC0003891.jpg
USCC0003892.jpg
USCC0003893.jpg
USCC0003894.jpg
USCC0003895.jpg
USCC0003896.jpg
USCC0003897.jpg
USCC0003898.jpg
USCC0003899.jpg
USCC0003900.jpg
USCC0003901.jpg
USCC0003902.jpg
USCC0003903.jpg
USCC0003904.jpg
USCC0003905.jpg
USCC0003906.jpg
USCC0003907.jpg
USCC0003908.jpg
USCC0003909.jpg
USCC0003910.jpg
USCC0003911.jpg

EXHIBIT 3-29

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003912.jpg
USCC0003913.jpg
USCC0003914.jpg
USCC0003915.jpg
USCC0003916.jpg
USCC0003917.jpg
USCC0003918.jpg
USCC0003919.jpg
USCC0003920.jpg
USCC0003921.jpg
USCC0003922.jpg
USCC0003923.jpg
USCC0003924.jpg
USCC0003925.jpg
USCC0003926.jpg
USCC0003927.jpg
USCC0003928.jpg
USCC0003929.jpg
USCC0003930.jpg
USCC0003931.jpg
USCC0003932.jpg
USCC0003933.jpg
USCC0003934.jpg
USCC0003935.jpg
USCC0003936.jpg
USCC0003937.jpg
USCC0003938.jpg
USCC0003939.jpg
USCC0003940.jpg
USCC0003941.jpg
USCC0003942.jpg
USCC0003943.jpg
USCC0003944.jpg
USCC0003945.jpg
USCC0003946.jpg
USCC0003947.jpg
USCC0003948.jpg
USCC0003949.jpg
USCC0003950.jpg
USCC0003951.jpg
USCC0003952.jpg
USCC0003953.jpg
USCC0003954.jpg
USCC0003955.jpg
USCC0003956.jpg
USCC0003957.jpg
USCC0003958.jpg
USCC0003959.jpg
USCC0003960.jpg
USCC0003961.jpg
USCC0003962.jpg
USCC0003963.jpg
USCC0003964.jpg

EXHIBIT 3-30

Highly Confidential—Attorneys' Eyes Only

**Exhibit 3: Documents Relied Upon**

USCC0003965.jpg
USCC0003966.jpg
USCC0003967.jpg
USCC0003968.jpg
USCC0003969.jpg
USCC0003970.jpg
USCC0003971.jpg
USCC0003972.jpg
USCC0003973.jpg
USCC0003974.jpg
USCC0003975.jpg
USCC0003976.jpg
USCC0003977.jpg
USCC0003978.jpg
USCC0003979.jpg
USCC0003980.jpg
USCC0003981.jpg
USCC0003982.jpg
USCC0003983.jpg
USCC0003984.jpg
USCC0003985.jpg
USCC0003986.jpg
USCC0003987.jpg
USCC0003988.jpg
USCC0003989.jpg
USCC0003990.jpg
USCC0003991.jpg
USCC0003992.jpg
USCC0003993.jpg
USCC0003994.jpg
USCC0003995.jpg
USCC0003996.jpg
USCC0003997.jpg
USCC0003998.jpg
USCC0003999.jpg
USCC0004000.jpg
USCC0004001.jpg
USCC0004002.jpg
USCC0004003.jpg
USCC0004004.jpg
USCC0004005.jpg
USCC0004006.jpg
USCC0004007.jpg
USCC0004008.jpg
USCC0004009.jpg
USCC0004010.jpg
USCC0004011.jpg
USCC0004012.jpg
USCC0004013.jpg
USCC0004014.jpg
USCC0004015.jpg
USCC0004016.jpg
USCC0004017.jpg

EXHIBIT 3-31

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

USCC0004018.jpg
USCC0004019.jpg
USCC0004020.jpg
USCC0004021.jpg
USCC0004022.jpg
USCC0004023.jpg
USCC0004024.jpg
USCC0004025.jpg
USCC0004026.jpg
USCC0004027.jpg
USCC0004028.jpg
USCC0004029.jpg

**Verizon**
VZ-00000004
VZ-00000012
VZ-00000021
VZ-00000024
VZ-00000026
VZ-00000029
VZ-00000037
VZ-00000042
VZ-00000045
VZ-00000048
VZ-00000054
VZ-00000060
VZ-00000066
VZ-00000070
VZ-00000079
VZ-00000083
VZ-00000086
VZ-00000093
VZ-00000097
VZ-00000100
VZ-00000109
VZ-00000111
VZ-00000114
VZ-00000116
VZ-00000123
VZ-00000135
VZ-00000137
VZ-00000141
VZ-00000145
VZ-00000147
VZ-00000151
VZ-00000153
VZ-00000160
VZ-00000168
VZ-00000177
VZ-00000182
VZ-00000184
VZ-00000195
VZ-00000203

EXHIBIT 3-32

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

VZ-00000207
VZ-00000211
VZ00013535-13553
1 of 17 Jul-13 to Sep-13 Verizon Highly Confidential Attorneys' Eyes Only.txt
10 of 17 Oct-15 to Dec-15 Verizon Highly Confidential Attorneys' Eyes Only.txt
11 of 17 Jan-16 to Mar-16 Verizon Highly Confidential Attorneys' Eyes Only.txt
12 of 17 Apr-16 to Jun-16 Verizon Highly Confidential Attorneys' Eyes Only.txt
13 of 17 Jul-16 to Sep-16 Verizon Highly Confidential Attorneys' Eyes Only.txt
14 of 17 Oct-16 to Dec-16 Verizon Highly Confidential Attorneys' Eyes Only.txt
15 of 17 Jan-17 to Mar-17 Verizon Highly Confidential Attorneys' Eyes Only.txt
16 of 17 Apr-17 to Jun-17 Verizon Highly Confidential Attorneys' Eyes Only.txt
17 of 17 Jul-17 to Oct-17 Verizon Highly Confidential Attorneys' Eyes Only.txt
2 of 17 Oct-13 to Dec-13 Verizon Highly Confidential Attorneys' Eyes Only.txt
3 of 17 Jan-14 to Mar-14 Verizon Highly Confidential Attorneys' Eyes Only.txt
4 of 17 Apr-14 to Jun-14 Verizon Highly Confidential Attorneys' Eyes Only.txt
5 of 17 Jul-14 to Sep-14 Verizon Highly Confidential Attorneys' Eyes Only.txt
6 of 17 Oct-14 to Dec-14 Verizon Highly Confidential Attorneys' Eyes Only.txt
7 of 17 Jan-15 to Mar-15 Verizon Highly Confidential Attorneys' Eyes Only.txt
8 of 17 Apr-15 to Jun-15 Verizon Highly Confidential Attorneys' Eyes Only.txt
9 of 17 Jul-15 to Sep-15 Verizon Highly Confidential Attorneys' Eyes Only.txt

**Walmart**
WM2017-022399C000001-1093
WM2017-022399C001094-3948
WM2017-022399C003949-4153
WM2017-022399C004154-4234

**Wistron**
WISTRON_1000000050
WISTRON_1000000051
WISTRON_1000000052
WISTRON_1000000053
WISTRON_1000000054
WISTRON_1000000055
WISTRON_1000000056
WISTRON_1000000057
WISTRON_1000000058
WISTRON_1000000059
WISTRON_1000000060
WISTRON_1000000061
WISTRON_1000000062
WISTRON_1000000063
WISTRON_1000000064
WISTRON_1000000065
WISTRON_1000000066
WISTRON_1000000067
WISTRON_1000000068
WISTRON_1000000069
WISTRON_1000000070
WISTRON_1000000071
WISTRON_1000000072
WISTRON_1000000073
WISTRON_1000000074

EXHIBIT 3-33

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

WISTRON_1000000075
WISTRON_1000000076
WISTRON_1000000077

**Phone Characteristics**
**Main Characteristics Websites:**
..\Qualcomm\data\3rd party phone characteristics\processed\scrape\progs\GSM
Arena\20180202_Content\phone pages
..\Qualcomm\data\3rd party phone characteristics\processed\scrape\progs\Phone
Arena\20180404_Content\phone pages
..\Qualcomm\data\3rd party phone characteristics\processed\scrape\progs\Phone
Scoop\20180506Content\details

