KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest - # 84065
rvannest@keker.com
Eugene M. Paige - # 202849
epaige@keker.com
Cody S. Harris - #255302
charris@keker.com
Justina Sessions - # 270914
jsessions@keker.com
Jesselyn Friley - # 319198
jfriley@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (pro hac vice)
gbornstein@cravath.com
Yonatan Even (pro hac vice)
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

Attorneys for Defendant
QUALCOMM INCORPORATED

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (pro hac vice)
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom (pro hac vice)
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile:  (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

IN RE: QUALCOMM ANTITRUST
LITIGATION


This Document Relates To:

ALL ACTIONS

Case No. 5:17-md-02773-LHK-NMC

**DEFENDANT QUALCOMM
INCORPORATED'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

Date:        September 27, 2018
Time:        1:30 p.m.
Dept.:       Courtroom 8, 4th Floor
Judge:       Hon. Lucy H. Koh

Trial Date:  June 24, 2019

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1291844

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ...................................................................................................1

    A.    Plaintiffs' putative class includes essentially every person that bought any cellphone in the United States since 2011. ........................................1

    B.    Plaintiffs' purported proof of impact and damages ..................................3

III.  LEGAL STANDARD.............................................................................................6

IV.   ARGUMENT .........................................................................................................7

    A.    Plaintiffs cannot prove antitrust impact or damages on a classwide basis. ............7

        1.    Plaintiffs' experts concede that the putative class includes many consumers who suffered no impact at all...................................7

        2.    Plaintiffs cannot show with common evidence or common methods that all or nearly all OEMs paid alleged overcharges. ................8

        3.    Plaintiffs cannot show pass-through by common proof at any step in the distribution chain. .........................................9

            a.    Plaintiffs cannot establish common impact in the form of increased prices because retailers priced at focal points.................9

            b.    Plaintiffs fail to establish that OEMs passed through the alleged overcharge in a higher "quality adjusted price." ..............10

                (i)    Plaintiffs' *theory* of OEM pass-through ignores OEMs' large and varying profit margins. .........................11

                (ii)   Plaintiffs' *modeling* of OEM pass-through analyzes how total costs affect price—not relatively small overcharges. ....................13

            c.    Plaintiffs cannot establish intermediate reseller, carrier, or retailer pass-through on a common basis.....................16

        4.    Plaintiffs' different equation for every distribution channel is not "common evidence" and cannot workably prove individual damages....................18

    B.    The size, scope, and diversity of the Proposed Class render it unsuitable for class treatment and therefore not "superior." ........................19

        1.    The putative class is so large, heterogeneous, and unmanageable that it is inferior to other available methods of adjudicating the controversy....................19

i

1291844

2.  Plaintiffs fail to consider superior methods to adjudicate the controversy.................................................................................................21

C.  The Proposed Class cannot be certified under Rule 23(b)(2). ...............................22

D.  Plaintiffs cannot certify a nationwide class under California law. .........................23

E.  Plaintiffs cannot seek class certification on an incomplete tying claim. ...............24

V.  CONCLUSION.................................................................................................................25

1291844

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Abrams v. Interco Inc.*
719 F.2d 23 (2d Cir. 1983).................................................................................. 20, 21

*Amchem Prods., Inc. v. Windsor*
521 U.S. 591 (1997)................................................................................................. 6

*Arnold v. United Artists Theatre Circuit, Inc.*
158 F.R.D. 439 (N.D. Cal. 1994)........................................................................... 23

*Barnes v. Amer. Tobacco Co.*
161 F.3d 127 (3d Cir. 1998)................................................................................... 23

*Brantley v. NBC Universal, Inc.*
675 F.3d 1192 (9th Cir. 2012) ............................................................................... 25

*Briseno v. ConAgra Foods, Inc.*
844 F.3d 1121 (9th Cir. 2017) ......................................................................... 19, 21

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*
140 F.3d 494 (3d Cir. 1998)................................................................................... 24

*Comcast Corp. v. Behrend*
569 U.S. 27 (2013)........................................................................................ 6, 7, 18

*Diacakis v. Comcast Corp.*
2013 WL 1878921 (N.D. Cal. May 3, 2013)......................................................... 22

*Eisen v. Carlisle & Jacquelin*
417 U.S. 156 (1974)............................................................................................... 21

*Ellis v. Costco Wholesale Corp.*
657 F.3d 970 (9th Cir. 2011) ................................................................................... 6

*Fosmire v. Progressive Max Ins. Co.*
277 F.R.D. 625 (W.D. Wash. 2011) ...................................................................... 23

*Free v. Abbott Labs., Inc.*
176 F.3d 298 (5th Cir. 1999) ................................................................................. 23

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*
547 U.S. 28 (2006)................................................................................................. 24

*In re Flash Memory Antitrust Litig.*
2010 WL 2332081 (N.D. Cal. June 9, 2010)................................................... 18, 22

*In re Flash Memory Antitrust Litig.*
2011 WL 1301527 (N.D. Cal. Mar. 31, 2011)....................................................... 22

*In re High-Tech Emp. Antitrust Litig.*
289 F.R.D. 555 (N.D. Cal. 2013)............................................................................. 7

iii

1291844

*In re Lithium Batteries Antitrust Litig.*
  2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ........................................................... 16

*In re Lithium Ion Batteries Antitrust Litig.*
  2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ................................................... 9, 10, 11

*In re Optical Disk Drive Antitrust Litig.*
  2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ........................................................... 24

*In re Optical Disk Drive Antitrust Litig.*
  303 F.R.D. 311 (N.D. Cal. 2014) ................................................................... 13, 14

*In re Paxel Litig.*
  212 F.R.D. 539 (C.D. Cal. 2003) ...................................................................... 23

*In re Rail FreightFuel Surcharge Antitrust Litig.*
  292 F. Supp. 3d 14 (D.D.C. 2017) ...................................................................... 8

*In re Visa Check/MasterMoney Antitrust Litig.*
  280 F.3d 124 (2d Cir. 2001) ............................................................................ 21

*Kansas v. UtiliCorp United, Inc.*
  497 U.S. 199 (1990) ...................................................................................... 23

*Key v. Qualcomm*
  No. 17-cv-00442 (N.D. Cal. Jan. 27, 2017) ...................................................... 24

*Lewallen v. Medtronic USA, Inc.*
  2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) ................................................ 23

*Leyva v. Medline Indus. Inc.*
  2013 WL 2306567 (9th Cir. May 28, 2013) ........................................................ 7

*Mazza v. Am. Honda Motor Co.*
  666 F.3d 581 (9th Cir. 2012) .............................................................. 6, 7, 20, 23, 24

*Messner v. Northshore Univ. HealthSystem*
  669 F.3d 802 (7th Cir. 2012) ............................................................................ 7

*Metromedia Broad. Corp. v. MGM/UA Entm't. Co.*
  611 F. Supp. 415 (C.D. Cal. 1985) .................................................................. 25

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*
  268 F. Supp. 3d 1071 (C.D. Cal. 2017) ............................................................ 25

*Phillips Petroleum Co. v. Shutts*
  472 U.S. 797 (1985) ...................................................................................... 23

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*
  532 F.3d 963 (9th Cir. 2008) ........................................................................... 25

*Ries v. Ariz. Beverages USA LLC*
  287 F.R.D. 523 (N.D. Cal. 2012) ..................................................................... 22

*Russell v. Kohl's Dep't Stores, Inc.*
  2015 WL 12748629 (C.D. Cal. Dec. 4, 2015) ................................................... 22

iv

*Senne v. Kansas City Royals Baseball Corp.*
   2017 WL 897338 (N.D. Cal. March 7, 2017) ...................................................... 6, 23

*Siegel v. Chicken Delight, Inc.*
   448 F.2d 43 (9th Cir. 1971) ................................................................................ 25

