1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 17-MD-02773-LHK |
| | **ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| | Re: Dkt. No. 507 |

Plaintiffs Sarah Key, Terese Russell, Carra Abernathy, Leonidas Miras, and James Clark (collectively, "Plaintiffs") bring a putative class action against Defendant Qualcomm Incorporated ("Qualcomm") alleging antitrust violations.  Qualcomm initiated separate patent-infringement proceedings against Apple Inc. ("Apple") before the International Trade Commission ("ITC") seeking to prevent importation of certain Apple devices into the United States.  ECF No. 573-1 ("Harris Decl."), Ex. A.  Before the Court is Plaintiffs' motion for a preliminary injunction, which seeks to enjoin Qualcomm from enforcing any exclusion or cease-and-desist order that the ITC may issue in that action.  ECF No. 507 ("Mot.").  Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES without prejudice Plaintiffs' motion for preliminary injunction.

# I. BACKGROUND

## A. Factual Background

Although the instant motions do not require full comprehension of Plaintiffs' underlying theories of liability, the Court nevertheless supplies a detailed description drawn from the allegations in the operative First Amended Complaint. This backdrop provides relevant context in analyzing Plaintiffs' current request for preliminary injunctive relief.

This case requires understanding the complicated interaction between cellular communications standards, standard essential patents ("SEPs"), and the market for baseband processors, or "modem chips." The Court begins by discussing cellular communications standards and modem chips generally. Then, the Court discusses Qualcomm's cellular communications SEPs and Qualcomm's participation in the markets for modem chips. Next, the Court discusses Plaintiffs' allegations that Qualcomm has used its SEPs and its modem chips monopoly to harm competition in certain modem chips markets. Finally, the Court discusses Plaintiffs' allegations that Qualcomm's conduct has caused them harm by raising the prices paid for products containing modem chips.

### 1. Cellular Technology and the Baseband Processor Industry Generally

#### i. Cellphone Networks

Cellular communications depend on widely distributed networks that implement cellular communications standards. ECF No. 490 ("FAC") ¶ 33. Cellular communications standards have evolved over four "generations." *Id.* ¶ 35. "First-generation cellular communications standards were developed in the 1980s. These standards support analog transmissions of voice calls." *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 955 (N.D. Cal. 2017) (citation omitted).

Second-generation ("2G") cellular communications were developed in the early 1990s. FAC ¶ 36. 2G cellular communications standards support digital transmissions of voice calls. *Id.* The leading 2G standards are the Global System for Mobile Communications standard ("GSM") and second generation Code Division Multiple Access standard ("2G-CDMA"). *Id.* AT&T and

Case No. 17-MD-02773-LHK
ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

T-Mobile chose to operate GSM networks. *Id.* By contrast, Verizon and Sprint operate 2G-CDMA networks. *Id.*

In the late 1990s, third-generation ("3G") cellular communications standards were introduced. *Id.* ¶ 37. The leading 3G standards are the Universal Mobile Telecommunications System ("UMTS") and third-generation CDMA ("3G-CDMA") standards. *Id.* Network operators that deployed 2G GSM networks, such as AT&T and T-Mobile, transitioned to 3G UMTS networks. *Id.* By contrast, network operators that deployed 2G-CDMA networks, such as Verizon and Sprint, transitioned to 3G-CDMA networks. *Id.*

In late 2009, fourth-generation ("4G") cellular communications standards were introduced. *Id.* ¶ 38. These standards support substantially higher data-transmission speeds than 3G standards. *Id.* The leading 4G standard is Long-Term Evolution ("LTE"). *Id.* Most major network operators worldwide have deployed LTE. *Id.*

### ii. Standard Essential Patents

Cellular communications standards, such as CDMA and LTE standards, are adopted by standards setting organizations ("SSOs"). *Id.* ¶ 34. SSOs that adopt cellular telecommunications standards include the European Telecommunication Standards Institute ("ETSI"), the Telecommunications Industry Association ("TIA"), and the International Telecommunications Union ("ITU"). *Id.* ¶ 35.

In setting a cellular communications standard, SSOs often include technology in the cellular communications standard that is patented. Patents that cover technology that is incorporated into a standard are known as "standard essential patents" ("SEPs"). *Id.* ¶ 34.

Importantly, before incorporating a technology into a standard, SSOs "require participants to publicly disclose any claimed SEPs and promise to license [SEPs] to anyone who practices the standard on a royalty-free or [fair, reasonable, and non-discriminatory ('FRAND')] basis." *Id.* ¶ 45. "Absent [such] safeguards, SEP holders could abuse the standard-setting process via 'patent hold-up,' which happens 'when the holder of a[n] [SEP] demands excessive royalties after companies are locked into using a standard.'" *Id.* ¶ 43 (citation omitted).

