1  Kalpana Srinivasan (237460)
   SUSMAN GODFREY L.L.P.
2  1901 Avenue of the Stars, Suite 950
   Los Angeles, CA 90067
3  Telephone: (310) 789-3100
   Facsimile: (310) 789-3150
4  ksrinivasan@susmangodfrey.com

5  Joseph W. Cotchett (36324)
   COTCHETT, PITRE & MCCARTHY, LLP
6  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
7  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
8  jcotchett@cpmlegal.com

9  ***Interim Co-Lead Class Counsel***

10 [Additional Counsel on Signature Page]

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

| 14 IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 5:17-md-02773-LHK-NMC |
|---|---|
| 15 | PLAINTIFFS' OPPOSITION TO DEFENDANT QUALCOMM INCORPORATED'S MOTION TO STRIKE THE DECLARATION OF KENNETH FLAMM |
| 18 | Date:   September 28, 2018 |
| 19 | Time:   1:30 p.m. |
|    | Dept:   Courtroom 8, 4th Floor |
|    | Judge:  Hon. Lucy H. Koh |
| 20 | |
| 21 | Trial Date: June 24, 2019 |

22

23        **REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED**

24

25

26

27

28

010669-11 1058686V1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND .....................................................................................................4

        A.      Plaintiffs' Expert Dr. Flamm ....................................................................4

        B.      Qualcomm's Experts Drs. Nevo and Willig...........................................8

        C.      Qualcomm's Expert Dr. Johnson ...........................................................10

III.    LEGAL STANDARD ..........................................................................................12

IV.     ARGUMENT .........................................................................................................13

        A.      Dr. Flamm reliably applied generally accepted hedonic-regression
                methodology. ............................................................................................13

        B.      Critiques about Dr. Flamm's data are unfounded and do not warrant
                exclusion. ..................................................................................................16

                1.      Qualcomm's "convenience sampling" critique is mistaken. ...................16

                2.      Qualcomm's "insufficient data" critique is meritless. ............................19

                3.      Qualcomm's "coding errors" critique is misguided. ..............................22

                4.      Qualcomm's complaints go to weight, not admissibility. ......................23

V.      CONCLUSION .....................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
5
   No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)......................4, 23

6

*Apple iPod iTunes Antitrust Litig.*,
   No. 05-CV-0037, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014)...........................................4

7

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
8
   2013 WL 5428139 (N.D. Cal. June 20, 2013)...................................................................14

9

*In re Chocolate Confectionary Antitrust Litigation*,
10
   289 F.R.D. 200 (M.D. Pa. 2012) ..................................................................................21

11

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ...........................................................................13

12

*Giuliano v. Sandisk Corp.*,
13
   No. C 10-02787 ............................................................................................12, 16, 18

14

*Hadley v. Kellogg Sales Co.*,
   Case No. 16-CV-04955-LHK, 2018 WL 3954587 (N.D. Cal. Aug. 17, 2018)..............12, 23
15

16

*Hemmings v. Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) ..................................................................................3, 25

17

*In re High Pressure Laminates Antitrust Litig.*,
18
   No. 00-mdl-1368, 2006 WL 931692 (S.D.N.Y. Apr. 7, 2006) .............................................4

19

*In re High-Tech Emp. Antitrust Litig.*,
20
   No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ...............................1, 3

21

*Kinetic Concept, Inc. v. Bluesky Med. Corp.*,
   2006 WL 6505346 (W.D. Tex. Aug. 11, 2006) ..................................................................17

22

*In re Korean Ramen Antitrust Litig.*,
23
   No. 13-CV-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017)...........................2, 21

24

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013) ....................................................................................3, 21
25

26

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) .............................................3, 21

27

*Nat'l Football League Props., Inc. v. N.J. Giants Inc.*,
28
   637 F. Supp. 507 (D.N.J. 1986).................................................................................17

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ........................................................................3, 12

*In re Online DVD Rental Antitrust Litig.*,
   No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) .............12, 13

*In re Processed Egg Prod. Antitrust Litig.*,
   No. 08-MD-2002, 2017 WL 3494221 (E.D. Pa. Aug. 14, 2017) ...........................4

*In re Se. Milk Antitrust Litig.*,
   No. 2:07-CV-188, 2010 WL 8228838 (E.D. Tenn. Dec. 8, 2010) ........................25

*In re Static Random Access (SRAM) Antitrust Litig.*,
   No. 07-md-01819 CW, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) ...................4

*In re Steel Antitrust Litig.*,
   No. 08 C 5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ................................4

*In re Sulfuric Acid Antitrust Litig.*,
   446 F. Supp. 2d 910 (N.D. Ill. 2006) ..................................................................4

*In re Taco Bell Wage & Hour Actions*,
   No. 1:07-CV-01314-OWW, 2011 WL 4479730 (E.D. Cal. Sept. 26, 2011) .......24

*In re TFT-LCD (Flat panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) .......................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M:07-1827 SI, 2013 WL 12347 (N.D. Cal. Jan. 8, 2013) ............................4

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab.
   Litig.*,
   2012 WL 4904412 (C.D. Cal. Sep. 20, 2012) ....................................................14

*United States v. City of Miami, Fla.*,
   115 F.3d 870 (11th Cir. 1997) ...........................................................................24

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ...........................................................................3

**Other Authorities**

Fed. Judicial Ctr., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 305 (3d ed.
   2011)...............................................................................................................7, 17

Mark L. Benson et al., BASIC BUSINESS STATISTICS 21-22 (13th ed. 2014) ...............17

# I.    INTRODUCTION

Tellingly, Defendant Qualcomm Inc.'s ("Qualcomm") motion to strike does not attack the core of Plaintiffs' pass through analysis, namely Dr. Kenneth Flamm's use of hedonic regression analysis—a widely accepted econometric methodology—to demonstrate how royalty overcharges raised the quality-adjusted prices of cell phones and in turn impacted consumer purchasers. Nor could it do so. This Court has recognized, "regression analysis is generally a reliable method for determining damages in antitrust cases and is a mainstream tool in economic study." *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *14 (N.D. Cal. Apr. 4, 2014).  Moreover, to attempt to justify its anticompetitive licensing practices, ***Qualcomm itself*** submitted an expert report to the Federal Trade Commission ("FTC") from economists that ████████████████████ ███████████████████████████████████████████████ ████████████████████ *See* Declaration of Rio Pierce in Support of Plaintiffs' Opposition to Defendant Qualcomm Inc.'s Motion to Strike the Declaration of Kenneth Flamm ("Pierce Decl.") Ex. 1 ("Nevo & Willig"), at 40-44. Because Qualcomm disqualified itself from complaining about Dr. Flamm's methodology, it instead resorts to quibbling about his use of data.

