Kalpana Srinivasan (237460)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile:  (310) 789-3150
Email: ksrinivasan@susmangodfrey.com

Joseph W. Cotchett (36324)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: jcotchett@cpmlegal.com

*Plaintiffs' Interim Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 5:17-md-02773-LHK |
| | The Honorable Lucy H. Koh |
| | **PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** |
| | Hearing Date:   September 27, 2018<br>Hearing Time:  1:30 p.m.<br>Courtroom:      Courtroom 8 |
| | Trial Date:  June 24, 2019 |

## **TABLE OF CONTENTS**

**Page(s)**

I.     COMMON ISSUES PREDOMINATE FOR PROVING QUALCOMM'S ANTITRUST
       VIOLATION................................................................................................ 3

II.    COMMON ISSUES PREDOMINATE FOR QUANTIFYING QUALCOMM'S SUPRA-
       FRAND ROYALTY. .................................................................................... 4

III.   COMMON ISSUES PREDOMINATE FOR PROVING CLASSWIDE, ANTITRUST
       IMPACT...................................................................................................... 6

       A.     Qualcomm Fails to Rebut Economic Literature on Pass Through............................ 6

       B.     Qualcomm Fails to Rebut Case-Specific Evidence of Pass Through. ................... 7

       C.     Qualcomm's Merits Attacks on Dr. Flamm's Analysis Are Mistaken. .................. 7

              1.     Qualcomm Misconstrues the "As-Is" and "But-For" Worlds for
                     OEMs. ............................................................................................. 8

              2.     Qualcomm Misconstrues the "As-Is" and "But-For" Worlds for
                     Retailers. ......................................................................................... 12

IV.    A CLASS ACTION IS MANAGEABLE AND SUPERIOR............................................ 14

V.     QUALCOMM'S REMAINING ARGUMENTS LACK MERIT. ..................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alberton v. Commonwealth Land Title Ins. Co.*,
2008 WL 1849774 (E.D. Pa. Apr. 25, 2008) ........................................................................14

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011).................................................................................................15

*Bruno v. Superior Court*,
179 Cal. Rptr. 342 (1980) .......................................................................................................6

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
191 Cal. App. 3d 1341 (1987)..................................................................................................6

*In re Cathode Ray Tube (CRT) Antitrust Litigation.*,
2013 WL 5429718 (N.D. Cal. June 20, 2013) ..................................................................12, 14

*In re Cipro Cases I & II*,
121 Cal. App. 4th 402 (2004) ..................................................................................................6

*Cooper v. Thoratec Corp.*,
2018 WL 2117337 (N.D. Cal. May 8, 2018) ...........................................................................5

*In re Domestic Air Transp. Antitrust Litig.*,
137 F.R.D. 677 (N.D. Ga. 1991)............................................................................................15

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986).................................................................................................................3

*In re Fisher*,
649 F.3d 401 (5th Cir. 2011)....................................................................................................3

*In re Flash Memory Antitrust Litigation*,
2010 WL 2332081 (N.D. Cal. June 9, 2010) .........................................................................14

*Gordon v. Microsoft Corp.*,
2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001) ................................................................10

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)................................................................................................15

*In re Korean Ramen Antitrust Litig.*,
2017 WL 235052 (N.D. Cal. 2017).........................................................................................15

*Murphy Tugboat Co. v. Crowley*,
658 F.2d 1256 (9th Cir. 1981)..................................................................................................1

*In re Optical Disk Drive Antitrust Litig. ("ODD I"),*
    303 F.R.D. 311 (N.D. Cal. 2014) ............................................................................12

*In re Optical Disk Drive Antitrust Litig. ("ODD II"),*
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............................................................12

*Pulaski & Middleman, LLC v. Google, Inc.,*
    802 F.3d 979 (9th Cir. 2015)..................................................................................14

*Rosack v. Volvo of America Corp.,*
    131 Cal.App.3d 741, 182 Cal.Rptr. 800 (1982) ....................................................13

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    264 F.R.D. 603 (N.D. Cal. Nov. 25, 2009) .......................................................6, 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) ..................................................14, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    2012 WL 555090 (N.D. Cal. Feb. 21, 2012) .....................................................6, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    267 F.R.D. 583 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D.
    Cal. July 28, 2011) .................................................................................................15

*United States v. Alexander,*
    106 F.3d 874 (9th Cir. 1997)..................................................................................15

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) (*en banc*) ..................................................................2

**Rules**

Federal Rule of Civil Procedure 23(b)(2) ......................................................................15

**Statutes**

California Business & Professions Code § 16760(d)........................................................6

**Other Authorities**

Rubenstein, 3 NEWBERG ON CLASS ACTIONS § 7:30 (5th ed.) ........................................5

Plaintiffs have gone above and beyond what is required to demonstrate that this case should proceed as a class action.  Plaintiffs have presented extensive, common evidence from which a jury could determine both the fact and the extent to which the class has suffered from Qualcomm's antitrust violations, including:

1.  Common and market-wide evidence of Qualcomm's market power, anticompetitive conduct, and harm to competition;

2.  Mr. Lasinski's common methodologies and evidence for quantifying Qualcomm's supra-FRAND royalty overcharges to OEMs; and

3.  Multiple methods of common proof establishing class-wide impact on consumers, including (a) economic literature, (b) case-specific documents and deposition testimony, and (c) Dr. Flamm's hedonic regression analysis.

