Kalpana Srinivasan (237460)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, 14th Floor
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
Email: ksrinivasan@susmangodfrey.com

Joseph W. Cotchett (36324)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: jcotchett@cpmlegal.com

*Plaintiffs' Interim Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 17-md-2773-JSC |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANT QUALCOMM INCORPORATED'S MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| This Document Relates To: | |
| ALL ACTIONS | Date: November 15, 2022<br>Time: 9:00 a.m.<br>Dept.: Courtroom 8, 19th Floor<br>Judge: Hon. Jacqueline Scott Corley |
| | Trial Date: TBD |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 1

II.  ARGUMENT ..................................................................... 5

     A.   The *FTC* Decision Does Not Dictate the Result of Plaintiffs' State-Law
          Claims Under the Doctrines of Res Judicata, Collateral Estoppel, or
          *Stare Decisis*. ....................................................... 5

     B.   Plaintiffs State Plausible Claims Under the Cartwright Act. ............ 7

          1.   The Cartwright Act is "Broader and Deeper" than the Sherman
               Act. ............................................................. 7

          2.   Plaintiffs Adequately Allege a Cartwright Act Claim. ........... 10

               a.   Plaintiffs' Factual Allegations Must Be Evaluated as a
                    Whole. ..................................................... 10

               b.   Plaintiffs' Tying and Exclusive Dealing Allegations State
                    a Claim in Light of *Cipro* and *Fisherman's Wharf*. ....... 13

               c.   Plaintiffs Allege Anticompetitive Harm in the Tying and
                    Tied Markets. .............................................. 13

               d.   The *FTC* Decision Does Not Require a Different Result. ..... 16

     C.   Plaintiffs State a Claim Under the UCL. ............................... 19

          1.   Plaintiffs adequately plead a derivative "unlawful" prong claim. ... 20

          2.   Plaintiffs adequately plead a UCL claim under the "unfair"
               prong. .......................................................... 20

               a.   The fate of Plaintiffs' UCL unfair prong claim does not
                    depend on whether Plaintiffs adequately allege a
                    Cartwright Act claim. ...................................... 20

               b.   Qualcomm's conduct satisfies all three tests for
                    unfairness under the UCL. .................................. 22

          3.   Plaintiffs adequately plead a UCL claim under the "fraudulent"
               prong. .......................................................... 24

III. CONCLUSION ................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  2011 WL 4948567 (N.D. Cal. Oct. 18, 2011)........................................................................... 9

*Arce v. Kaiser Found. Health Plan, Inc.*,
  181 Cal. App. 4th 471 (2010) ................................................................................................ 23

*Aryeh v. Canon Bus. Sols., Inc.*,
  55 Cal.4th 1185 (2013) ............................................................................................................ 8

*AT&T Mobility LLC v. AU Optronics Corp.*,
  707 F.3d 1106 (9th Cir. 2013)................................................................................................. 9

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ............................................................................................. 5, 17

*Brooks v. Bank of Am., N.A.*,
  2021 WL 1541643 (S.D. Cal. Apr. 20, 2021)....................................................................... 22

*Camacho v. Auto. Club of S. Cal.*,
  142 Cal. App. 4th 1394 (2006) .............................................................................................. 24

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tele. Co.*,
  20 Cal.4th 163 (1999) ................................................................................................ 20, 21, 23

*Cellular Plus, Inc. v. Superior Ct.*,
  14 Cal. App. 4th 1224 (1993) ................................................................................................ 10

*Cent. Valley Med. Grp., Inc. v. Indep. Physician Assocs. Med. Grp., Inc.*,
  2019 WL 3337891 (E.D. Cal. July 25, 2019) .................................................................. 20, 21

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) .................................................................................................. 21

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021) ............................................................................................. 5, 17

*City of San Jose v. Office of the Comm'r of Baseball*,
  776 F.3d 686 (9th Cir. 2015)................................................................................................. 21

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)............................................................................................................... 13

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*,
  4 Cal. 3d 842 (1971) .............................................................................................................. 13

iii

*County of Tuolumne v. Sonora Cmty. Hosp.*,
 236 F.3d 1148 (9th Cir. 2001)................................................................................ 9

*Darling v. Green*,
 2013 WL 11323320 (C.D. Cal. Sept. 25, 2013).................................................... 24

*Darush v. Revision LP ("Darush I")*,
 2013 WL 1749539 (C.D. Cal. Apr. 10, 2013) ........................................................ 9

*Darush v. Revision LP ("Darush II")*,
 2013 WL 12142621 (C.D. Cal. Aug. 28, 2013)...................................................... 9

*Dimidowich v. Bell & Howell*,
 803 F.2d 1473 (9th Cir. 1986)................................................................................ 7

*Eastman v. Quest Diagnostics*,
 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ........................................................ 9

*Epic Games, Inc. v. Apple Inc.*,
 559 F. Supp. 3d 898 (N.D. Cal. 2021), *injunction stayed pending appeal*, 2021
 WL 6755197 (9th Cir. Dec. 8, 2021) .................................................................... 21

*Epic Games, Inc. v. Apple, Inc.*,
 No. 21-16506 ........................................................................................................ 21

*Fisherman's Wharf Bay Cruise Corp. v. Superior Ct.*,
 114 Cal. App. 4th 309 (2003) .......................................................................*passim*

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
 55 Cal. App. 4th 381 (2020) ................................................................................. 17

*Forsyth v. Humana, Inc.*,
 114 F.3d 1467 (9th Cir. 1997)............................................................................... 16

*Freeman v. San Diego Ass'n of Realtors*,
 322 F.3d 1133 (9th Cir. 2003)............................................................................... 19

*Freeman v. San Diego Ass'n of Realtors*,
 77 Cal. App. 4th 171 (1999) ................................................................................. 19

*FTC v. Qualcomm, Inc.*,
 969 F.3d 974 (9th Cir. 2020).........................................................................*passim*

*Gainesville Inv., LLC v. Astronergy Solar, Inc.*,
 2022 WL 2818259 (C.D. Cal. July 18, 2022) ...................................................... 24

*Gately v. Massachusetts*,
 2 F.3d 1221 (1st Cir. 1993) ................................................................................... 6

*Gee v. Tenneco, Inc.*,
   615 F.2d 857 (9th Cir. 1980) ......................................................................................... 7

*Hemmings v. Tidyman's, Inc.*,
   285 F.3d 1174 (9th Cir. 2002) ....................................................................................... 7

*Hendricks v. Dynegy Power Mktg., Inc.*,
   160 F. Supp. 2d 1155 (S.D. Cal. 2001) ...................................................................... 20

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
   2016 WL 4087302 (S.D. Cal. Aug. 1, 2016) ........................................................ 21, 23

*In re Ambac Bond Ins. Cases*,
   2016 WL 661903 (Cal. Ct. App. Feb. 18, 2016) (unpublished) ............................... 21

*In re Automobile Antitrust Cases I & II*,
   1 Cal. App. 5th 127 (2016), *rev. denied* (Oct. 19, 2016) ....................... 4, 11, 12, 23

*In re Cal. Gasoline Spot Market Antitrust Litig.*,
   2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) .............................................................. 8

*In re Cipro Cases I & II*,
   61 Cal. 4th 116 (2015) ......................................................................................... *passim*

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
   958 F.3d 1239 (9th Cir. 2020) ................................................................................... 5, 6

*In re Osborne*,
   76 F.3d 306 (9th Cir. 1996) ......................................................................................... 6

*In re Qualcomm Antitrust Litig.*,
   328 F.R.D. 280 (N.D. Cal. 2018) ................................................................................. 8

*Intel Corp. v. Fortress Inv. Grp. LLC*,
   2020 WL 1983487 (N.D. Cal. Mar. 19, 2020) ........................................................... 22

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ...................................................................................... 10

*Korea Kumho Petrochem. v. Flexsys Am. L.P.*,
   2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ........................................................ 5, 20

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) .......................................................................................... 22, 25

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ..................................................................................................... 9

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ...................................................................................... 18

*Littlejohn v. United States*,
  321 F.3d 915 (9th Cir. 2003) ................................................................................ 5

*LLC v. Nat'l Assoc. of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ................................................................................. 8

*Loeffler v. Target Corp.*,
  58 Cal.4th 1081 (2014) ......................................................................................... 20

*Lona's Lil Eats, LLC v. DoorDash, Inc.*,
  2021 WL 151978 (N.D. Cal. Jan. 18, 2021) ........................................................ 25

*Lorenzo v. Qualcomm, Inc.*,
  2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) ...................................................... 25

*Lozano v. AT&T Wireless Servs.*,
  504 F.3d 718 (9th Cir. 2007) ................................................................................ 23

*McAdams v. Monier, Inc.*,
  182 Cal. App. 4th 174 (2010) ............................................................................... 24

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .............................................................................. 16

*Microsoft Corp. v. Motorola, Inc.*,
  864 F. Supp. 2d 1023 (W.D. Wash. 2012) ...................................................... 23, 25

*Multistate Legal Stud., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*,
  63 F.3d 1540 (10th Cir. 1995) .............................................................................. 16

*Name.Space v. ICANN*,
  795 F.3d 1124 (9th Cir. 2015) ................................................................................ 8

*Pacific Bell Tel. Co. v. linkLine Communications*,
  555 U.S. 438 (2009) ......................................................................................... 17, 18

*Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
  814 F.2d 358 (7th Cir. 1987) ................................................................................ 19

*Royal Primo Corp. v. Whitewater W. Indus., Ltd*,
  2016 WL 4080177 (N.D. Cal. July 29, 2016) ...................................................... 25

*Sam Fox Pub. Co. v. United States*,
  366 U.S. 683 (1961) ................................................................................................ 5