**Operating Systems**
https://en.wikipedia.org/wiki/Samsung_SGH-G800
https://www.mobilesmspk.net/compare/samsung-l600/samsung-c3750
https://www.mobilesmspk.net/compare/samsung-u485-intensity-iii/samsung-u460-intensity-ii
https://www.itproportal.com/reviews/mobile-phones/alcatel-onetouch-720-review/
https://www.gsmarc.com/alcatel/ot-838/full-specs/
http://www.techinsights.com/DeviceProfile5F_AustinParts.aspx?TeardownId=1468
https://www.att.com/devicehowto/tutorial.html#!/interactive/id/interactive_1500006259?make=ATT&model=AT
TM3620
https://www.phonescoop.com/phones/phone.php?p=2652
https://www.phonescoop.com/phones/phone.php?p=3355
https://www.att.com/esupport/article.html#!/wireless/KB410126
https://www.phonescoop.com/phones/phone.php?p=3968
https://www.att.com/esupport/article.html#!/wireless/KB410511
https://www.newegg.com/Product/Product.aspx?Item=N82E16875561138
https://www.newegg.com/Product/Product.aspx?Item=N82E16875561139
https://www.cnet.com/products/blu-speed/review/
https://www.phonemore.com/compare/phones/blu-tattoo-mini-tv-q190t-vs-hyundai-orbit/7514446
https://www.tuffphones.co.uk/blog/CAT_B25_Review/
http://driversfromsabina.club/cricket-captr-28/
http://www.fosspatents.com/2011/07/interdigital-sues-huawei-zte-and-nokia.html
https://mobilephonecatalog.wordpress.com/page/12/?archives-list=1
http://www.phonesranking.com/Huawei%20Pal/
http://charitymobile.com/phones-cadence.html
https://www.phonescoop.com/phones/phone.php?p=4335
https://www.gsmarc.com/kyocera/durashock/full-specs/
http://www.comparecellular.com/cell-phones/kyocera-duraxt/specifications.asp
https://www.phonescoop.com/phones/phone.php?p=1892
https://www.phonerated.com/specs-lg_221c
https://shop65.staginghomesourcesystems.net/Appliances/Dryer?product_id=4699
https://tracfonereviewer.blogspot.com/2012/12/tracfone-review-lg-840g.html
https://egypt.souq.com/eg-en/lg-a230-proprietary-black-4205778/i/
http://www.mtn.onlinecare.wds.co/LG_C100/MTN/en/specification
https://www.phonemore.com/lg-c320-intouch-lady/specs/869
https://www.phonemore.com/lg-cookie-kp500/specs/229
https://productz.com/en/lg-cookie-lite-t300
http://www.comparecellular.com/cell-phones/lg-cookie-plus/specifications.asp
https://www.phonemore.com/lg-cookie-wifi-t310i/specs/872
https://www.phonescoop.com/phones/phone.php?p=3213
https://ezinearticles.com/?LG-Cosmos-Touch-Cell-Phone&id=5784743

EXHIBIT 3-34

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.mobilesmspk.net/compare/lg-cu500/lg-trax-cu575
http://www.mobiletechreview.com/phones/LG-Dare.htm
https://www.justanswer.com/cell-phones/44q9o-hello-i-need-know-operating-system-lg-env-2.html
https://en.wikipedia.org/wiki/LG_enV3_(VX9200)
http://www.comparecellular.com/cell-phones/lg-envoy-ii/specifications.asp
http://www.comparecellular.com/cell-phones/lg-envoy-iii/specifications.asp
https://www.phonerated.com/specs-lg_exalt_ii
https://www.pdevice.com/product/lg-exalt-lte-price-specs
http://www.boeboer.com/lg-exalt-vn360-user-manual-start-guide-verizon/
https://www.phonemore.com/lg-extravert-2-vn280/specs/1868
http://www.comparecellular.com/cell-phones/lg-f4n/specifications.asp
https://www.whistleout.com/CellPhones/Phones/LG/LG-Freedom-II
https://www.mobilesmspk.net/compare/lg-gb125/lg-gb220
https://www.mobilesmspk.net/compare/lg-gb160/lg-a180
https://www.mobilesmspk.net/compare/lg-s5300/lg-gb230-julia
http://www.expertreviews.co.uk/mobile-phones/48973/lg-gc900-viewty-smart-review
https://www.mobilesmspk.net/compare/lg-ke260/lg-gd330
https://www.mobilegazette.com/lg-gd880-mini-10x02x09.htm
https://uae.souq.com/ae-en/lg-gd900-crystal-wifi-485516/i/
https://www.mobilesmspk.net/compare/lg-b2070/lg-gm200-brio
https://www.phonemore.com/lg-cookie-fresh-gs290/specs/1406
https://uae.souq.com/kw-en/lg-gs500-cookie-plus-487882/i/
https://www.mobilesmspk.net/compare/lg-gt365-neon/samsung-gravity-q-t289
http://www.hellkom.co.za/cellphones//189/Mobile-Phone-LG-GT400-Viewty-Smile.html?id=189
http://www.expertreviews.co.uk/mobile-phones/48978/lg-gt505-review
https://shop65.staginghomesourcesystems.net/index.php?route=product/product&manufacturer_id=10&product_id=5712&page=5
https://www.mobilesmspk.net/compare/lg-gb130/lg-gu230-dimsun
https://www.phonemore.com/compare/phones/lg-gu285-vs-samsung-sgh-d820/7499547
https://www.mobilesmspk.net/compare/lg-s5200/lg-gu292
https://www.themobileindian.com/product-finder/mobile/lg-gw300-457
http://www.hellkom.co.za/compare-cellphones/GW525%20vs%20Dream/
https://www.themobileindian.com/product-finder/mobile/lg-gx200-325
https://www.themobileindian.com/product-finder/mobile/lg-gx500-399
http://www.hardwarezone.com/product-lg-kc910-renoir-8-megapixel-camera-phone/specifications
https://www.mobilesmspk.net/compare/lg-ke970-shine/lg-gb280
https://www.mobilesmspk.net/compare/lg-kf240/lg-gb130
https://www.mobilesmspk.net/compare/lg-kf300/lg-kp215
https://www.mobilesmspk.net/compare/lg-kp215/lg-kf305
https://www.mobilesmspk.net/compare/lg-kf750-secret/lg-kc550
https://www.gsmarena.com/lg_kf900_prada-reviews-2552p21.php
https://www.mobilesmspk.net/compare/lg-kg810/lg-gb220
https://productz.com/en/lg-km570-vs-lg-shine-ke970
http://www.expertreviews.co.uk/mobile-phones/48274/lg-km900-arena-review
https://uae.souq.com/kw-en/lg-kp105-645483/i/
https://www.gsmarena.com/lg_kp500_cookie-reviews-2536p98.php
https://www.phonemore.com/lg-ks360/specs/1411
https://productz.com/en/doro-phoneeasy-612-vs-lg-ks365
https://yamobi.ru/gadgets/LG_KS660.html
https://www.phonescoop.com/phones/phone.php?p=2315
http://www.comparecellular.com/cell-phones/lg-neon-te365/specifications.asp
https://productz.com/en/lg-bl40
http://www.comparecellular.com/cell-phones/lg-pop-gd510/specifications.asp

EXHIBIT 3-35

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://community.sprint.com/t5/LG-Board/LG-LN240-Remarq-No-Hindi-Fonts/td-p/225158
https://www.phonescoop.com/phones/phone.php?p=4440
https://www.phonemore.com/lg-rumor-reflex-sprint/specs/714
https://www.themobileindian.com/product-finder/mobile/lg-s310-1437
https://www.gsmarc.com/lg/saber/full-specs/
https://www.phonescoop.com/phones/phone.php?p=2546
http://www.love-taiwan.com.tw/product.asp?pid=282
https://www.phonemore.com/lg-t375-cookie-smart/specs/347
https://www.phonemore.com/lg-t510/specs/188
https://www.mobilesmspk.net/compare/lg-town-gt350/samsung-gravity-q-t289
https://www.phonescoop.com/phones/phone.php?p=4500
https://www.mobilesmspk.net/compare/lg-kp152/lg-u370
https://en.wikipedia.org/wiki/LG_Viewty
https://www.phonemore.com/lg-viewty-snap-gm360/specs/1400
https://www.phonescoop.com/phones/phone.php?p=1378
http://www.wikiwand.com/en/LG_VX8700
http://www.comparecellular.com/cell-phones/lg-wine-iii/specifications.asp
https://www.phonemore.com/lg-xenon-gr500/specs/507
https://www.phonemore.com/lg-xpression-2-c410/specs/2234
https://www.phonemore.com/lg-xpression-c395/specs/807
https://www.phonemore.com/microsoft-kin-one/specs/1899
https://www.phonemore.com/compare/phones/microsoft-kin-two-vs-samsung-sgh-t809/7503920
https://www.phonescoop.com/phones/phone.php?p=2278
http://www.comparecellular.com/cell-phones/motorola-brute-i680/specifications.asp
https://www.mobilesmspk.net/compare/motorola-em25/plum-dazzle
https://www.mobilesmspk.net/compare/motorola-em28/motorola-wx265
http://www.hellkom.co.za/cellphones/316/Motorola-EX112.html
https://www.phonemore.com/motorola-ex115/specs/33
https://www.phonemore.com/motorola-ex119/specs/727
https://www.gsmarc.com/motorola/ex122/compare/
http://www.hellkom.co.za/compare-cellphones/EX128%20vs%20One%20Max/
https://uae.souq.com/kw-en/motorola-ex226-5012568/i/
http://www.comparecellular.com/cell-phones/motorola-i365/specifications.asp
http://www.comparecellular.com/cell-phones/motorola-i365is-intrinsically-safe/specifications.asp
http://www.comparecellular.com/cell-phones/motorola-i576/specifications.asp
https://www.phonescoop.com/phones/phone.php?p=349
https://www.phonescoop.com/phones/phone.php?p=512
https://www.mobilesmspk.net/compare/motorola-krzr-k1/motorola-krzr-k3
https://www.phonemore.com/motorola-motocubo-a45/specs/867
https://www.mobilesmspk.net/compare/motorola-motofone-f3/motorola-wx294
https://www.phonemore.com/motorola-motokey-3-chip-ex117/specs/325
https://www.mobilesmspk.net/compare/motorola-motokey-mini-ex108/motorola-motokey-3-chip-ex117
http://www.comparecellular.com/cell-phones/motorola-r765is-intrinsically-safe/specifications.asp
https://www.phonemore.com/motorola-razr-v3i/specs/410
http://www.fonearena.com/motorola-razr2-v9x_793.html
http://www.comparecellular.com/cell-phones/motorola-rival-a455/specifications.asp
https://uae.souq.com/kw-en/motorola-slvr-l6-481932/i/
https://www.mobilesmspk.net/compare/motorola-slvr-l9/motorola-wx294
https://uae.souq.com/kw-en/motorola-v195-645341/i/
https://www.phonescoop.com/phones/phone.php?p=688
https://uae.souq.com/kw-en/motorola-v60-472856/i/
https://pricespy.co.uk/phones-gps/mobile-phones/motorola-w220--p118869
http://www.cellphonedia.com/motorola-cell-phones/motorola-w270.html