*Sweet v. Pfizer*
   232 F.R.D. 360 (C.D. Cal. 2005) ........................................................................ 23

*Torres v. Mercer Canyons Inc.*
   835 F.3d 1125 (9th Cir. 2016) .............................................................................. 8

*Tyson Foods, Inc. v. Bouaphakeo*
   136 S. Ct. 1036 (2016) ......................................................................................... 9

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*
   89 F.3d 233 (5th Cir. 1996) ................................................................................. 25

*Wal-Mart Stores, Inc. v. Dukes*
   564 U.S. 338 (2011) ............................................................................... 6, 20, 22

*Zinser v. Accufix Research Inst., Inc.*
   253 F.3d 1180 (9th Cir.) ....................................................................................... 6

**State Cases**

*Abbott Labs., Inc.v. Segura*
   907 S.W.2d 503 (Tex. 1995) ............................................................................... 23

*Belton v. Comcast Cable Holdings, LLC*
   151 Cal. App. 4th 1224 (2007) ............................................................................ 24

*Minuteman, LLC v. Microsoft Corp.*
   147 N.H. 634 (2002) ............................................................................................ 23

*Stifflear v. Bristol-Myers Squibb Co.*
   931 P.2d 471 (Colo. App. 1996) .......................................................................... 24

**Federal Statutes**

28 U.S.C. § 2072 .......................................................................................................... 20

**Federal Rules**

Fed. R. Civ. P. 23 ................................................................................................. *passim*

OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 5:17-md-02773-LHK

1291844

## I.     INTRODUCTION

The Court should decline to certify as a class this sprawling agglomeration of indirect purchasers, which is virtually unprecedented in size and scope.  Plaintiffs' proposed class consists of at least *250 million* consumers who purchased or paid for, in whole or in part, more than 1 billion cellphones, from any channel, over the last seven years.  Plaintiffs have failed to meet their burden under Federal Rule of Civil Procedure 23(b) to (1) demonstrate through common proof that all or nearly all class members were impacted, and (2) establish that a class consisting of nearly every U.S. cellphone consumer is sufficiently manageable and superior to other methods of adjudicating the controversy.  Not only would the proposed class result in a trial of enormous complexity, but Plaintiffs' pass-through analysis is fundamentally misdirected.  Plaintiffs' primary expert, Dr. Kenneth Flamm, spends hundreds of pages establishing that costs generally affect prices, but never shows that the conduct or alleged overcharges at issue actually raised prices or lowered phone quality.  Nor can Plaintiffs represent an injunctive-relief class under Rule 23(b)(2).  Plaintiffs' request for $5 billion in monetary damages predominates over their ill-defined request for an injunction.

## II.     BACKGROUND

### A.     Plaintiffs' putative class includes essentially every person that bought any cellphone in the United States since 2011.

The putative class's claims encompass roughly 1.2 billion transactions.[1]  This includes phones made by over twenty original equipment manufacturers ("OEMs"), each of whom made individualized decisions about whether and how many models to make, the parts to include, and the prices at which to sell those phones to intermediaries and, in some cases, to consumers.

Putative class members acquired their phones through many channels. 

[2]  For instance, OEMs sell devices to cellular network carriers such as AT&T, Verizon Wireless, T-Mobile, Sprint, and U.S. Cellular.  In addition, some OEMs sell devices

---

[1] *See* Declaration of Kenneth Flamm in Support of Plaintiffs' Motion for Class Certification (Flamm Decl.) Ex. 7.

[2] *See* Declaration of Justina Sessions in Opposition to Plaintiffs' Motion for Class Certification (Sessions Decl.) Ex. A (QNDCAL00156633) at 37.

through their own retail outlets.  Putative class members also buy devices from third-party retailers (*e.g.*, Best Buy, Amazon, and WalMart), and from authorized dealers (*e.g.*, Cellular Sales or Wireless Zone).  Retailers and authorized dealers, moreover, buy devices directly from OEMs and from distributors (*e.g.*, Ingram).  Putative class members also obtained refurbished devices through insurers, bought used phones on eBay, and received phones from their employers.

The Named Plaintiffs demonstrate the wide variety of distribution channels, price points, promotions and subsidies, and payment arrangements encompassed within the class.  Plaintiff Sarah Key bought an iPhone 5S from Verizon at an unknown time for an unknown price.  She received a monthly $25 "device payment discount" on her bill and a free Verizon Jetpack WiFi Hotspot with that purchase.  Her father reimbursed her for the phone and service plan in some unknown amount and is, therefore, also part of the putative class.[3]

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

Plaintiff Carra Abernathy bought an iPhone 5S in November 2013 for $399 from the Apple Store.  The retail price of that phone was $849.99, but that price was subsidized when Ms. Abernathy's mother agreed to a service contract.  Ms. Abernathy also applied a $183 Apple gift card, and possibly a trade-in credit, to the $399 price.  Ms. Abernathy reimbursed her mother $50 per month for the service contract.  Ms. Abernathy also bought two refurbished iPhone 5S's through Apple's AppleCare program for $79 each.[5] ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[3] *Id.* Ex. C (Key Dep. Excerpts) at 84:15-19; 89:12-90:16; 99:4-12; 114:15-24; 132:1-24; 142:15-17; Ex. 6.

[4] *Id.* Ex. D (Russell Dep. Excerpts) at 102:16-24

[5] *Id.* Ex. E (Abernathy Dep. Excerpts) at103:19-107:7; 114:25-115:5; 120:21-121:11; 165:3-25.

1291844

1  ███████████████████████ Finally, Ms. Abernathy bought an iPhone 7 Plus in

2  December 2016 ████████████████████████████ for which she paid $150

3  toward the retail price of $869.99 and also received a $135 trade-in credit for her previous

4  iPhone.[6]

5      James Clark bought two devices in 2014, at unknown prices, from Verizon and T-Mobile.

6  He received a Samsung Galaxy S6 in October 2015 from a third-party insurer, as a replacement

7  for his prior Google-branded Motorola Nexus 6 (purchased at an unknown price).  Mr. Clark sold

8  his Galaxy S6 for $410 the same month.  He then bought a Google-branded Huawei Nexus 6P

9  from the Google Store for $549, paying $0 down and agreeing to 24 monthly installment

10  payments of $22.88.  In October 2017 he bought a Google Pixel 2 XL from the Google Store for

11  $0 down and 24 monthly payments of $35.38.[7]  Dr. Flamm does not purport to analyze whether

12  or how Google passed through costs.  *See* Flamm Decl. ¶ 261.

13      Leonidas Miras bought a Blackberry 9930 from the Verizon store in August 2011, for

14  $314.61 (a price that may include tax).  He requested and received at no charge two replacement

15  Blackberry 9930's through insurance claims.  He then obtained a Motorola Droid 3 for $49.99

16  through Asurion Insurance.  Later he bought a Samsung Galaxy S4 from an unknown source,

17  which Asurion replaced at no charge.  Mr. Miras then bought a Samsung Galaxy S7 in June 2016

18  from Verizon Wireless for $0 and 24 monthly payments of $19.82.  Asurion Insurance

19  subsequently provided Mr. Miras with a replacement Galaxy S7 for $0.[8]  Dr. Flamm does not

20  purport to analyze pass-through on devices provided by insurers, and thus performed no impact

21  analysis with respect to Mr. Miras's five insurer-provided phones.  *Id.*

22      **B.     Plaintiffs' purported proof of impact and damages**

23      In an attempt to show common impact to this sprawling class, Plaintiffs submit a web of

24  interrelated expert declarations.  Relevant here, Plaintiffs asked Michael Lasinski to determine

25  what the "appropriate FRAND royalty rate for Qualcomm's . . . [standard-essential patents

---

26  [6] *Id.* Ex. E (Abernathy Dep. Excerpts) at 24:6-25:25.