### iii. Baseband Processors

In order to communicate with a cellular communications network, a cellphone handset ("handset") must contain a semiconductor device known as a baseband processor, or "modem chip." *Id.* ¶ 33. More specifically, in order to communicate with a *particular* cellphone network, the handset must contain a modem chip that complies with the cellular communications standards that the particular cellphone network supports. *Id.* For example, a handset that contains a modem chip that complies only with UMTS standards cannot communicate with a cellular network that uses 3G-CDMA standards. "Multi-mode" modem chips can comply with more than one cellular communications standard. *Id.*

To be used on a network that deploys LTE—the leading 4G standard used by major cellular network operators—the handset must ordinarily contain a modem chip that complies with LTE standards and is also "backward compatible" with 2G and 3G standards. *Id.* ¶ 41. This is because network operators have "continued to use the prior standards" and "have not yet replaced their 2G and 3G infrastructure with the new 4G infrastructure." *Id.* Accordingly, most manufacturers "must purchase multimode chips in order to make [handsets] that can function on the major U.S. wireless networks." *Id.*

### iv. Cellular Handset Tiers and Smartphones

Cellular handsets are produced by original equipment manufacturers ("OEMs") such as Apple and Samsung. *Id.* ¶¶ 1–2, 39. Since the late 2000s, the market for handsets with advanced computing capability, such as smartphones and tablets, has "grown tremendously." *Id.* ¶¶ 2–3.

Competition in the manufacturing and sale of handsets has developed over time into "tiers": premium, mid, and low. *Id.* ¶ 39. "Premium"-tier smartphones include brands such as Apple's iPhone and Samsung's Galaxy-S. *Id.* Premium smartphones are of particular importance to OEMs because they "tend to have higher prices and margins than lower-tier products and are important for branding." *Id.*

Among the cellular communications standards discussed above, "LTE functionality, including its high data transmission speed, is central to modern [handsets], as consumers

increasingly use them to transmit large volumes of data." *Id.* ¶ 40. Specifically, LTE allows for the transmission of large volumes of data, which has grown increasingly more important than cellular voice traffic. *Id.*

### 2. Qualcomm's Participation in the Modem Chip Market

Qualcomm is the leading supplier of modem chips worldwide. *Id.* ¶ 7. In particular, Qualcomm is dominant in the supply of two types of modem chips: (1) modem chips that comply with CDMA standards ("CDMA modem chips"); and (2) modem chips for use in premium tier handsets, which comply with advanced LTE standards ("premium-LTE modem chips"). *Id.*

### i. CDMA Chips

First, Qualcomm has been particularly dominant in the supply of CDMA modem chips. *Id.* ¶¶ 57–58. As set forth above, major carriers such as Verizon and Sprint have deployed CDMA networks. *Id.* ¶ 36. OEMs that wish to manufacture handsets to operate on CDMA networks such as Verizon and Sprint must use modem chips that comply with CDMA standards.

Qualcomm is the dominant supplier of CDMA modem chips. From 2001 through 2015, Qualcomm's worldwide share of CDMA modem chips exceeded 80%. *Id.* ¶ 57. At the time of the FAC, it was also estimated that "Qualcomm's worldwide share of the CDMA [modem] chip market for 2016 [was] likely to exceed or at least meet its historically greater than 80% share of the market." *Id.*

Qualcomm faces "limited competition for the supply of CDMA" modem chips. *Id.* ¶ 58. In the past ten years, "the only supplier of CDMA [modem chips] other than Qualcomm was Via Technologies," a Taiwanese company. *Id.* (citation omitted). However, Via Technologies has focused its sales on the lower-tier handset market, rather than the premium market. *Id.* This is partly because Via Technologies has not offered multi-mode modem chips "that combine CDMA functionality with UMTS or LTE functionality." *Id.* (citation omitted). In 2015, Intel Corporation ("Intel") acquired Via Technology's CDMA modem chip business. *Id.* However, Intel "has not yet commercialized a [modem] chip that integrates Via [Technology]'s CDMA technology" with "Intel's [own] multi-mode [modem chip] technologies." *Id.*

Another Taiwanese company, MediaTek Inc. ("MediaTek"), licensed technology from Via Technologies in late 2013 and began to offer CDMA modem chips in 2015. *Id.* However, MediaTek has not offered multi-mode CDMA modem chips that are "suitable for use in flagship handsets." *Id.* (citation omitted). Overall, MediaTek's sale of CDMA modem processors has been small. *Id.*

### ii. Premium-LTE Modem Chips

As discussed above, most cellular network operators have deployed LTE networks. *Id.* ¶ 59. This includes major U.S. cellular network operators such as Verizon, AT&T, T-Mobile, and Sprint. *Id.*

LTE functionality has continually advanced since the first LTE network was introduced in 2010. *Id.* These advances have allowed for progressively faster data speeds. *Id.* Accordingly, as LTE technology has progressed, "[modem] chip manufacturers have added advanced features." *Id.* For premium tier handsets, OEMs typically require modem chips with "advanced LTE functionality" that support advanced data download and upload speeds, in addition to other functions. *Id.* For an OEM designing and manufacturing a premium tier handset, a modem chip that supports only earlier LTE technology is not a substitute for a modem chip that supports advanced LTE standards. *Id.* Accordingly, just as OEMs produce handsets in "tiers," competition among LTE modem chip manufacturers also occurs in tiers. *Id.* ¶ 60.

Qualcomm has consistently been the dominant supplier of premium LTE modem chips. *Id.* ¶ 61. From 2012 through 2014, Qualcomm's annual worldwide share of premium LTE modem chip sales exceeded 80%. *Id.* Although Qualcomm's worldwide share dipped to 69% in 2015, its worldwide share for 2016 "remained at the dominant levels it [had] since 2012." *Id.*

Qualcomm faces limited competition in the premium LTE modem chip market. *Id.* ¶ 62. Indeed, one of Qualcomm's "only competitor[s] in the LTE modem chip market is Intel." *Id.* Intel has begun to supply a portion of Apple's modem chip requirements for the iPhone 7, *id.* ¶ 109, but for many years "Qualcomm effectively blocked Apple from using Intel as a [modem] chip supplier," *id.* ¶ 62.