Qualcomm's efforts to nibble around the edges of Dr. Flamm's analysis are without merit: at best, the attacks on his use of data amount to fodder for cross-examination at trial and as discussed below, are generally unfounded given the methodology outlined by Dr. Flamm, the extensive data he relied upon, and his ability to easily address many of Qualcomm's gripes without impacting his analysis, as set forth in his attached declaration. *See* Pierce Decl. Ex. 2 ("Flamm Opp. Decl."). In particular, contrary to Qualcomm's contentions, Dr. Flamm did not use convenience sampling—instead he used all data that met his methodological criteria. Dr. Flamm used extensive transactional data from every segment of the distribution chain, incorporating into his model data on the sales of ███████████████████████████████████ from 19 different third parties, and his passthrough rate for contract manufacturers is supported by ample documentary evidence. Dr. Flamm fully addresses Qualcomm's critique regarding coding of the data from two third parties; they do not materially alter his results or implicate the soundness of his underlying methodology.

1    Fundamentally, Dr. Flamm's methodology is not contested by Qualcomm as a subject of its

2   *Daubert* motion and is supported by significant record evidence that firms in this particular industry

3   compete with respect to both the price and the quality of cell phones. As the cost of cell phone

4   components decreases over time (as expected, in accordance with Moore's Law), new and improved

5   phones are introduced and sold in particular price bands, while phones with unimproved features are

6   sold at lower prices. Dr. Flamm analyzes voluminous transactional data to estimate the extent to which

7   cost changes are passed along to consumers in the form of changes to quality-adjusted prices.[1]

8   Specifically, Dr. Flamm's regression analysis statistically estimates the extent to which changes in cell

9   phone costs upstream result in changes in price downstream, while controlling for the same ten key

10  cell phone quality characteristics that Qualcomm's own retained economists used in their FTC

11  submission. This analysis is used to demonstrate how Qualcomm's supra-FRAND royalty damages—

12  the calculation of which Qualcomm does not contest in its *Daubert* motion or in its motion for class

13  certification—flow through to consumers.  In doing so, Dr. Flamm:

14    - Considered extensive transactional level price, cost, and quality characteristics data that
15      Plaintiffs' counsel collected from 19 different market participants;

15    - Analyzed all data that met his methodological criteria, rather than using a "haphazard"
16      or biased selection process as Qualcomm implies;

17    - Ultimately relied upon data encompassing ██████████████████████████████████████
18      ████████████ and covering every link in the cell phone distribution chain (including
      data from 6 manufacturers, 5 wireless carriers, 6 major retailers, a contract
      manufacturer, and the world's largest distributor of cell phones). Flamm Opp. Decl.
19    ¶ 36.

20    Dr. Flamm's rigorous analysis—which estimates that every $1 of Qualcomm's royalty

21  overcharge was passed along to consumers as an $0.87 increase in quality-adjusted prices—goes above

22  and beyond what courts have required in similar cases. *See In re Korean Ramen Antitrust Litig.*, No.

23  13-CV-04115-WHO, 2017 WL 235052, at *19 (N.D. Cal. Jan. 19, 2017) (admitting expert testimony

24  based on an estimate of "a conservative 100% rate as the pass-through" of overcharges to indirect

25

26    _____

27    [1] For an explanation of how hedonic quality adjustment is used in connection with the Consumer
    Price Index, *see* U.S. Dep't of Labor, *Frequently Asked Questions about Hedonic Qialty Adjustment
    in the CPI*, https://www.bls.gov/cpi/quality-adjustment/questions-and-answers.htm (last modified
28  May 2, 2018).

purchasers based on a dataset of "2 retailers and 2 end purchasers"). Qualcomm's motion expresses nothing more than "a prototypical concern that goes to weight, not admissibility." *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *20.

Rather than attack Dr. Flamm's methodology as being unsound, Qualcomm instead contests certain of Dr. Flamm's data selection and processing choices. But such criticisms are not grounds for exclusion, as "the selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) (reversing district court's exclusion of an expert opinion where what the "district court took issue with was not [the expert's methodology]… but rather his selection of certain data from which to extrapolate."). Instead, reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) (quotations and citations omitted). Longstanding Ninth Circuit precedent confirms that Qualcomm's complaints about the use and processing of data go to the weight and not the admissibility of an expert's analysis "unless the data set [is] so incomplete as 'to be irrelevant.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)). Qualcomm has made no such showing—indeed the sole regression analysis of Qualcomm's expert relies upon the same basic Apple data set used by Dr. Flamm. As a result, Qualcomm's objections to the completeness of Dr. Flamm's study "should be addressed by rebuttal, not exclusion." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005).

Particularly in antitrust cases, courts recognize that an acceptable empirical model is a "reasoned and educated attempt to describe reality by accepted methods of statistical analysis using available real world observations, data, and knowledge" rather than a "Pythagorean demonstration of a mathematical truth that can be revealed indisputably." *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *12 (E.D. Pa. July 29, 2015) (quotation and citation omitted). Thus, "[e]ven if the data relied on by the expert is 'imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony." *Id.*

1  (quotation and citation omitted). Courts in antitrust cases routinely decline to exclude expert regression

2  analyses based solely on the type of data disagreements that Qualcomm raises because "determination

3  of which dataset is most reliable is a merits question and does not preclude [an expert's] preference of

4  one over the other." *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP,

5  2014 WL 7882100, at *49 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-

6  MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("The defendants are of course free

7  to tell the jury which data source they believe is more reliable . . . .").[2] The same result is justified here.

8     In any event, as explained below, Dr. Flamm has addressed many of Qualcomm's complaints

9  about his data, without any material impact on his model or its results. For any disputes that remain,

10  Qualcomm is free to ask the jury to consider their impact on Dr. Flamm's conclusions.  Qualcomm's

11  motion should be denied.

12  **II.**   **BACKGROUND**

13  **A.**   **Plaintiffs' Expert Dr. Flamm**

14     In conjunction with Plaintiffs' Motion for Class Certification, Dr. Flamm prepared an

15  extensive declaration demonstrating that (1) common methods exist to determine the relevant

16  markets, (2) Qualcomm possessed monopoly power, and (3) common methods exist to show that the

17  supra-FRAND Qualcomm royalty overcharge was passed through the cell phone distribution chain to

18  class members. Qualcomm makes no effort to attack Dr. Flamm's opinions with regard to market

19  definition and monopoly power.