Qualcomm does not seriously dispute that common issues predominate with respect to the first two issues above.

Instead, Qualcomm's opposition is largely directed to claiming that Plaintiffs' pass-through analysis fails to account for "real-world" facts. Opp. 15. In truth, it is Qualcomm that acts like an ostrich, hiding its head in the sand to avoid economic reality. Qualcomm and its expert, Dr. Johnson, ignore overwhelming academic authority and case-specific record evidence confirming what economic common sense makes clear: Qualcomm's anticompetitive, industry-wide surcharge on OEMs was ultimately felt by consumers through higher quality-adjusted prices of cellular phones. To accept Qualcomm's contrary position is to believe -- without any evidence -- that cellular phone market participants acted altruistically rather than to maximize profits, absorbing Qualcomm's overcharges to avoid harming class members.  But in a "hypothetical economic construction . . . economic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality." *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981). No such evidence exists here; instead, extensive testimony and documentary evidence shows that OEMs would have used the money saved from the surcharge to reduce prices and enhance the quality of consumer phones.

Qualcomm attempts to chip at the edges of Dr. Flamm's hedonic regression analysis. But Dr. Flamm's methodology of assessing quality-adjusted prices is one that █████████ ████████████████████████████████████████████████████████████████████

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

███████████████████████████████████████████

█████████ Dr. Flamm's analysis demonstrates that in a "but-for" world, absent Qualcomm's anticompetitive conduct, such quality-adjusted prices would have fallen further. Qualcomm lacks a reasonable basis for criticizing this economically sound extension of its own approach.

To the contrary, Qualcomm's critiques of Dr. Flamm's analysis fundamentally misconstrue both the "as-is" and "but-for" worlds as involving an individual OEMs' "respon[se]" when "faced with cost changes" to the Qualcomm royalty in the middle of the design-cycle for a particular device. Opp. 11-15. Qualcomm's argument is wide of the mark. Mr. Lasinski's analysis demonstrates that Qualcomm's "as-is" and "but-for" *royalty rates* are "fixed by agreement *ex ante* and predictable to OEMs, rather than changing unexpectedly quarter-by-quarter and mid-way through the design cycle of any particular device." Lasinski Reply Decl. ¶ 5. Quarterly variation in the per-OEM, *average overcharge* calculation is due solely to "changes in the mix of devices sold by the OEM" and not fluctuating royalty rates. *Id.* Qualcomm and Dr. Johnson thus confuse "a counterfactual cost change (*i.e.*, the change between Qualcomm's actual royalty rates and its 'but-for' FRAND rates, both of which are known and predictable) and a cost change across time (*i.e.*, varying and unpredictable changes in component costs)"—an error that infects their entire analysis. Flamm Reply Decl. § II.A.

Qualcomm also vastly overstates Plaintiffs' burden, claiming that Dr. Flamm must *prove* in a hypothetical, "but-for" world (1) the specific quality adjustment an OEM would have made to each device in a "but-for" if prices remained the same and (2) that pricing strategies in the "as-is" world such as focal point pricing and carrier "subsidies" would not have become less generous to consumers.

Both arguments lack merit.  *First*, because neither "plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent defendant's exclusionary conduct," to "some degree, the defendant is made to suffer the uncertain consequences of [its] own undesirable conduct." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (*en banc*). Plaintiffs rely upon well-established economic principles to predict OEM behavior in the "but-for" world. And extensive documentary and deposition evidence

demonstrates that vigorous competition forced OEMs to eliminate desired features to achieve relatively modest cost savings – ones that were smaller than Qualcomm's royalty surcharge. Flamm Reply Decl. § II.B.3.[1] Qualcomm's critiques of Dr. Flamm merely confirm that the core issues in this case are merits questions that can be answered with common evidence about the economic behavior of Qualcomm, OEMs, and retailers/carriers. *Second*, it is entirely appropriate to hold various practices in the "as-is" world constant in the "but-for" world absent any economically rational reason to believe the elimination of Qualcomm's anticompetitive conduct would change those practices as well. *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011) ("[A]scertaining the existence of but-for causation requires a court to create a mental picture of a situation identical to the actual facts of the case in all respects save one: the defendant's wrongful conduct is now 'corrected' to the minimal extent necessary to make it conform to the law's requirements.").

Qualcomm not only wants to hide from the impact of its conduct on individual class members, but also to run from the consequences for the class as a whole. The fact that it can be shown that hundreds of millions of consumers were impacted by Qualcomm's conduct only highlights why class treatment is particularly appropriate in this case.

## I.      Common Issues Predominate for Proving Qualcomm's Antitrust Violation.

Common issues predominate with respect to Qualcomm's market power, anticompetitive conduct, and harm to competition. Qualcomm's ***only*** argument relating to any of these issues is an erroneous critique of Plaintiffs' tying theory—a mistaken merits argument that hinges on common evidence. Opp. 25. *First*, contrary to Qualcomm's contention that Plaintiffs fail to specify a market for the tied product, Qualcomm's ability to exert anticompetitive price effects by charging a supra-FRAND royalty inherently demonstrates a market for the tied product of Qualcomm's SEPs.[2] Elhauge Reply Decl. § I.A. *Second*, Qualcomm wrongly contends that

---

[1] *See also Gordon v. Microsoft Corp.*, 2001 WL 366432, at *10 (Minn. Dist. Ct. Mar. 30, 2001) (granting class cert.) ("[A] hypothetical question generally cannot be answered by historical data about what actually happened, but must often be answered by general principles about what generally tends to happen.") (quotation marks and citation omitted).