*Schnall v. Hertz Corp.*,
  78 Cal.App.4th 1144 (2000) .................................................................................. 20

vi

*Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
    552 F.Supp.3d 901 (N.D. Cal. 2021) ................................................................. 25

*Sidibe v. Sutter Health*,
    No. 3:12-cv-4854-LB, ECF No. 1530 (Verdict Form) (N.D. Cal. Mar. 11,
    2022) ................................................................................................................. 9

*State of California ex. rel. Van de Kamp v. Texaco*,
    46 Cal.3d 1147 (1988) ....................................................................................... 8

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) .......................................................................... 6, 7

*TCL Commn's Tech. Holdings v. Telefonaktiebolaget LM Ericsson*,
    2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) ..................................................... 25

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*,
    169 Cal. App. 4th 357 (2008) ........................................................................... 13

*UFCW & Emps. Benefit Trust v. Sutter Health*,
    No. CGC-14-538451, 2019 WL 2372274 (Cal. Super. Ct. Mar. 14, 2019) .......... 9

*Universal Grading v. eBay*,
    563 F. App'x 571 (9th Cir. 2014) ....................................................................... 8

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ........................................................................ 20, 24

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .............................................................................. 17

*Zhang v. Superior Ct.*,
    57 Cal.4th 364 (2013) ....................................................................................... 24

**Statutes**

California Business & Professions Code Section 17043 ............................................. 10

California's Cartwright Act and Unfair Competition ........................................... *passim*

Sherman Act ..................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................ 24

**Other Authorities**

Wright & Miller, 5A FED. PRAC. & PROC. CIV. § 1298 & n.22 (4th ed. Apr. 2022
    update) .............................................................................................................. 25

vii

Cal. Lawyers Ass'n, *Antitrust & Unfair Competition Law* (rev. Feb. 2022) ................................. 9

Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 397, 472-73 (2009) ............................................. 18

Einer Elhauge, *U.S. Antitrust Law & Economics* 466 (3d ed. 2018) ............................................. 3

Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952, 2005, 2020 (2021) ...................................................................................... 14

Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683 (2020)........................... 19

Herbert Hovenkamp, *Tying, Exclusivity, and Standard-Essential Patents*, 19 Colum. Sci & Tech. L. Rev. 79 (2017) .................................................................. 14

10918428v1/015494

## I.   **INTRODUCTION**

Qualcomm urges this Court to dismiss Plaintiffs' claims, contending they mirror those addressed in *FTC v. Qualcomm, Inc.*, 969 F.3d 974 (9th Cir. 2020). But Plaintiffs' allegations are undeniably based on different laws, different theories of anticompetitive harm, a different factual record, and different legal standards. Qualcomm concedes, as it must, that the *FTC* decision does not bar Plaintiffs' claims as a matter of "res judicata or collateral estoppel." It thus falls back on a theory that the *FTC* decision is *stare decisis*. But while the *FTC* action was decided under the federal Sherman Act, Plaintiffs have amended their Complaint ("SAC") to plead claims *only* under California's Cartwright Act and Unfair Competition Law ("UCL") on behalf of California consumers. ECF No. 887. Qualcomm then pivots to the erroneous suggestion that standards for liability under the Cartwright Act and UCL are identical to those under the Sherman Act. This ignores binding authority holding that (1) the Cartwright Act makes illegal conduct that does not violate the Sherman Act and (2) the UCL makes illegal conduct that does not violate *either* antitrust law. *Infra* § 2.B.II (citing cases).

Tellingly, Qualcomm mentions the California Supreme Court's decision in *In re Cipro Cases I &II*, 61 Cal. 4th 116 (2015), only in passing. MTD 3. *Cipro* held that the U.S. Supreme Court's decisions regarding the intersection of patent and antitrust law are "not dispositive on matters of state law" and do not "dictate how the Cartwright Act must be read." 61 Cal. 4th at 142. Directly contrary to the *FTC* decision, *Cipro* held that, under the Cartwright Act, the "abuse of patent rights may *also* run afoul of the antitrust law," and the "scope of the patent test" is not the law of California. *Id.* at 145, 150. *Cipro* held that a "reverse payment patent settlement" agreement could give rise to antitrust liability under the Cartwright Act because an "agreement to exchange consideration for elimination of any portion of the period of competition that would have been expected had the patent been litigated is a violation of the Cartwright Act." *Id.* at 150-51. Plaintiffs' allegations plausibly state a claim in light of *Cipro*. Qualcomm's assertion that Plaintiffs merely amended the SAC to "remove" references to the FTC's complaint ignores the fact that Plaintiffs' claims arise under a different body of laws and completely elides Plaintiffs' different factual allegations—based on years

1  of developing a different substantive record—explaining why their state-law claims are actionable

2  under California law and not foreclosed by the *FTC* decision.

3      NLNC Tying: Plaintiffs allege Qualcomm's NLNC policy is unlawful tying under California

4  law—a legal framework for evaluating anticompetitive conduct and effects—that Qualcomm

5  concedes the FTC never alleged under federal antitrust law. MTD 3. Plaintiffs allege Qualcomm had

6  market power in the markets for the tying products, namely CDMA and Premium LTE chipsets, and

7  coerced OEMs to accept a supra-FRAND license in the tied market for Qualcomm's Standard

8  Essential Patents or "SEPs." SAC ¶¶ 2, 55, 58-60, 78-86. More specifically, Qualcomm coerced

9  OEMs to:

10  • Buy a separate, supra-FRAND license to Qualcomm's entire 3G and 4G SEP portfolio
11    (not only for CDMA and Premium LTE, but also for WCDMA/UMTS and non-Premium LTE technology);

12  • Pay substantial, supra-FRAND royalties representing several *multiples* of a FRAND
13    rate, calculated as a percentage of the entire price of the phone, regardless of whether the phone used Qualcomm's chips or a competitors';

14  • Forego the right to litigate Qualcomm's failure to license on FRAND terms or whether
15    Qualcomm's patents were valid, essential, infringed, and not exhausted by the sale of Qualcomm's chips.

16  *Id.* ¶¶ 2, 15, 64, 76. Qualcomm's simultaneous refusal to license chipset competitors pursuant to its

17  FRAND commitments strengthened the tie's effectiveness: had Qualcomm done so in a but-for

18  world, chipset competitors would have received a license calculated on the price of the chipset rather

19  than the phone, passing the savings to OEMs and ultimately consumers. *Id.* ¶¶ 18, 193-94. Instead,

20  Qualcomm's supra-competitive royalties amounted to billions of dollars, 93% of which were passed

21  on to consumer class members in the form of higher device prices. *Id.* ¶¶ 21, 198, 212, 241.

22      Exclusive Dealing: Qualcomm used its profits from the supra-FRAND royalties to offer so-

23  called "marketing incentives" or "rebates" to OEMs in exchange for exclusivity or near-exclusivity.

24  *Id.* ¶ 72. Although Qualcomm labels these payments as "incentives" or "rebates," they are not true

25  discounts but are rather "***penalties*** for non-exclusivity." *Id.* ¶¶ 16, 73, 153. As Plaintiffs explain—

26  and as supported by the expert analysis of Professor Einer Elhauge—a true loyalty "discount" offers

27  customers a "reduction from the price that would have been charged without the loyalty condition,"

28  while a disloyalty penalty "threatens disloyal customers with higher prices than they would have

paid without the loyalty program." *Id.* ¶ 73; *accord* Einer Elhauge, *U.S. Antitrust Law & Economics* 466 (3d ed. 2018). Here, there was no discount: Qualcomm's prices for its chips and royalties (and thus the "all-in" chipset price) were supra-competitive, and the evidence dispels any claim that a change in Qualcomm's royalty rates would have been offset by an opposing change in Qualcomm's chipset prices under the "single monopoly profit" theory. *Id.* ¶¶ 74-75, 199, 201.

<u>Harm to Competition</u>: Qualcomm's conduct caused anticompetitive effects in the tied market for Qualcomm's SEPs similar to those the California Supreme Court found unlawful in *Cipro*. In *Cipro*, the Court held that "[a]n agreement to exchange consideration for elimination of any portion of the period of competition that would have been expected had a patent been litigated is a violation of the Cartwright Act." *Cipro*, 61 Cal. 4th at 150. In this action, Plaintiffs' allegations describe the same anticompetitive effect in the tied market: that Qualcomm's tie "allow[ed] weak patents to offer the exact same" (or, worse, an even greater) "exclusionary potential and monopoly possibilities as strong ones," substituting "consensual monopoly in place of potential competition that would have followed" litigation regarding invalidity or noninfringement, FRAND royalty rates, exhaustion, or essentiality. *Cf. id.* at 130, 150-51; SAC ¶¶ 2, 15, 60, 235. As paragraph 74 of the SAC illustrates, Qualcomm's artificial insulation of its patents from challenge enabled Qualcomm to charge a greater "all-in" price for its modem chips, passing on the overcharges to consumers buying cellular devices. Had Qualcomm charged a monopoly chipset price and a FRAND royalty, it would face a threat from the competitor's "all in" price. Qualcomm avoids such competition by (1) using its chipset monopolies to coerce OEMs to pay supra-FRAND royalties regardless of who supplies the chips while (2) providing so-called "rebates" only when OEMs use Qualcomm's chips. *Id.* ¶¶ 74-75.

Plaintiffs' allegations state a plausible Cartwright Act claim. Although a business may "develop monopoly power" through "the superiority of its product or business acumen," it may not "maintain that power through agreement and combination with others" that provides "an enclave free from the danger of outside incursions in which to exercise monopoly power and extract monopoly premiums." *Cipro*, 61 Cal. 4th at 149 (cleaned up). California's "[a]ntitrust law condemns a patentee's payment to maintain supra-competitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market." *Id.* All the more so here,

1  where Qualcomm accomplished the same end coercively "through a combination of written

2  exclusive dealing contracts and exclusive dealing arrangements implied through its other unlawful

3  practices (illegal tie-ins and unfair pricing discrimination)." *Fisherman's Wharf Bay Cruise Corp.*

4  *v. Superior Ct.*, 114 Cal. App. 4th 309, 335-37 (2003).