EXHIBIT 3-36

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://productz.com/en/motorola-w388
https://www.google.com/search?ei=3yQtW5DYDMvAjwT884nQBQ&q=%22MOTOROLA+W396%22+proprietary+o
perating+system+-ebay&oq=%22MOTOROLA+W396%22+proprietary+operating+system+-ebay&gs_l=psy-
ab.3...854.1120.0.1266.3.3.0.0.0.0.74.206.3.3.0....0...1.1.64.psy-ab..0.0.0....0.-RyiTkyYr8g
https://www.mobilesmspk.net/compare/motorola-w510/motorola-krzr-k1
https://www.mobilesmspk.net/compare/motorola-ve75/motorola-w7-active-edition
https://www.mobilesmspk.net/compare/motorola-w180/motorola-wx160
https://www.croma.com/motorola-wx290-gsm-mobile-phone/p/168802
http://www.fonearena.com/motorola-wx295_1235.html
http://www.hellkom.co.za/cellphones/416/Nokia-100.html
https://www.phonemore.com/nokia-105/specs/722
http://www.fonearena.com/nokia-106_3818.html
http://www.fonearena.com/nokia-208_3600.html
https://uae.souq.com/ae-en/nokia-2720-fold-54484000033/u/
https://uae.souq.com/ae-en/nokia-2730-classic-30mb-3g-black-486565/i/
https://devices.vodafone.com.au/web/nokia-3310-2017-proprietary-os/specifications
https://uae.souq.com/ae-en/nokia-5030-xpressradio-485018/i/
https://uae.souq.com/ae-en/nokia-6085-black-64195200033/u/
https://uae.souq.com/kw-en/nokia-6101-475671/i/
https://productz.com/en/nokia-106-vs-nokia-6103
https://www.mobilesmspk.net/compare/nokia-6126/nokia-6133
https://www.mobilesmspk.net/compare/nokia-6133/nokia-6125
https://uae.souq.com/ae-en/nokia-6210-63095700033/u/
https://www.mobilesmspk.net/compare/nokia-6301/nokia-301
https://uae.souq.com/ae-en/nokia-7020-45-mb-grey-5502016/i/
https://uae.souq.com/ae-en/nokia-7230-645628/i/
http://www.hellkom.co.za/cellphones/53/Nokia-7705-Twist.html
https://uae.souq.com/ae-en/nokia-8800-sirocco-128-mb-silver-5771096/i/
https://uae.souq.com/ae-en/nokia-asha-300-140-mb-3g-+-wifi-graphite-5429150/i/
https://www.phonemore.com/compare/phones/nokia-asha-302-vs-nokia-n85/151663
http://www.hellkom.co.za/cellphones/461/Nokia-Asha-303.html
https://www.phonemore.com/compare/phones/nokia-asha-308-vs-samsung-sgh-d820/7498381
https://uae.souq.com/ae-en/nokia-c1-01-dark-grey-4256404/i/
https://uae.souq.com/ae-en/nokia-c2-01-489959/i/
http://www.comparecellular.com/cell-phones/nokia-c2-02/specifications.asp
https://www.themobileindian.com/product-finder/mobile/nokia-c2-05-4475
https://uae.souq.com/ae-en/nokia-c3-00-55-mb-wifi-graphite-grey-488238/i/
http://www.hellkom.co.za/cellphones/395/Nokia-1618.html
http://www.fonearena.com/nokia-x1-00_1472.html
https://uae.souq.com/ae-en/nokia-x3-02-touch-type-pink-english-4882463/i/
https://www.gsmarena.com/nokia_x3_02_touch_and_type-reviews-3479p269.php
https://www.phonemore.com/pantech-breeze-iii-p2030/specs/1247
https://www.phonescoop.com/phones/phone.php?p=3187
https://www.phonescoop.com/phones/phone.php?p=2442
https://www.gsmarc.com/pantech/reveal/full-specs/
https://www.walmart.com/ip/POSH-Lynx-A100-GSM-Dual-SIM-Cell-Phone-Unlocked/46821855
https://support.t-mobile.com/docs/DOC-8410
https://www.phonescoop.com/phones/phone.php?p=3672
https://www.phonescoop.com/phones/phone.php?p=1993
https://www.phonescoop.com/phones/phone.php?p=1974
https://www.phonescoop.com/phones/phone.php?p=1602
https://www.phonescoop.com/phones/phone.php?p=71
https://www.phonescoop.com/phones/phone.php?p=1118

EXHIBIT 3-37

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.phonescoop.com/phones/phone.php?p=158
https://www.mobilesmspk.net/compare/htc-s710/samsung-a667-evergreen
https://www.mobilesmspk.net/compare/samsung-t429/samsung-a687-strive
https://www.mobilesmspk.net/compare/samsung-a717/samsung-m370
http://www.comparecellular.com/cell-phones/samsung-a777/specifications.asp
https://www.mobilesmspk.net/compare/samsung-t429/samsung-a797-flight
http://www.hellkom.co.za/compare-cellphones/A817%20Solstice%20II%20vs%20Z3/
https://www.mobilesmspk.net/compare/samsung-a877-impression/samsung-e1260b
https://saudi.souq.com/sa-en/samsung-b2100-quad-band-phone-extreme-anti-shock-waterproof-built-in-flashlight-bluetooth-international-version-4788300/i/
https://www.mobilesmspk.net/compare/samsung-b2100-xplorer/samsung-c3350
https://www.goodgearguide.com.au/review/samsung/b3310/332518/specs/
https://www.goodgearguide.com.au/review/samsung/b3410/345627/
https://www.phonemore.com/samsung-duos-gt-b5722/specs/1094
https://www.mobilegazette.com/samsung-b7722-11x03x15.htm
https://www.phonemore.com/samsung-beat-dj-gt-m7600/specs/692
http://www.samsung.com/us/system/consumer/product/2008/11/12/sgh_t919cnatmb/SGH-t919-Behold_IG_Lo.pdf
https://www.phonemore.com/samsung-champ-2-gt-c3330/specs/957
http://www.hellkom.co.za/compare-cellphones/C3510%20Genoa%20vs%20Ozone/
https://uae.souq.com/kw-en/samsung-c3520-gray-english-4955089/i/
https://www.mobilesmspk.net/compare/samsung-c3590/samsung-m370
http://www.hellkom.co.za/compare-cellphones/C5130%20Float%20vs%206230/
https://www.gsmarc.com/samsung/c5510/full-specs/
https://www.phonemore.com/samsung-duos-gt-c6112/specs/971
https://www.phonemore.com/samsung-chat-357/specs/963
https://www.mobilesmspk.net/compare/samsung-chatt-322-wi-fi/samsung-e1260b
https://uae.souq.com/ae-en/samsung-ch-t-335-s3350-5245926/i/
http://www.fonearena.com/samsung-ch@t-350_1403.html
http://www.hellkom.co.za/cellphones/445/Samsung-Ch-t-527.html
https://www.phonemore.com/samsung-champ-deluxe-duos-c3312/specs/498
https://www.themobileindian.com/product-finder/mobile/samsung-champ-35g-4459
https://www.phonescoop.com/phones/phone.php?p=3635
https://www.phonescoop.com/phones/phone.php?p=2103
https://www.gsmarena.com/sony_ericsson_k770-2052.php
https://www.phonescoop.com/phones/phone.php?p=903
https://www.phonescoop.com/phones/phone.php?p=1264
https://www.gsmarena.com/sony_ericsson_j105_naite-2818.php
https://www.phonescoop.com/phones/phone.php?p=602
https://www.phonescoop.com/phones/phone.php?p=228
https://www.phonescoop.com/phones/phone.php?p=275
https://www.phonescoop.com/phones/phone.php?p=93
https://www.phonescoop.com/phones/phone.php?p=496
https://www.phonescoop.com/phones/phone.php?p=116
https://www.phonescoop.com/phones/phone.php?p=1670
https://www.phonescoop.com/phones/phone.php?p=1670
http://www.fonearena.com/blog/39840/sony-ericsson-txt-announced.html
http://www.fonearena.com/sony-ericsson-txt-pro_1521.html
https://www.phonescoop.com/phones/phone.php?p=1102
https://www.phonescoop.com/phones/phone.php?p=904
https://www.phonescoop.com/phones/phone.php?p=1460
https://www.gsmarena.com/sony_ericsson_w380-2171.php
https://www.gsmarena.com/sony_ericsson_w395-2669.php