27  [7] *Id.* Ex. F (Clark Dep. Excerpts) at 34:2-25; 36:17-38:8; Exs. 4, 5, CLARK_00000006.

28  [8] Sessions Decl. Ex. G (Miras Dep. Excerpts) at 35:4-37:8; 48:25-52:3; 107:4-108:9; Exs. 3 & 7.9.

1291844

("SEPs")] should have been" and how much five OEMs paid Qualcomm (on licenses that include SEPs and non-essential patents) in excess of that rate. Lasinski Decl. ¶ 9.[9] The difference is, Plaintiffs contend, the "overcharge" paid by each. Mr. Lasinski calculates varying "exemplary overcharges" by OEM, by quarter:



Lasinski Decl. App'x C (Revised).

Lasinski Decl. n.5.

Plaintiffs then asked Dr. Flamm to assume that Qualcomm overcharged OEMs and determine whether and how much of an unspecified overcharge would have been passed through the multifaceted production-and-sale chain all the way to end consumers.[10] Dr. Flamm claims that end-purchasers could have been harmed in one of two ways: they could have purchased (1) the same device for less money; or (2) theoretically, a phone of "higher quality" than the one they bought, for the same nominal price. Dr. Flamm's analysis "does not tell us which combination of these occurred." Flamm Decl. ¶ 106.

Flamm Dep. at 180:25-

---

[9] On August 6, 2018, over a month after he signed his declaration and just three days before Qualcomm's response was due, it "came to Mr. Lasinksi's attention" that he had calculated his alleged overcharges including data for tablets. Tablet purchasers are not in the class. Plaintiffs served an errata to Mr. Lasinksi's declaration that slightly raises the estimated overcharges and reduces the OEMs' total overpayment. Dr. Flamm provided a corresponding errata on August 8.

[10]

Ex. B, Flamm Dep. at 139:11-15.

1291844

181:20.

Dr. Flamm attempts to demonstrate how OEMs would pass through an overcharge in the form of higher prices or lower quality (or both) by performing a regression analysis.  His regression takes the total material cost or cost of goods sold[11] of a phone and uses that variable to explain its price, while purporting to hold "quality" constant.  Not surprisingly, Dr. Flamm concludes that devices that cost more to make are sold for higher prices.  His model does not, however, attempt to directly assess how any OEM actually treated any alleged overcharge.

Dr. Flamm combines his regression result with two assumptions.  *First*, he assumes that the alleged overcharge would have the same relationship to price as his total-costs variable or, in other words, that the alleged overcharge and total costs would be passed through at the same rate.  *Second*, he assumes that quality would have the same relationship to price as his total-cost variable—meaning that an OEM would adjust "quality" in response to a total-cost change in the same amount that it would adjust price in response to a total-costs change, if the OEM adjusted quality rather than price.  Relying on these assumptions, he concludes that the rate at which total costs affect price is also the rate at which an OEM passes through the alleged overcharge.

Dr. Flamm then performs essentially the same exercise, using the same assumptions, for every link in the distribution chain, to arrive at purported "pass-through rates" for selected carriers, a few retailers, and one distributor.  Flamm Decl. ¶¶ 260-82.  Dr. Flamm admits that each of these intermediaries and end-sellers have their own unique pricing, subsidizing, discounting, marketing, and incentive strategies.  *Id.* ¶ 231-44.  He then consciously ignores these myriad strategies, assuming that all would have been *identical* in the but-for world.  *Id.* ¶ 232.

Plaintiffs offer no economic modeling or other allegedly common evidence to show the impact to potential class members from any alleged harm in the market(s) for semiconductor chips.[12] ███████████████████████████████████████████

██████████████████████ Ex. B (Flamm Depo Excerpts) at 55:10-56:25.

---

[11] He uses Apple's "total material cost" and other OEMs' cost of goods sold.  Flamm Decl. ¶ 255.

[12] Plaintiffs claim that Apple would have saved $7 per iPad Mini chipset if Apple had used Intel's instead of Qualcomm's.  *See* Br. at 14.  But iPad purchasers are not in the putative class, and Apple prices its iPhones with Intel chips the same as iPhones with Qualcomm chips.

### III.   LEGAL STANDARD

The trial court "must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  Rule 23(a) requires: (1) numerosity; (2) common questions; (3) typicality; and (4) adequacy.  *See* Fed. R. Civ. P. 23(a).   Plaintiffs must also "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Here, Plaintiffs seek certification under either Rule 23(b)(2) or Rule 23(b)(3). Rule 23(b)(3) requires both *predominance* and *superiority*.  Fed. R. Civ. P. 23(b)(3).  The predominance requirement is "far more demanding" than establishing a common question under Rule 23(a)(2).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  And because Rule 23(b)(3) certification is an "adventuresome innovation . . . designed for situations in which class-action treatment is not as clearly called for," the court has a "duty to take a close look at whether common questions predominate over individual ones." *Comcast*, 569 U.S. at 34 (internal quotations omitted).  Regarding superiority, Rule 23(b)(3) instructs the court to consider whether the proposed class action "is superior to other available methods for fairly and efficiently adjudicating the controversy," including "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).

Rule 23(b)(2) requires Plaintiffs to demonstrate that the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  A 23(b)(2) class "must be cohesive," meaning that individual issues cannot predominate.  *See Senne v. Kansas City Royals Baseball Corp.*, 2017 WL 897338, at *37 (N.D. Cal. March 7, 2017).  A Rule 23(b)(2) class does ***not*** cover class members' claims for non-incidental monetary relief.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–61 (2011).  "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).[13]

---

[13] Plaintiffs may not avoid satisfying Rule 23(b)(3)'s requirements when the "plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction."  *Dukes*, 564 U.S. at 364; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) (holding that the absence of Rule 23(b)(3)'s procedural "protections in a class

## IV.   ARGUMENT

### A.   Plaintiffs cannot prove antitrust impact or damages on a classwide basis.

"Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that results from a violation of the antitrust laws.  It is the causal link between the antitrust violation and the damages sought by plaintiffs." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 565–66 (N.D. Cal. 2013) (citations omitted).  "[T]o prove common impact, [p]laintiff[s] must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anti-competitive conduct." *Id.* at 567 (internal quotation marks omitted).

Plaintiffs must also produce a method "establishing that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34.  This separate requirement may be satisfied by a common method applicable to the class showing that damages for each class member "could feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva v. Medline Indus. Inc.*, 2013 WL 2306567, at *3 (9th Cir. May 28, 2013).  Both inquiries require "a thorough review of Plaintiffs' theory and methodology"—a merely "plausible" method is insufficient.  *In re High-Tech*, 289 F.R.D. at 567.

#### 1.   Plaintiffs' experts concede that the putative class includes many consumers who suffered no impact at all.

Common questions cannot predominate where a large portion of the class was not impacted.  *See Mazza*, 666 F.3d at 596 (finding that common questions did not predominate where the class was defined to include members who were not exposed to the allegedly misleading advertising); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012).  Here, Plaintiffs' only theory of impact and damages to indirect purchasers is that device-makers, retailers, and carriers passed on an allegedly "supra-FRAND" portion of Qualcomm license fees. ████████████████████████████████████

action predominantly for monetary damages violates due process").

1  ██████████████████████  ██  .[14]  ████████████████████████

2  ████████  Lasinski Decl. n.5.  ████████████████████

3  ██████████████████  Ex. B Flamm Dep. at 147:3-15.  Under Mr. Lasinski

4  and Dr. Flamm's theories, Apple was not "overcharged" after October 1, 2016.[15]  The data

5  produced in this case show that potential class members bought at least 95 million Apple phones

6  after October 1, 2016.  *See* Johnson Decl. Ex. 7.  (Sessions Decl. Ex. H).  Plaintiffs' proposed

7  class thus includes a large number of class members for whom Plaintiffs cannot prove impact.