United States District Court
Northern District of California

### 3. Qualcomm's Cellular Communications SEPs

In addition to supplying modem chips to OEMs, Qualcomm also has several patents that have been declared essential to cellular communications standards. *Id.* ¶¶ 45, 50.

Qualcomm has participated in the cellular standard setting process through SSOs such as ETSI, TIA, and Alliance for Telecommunications Industry Solutions ("ATIS"). *See id.* ¶ 50. "Qualcomm was a leading developer and proponent of 2G-CDMA standards. Qualcomm has a correspondingly high share of all patents declared essential to 2G-CDMA standards. Qualcomm also participated in 3G standard setting, though to a less significant degree." *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d at 957–58 (citation omitted). Qualcomm "had a smaller share of SEPs related to the UMTS and 3G-CDMA standard than its share of the 2G-CDMA SEPs." FAC ¶ 37. Qualcomm's share of SEPs in LTE standards "is much lower" than Qualcomm's share of CDMA SEPs. *Id.* ¶ 38. Qualcomm's share of LTE SEPs "is roughly equivalent to that of other industry competitors." *Id.* "One study of declared LTE SEPs found that Qualcomm had a 13% share of 'highly novel' essential LTE patents, compared to 19% for Nokia and 12% for both Ericcson and Samsung." *Id.*

Qualcomm has committed "to ETSI, TIA, [ATIS], and other SSOs that it w[ill] license its cellular SEPs" on FRAND terms. *Id.* ¶ 50. "Qualcomm is thus required to license its cellular SEPs on FRAND terms to [handset] OEMs, as well as competing [modem] chip suppliers." *Id.* ¶ 52. In practice, however, Qualcomm licenses its SEPs to OEMs, but Qualcomm "refuses" to license its SEPs to competing modem chip manufacturers. *Id.* ¶ 65.

In licensing its SEPs to OEMs, Qualcomm collects a royalty rate of approximately 5% of the value of the net selling price of the handset. *Id.* ¶ 13. For example, if an OEM sells a handset that is priced at $600, Qualcomm will collect a $30 royalty for each sale. Among SEP holders, Qualcomm garners an outsized share of licensing revenues paid by OEMs, and OEMs pay Qualcomm far more in royalties than OEMs pay other SEP licensors, even those with comparable portfolios of cellular SEPs. *Id.* Indeed, an analysis conducted by Qualcomm in 2015 showed that revenues from Qualcomm's licensing program were "'equivalent in size to the sum of ~12

companies with a form of technology licensing,' including leading cellular SEP licensors such as Ericsson, Nokia, and Interdigital." *Id.* (citation omitted).

### 4. Qualcomm's Alleged Anticompetitive Conduct

Plaintiffs allege that Qualcomm uses its dominance in the supply of CDMA and premium-LTE modem chips to skew SEP licensing negotiations toward outcomes that benefit Qualcomm and harm Qualcomm's modem chip competitors. *Id.* ¶ 52. Plaintiffs allege that Qualcomm does this through a course of conduct that includes three primary practices: (i) a "no license-no chips" policy; (ii) Qualcomm's refusal to license its SEPs to competing modem chip manufacturers; (iii) Qualcomm's exclusive dealing arrangements with Apple. *Id.* ¶ 53.

### i. "No License-No Chips"

As discussed above, Qualcomm's FRAND commitments "require[] [Qualcomm] to license its cellular SEPs on FRAND terms to [handset] OEMs, as well as competing chip suppliers." *Id.* ¶ 52. Nonetheless, Qualcomm refuses to license its SEPs to competing modem chip manufacturers. Thus, competing modem chip manufacturers cannot sell to OEMs modem chips "that convey the rights to Qualcomm's cellular SEPs." *Id.* ¶ 72. Instead, Qualcomm licenses its SEPs to only OEMs who make and sell handsets (or those OEMs' contract manufacturers). *Id.* ¶ 8a. In licensing its SEPs to OEMs, Plaintiffs allege that "Qualcomm conditions OEMs' access to [Qualcomm's modem] chips on [OEMs'] accepting a separate license to Qualcomm's cellular SEPs on Qualcomm's preferred terms." *Id.* ¶ 74. Essentially, unless OEMs agree to take out a separate SEP licensing agreement with Qualcomm on Qualcomm's preferred terms that covers all of the handsets that the OEM sells, Qualcomm will not supply the OEM with any Qualcomm modem chips. *Id.* Plaintiffs call this practice Qualcomm's "no license-no chips" policy. *Id.*

Plaintiffs allege that Qualcomm's conduct is unique among modem chip suppliers and suppliers of other cellular-equipment components. *Id.* ¶ 85. "Other component suppliers rely on component sales to convey their intellectual property rights to OEM customers, rather than selling the components and also entering into a separate intellectual property license." *Id.* When a supplier sells a component, such as a modem chip, to an OEM, that sale, under the doctrine of

patent exhaustion, ordinarily terminates any right of the supplier under patent law to control any further use or sale of the component. *Id.* "Thus, a supplier's sale of a component to an OEM would already exhaust their patent rights, obviating the need—and making it unlawful—to require a separate patent license." *Id.*