20

21

22

23     [2] *See also, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 923 (N.D. Ill. 2006)
(declining to exclude plaintiff's expert regression because failure to consider certain variables,

24  factors, or data "goes only to the weight" and not admissibility of such "analysis"); *In re Processed
Egg Prod. Antitrust Litig.*, No. 08-MD-2002, 2017 WL 3494221, at *5 (E.D. Pa. Aug. 14, 2017)

25  (same); *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *10 (N.D. Ill. Sept. 9,
2015) (same); *Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037 YGR, 2014 WL 4809288, at *6

26  (N.D. Cal. Sept. 26, 2014) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M:07-1827 SI,
2013 WL 12347, at *1 (N.D. Cal. Jan. 8, 2013) (same); *In re Static Random Access (SRAM) Antitrust*

27  *Litig.*, No. 07-md-01819 CW, 2010 WL 5071694, at *5 (N.D. Cal. Dec. 7, 2010) (same); *In re High
Pressure Laminates Antitrust Litig.*, No. 00-mdl-1368, 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7,

28  2006) (same).

OPP TO MOTION TO STRIKE FLAMM DECLARATION -4-
Case No.: 5:17-md-02773-LHK-NMC
010669-11 1058686V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dr. Flamm's opinions regarding the passthrough of damages to purchasers of impacted phones are supported by substantial analysis.  Much of his work is based on the documentary evidence produced in this case from Qualcomm and third parties, such as major cell phone manufacturers, and corresponding deposition testimony.  He analyzes the cell phone market to show that the Qualcomm royalty was a universally known component cost in the cell phone industry, that Qualcomm knew its royalty elevated device prices, and that the Qualcomm royalty raised the prices of cell phones and limited the ability of manufacturers to increase quality.  Declaration of Dr. Kenneth Flamm (July 5, 2018, ECF No. 517-4) ("Flamm Class Cert. Decl.") ¶¶ 175-216. Dr. Flamm also evaluates documents produced by Qualcomm and third parties in concluding the Qualcomm royalty—which includes the supra-FRAND overcharge inflated the total costs for OEMs.  *Id.* ¶¶147-158. Dr. Flamm then determines that cell phone manufacturers passed through rapidly declining components costs through decreases in the quality-adjusted prices of cell phones. *Id.* ¶¶176-186. Manufacturers and wireless operators carefully consider even minor costs, and manufacturers remove features from their devices to reduce total component costs for cell phones.[3]  In short, Dr. Flamm opines based on documentary evidence that the Qualcomm royalty overcharge affected both the nominal price and the feature quality of cell devices sold during the relevant period. Flamm Class Cert. Decl. ¶ 175.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dr. Flamm also relies heavily on Qualcomm's own internal documents, which demonstrate how manufacturers would have chosen higher quality components in the but-for world where Qualcomm charged FRAND royalties. ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶¶ 159-165, 187-188. Dr. Flamm further relied on documentary evidence from third parties regarding the use of rebates and promotional pricing mechanisms and carrier subsidization strategies. *Id.* ¶¶ 234-244. He determined that rebates and promotional pricing mechanisms would have operated the same in the but-for world as in the as-is world and that carrier subsidization strategies do not prevent demonstrating passthrough on a class wide basis. *Id.* ¶¶ 231-233.

In addition to his analysis of documentary evidence, Dr. Flamm relies heavily on both economic theory and empirical economic studies which show that industry-wide costs—akin to the surcharge imposed here by the supra-FRAND surcharge across all OEMs here—are systematically passed through to consumers.[4] The wide-ranging economic literature on the behavior of companies faced with an industrywide surcharge is consistent with Dr. Flamm's hedonic regressions. *Id.* ¶¶ 72-146.

Dr. Flamm's hedonic regression analysis of quality adjusted prices for cell phones is designed to answer through statistical testing the following question: for any given set of features, if costs

_____

[4] Moreover, as stated by Dr. Flamm in his class certification report and not addressed by Dr. Johnson in his response, under a general model of imperfect competition, "increases in the price of an input always lead to an increase in the price of the product downstream. Thus, in the most general of circumstances, using widely accepted and utilized economic models of imperfect competition, economic theory tells us to expect at least some degree of positive impact on downstream prices (like those for mobile devices) due to the elevated input prices." Flamm Class Cert. Decl. ¶ 128.

were at different levels (lower in this market), what would happen to the price for those particular phone features. *Id.* ¶¶ 252-260. The answer is statistically unequivocal—for a given set of phone features, lower costs for those features will result in lower prices. *Id.* ¶¶ 261-282. The dependent variable in Dr. Flamm's regression is cell phone prices; the independent (explanatory) variables are product characteristics and cell phone costs.[5] Dr. Flamm makes the choice to use data on the nominal sales prices of cell phones for his dependent variable of cell phone price. Flamm Class Cert. Decl. ¶ 254. Dr. Flamm employs quality control variables for ten key cell phone product characteristics to control for the varying quality (features) of different phone models. *Id.* ¶ 256.  Dr. Flamm uses the same ten characteristics that Qualcomm's economists, as described below, included in their own hedonic regression "based on an analysis of materials provided by Qualcomm that identify phone characteristics most important to consumers." Nevo & Willig at 43.

Dr. Flamm's cost variable uses total cost data from cell phone manufacturers and resellers that includes the Qualcomm royalty cost.[6] Dr. Flamm's usage of total cost data for his cost variable is supported by extensive record evidence that (1) cell phone manufacturers considered the Qualcomm royalty as part of their total costs; and (2) cell phone manufacturers determined the price and level of quality of their devices based on their total costs, rather than on any individual cost component. Flamm Class Cert. Decl. ¶¶ 147-174.

Dr. Flamm ran his regression analysis on an extensive amount of transactional data, encompassing ███████████ in total cell phone sales. Flamm Opp. Decl. ¶ 36. Based on this statistical

---

[5] *See* Fed. Judicial Ctr., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 305 (3d ed. 2011) ("Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable.").

[6] Dr. Flamm's initial report included a material cost measure for Apple that did not include royalty costs. This metric is informative to how Apple responds to cost changes. Dr. Flamm has nevertheless provided an updated analysis that uses total cost data from Apple that includes the Qualcomm royalty cost. Flamm Opp. Decl. ¶ 10.

analysis, Dr. Flamm estimated a composite passthrough rate of 87.4%: for every $1 in total cost change, there is a corresponding $0.87 change in the quality-adjusted prices of the cell phones. Flamm Class Cert. Decl. ¶ 290.  Another expert—Mr. Lasinski—calculated the Qualcomm surcharge for phones in the class.  Dr. Flamm's regression analysis provides a common method for proving the extent of passthrough to consumers and shows consistently high, positive rates of passthrough for every segment of the cell phone distribution chain—*i.e.*, class members were impacted because total costs, including the Qualcomm royalty overcharge, were passed through the cell phone distribution chain to consumers in the form of higher quality adjusted prices. Dr. Flamm's regression analysis also provides a common method for estimating antitrust damages because in the but-for world, each $1 decrease in the Qualcomm royalty overcharge would result in a $0.87 decrease in the quality adjusted prices that class members paid for cell phones. Dr. Flamm applies his composite passthrough rate to Mr. Lasinski's total royalty overcharge calculation to estimate total antitrust damages. *Id.* ¶ 291.