[2] *See also, e.g.*, *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("[P]roof of

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

1   Plaintiffs' impact model "does not attempt to assess the fair market value" of the combination of

2   Qualcomm's chipsets and royalties is mistaken. Opp. 25. While Plaintiffs' conservative damages

3   model does not *quantify* the *amount* of the chipset overcharge, Professor Elhauge explained in his

4   opening declaration how Qualcomm's conduct elevated chipset prices and why "the prices of

5   Qualcomm's chipsets and royalties both exceeded their fair market value." Elhauge Reply Decl. §

6   I.B.  Qualcomm fails to rebut this showing at all.

7   **II.      Common Issues Predominate for Quantifying Qualcomm's Supra-FRAND Royalty.**

8          Plaintiffs' expert Mr. Lasinski laid out a common approach for calculating the supra-

9   FRAND royalty Qualcomm unlawfully charged each OEM. Applying common methodologies to

10  common forms of proof (including comparable license agreements), Mr. Lasinski is able to

11  calculate: (1) Qualcomm's "as-is" and "but-for" FRAND royalty rates; (2) the average resulting

12  overcharge for each OEM based on its mix of products sold; and even (3) device-specific

13  overcharges. *See* Lasinski Class Cert Decl. (Doc. No. 517-6), Fig. 55, Schedule 27.1. Qualcomm

14  baselessly claims that Mr. Lasinski's mere use of OEM-specific data defeats class certification,

15  but cites no supporting case law whatsoever. Opp. 8-9. In addition, Qualcomm contends that

16  Plaintiffs "cannot prove impact" for Apple device purchasers after 2016 because (1) ███████

17  ████████████████████████████████████████████████████████████████████████████

18  ███████    (2) ██████████████████████████████████████████████  Opp. 8.

19  Both arguments are mistaken.

20          *First*, ███████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████  Qualcomm charged

24  Apple's CMs royalties on iPhones sold after 2016 and is vigorously litigating its claim that it is

25  entitled to those payments, for which Apple has recorded an accrual.[3] ████████████████

26  (… cont'd)

27  actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but
    a surrogate for detrimental effects.") (quotation marks and citation omitted).

28  [3] *See* Exs. 5, 6. Unless otherwise noted, cited Exhibits are from Kalpana Srinivasan's Declaration.

1  ██████████████████████████████████████████████████████████████

2  ████████████████████████████  *Compare* Ex. 8 (████████████████████

3  ████████████████████████████████████)  *with* Ex. 7 at 77 ██████████

4  ████████████████████████████████████████████████████).  Moreover,

5  ██████████████████████████████████████████████████████████████

6  ████████████████████████████████████  Elhauge Reply Decl. ¶ 9. "The effect

7  of Qualcomm's anticompetitive conduct on chipset prices is a common impact across all OEMs,

8  including Apple, that persists beyond 2016." This injury persists even though Plaintiffs do not

9  include such chipset overcharges in their damages model. *Id.*[4]

10        *Second*, while Mr. Lasinski has not yet calculated Qualcomm's supra-FRAND royalty

11  overcharge to Apple after 2016, he confirms that he would apply the same common methodology

12  and common evidence that he has used to quantify Qualcomm's exemplary supra-FRAND

13  royalty surcharge for every other period. Lasinski Reply Decl. ¶ 4, n.4.[5]  The fact that Mr.

14  Lasinski has not yet completed those calculations at the certification stage does not demonstrate,

15  as Qualcomm apparently believes, that "Plaintiffs' experts admit [they] were not impacted." Opp.

16  8.[6] Mr. Lasinski's quantification of the industry-wide, supra-FRAND royalty surcharge is based

17  on a common methodology and common proof. Qualcomm fails to demonstrate otherwise.

18

19  [4] *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *24 (N.D. Cal. Feb. 21, 2017) (class
    certified where expert reduced damages for uninjured class members).

20

21  [5] Qualcomm takes Dr. Flamm's testimony regarding 2017 Apple purchasers out-of-context. Dr.
    Flamm merely testified, correctly, that he had been told that "there were no damages that were
22  going to be claimed for Apple's purchase after the date I mentioned earlier" in connection with
    the "number I received that apparently reflects Dr. Lasinski's analysis." Ex. 9 at 149:11-150:1.
23  That is true, insofar as Mr. Lasinski has not yet calculated post-2016 damages. But nothing
    suggests Mr. Lasinksi would not be able to calculate the amount of the Apple overcharge for the
    post-2016 period using the same common methods and common evidence.

24

25  [6] In any event, Qualcomm's argument that a discrete subset of persons who purchased Apple
    iPhones during the pendency of the litigation may not have been harmed presents no reason to
26  deny class certification as a whole. To the extent it becomes necessary, a subclass of such
    purchasers could be created at any time. *See, e.g.*, Rubenstein, 3 NEWBERG ON CLASS ACTIONS §
27  7:30 (5th ed.) ("[S]ubclassing may be undertaken at any time. Courts will generally consider
    subclassing when the need arises."); *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *6 (N.D.
28  Cal. May 8, 2018) (denying "Defendants' alternative requests to end the Class Period on
    November 27, 2013 subclasses . . . at this time without prejudice").