5      Qualcomm's attempt to avoid this conclusion by relying on the *FTC* decision is to no avail.

6  The *FTC* decision expressly considered Qualcomm's NLNC policy in isolation from Qualcomm's

7  other alleged conduct. *FTC*, 969 F.3d at 993. As to the NLNC policy standing alone, the Court found

8  that (1) it "raises the 'all-in' price that an OEM must pay for modem chips (chipset + licensing

9  royalties) regardless of which chip supplier the OEM chooses to source its chips from"; (2) "whether

10  that all-in price is reasonable or unreasonable is an issue that sounds in patent law, not antitrust law";

11  and (3) "it involves potential harms to Qualcomm's *customers*, not its competitors" and thus fails to

12  show harm to competition "in the relevant antitrust markets." *Id.* at 1002. When separately

13  considering Qualcomm's practices in the chipset markets, standing alone, the Court found that the

14  FTC alleged Qualcomm charged "ultralow prices on its own modem chips," without establishing

15  "predatory" or "below-cost" pricing. *Id.*

16      By contrast, such restraints would not be considered in isolation under the Cartwright Act,

17  as the "character and effect" of Qualcomm's conduct "are not to be judged by dismembering it and

18  viewing its separate parts, but only by looking at it as a whole." *In re Automobile Antitrust Cases I*

19  *& II*, 1 Cal. App. 5th 127, 152 (2016) (cleaned up), *rev. denied* (Oct. 19, 2016). Plaintiffs do not

20  allege that Qualcomm charged "ultralow" prices for its chipsets. Instead, Plaintiffs' SAC plausibly

21  explains how the *combination* of Qualcomm's NLNC tie and exclusive dealing arrangements raise

22  rivals' costs, insulating Qualcomm from competition and increasing prices in *both* the tying and

23  tied markets. The California Supreme Court would not immunize such practices from antitrust

24  scrutiny merely because Qualcomm's anticompetitive conduct involves the assertion of patent

25  rights and potential breaches of contractual obligations. *Cipro*, 61 Cal. 4th at 145. And contrary to

26  *FTC*'s dicta that increased prices to OEMs and consumers failed to show harm to competition, the

27  Ninth Circuit itself has more recently held otherwise: Because the "principal objective of antitrust

28  policy is to maximize *consumer* welfare… increased prices" paid by customers are "precisely the

1   kinds of harms to competition that the antitrust laws were intended to prevent." *City of Oakland v.*

2   *Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021); *Aya Healthcare Servs., Inc. v. AMN*

3   *Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) (holding "increased prices" to customers

4   constitute "direct evidence of harm to competition"). The same is true under *Cipro*.  61 Cal. 4th at

5   136 (the Cartwright Act's "principal goal is the preservation of consumer welfare").

6        Qualcomm's suggestion that plaintiffs' UCL claim rises and falls with the Cartwright Act

7   claim is equally wrong. "An act need not violate the antitrust laws to be … unfair." *Korea Kumho*

8   *Petrochem. v. Flexsys Am. L.P.*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (dismissing

9   Cartwright Act claim but not UCL unfair claim). Plaintiffs allege how Qualcomm's practices are

10  unfair because Qualcomm systematically violated those commitments by coercing customers to pay

11  supra-FRAND prices, in violation of antitrust laws. And Plaintiffs detail how Qualcomm routinely

12  gave false FRAND-related assurances to standard setting organizations to consumers' detriment.

13  Qualcomm's suggestion that plaintiffs must plead reliance to allege fraudulent conduct improperly

14  conflates *causation* and *reliance*; plaintiffs unquestionably allege they suffered harm "as a result of"

15  Qualcomm's fraudulent misrepresentations.

16       Plaintiffs respectfully submit that the Court should deny Qualcomm's motion in its entirety.[1]

17  **II.   ARGUMENT**

18      **A.   The *FTC* Decision Does Not Dictate the Result of Plaintiffs' State-Law Claims**
         **Under the Doctrines of Res Judicata, Collateral Estoppel, or *Stare Decisis*.**

19

20       The *FTC* decision does not bar Plaintiffs' claims as a matter of "res judicata or collateral

21  estoppel." MTD 7. Neither doctrine applies, as Plaintiffs' state-law claims were not at issue (let

22  alone actually decided) in the *FTC* case, and Plaintiffs are not in privity with the FTC.[2] That would

23  be true even if Plaintiffs asserted federal claims. *Sam Fox Pub. Co. v. United States*, 366 U.S. 683,

---

[1] Plaintiffs have attached the expert reports of Einer Elhauge and Robert Akl as Exhibits A-C to the
Declaration of Kalpana Srinivasan filed concurrently with this opposition brief. These expert
reports include material that Plaintiffs referenced in the SAC and could allege in an amended
complaint should the Court find further allegations are warranted.

[2] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239,
1255 (9th Cir. 2020) ("*NCAA*") (res judicata requires "identity of claims" and "identity or privity
between the parties"); *Littlejohn v. United States*, 321 F.3d 915, 924 & n.10 (9th Cir. 2003)
(collateral estoppel or issue preclusion requires the prior litigation to involve "the same parties,"
that the issues be "identical," and that the issues have been "actually litigated in the prior action").

689 (1961) ("a person whose private interests coincide with the public interest in government antitrust action is [] not bound by the eventuality of such litigation").

Instead, Qualcomm contends that *Stromberg* "recognized" that "the issues the *FTC* opinion decided were legal in nature" and, thus, "*stare decisis*" bars Plaintiffs' claims. MTD 7. Qualcomm is mistaken. *Stare decisis* applies only where a court has "furnished the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hierarchy." *In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996). "As *stare decisis* is concerned with rules of law, however, a decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record." *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993).

Although the Ninth Circuit observed generally in *Stromberg* that "many of our conclusions in *FTC v. Qualcomm* were conclusions of law," that does not dispose of the question here. The Ninth Circuit did not hold that any legal conclusions under federal law govern Plaintiffs' state-law claims or that Plaintiffs are precluded from developing a different factual record that would dictate a different outcome in this case, given the Ninth Circuit's recognition in subsequent decisions that "antitrust decisions are particularly fact bound."[3] *Id.* at 1074; *accord NCAA*, 958 F.3d at 1253 (cited *supra* at n.1). In this case, both the law and evidence differ materially from *FTC*, as shown below.

In support of its *stare decisis* argument, Qualcomm repeatedly chastises Plaintiffs for having failed to identify an "extraordinary" enough difference between this case and *FTC v. Qualcomm* to justify the continuation of this litigation. Yet Qualcomm never defines what "extraordinary" means. Fortunately, the Ninth Circuit did: "there would have to be some extraordinary difference for Plaintiffs' claims here to not fail as a matter of law—for instance, differences between Sherman Act claims brought by the government versus private parties, differences between Sherman Act analysis

---

[3] As one example, the Ninth Circuit in *FTC* concluded Qualcomm's royalties were not anti-competitive, in part, because Qualcomm's royalties need not "precisely reflect a patent's current, intrinsic value . . . ." 969 F.3d at 999. Here, Plaintiffs do not argue a mere mismatch of royalty rates to "intrinsic value." Plaintiffs have developed a different record that shows that Qualcomm charged up to two to three times what a FRAND royalty would have been for certain OEMs, resulting in billions of dollars of overcharges. SAC ¶¶ 21, 76. Plaintiffs also rely on a complete census prepared by Dr. Robert Akl, which was not complete at the time expert reports were due in FTC. Dr. Akl found substantial numbers of Qualcomm's patents were not essential, embodied at the chipset level, and were expiring.

and other state laws that might apply, or difference in Plaintiffs' ability to meet their burden of proof under the rule of reason." *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021). To the Ninth Circuit, therefore, a difference between the Sherman Act and the Cartwright Act (an "other state law[]") is an "extraordinary" enough reason for this case to proceed. Qualcomm implies the difference between the Sherman Act and the Cartwright Act must itself be "extraordinary" – whatever that means. But the Ninth Circuit did not say that; if there is a difference here between state and federal law, that satisfies the Ninth Circuit's demand.

### B.   Plaintiffs State Plausible Claims Under the Cartwright Act.

#### 1.   The Cartwright Act is "Broader and Deeper" than the Sherman Act.

The California Supreme Court, not the Ninth Circuit, is the final arbiter in interpreting the Cartwright Act. "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). This Court is "bound by the pronouncements of the state's highest court," and "[i]f the particular issue has not been decided," must "predict how the state's highest court would resolve it." *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002) (citations omitted); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (permitting federal court to "look[] for 'guidance' to decisions by intermediate appellate courts of the state" where the highest court has not decided an issue). The Court considers "existing state law without predicting potential changes in that law." *Hemmings*, 285 F.3d at 1203.

Qualcomm admits the Cartwright Act is "broader and deeper" than the Sherman Act. MTD 3. But in its only discussion of *Cipro*, Qualcomm claims this is of no moment, since "[s]tate antitrust law is 'fully compatible with federal law.'" MTD 3 (quoting *Cipro*, 61 Cal. 4th at 160). Qualcomm's selective quotation omits *Cipro*'s further pronouncement that the Cartwright Act's "greater domain" poses no preemption or "supremacy clause problems." *Cipro*, 61 Cal. 4th at 1160 (citing *California v. ARC Am.*, 490 U.S. 93, 102 (1989)). Qualcomm erroneously suggests that (1) dismissal of a Sherman Act claim necessitates dismissal of a Cartwright Act claim; because (2) the *only* difference between the two statutes is that the Cartwright Act permits "indirect purchaser" suits; and (3)

7

1    "substantive" standards for anticompetitive conduct under "California and federal antitrust laws are

2    identical." MTD 7. Qualcomm is incorrect on all three counts.