EXHIBIT 3-38

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.phonescoop.com/phones/phone.php?p=2148
https://www.phonescoop.com/phones/phone.php?p=2148
https://www.phonescoop.com/phones/phone.php?p=1210
https://en.wikipedia.org/wiki/Sony_Ericsson_W595
https://en.wikipedia.org/wiki/Sony_Ericsson_W595
https://www.gsmarena.com/sony_ericsson_w705-2585.php
https://www.phonescoop.com/phones/phone.php?p=1458
https://www.phonescoop.com/phones/phone.php?p=1458
https://www.phonescoop.com/phones/phone.php?p=893
https://en.wikipedia.org/wiki/Sony_Ericsson_W890i
https://www.phonescoop.com/phones/phone.php?p=1353
https://www.gsmarena.com/sony_ericsson_w995-2682.php
https://www.gsmarena.com/sony_ericsson_w995-2682.php
https://www.phonescoop.com/phones/phone.php?p=854
https://www.phonescoop.com/phones/phone.php?p=1101
https://www.phonescoop.com/phones/phone.php?p=497
https://www.phonescoop.com/phones/phone.php?p=765
https://www.phonescoop.com/phones/phone.php?p=1211
https://www.phonescoop.com/phones/phone.php?p=3841
https://www.phonescoop.com/phones/phone.php?p=2134
https://www.phonescoop.com/phones/phone.php?p=2857
https://www.phonescoop.com/phones/phone.php?p=4022
https://www.phonescoop.com/phones/phone.php?p=2359
https://www.phonescoop.com/phones/phone.php?p=2359
https://www.gsmarena.com/unnecto_primo-6001.php
https://www.gsmarena.com/unnecto_primo_3g-6002.php
https://www.gsmarena.com/unnecto_shell-6006.php
https://www.phonescoop.com/phones/phone.php?p=1527
https://www.phonescoop.com/phones/phone.php?p=1563
https://www.phonescoop.com/phones/phone.php?p=852
https://www.phonescoop.com/phones/phone.php?p=902
https://www.phonescoop.com/phones/phone.php?p=1563
https://www.phonescoop.com/phones/phone.php?p=1563
https://www.phonescoop.com/phones/phone.php?p=1938
https://www.phonescoop.com/phones/phone.php?p=2296
https://www.phonescoop.com/phones/phone.php?p=2491
https://www.phonescoop.com/phones/phone.php?p=2769
https://www.phonescoop.com/phones/phone.php?p=1770
https://www.phonescoop.com/phones/phone.php?p=1770
https://www.phonescoop.com/phones/phone.php?p=2082
https://www.phonescoop.com/phones/phone.php?p=2082
https://www.phonescoop.com/phones/phone.php?p=2127
https://www.phonescoop.com/phones/phone.php?p=2591
https://www.verykool.net/Products/i127
https://www.verykool.net/Products/i316
https://www.verykool.net/Products/i603
https://www.verykool.net/Products/R25
https://www.verykool.net/Products/r27
https://www.verykool.net/Products/r28
https://www.gsmarena.com/celkon_a407-7282.php
https://www.gsmarena.com/celkon_a518-7283.php
https://www.gsmarc.com/verykool/leo-ii-s4003/full-specs/#m-f-network
https://www.mobileread.com/forums/attachment.php?attachmentid=147810&d=1460580132

EXHIBIT 3-39

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.phonemore.com/samsung-galaxy-ace-duos-gt-s6802b/specs/59
https://www.phonemore.com/samsung-galaxy-ace-duos-gt-s6802b/specs/59
https://www.phonemore.com/samsung-galaxy-ace-ii-x-gt-s7560m/specs/1493
https://www.phonemore.com/samsung-galaxy-chat-gt-b5330/specs/82
https://www.phonemore.com/samsung-galaxy-core-2-duos-sm-g355m/specs/1671
https://www.phonemore.com/samsung-galaxy-core-2-duos-sm-g355m/specs/1671
https://www.pdevice.com/product/samsung-galaxy-express-3-specs
https://www.phonegg.com/phone/3749-Samsung-Galaxy-Fame-Lite-Duos-S6792L
https://www.phonegg.com/phone/3749-Samsung-Galaxy-Fame-Lite-Duos-S6792L
https://www.phonegg.com/phone/3748-Samsung-Galaxy-Fame-Lite-S6790
https://www.gadgetsnow.com/mobile-phones/Samsung-Galaxy-Grand-Neo-Plus
https://www.pdevice.com/product/samsung-galaxy-j1-mini-prime-price-specs
https://www.gsmmachine.com/samsung-galaxy-luna-6931.html
https://www.gsmarena.com/samsung_galaxy_note7-8082.php
https://www.phonemore.com/samsung-galaxy-pocket-gt-s5300/specs/792
https://gadgets.ndtv.com/samsung-galaxy-j7-pro-4215
https://www.cellhut.com/Samsung-Galaxy-Proclaim-S720C-CDMA-Quadband-Phone-33275.html
https://www.phonemore.com/samsung-galaxy-trend-lite-gt-s7390/specs/1263
https://www.devicespecifications.com/en/model/e6c4300a
https://en.wikipedia.org/wiki/Samsung_Galaxy_W#Processor
https://www.phonemore.com/samsung-galaxy-y-gt-s5360/specs/3220
https://www.phonemore.com/samsung-galaxy-y-duos-gt-s6102/specs/9
https://www.phonemore.com/samsung-galaxy-y-duos-gt-s6102/specs/9
https://www.phonemore.com/samsung-galaxy-y-gt-s5360/specs/3220

**Processors**

..\Qualcomm\data\3rd party phone characteristics\processed\progs_intermediate\Variants\mhz
work\data_files\MOTO-QUAL-01906017_SpecTraxExport - 4Q Ending 2013-13-31.xlsx
http://phonedb.net/index.php?m=processor&id=388&c=mediatek_mt8317
https://videocardz.net/soc/mediatek-mt8317/
https://en.wikipedia.org/wiki/MediaTek
https://www.comparebeforebuying.com/phones/phone/review-and-specs/samsung-galaxy-fame-lite-duos-gt-s6792l
https://www.gadgetsnow.com/mobile-phones/Samsung-Galaxy-Fame-Lite-S6790
https://en.wikipedia.org/wiki/List_of_Qualcomm_Snapdragon_systems-on-chip
https://www.qualcomm.com/products/snapdragon/processors/412
https://www.qualcomm.com/snapdragon/modems/comparison
https://en.wikipedia.org/wiki/Scorpion_(CPU)
https://en.wikipedia.org/wiki/Krait_(CPU)
https://en.wikipedia.org/wiki/Kryo
https://en.wikipedia.org/wiki/Exynos
https://www.semiwiki.com/forum/content/4597-curious-case-samsungs-shannon-chips.html
https://www.samsung.com/semiconductor/minisite/exynos/products/all-processors/
https://en.wikipedia.org/wiki/List_of_Samsung_System_on_Chips
https://en.wikipedia.org/wiki/Apple-designed_processors#A_series
https://en.wikipedia.org/wiki/Apple_A4
https://en.wikipedia.org/wiki/Apple_A5
https://en.wikipedia.org/wiki/Apple_A5X
https://en.wikipedia.org/wiki/Apple_A6
https://en.wikipedia.org/wiki/Apple_A6X
https://en.wikipedia.org/wiki/Apple_A7
https://en.wikipedia.org/wiki/Apple_A8
https://en.wikipedia.org/wiki/Apple_A8X