8  *Cf. Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016); *see also in re Rail*

9  *FreightFuel  Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 138 (D.D.C. 2017) (concluding that

10  common questions do not predominate because over 2,000 uninjured plaintiffs would have to be

11  "weeded out" from a class of 16,000).  Plaintiffs cannot, therefore, show impact to "all or nearly

12  all" putative class members.

13       The Apple purchasers who Plaintiffs' experts admit were not impacted illustrate the

14  untenability of Plaintiffs' pass-through theory.  Apple sold the same phones, at the same prices,

15  before and after it stopped paying any alleged overcharge.  Thus, in what amounts to a real-life

16  "but-for" world, Plaintiffs' theorized price or quality adjustment did not occur.

       **2.**     **Plaintiffs cannot show with common evidence or common methods**
17
                 **that all or nearly all OEMs paid alleged overcharges.**
18

19       Before proving that the overcharge alleged by Plaintiffs was passed through to consumers,

20  they must first prove that each OEM actually paid an alleged overcharge.  Mr. Lasinski purports

21  to calculate alleged overcharges to OEMs by comparing his hypothetical FRAND rate to each

22  OEM's "historical weighted average royalty rate."  Lasinski Decl. ¶ 147.  ████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ─────────────────────

26

27  ████████████████████  *Id.*

[15] Plaintiffs cannot argue on reply that post-2016 Apple purchasers were impacted in some other
28  way.  Qualcomm would have no opportunity to respond to this new theory.  An Apple-specific
theory of harm would not be common to the class of Apple and non-Apple purchasers alike.

1291844

These analyses could not be done with common proof, as Mr. Lasinski's own declaration reveals.  He performed exemplary overcharge calculations for five specific devices, but testified that he relied on different evidence to perform those calculations.

For the purposes of predominance an "individual question" is "one where members of a proposed class will need to present evidence that varies from member to member."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotations omitted).  As this example illustrates, Plaintiffs intend to present different evidence to prove alleged overcharges to different OEMs.

### 3.  Plaintiffs cannot show pass-through by common proof at any step in the distribution chain.

A proposed method for showing classwide impact cannot support certification if it "leaves too much uncertainty as to whether pass-through can be estimated reliably" at each step in the distribution chain.  *See In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *4 (N.D. Cal. Mar. 5, 2018) (hereafter *Batteries*).  Plaintiffs' model fails at every one.

### a.  Plaintiffs cannot establish common impact in the form of increased prices because retailers priced at focal points.

Plaintiffs cannot prove on a classwide basis that any alleged overcharges were passed through to end consumers who paid increased *prices* for their cellular phones because "focal-point pricing" was ubiquitous throughout the class period.  Johnson Decl. ¶¶ 118–22.  Focal-point pricing is the marketing strategy of setting consumer prices at "focal" points, such as those ending in $9.99.  *Id.* at ¶ 118. Retailers who use focal-point pricing "may assign products with small to moderate differences in costs to the same price point despite cost differences, or may not move a

9

given product to the next higher price point in response to relatively small cost increases."

*Batteries*, 2018 WL 1156797, at *4.  In other words, with focal-point pricing, the retail price

remains the same despite marginal changes in costs.

Focal-point pricing was a dominant marketing strategy for cellphones sold during the

class period.  Johnson Decl. ¶ 119–22. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ When OEMs or retailers reduced the

retail price of a given cellphone model, they typically reduced it to another focal-point price.  *Id.*

Ex. 15–17.  This pricing strategy demonstrates that OEMs and retailers do not adjust retail *prices*

to pass through small changes in input costs.  That precludes Plaintiffs from proving that end

users paid increased prices for their cellular phones on a classwide basis.  *See Batteries*, 2018 WL

1156797 at *4.

Dr. Flamm concedes that focal-point pricing "would have occurred in the *but-for* world as

well."  Flamm Decl. ¶ 232.  But he does not account for how, and by how much, focal-point

pricing affects the alleged pass-through rate for the OEM and retailer points in the distribution

chain.  Instead, he purports to calculate the alleged pass-through as an amalgamation of ████

██████████████████████████████████████████████

████████████████ His analysis fails at each level of the distribution chain.

        **b.**     **Plaintiffs fail to establish that OEMs passed through the alleged overcharge in a higher "quality adjusted price."**

Dr. Flamm's theory that the purported overcharge was passed through as "a higher price, a

lower quality phone, or both" is just that—a theory.  Mot. at 25.  Dr. Flamm's model cannot show

that any OEM actually raised the price of a phone, would have made a different, "better" phone

absent the overcharge, or some combination of the two—let alone that this happened on a

common basis across the putative class.  Failure to show "whether such quality-based 'pass

through' ever occurred, or in what amounts" precludes class certification on such a theory.

10

1291844

*Batteries*, 2018 WL 1156797 at *4.  Like the expert in *Batteries*, Dr. Flamm offers "various kinds of statistical data analyses to support his economic theory of quality adjusted pricing."  *Id.*  Crucially, however, these analyses fail to "demonstrate that any products (and thus the purchasers of those products) actually experienced a quality reduction."  *Id.*  At best, they "demonstrate little more than that product cost changes correspond to product price changes, an unsurprising result."  *Id.*; Flamm Decl. at ¶ 128 (describing model as assuming that "increases in the price of an input always lead to an increase in the price of the product downstream").  The actual evidence contradicts any conclusion that all or nearly all of the putative class suffered economic harm measurable by common methods.

> **(i)    Plaintiffs' *theory* of OEM pass-through ignores OEMs' large and varying profit margins.**

A product's price is equal to its total cost plus the seller's profit margin (or markup).  Flamm Decl. ¶ 253.  OEMs control their markup (and prices) for cellphones: as Dr. Flamm admits, OEMs have "significant monopoly power" and "price-setting ability" based on product differentiation and consumer loyalty.  *Id.* ¶¶ 74–76. ███████████████████████ ████████████████  Flamm Dep. at 122:24.  Nevertheless, Dr. Flamm insists that OEMs *must* account for any increased costs (*e.g.*, the alleged overcharge) by either raising prices or reducing quality "because survival offers no alternative."  Flamm Decl. ¶ 87.  That theory ignores real-world evidence that OEMs make highly individualized decisions about costs and margins.[16]

Deposition testimony, including that cited by Dr. Flamm, shows that OEMs faced with cost changes can respond in at least four different ways: (i) renegotiate with suppliers to attempt to change other costs; (ii) adjust profit margins; (iii) change device components or "quality;" or (iv) change their prices.  For example:



---

[16] Plaintiffs claim that two Qualcomm documents show that the royalty "was passed through in the form of higher market prices on cellular phones."  Neither document even purports to show the effect of a royalty overcharge on any actual device.  These documents confirm the unremarkable fact that an OEM's price is made up of costs, expenses, and margin.  If an OEM had a fixed markup, then cost changes would affect price, but here OEMs do not.



Dr. Flamm assumes that OEMs always change only device prices or quality, regardless of the magnitude or type of overcharge, and do not renegotiate other costs or adjust profit margins. But the data contradict this assumption: the OEMs that Dr. Flamm analyzed made significant, and varied, profits on their phones.  OEMs' margins dwarf the alleged overcharge:



[17] Sessions Decl. Ex. K ████████████ at 78:21–25 (emphasis added).

[18] *Id.* Ex. L ████████████ at 432:2-4 (emphasis added).

[19] *See* Srinivasan Decl. [Dkt. 524-1] Ex. 56 ████████████ at 161:21-162:12 (emphasis added).

[20] Sessions Decl. Ex. M ████████████ at 211:20-212:8 (emphasis added).

[21] *Id.* Ex. N ████████████ at 303:3-18 (emphasis added).