Plaintiffs further allege that Qualcomm's "no license-no chips" policy stifles the normal process of negotiating the royalty rates of Qualcomm's FRAND-encumbered SEPs. OEMs have a number of grounds to "attack Qualcomm's royalty demands in court as being non-FRAND." *Id.* ¶ 83. For example, OEMs could argue that Qualcomm's royalties "do not reflect the value contributed by its patented inventions," are much higher than those "charged by other SEP licensors with similar technical contributions," constitute "a percentage of the [entire handset's] price," and "do[] not account for the value of any cross-licensed patents." *Id.* However, Plaintiffs allege that OEMs do not challenge Qualcomm's royalty terms because of Qualcomm's "no license-no chips" policy. *Id.* ¶ 96. Losing access to Qualcomm's modem chips would be a substantial loss to OEMs given Qualcomm's "dominance in CDMA and premium LTE [modem] chips." *Id.* ¶ 95.

Thus, "[t]o maintain access to Qualcomm's [modem] chips, OEMs have been coerced into accepting royalty and other license terms that they would not otherwise accept." *Id.* ¶ 96. Specifically, OEMs pay Qualcomm royalties that "do not reflect OEMs' assessment of patent royalties that a court or neutral arbiter would deem reasonable, including in light of Qualcomm's FRAND commitments." *Id.* "Instead, the royalties reflect Qualcomm's dominant position in the [modem] chip markets, and include the added increment that OEMs pay to Qualcomm to avoid disruption of [modem chip] supply." *Id.*

Plaintiffs call this "added increment"—the incremental above-FRAND royalty that OEMs pay Qualcomm—a "surcharge." *Id.* ¶ 82. This "surcharge" raises an OEM's cost of purchasing any *modem chip* because OEMs consider the "all-in" cost of a modem chip as consisting of two components: (i) the nominal price of the modem chip itself, and (ii) "any patent royalties the OEM must pay to use that [modem] chip in a [handset]." *Id.* ¶ 77. Qualcomm's "surcharge" raises the

Case No. 17-MD-02773-LHK
ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

latter component—the patent royalties to use the modem chip in the handset—for every modem chip that an OEM buys, including the modem chips made by Qualcomm's competitors. *Id.* ¶ 78. "By raising OEMs' all-in cost of using competitors' chips, Qualcomm's conduct has diminished OEMs' demand for such processors, reduced competitors' sales and margins, and diminished competitors' ability and incentive to invest and innovate." *Id.* ¶ 138. Moreover, Qualcomm has also "limited competitors' ability to discipline the all-in prices that Qualcomm charges for [modem chips]." *Id.* ¶ 79. "Th[e] inflated supra-FRAND royalty is ultimately passed onto consumers of [handsets] like Plaintiffs." *Id.* ¶ 96.

In addition, Plaintiffs allege that "Qualcomm can discriminate in its royalties" by "offer[ing] OEMs incentive payments to discount Qualcomm's above-FRAND royalties if an OEM uses Qualcomm's chips as opposed to those of a competitor." *Id.* ¶ 81. Qualcomm can do so based on its accumulation of funds from charging the surcharge. *Id.* ¶ 80. In other words, "the surcharge is a means to extract a higher price for Qualcomm's own chips without being undercut by competing chip manufacturers." *Id.* In this way, the revenue that Qualcomm earns from its surcharge "comes back to Qualcomm as a form of profit and maintains Qualcomm's chip monopoly." *Id.*

### ii. Qualcomm's Refusal to License its SEPs to Chip Competitors

As discussed briefly above, Plaintiffs allege that Qualcomm refuses to license its FRAND-encumbered SEPs to competing modem chip manufacturers. Rather, Qualcomm licenses its SEPs only to OEMs who manufacture handsets (or those OEMs' contract manufacturers). *Id.* ¶ 8a. Plaintiffs contend that this practice violates Qualcomm's FRAND commitments, which "require[] [Qualcomm] to license its cellular SEPs on FRAND terms to [handset] OEMs, as well as competing chip suppliers." *Id.* ¶ 52. Although several of Qualcomm's competitors, including Intel and Samsung, have requested SEP licenses from Qualcomm, "Qualcomm has simply refused to offer *any* licenses to potential competitor [modem] chip manufacturers." *Id.* ¶ 65.

According to Plaintiffs, if Qualcomm licensed its modem chip competitors—as opposed to only OEMs—Qualcomm would not be able to use the threat of a disruption in supply of its

modem chips to induce OEMs to agree to Qualcomm's preferred royalty terms. *Id.* ¶ 78. This is because, unlike OEMs who depend on Qualcomm for modem chip supply, competing modem chip manufacturers do not need modem chips from Qualcomm. *Id.* However, because Qualcomm does not license its competitors, competitors cannot offer competitive pricing and are therefore unable to "discipline the all-in prices that Qualcomm charges for" modem chips. *Id.* ¶ 79. Again, "[t]he revenue from Qualcomm's surcharge comes back to Qualcomm as a form of profit and maintains Qualcomm's chip monopoly." *Id.* ¶ 80.