Qualcomm does not take issue in its motion with Mr. Lasinski's calculation of the surcharge imposed by Qualcomm's royalties.  Nor does Qualcomm dispute the voluminous analysis of documentary evidence produced in this case or address Dr. Flamm's reliance on economic theory. Qualcomm also does not attack Dr. Flamm's use of hedonic regressions, and the same methodology was relied upon by Qualcomm's own economists, Drs. Nevo and Willig, in a submission to the FTC to support their claim that Qualcomm's anticompetitive licensing practices had no impact on competition in the cell phone market at issue here.  Instead, Qualcomm objects to the amount of data that Dr. Flamm uses and how he processes certain portions of it.

**B.**      **Qualcomm's Experts Drs. Nevo and Willig**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23            Dr. Flamm's hedonic regressions controls for the exact same

24 features to demonstrate a decline in quality-adjusted prices. The conclusions of Drs. Nevo & Willig

25 and Dr. Flamm are consistent.

26            , and Dr. Flamm shows *quality-adjusted*

27

28

1    ***prices would have declined even more for consumers in the but-for world*** that featured a lower

2    Qualcomm royalty surcharge and thus lower total costs for manufacturers.

3    **C.    Qualcomm's Expert Dr. Johnson**

4             Qualcomm submitted a declaration from Dr. John Johnson IV in support of its

5    Opposition to Plaintiffs' Motion for Class Certification.  Expert Report of Dr. John H. Johnson, IV

6    (Aug. 9, 2018, ECF No. 641-11) ("Johnson Decl.").  In that declaration, Dr. Johnson makes a

7    number of attacks that do not directly address Dr. Flamm's conclusions.

8             Dr. Johnson's declaration focuses very little on documentary evidence.  Indeed, Dr. Johnson

9    fails to address the various assumptions upon which Dr. Flamm relies in his declaration.  For

10   example, Dr. Johnson does not dispute that the Qualcomm royalty was a universally known

11   component cost in the cell phone industry, that cell phone manufacturers testified that Qualcomm's

12   royalty raised the prices of cell phones, or that manufacturers and wireless operators carefully

13   consider even minor costs.  Dr. Johnson does not rebut the extensive expert work of Michael

14   Lasinski—calculating the supra-FRAND royalty surcharge imposed by Qualcomm on phones during

15   the class period. Nor does he address the extensive Qualcomm evidence demonstrating Qualcomm's

16   own analysis that the royalty cost raised the prices of cell phones.  Dr. Johnson only seeks to counter

17   Dr. Flamm's ultimate conclusion that in the but-for world, consumers would have paid higher prices

18   for phones, would have obtained lower quality phones, or a combination of the two.  In an effort to

19   disagree with Dr. Flamm, however, Dr. Johnson frequently conflates the actual and but-for worlds.

20   For example, he focuses his declaration on how cell phone manufacturers in the actual world

21   sometimes miss cost targets. This analysis is irrelevant.  The appropriate inquiry is how OEMs

22   would have responded in the but-for world with advance notice of lower expected Qualcomm royalty

23   costs when planning the prices and features for their cell phone models.

Dr. Johnson also fails to offer any rebuttal to Dr. Flamm's analysis of economic theory. He neither responds to Dr. Flamm's analysis of economic theory nor offers a competing interpretation of economic theory upon which to base his results. Dr. Johnson ***does not deny*** that the supra-FRAND royalty charged by Qualcomm is passed through to consumers. He does not counter the extensive economic literature showing systematic passthrough of industrywide taxes to consumers. Instead, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. This analysis is improper as it is contrary to economic principles which guide how to analyze a changing variable—here a declining royalty rate in the but-for world.

This analysis is inconsistent with internal manufacturer documents and deposition testimony, ████████████████████████████████████████████████████████ ███████████████████████████████████.[7] Dr. Johnson offers no basis to ignore this testimony, and fails to rely on any documentary evidence or economic theory to support this peculiar result. In fact, when asked in deposition, █████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

_____

█ ███████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████

1

2

3

4

In short, Dr. Johnson's opinions do not directly rebut Dr. Flamm and only attempt to obfuscate the issues before the Court.  His minor critiques of Dr. Flamm's data usage are the subject of this motion.

### III.    LEGAL STANDARD

"As a general matter, so long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702." *Obrey*, 400 F.3d at 696. "Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable." *Hadley v. Kellogg Sales Co.*, Case No. 16-CV-04955-LHK, 2018 WL 3954587, at *14 (N.D. Cal. Aug. 17, 2018). "The duty falls squarely upon the district court to 'act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standard. However, this duty is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions." *Id.* (quotation marks and citations omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (quotation marks and citation omitted).

At the class certification stage, the relevant question is "not whether [an expert's] regression analysis is correct or supported by reliable facts but rather whether his analysis is the product of a generally accepted method for demonstrating antitrust impact and damages through common evidence." *Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *10 (N.D. Cal. May 14, 2015). Plaintiffs are not required to "prove the merits of their case-in-chief," nor "demonstrate that their analysis captures all the proper variables and thus reaches the 'right' answer, as the defendants would require . . . ." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *10 (N.D. Cal. Dec. 23, 2010), *aff'd*, 779 F.3d 934 (9th Cir. 2015) (quotation marks and citation omitted). "The court must thus ultimately leave disputes over the results reached and assumptions made with respect to competing methodologies to the trier of fact, and discern only whether the plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury can be proved on a class-wide basis." *Id.* (quotation marks and citation omitted). The Court need not "delve

1  further into the merits by going point-by-point through each expert's theory to decide who has designed

2  the 'better' equation." *Id.* (quotation marks and citation omitted).

### IV.   ARGUMENT

4  Dr. Flamm uses hedonic regression analysis, a widely-accepted econometric methodology, to

5  statistically estimate the extent to which (1) changes in total costs per unit upstream (the independent

6  variable); (2) result in changes in nominal cell phone price set by phone makers downstream (the

7  dependent variable); (3) after controlling ████████████████████████████████████████████

8  ████████████████████████████████. Flamm Class Cert. Decl. ¶¶ 252-259. Dr. Flamm

9  applied this methodology to extensive transactional data produced by six major cell phone

10  manufacturers ███████████████████████████), five wireless carriers ██████████

11  ████████████████████████, six of the largest U.S. retailers (████████████████

12  ██████████████), the largest U.S. distributor (██████████, and a major contract

13  manufacturer ████████). *Id.* ¶ 261. Dr. Flamm's analysis estimates a quantity-weighted average

14  passthrough rate of 87.4% on a classwide basis. *Id.* ¶ 290. This means that every $1 of Qualcomm's

15  royalty overcharge upstream resulted in an $0.87 increase in the quality-adjusted prices that consumers

16  paid for cell phones as compared to the "but-for" world absent Qualcomm's illegal conduct.