III.   **Common Issues Predominate for Proving Classwide, Antitrust Impact.**

Plaintiffs also use common methodologies and evidence to show Qualcomm's overcharges were passed through and caused "antitrust impact" to the class. "[A]ntitrust plaintiffs benefit from an especially lenient burden when it comes to proof of impact." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at *4 (N.D. Cal. Feb. 21, 2012). Under California substantive law, "***injury to the class may be assumed***" in "cases where consumers have purchased products in an anticompetitive market, even if some consumers did not actually have to pay the overcharge because of their individual circumstances." *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 413 (2004).[7]  But Plaintiffs do not rest on the presumption of classwide impact alone. Instead, Plaintiffs offer multiple forms of common proof that Qualcomm's overcharge was passed through, which Qualcomm fails to undermine.

A.   **Qualcomm Fails to Rebut Economic Literature on Pass Through.**

Dr. Flamm's opening declaration discusses extensive economic literature demonstrating that industry-wide taxes, akin to Qualcomm's supra-FRAND royalty surcharge, are passed through to consumers at high rates. *See* Flamm Decl. (Doc. No. 550-1) § III.B.2. Dr. Johnson relegates his entire analysis of this point to a single footnote in which he contends that such articles "only provide an exposition of various economic concepts" and "do not pertain to the industry or alleged conduct at issue here." Johnson Decl. ¶ 42, n.53. But Dr. Johnson does not dispute that (1) these articles demonstrate high pass through rates of industry-wide taxes and (2) Qualcomm's supra-FRAND royalty operates much like an industry-wide tax. *See id.* Moreover,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Ex. 4 at 90:6-13.

---

[7] *In re SRAM*, 264 F.R.D. at 612 n.5 (holding this presumption "is a matter of substantive law"). *See also B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1351 (1987) (certifying class and noting that damage can be inferred in markets characterized by individually-negotiated prices, varying profit margins, and intense competition); *Bruno v. Superior Court*, 179 Cal. Rptr. 342, 346, n.4 (1980) (holding that due process does not prevent aggregate calculation of damages classwide); Cal. Bus & Prof. Code § 16760(d) (same).

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

1

**B.      Qualcomm Fails to Rebut Case-Specific Evidence of Pass Through.**

2

Qualcomm also ignores the substantial, case-specific evidence of pass through Plaintiffs'

3

opening brief outlined— ████████████████████████████████████ *See* Mot.

4

22, Exs. 52-53 (Doc. Nos. 522-8-9). For instance, ████████████████████████

5

████████████████████████████████████████████████████████

6

████████████ Ex. 52 (Doc. No. 522-8). ████████████████████████

7

████████████████████████████████████████████████████████

8

██████████████████████████.[8] *See, e.g.,* Ex. 50 (Doc. No. 522-6); Ex. 51 (Doc. No.

9

522-7). *See also* Flamm Reply Decl. ¶¶ 159-165. ████████████████████████

10

████████████████████████████████████████████████████████

11

████████████████████████████████████████████████████. *See*

12

Mot. 22, Exs. 3, 54 (Doc. Nos. 517-3, 522-10).  Qualcomm fails to address such evidence.

13

**C.      Qualcomm's Merits Attacks on Dr. Flamm's Analysis Are Mistaken.**

14

Any one of the above categories of common proof is alone sufficient to establish common

15

impact on a class-wide basis. All of them combined, along with California's presumption of

16

classwide impact, are more than enough. Nevertheless, Plaintiffs also present Dr. Flamm's

17

hedonic regression analysis to demonstrate that on a weighted average basis, each $1 of

18

Qualcomm's royalty overcharge was passed through to consumers as an $0.88 increase in the

19

quality-adjusted prices of cellular phones.  Flamm Reply Decl., Tbl. 11. As set forth more fully in

20

Plaintiffs' opposition to Qualcomm's motion to strike, Qualcomm fails to challenge Dr. Flamm's

21

hedonic regression ***methodology*** (which its own experts have used in connection with the FTC's

22

investigation). Doc. No. 709 at 8-9. Qualcomm's merits-based attacks on Dr. Flamm's

23

***conclusions*** are mistaken and only demonstrate that OEMs' behavior and the ultimate impact on

24

consumers can be analyzed based on common evidence and be decided at the merits phase.

25

[8] Qualcomm relegates its discussion of this evidence to a single, perfunctory footnote in which it
contends that "[i]f an OEM had a fixed markup, then cost changes would affect price, but here

26

OEMs do not." Opp. 11 n.16. Qualcomm offers no support for the notion that pass through only
occurs when market participants have "fixed markups." And for the reasons discussed in Part

27

III.C.1.A, *infra*, the relevant question here is not how OEMs would react to "cost changes" in the
Qualcomm royalty rate. Instead, the relevant question is how OEMs would react in a "but-for"

28

world to a systematic and industry-wide reduction in Qualcomm's predictable royalty rates.

1        1.    Qualcomm Misconstrues the "As-Is" and "But-For" Worlds for OEMs.