3        *First*, contrary to Qualcomm's erroneous suggestion that the absence of a Sherman Act claim

4    means a Cartwright Act claim necessarily fails (MTD 10), the Ninth Circuit has held otherwise. In

5    *Samsung v. Panasonic*, a case not mentioned by Qualcomm, the Ninth Circuit held it was reversible

6    error for the district court to dismiss a "Cartwright Act claim" on the grounds that "interpretation of

7    California's antitrust statute [is] coextensive with the Sherman Act" because "[t]his is no longer the

8    law in California." 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (citing *Aryeh v. Canon Bus. Sols., Inc.*,

9    55 Cal.4th 1185, 1195 (2013)). For over three decades, the California Supreme Court has recognized

10   that the Cartwright Act, first enacted in 1907, did *not* take the federal Sherman Act as its model but

11   instead was "patterned closely after the original 1889 Texas act and its progeny, most notably the

12   1899 Michigan act." *State of California ex. rel. Van de Kamp v. Texaco*, 46 Cal.3d 1147, 1161

13   (1988) ("*Texaco*"). Thus, "[i]nterpretations of federal antitrust law are at most instructive, not

14   conclusive, when construing the Cartwright Act." *Aryeh*, 55 Cal. 4th at 1195 (citing *Texaco*).

15       *Second*, Qualcomm's cited cases are inapposite or have been overruled. *Name.Space v.

16   ICANN*, 795 F.3d 1124, 1131 & n.5 (9th Cir. 2015), stands for the unremarkable proposition that

17   courts do not "infer a conspiracy based on speculation" under either the Sherman Act or the

18   Cartwright Act. Qualcomm cites the finding from *Universal Grading v. eBay*, 563 F. App'x 571,

19   573 (9th Cir. 2014) (mem. disp.), that "derivative" state-law claims based on the Sherman Act were

20   subject to dismissal. Whatever the Court meant by "derivative," it does not mean that *all* Cartwright

21   Act claims are derivative of Sherman Act claims, since the Ninth Circuit decided *Samsung v.

22   Panasonic* three weeks later. Qualcomm cites cases finding that where a Sherman Act claim

23   *survives*, so, too, will claims under the broader Cartwright Act.[4] But merely because adequately

24   pleading a Sherman Act violation means that a claim will necessarily be stated under the "broader

25

26   ─────────────────
     [4] *See PLS.com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 831-32 (9th Cir. 2022) (holding
27   plaintiff adequately alleged a violation of the Sherman Act, and, therefore, the Cartwright Act); *In
     re Cal. Gasoline Spot Market Antitrust Litig.*, 2021 WL 1176645, at *2, 6 (N.D. Cal. Mar. 29, 2021)
28   (holding allegations showing a Sherman Act violation sufficed to show a Cartwright Act violation);
     *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 296 (N.D. Cal. 2018) (same).

and deeper" Cartwright Act, does not mean it is *necessary* to do so. Cases that erroneously state otherwise—or where parties erroneously *conceded* this to be so—do not aid Qualcomm's position.[5]

*Third*, Qualcomm cites no authority for the proposition that the Cartwright Act's repeal of *Illinois Brick*'s bar on indirect purchaser suits for damages is its *only* substantive difference from the Sherman Act. Numerous other differences abound. *See* Cal. Lawyers Ass'n, *Antitrust & Unfair Competition Law* (rev. Feb. 2022) (discussing differences in origin and interpretation between Sherman and Cartwright Acts). For instance, the Cartwright Act "reaches beyond the Sherman Act to threats of competition in their incipiency." *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110 (9th Cir. 2013) (citing *Cianci v. Superior Ct.*, 40 Cal. 3d 903, 918 (1985) (noting the Cartwright Act "goes beyond 'clear-cut menaces to competition' in order to deal with merely 'ephemeral possibilities'")). In another example, vertical minimum resale price maintenance is a *per se* violation of the Cartwright Act, whereas the Sherman Act evaluates such restraints under the Rule of Reason.[6] And in yet another recent instance, antitrust claims brought against Sutter Health in federal court under the Sherman Act failed on the merits, while claims brought in state court under the Cartwright Act and UCL resulted in (a) an order denying summary adjudication and allowing the claims to proceed to trial followed by (b) a $575 million dollar settlement including 10 years of broad injunctive relief. *Compare Sidibe v. Sutter Health*, No. 3:12-cv-4854-LB, ECF No. 1530 (Verdict Form) (N.D. Cal. Mar. 11, 2022), *with UFCW & Emps. Benefit Trust v. Sutter Health*, No. CGC-14-538451, 2019 WL 2372274 (Cal. Super. Ct. Mar. 14, 2019) (order denying motion for summary adjudication), *and id.*, 2021 WL 5027178 (Cal. Super. Ct. Aug, 27, 2021) (final judgment). "[N]either the Sherman Act nor the Commerce Clause" preempts these

---

[5] *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (pre-*Samsung* case erroneously stating "[t]he analysis under California's antitrust laws mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act"); *Eastman v. Quest Diagnostics*, 2016 WL 1640465, at *6 (N.D. Cal. Apr. 26, 2016) (resting on overruled *Tuolumne* decision, plus Plaintiffs' concession that their Sherman and Cartwright Act claims "rise and fall together"); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 2011 WL 4948567 at *7 n.7 (N.D. Cal. Oct. 18, 2011) (pre-*Samsung* case where "parties agree[d]" Apple's Cartwright Act and § 1 claims "require the same showings").

[6] *Darush v. Revision LP ("Darush I")*, 2013 WL 1749539, at *6 (C.D. Cal. Apr. 10, 2013) (holding California Supreme Court precedent made such arrangements "*per se* unlawful," despite contrary decision under Sherman Act in *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007); *see also Darush v. Revision LP ("Darush II")*, 2013 WL 12142621, at *2-3 (C.D. Cal. Aug. 28, 2013) (same).

9

10918428v1/015494

1    differences in California state antitrust law. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d

2    979, 993 (9th Cir. 2000); *Cellular Plus, Inc. v. Superior Ct.*, 14 Cal. App. 4th 1224, 1241-42

3    (1993).[7]

4           Of particular relevance here, the California Supreme Court has already signaled it would not

5    agree with *FTC* that "the remedy for breaching a FRAND commitment" necessarily rests in

6    "contract and patent law," not "antitrust liability." MTD 17 (quoting *FTC*, 969 F.3d at 1005). As

7    discussed in Part I above, the California Supreme Court in *Cipro* held that "abuse of patent rights

8    may *also* run afoul of antitrust law" under the Cartwright Act, rejecting the "scope of the patent test"

9    that "insulates from antitrust scrutiny virtually any agreement that restrains trade no more than the

10   patent itself would have, if valid." *Id.* at 145. Instead, *Cipro* held that the Cartwright Act's "method

11   of analysis" for "assess[ing] anticompetitive harm" from restraints related to patent rights "is not

12   materially different from that applied in any other garden-variety antitrust case."[8] *Id.*

    **2.    Plaintiffs Adequately Allege a Cartwright Act Claim.**

13          The California Supreme Court's unanimous decision in *Cipro* demonstrates Plaintiffs have

14   pled a viable Cartwright Act claim. Because Qualcomm cannot square its argument that Plaintiffs'

15   claims are subject to dismissal with *Cipro*, it largely chooses to ignore it—even though Plaintiffs

16   have repeatedly invoked *Cipro* in briefing and the SAC itself. SAC ¶ 5; ECF No. 881 (Joint

17   Statement) at 3, 4; Case No. 19-15159, ECF No. 210, at 4, 11, 18-20, 22, 25. Qualcomm's further

18   attempt to break Plaintiffs' claims up into constituent pieces and attack each one separately and in

19   isolation from each other under the wrong legal standards fails to justify dismissal.

20          a.    Plaintiffs' Factual Allegations Must Be Evaluated as a Whole.

21          As an initial matter, Qualcomm improperly invites the Court to segregate Plaintiffs' claim

22   into "three alleged bases" and to separately evaluate each one, and its alleged anticompetitive

23

24   ───────────────
     [7] Section 17043 of the California Business & Professions Code is another example of how
25   California competition law differs materially from federal law. Because Section 17043 defines
     "below cost" sales differently than federal law, it provides a basis of liability under state law where
     predatory pricing could not otherwise be shown under the Sherman Act.
26   [8] In *Cipro*, the California Supreme Court adopted the U.S. Supreme Court's decision in *FTC v.
     Actavis* only to "the extent to which its analysis establishes the metes and bounds of patent law and
27   policy," of which the U.S. Supreme Court is the "final arbiter." 61 Cal. 4th at 142. The California
     Supreme Court was clear that "*Actavis* is not dispositive on matters of state law" and "would not
28   dictate how the Cartwright Act must be read." *Id.*

effects, in isolation. MTD 10. According to Qualcomm, these three separate "bases" are (1) a stand-alone claim that Qualcomm's refusal to license chipset competitors violates the antitrust laws; (2) an exclusive dealing claim solely with respect to Apple; and (3) a tying challenge to the NLNC policy. MTD 10-11. Qualcomm misstates both the nature of Plaintiffs' allegations and how the California Supreme Court evaluates such allegations under the Cartwright Act.