EXHIBIT 3-40

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://en.wikipedia.org/wiki/Apple_A9X
https://en.wikipedia.org/wiki/Apple_A10X
https://en.wikichip.org/wiki/apple/ax/a10x
https://en.wikipedia.org/wiki/Apple_A11
https://igotoffer.com/blog/apple-a11-full-information-specifications/
https://www.anandtech.com/show/9686/the-apple-iphone-6s-and-iphone-6s-plus-review/4
https://arstechnica.com/gadgets/2016/09/iphone-7-and-7-plus-review-great-annual-upgrades-with-one-major-catch/5/#h2
https://en.wikipedia.org/wiki/Atom_(system_on_chip)
https://en.wikipedia.org/wiki/List_of_Intel_Atom_microprocessors
https://en.wikipedia.org/wiki/MediaTek#Smartphone_application_&_modem_processors_/_SoCs
https://en.wikichip.org/wiki/mediatek/helio
https://en.wikichip.org/wiki/mediatek/helio/mt6795m
http://www.gizbeat.com/10275/new-mediatek-soc-mtk6737-vs-mtk6737t-update-to-mtk6735/
https://en.wikipedia.org/wiki/MediaTek
https://en.wikipedia.org/wiki/HiSilicon
https://en.wikipedia.org/wiki/OMAP
https://en.wikipedia.org/wiki/NovaThor
https://en.wikipedia.org/wiki/Allwinner_Technology#A-Series
https://en.wikipedia.org/wiki/Rockchip#Rockchip_RK30xx_series
https://en.wikipedia.org/wiki/Spreadtrum
https://www.androidauthority.com/spreadtrum-processors-guide-848691/
http://www.spreadtrum.com/mobile-chipsets
https://en.wikipedia.org/wiki/Tegra
https://en.wikipedia.org/wiki/List_of_ARM_microarchitectures
https://en.wikipedia.org/wiki/List_of_applications_of_ARM_cores
https://en.wikipedia.org/wiki/Comparison_of_ARMv7-A_cores
https://en.wikipedia.org/wiki/Comparison_of_ARMv8-A_cores
Snapdragon Branding Update Tim McDonough, VP of Marketing, QCT [emea-summit-snapdragon-branding-update.pdf]
QMC Chipset Product Roadmaps November 2012 Qualcomm [2012-roadmap.pdf]
NXP Mobile eXtreme Convergence Platforms [MXC27530FS.pdf]
QSC6270 Single-Chip Solution Qualcomm [qsc6270-brief.pdf]
qualcomm-205-mobile-platform-brief.pdf
qualcomm-snapdragon-630-mobile-platform-product-brief.pdf
qualcomm-snapdragon-660-mobile-platform-product-brief.pdf
snapdragon-200-processor-product-brief.pdf
snapdragon-208-processor-product-brief.pdf
snapdragon-210-processor-product-brief.pdf
snapdragon-212-mobile-platform-product-brief.pdf
snapdragon-400-processor-product-brief.pdf
snapdragon-410-processor-product-brief.pdf
snapdragon-412-processor-product-brief.pdf
snapdragon-415-processor-product-brief.pdf
snapdragon-425-processor-product-brief.pdf
snapdragon-427-processor-product-brief.pdf
snapdragon-430-processor-product-brief.pdf
snapdragon-435-processor-product-brief.pdf
snapdragon-450-mobile-platform-product-brief.pdf
snapdragon-600-processor-product-brief.pdf
snapdragon-610-processor-product-brief.pdf
snapdragon-615-processor-product-brief.pdf
snapdragon-616-processor-product-brief.pdf

EXHIBIT 3-41

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

snapdragon-617-processor-product-brief.pdf
snapdragon-625-processor-product-brief.pdf
snapdragon-626-processor-product-brief.pdf
snapdragon-650-processor-product-brief.pdf
snapdragon-652-processor-product-brief.pdf
snapdragon-653-processor-product-brief.pdf
snapdragon-800-processor-embedded-product-brief.pdf
snapdragon-800-processor-product-brief.pdf
snapdragon-801-processor-product-brief.pdf
snapdragon-805-processor-product-brief.pdf
snapdragon-808-processor-product-brief.pdf
snapdragon-810-processor-product-brief.pdf
snapdragon-820-processor-product-brief.pdf
snapdragon-821-processor-product-brief.pdf
snapdragon-835-mobile-platform-product-brief.pdf
snapdragon-845-mobile-platform-product-brief.pdf
snapdragon-e-selection-guide_0817_web.pdf
snapdragon-s3-s2-s1-processor-product-specs.pdf
OMAP 3 family of multimedia applications processors TI [swpt024b.pdf]

**Phone IDs (generic)**
http://www.gsmchoice.com/en/
https://gadgets.ndtv.com/
https://www.pcmag.com/
https://www.verizonwireless.com/
https://www.sprint.com/
https://www.uscellular.com/
https://www.amazon.com/
https://www.ebay.com/

**Phone IDs**
https://www.samsung.com/us/support/owners/product/homesync-at-t
https://www.samsung.com/us/support/owners/product/homesync-wi-fi-only
https://www.phonemore.com/samsung-google-nexus-s-gt-i9020/specs/38,
https://www.androidpolice.com/2010/11/11/meet-the-samsung-gt-i9020-better-known-as-the-google-nexus-s/
https://www.gsmarena.com/samsung_galaxy_nexus_i9250-4219.php
https://www.samsung.com/us/support/owners/product/galaxy-s4-google-pure-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-note-10-1-wi-fi
https://www.samsung.com/us/mobile/galaxy-tab/GT-P1010CWAXAR-specs
https://www.samsung.com/us/support/owners/product/galaxy-tab-2-7-0-wi-fi
https://www.samsung.com/us/support/owners/product/galaxy-tab-2-10-1-student-edition-wi-fi
https://www.gsmarena.com/samsung_galaxy_tab_10_1_p7510-3894.php,
https://www.samsung.com/us/mobile/galaxy-tab/GT-P7510MAYXAB-specs
https://www.samsung.com/us/support/owners/product/google-nexus-10-tab-wi-fi
https://www.samsung.com/us/support/owners/product/gem-verizon
https://www.samsung.com/us/support/owners/product/illusion-verizon
https://www.samsung.com/us/mobile/phones/all-phones/s/_/n-10+11+hv1rp/
https://www.pcmag.com/article2/0,2817,2356673,00.asp, http://www.samsung.com/us/mobile/cell-phones/SCH-I220MBAMTR-specs
http://www.samsung.com/us/product/productForward.do?groupUrlName=mobile&typeUrlName=cell-phones&mdlUrlName=SCH-I225MGAUSC&pageUrlName=specs, https://www.phonedog.com/products/samsung-exec-sch-i225
https://www.samsung.com/us/support/owners/product/metrix-us-cellular

EXHIBIT 3-42

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/stratosphere-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s4-mini-verizon
https://www.samsung.com/us/support/owners/product/fascinate-verizon
https://www.samsung.com/us/support/owners/product/droid-charge-verizon
https://www.samsung.com/us/support/owners/product/galaxy-nexus-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-developer-edition-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s4-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s4-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-note-ii-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-2-10-1-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-7-0-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-7-7-verizon
https://www.samsung.com/us/support/owners/product/Omnia
https://www.pcmag.com/article2/0,2817,2348864,00.asp, http://www.samsung.com/us/mobile/cell-phones/SCH-I920DAAVZW-specs
https://www.samsung.com/us/support/owners/product/galaxy-note-10-1-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-note-10-1-verizon
https://www.samsung.com/us/support/owners/product/ativ-odyssey-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-c-spire
https://www.samsung.com/us/support/owners/product/mobile-hotspot-us-cellular
https://www.samsung.com/us/support/owners/product/jetpack-verizon
https://www.cnet.com/products/samsung-stunt-sch-r100-metropcs/review/,
http://www.samsung.com/us/mobile/cell-phones/SCH-R100DBAMTR-specs
https://www.samsung.com/us/support/owners/product/jitterbug-plus-great-call
https://www.samsung.com/us/support/owners/product/contour-cdma-unlocked
https://www.samsung.com/us/support/owners/product/chrono
https://www.samsung.com/us/support/owners/product/chrono-2-us-cellular
https://www.samsung.com/us/support/owners/product/chrono-2-unlocked
https://www.samsung.com/us/support/owners/product/contour-2-metropcs
https://www.cnet.com/products/samsung-axle-sch-r311-u-s-cellular/review/,
http://www.samsung.com/us/product/productForward.do?groupUrlName=mobile&typeUrlName=cell-phones&mdlUrlName=SCH-R311ZGAUSC&pageUrlName=specs
http://www.samsung.com/us/mobile/cell-phones/SCH-R330ZRAUSC-specs,
https://www.cnet.com/products/samsung-sch-r330-stride-red-u-s-cellular/review/
https://www.samsung.com/us/support/owners/product/freeform-alltel
https://www.samsung.com/us/support/owners/product/r355c-net-10
https://www.samsung.com/us/support/owners/product/r375c-tracfone
https://www.samsung.com/us/support/owners/product/comment-cricket
https://www.samsung.com/us/support/owners/product/comment-2-cricket
https://www.samsung.com/us/support/owners/product/samsung-freeform-4-us-cellular
https://www.phonescoop.com/phones/phone.php?p=1933,
http://www.samsung.com/us/product/productForward.do?groupUrlName=mobile&typeUrlName=cell-phones&mdlUrlName=SCH-R420DAAMTR&pageUrlName=specs
http://www.samsung.com/us/mobile/cell-phones/SCH-R451ZKGTRF-specs, https://www.ebay.com/p/Samsung-Messager-Sch-r451-Black-Cellular-Phone/1100381415
https://www.cnet.com/products/samsung-myshot-ii-sch-r460-cricket/specs/,
https://www.phonescoop.com/phones/phone.php?p=1964
https://www.samsung.com/us/support/owners/product/comment-3-cricket
https://www.samsung.com/us/support/owners/product/samsung-freeform-5-us-cellular
https://www.samsung.com/us/support/owners/product/freeform-5-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-cricket
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-unlocked