1291844

Johnson Decl. Ex.10.  These large and varied OEM margins are consistent with Dr. Flamm's conclusion that OEMs have the ability to set the prices at which they sell their devices, but inconsistent with his assumption that OEMs would nonetheless necessarily pass on all costs.  For instance, ████████████████████████████████████████████████ ████████████████████████████████████████████ OEMs' responses to varied overcharges would not be common across the class.

(ii) <b>Plaintiffs' <i>modeling</i> of OEM pass-through analyzes how total costs affect price—not relatively small overcharges.</b>

Dr. Flamm purports to demonstrate that OEMs necessarily incorporate small cost changes into device prices by creating "pass-through regressions" for six OEMs.  He admits that pass-through is "fundamentally an empirical question" and that ██████████████████ ████████████████████████████ Flamm Decl. ¶ 134; Flamm Dep. 46:1-7.  But Dr. Flamm's models do not address the relevant question of whether and at what rate an OEM passed on the particular overcharges at issue here.[22]  Indeed, Dr. Flamm admits that his model does not depend on the size of the cost change (or overcharge), as he looks only at aggregated total costs and assumes all costs are passed through in exactly the same way.  *See* Flamm Decl. ¶ 251; Flamm Dep. at 143:23-144:11.  But Dr. Flamm "ha[s] not presented a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate" given that the overcharge makes up a "relatively small portion" of the total cost of the device.  *In re Optical Disk Drive Antitrust Litig. ("ODD")*, 303 F.R.D. 311, 324-25 (N.D. Cal. 2014).

An alleged overcharge that constitutes a small portion of a finished product's price may, as a practical matter, be outweighed by other economic factors affecting pricing and product quality decisions.  OEMs are even less likely to pass through small overcharges when their profit margins are as large as they are here.  *See* Johnson Decl. ¶¶ 5–6.  Indeed, if OEMs passed through every cost change, as Dr. Flamm assumes, the prices and qualities of their phones would change

---

[22] Plaintiffs emphasize that Qualcomm has used hedonic regressions in the past.  That is a non-sequitur.  The Nevo and Willig hedonic regression on which Plaintiffs rely showed that quality adjusted prices of smartphones declined over time.  That analysis has no bearing on whether plaintiffs can demonstrate impact to all or nearly all class members through common proof.

1  constantly.  Here, Plaintiffs' alleged overcharges vary from OEM to OEM, and within OEMs

2  from quarter to quarter, ███████████████████████████████████████

3  ████████████████████████████████████████  Lasinski App'x C (Revised).  Dr.

4  Flamm does not analyze pass-through of these overcharges or of costs of similar magnitudes.  Dr.

5  Flamm's reliance on total cost to estimate pass-through distinguishes his analysis in this case

6  from his second-try analysis in *ODD*.  There, in response to this very criticism, Dr. Flamm

7  "performed additional studies using detailed component level characteristic and cost

8  information."  (Revised Motion for Class Certification at 30, *In re Optical Disk Drive Antitrust*

9  *Litig.,* No. 3:10-md-02143 RS, Dkt. 1630).[23]  He did not do so here.

10  Moreover, an OEM's response to a change in the cost of a specific input will depend

11  (among other things) on the input and the size of the change, Johnson Decl. ¶¶ 54–56, 92, just as

12  an individual would respond differently to a $5 increase in their grocery bill or a $500 increase in

13  their monthly rent.  Yet Dr. Flamm simply assumes that Samsung responds to a ███████████

14  overcharge in the exact same way that it would respond to a 75% cost change.

15  Unlike Dr. Flamm, Dr. Johnson *tested* the assumption that all costs are passed through in

16  the same way.  They are not.  Apple divides costs into two categories: material costs and non-

17  material costs. ██████████████████████████████████████[24]  When

18  Dr. Flamm analyzed Apple pass-through, he looked at the rate at which Apple passes on total

19  material costs ██████████████████████████████  Dr. Johnson re-ran Dr.

20  Flamm's model using both Apple's "material costs" and "non-material costs."  Interpreting the

21  results as Dr. Flamm does, Dr. Johnson's analysis would show that Apple passed through 312%

22  of "total material costs" and passed through an amount of non-material costs ████████████

23  ████████████████  at a rate indistinguishable from zero.  Johnson Decl. ¶¶ 110–11.[25]

24

25  [23]  Qualcomm is neither suggesting that Dr. Flamm's interpretation of regression coefficients is
correct, nor that some unspecified analysis on smaller costs would suffice to show predominance.

26  [24]  *See* Sessions Decl. Ex. O (APL-QC-FTC_22646030) at 3; *see also id.* 4, 9, 10, 13, 15, 16.

27  [25]  Dr. Johnson ran this test on a corrected version of Dr. Flamm's Apple data set, eliminating
obvious errors like coding Blackberry phones as Apple phones.  Johnson Decl. ¶ 108  App'x F.

28  He also ran the test using Dr. Flamm's as-is Apple data set and obtained similar results.  *Id.*
n.195.

1291844

The real-world evidence also belies Dr. Flamm's assumptions.  Dr. Flamm estimates that Apple passes through total material costs at a rate of 174.6%.  But in reality, Apple's prices reflect a very different relationship to individual costs.  For example, ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ Johnson Decl. n.153.  But Apple priced the high-storage versions of both the iPhone 6S and the iPhone 7 exactly $100 above the mid-storage versions, █████████████████████████████████ *Id.* ¶ 84.  ████████████████ ███████████████████████████████████████████████████████

Dr. Flamm's model also fails to verify another fundamental assumption: that an OEM's costs affect either the price the OEM charges, the quality of the device the OEM makes, or both. Having provided no common evidence that OEMs' costs affect the actual prices they charge, he assumes that added costs must be made up in quality reductions.  But Dr. Flamm never tests this assumption.  His hedonic regression purports to estimate price as a function of costs and quality attributes; it does *not* test the relationship between quality attributes and costs.

The actual evidence contradicts Dr. Flamm's untested assumption.  In many instances, OEMs adjusted neither quality nor price when their costs changed or deviated from targets.  For example, Apple released the baseline iPhone 5 at the planned $649 price point, ████████████ ███████████████████████████ Johnson Decl. ¶ 92.  The iPhone 7 ███████████████ but also launched at $649.  *Id.* n.165.  And the iPhone 4S ████████████████████████ but Apple still priced it at $649 (falling to $549 upon the 5's launch) while leaving the design unchanged.  *Id.* ¶ 92 & Exs. 14, 19.

In fact, Apple did not change iPhone prices or features after October 2016 █████████████ ███████████████████████████████ Apple launched the baseline iPhone 7 at $699 in September 2016, and continued to sell iPhone 7s with the same features at the same prices until the iPhone 8 launched in September 2017 (at which point Apple reduced the 7's price by $100). Thus, ███████████████████████████████████ Apple still sold the iPhone 7 at the same price with the same features as it did when the alleged overcharge was ██████ *Id.* Ex. 19.