### iii. Qualcomm's Exclusive Deals with Apple

In addition to Qualcomm's "no license-no chips" policy and Qualcomm's refusal to license its SEPs to its competitors, Plaintiffs further allege that Qualcomm has entered exclusive deals with Apple. *Id.* ¶ 106.

"Apple is a particularly important OEM from the perspective of a nascent [modem chip] supplier." *Id.* ¶ 108. Specifically, "Apple sells large volumes of premium handsets that require premium LTE" modem chips which "command higher prices . . . than lower-tier [modem chips]." *Id.* ¶ 108a. Moreover, Apple provides additional benefits to chip suppliers because modem chip suppliers for Apple learn from Apple's engineer teams, achieve "technical validation" by meeting Apple's complicated technical requirements, and "can field-test [their modem chips] through global launches." *Id.* ¶ 108b–d.

Plaintiffs allege that Apple has entered into *de facto* exclusive agreements with Qualcomm to use only Qualcomm's modem chips in Apple's flagship products. *Id.* ¶ 106. Specifically, Apple "repeatedly engaged in negotiations with Qualcomm concerning the excessive royalties Qualcomm charged such contract manufacturers to license its SEPs." *Id.* ¶ 98. Apple entered into agreements with Qualcomm in 2007, 2009, 2011, and 2013.

In 2007, "Qualcomm agreed to pay to Apple marketing incentives." *Id.* ¶ 100. In return, Apple had to agree not to incorporate a prospective fourth-generation standard that was opposed by Qualcomm but championed by Intel, Qualcomm's competitor. *Id.*

In 2009, Qualcomm and Apple entered into an agreement "address[ing] the process by which Qualcomm supplied chips and associated software to Apple." *Id.* ¶ 101. Under the agreement, "Apple's ability to sue Qualcomm for patent infringement concerning Qualcomm [modem] chips" was restricted. *Id.* Additionally, Qualcomm "capp[ed] its liability for the failure to supply" and "reserv[ed] for itself the ability to terminate its obligation to supply [modem] chips to Apple's contract manufacturers." *Id.*

In 2011, Qualcomm entered into an agreement with Apple through which "Qualcomm agreed to make substantial incentive payments to Apple if Apple agreed to exclusively use Qualcomm [modem] chips in all new iPhone and iPad models." *Id.* ¶ 102. If Apple launched a new handset with a non-Qualcomm modem chip, "Apple would forfeit all of these incentive payments." *Id.* The agreement also provided that "Apple could not initiate any action or litigation against Qualcomm for intellectual property infringement." *Id.*

In 2013, Qualcomm entered into an agreement with Apple that modified and extended the term of the exclusivity arrangement set forth in the companies' 2011 agreement. *Id.* ¶ 103. Under the 2013 agreement, Qualcomm "agreed to make payments to Apple consistent with" the 2007 agreement involving marketing incentives. *Id.* ¶ 104. Qualcomm's agreement to do this was subject to a new condition: "Apple could neither initiate nor induce others to initiate litigation based on Qualcomm's failure to offer licenses on FRAND terms." *Id.* ¶ 103. Further, "Qualcomm also agreed to make separate substantial incentive payments to Apple so long as Apple exclusively sourced [modem] chips from Qualcomm." *Id.* If, during the period of the agreement, Apple launched a new handset with a non-Qualcomm modem chip, Apple would forfeit past and future incentive payments. *Id.*

According to Plaintiffs, "Qualcomm's 2011 and 2013 agreements with Apple were, and were intended by Qualcomm to be, *de facto* exclusive deals that were as effective as express purchase requirements and that essentially foreclosed Qualcomm's competitors from gaining [modem chip] business at Apple." *Id.* ¶ 106. Although Apple had "an interest in developing and working with additional suppliers of [modem chips]," the "large penalties that Apple would face"

from Qualcomm if Apple chose to source chips from another supplier "prevented Apple from using alternative suppliers" during the effective exclusivity period under the agreements. *Id.* ¶ 106a–b; *see also id.* ¶ 109 (alleging penalties are sufficiently large that they effectively prevent other modem chip manufacturers from competing with Qualcomm to gain business from Apple).

As a result of Qualcomm's exclusive dealing arrangements with Apple, Apple sourced modem chips exclusively from Qualcomm for all new iPad and iPhone products that Apple launched from October 2011 until September 2016. *Id.* ¶ 107. Qualcomm's exclusive agreements with Apple "excluded competition from other [modem] chip suppliers and harmed competition." *Id.* ¶ 108. These exclusive agreements also "prevented Qualcomm's competitors from attaining the[] benefits" of working with Apple "and foreclosed a substantial share of the market for premium LTE chips." *Id.* ¶ 109.