17  Dr. Flamm's statistical analysis is therefore a common method of calculating the damages to

18  consumers, as it shows consistently high, positive rates of passthrough for every segment of the cell

19  phone distribution chain. As set forth below, Dr. Flamm's analysis represents a reliable application of

20  a generally-accepted methodology. Qualcomm's arguments to the contrary are misplaced disputes

21  about Dr. Flamm's data usage—complaints that are incorrect, have been addressed, and in any event

22  do not justify exclusion.

### A.   Dr. Flamm reliably applied generally accepted hedonic-regression methodology.

24  Qualcomm's motion to strike does not take issue with Dr. Flamm's methodological approach

25  of using a hedonic regression analysis to estimate the extent to which changes in upstream costs affect

26  quality-adjusted prices downstream.

27  Multiple courts have recognized that hedonic regression analysis is a widely-accepted

28  econometric methodology. *See, e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 947 (C.D. Cal.

2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (granting motion for class certification where expert used hedonic regression to determine damages attributable to ConAgra's labeling of Wesson Oils as "100% Natural"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5428139, at *8 (N.D. Cal. June 20, 2013), *report and recommendation adopted,* No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (granting class certification where expert used hedonic regression to verify the existence of a price structure among different models of CRT products); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 2012 WL 4904412, at *3-4 (C.D. Cal. Sep. 20, 2012) ("Dr. Williams' proposed methods of analysis, i.e. hedonic regression, contingent valuation, and discrete choice, are generally accepted, have been tested, and are part of peer-reviewed studies.").

Neither Qualcomm nor its retained expert Dr. Johnson disputes this fact. ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████ To the contrary, in ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████
        ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████████

Dr. Flamm's use of hedonic regression analysis allows him to measure the full extent of antitrust impact and damages caused by the Qualcomm royalty overcharge because it allows him to meaningfully capture the economic reality that consumers would benefit in the but-for world of lower Qualcomm royalty costs from both decreases in nominal prices and increases in device quality.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████ Thus, regression

analysis that only examined the relationship between cost changes and nominal cell phone prices, but did not control for quality, would fail to measure the increased consumer benefits that would have occurred in the but-for world because of quality improvements enabled by a lower Qualcomm royalty cost.

Dr. Flamm's methodology and conclusions are consistent with extensive academic literature demonstrating that industry-wide taxes like Qualcomm's royalty surcharge are passed through to consumers at high rates. Flamm Class Cert. Decl. ¶¶ 136-146. More critically, they are consistent with extensive documentary and deposition evidence in this case demonstrating that manufacturers determine the features (quality) and price of cell phones in a dynamic process based on changes in total costs that include the Qualcomm royalty component cost. *Id.* ¶¶ 190-216. For example, ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████      ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██

Qualcomm's motion to strike does not challenge Dr. Flamm's decision to use hedonic regression to assess changes in quality-adjusted prices of cell phones. Nor does Qualcomm's motion to strike challenge Dr. Flamm's methodological decisions to (1) use total costs as the dependent variable in his regression or (2) ███████████████████████████████████████

████████████████████████████      Qualcomm has no answer whatsoever for the breadth of economic literature and case-specific facts that are consistent with and reinforce Dr. Flamm's methodology and conclusions. Qualcomm's expert has no opinion on whether cell phone manufacturers consider the Qualcomm royalty as part of total costs. Johnson Dep. at 88:23-89:3.  Qualcomm has not performed its own regression analysis showing the ***absence*** of passthrough. Quite the opposite—███████

████████████████████████████████████████████████████████████

████████████████████████      Instead, Dr. Johnson erroneously claims that Dr. Flamm simply "assumes"

1   the entire Qualcomm royalty overcharge is necessarily passed through for purposes of antitrust

2   impact.[8] This is false.  As described above, Dr. Flamm never assumes anything. Instead, Dr. Flamm's

3   conclusion that the weighted pass-through rate is $0.87 per $1 of overcharge is based on an empirical

4   regression supported by hundreds of pages of analysis of documentary and statistical evidence detailed

5   in Dr. Flamm's report.

6         A court in this district rejected largely identical arguments from a defendant in a recent antitrust

7   class action that "[plaintiff expert's] opinions are predicated on the assumption of 100% pass-through

8   . . . [because] a review of [the expert's] report reveals that he did not assume 100% pass-through;

9   rather, he calculated the overall pass-through rate to be 80.1% using regression analysis." *See Giuliano*,

10  2015 WL 10890654, at *10. Here, too, Dr. Flamm does not simply rely on the assumption that the

11  royalty overcharge is "necessarily" passed through at 100% but calculated a royalty rate of 87.4%

12  based on empirical application of his hedonic regression analysis, and supported by a careful review

13  of the extensive documentary evidence. Other than Qualcomm's misplaced assertion that Dr. Flamm

14  somehow "assumed" a 100% passthrough rate—which is a plain misstatement of Dr. Flamm's

15  opinions—it does not raise any serious challenge to Dr. Flamm's methodological approach. Dr.

16  Flamm's hedonic regression analysis of quality-adjusted cell phone prices is a reliable application of

17  a generally-accepted methodology for proving antitrust injury and damages on a classwide basis.

18  **B.**     **Critiques about Dr. Flamm's data are unfounded and do not warrant exclusion.**

19        Having no basis to attack Dr. Flamm's underlying methodology, Qualcomm instead criticizes

20  Dr. Flamm's use of data. But these critiques fail to justify striking Dr. Flamm's opinions because: (1)

21  they are often mistaken; (2) they have no material impact on Dr. Flamm's methodology or conclusions;

22  and (3) they are the sort of "prototypical" expert disagreements that should be resolved by the jury.

23        **1.**     **Qualcomm's "convenience sampling" critique is mistaken.**

24        Qualcomm claims Dr. Flamm improperly used "convenience sampling" based on the amount

25  of data he was able to collect.  This is simply incorrect.

26

27      [8] ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1   Convenience sampling occurs when one makes a haphazard selection of only a portion of the

2   available data. Qualcomm's own cited authority explains that "to collect a convenience sample, you

3   select items that are easy, inexpensive, or convenient to sample. For example, in a warehouse of

4   stacked items, selecting only the items located on the tops of each stack and within easy reach would

5   create a convenience sampling." Mark L. Benson et al., BASIC BUSINESS STATISTICS 21-22 (13th ed.

6   2014). Dr. Flamm has not engaged in convenience sampling, as explained below, because he used all

7   available data that met his methodological criteria. But even if Dr. Flamm had engaged in convenience

8   sampling, that would not preclude admissibility. A convenience or "non-probability survey . . . is

9   sufficiently reliable to be admitted into evidence and accorded substantial weight . . . ." *Nat'l Football*

10  *League Props., Inc. v. N.J. Giants Inc.*, 637 F. Supp. 507, 515 (D.N.J. 1986) (accepting expert survey

11  into evidence)*; see also Kinetic Concept, Inc. v. Bluesky Med. Corp.*, 2006 WL 6505346, *14 (W.D.