2        Qualcomm's critiques of Dr. Flamm's analysis reveal its fundamental misconception

3    about the nature of both the "as-is" and "but-for" worlds. Qualcomm repeatedly implies that (1)

4    Qualcomm's royalties varied by quarter and (2) the relevant question is therefore how individual

5    OEMs would respond when "faced with cost changes" to the Qualcomm royalty in particular (as

6    opposed to total costs). *See, e.g.*, Opp. 11-15. This faulty premise underlies all of Qualcomm's

7    critiques concerning pass through at the OEM level and therefore fatally undermines them all.

8            a.    *Qualcomm's Per-Device Royalty Rates are Fixed Ex Ante and Do
9                  Not Vary Unpredictably.*

10       Qualcomm's suggestion that its royalty rates varied over time—implying "constantly

11   changing" phones under Dr. Flamm's analysis—is misleading. Opp. 13-14. Qualcomm's "royalty

12   rate structures are fixed by agreement *ex ante* and predictable to OEMs, rather than changing

13   unexpectedly quarter-by-quarter and mid-way through the design cycle of any particular device."

14   Lasinski Reply Decl. ¶ 8. "The same would be true in the hypothetical 'but-for' world" except

15   "that the rate structures would be systematically lower" industry-wide." *Id.* Qualcomm and Dr.

16   Johnson therefore wrongly conflate "(1) Qualcomm's **_royalty rate structures_** (which are fixed by

17   agreement *ex ante* and predictable to OEMs over time) with (2) the **_amount of Qualcomm's_**

18   **_average overcharge_** to each OEM (which varied by quarter based on changes in the selling price

19   of mobile devices and the mix of device types the OEM sold)." *Id.* (emphasis added).

20       Qualcomm also conflates "the exemplary **_average_** overcharges for each OEM" with "the

21   specific overcharge for a given mobile device." *Id.* ¶ 5. Qualcomm's consistent "as-is" and

22   exemplary "but-for" FRAND royalty rates result "in the per-unit overcharge on a given product

23   declining predictably with the mobile unit's price over its lifecycle." *Id.* ¶ 8. By contrast, "the

24   **_average_** overcharge for a given OEM changes—both rising and falling—quarter to quarter due to

25   changes in the mix of devices sold by the OEM," because CDMA2000 and WCDMA devices, for

26   example, are subject to different, fixed FRAND rates. *Id.* "Such fluctuations do not imply any

27   change in (1) the royalty rate structures set forth by Qualcomm's actual license agreements or (2)

28   the exemplary 'but-for' FRAND rates that would apply to specific products sold by that OEM."

   b.   *Qualcomm's Royalty Rates Would Be Systematically Reduced Industry-Wide in the "But-For" World.*

As a result, Qualcomm's contention that "[i]n many instances, OEMs adjusted neither quality nor price **when their costs changed or deviated from targets**," Opp. 11-12 & 15, is irrelevant to evaluating antitrust impact here. Flamm Reply Decl. § II.A.3. "In fact, the relevant pass-through question at issue in this case is: in a counterfactual 'but-for' world in which Qualcomm's consistent and predictable market-wide royalties throughout the relevant period were systematically lower than what prevailed in the actual world, would end-consumers have experienced systematically lower quality-adjusted prices?" *Id.* ¶ 18.

Thus, Qualcomm's suggestion that when "**faced with cost changes**" an OEM may "respond" by "renegotiat[ing] with suppliers to attempt to change other costs" or "adjust[ing] profit margins" rather than adjusting quality or price is off-point. Opp. 11. This scenario involves a mid-design-cycle and "**unanticipated** cost increase—one that would prompt an OEM to 'renegotiate with suppliers of other components' or 'absorb' the cost increase" in lower margins. Flamm Reply Decl. ¶ 49. "By contrast, the 'but-for' world is one in which all OEMs industry-wide would have faced a **systematic and predictable** decrease in their Qualcomm royalty rates *ex ante* before they set the target costs, prices, and features for any devices" (and thus before **any** negotiations over other components of a particular phone). *Id.* Testimony and economic theory demonstrate that each OEM would be highly motivated to remain competitive by passing through those savings in improved quality-adjusted prices to consumers.[9] *Id.* § II.B.2. As ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.‚"[10]

Ex. 10 at 212:13-19.

---

[9] As explained by Dr. Flamm, in both the "as-is" and "but-for" worlds, "we must assume that each OEM will behave as an economically rational actor and will thus pursue the profit-maximizing motive of negotiating the best cost for the components they purchase, all else being equal." Flamm Reply Decl. ¶ 50, n.45.

[10] Qualcomm's counter-argument that varying "gross margins" indicate OEMs absorb overcharges is mistaken, as (1) "[g]ross margins and profitability can differ substantially" and (2) overwhelming evidence demonstrates vigorous competition on both price and quality. Flamm Reply Decl. § II.B.3.

c.   *Dr. Flamm's Analysis Accounts for Focal Point Prices.*

Qualcomm cites *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) for the notion that focal point pricing strategies belie the notion that prices are adjusted "to pass through small ***changes in costs***." Opp. 10. Qualcomm contends Dr. Flamm "does not account for how, and by how much, focal-point pricing affects the alleged pass-through rate for the OEM and retailer points in the distribution chain." *Id.* Qualcomm is wrong and *Batteries* is off-point.