As shown in Part I above, Plaintiffs allege that Qualcomm's NLNC tie imposed supra-FRAND licenses on OEMs regardless of whose chipsets they used and in violation of its contractual FRAND commitments. SAC ¶¶ 71-77. The supra-FRAND component of the resulting royalties raised OEMs' "all in" costs of using either Qualcomm or its competitors' chipsets above prices that would have prevailed in a "but-for" world in which Qualcomm (1) could charge a monopoly, but profit-maximizing price for its chipsets and (2) could not coerce OEMs into taking a supra-FRAND license rather than litigating its right to obtain a FRAND one. One reason this tie was *effective* is that Qualcomm *also* refused to exhaustively license its chipset competitors (which, in a but-for world, would have resulted in lower royalties calculated on the price of a chipset being passed through to OEMs).[9] While Qualcomm was thereby able to raise its rivals' costs, Qualcomm itself *collected* the supra-FRAND royalties, which it then used to fund its exclusivity arrangements not only with Apple but with nearly every other major OEM in the market. *Id.* ¶¶ 21, 77. Those exclusive dealing arrangements *in combination* foreclosed a substantial share of the chipset market, entrenching Qualcomm's monopoly and strengthening its ability to impose the NLNC tie.

Qualcomm attempts to break these elements apart and judge each in isolation (while also ignoring that Plaintiffs' exclusive dealing allegations are not limited to Apple). But California courts would not do so under the Cartwright Act, as plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *In re Automobile Antitrust Cases I & II*, 1 Cal. App. 5th at 152. "Thus, the

---

[9] Qualcomm's cases standing for the proposition that a mere refusal to license competitors, standing alone, would not violate an "antitrust duty to deal" therefore miss the point. MTD 10. For the reasons described in Parts II.B.2.b and D *infra* concerning Plaintiffs' UCL claim, California courts would hold that a FRAND commitment is a "legal provision" that gives rise to a duty to deal.

11

character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (cleaned up).

The Court of Appeal's decision in *Fisherman's Wharf*, 114 Cal. App. 4th at 336, is instructive. There, the California Court of Appeal reversed a grant of summary judgment under the Cartwright Act where (1) the defendant's "written exclusive dealing contracts with tour operators alone foreclosed as much as 20 percent of the wholesale market for bay cruise tours" and (2) the defendant "had *actually* foreclosed as much as *two-thirds* of the wholesale ticket market through a combination of these written exclusive dealing contracts and exclusive dealing arrangements implied through its other unlawful practices (illegal tie-ins and unfair pricing discrimination)." In doing so, the Court of Appeal overruled the trial court's conclusion that the "exclusive dealing claim, however, is an independent cause of action" that "must stand, if at all, on its own two feet." *Id.* Instead, the court held that "in assessing whether a 20-percent market foreclosure is substantial for purposes of the statute, courts must consider any other existing unique market factors which bear on the degree of residual competition between the parties remaining after the exclusive arrangements." *Id.* at 337.

In analyzing the combined effect of the various restraints, the court noted that:

- The defendant used its "monopoly power over the lucrative Alcatraz concession" as "leverage to gain exclusive wholesale cruise bay cruise business";

- The defendant already controlled "two-thirds" of the bay cruise market and, through exclusive dealing, could undermine its sole competitor in that market "by inhibiting the free choice of even 20 percent of tour operators"; and

- The "exclusive dealing agreements at issue foreclosed" the competitor "from a segment of the bay cruise market that plays a crucial role in its economic viability," thereby preventing the competitor from "cover[ing] its fixed operating costs" such that it "will eventually fail."

*Id.* at 338. Based on these *combined* effects on competition from the various restraints, "coupled with other factors present on this record," the Court of Appeal held that a trier of fact could "find a combination in unreasonable restraint of trade in violation of [Cartwright Act] section 16720." *Id.* The court further held that the trial court had improperly "focused solely on the fixed percentage of the market locked up through *written* exclusive dealing agreements," while ignoring evidence of other "tie-ins" and exclusive "arrangements" that "may have the practical effect of exclusivity, even

12

though not denominated exclusive." *Id.* at 338-39. In short, the Court of Appeal held the lower court erred in failing to consider the "full panoply" of "exclusionary conduct." *Id.* at 339. Plaintiffs respectfully submit the Court should decline Qualcomm's invitation to commit the same error here.[10]

          b.   Plaintiffs' Tying and Exclusive Dealing Allegations State a Claim in Light of *Cipro* and *Fisherman's Wharf.*

Under the Cartwright Act, "[t]ying arrangements are illegal per se whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856 (1971). The Cartwright Act sets forth a different express statutory framework for tying claims and has a more liberal test for finding a violation than the Sherman Act. *See UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008) (setting forth the elements of a tying claim under California law). Plaintiffs allege a unlawful restraint of trade under the Cartwright Act by pleading: "(1) a tying agreement, arrangement or condition [] whereby the sale of the tying product [or service] was linked to the sale of the tied product or service; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; (3) a substantial amount of sale was effected in the tied product; and (4) the complaining party sustained pecuniary loss as a consequence of the unlawful act." *Id.* Based on the facts discussed in Parts I and II.B.2.a, Plaintiffs have pled each of these elements.

          c.   Plaintiffs Allege Anticompetitive Harm in the Tying and Tied Markets.

*First*, with respect to Plaintiffs' allegations of exclusive dealing, Qualcomm's only argument is that the *FTC* decision found the Apple exclusive deal, standing alone, demonstrated insufficient foreclosure. MTD at 11. But Qualcomm ignores that Plaintiffs allege not only exclusive deals with Apple, but also with nearly every other major OEM. SAC ¶¶ 16, 72-73. As in *Fisherman's Wharf*, the anticompetitive effect of the Apple exclusive tie must be evaluated in combination with the foreclosure caused by Qualcomm's *other* anticompetitive conduct, including its exclusive arrangements with other OEMs *and* its NLNC tie. Plaintiffs allege that the combined effect of these

---

[10] *FTC* did not cite *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), which holds that plaintiffs must "be given the full benefit of their proof" without compartmentalizing claims. *Id.* at 699. In contrast, California law, consistent with *Continental Ore*, would evaluate how Qualcomm's restraints operated together to injure competition and consumers.

1  arrangements resulted in the near total exclusion of Qualcomm's competitors from the CDMA and
2  Premium LTE chipset markets.[11] *Id.* ¶¶ 16, 21-22.

3       *Second*, Qualcomm argues that because it has a monopoly in its own purported SEPs, a tie
4  that requires the purchase of a supra-FRAND license to its SEP portfolio cannot cause any
5  anticompetitive harm in the tied market. MTD 12-13. In doing so, Qualcomm relies on a series of
6  off-point cases that do not involve restraints involving patents[12] and *ignores* the *Cipro* decision.
7  Qualcomm's reasoning makes no sense in light of *Cipro*, in which the patentee drug manufacturer
8  *also* had a monopoly in its own patents. Yet the California Supreme Court held that an agreement
9  compensating generic rivals to forego *challenging* those patents could cause anticompetitive effects
10 in both the market for competing technologies and the market for the patented products: "An
11 agreement to exchange consideration for elimination of any portion of the period of competition that
12 would have been expected had a patent been litigated is a violation of the Cartwright Act." *Cipro*,
13 61 Cal.4th at 150. The court observed that in the but-for world absent such a reverse-settlement,
14 "one would expect rational parties that settle [patent litigation] to select a market entry point roughly
15 corresponding to their joint expectation as to when entry would have occurred, on average, if the
16 patent's validity and infringement had been fully litigated." *Id.* at 151. In so ruling, it noted that
17 Congress did not "grant inventors eternal monopolies; instead, it approved a scheme that
18 presumptively represents the appropriate balance between promoting innovation and allowing
19 competition." *Id.* at 155. Reverse-payment settlements that "may enable the parties to extend the

20

21 [11] Plaintiffs also rely on Prof. Elhauge's expert opinion that absent Qualcomm's exclusive deal with
   Apple, Intel's CDMA business would have advanced at least two years earlier and achieved more
22 scale and innovation in CDMA and premium-LTE chips. Srinivasan Decl., Ex. A (Elhauge Merits
   Report) ¶¶ 147-48. He further opines that although Intel was finally able to begin supplying Apple,
   it was a less efficient competitor than it would have been in a but-for world. *Id.* ¶¶ 153-58.
23 [12] A thorough discussion of many of these distinguishable cases, in which there is "zero foreclosure"
   due to a lack of "rival sellers" may be found in Areeda & Hovenkamp, *supra*, ¶ 1723. The same
24 treatise explains in detail why the conduct described in *FTC v. Qualcomm* demonstrates
   anticompetitive effects rather than "zero foreclosure." *Id.* ¶ 1780c. Given the California Supreme
25 Court's express reliance on this treatise, along with Prof. Hovenkamp's other writings on the
   intersection of antitrust and patent law in *Cipro*, 61 Cal.4th at 643, there is good reason to think it
26 would find Qualcomm's tying arrangements caused anticompetitive effects. *See also* Herbert
   Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952, 2005, 2020 (2021) (criticizing
27 the *FTC* decision on grounds the California Supreme Court would likely find persuasive); Herbert
   Hovenkamp, *Tying, Exclusivity, and Standard-Essential Patents*, 19 Colum. Sci & Tech. L. Rev. 79
28 (2017) (explaining why Qualcomm's alleged conduct establishes harm to competition).

monopoly beyond that point" cause anticompetitive effects, as "insufficient scrutiny of such settlements has the potential to hamper innovation by allowing weak patents to offer the exact same exclusionary potential and monopoly possibilities as strong ones." *Id.*

Plaintiffs allege similar anticompetitive effects in the tied market here, where the tied product was subject to FRAND limits in a but-for world absent the tie. *See* SAC ¶¶ 2, 15, 60, 235. Thus, absent the tie, Qualcomm could not have charged the ex post monopoly price, despite the existence of ex post monopoly power: Qualcomm and its OEMs would have negotiated a license with the understanding that, if negotiations fell apart, OEMs could sue to challenge Qualcomm's patents as non-essential, invalid, not infringed, expired, or exhausted by the sale of Qualcomm's own chipsets, thereby (1) preventing "weak" patents from offering the same "exclusionary potential and monopoly possibilities as strong ones" and (2) resulting in a FRAND royalty Qualcomm promised to provide in order to ensure its patents would become part of the standard.[13] By imposing the tie, Qualcomm compelled OEMs to take *supra*-FRAND licenses and forego any ability to litigate the patents.