EXHIBIT 3-43

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/galaxy-s-iii-metro-pcs
http://www.samsung.com/us/mobile/cell-phones/SCH-R560TSAMTR-specs, https://www.ebay.com/p/Samsung-Messager-II-SCH-R560-Silver-MetroPCS-Cellular-Phone/99985385
https://www.amazon.com/Samsung-SCH-R600-Hue-II-Blue/dp/B005HOTWA8,
https://www.cnet.com/products/samsung-hue-ii-sch-r600-alltel/specs/
https://www.samsung.com/us/mobile/cell-phones/SCH-R630LBAUSC-specs,
https://www.cnet.com/products/samsung-messager-touch-sch-r630/specs/
https://www.samsung.com/us/support/owners/product/messager-touch-ii
https://www.samsung.com/us/support/owners/product/repp-us-cellular
https://www.samsung.com/us/support/owners/product/suede-cricket-wireless
https://www.samsung.coom/us/support/owners/product/admire-metro-pcs
https://www.samsung.com/us/support/owners/product/galaxy-discover-cricket
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-cdma-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-us-cellular
https://www.phonescoop.com/phones/phone.php?p=1943,
https://www.pcmag.com/article2/0,2817,2346878,00.asp
https://www.samsung.com/us/support/owners/product/galaxy-admire-metropcs
https://www.samsung.com/us/support/owners/product/galaxy-admire-2-cricket
https://www.samsung.com/us/support/owners/product/galaxy-axiom-us-cellular
http://www.samsung.com/us/mobile/cell-phones/SCH-R850ZKAUSC-specs,
https://www.phonedog.com/products/samsung-caliber-sch-r850
https://www.samsung.com/us/support/owners/product/ativ-odyssey-us-cellular
https://www.samsung.com/us/support/owners/product/acclaim-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s4-mini-u-s-cellular
https://www.samsung.com/us/support/owners/product/galaxy-attain-metropcs
https://www.samsung.com/us/support/owners/product/aviator-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-lightray-metropcs
https://www.samsung.com/us/support/owners/product/galaxy-note-ii-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s4-cricket
https://www.samsung.com/us/support/owners/product/galaxy-s4-c-spire
https://www.samsung.com/us/support/owners/product/galaxy-s4-us-cellular
https://www.samsung.com/us/support/owners/product/s380c-straight-talk
https://www.samsung.com/us/support/owners/product/galaxy-proclaim-net10-and-straighttalk
https://www.samsung.com/us/support/owners/product/galaxy-discover-net-10
https://www.samsung.com/us/support/owners/product/galaxy-centura-straight-talk
https://www.samsung.com/us/support/owners/product/showcase-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-tracfone
https://www.cnet.com/products/samsung-knack-sch-u310-verizon-wireless/review/,
http://www.samsung.com/us/mobile/cell-phones/SCH-U310ZNAVZW-specs
https://www.samsung.com/us/support/owners/product/haven-verizon
https://www.samsung.com/us/support/owners/product/smooth-alltel
https://www.samsung.com/us/support/owners/product/gusto-verizon
https://www.samsung.com/us/support/owners/product/gusto-2-verizon
https://www.samsung.com/us/support/owners/product/brightside-verizon
https://www.cnet.com/products/samsung-sch-u410-verizon-wireless/review/,
https://www.phonearena.com/phones/Samsung-SCH-U410_id1893
https://www.phonescoop.com/phones/phone.php?p=1607, https://www.phonearena.com/phones/Samsung-SCH-U430_id2888
https://www.phonearena.com/phones/Samsung-SCH-U440-Cleo_id2915
https://www.samsung.com/us/support/owners/product/double-take-verizon
https://www.ebay.com/p/Samsung-Juke-SCH-U470-Red-Verizon-Cellular-Phone/99982912,
https://www.digitaltrends.com/cell-phone-reviews/samsung-juke-sch-u470-review/
https://www.samsung.com/us/support/owners/product/intensity-iii-verizon

EXHIBIT 3-44

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.amazon.com/Samsung-Trance-SCH-U490-Phone-Verizon/dp/B008DVFJOK,
https://www.phonescoop.com/phones/phone.php?p=1924
https://www.samsung.com/us/support/owners/product/convoy-2-verizon
https://www.samsung.com/us/support/owners/product/convoy-3-verizon
https://www.cnet.com/products/samsung-gleam-sch-u700/review/,
https://www.phonescoop.com/phones/phone.php?p=1255
https://www.amazon.com/Samsung-Alias-SCH-u740-Verizon-Black/dp/B006V6RYGA,
https://www.ebay.com/p/Samsung-Alias-SCH-U740-Black-Verizon-Cellular-Phone/101865493
https://www.cnet.com/products/samsung-glyde-sch-u940-verizon-wireless/review/,
https://www.amazon.com/Samsung-Contract-Camera-QWERTY-Touchscreen/dp/B004VRJ036
https://www.cnet.com/products/samsung-rogue-sch-u960-verizon-wireless/review/,
https://www.amazon.com/Samsung-U960-Verizon-Wireless-Contract/dp/B004WF4U8W
https://www.samsung.com/us/support/owners/product/a137-gophone-at-t
https://www.samsung.com/us/support/owners/product/a157-gophone-at-t
https://www.gsmarena.com/samsung_a167-2799.php
https://www.gsmarena.com/samsung_a177-2796.php
https://www.samsung.com/us/support/owners/product/denim-cricket
https://www.gsmarena.com/samsung_a237-2518.php
https://www.cnet.com/products/samsung-eternity-ii-sgh-a597-at-t/review/,
http://www.samsung.com/us/mobile/cell-phones/SGH-A597ZBAATT-specs
https://www.phonescoop.com/phones/phone.php?p=1962
https://www.gsmarena.com/samsung_a797_flight-3011.php, https://www.amazon.com/Samsung-Flight-SGH-A797-Cell-Phone/dp/B002VEC84O
https://www.samsung.com/us/support/owners/product/rugby-ii-at-t
https://www.samsung.com/us/support/owners/product/impression-at-t
https://www.phonescoop.com/phones/phone.php?p=2160
http://www.samsung.com/us/mobile/cell-phones/SGH-A897ZKAATT-specs,
https://www.gsmarena.com/samsung_a897_mythic-2996.php
https://www.gsmarena.com/samsung_a927_flight_ii-3467.php
https://www.samsung.com/us/support/owners/product/rugby-iii-at-t
https://www.samsung.com/us/support/owners/product/ativ-s-neo-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s4-mini-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note-ii-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s4-at-t
https://www.samsung.com/us/support/owners/product/galaxy-amp-cricket-wireless
https://www.samsung.com/us/support/owners/product/galaxy-express-cricket-wireless
https://www.samsung.com/us/support/owners/product/galaxy-express-gophone-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note-8-0-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-2-10-1-at-t
https://www.samsung.com/us/support/owners/product/galaxy-mega-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s4-active-at-t
https://www.samsung.com/us/product/productForward.do?groupUrlName=mobile&typeUrlName=cell-phones&mdlUrlName=SGH-I627MAAATT&pageUrlName=specs,
https://www.phonescoop.com/phones/phone.php?p=1796
https://www.gsmarena.com/samsung_i637_jack-2798.php
https://www.samsung.com/us/support/owners/product/focus-2-windows-phone-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note-at-t
https://www.samsung.com/us/support/owners/product/galaxy-sii-skyrocket-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-at-t
https://www.samsung.com/us/support/owners/product/galaxy-sii-at-t
https://www.samsung.com/us/support/owners/product/galaxy-appeal-at-t
https://www.samsung.com/us/support/owners/product/focus-windows-at-t
https://www.samsung.com/us/support/owners/product/captivate-glide-at-t