### c.   Plaintiffs cannot establish intermediate reseller, carrier, or retailer pass-through on a common basis.

Plaintiffs likewise cannot show through common proof that the intermediate resellers, carriers, and retailers passed on any alleged overcharge.  These intermediaries' pricing and marketing practices ensure that individualized questions of impact predominate.  "[I]ndirect purchaser plaintiffs must find a way to account for the decision-making of a variety of resellers and manufacturers in an intricate distribution chain."  *In re Lithium Batteries Antitrust Litig.*, 2017 WL 1391491, at *12 (N.D. Cal. Apr. 12, 2017) (internal quotations omitted).[26]

*Consumers bought the same devices at very different prices.*  The prices that individual class members paid for their phones, and, thus, the baseline from which "impact" is assessed, varied drastically.  *See* Johnson Decl. ¶¶ 123–37.  Factors leading to these price differences are as varied as the prices themselves, and include carriers' and retailers' decisions to offer (1) subsidies; (2) financing, upgrade, and trade-in programs; (3) rebates, discounts, and promotions; and (4) bundling programs.  *Id.*

Some carriers subsidized phones for customers who subscribed to their services.  *Id.* ¶¶ 125–34.  These varied from covering the entire price of the device to a portion thereof.  *See id.* ¶ 129.  As a result, many consumers paid less than full price for their phones, and many purchased their phones for below the production cost or even received them for free.  *Id.* ¶ 133.  Dr. Flamm claims that he can ignore subsidies because he assumes that carriers "made up" the cost of any subsidy through a service plan.[27]  But he performed no analysis to test this assumption.  Even the statements that Dr. Flamm relies on make clear that, at most, consumers repay *some* of the subsidies *sometimes*.  Flamm Decl. ¶¶ 237–38. The fact that carriers *try* to recover subsidies through service contracts does not demonstrate that any class member (let alone all or nearly all) actually reimbursed a carrier subsidy through a service contract.  The data show otherwise: ██

████████████████████████████████████████████████

---

[26] Plaintiffs also fail to make the required showing of intermediate reseller, carrier, or retailer pass-through because of focal point pricing as discussed *supra* at 9.

[27] Dr. Flamm did not study the pricing or market for service plans.  Dr. Johnson's analysis shows that carriers priced service plans at focal points and that carriers did not tailor service-plan prices to the price of devices.  Johnson Decl. ¶¶ 132-33.

16

1291844

█████████████████████████████ Johnson Decl. Ex. 28.  Thus, the question of the (upfront + actually-paid service-cost) price of a phone is a highly individualized question not susceptible of common proof.

Dr. Flamm similarly ignores rebates, discounts, promotions, carrier financing, upgrade, and trade-in programs.  As a result of these programs, potential class members paid significantly different amounts for the same phone—including getting their phone below cost or free—depending on when and where they bought it.  *Id.*  Putative class members received discounts that varied widely by device, time of purchase, and location.  *Id.* Some originated with the retailer or carrier, and others with the OEMs.  *Id.*  Many consumers acquired new phones after having paid through installments only a portion of the phone's retail price.  *Id.* ¶¶ 135–37.  The terms of these programs also varied widely—for example, requiring different amounts to be paid over different lengths of time—as did their prevalence during the Class Period.  *Id.*  As a result, if two consumers bought identical devices from the same carrier at the same time and under the same upgrade program, but one upgraded at the first available moment while the other upgraded only after several more installment payments were made, then those two consumers paid significantly different prices for their phones.  *Id.*

Dr. Flamm offers no reliable methodology to account for the impact of these consumer-facing price reductions.  He simply declares that they have no effect whatsoever on his results because he assumes they would have been exactly the same in the "but-for" world where prices or quality were different.[28]  Flamm Decl. ¶ 232.  But he has no plausible explanation for how his assumption would work in the case of consumers who, as a result of a carrier or retailer discount or program, receive their phones at no cost.  In the but-for world, the carriers and retailers could not have given such customers any price that is further reduced (from $0); moreover, according to Dr. Flamm, they could not adjust the quality of the devices sold because device quality was already determined further up the production chain.  ██████████████████████

---

[28] Dr. Flamm also cites a statistical regression that he claims shows the amount of pass-through at the carrier and retailer level.  Flamm Decl. ¶¶ 272–82.  But Dr. Flamm's regression on the carrier and retailer level suffers from the same fundamental flaws as his regression on the OEM level (as discussed above).

17

1291844

1  ███████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████ *Id.* This is

4  speculative and implausible.

**4.  Plaintiffs' different equation for every distribution channel is not "common evidence" and cannot workably prove individual damages.**

Dr. Flamm's models cannot be used to calculate damages for each class member.  Dr. Flamm specifies a different pass-through rate for every permutation of possible distribution channels.  It would be far too individualized and complicated to calculate any individual's damages according to this model.  *See Comcast*, 569 U.S. at 34.  To take account of the differences among (i) alleged overcharges for each OEM in each month of the class period (which Mr. Lasinski promises to expand to different overcharges on every single different device); (ii) pass-through rates for each OEM; (iii) pass-through rates for each additional level in the distribution chain; and (iv) average pass-through rate for the type of purchase (with service contract, without service contract, indirect sale), Dr. Flamm proposes a *different* calculation for each chain of purchase.  Flamm Decl. ¶¶ 262, 271, 279, 282.  As in *Flash Memory*, this "amounts to a retailer-by-retailer, manufacturer-by-manufacturer and product-by-product analysis of pass-through," which only underscores "the individualized nature of the evidence that will be required to show impact."  *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *12 (N.D. Cal. June 9, 2010).  Moreover, Dr. Flamm nowhere explains how one could apply his models to a particular purchase price, let alone account for the terms of the individual's purchase, including incentives, rebates, financing, service contracts, and so on.  This chain of individualized inquiries forecloses class certification, especially when the Proposed Class may top a billion individual claims.  *See infra* Part IV.B.

Notably, Dr. Flamm never claims that his models can determine an individual's damages.  Instead, the "damages to class members" section of his declaration is one paragraph long.  He "applies the weighted average pass-through rate as determined using these exemplary methods (87.4%) to the total supra-FRAND royalty payments as calculated by Michael Lasinski" to come

1291844

up with "damages to the indirect purchaser class in the amount of $4.99 billion."  Flamm Decl.

¶ 291.  This aggregated approach simply assumes away all of the individual variations that even

Dr. Flamm admits are present among the myriad distribution channels by which indirect

purchasers received their phones.  It fails to explain how a damages model might account for

class members who received their phones at a discount or for free,[29] or how class members who

traded in their devices, purchased refurbished devices, or bought phones second-hand would be

treated.[30]  In short, Dr. Flamm does not purport to be able to "quantify the amount of overcharge

for each Class member," and Plaintiffs have proposed no method to do so.

### B.   The size, scope, and diversity of the Proposed Class render it unsuitable for class treatment and therefore not "superior."

Plaintiffs formulaically walk through Rule 23's requirements as if this were an ordinary

class-certification motion.  It is not.  In proposing as a class an agglomeration of individuals

consisting of every person (or entity) in the United States who purchased, contributed to, or

provided reimbursement for the purchase of nearly every cellphone over the past seven years, *see*

Mot. at 3, Plaintiffs have overreached.  To certify a class this vast (250 million people across

every state and territory in the Union)[31] and heterogeneous, the Court would necessarily forgo the

"rigorous analysis" Rule 23 requires, gloss over the many individualized inquiries inherent in a

class of this magnitude, and violate Qualcomm's (and absent class members') due-process rights.

### 1.   The putative class is so large, heterogeneous, and unmanageable that it is inferior to other available methods of adjudicating the controversy.

Rule 23(a)(1) sets a floor for numerosity, but no ceiling.  Rule 23(b)(3), however,

"contains a specific, enumerated mechanism" to ensure that a class action remains within the

bounds of reason: "the manageability criterion of the superiority requirement."  *Briseno v.*

*ConAgra Foods, Inc.*, 844 F.3d 1121, 1127–28 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 313

---

[29] Named Plaintiff Sarah Key bought at least one, and possibly two of her three phones, at discounted or subsidized prices.

[30] Named Plaintiff Carra Abernathy bought two refurbished phones, out of five total.

[31] ███████████████████████████████████  Sessions Decl. Ex. P (LGEMU-000305734 at 5).

(2017).  That requirement demands that the proposed class action be "superior to other available methods for *fairly* and efficiently adjudicating the controversy," taking into account "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3) (emphasis added).  Plaintiffs have the burden to establish superiority.  *Abrams v. Interco Inc.*, 719 F.2d 23, 31 (2d Cir. 1983) ("The district court was under no obligation to exercise its own ingenuity to devise a manageable class limited to a single geographical area or product line.").