### 5. Plaintiffs' Alleged Injury

Plaintiffs assert that Qualcomm's conduct caused them injury. According to Plaintiffs, "Qualcomm used its" practices to "coerce acceptance of [above]-FRAND licensing rates and terms for its SEPs." *Id.* ¶ 143. As noted above, this raises the "all-in" price of every modem chip because OEMs must pay a surcharge to Qualcomm "to ensure continued access to Qualcomm's modem chips supply." *Id.* "The artificially inflated all-in cost for modem chips in turn resulted directly in increases for the price of [handsets] that use those [modem] chips." *Id.*

Plaintiffs further allege that the surcharge was "passed down the distribution chain from the modem chips purchasers to Plaintiffs" who purchase "the [handsets] containing such [modem] chips." *Id.* ¶ 144. In other words, Qualcomm's surcharge was "passed on" to Plaintiffs through OEMs, distributors, and retailers and "can be directly traced through a straightforward distribution chain." *Id.* OEMs, distributors, and retailers cannot "readily absorb the [surcharge] Qualcomm charges for its modem chips" because they are "generally subject to vigorous price competition" and "generally operate on thin margins." *Id.* ¶ 150. "The inflated all-in cost of a modem chip raises the prices consumers pay for [handsets] incorporating modem chips." *Id.* ¶ 126. Qualcomm's royalty rates are generally based on "a percentage of the wholesale price of" the

United States District Court
Northern District of California

entire handset, rather than the modem chip. *Id.* ¶ 146. Plaintiffs allege that, in this way, Qualcomm "directly distorted and increased the price of the [handsets] paid by Plaintiffs." *Id.* ¶ 145. By "us[ing] a royalty base that is the price of the [handset] as a whole," Qualcomm targeted the effect of its conduct "at the [handsets] as a whole rather than merely their components." *Id.* ¶ 146. Therefore, according to Plaintiffs, "[t]he [handset] product market is inextricably intertwined with the CDMA and premium-LTE [modem] chip markets." *Id.* ¶ 127.

## B. Procedural Background

In a separate action initiated in January 2017, the Federal Trade Commission sued Qualcomm in this Court and alleged that Qualcomm engaged in unfair methods of competition in violation of § 5 of the Federal Trade Commission Act. *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2017 WL 2774406, at *7 (N.D. Cal. June 26, 2017).

Subsequently, a number of class action lawsuits were filed by consumers against Qualcomm. These lawsuits generally alleged that Qualcomm's conduct violated state and federal antitrust and consumer protection laws. In early 2017, Plaintiffs in several of the class action lawsuits moved to centralize pretrial proceedings in a single judicial district. 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."). On April 6, 2017, the Judicial Panel on Multidistrict Litigation issued a transfer order selecting the undersigned judge as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict litigation ("MDL") arising out of Qualcomm's allegedly anticompetitive conduct. *See* ECF No. 1 at 1–3.

On July 11, 2017, Plaintiffs in the MDL cases filed a Consolidated Class Action Complaint ("CCAC") asserting two federal statutory claims and two state statutory claims: (1) a claim under the California Cartwright Act, (2) a claim under § 1 of the federal Sherman Act, (3) a claim under § 2 of the federal Sherman Act, and (4) a claim under the California Unfair Competition Law ("UCL"). ECF No. 94.

On August 11, 2017, Qualcomm moved to dismiss all of the claims in the CCAC and to strike Plaintiffs' nationwide class allegations. ECF No. 110. On November 10, 2017, the Court granted Qualcomm's motion in one limited respect but otherwise denied Qualcomm's motion. ECF No. 175 at 45. Specifically, the Court granted with prejudice Qualcomm's motion to dismiss Plaintiffs' federal Sherman Act § 1 and § 2 claims to the extent those claims seek damages, but otherwise denied Qualcomm's motion to dismiss and to strike Plaintiffs' nationwide class allegations. *Id.* Thus, Plaintiffs retain their California Cartwright Act and UCL claims in their entirety and their federal Sherman Act § 1 and § 2 claims to the extent those claims do not seek damages.

On May 31, 2018, Plaintiffs sent Qualcomm a copy of a proposed amended complaint. ECF No. 489 at 1. On June 12, 2018, Qualcomm consented to the filing of the proposed amended complaint. *Id.* The next day, on June 13, 2018, Plaintiffs filed the First Amended Complaint. *See* FAC. Qualcomm filed an answer on June 27, 2018. ECF No. 495. The parties are currently briefing class certification and *Daubert* issues. *See* ECF Nos. 432, 524, 642, 643.

In the meantime, on July 7, 2017, Qualcomm initiated proceedings in the ITC. Harris Decl., Ex. A. In its complaint, Qualcomm claims that "Apple's imported mobile electronic devices that do not incorporate a Qualcomm brand [modem chip] . . . infringe, or are manufactured by processes that infringe, one or more claims" of Qualcomm's patents. *Id.* ¶ 2. Qualcomm does not assert any SEPs in the ITC case; rather, the case is limited to non-SEPs. Qualcomm seeks an order excluding infringing Apple mobile devices from importation into the United States. *Id.* ¶ 107. The hearing before the ITC's Administrative Law Judge ("ALJ") concluded on June 26, 2018. Harris Decl., Ex. B. The ALJ must issue his initial determination by September 14, 2018. *Id.* The full ITC will then review the ALJ's initial determination and is expected to issue a final determination by January 14, 2019. *Id.* If the ITC finds that exclusion is warranted, that determination is subject to a 60-day presidential review period. 19 U.S.C. § 1337(j)(2).

On June 28, 2018, Plaintiffs filed their motion for preliminary injunction, which seeks to enjoin Qualcomm from enforcing any exclusion or cease-and-desist order that the ITC may issue.

ECF No. 507 ("Mot."). Qualcomm filed its opposition on July 12, 2018, ECF No. 573 ("Opp."), and Plaintiffs filed their reply on July 19, 2018, ECF No. 620 ("Reply").