12  Tex. Aug. 11, 2006) (permitting plaintiff's expert to present results from a survey using a convenience

13  sample). The Federal Judicial Center has noted that the use of convenience sampling does not preclude

14  admissibility, but has cautioned that where convenience sampling is used, the court should be cautious

15  of potential bias. Fed. Judicial Ctr., *supra* note 5, at 224–25 (discussing factors to be considered in

16  evaluating credibility of experts). For example, when conducting a mall survey, an interviewer's

17  discretion may lead to selection bias. *Id.*

18  Qualcomm does not claim that Dr. Flamm's data selection demonstrates any improper exercise

19  of discretion or bias in favor of finding pass-through. To the contrary, Dr. Flamm's data selection was

20  based on two key neutral methodological choices: (1) ██████████████████████████

21  ██████████████████████████████ and (2) to focus his analysis on the first month or period

22  of pricing data after a cell phone was introduced to the market. In essence, Qualcomm is arguing that

23  Dr. Flamm should have used a *smaller*, random sample rather than *all* available data that met his

24  methodological criteria. *See* Mot. at 5 (contrasting a "convenience sample" with a "random sample,

25  which is more likely to represent the full set of observations"). But for the reasons set forth below,

26  Qualcomm is mistaken.

27  *First*, Dr. Flamm excluded data that did not include sufficient information on the ten quality

28  control characteristics used in his model—the very same characteristics that ██████████████

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ███████████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ████

7      Notably, Qualcomm's motion only identifies ***two phone models*** that Dr. Flamm did not include

8 in his analysis as a result of this methodological choice. Mot. at 6 ("Dr. Flamm excludes all phones for

9 which he doesn't have data on all ten features. . . . this leads him to exclude two entire models of

10 Samsung phones."). As an initial matter, the number of phone models that Dr. Flamm examined,

11 ████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████████████ *See*

13 Flamm Opp. Decl. ¶ 36; Nevo & Willig at 28 n.53. ██████████████████████████

14 █████████████████, identified by Qualcomm have combined total sales of ██ million units. Johnson

15 Decl. ¶ 104 & n.186. By contrast, Dr. Flamm's original report analyzed data on ████████████

16 ██████████████████████████. Flamm Opp. Decl. ¶ 13. In any event, based on

17 his investigation of additional sources to identify all ten product characteristics, Dr. Flamm has updated

18 his regression analysis to account for ██████████████████████████████████

19 ████████████████████. *Id.* ¶ 14.

20      *Second*, Dr. Flamm chose to focus on cell phone prices during the first period in which each

21 particular phone model was introduced to the marketplace because the initial price data best represents

22 "the passthrough of higher costs into lower quality at the phone design" and the

23 "initial launch stage drives our lower bound estimates of the loss to final purchasers." Flamm Class

24 Cert. Decl. ¶ 258. Qualcomm does not argue that this methodological choice, on its own, is grounds

25 for exclusion of Dr. Flamm's testimony. Dr. Flamm has also rerun his regression analysis using

26 average price and cost data for the entire lifespan of the device for cell phone manufacturers, contract

27 manufacturers, and distributors. Courts routinely accept the use of averages in econometric models,

28 including for the calculation of damages. *See Giuliano*, 2015 WL 10890654, at *10 ("Courts have

1   rejected similar arguments and held that averaged and aggregated data is not fatal to econometric

2   models used to measure the extent of pass-through of component costs in the prices paid for end-use

3   products") (collecting cases); *In re TFT-LCD (Flat panel) Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D.

4   Cal. 2010) ("[A] number of courts have held that averaged and aggregated data may be used to

5   demonstrate pass-through"). These alternative passthrough results also show consistent, positive

6   passthrough rates and demonstrate that Dr. Flamm's modeling choices have not systematically biased

7   his statistical estimates.  This alternative calculation captures, by revenue, ████████████████

8   ████████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████. Flamm Opp. Decl. ¶¶ 33-35

10      Qualcomm's "convenience sampling" critique is utterly mistaken and should be rejected.

11      **2.      Qualcomm's "insufficient data" critique is meritless.**

12      Qualcomm further argues that Dr. Flamm is not using enough data.  But Dr. Flamm used data

13   from every step of the cell phone distribution chain, including data from 6 different manufacturers, 6

14   different retailers, 5 wireless carriers, a contract manufacturer, and a distributor. Qualcomm does not

15   claim that Dr. Flamm is missing data for any entire segment of the cell phone market.  Instead, it

16   mainly argues that Dr. Flamm's analysis is unreliable because he does not have enough data from two

17   specific segments of the distribution chain: (1) contract manufacturers and (2) distributors. Once again,

18   Qualcomm is mistaken on both counts.

19      *First*, Qualcomm criticizes Dr. Flamm for using data from one contract manufacturer, ████████,

20   while not using data from ██████████████████ Mot. at 6. Dr. Flamm did not use data from other

21   contract manufacturers because they did not produce data that was usable within the price/cost

22   parameters established by his regression equation. In particular, these contract manufacturers ████████

23   ██████████████████████████████████and thus did not fit the specifications of Dr.

24   Flamm's regression. Flamm Opp. Decl. ¶ 22.

25      More importantly, however, Dr. Flamm did not need to use data from each contract

26   manufacturer to establish the completely undisputed proposition that Apple reimbursed each contract

27   manufacturer for the entirety of the Qualcomm royalty overcharge. ████████████████████

28   ██████████████████████████████, and there is simply ***no***

*dispute that all of Apple's contract manufacturers passed through Qualcomm's royalty charge to Apple throughout the relevant period*. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Flamm Opp. Decl. ¶¶ 25-27

      Qualcomm itself has repeatedly acknowledged that the contract manufacturers fully pass through the Qualcomm royalty payment to Apple. Qualcomm's lead counsel stated at a hearing in the ongoing litigation between Qualcomm and Apple in the Southern District of California that "the price that [the contract manufacturers] charge Apple is a pass-along of the royalties that they pass to us." Pierce Decl. Ex. 9, at 25. Moreover, in its own complaint against Apple, Qualcomm made a judicial admission that "***Apple is obliged to reimburse contract manufacturers for their royalty payments to Qualcomm***." Pierce Decl. Ex. 10, at ¶ 217. When confronted with these facts supporting a full passthrough of Qualcomm's royalties by the contract manufacturers to Apple in his deposition, Dr. Johnson testified repeatedly: "I don't have an opinion on that." Johnson Dep. at 120:2–121:4.