Focal point strategies exist in both the "as-is" and "but-for" worlds. Flamm Reply Decl. ¶ 73. For focal point pricing in the "as-is" world, Dr. Flamm's "hedonic regression analysis is a method applicable to class-wide data that accounts for them, and in [his] exemplary application, demonstrates that 88% of upstream cost changes are passed through to consumers in the form of quality-adjusted price changes" notwithstanding focal point pricing. *Id.* By extension, Dr. Flamm's regression analysis is a "method for determining whether the entire class of consumers was harmed (or not) by pass-through of Qualcomm's alleged overcharge" to the extent the same "pricing strategies would also exist in the 'but-for' world." *Id.*

Unlike in *Batteries*, Qualcomm's royalty is an industry-wide surcharge on every OEM. Such industry-wide costs are more likely to be passed through than OEM-specific ones. Flamm Class Cert Decl. at ¶ 122. *See also Gordon*, 2001 WL 366432, at *10. And unlike the hidden cartel overcharge in *Batteries*, here it is undisputed that OEMs factored in the Qualcomm royalty during the design process and specifically included it as a cost in their bill of materials (BOM), increasing the likelihood of pass through. *See, e.g.,* Ex. 11 at 409:11-410:3 (██████████████████████████████████████████████████; Mot. 22, n.30. *See also* Flamm Reply Decl. § IV.B.

Even if a phone's nominal, focal point price would not shift in light of Qualcomm's royalty surcharge being eliminated, Dr. Flamm demonstrates that OEMs would have been economically motivated and actually able to improve features in the "but-for" world. *Id.* § II.B.2-3. OEMs viewed the cellular phone market as competitive and believed they needed to improve a phone's features or lower its price to consumers in order to stay competitive, often pursuing

"small cost breaks" amounting to much less than the Qualcomm royalty overcharge by "defeatur[ing]" chipsets (decisions that could be reversed in the "but-for" world). *Id.* ¶ 62. Qualcomm's denial runs counter to rational economic behavior and the facts of this case.

d.   *OEMs Optimized Total Costs, Not Individual Components.*

Finally, Qualcomm contends that because "an OEM's ***response*** to a ***change in the cost of a specific input*** will depend (among other things) on the input and the size of the change," all costs "are not" passed through "in the same way." Opp. 14. Once again, the relevant question is not how an OEM would "respon[d]" to "a change" in Qualcomm's royalty mid-way through the design cycle in a "but-for" world—but rather how it would act in the face of a systematic and industry-wide reduction of Qualcomm's royalty rate structures *ex ante*, before even beginning the design cycle on any device. Flamm Reply Decl. ¶ 49.  Moreover, Qualcomm's argument ignores overwhelming documentary and testimonial evidence that (1) OEMs optimized their total incremental costs ***as a whole***, ███████████████████████, as opposed to optimizing stand-alone component costs in isolation; and (2) royalties are not treated differently from any other marginal cost, but are considered with all costs when making price and feature determinations. [11] Flamm Reply Decl. § IV.B. Qualcomm and Dr. Johnson both fail to cite any case-specific evidence or economic literature that would support the notion that OEMs consider royalty costs to be distinct from other costs and pass them through at different rates.

Instead, Qualcomm's only "evidence" of this theory is Dr. Johnson's regression on Apple's royalty data, which according to Qualcomm demonstrates that "non-material costs (███████████████)" are passed through differently from materials costs and "at a rate indistinguishable from zero." Opp. 14. But as Dr. Flamm explains in his reply declaration, Dr. Johnson's analysis is deeply flawed, demonstrating nothing other than statistical "noise" that should be disregarded. Flamm Reply Decl. ¶ 110. Dr. Flamm explains that "slicing component cost categories into sub-categories can produce spurious estimates of pass-through relationships in finite samples, even when firms are passing through total incremental unit cost." *Id.* ¶ 108.

---

[11] Dr. Johnson's attempts to isolate and measure Apple's margin on individual quality controls variables (such as storage) standing in isolation is misguided. *See* Flamm Reply Decl. § III.

When Dr. Flamm adjusts Dr. Johnson's model to capture all "non-material costs," the "royalty pass-through rate [is] statistically indistinguishable from the pass through of non-royalty costs at the 90% confidence level" and the pass through coefficient swings almost "800% in a positive direction compared to Dr. Johnson's original model." *Id.* ¶ 110. And when Dr. Johnson's analysis is merely adjusted to account for the coding error that he admitted in his errata, Dr. Johnson's statistically insignificant pass through rate of non-material costs becomes "statistically significantly negative, implying at face value that a $10 royalty ***reduction*** would ***increase*** iPhone prices by $80." *Id.* ¶ 112 (emphasis added). This highly sensitive and economically irrational result shows it is Dr. Johnson's analysis that is misguided, not Dr. Flamm's.

Finally, Qualcomm cites *In re Optical Disk Drive Antitrust Litig. ("ODD I")*, 303 F.R.D. 311, 324-25 (N.D. Cal. 2014), for the proposition that Dr. Flamm has "not presented a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate" for OEMs given that the "overcharge" makes up a "relatively small portion" of the device's total cost. Opp. 13. But Dr. Flamm did not assume a uniform pass through rate; he calculated individual passthrough rates for six different OEMs as a basis for modeling a composite passthrough rate. And as discussed above, there is extensive evidence demonstrating that OEMs traded-off features in order to pursue cost savings smaller than the Qualcomm royalty overcharge. Qualcomm also omits completely that the court ***reversed*** its ruling in *ODD I* when it certified the class in *In re Optical Disk Drive Antitrust Litig. ("ODD II")*, 2016 WL 467444, at *2 (N.D. Cal. Feb. 8, 2016).