Plaintiffs also allege that Qualcomm's tying conduct unlawfully maintained its monopoly by causing anticompetitive effects in the tying markets for CDMA and Premium LTE chipsets. *See* SAC ¶¶ 70-79. When "[t]ying by a monopolist" is alleged to constitute unlawful monopoly maintenance, "the technical requirements of tying law, such as 'separate' tying and tied products, give way to the more general monopolization standard of acts that injure competition unnecessarily." Areeda & Hovenkamp, *supra*, ¶ 1719d. Thus, one analyzing "the same tying as unlawful monopolization" would "likely look at the tie's propensity to maintain or extend power in the tying" market. *Id.* And here, Plaintiffs allege just that: Qualcomm's NLNC tie and the resulting supra-competitive royalties raised OEMs' "all-in" costs of all chipsets (including rivals'), while Qualcomm's collection of the *profits* from the supra-FRAND royalty allowed it to impose exclusive dealing penalties via so-called "incentives" that further insulated it from chipset price competition in the tying market.

---

[13] These allegations differ from *FTC.* There, the Ninth Circuit stated, "When Qualcomm licenses its SEPs to an OEM, those patent licenses have value—indeed, they are necessary to the OEM's ability to market and sell its cellular products . . . ." 969 F.3d at 1000. Here, Plaintiffs allege the opposite. A substantial number of Qualcomm's SEPs did not add value because they were expired, invalid, or otherwise not essential. SAC ¶ 44; *see also* Srinivasan Decl., Ex. C.

1   Such a "raising rivals' costs" theory of anticompetitive harm is widely recognized and there

2   is no reason to doubt that the California Supreme Court would apply it to the Cartwright Act. *See,*

3   *e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997) (holding conduct that "increase[s]

4   the operating cost" of competitors may constitute an "antitrust violation") (citing with approval

5   Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to*

6   *Achieve Power Over Price*, 96 Yale L.J. 209, 235-62 (1986), *partially overruled on other grounds*);

7   *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) (holding conduct harms competition when

8   it "allows a monopolist to maintain monopoly power by raising its rivals' costs sufficiently to

9   prevent them from growing into effective competitors"); *Multistate Legal Stud., Inc. v. Harcourt*

10  *Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1553 n.12 (10th Cir. 1995) (same).

11             d.   The *FTC* Decision Does Not Require a Different Result.

12  Qualcomm points to various statements in the *FTC's* decision that each aspect of

13  Qualcomm's alleged conduct, viewed in isolation, failed to establish harm to competition. But the

14  Ninth Circuit in the *FTC* case did not address the raising rivals' costs theory of anticompetitive

15  conduct. Instead, given the facts and theories the Ninth Circuit understood the FTC to have alleged—

16  no tying claim, no allegations of the tied market for Qualcomm's SEPs, no explanation of how

17  Qualcomm's so-called "rebates" or "incentives" were actually *penalties* for exclusivity that resulted

18  in Qualcomm charging *higher* chipset prices than it would have in a but-for world—the Court

19  applied a different analytical approach than the California Supreme Court would apply to Plaintiffs'

20  Cartwright Act claims in this case.

21  As an initial matter, the *FTC* decision expressly held that Qualcomm's NLNC policy must

22  be considered in isolation from Qualcomm's other alleged conduct (including its so-called "rebates"

23  on chips and exclusive deals). *FTC*, 969 F.3d at 993. As shown in *Fisherman's Wharf* discussed

24  above, California courts would not do so. *Supra* § II.B.2.a-b. The Ninth Circuit then observed that

25  a "substantial portion of the district court's ruling considered alleged economic harm to OEMs—

26  who are Qualcomm's customers, not its competitors—resulting in higher prices to consumers." *FTC*,

27  969 F.3d at 992. The court held that such "harms, even if real, are not 'anticompetitive' in the

28  antitrust sense—at least not *directly*—because they do not involve restraints on trade or exclusionary

conduct in 'the area of effective competition.'" *Id.* To the extent this was one of the "legal rules" Qualcomm references, the Ninth Circuit has since abandoned it by repeatedly clarifying that "proof of actual detrimental effects on competition, such as reduced output, *increased prices*, or decreased quality in the relevant market" constitutes "*direct*" evidence of anticompetitive harm. *Aya Healthcare*, 9 F.4th at 1112 (emphasis added); *see also Oakland Raiders*, 20 F.4th at 458 (same). The California Supreme Court would likewise decline to disregard increased prices to OEMs and consumers as irrelevant for purposes of showing anticompetitive harm; to the contrary, increased prices to consumers are *direct* evidence of actionable anticompetitive exclusionary conduct.[14]

Next, the Ninth Circuit held that to the extent FTC suggested Qualcomm priced its chips "ultralow" by offering discounts, such "margin squeeze" allegations failed under *Pacific Bell Tel. Co. v. linkLine Communications*, 555 U.S. 438, 451-52 (2009) absent evidence of "predatory" or "below-cost" pricing. *FTC*, 969 F.3d at 1001. There is no reason to conclude the same would apply to Plaintiffs' claims under the Cartwright Act. In *linkLine*, a vertically integrated defendant "squeezed" its rivals' "profit margins by setting a high wholesale price for DSL transport and a low retail price for DSL Internet service." 555 U.S. at 433. The case therefore involved (1) a defendant that merely engaged in the unilateral setting of its own prices, without more and (2) an alleged exclusionary mechanism premised on consumer prices being "too low." *Id.* Here, however, Plaintiffs do not allege that Qualcomm merely set its own prices or did so at a price that was "too low." Instead, Plaintiffs allege that Qualcomm's coercive tying and exclusive dealing conduct in combination raised rivals' costs, foreclosed competition by OEMs, including Apple and other major device manufacturers, and thereby increased prices to consumers. In particular, Plaintiffs explain how the so-called "discounts" were not discounts but instead *penalties* for disloyalty—analysis presented by Professor Elhauge that the FTC did not have in its own record.

Plaintiffs are not aware of any other federal appellate case in which *linkLine*'s price-cost test applied to the type of conduct that Plaintiffs allege in greater detail here. Instead, courts have rejected such arguments on facts like these. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269

---

[14] *Cipro*, 61 Cal.4th at 136 (holding Cartwright Act's "principal goal is the preservation of consumer welfare"); *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 4th 381, 418 (2020) (holding "direct evidence of anticompetitive effects" include "increased prices").

(3d Cir. 2012) (declining to apply predatory pricing "price-cost" test where "Plaintiffs did not rely solely on the exclusionary effect of [defendant's] prices, and instead highlighted a number of anticompetitive provisions" such as "imposing *de facto* purchase requirements of roughly 90% for at least five years" and working "in concert with OEMs" to ensure competitors "would be unable to build enough market share to pose any threat" to its "monopoly").

For instance, in *LePage's, Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003), *cited with approval in Fisherman's Wharf*, 114 Cal. App. 4th at 338, the court declined to evaluate a "bundled rebate" under the "price-cost" test. In so holding, the court considered a scenario in which (1) "the customer buys the defendant's [product] *B* in order to receive a greater discount on *A*, which the [rival] does not produce" and (2) "the rival can compete in *B* only by giving the customer a price that compensates it for the foregone *A* discount." *LePage's*, 324 F.3d at 155 (quoting Areeda & Hovenkamp, *supra*, ¶ 794 at 83). Similarly, here, Qualcomm's OEMs are willing to agree to exclusivity in chipsets because they view Qualcomm's "rebates" and "incentives" in chipsets (product B) as offsetting the supra-competitive royalties Qualcomm charges (product A). Qualcomm's rival chip makers cannot "produce" Qualcomm's licenses (product A), and so they can only compete in *B* by giving the customer a price that compensates it for the foregone *A* discount. In these circumstances, "even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce."[15] *Id.* There is no reason to think the California Supreme Court would bar Plaintiffs' claims under *linkLine* in such circumstances, as opposed to applying the raising rivals' cost framework.

Finally, when considering the NLNC policy in isolation from the above conduct, the Ninth Circuit held that (1) the reasonableness of Qualcomm's royalties necessarily "sounds in patent law, not antitrust law"; (2) their "potential harm to Qualcomm's *customers*, not its competitors" necessarily fails to show harm to competition "in the relevant antitrust markets"; and (3) are "chip-supplier neutral" insofar as they raise "the 'all-in' price that an OEM must pay for modem chips

---

[15] *See also* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 397, 472-73 (2009) ("bundled discounts not only lacked any offsetting efficiencies, but were significant enough to foreclose major outlets and create adverse effects on rival competitiveness").