EXHIBIT 3-45

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/focus-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-8-9-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-7-0-at-t
https://www.samsung.com/us/support/owners/product/galaxy-mega-metro-pcs
https://www.samsung.com/us/support/owners/product/galaxy-s4-t-mobile
https://www.samsung.com/us/support/owners/product/s125g-tracfone
https://www.samsung.com/us/support/owners/product/s150g-tracfone
https://www.samsung.com/us/support/owners/product/s275g-tracfone
https://www.samsung.com/us/support/owners/product/s390g-tracfone
https://www.samsung.com/us/support/owners/product/s425g-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-discover-net10
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-s4-tracfone
https://www.phonearena.com/phones/Samsung-SGH-T105G_id4085
https://www.samsung.com/us/support/owners/product/t139-t-mobile
https://www.phonearena.com/phones/Samsung-SGH-T155G_id4236
https://www.samsung.com/us/support/owners/product/t159-t-mobile
https://www.samsung.com/us/support/owners/product/freeform-m-metro-pcs
https://www.samsung.com/us/support/owners/product/t199-t-mobile
https://www.phonescoop.com/phones/phone.php?p=1876, https://www.samsung.com/us/mobile/cell-phones/SGH-T201VSGTRF-specs
https://www.phonearena.com/phones/Samsung-SGH-T239_id3603
https://www.samsung.com/us/support/owners/product/t245g-tracfone
https://www.gsmarena.com/samsung_t249-3582.php
http://www.gsmchoice.com/en/catalogue/samsung/sght255g/, https://www.ebay.com/p/Samsung-SGH-T255G-Ebony-Black-Unlocked-Cellular-Phone/111407520
https://www.samsung.com/us/support/owners/product/t259-t-mobile
https://www.samsung.com/us/support/owners/product/gravity-q-t-mobile
https://www.phonearena.com/phones/Samsung-SGH-T301G_id3276
https://www.samsung.com/us/support/owners/product/t330-tracfone
https://www.samsung.com/us/support/owners/product/t340g-tracfone
https://www.samsung.com/us/support/owners/product/smiley-t-mobile
https://www.samsung.com/us/product/productForward.do?groupUrlName=mobile&typeUrlName=cell-phones&mdlUrlName=SGH-T369ZKWTMB&pageUrlName=specs
https://www.samsung.com/us/support/owners/product/gravity-txt-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-light-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-light-metro-pcs
https://www.samsung.com/us/support/owners/product/t404-tracfone
https://www.gsmarena.com/samsung_t459_gravity-2588.php
https://www.samsung.com/us/support/owners/product/dart-t-mobile
https://www.samsung.com/us/support/owners/product/t528g-tracfone
https://www.gsmarena.com/samsung_t559_comeback-2883.php
https://www.samsung.com/us/support/owners/product/gravity-smart-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-exhibit-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-exhibit-metro-pcs
https://www.phonearena.com/phones/Samsung-SGH-T659_id3836
https://www.samsung.com/us/support/owners/product/exihibit-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-2-10-1-t-mobile
https://www.samsung.com/us/support/owners/product/sidekick-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-7-0-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-10-1-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-7-0-plus-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note-t-mobile

EXHIBIT 3-46

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/galaxy-note-ii-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-t-mobile
https://www.samsung.com/us/support/owners/product/gusto-3-verizon
https://www.samsung.com/us/support/owners/product/galaxy-ace-style-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-core-prime-virgin-mobile
https://www.samsung.com/us/support/owners/product/core-prime-sprint
https://www.samsung.com/us/support/owners/product/galaxy-core-prime-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-avant-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-grand-prime-at-t
https://www.samsung.com/us/support/owners/product/galaxy-grand-prime-cricket
https://www.samsung.com/us/support/owners/product/galaxy-grand-prime
https://www.samsung.com/us/support/owners/product/galaxy-grand-prime-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-grand-prime-t-mobile
https://www.samsung.com/us/support/owners/product/on5-t-mobile
https://www.samsung.com/us/support/owners/product/on5-metro-pcs
https://www.samsung.com/us/support/owners/product/on5-pre-paid-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-mini-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s5-mini-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-alpha-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s5-sport-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s5-active-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s6-active-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s7-active-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s8-active-att#manuals
https://www.samsung.com/us/support/owners/product/galaxy-s8-active-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s8-active-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s5-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s5-cricket
https://www.samsung.com/us/support/owners/product/galaxy-s5-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s5-virgin-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s5-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s5-metropcs
https://www.samsung.com/us/support/owners/product/galaxy-s5-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s5-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s6-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s6-cricket
https://www.samsung.com/us/support/owners/product/galaxy-s6-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s6-boost
https://www.samsung.com/us/support/owners/product/galaxy-s6-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s6-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s6-metropcs
https://www.samsung.com/us/support/owners/product/galaxy-s6-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s6-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-plus-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-plus-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-plus-t-mobile

EXHIBIT 3-47

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/galaxy-s6-edge-plus-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s7-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s7-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s7-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s7-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s7-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s7-32gb-metro-pcs
https://www.samsung.com/us/support/owners/product/galaxy-s7-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s7-xfinity
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s7-edge-xfinity
https://www.samsung.com/us/support/owners/product/galaxy-s8-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s8-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s8-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s8-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s8-c-spire
https://www.samsung.com/us/support/owners/product/galaxy-s8-cricket
https://www.samsung.com/us/support/owners/product/galaxy-s8-boost
https://www.samsung.com/us/support/owners/product/galaxy-s8-xfinity
https://www.samsung.com/us/support/owners/product/galaxy-s8-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-s8-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s8-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s8-virgin-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-at-t
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-c-spire
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-xfinity
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s8-plus-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-s9-verizon
https://www.samsung.com/us/support/owners/product/galaxy-s9-plus-verizon
https://www.samsung.com/us/support/owners/product/galaxy-j1-verizon
https://www.samsung.com/us/support/owners/product/galaxy-amp-2-cricket
https://www.samsung.com/us/support/owners/product/galaxy-amp-prime-at-t
https://www.samsung.com/us/support/owners/product/galaxy-amp-prime-cricket
https://www.samsung.com/us/support/owners/product/galaxy-j3-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-j3-verizon
https://www.gsmarena.com/samsung_galaxy_j3_(2016)-7760.php
https://www.samsung.com/us/support/owners/product/galaxy-sol-2-cricket
https://www.samsung.com/us/support/owners/product/galaxy-amp-prime-2-cricket
https://www.samsung.com/us/support/owners/product/galaxy-j3-boost
https://www.samsung.com/us/support/owners/product/galaxy-j3-sprint
https://www.samsung.com/us/support/owners/product/galaxy-j3-virgin-mobile-usa
https://www.samsung.com/us/support/owners/product/galaxy-j3-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-j3-2017-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-j3-prime-tmobile

EXHIBIT 3-48

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/galaxy-j3-metro-pcs
https://www.samsung.com/us/support/owners/product/galaxy-j3-eclipse-verizon
https://www.samsung.com/us/support/owners/product/galaxy-j7-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-j7-metro-pcs
https://www.samsung.com/us/support/owners/product/galaxy-halo-cricket
https://www.samsung.com/us/support/owners/product/j7-perx-boost
https://www.samsung.com/us/support/owners/product/j7-perx-sprint
https://www.samsung.com/us/support/owners/product/j7-perx-virgin-mobile
https://www.samsung.com/us/support/owners/product/galaxy-j7-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-j7-t-mobile-#solutions
https://www.samsung.com/us/support/owners/product/galaxy-j7-metropcs
https://www.samsung.com/us/support/owners/product/galaxy-j7-unlocked
https://www.samsung.com/us/support/owners/product/galaxy-j7-t-mobile-
https://www.samsung.com/us/support/owners/product/galaxy-note-3-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note-3-sprint
https://www.samsung.com/us/support/owners/product/galaxy-note-3-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-note-3-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note-3-verizon
https://www.samsung.com/us/support/owners/product/galaxy-note-4-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note-4-sprint
https://www.samsung.com/us/support/owners/product/galaxy-note-4-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note-4-verizon
https://www.samsung.com/us/support/owners/product/galaxy-note-edge-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note-edge-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note5-at-t
https://www.samsung.com/us/support/owners/product/galaxy-note5-sprint
https://www.samsung.com/us/support/owners/product/galaxy-note5-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-note5-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note5-verizon
http://www.samsung.com/us/note7recall/
https://www.samsung.com/us/support/owners/product/galaxy-note8-att#manuals
https://www.samsung.com/us/support/owners/product/galaxy-note8-sprint
https://www.samsung.com/us/support/owners/product/galaxy-note8-verizon#manuals
https://www.samsung.com/us/support/owners/product/galaxy-note8-unlocked#manuals
https://www.samsung.com/us/support/owners/product/galaxy-note8-xfinity
https://www.samsung.com/us/support/owners/product/galaxy-note8-t-mobile#manuals
https://www.samsung.com/us/support/owners/product/galaxy-note8-us-cellular#manuals
https://www.samsung.com/us/support/owners/product/galaxy-note-10-1-2014-edition-verizon
https://www.samsung.com/us/support/owners/product/galaxy-note-10-1-2014-edition-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note-pro-12-2-verizon
https://www.samsung.com/us/support/owners/product/galaxy-note-pro-12-1-at-t
https://www.samsung.com/us/support/owners/product/galaxy-luna-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-s5-tracfone
https://www.samsung.com/us/support/owners/product/galaxy-tab-3-7-0-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-3-7-0-sprint
https://www.samsung.com/us/support/owners/product/galaxy-tab-3-7-0-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-7-0-sprint
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-8-0-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-8-0-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-8-0-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-a-8-0-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-e-8-0-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-e-8-0-sprint