A 250-million-person class holding more than a billion individual claims is inherently unmanageable, unfair, and inferior to alternative forms of adjudication, especially in light of the myriad individualized impact and damages questions that Plaintiffs' experts gloss over.  *See supra* Part IV.A.  No defendant can fairly or adequately present its defenses against a class as large and diverse as the entire adult U.S. population.  *See Dukes*, 564 U.S. at 367; 28 U.S.C. § 2072(b) (providing that Rule 23 cannot "abridge, enlarge, or modify any substantive right").  That is especially true in this case.  To certify this class as-is, the Court would have to conclude that there is no meaningful difference among cellphone manufacturers regarding whether and how they translate small cost increases into price, quality, design, or functionality for every model cellphone each company has released in the last seven years; or, alternatively, that Qualcomm has no meaningful right to test and rebut that claim.  The Court would likewise have to elide all differences among class members who paid nothing for their phones, those who paid full freight, and still others who received varying rebates or discounts.  Such an approach cannot satisfy the "rigorous analysis" Rule 23 demands. *Mazza*, 666 F.3d at 588.

Furthermore, Plaintiffs have offered no plan to "fairly and efficiently" manage a 250-million-person class.  Fed. R. Civ. P. 23(b)(3).  The Second Circuit's opinion in *Abrams* is instructive.  There, the proposed class consisted of all consumers nationwide who had purchased any Interco product—shoes, raincoats, and other apparel—over the previous four years.  719 F.2d at 25.  The class in *Abrams* totaled only 3.1 million consumers—a fraction of Plaintiffs' Proposed Class.  *Id.* at 30.  The court first found problems regarding the notice Rule 23(c)(2) requires,

noting that class counsel had "given no thought to the question of notice."[32]  But, as the Second

Circuit further held, the "more serious problem of manageability relates to damages."  *Id.* at 31.

The intractable problem was that each class member would be entitled "not to a refund," but

rather to three times the amount of his or her overpayment, as compared to but-for prices.  *Id.*  In

reasoning directly applicable here, the court held that determining such damages "would be

complicated by the scores of different products involved, varying local market conditions,

fluctuations over time, and the difficulties of proving consumer purchases after a lapse of five or

ten years."  *Id.*  Judge Friendly concluded that "plaintiffs are the victims of their own ambitions"

in having sought too large and diverse a class.  *Id.*  The same obtains here.  The problems the

Second Circuit identified in *Abrams* are magnified a hundredfold in this case.  What's more, the

"management tools" district courts usually employ to address individualized issues that may arise

in large class actions will break down at this scale.  *See Briseno*, 844 F.3d at 1128; *In re Visa

Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *overruled on other

grounds*, *In re IPO Sec. Litig.*, 471 F.3d 24, (2d Cir. 2006) .  No claims administrator could

process and verify a billion claims from more than a quarter-billion people, and no special master

could preside over so many "individual damage proceedings."  *Visa*, 280 F.3d at 141.

### 2. Plaintiffs fail to consider superior methods to adjudicate the controversy.

Qualcomm is not arguing that the issues Plaintiffs raise must go un-litigated because the

alleged conduct supposedly affected so many people.  The key question under Rule 23(b)(3) is

whether there are other, better methods to "adjudicat[e] the controversy."  And it is Plaintiffs'

burden—not Qualcomm's or the Court's—to propose any such methods.  *See Abrams*, 719 F.2d

at 31.  They have not, for example, proposed subclasses based on brand, distribution channel, or

some other criteria that might prove practicable in terms of litigating defenses, providing notice,

managing damages inquiries, and administering and verifying claims.  While Qualcomm does not

concede that such subclasses would satisfy the requirements of Rule 23(b)(3), Plaintiffs have

---

[32] Plaintiffs here have likewise offered no plan for providing notice to every class member. "[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 176 (1974).

1  elected to propose only a class of nearly every U.S. consumer.

2      **C.    The Proposed Class cannot be certified under Rule 23(b)(2).**

3          Plaintiffs suggest in passing that the Court could certify their class under Rule 23(b)(2).

4  But a Rule 23(b)(2) class cannot be certified where "it appears . . . that Plaintiff's claim for

5  injunctive relief is incidental to his claim for damages." *Diacakis v. Comcast Corp.*, 2013 WL

6  1878921, at \*9 (N.D. Cal. May 3, 2013).  Plaintiffs' claim for monetary relief dominates here.

7  Their $5 billion damages demand cannot possibly be described as "incidental" to any other

8  requests for relief in this case.  *See Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D.

9  Cal. 2012) (finding that large, aggregate request for monetary relief was not incidental to

10 injunctive relief).  The Supreme Court has emphasized that monetary relief is not incidental—and

11 therefore a (b)(2) class cannot be certified—"when each class member would be entitled to an

12 individualized award of monetary damages."  *Dukes*, 564 U.S. at 360–61.  Where, as here,

13 Plaintiffs' requested monetary relief is based on each plaintiff's purchase of a particular product

14 at a particular price, such request inherently requires individualized determinations of each

15 damages award.  *See Russell v. Kohl's Dep't Stores, Inc.*, 2015 WL 12748629, at \*6 (C.D. Cal.

16 Dec. 4, 2015) (certification inappropriate where damages will be driven by "[c]ircumstances such

17 as whether a class member used coupons, how many products she purchased, which products she

18 purchased, and the disparity between the stated and actual [price] on those specific products");

19 *Ries*, 287 F.R.D. at 541 (declining to certify a request for restitution under (b)(2) because it

20 "would require individualized assessments of damages based on how many products the class

21 member had bought").  For example, in *Flash Memory*, the court refused to certify a (b)(2) class

22 of indirect purchasers because it was clear "that the crux of their claims is that direct purchasers

23 paid artificially-inflated prices . . . and that those alleged overcharges were passed along to

24 indirect purchasers."  *In re Flash Memory Antitrust Litig.*, 2011 WL 1301527, at \*7 (N.D. Cal.

25 Mar. 31, 2011).  In such a case, it is "readily apparent that Plaintiffs' claims for monetary relief

26 remain predominant."  *Id.*

27          Rule (b)(2) certification is also inappropriate because the class is not cohesive—i.e.,

28 Plaintiffs have failed to show that the "relief is appropriate respecting the class as a whole."  *See*

1    *Senne*, 2017 WL 897338, at *37; *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 635-36

2    (W.D. Wash. 2011); *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 451 (N.D.

3    Cal. 1994).  A Rule (b)(2) class "must not be overrun with individual issues," *Sweet v. Pfizer*, 232

4    F.R.D. 360, 374 (C.D. Cal. 2005), and requires more cohesion than a (b)(3) class, *Barnes v. Amer.*

5    *Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998).  This is because in a (b)(2) action, unnamed

6    class members are bound by the result without the opportunity to opt out.  *Id.*  Thus courts have

7    rejected (b)(2) classes based on the same individualized issues that defeat predominance under a

8    (b)(3) class.  *See, e.g.*, *Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899, at *3 (N.D. Cal.

9    Aug. 28, 2002); *In re Paxel Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003).

10           **D.     Plaintiffs cannot certify a nationwide class under California law.**

11           As Qualcomm argued in its Motion to Dismiss, and raises here for the purposes of

12   preserving the argument, a nationwide class cannot be certified on the basis of a single state's

13   laws unless the application of that law to all class members comports with the Due Process

14   Clause and the Full Faith and Credit Clause of the U.S. Constitution.  *Phillips Petroleum Co. v.*

15   *Shutts*, 472 U.S. 797 (1985).  California law "may only be used on a classwide basis if the

16   interests of other states are not found to outweigh California's interest in having its law applied."