## II.    LEGAL STANDARD

The party seeking an injunction bears the burden of proving the propriety of such a remedy. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). The issuance of a preliminary injunction is at the discretion of the district court. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## III.    DISCUSSION

Plaintiffs ask this Court to exercise its authority under the All Writs Act, 28 U.S.C. § 1651, to issue a preliminary injunction "barring Qualcomm (and its subsidiaries) from enforcing, or seeking to enforce, an ITC exclusion order, cease and desist order, or other injunctive relief against the importation of Apple products." Mot. at 19. Qualcomm raises five arguments in opposition: (1) Plaintiffs lack Article III standing to seek their requested relief, (2) Plaintiffs have failed to satisfy the traditional factors for granting a preliminary injunction, (3) a district court may not enjoin ITC proceedings under the All Writs Act, (4) Plaintiffs' requested relief would violate Qualcomm's First Amendment right to petition, and (5) Plaintiffs have not shown circumstances satisfying the standard for issuance of an injunction under the All Writs Act. Opp. at 1–2. Here, the Court addresses only Qualcomm's first contention—namely, that Plaintiffs lack Article III standing to seek their requested preliminary injunction—because that ground suffices to deny Plaintiffs' motion for preliminary injunction.

Specifically, Qualcomm argues that Plaintiffs lack Article III standing to pursue their requested preliminary injunction at this time. Opp. at 6–8. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Moreover, "a plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). This

Case No. 17-MD-02773-LHK
ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

includes requests for preliminary injunctive relief, *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), like the one at issue here.

Article III standing requires that (1) the plaintiffs suffered an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "'fairly traceable' to the challenged conduct"; and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. Here, the parties focus on whether Plaintiffs have shown an imminent injury in fact. As the U.S. Supreme Court has explained, "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Plaintiffs need not demonstrate "that it is literally certain that the harms they identify will come about," as standing may be "based on a 'substantial risk' that the harm will occur." *Id.* at 414 n.5 (citation omitted). However, "allegations of *possible* future injury" based on "a highly attenuated chain of possibilities" do not suffice. *Id.* at 409–10 (alteration and citation omitted).

The U.S. Supreme Court's decision in *Clapper* is instructive. There, the respondents—a group of U.S.-based attorneys and organizations—asserted injury in fact based on a fear that their communications with individuals outside the United States were likely to be intercepted under the Foreign Intelligence Surveillance Act ("FISA") at some point in the future. *Id.* at 406. The Supreme Court found no standing, explaining that the respondents' argument rested on the "highly speculative fear" that:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [FISA] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [FISA's] many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

Case No. 17-MD-02773-LHK
ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Id.* at 410.  The U.S. Supreme Court held that this "highly attenuated" chain of possibilities did not result in a "certainly impending" injury.  *Id.*  Notably, the Court observed that the first three steps of the chain depended on the independent choices of the Government and the Foreign Intelligence Surveillance Court, yet the respondents could only speculate as to what decision those third parties would take at each step.  *Id.* at 413.  Moreover, the respondents could not show with any certainty that their communications with the foreign persons allegedly under surveillance would be intercepted.  *Id.* at 412.  As a result, the overall chain of inferences was "too speculative" to constitute a cognizable injury.  *Id.* at 401.

The instant case shares critical similarities with *Clapper*.  Plaintiffs here do not claim that they are injured by the mere pendency of an action before the ITC.  Rather, Plaintiffs assert that if the ITC issues an exclusion or cease-and-assist order, Qualcomm's enforcement of that order will cause economic harm to consumers in the marketplace.  Reply at 1.  As Plaintiffs appear to recognize, their purported harm depends upon a number of contingencies.  At a minimum, the following events must occur for Plaintiffs to experience their asserted injury: (1) the ITC's Administrative Law Judge ("ALJ") must issue his initial determination on patent infringement and validity and whether exclusion is in the public interest (by September 14, 2018); (2) the full ITC must review the ALJ's initial determination and enter a final exclusion or cease-and-desist order based on Qualcomm's proving (a) patent infringement, (b) patent validity, and (c) that exclusion is in the public interest (expected by January 14, 2019); (3) the President must not exercise his authority under 19 U.S.C. § 1337(j)(2) to disapprove the ITC's exclusion determination; (4) if an appeal is taken, the Federal Circuit must allow issuance of an exclusion order; and (5) Qualcomm must enforce the exclusion or cease-and-desist order against Apple.  As in *Clapper*, this chain of inferences is too speculative to conclude that Plaintiffs face an imminent risk of injury.

Importantly, like in *Clapper*, the first three steps of the chain involve choices by independent decisionmakers, including individuals in other branches of the government.  Before *Clapper*, the U.S. Supreme Court explained that standing may be more difficult to establish when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered

Case No. 17-MD-02773-LHK
ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)). In *Clapper*, the U.S. Supreme Court reiterated that courts should be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." 568 U.S. at 413; *see also Whitmore*, 495 U.S. at 159–60 (finding no standing where it was "not possible for [the] litigant to prove in advance that the judicial system will lead to any particular result in his case").