      *Second*, Qualcomm criticizes Dr. Flamm for using data from a single distributor. Dr. Flamm's original report used data from Brightstar, the largest individual phone distributor, and his analysis included ████████████████████████████████████████████████████████████████████. Flamm Opp. Decl. ¶ 27 n.67. At the time of Dr. Flamm's report, Brightstar was the only distributor that had produced transactional data. Dr. Flamm's reply declaration includes data from a second distributor, Ingram Micro, who belatedly produced data after the preparation of Dr. Flamm's original

---

[9] ██████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████
[10] ██████████████████████████████████████████
████████████████████████████████████████████

report.[11]  Dr. Flamm has now analyzed distributor transactional data for ████████████████ ████████████████████████████████  and estimated high positive passthrough rates for distributors.  Flamm Opp. Decl. ¶ 35.  Dr. Flamm's updated passthrough rate for distributors is 88.4%, a minute difference from his estimate of 89.1% in his original report. *See id*. ¶ 15.

Qualcomm's arguments for exclusion here boil down to an attack that Dr. Flamm's methodology is not reliable because he did not use enough data. But "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." *Manpower*, 732 F.3d at 808. In a prior antitrust class action, *In re Chocolate Confectionary Antitrust Litigation*, 289 F.R.D. 200, 213 (M.D. Pa. 2012), Qualcomm's expert here, Dr. Johnson, "roundly criticize[d] [Plaintiff's expert economist] for relying upon price information from a single customer." The court, however, rejected Dr. Johnson's arguments because "although there are limitations to [plaintiff expert's] analysis, they are not fatal to admissibility under Rule 702." *Id.* Here, Dr. Johnson tries to apply the same criticisms even though Dr. Flamm used transactional data from 19 different third parties, a far more extensive cross-selection of data than in *Chocolate Confectionary*. So, just as in *Chocolate Confectionary*, "Dr. Johnson's criticism goes only to the weight of" Dr. Flamm's analysis. *Id.* Applying the same basic logic, a trial court admitted plaintiff expert's regression analysis for damages in an antitrust cartel case that used data from only some of the defendants because "an expert does not run afoul of Rule 702 simply for extrapolating data from one defendant to another." *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *12–13 (admitting expert analysis that included only data from a subset of defendants which covered only 31% of all purchasers). The same is true here for Dr. Flamm's extrapolation of third party data. *See In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *19 (rejecting defendant's motion to exclude passthrough analysis based on third party data from 2 retailers and 2 end purchasers where "defendants do not show how small sample size [of Plaintiff's expert] creates actual problems with his conclusions.").

---

[11] Ingram produced transactional data on August 8, 2018, in response to the May 24, 2018 order of Judge Cousins on the scope of Ingram's production. *See* Civil Minutes (May 24, 2018, ECF No. 483).

1

### 3.     Qualcomm's "coding errors" critique is misguided.

2

Finally, Qualcomm identifies supposed processing issues with Dr. Flamm's use of Apple and

3

Wistron data. Once again, these critiques are largely overstated and do not come close to warranting

4

exclusion.

5

*First*, Qualcomm criticizes Dr. Flamm for not using the "price or cost of a device at the time

6

of launch" for various iPhone models. Mot. at 9. But ironically, much of this supposed "problem"

7

actually resulted from ***Dr. Johnson's own coding error***, which he was forced to correct in an erratum

8

he issued the day before his deposition.[12]  Errata to Def. Qualcomm Inc.'s Mot. Strike Decl. of Kenneth

9

Flamm ("Errata") (Aug. 21, 2018, ECF No. 692-5) ("Errors in the launch dates of certain versions of

10

some Apple models were inadvertently incorporated into Exhibit 22, resulting in incorrect entries.").

11

████████████████████████████████████████████████████████████

12

████████     Errata Ex. A, at ¶ 4 (Aug. 21, 2018, ECF No. 692-3). Qualcomm's own erratum shows

13

that Dr. Flamm ███████████████████████████ in his original report either from the initial

14

launch quarter, or the quarter immediately before the initial launch. *Id.* ¶ 5.

15

Dr. Johnson did, however, identify one Apple transactional data file with pricing information

16

on certain models that was not included in Dr. Flamm's initial results based on its format. Flamm Opp.

17

Decl. ¶ 9. Fair enough.  Dr. Flamm has updated his results with this additional transactional data and

18

████████████████████████████████████████████████████████████

19

████████ hat are from the initial launch quarter of the device.[13]

20

Dr. Johnson's model found that the passthrough rate increases with his revised data. *See*

21

Johnson Decl., Exhibit F1 (Apple passthrough rate of 219% using Dr. Flamm's model and data);

22

Exhibit 23 (Apple passthrough rate of 389% using Dr. Johnson's revised data). Dr. Flamm's updated

23

results that include these additional Apple models make no material difference to Dr. Flamm's

24

conclusions because they continue to show high, positive passthrough rates for cell phone

25

26

---

[12] Qualcomm corrected Dr. Johnson's report, but not the claim in its motion to strike that Dr. Flamm did not use cost data from the time of launch for various iPhone models

27

[13] ████████████████████████████████████████████

28

████████████████████. See Flamm Opp. Decl. ¶ 11 n.16.

1  manufacturers. Flamm Opp. Decl. ¶ 14. Dr. Flamm's declaration therefore fully addresses

2  Qualcomm's criticism that his analysis is unreliable because he does not use price or cost data from

3  the time of launch for certain iPhones.

4        *Second*, Qualcomm is correct that Dr. Flamm coded ████████████████████

5  ███████████████████████████████████ Dr. Flamm's declaration provides updated results

6  with corrected coding but ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ██████████████. *Id.* ¶ 12. Dr. Flamm's declaration provides updated results with corrected coding but

9  the passthrough rate for Wistron remains identical. *Id.*

10        Courts recognize that minor processing errors may occur when experts use large amounts of

11  electronic data but that "as a purely equitable matter, these inconsistencies are virtually inevitable when

12  experts draw from such large data pools." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL

13  7882100, at *56. Qualcomm failed to conduct any empirical examination demonstrating that either of

14  these coding disputes would systematically bias Dr. Flamm's analysis. *Id.* ("The defendants argue that

15  this [data processing] inconsistency renders the regressions 'meaningless,' but they provide no basis

16  for such hyperbole. Most importantly, the defendants give no indication of how commonly this

17  oversight occurred. Without such an indication, the court has no grounds for assuming that these errors

18  materially affected the results of [expert's] customer model."). Even if such errors "materially affected

19  the results . . . unless they did so enough to make the model completely unreliable, this issue would go

20  purely to the weight the factfinder should credit [an expert]'s customer model, and not to its status as

21  persuasive common evidence of impact for class certification purposes." *Id.* Here, however, Dr.

22  Flamm's attached declaration fully addresses the processing issues identified by Qualcomm and

23  provides updated passthrough rates for Apple and Wistron, finding that the pass-through rate**s** that

24  remain fully consistent with Dr. Flamm's opinions in his original report. Flamm Opp. Decl. ¶¶ 11-14.