2.    Qualcomm Misconstrues the "As-Is" and "But-For" Worlds for Retailers.

Qualcomm's arguments concerning pass through at the retail level are equally misguided. *First*, Qualcomm argues that (1) carriers offer a variety of "rebates, discounts, promotions, carrier financing" and similar strategies at the retail level and (2) it is wrong to "assume[] they would have been exactly the same in the 'but-for' world where prices or quality were different." Opp. 17. Not so. The "but-for" world differs from the "as-is" world only with respect to the challenged conduct, such that discounts and rebates would be held constant. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *20 (N.D. Cal. June 20, 2013), *R&R adopted*, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ("CRT manufacturers would have offered special price

1    concessions to those buyers in the but-for as well as the actual world."); *Rosack v. Volvo of*

2    *America Corp.*, 131 Cal.App.3d 741, 755, 182 Cal.Rptr. 800 (1982) ("Courts have held that

3    'contentions of infinite diversity of product, marketing practices, and pricing have been made in

4    numerous cases and rejected.'") (citation omitted). ██████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████ Ex. 4 at 100:2-101:8. █

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████ *Id.* at 94:10-22. Qualcomm's argument that there

12   ***might*** be differences in these practices in the "but-for" world is nothing more than a baseless

13   strawman. Flamm Reply Decl. § V.A.2.

14        *Second*, Dr. Flamm's regression directly controls for subsidies by accounting for phone

15   characteristics, plan or plan characteristics, promotions, discounts, gift cards, upgrades or trade-

16   ins, and monthly charges or ARPU.  Flamm Reply Decl. at § V.B, Tbl. 5.  Dr. Flamm does not

17   assume that the pass through rates for subsidized phones are equal to pass through rates of

18   unsubsidized phones; rather, he found statistically significant pass through rates for each carrier

19   for both subsidized phones and phones sold without contracts.  *Id.*  Qualcomm fixates on the

20   notion that some class-members received supposedly "free" phones and were therefore uninjured.

21   Opp. 16-17. But neither Qualcomm nor Dr. Johnson has any answer to ***the carriers' admissions***

22   ***in FCC filings*** that there is no such thing as a "free" phone because they recoup phone subsidies

23   through locked-in service plans. *See* Flamm Reply Decl. ¶¶ 130-131.

24        *Third*, Qualcomm wrongly argues that Plaintiffs are somehow required to "calculate the

25   overcharge" on "any particular device purchased by a class member," resulting in a "different

26   pass-through rate for every permutation of possible distribution channels." Opp. 8, 18. Qualcomm

27   is wrong. Mr. Lasinski calculates a weighted, average overcharge for each OEM based on the mix

28   of devices each one sold. *Id.* ¶¶ 5-9. In *ODD II*, the court certified a class in which Dr. Flamm

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

presented a revenue-weighted, average pass-through rate based on three supply channels. *See* Ex. 12 at 174 (calculating revenue-weighted average pass-through rate based on three supply channels). Here, Dr. Flamm went much further, calculating a revenue-weighted, average pass-through rate of 88% based on the share of commerce in 18 primary sales channels. *See* Flamm Reply Decl. Tbl. 11. Other courts have approved similar weighted-average methodologies, which avoid the kind of individualized pass-through inquiry at issue in *In re Flash Memory Antitrust Litigation*, 2010 WL 2332081, at *12 (N.D. Cal. June 9, 2010).  *See In re SRAM Antitrust Litig.*, 2010 WL 5071694, at *5 (N.D. Cal. Dec. 7, 2010).

## IV.   A Class Action is Manageable and Superior.

Unable to dispute predominance, Qualcomm suggests that regardless of the facts of a given case, any "250-million person class holding more than a billion individual claims is inherently unmanageable, unfair, and inferior to other forms of adjudication . . . ." Opp. 20. Qualcomm's concerns are overstated. As detailed in the Srinivasan Declaration, Plaintiffs have received RFP responses from multiple claims administrators, confirming they will be able to reach a minimum of 70% of class members using notice methods approved in similarly large antitrust class actions.[12] *See* Srinivasan Decl. ¶¶ 14-15. Qualcomm contends it will be unable to litigate its defenses, but each of its defenses to liability above hinge on common questions and common proof concerning the behavior of Qualcomm, OEMs, and retailers/carriers (rather than individual inquiries unique to every class member). And contrary to Qualcomm's suggestion that "individual damage" issues prevent certification, the Ninth Circuit has made clear that "differences in damage calculations" among class members "does not defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015).

---

[12] *See In re TFT-LCD Antitrust Litig.*, 07-md-1827, Dkt. 4424, 4468 (N.D. Cal. Dec. 23, 2011) (finding publication notice satisfactory to reach nationwide class of indirect purchasers of flat panel televisions and other devices); *In re Cathode Ray Tube (CRT) Antitrust Litigation*, No. 07-cv-5944, Dkt. 3861 at 25, 3906 (N.D. Cal. May 29, 2015) (finding combination of publication notice and targeted email notice appropriate for notice indirect purchasers of televisions and computer monitors); *See also Alberton v. Commonwealth Land Title Ins. Co.,* 2008 WL 1849774, at *3 (E.D. Pa. Apr. 25, 2008) (notice projected to reach 70% of class was sufficient).