(chipset + licensing royalties) regardless of which chip supplier the OEM chooses to source its chip from." *FTC*, 969 F.3d at 1002. As discussed above, the California Supreme Court's *Cipro* decision makes clear that it would reject the first two propositions as a matter of law under the Cartwright Act. Nor would California courts formalistically look at the NLNC policy's facial "neutrality," while disregarding its "economic substance" when combined with Qualcomm's *other* anticompetitive conduct. *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 189 n.20 (1999)[16]; *see also Fisherman's Wharf*, 114 Cal. App. 4th at 653 (considering the "full panoply" of defendant's "exclusionary conduct" together). Instead, the California Supreme Court would find persuasive Judge Easterbrook's analysis in *Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 368 (7th Cir. 1987)—a decision the *FTC* case did not address. In *Premier*, an electrical contractors' trade association enlisted a union to collect a 1% fee from members and nonmembers "when the nonmembers began underbidding members…." 814 F.2d at 368. While such a fee facially applied to all electrical contractors, its economic effect was not "supplier neutral" at all. For the association's rivals, the fee represented an "increase" in the "costs of doing business." *Id.* For the association itself, the fee represented "higher profits" collected for its fund and decreased competition from non-members whose costs had risen. *Id.* The same is true here: Qualcomm's NLNC tie imposes supra-competitive costs on competitors, while reaping profits for Qualcomm that it uses to impose disloyalty penalties and foreclose rival chipset suppliers from the market.[17]

At the pleading stage, Plaintiffs have plausibly stated a Cartwright Act claim.

**C.    Plaintiffs State a Claim Under the UCL.**

As with their Cartwright Act claims, Plaintiffs' UCL claims must be evaluated on their own merit. Qualcomm focuses much of its attack on arguing that Plaintiffs' UCL claims necessarily rise or fall with their Cartwright Act claims, or that they are somehow foreclosed by the Ninth Circuit's

---

[16] Notably, after the trial court dismissed the suit on the pleadings and the California Court of Appeal affirmed, the *Freeman* plaintiffs filed federal claims against the same defendant in federal district court. The Ninth Circuit concluded that California law was not identical to federal law, and partially reversed the district court's grant of summary judgment. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1142 n.8, 1157 (9th Cir. 2003).

[17] California courts would also find persuasive the FTC's Antitrust Guidelines for the Licensing of Intellectual Property, which confirm that "standard antitrust analysis applies to intellectual property." *See also* Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683 (2020) (discussing intersection of patent and antitrust law, and critiquing *FTC v. Qualcomm*).

1   decision that Qualcomm has not violated the Sherman Act. MTD 18-21. Qualcomm appears to ask
2   this Court to rewrite the UCL by holding that the "unfair" and "fraudulent" prongs do not apply in
3   any case where the plaintiff also brings antitrust claims. That request is contrary to the UCL's text,
4   history, and case law, and Qualcomm's other arguments similarly lack merit.

5          **1.**        **Plaintiffs adequately plead a derivative "unlawful" prong claim.**

6         The UCL's unlawful prong "borrows violations of other laws and treats them as unlawful
7   practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc.*
8   *v. L.A. Cellular Tele. Co.*, 20 Cal.4th 163, 180 (1999) ("*Cel-Tech*"). Here, Plaintiffs plead a
9   straightforward unlawful prong claim that is derivate of their Cartwright Act claim. SAC ¶ 248. The
10  claim thus survives the Motion for all the same reasons, and to the same extent, that Plaintiffs'
11  Cartwright Act claim does.

12         **2.**        **Plaintiffs adequately plead a UCL claim under the "unfair" prong.**

13        Plaintiffs allege in detail that regardless of whether Qualcomm's practices violate the
14  Cartwright Act, they still run afoul of the UCL's broader prohibition on "unfair" practices. *Id.* ¶¶ 6,
15  249-253. Decades of case law establish that "a practice may be deemed unfair [under the UCL] even
16  if not specifically proscribed by some other law." *Cel-Tech*, 20 Cal.4th at 180-81; *Loeffler v. Target*
17  *Corp.*, 58 Cal.4th 1081, 1125 (2014). Additionally, "unfairness is an equitable concept that cannot
18  be mechanistically determined" at the pleading stage. *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144,
19  1167 (2000); *accord Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008).

20        a.    The fate of Plaintiffs' UCL unfair prong claim does not depend on
                whether Plaintiffs adequately allege a Cartwright Act claim.

21        As a threshold matter, Qualcomm argues that if Plaintiffs' Cartwright Act fails, it
22  automatically dooms their UCL unfair prong claim. MTD 18-19. Courts have repeatedly rejected
23  this argument. *See, e.g.*, *Cent. Valley Med. Grp., Inc. v. Indep. Physician Assocs. Med. Grp., Inc.*,
24  2019 WL 3337891, at *4 (E.D. Cal. July 25, 2019) (holding an "anti-trust violation is not a
25  mandatory predicate for [UCL unfair] claims," and distinguishing many of Qualcomm's cases);
26  *Korea Kumho*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008); *Hendricks v. Dynegy Power*
27  *Mktg., Inc.*, 160 F. Supp. 2d 1155, 1165 (S.D. Cal. 2001) (consumer could plead UCL claim "by
28  alleging that the anti-competitive activity was unfair or deceptive even if not unlawful" under the

Cartwright Act); *accord Epic Games, Inc. v. Apple, Inc.*, No. 21-16506, Brief of the State of California as Amicus Curiae in Support of Neither Party, 2022 WL 1052172, at *12-19 (9th Cir. Mar. 31, 2022) ("Cal. Att'y Gen. Br.") (arguing "conduct may violate the UCL without violating antitrust law"); *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 2016 WL 4087302, at *12 (S.D. Cal. Aug. 1, 2016) ("an unfair UCL claim may also be predicated on conduct that 'violates the policy or spirit of the antitrust laws because it ... significantly threatens or harms competition,'" such as by engaging in "horizontal price-fixing, exclusive dealing, or monopolization") (quoting *Cel-Tech*, 20 Cal. 4th at 187).

Qualcomm's cases are not to the contrary. *See* MTD 18-19 n.5. For example, *Chavez* and *City of San Jose* merely apply the rule that "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the [UCL] to assault that harbor." *Cel-Tech*, 20 Cal. 4th at 182, 184 (distinguishing a statutory "safe harbor" from a statute that merely does not prohibit an activity); *see City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 688, 691-92 (9th Cir. 2015) (holding century-old "baseball exemption" from federal antitrust law, which preempts conflicting state laws, provided safe harbor for MLB's conduct); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) (holding that Cartwright Act included safe harm for "unilateral action" and plaintiffs had not plead adequate facts to state a plausible claim of other coercive conduct); *accord In re Ambac Bond Ins. Cases*, 2016 WL 661903, at *11 (Cal. Ct. App. Feb. 18, 2016) (unpublished).

Qualcomm wrongly claims *Chavez* requires automatic dismissal of competitor plaintiffs' UCL claims when their other claims fail. Many courts have recognized a post-*Chavez* split in authority, disagreeing with the cases cited by Qualcomm. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1053-54 nn. 631-32 (N.D. Cal. 2021) (expressly rejecting the Ninth Circuit's unpublished decision in *LiveUniverse*), *injunction stayed pending appeal*, 2021 WL 6755197 (9th Cir. Dec. 8, 2021); *Cent. Valley Med. Grp.*, 2013 WL 3337891, at *4 (noting the above cases are contrary to *Cel-Tech*); Cal. Att'y Br., 2022 WL 1052172, at *16-19 (opining the UCL holdings in the above cases are "overbroad and cannot be squared with California Supreme Court precedent").

b.     <u>Qualcomm's conduct satisfies all three tests for unfairness under the UCL.</u>

*First*, Qualcomm's practices are unfair under the balancing test, which asks whether the practice at issue "offends an established public policy or … is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Brooks v. Bank of Am., N.A.*, 2021 WL 1541643, at *4 (S.D. Cal. Apr. 20, 2021). Qualcomm's alleged unfair practices arise from its scheme of making voluntary FRAND commitments in order to obtain SEPs, and then systematically violating those commitments by coercing its customers to accept or otherwise adhere to non-FRAND, supra-competitive SEP licensing terms. *See* SAC ¶¶ 14-19, 42, 46-53, 227(h), (p), 249, 251(a)-(e), (g). Qualcomm intentionally violated FRAND rules—despite its commitments to the contrary in order to be adopted as the standard—to reinforce its market dominance and extract billions of dollars in additional revenue, the costs of which are ultimately paid by consumers. *Id.* ¶¶ 1, 19-21, 76, 89, 128, 192-198, 212-213, 241. Qualcomm's practices offend public policy, are unscrupulous, and cause substantial injury to consumers by undermining the SSOs and the standard-setting process more generally, harming competition and innovation in the modem chip and cellular device markets, limiting consumer choice, and directly resulting in Plaintiffs and class members being overcharged hundreds of millions or billions of dollars in the form of higher-priced and/or lower-quality cellular devices. *Id.* ¶¶ 1, 11, 21-26, 70, 193, 212-213, 241, 250(c); *see Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 325, 323, 329-30 (2011) (noting the "innumerable" forms of UCL economic injury include "surrender[ing] in a transaction more, or acquir[ing] in a transaction less, than [plaintiff] otherwise would have" or having to pay an "overcharge").[18] At the same time, Qualcomm's practices had no legitimate utility—i.e., they may have accomplished Qualcomm's purpose of stifling competition and increasing its revenue and market dominance, but they provided no legitimate benefit to those markets, consumers, or society. SAC ¶¶ 17, 70, 235, 240, 253. Any

---

[18] *See also Intel Corp. v. Fortress Inv. Grp. LLC*, Brief of Amici Curiae Fair Standards Alliance, 2020 WL 1983487 (N.D. Cal. Mar. 19, 2020) (describing abuses of the standard-setting process).

1  contrary factual findings by the *FTC* court based on a different evidentiary record compiled by

2  different parties trying to prove different claims is not, and should not be, binding on Plaintiffs here.

3  *Second*, to the extent, if at all, necessary, Plaintiffs' allegations also satisfy the tethering test,

4  which requires alleging "conduct that threatens an incipient violation of an antitrust law, or violates

5  the policy or spirit of one of those laws because its effects are comparable to or the same as a

6  violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal.4th

7  at 187; *see also Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 735-36 (9th Cir. 2007) (test requiring

8  alleged unfairness "be tethered to some legislatively declared policy or proof of some actual or

9  threatened impact on competition"). Plaintiffs satisfy this test by alleging that Qualcomm's practices

10  (1) violate the federal and state public policies of supporting the SSOs, which would cease to

11  function if all SEP holders behaved like Qualcomm in ignoring their FRAND commitments, duty to

12  deal on a nondiscriminatory basis, and U.S. and California public policy supporting the SSOs and

13  the setting of international standards, SAC ¶ 249(a)-(c); *see Broadcom*, 501 F.3d 297; *Microsoft*,

14  2013 WL 2111217, at *10; (2) violate the policy and spirit of the Cartwright Act and other California

15  antitrust law and principles, SAC ¶ 249(d); *see Imperial Irrigation Dist.*, 2016 WL 4087302, at *12-

16  13 (noting this includes opposition to exclusive-dealing and monopolistic behaviors); (3) for similar

17  reasons, have effects that are the same as or similar to a violation of the Cartwright Act, SAC

18  ¶ 250(b); (4) threaten an incipient violation of the Cartwright Act, SAC ¶ 250(a); and (5) for all the

19  foregoing reasons, significantly threaten and harm competition in the relevant modem chip and

20  cellular device markets, SAC ¶ 250(c).

21  Qualcomm's three contrary arguments all fail. It first argues that a breach of contract is not

22  *per se* unfair (MTD 21) but omits the other half of the rule that breaching conduct *can* be unfair if it

23  meets the UCL test for unfairness, such as when a defendant "systematic[ally] breach[es]" contracts

24  resulting in widespread consumer harm. *Arce v. Kaiser Found. Health Plan, Inc.*, 181 Cal. App. 4th

25  471, 490 (2010). That is precisely what Plaintiffs allege here. SAC ¶¶ 15-16, 53, 122, 233.

26  Qualcomm has breached its SSO commitments to all participants in the industry practicing that

27  standard. Qualcomm next argues that "a breach of an SSO commitment does not rise to the level of

28  an antitrust violation" (MTD 19), but that is beside the point. Plaintiffs do not have to show *antitrust*

23

violations here, but that Qualcomm's years of systematically breaching its FRAND promises violates the UCL standard for unfairness. Finally, Qualcomm argues Plaintiffs lack third-party beneficiary status to challenge Qualcomm's FRAND breaches (MTD 21), but this is contrary to the well-settled UCL rule that unfairness "may be established independent of any contractual relationship between the parties." *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 188 (2010).[19]

*Third*, Plaintiffs' allegations also satisfy the third balancing test of unfairness, which requires "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006). Plaintiffs adequately allege unfair conduct for the same reasons their allegations pass muster under the first balancing test described above as to steps 1 and 2. As to step 3, consumers could not reasonably have avoided the overcharges and other injuries to competition, innovation, and consumer choice alleged in the SAC because Qualcomm "has entered into license agreements with every known handset supplier" and dominates modem chipset sales in the relevant markets. *See, e.g.*, SAC ¶¶ 11, 55, 69, 72.

### 3. Plaintiffs adequately plead a UCL claim under the "fraudulent" prong.

The UCL's "fraudulent" prong is different from common law fraud or deception. *Zhang v. Superior Ct.*, 57 Cal.4th 364, 380 (2013). This "will usually be a question of fact." *Williams*, 552 F.3d at 938. Here, Plaintiffs allege Qualcomm spent years pursuing a complex scheme of obtaining SEPs by deceiving SSOs and others with FRAND-related promises, and then systematically violating those promises to increase its profits and market dominance at the expense of competitors and consumers. SAC ¶¶ 213, 235, 254.

Qualcomm misses the mark in arguing Plaintiffs fail to satisfy the requirements of Rule 9(b) by not alleging "specific fraudulent statements" (MTD 22:2) because that requirement is "less stringently applied" where, as here, there is an alleged complex scheme of systematic deception over

---

[19] *Accord McKell*, 142 Cal. App. 4th at 1471; *CF Gainesville Inv., LLC v. Astroenery Solar, Inc.*, 2022 WL 2818259, at *5 (C.D. Cal. July 18, 2022) (parties' "privity of contract" was "not relevant" to UCL claim); *Darling v. Green*, 2013 WL 11323320, at *10 (C.D. Cal. Sept. 25, 2013) (same).

1   a long period of time. *Royal Primo Corp. v. Whitewater W. Indus., Ltd*, 2016 WL 4080177, at *8

2   (N.D. Cal. July 29, 2016); *accord* Wright & Miller, 5A Fᴇᴅ. Pʀᴀᴄ. & Pʀᴏᴄ. Cɪᴠ. § 1298 & n.22 (4th

3   ed. Apr. 2022 update) (collecting cases). Plaintiffs also plausibly allege that Qualcomm's deception

4   can reasonably be inferred from the fact that SSOs do not grant SEPs without FRAND commitments.

5   SAC ¶¶ 12, 14, 45-53, 254; *accord Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1032

6   (W.D. Wash. 2012). Plaintiffs further allege that Qualcomm intentionally gave false FRAND-related

7   assurances to the SSOs on a routine and systematic basis to obtain SEPs. SAC ¶ 254.[20]

8       Qualcomm also argues that Plaintiffs were required to but failed to allege reliance on

9   Qualcomm's misrepresentations (MTD 22-23), which misstates the law. Reliance is not required

10  here because the case does not involve false advertising or misrepresentations to consumers. Instead,

11  Plaintiffs need only show a "causal connection" between the defendant's fraudulent conduct and the

12  Plaintiffs' harm. *Kwikset*, 51 Cal. 4th at 326.[21] Plaintiffs do that here by alleging Qualcomm

13  perpetrated a fraud with the effect of passing on billions of dollars in overcharges to Plaintiffs and

14  other consumers. *See* SAC ¶¶ 21-26, 76, 193, 199-213, 241; c*f. Lorenzo v. Qualcomm, Inc.*, 2009

15  WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (finding UCL claim not adequately alleged where

16  amended complaint failed to allege facts showing plaintiff paid a supra-competitive price).

17  **III.   CONCLUSION**

18      For the reasons discussed above. Plaintiffs respectfully request the Court deny Qualcomm's

19  motion to dismiss.

20

21

22

23

24

---

[20] This is unlike *TCL Commn's Tech. Holdings v. Telefonaktienbolaget LM Ericsson*, 2016 WL
7049263 (C.D. Cal. Aug. 9, 2016), which was decided on the lack of evidence at summary judgment
that defendant made an intentionally false promise to issue licenses on FRAND terms.
[21] *Accord Lona's Lil Eats, LLC v. DoorDash, Inc.*, 2021 WL 151978, at *11-12 (N.D. Cal. Jan. 18,
2021) (collecting cases and explaining UCL causation requirement is intended to prevent claims
from uninjured plaintiffs who never used defendant's product or service); *Scilex Pharms. Inc. v.
Sanofi-Aventis U.S. LLC*, 552 F.Supp.3d 901, 915 (N.D. Cal. 2021) (similar and disavowing its
prior decisions requiring reliance in certain scenarios).

1   Dated:  September 15, 2022                    By:  /s/ *Kalpana Srinivasan*
                                                     Kalpana Srinivasan
2                                                    Marc M. Seltzer
                                                     Steven G. Sklaver
3                                                    Amanda Bonn
                                                     Oleg Elkhunovich
4                                                    Krysta Kauble Pachman
                                                     SUSMAN GODFREY L.L.P.
5                                                    1900 Avenue of the Stars, Suite 1400
6                                                    Los Angeles, CA 90067
                                                     Telephone: (310) 789-3100
7                                                    Facsimile: (310) 789-3150
                                                     Email: ksrinivasan@susmangodfrey.com
8                                                    Email: mseltzer@susmangodfrey.com
9                                                    Email: ssklaver@susmangodfrey.com
                                                     Email: abonn@susmangodfrey.com
10                                                   Email: oelkhunovich@susmangodfrey.com
                                                     Email: kpachman@susmangodfrey.com
11
12                                                   Joseph Grinstein
                                                     SUSMAN GODFREY L.L.P.
13                                                   1000 Louisiana Street, Suite 5100
                                                     Houston, TX 77002
14                                                   Telephone: (713) 651-9366
                                                     Facsimile: (713) 654-6666
15                                                   Email: jgrinstein@susmangodfrey.com
16
                                                 By:  /s/ *Joseph W. Cotchett*
17                                                   Joseph W. Cotchett
                                                     Nanci E. Nishimura
18                                                   Adam J. Zapala
                                                     Brian Danitz
19                                                   James Dallal
                                                     Andrew F. Kirtley
20                                                   COTCHETT, PITRE & McCARTHY, LLP
                                                     840 Malcolm Road, Suite 200
21                                                   Burlingame, CA 94010
                                                     Telephone: (650) 697-6000
22                                                   Facsimile: (650) 697-0577
                                                     Email: jcotchett@cpmlegal.com
23                                                   Email: nnishimura@cpmlegal.com
24                                                   Email: azapala@cpmlegal.com
                                                     Email: bdanitz@cpmlegal.com
25                                                   Email: jdallal@cpmlegal.com
                                                     Email: akirtley@cpmlegal.com
26
27                                                   ***Plaintiffs' Co-Lead Counsel***
28

1

2   By: /s/ Steve W. Berman
        Steve W. Berman
3       Rio Pierce
        HAGENS BERMAN SOBOL SHAPIRO LLP
4       1918 Eighth Avenue, Suite 3300
        Seattle, WA 98101
5       Telephone: (206) 268-9320
        Facsimile: (206) 623-0594
6       Email: steve@hbsslaw.com
        Email: riop@hbsslaw.com
7

8       *Plaintiffs' Steering Committee*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28