EXHIBIT 3-49

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/galaxy-tab-e-8-0-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-tab-e-8-0-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-e-8-0-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-e-8-0-refresh-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-10-1-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-10-1-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-tab-4-10-1-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-e-9-6-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-a-10-1-sprint
https://www.samsung.com/us/support/owners/product/galaxy-view-18-4-wi-fi
https://www.samsung.com/us/support/owners/product/galaxy-view-18-4-at-t
https://www.samsung.com/us/support/owners/product/galaxy-view-18-4-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-8-4-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-8-4-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-10-5-wi-fi
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-10-5-att
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-10-5-sprint
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-10-5-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-10-5-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-s-10-5-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-s2-9-7-at-t
https://www.samsung.com/us/support/owners/product/galaxy-tab-s2-9-7-sprint
https://www.samsung.com/us/support/owners/product/galaxy-tab-s2-9-7-us-cellular
https://www.samsung.com/us/support/owners/product/galaxy-tab-s2-9-7-t-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-s2-9-7-verizon
https://www.samsung.com/us/support/owners/product/galaxy-tab-s2-9-7-refresh-att
https://www.samsung.com/us/support/owners/product/galaxy-tab-s3-verizon
https://www.samsung.com/us/support/owners/product/mobile-hotspot-pro-t-mobile
https://www.samsung.com/us/mobile/mobile-accessories/phones/sm-v2010abaatt-sm-v2010abaatt/
https://www.samsung.com/us/support/owners/product/galaxy-gear-first-gen
https://www.samsung.com/us/support/owners/product/galaxy-book-10-6-wi-fi
https://www.samsung.com/us/support/owners/product/galaxy-book-12-verizon
https://www.phonearena.com/phones/Samsung-SPH-A310_id3170
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-4g-boost-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-4g-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s-ii-4g-virgin-mobile
https://www.samsung.com/us/support/owners/product/ativ-s-neo-sprint
https://www.samsung.com/us/support/owners/product/galaxy-victory-virgin-mobile
https://www.samsung.com/us/support/owners/product/galaxy-s4-mini-sprint
https://www.samsung.com/us/support/owners/product/galaxy-mega-sprint
https://www.samsung.com/us/support/owners/product/galaxy-nexus-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s-iii-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s4-sprint
https://www.samsung.com/us/support/owners/product/galaxy-s4-boost-mobile
https://www.samsung.com/us/support/owners/product/galaxy-note-ii-sprint
https://www.samsung.com/us/support/owners/product/factor-boost-mobile
https://www.samsung.com/us/support/owners/product/entro-virgin-mobile
https://www.phonearena.com/phones/Samsung-SPH-M330_id3966
https://www.phonearena.com/phones/Samsung-Mantra_id3431
https://www.samsung.com/us/support/owners/product/seek-sprint
https://www.samsung.com/us/support/owners/product/m360-sprint
https://www.samsung.com/us/support/owners/product/array-boost-mobile
https://www.samsung.com/us/support/owners/product/array-sprint

EXHIBIT 3-50

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.samsung.com/us/support/owners/product/montage-virgin-mobile
https://www.samsung.com/us/support/owners/product/m400-sprint
https://www.samsung.com/us/support/owners/product/galaxy-rush-boost-mobile
https://www.samsung.com/us/support/owners/product/galaxy-reverb-virgin-mobile
https://www.samsung.com/us/support/owners/product/galaxy-tab-7-0-sprint
https://www.samsung.com/us/support/owners/product/galaxy-tab-2-10-1-sprint
https://www.asus.com/Phone/PadFone_mini_43_A11/
https://www.asus.com/Phone/ZenFone-A400CG/
https://www.asus.com/Phone/ZenFone-A500CG/
https://www.asus.com/Phone/ZenFone-A500KL/
https://www.asus.com/Phone/ZenFone_5_A502CG/specifications/
https://www.asus.com/Phone/ZenFone_6_A600CG/specifications/
https://www.asus.com/Phone/PadFone_A66/
https://www.asus.com/Phone/PadFone_2_A68/
https://www.asus.com/Phone/PadFone-A80/
https://www.asus.com/Phone/The_new_PadFone_Infinity_A86/
https://www.asus.com/Phone/ASUS_PadFone_X_US/
https://www.asus.com/Phone/ASUS_Fonepad_7_FE170CG/
https://www.asus.com/Phone/ASUS_Fonepad_7_FE375CG/
https://www.asus.com/Phone/ASUS_Fonepad/
https://www.asus.com/Tablets/ASUS_Fonepad_7_ME372CG/
https://www.asus.com/us/Tablets/ASUS_MeMO_Pad_7_LTE_ME375CL/
https://www.asus.com/us/Tablets/ASUS_MeMO_Pad_7_ME572CL/
https://www.asus.com/us/Tablets/Nexus_7/
https://www.asus.com/supportonly/P525/HelpDesk/?SearchKey=P525/
https://www.asus.com/Mobile-Phone/P527/
https://www.asus.com/Phone/PadFone_mini_PF400CG/
https://www.asus.com/Phone/PadFone_X_mini_PF450CL_US_only/
https://www.asus.com/Phone/PadFone_S_PF500KL/
https://www.asus.com/Tablets/ASUS_Transformer_Pad_TF103CG//HelpDesk/?SearchKey=TF103CG/
https://www.asus.com/Tablets/ASUS_Transformer_Pad_TF300TG/specifications/
https://www.asus.com/us/Tablets/ASUS_Transformer_Pad_TF300TL/
https://www.asus.com/in/Tablets/ASUS_Vivo_Tab_RT_TF600TG/specifications/
https://www.asus.com/us/Tablets/ASUS_VivoTab_RT/
https://www.asus.com/us/Phone/ZenFone-2E-US-ATT-exclusive/
https://www.asus.com/us/Phone/ZenFone-AR-V570KL-Verizon-exclusive/
https://www.asus.com/us/Tablets/ASUS_ZenPad_C_70_Z170CG/
https://www.asus.com/us/Tablets/ASUS_ZenPad_10_Z300CL/
https://www.asus.com/us/Phone/ZenFone-3-Max-ZC520TL/
https://www.asus.com/us/Phone/ZenFone-3-Laser-ZC551KL/
https://www.asus.com/us/Phone/ZenFone-4-Max-ZC554KL/
https://www.asus.com/Phone/ZenFone_2_ZE500CL/
https://www.asus.com/us/Phone/ZenFone_2_ZE550ML/
https://www.asus.com/us/Phone/ZenFone-2-Laser-ZE551KL/
https://www.asus.com/Phone/ZenFone_2_ZE551ML/
https://www.asus.com/us/Phone/ZenFone-3-ZE552KL/
https://www.asus.com/us/Phone/ZenFone-3-Zoom-ZE553KL/
https://www.asus.com/us/Phone/ZenFone-3-Deluxe-ZS550KL/
https://www.asus.com/us/Phone/ZenFone-3-Deluxe-ZS570KL/
https://www.asus.com/us/Phone/ZenFone-AR-ZS571KL/
https://www.asus.com/us/Tablets/ASUS-ZenPad-Z10-ZT500KL-Verizon-exclusive/
https://www.asus.com/us/Tablets/ASUS-ZenPad-Z8-ZT581KL-Verizon-exclusive/
https://www.asus.com/us/Tablets/ASUS-ZenPad-Z8s-ZT582KL-Verizon-exclusive/

EXHIBIT 3-51

Highly Confidential—Attorneys' Eyes Only

## Exhibit 3: Documents Relied Upon

https://www.asus.com/Phone/ZenFone-Zoom-ZX551ML/
https://www.asus.com/Tablets/ASUS_MeMO_Pad_FHD_10_ME302KL/
https://www.asus.com/Tablets/ASUS_Fonepad_7_ME372CL/
https://www.asus.com/us/Tablets/ASUS_VivoTab_Smart/
https://www.asus.com/us/Tablets/Nexus_7_2013/
https://www.asus.com/Tablets/ASUS_ZenPad_70_Z370CG/

**Company Websites**
https://www.apple.com/sitemap/
https://www.asus.com/About_ASUS/Company-Introduction
https://www.htc.com/us/about/
http://www.lg.com/global/investor-relations/company-info
https://www.motorola.com/us/about
https://www.samsung.com/us/aboutsamsung/home/
https://www.wistron.com/CMS/Page/175
https://www.att.com/
https://www.sprint.com
https://www.t-mobile.com/
https://www.uscellular.com/
https://www.verizonwireless.com/
 https://www.brightstar.com/newsroom/
https://www.aboutamazon.com/
https://corporate.bestbuy.com/about-best-buy/
https://www.frys.com/
https://www.metropcs.com/content/metro/en/desktop/metro/press/company-fact-sheet.html
https://www.boostmobile.com/why-boost/prepaid.html
https://www.newegg.com/Info/AboutUs.aspx
https://www.target.com
https://corporate.walmart.com/our-story

EXHIBIT 3-52

Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

Exhibit 4:



Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:** ███████████████████████

Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**

Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:** 

Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**

Highly Confidential—Attorneys' Eyes Only

**Exhibit 4:**



Highly Confidential—Attorneys' Eyes Only

Highly Confidential—Attorneys' Eyes Only

**Exhibit 5:**

Highly Confidential—Attorneys' Eyes Only

**Exhibit 5:**

Highly Confidential—Attorneys' Eyes Only

**Exhibit 6:**



**Exhibit 7:**



Highly Confidential—Attorneys' Eyes Only

**Exhibit 8:**

Highly Confidential—Attorneys' Eyes Only

**Exhibit 8:** ██████████████████████████



Highly Confidential—Attorneys' Eyes Only