17   *Mazza*, 666 F.3d at 590 (internal quotations omitted).  Many states follow *Illinois Brick* and do

18   not authorize indirect-purchaser recovery in antitrust suits.  *See, e.g.*, *Abbott Labs., Inc. (Ross*

19   *Labs. Div.) v. Segura*, 907 S.W.2d 503, 506 (Tex. 1995); *Free v. Abbott Labs., Inc.*, 176 F.3d 298,

20   300-01 (5th Cir. 1999), *aff'd*, 529 U.S. 333 (2000); *Minuteman, LLC v. Microsoft Corp.*, 147

21   N.H. 634, 639 (2002).

22           Qualcomm recognizes that this Court has already conducted a choice-of-law analysis on

23   this subject, holding that no true conflict exists between California law and the laws of non-

24   repealer states.  Dkt. 175 at 39.  But this conclusion cannot support application of California law

25   to a massive group of consumers spanning the country.  The Supreme Court's "concerns in

26   *Hanover Shoe* and *Illinois Brick* [were] about the difficulties of apportionment, the risk of

27   multiple recovery, and the diminution of incentives for private antitrust enforcement . . . ."

28   *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208 (1990).  These various interests have been

1291844

1    expressly echoed by courts applying the laws of repealer states.  *See, e.g., Stifflear v. Bristol-*

2    *Myers Squibb Co.*, 931 P.2d 471, 476 (Colo. App. 1996).  The decision *not* to allow indirect-

3    purchaser recovery cannot be reconciled with California's approach.  Under *Mazza* this

4    establishes a "true conflict."  *See Mazza*, 666 F.3d at 590.  "Given that the action simply could

5    not go forward in non-repealer states. . . , it is too much of a stretch to employ California law as

6    an end run around the limitations those states have elected to impose on standing."  *In re Optical*

7    *Disk Drive Antitrust Litig.*, 2016 WL 467444, at *13 (N.D. Cal. Feb. 8, 2016)

8         **E.**    **Plaintiffs cannot seek class certification on an incomplete tying claim.**

9         A plaintiff in a tying case must prove "sufficient power in the tying product market to

10   restrain competition in the market for the tied product."  *See Ill. Tool Works Inc. v. Indep. Ink,*

11   *Inc.*, 547 U.S. 28, 36 (2006).  Plaintiffs' First Amended Complaint, filed three weeks before this

12   motion, does not discuss a market for a tied product or even define what exactly the allegedly tied

13   product is.[33]  In their briefing, Plaintiffs variously refer to the alleged tied product as either

14   "[Qualcomm's] cellular SEP license," Mot. at 17, or "supra-FRAND licenses for Qualcomm's

15   cellular SEPs."  Elhauge Decl. ¶ 26.  Plaintiffs assert that "Qualcomm had monopoly power over

16   the tying baseband processor chips that OEMs needed in order to create phones, and the tie

17   coerced OEMs into accepting higher royalty rates than they would have paid under FRAND."

18   Mot. at 17.  This argument fails for two reasons:

19        *First*, Plaintiffs fail to assert a ***market*** for the allegedly tied product.  "The antitrust

20   concern over tying arrangements arises when the seller can exploit its market power in the tying

21   market to force buyers to purchase the tied product which they otherwise would not, thereby

22   restraining competition in the tied product market."  *Brokerage Concepts, Inc. v. U.S. Healthcare,*

23   *Inc.*, 140 F.3d 494, 510 (3d Cir. 1998); *see Belton v. Comcast Cable Holdings, LLC*, 151 Cal.

24   App. 4th 1224, 1234 (2007) (tying arrangement must curb "competition in the sale of the tied

25   product").  The "potential injury to competition threatened" by tying is that the arrangement will

26   "harm existing competitors or create barriers to entry of new competitors in the market for the

27   

28   ---

[33] A pre-consolidation complaint filed by one of the Interim Co-Lead Counsel firms alleged an "SEP Licensing Market."  *Key v. Qualcomm*, No. 17-cv-00442, Dkt. 1 ¶ 138 (N.D. Cal. Jan. 27, 2017).  That allegation is not present in subsequent consolidated complaints.

tied product" or will "force buyers into giving up the purchase of substitutes for the tied product." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012); *see also United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) (plaintiffs must establish "the actual effect of the tying arrangement on competition in the tied market"); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.,* 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017) ("An antitrust complaint must define the relevant market for both the tying product and the tied product"). Plaintiffs cannot obtain class certification on a tying-based impact theory when they fail to define the market for the allegedly tied product.

*Second*, Plaintiffs' impact model does not attempt to assess the fair market value of the combination of allegedly tied and tying products. "Simply to show that a noncompetitive price has been paid for the product which is tied is not enough" to show antitrust impact. *Metromedia Broad. Corp. v. MGM/UA Entm't. Co.*, 611 F. Supp. 415, 426 (C.D. Cal. 1985). Rather, "to demonstrate the injury necessary to establish defendant's liability, plaintiff must prove that the payment for both the tied and tying product exceeded their combined fair market value." *Id.* (internal quotation marks omitted); *see also Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 52 (9th Cir. 1971) (holding that an assessment of injury from an alleged tie must take into account the cost or value of both the tied and tying products), *abrogated on other grounds*, *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 n.3 (9th Cir. 2008). It is not enough to allege that the tying arrangement inflated prices for consumers. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012). Yet that is all Plaintiffs have done here.

Plaintiffs' tying claim not only fails on the merits, but it also adds additional individualized inquiries to an already impossibly complicated case dominated by individualized issues. Plaintiffs accuse Qualcomm of giving some (but not all) OEMs "disguised royalty relief" through chip rebates. *See* Consol. Amend. Compl. ¶¶ 100–03. Thus, to show antitrust impact to some putative class members, Plaintiffs would have to show that each alleged bundle of license and chip-supply terms to each individual OEM was supra-competitive.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' request for class certification.

1   Dated:  August 9, 2018                                KEKER, VAN NEST & PETERS LLP

2

3                                                    By:   */s/ Robert A. Van Nest*
                                                          ROBERT A. VAN NEST
4                                                         EUGENE M. PAIGE
                                                          CODY HARRIS
5                                                         JUSTINA SESSIONS
                                                          JESSELYN FRILEY
6

7                                                         Gary A. Bornstein *(pro hac vice)*
                                                          Yonatan Even *(pro hac vice)*
8                                                         CRAVATH, SWAINE & MOORE LLP
                                                          Worldwide Plaza
9                                                         825 Eighth Avenue
                                                          New York, NY 10019-7475
10                                                        Tel.: (212) 474-1000
                                                          Fax: (212) 474-3700
11                                                        gbornstein@cravath.com
                                                          yeven@cravath.com
12
                                                          Richard S. Taffet *(pro hac vice)*
13                                                        MORGAN, LEWIS & BOCKIUS LLP
                                                          101 Park Avenue
14                                                        New York, NY 10178-0060
                                                          Tel.: (212) 309-6000
15                                                        Fax: (212) 309-6001
                                                          richard.taffet@morganlewis.com
16
                                                          Willard K. Tom *(pro hac vice)*
17                                                        MORGAN, LEWIS & BOCKIUS LLP
                                                          1111 Pennsylvania Avenue NW
18                                                        Washington, DC 20004-2541
                                                          Tel.: (202) 739-3000
19                                                        Fax: (202) 739 3001
                                                          willard.tom@morganlewis.com
20
                                                          Geoffrey T. Holtz (SBN 191370)
21                                                        MORGAN, LEWIS & BOCKIUS LLP
                                                          One Market, Spear Street Tower
22                                                        San Francisco, CA 94105-1596
                                                          Tel.: (415) 442-1000
23                                                        Fax: (415) 442-1001
                                                          donn.pickett@morganlewis.com
24                                                        gholtz@morganlewis.com

25                                                        Attorneys for Defendant
                                                          QUALCOMM INCORPORATED
26

27

28

OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 5:17-md-02773-LHK

1291844