Here, the ITC and the President have express statutory authority to make exclusion decisions. It is true that the ITC does not have unlimited discretion because, as relevant here, the authorizing statute prescribes a timeline for the ITC to determine whether imported articles infringe a valid patent or were made by a process that infringes a valid patent. 19 U.S.C. § 1337(a)(1)(B). Nevertheless, the ITC has broad authority to find that exclusion is not warranted after considering public interest factors, such as "the effect . . . upon . . . competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers." *Id.* § 1337(d)(1). On appeal, the ITC's findings as to these factors "are reviewable only for abuse of administrative discretion." *Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n*, 899 F.2d 1204, 1208 (Fed. Cir. 1990); *see Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1358 (Fed. Cir. 2010) (noting that the standard of review is "whether [the ITC's action] is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

The President's statutory authority to override the ITC's judgment is even more expansive. Specifically, the President may disapprove the ITC's determination—and thereby void the ITC's orders—"for policy reasons," 19 U.S.C. § 1337(j)(2), and the President's decision is not reviewable in court, *Duracell, Inc. v. U.S. Int'l Trade Comm'n*, 778 F.2d 1578, 1581–82 (Fed. Cir. 1985). Given the various policy concerns at issue, courts are particularly ill-equipped to forecast how either the ITC or the President will strike the appropriate balance. *See Green v. Frazier*, 253

19

U.S. 233, 240 (1920) ("Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government.").

Plaintiffs' own submissions confirm, rather than undermine, the difficulty (if not futility) of attempting to predict the ITC's action.  For example, Plaintiffs filed an article describing the proceedings before the ALJ.  ECF No. 620-3.  Plaintiffs emphasize that an ITC staff lawyer who participated in the proceedings concluded that Apple's devices infringe at least one of Qualcomm's patents.  *Id.* at 2.  However, the ITC staff lawyer also "recommended that future iPhones with 5G be exempt from import ban" to avoid the untoward consequences of completely excluding Intel from the 5G market.  *Id.* at 3.  Similarly, Plaintiffs point out that, during the trial, the ALJ stated that "[he] think[s] it's very likely that there will be a violation found."  ECF No. 620-12 at 143:4–5.  Even putting aside the familiar caution that a decisionmaker's comments at an oral hearing are not always indicative of the actual result, the ALJ immediately followed his statement with the qualification that he could not predict "[w]hether or not the public interest will be sufficient to outweigh [the violation]."  *Id.* at 143:5–7.  These differing accounts highlight the high degree of uncertainty associated with anticipating the outcome before the ALJ, let alone the full ITC or the President.

Moreover, even if the ITC issues an exclusion or cease-and-desist order and the President does not disapprove, Qualcomm's ability to enforce the order could be significantly delayed or completely or partially overturned on appeal.  Specifically, within sixty days of the expiration of the presidential review period or the date on which the President notifies the ITC of his approval, any party adversely affected by the ITC's order may appeal to the Federal Circuit.  19 U.S.C. § 1337(c), (j)(4).  Plaintiffs "can only speculate as to whether that court will" uphold any exclusion order in whole or in part.  *Clapper*, 568 U.S. at 413; *see also Whitmore*, 495 U.S. at 159–60 (finding no standing because the litigant could not "prove in advance that the judicial system will lead to any particular result in his case").

Case No. 17-MD-02773-LHK
ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Additionally, the Court cannot ascertain the resulting effects in the market without some semblance of the scope of the relevant exclusion or cease-and-desist order. For example, Plaintiffs express concerns that an exclusion order will preclude Intel from entering the 5G market but, as discussed above, Plaintiffs' submissions acknowledge the possibility that the ALJ could exempt future iPhones with 5G from any exclusion order. ECF No. 620-3 at 3. Similarly, Plaintiffs cite to an American Consumer Institute Center for Citizen Research report, which estimates that an exclusion order would ban 29.3 million Apple smartphones and create a shortage that "will result in a $47 average price increase per unit sold." ECF No. 620-4 at 7. While the Court agrees that this report identifies concrete harms that would be felt by consumers, the report assumes that the ITC will issue Qualcomm's proposed exclusion order without exemptions. *Id.*[1] At this time, Plaintiffs' claim of an imminent injury is too speculative.

At bottom, Plaintiffs cannot sustain their request for a preliminary injunction because their asserted harm relies on a speculative and attenuated inferential chain, which centrally includes intervening decisions by multiple independent decisionmakers. As in *Clapper*, Plaintiffs' "theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" 568 U.S. at 401 (citation omitted). Because Plaintiffs lack Article III standing to pursue the relief that they seek, the Court DENIES Plaintiffs' motion for preliminary injunction on this ground.

---

[1] At this time, no Plaintiff has stated that he or she intends to purchase one of the accused Apple devices in the future; thus, it is not clear that Plaintiffs have an injury sufficient to seek to enjoin enforcement of a forward-looking exclusion or cease-and-desist order. *See In Re Certain Steel Rod Treating Apparatus & Components Thereof*, Inv. No. 337-TA-97, 215 U.S.P.Q. 229 (U.S.I.T.C. 1981) (noting that exclusion and cease-and-desist orders provide "prospective rather than retrospective" relief). Plaintiffs would not be subject to any shortage of cellphones or incremental increase in the retail price of a cellphone that could result from Qualcomm's enforcement of such an order if no Plaintiff plans to buy at least one of the accused Apple devices. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

21

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES without prejudice Plaintiffs' motion for preliminary injunction.

**IT IS SO ORDERED.**

Dated: August 29, 2018

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California