25  Qualcomm's questionable quibbles do not justify excluding Dr. Flamm's opinions altogether.

26      **4.**    **Qualcomm's complaints go to weight, not admissibility.**

27        As discussed in Part I above, all of Qualcomm's complaints about Dr. Flamm's use of data go

28  to weight and not admissibility. *See supra* note 2 and accompanying text; *see also, e.g.*, *Hadley*, 2018

WL 3954587, at *14. Qualcomm cites three cases to support its specific position that the way Dr. Flamm uses data warrants exclusion, but all three cases are distinguishable. *See* Mot. at 4.

In *United States v. City of Miami,* an employment discrimination case, the Eleventh Circuit instructed the district court on remand to examine "the actual number of black, female and Hispanic applicants eligible for promotions relative to the number of such individuals actually promoted." *United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997). But the defendant's expert then submitted a report that conflicted with the court's mandate because it "failed to look at the number of employees of a given race or sex eligible for promotion" and did not examine "how many applicants within a particular group took or passed a promotional exam." *Id.* Furthermore, the expert used a particular set of data based on a demonstrably false assumption and then testified that he would have used a different set of data if his assumption was corrected. *Id.* The Eleventh Circuit then excluded the expert's testimony. *Id.* But here, Qualcomm has neither claimed that Dr. Flamm's opinions ignore the specific instructions of the Court, nor that Dr. Flamm testified he would have used entirely different data with a corrected factual assumption.

In *Slaughter v. Southern Talc Co.*, a mass tort action for asbestos-related injuries, the Fifth Circuit affirmed partial summary judgment for defendants because the opinions of plaintiffs' medical doctors were based on medical examination reports that "were replete with 'so many obvious errors as to be of no value to the trier of fact.'" 919 F.2d 304, 307 (5th Cir. 1990) (quotations marks and citation omitted).  Qualcomm has not claimed that there are any errors in the underlying transactional data upon which Dr. Flamm relied. Instead, they have argued that Dr. Flamm didn't use enough of the underlying transactional data—illustrating that Qualcomm makes no claims that the produced transactional data is filled with "obvious errors." To the contrary, the sole empirical analysis performed by Dr. Johnson also relied on a modified version of Dr. Flamm's Apple data set. Johnson Decl. ¶ 108. And in *Taco Bell Wage & Hour Actions*, the plaintiff's expert erroneously included data from employees who were not part of the class and from a period of time prior to the class period. *See In re Taco Bell Wage & Hour Actions,* No. 1:07-CV-01314-OWW, 2011 WL 4479730, at *6 (E.D. Cal. Sept. 26, 2011) ("the data on which [expert] bases his opinion includes employees who are not in the

1    final pay subclass"). Qualcomm has not argued as a basis of exclusion that Dr. Flamm's analysis should

2    be excluded because he used data from non-class-members or before the class period.

3           Even assuming *arguendo* that Qualcomm's criticisms have merit—which they do not—they

4    would not warrant excluding Dr. Flamm's opinion because they go to weight, not admissibility.  *See*

5    *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the

6    inadequacies of a study are more appropriately considered an objection going to the weight of the

7    evidence rather than its admissibility.").  Qualcomm "is free to show that [Dr. Flamm] is wrong and

8    his data [is] flawed. This is not, however, a *Daubert* issue." *In re Se. Milk Antitrust Litig.*, No. 2:07-

9    CV-188, 2010 WL 8228838, at *2 (E.D. Tenn. Dec. 8, 2010).  In short, Qualcomm's objections to Dr.

10   Flamm's data processing are fully addressed in Dr. Flamm's declaration and certainly provide no basis

11   for excluding Dr. Flamm's testimony.

12                              **V.      CONCLUSION**

13          Qualcomm has failed to contest the core of the methodology of Plaintiffs' pass through expert.

14   Instead, it resorts to making scattershot arguments regarding Dr. Flamm's use of data.  Qualcomm's

15   critiques are misstated, readily addressed and do not alter the underlying methodology. To the extent

16   any disputes remain, they should be reserved for cross examination.

17   DATED: August 30, 2018                    HAGENS BERMAN SOBOL SHAPIRO LLP

18

19                                             By _____/s/ Jeff D. Friedman_____

20                                             Jeff D. Friedman (173886)
                                               Rio Pierce (298297)
21                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                               715 Hearst Avenue, Suite 202
22                                             Berkeley, CA 94710
                                               Telephone: (510) 725-3000
23                                             Facsimile: (510) 725-3001
                                               jefff@hbsslaw.com
24                                             riop@hbsslaw.com

25                                             Steve W. Berman (*pro hac vice*)
                                               1918 Eighth Avenue, Suite 3300
26                                             Seattle, WA 98101
                                               Telephone: (206) 623-7292
27                                             Facsimile: (206) 623-0594
                                               steve@hbsslaw.com

28                                             *Plaintiffs' Steering Committee*

1

2    Kalpana Srinivasan (237460)
     Marc M. Seltzer (54534)
3    Steven G. Sklaver (237612)
     Amanda Bonn (270891)
4    Oleg Elkhunovich (269238)
     SUSMAN GODFREY L.L.P.
5    1901 Avenue of the Stars, Suite 950
     Los Angeles, CA 90067-6029
6    Telephone: (310) 789-3100
     Facsimile: (310) 789-3150
7    ksrinivasan@susmangodfrey.com
     mseltzer@susmangodfrey.com
8    ssklaver@susmangodfrey.com
     abonn@susmangodfrey.com
     oelkhunovich@susmangodfrey.com
9
10   Joseph Grinstein (*pro hac vice*)
     jgrinstein@susmangodfrey.com
11   SUSMAN GODFREY L.L.P.
     1000 Louisiana, Suite 5100
12   Houston, TX 77002-5096
     Telephone: (713) 651-9366
13   Facsimile: (713) 65-6666
     jgrinstein@susmangodfrey.com
14
     Joseph W. Cotchett (36324)
15   Mark F. Ram (294050)
     Brian Danitz (247403)
16   Tamara Prevost (313422)
     COTCHETT, PITRE & MCCARTHY, LLP
17   840 Malcolm Road, Suite 200
     Burlingame, CA 94010
18   Telephone: (650) 697-6000
     Facsimile: (650) 697-0577
19   jcotchett@cpmlegal.com
     mram@cpmlegal.com
20   bdanitz@cpmlegal.com
     tprevost@cpmlegal.com
21
     ***Plaintiffs' Co-Lead Counsel***
22

23

24

25

26

27

28

OPP TO MOTION TO STRIKE FLAMM DECLARATION -26-
Case No.: 5:17-md-02773-LHK-NMC
010669-11 1058686V1