Yes, this class will be large.  But many courts have certified broad classes with similarly high numbers of potential class members.[13] And antitrust defendants deserve no pass on their alleged misconduct simply because it harmed an extraordinary number of people; the opposite is true. *See In re SRAM*, 264 F.R.D. at 615 ("Certifying the IP national injunctive relief class and state classes is superior to, and more manageable than, any other procedure available for the treatment of factual and legal issues raised by IP Plaintiffs' claims.").[14]

## V.     Qualcomm's Remaining Arguments Lack Merit.

*First*, Qualcomm's discussion of individual Plaintiffs' purchases does not defeat certification as (1) each Plaintiff had at least one phone purchase whose legitimacy Qualcomm does not question and (2) Qualcomm's contention that post-2016 iPhone purchasers were not injured is mistaken. *See* § II, *supra*; Flamm Reply Decl. App'x B. *Second*, numerous courts have rejected Qualcomm's argument that an injunctive relief class cannot be certified under Rule 23(b)(2), and the same result is warranted here.[15] *Third*, Qualcomm fails to show why California law cannot be applied to the class as a whole. Nor has it satisfied applicable substantive and procedural rules with respect to seeking reconsideration of the Court's choice-of-law ruling made at the motion to dismiss stage, Dkt. 175 at 41-42, which is now law of the case. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (the "law of the case" doctrine generally precludes reconsideration of "an issue that has already been decided by the same court"); N.D. Cal. Civ. L.R. 7-9(a)-(b) (setting forth rules regarding motions for reconsideration).

For these reasons, Plaintiffs respectfully submit that the Court should certify the class.

---

[13] *See, e.g, In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 939 n.4 (9th Cir. 2011) (class with over 100 million purchases); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("nationwide class with millions of class members residing in fifty states").

[14] *See, e.g.*, *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052 (N.D. Cal. 2017) (Rule 23(b)(2) class appropriate given defendants' continuing market power and market concentration); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 693–94 (N.D. Ga. 1991) (class action the "only fair method of adjudication" for millions of plaintiffs) (citations omitted).

[15] *See also In re TFT-LCD*, 267 F.R.D. at 596 (certifying injunctive relief class where cartel operated in a market with high barriers to entry); *In re SRAM*, 264 F.R.D. at 611 (injunctive relief warranted because of "significant risk that the conspiracy will persist or reform in the future.").

| | | |
|---|---|---|
| 1 | Dated: September 6, 2018 | By: /s/ *Kalpana Srinivasan* |
| 2 | | Kalpana Srinivasan<br>Marc M. Seltzer |
| 3 | | Steven G. Sklaver<br>Amanda Bonn<br>Oleg Elkhunovich |
| 4 | | SUSMAN GODFREY L.L.P.<br>1901 Avenue of the Stars, Suite 950 |
| 5 | | Los Angeles, CA 90067<br>Telephone: (310) 789-3100 |
| 6 | | Facsimile:  (310) 789-3150<br>Email: ksrinivasan@susmangodfrey.com |
| 7 | | Email: mseltzer@susmangodfrey.com<br>Email: ssklaver@susmangodfrey.com<br>Email: abonn@susmangodfrey.com |
| 8 | | Email: oelkhunovich@susmangodfrey.com |
| 9 | | Joseph Grinstein (*pro hac vice*)<br>SUSMAN GODFREY L.L.P. |
| 10 | | 1000 Louisiana Street, Suite 5100<br>Houston, TX 77002 |
| 11 | | Telephone: (713) 651-9366<br>Facsimile:  (713) 654-6666 |
| 12 | | Email: jgrinstein@susmangodfrey.com |
| 13 | | By: /s/ *Joseph W. Cotchett*<br>Joseph W. Cotchett |
| 14 | | Adam J. Zapala<br>Brian Danitz<br>Mark F. Ram |
| 15 | | Michael Montano<br>Toriana S. Holmes |
| 16 | | COTCHETT, PITRE & McCARTHY<br>840 Malcolm Road, Suite 200 |
| 17 | | Burlingame, CA 94010<br>Telephone: (650) 697-6000 |
| 18 | | Facsimile: (650) 697-0577<br>Email: swilliams@cpmlegal.com |
| 19 | | Email: jcotchett@cpmlegal.com<br>Email: azapala@cpmlegal.com<br>Email: bdanitz@cpmlegal.com |
| 20 | | Email: mram@cpmlegal.com<br>Email: mmontano@cpmlegal.com |
| 21 | | Email: tholmes@cpmlegal.com |
| 22 | | ***Plaintiffs' Co-Lead Counsel*** |
| 23 | | By: /s/ *Steve W. Berman*<br>Steve W. Berman |
| 24 | | HAGENS BERMAN SOBOL SHAPIRO LLP<br>1918 Eighth Avenue, Suite 3300 |
| 25 | | Seattle, WA 98101<br>Telephone: (206) 268-9320 |
| 26 | | Facsimile: (206) 623-0594<br>Email: steve@hbsslaw.com |
| 27 | | ***Plaintiffs' Steering Committee*** |
| 28 | | |

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION