UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: QUALCOMM ANTITRUST
LITIGATION

Case No.  17-md-02773-JSC

**ORDER REGARDING MOTION TO
DISMISS**

Re: Dkt. No. 895

Cellphones and tablets connect us to one another.  To do so, devices rely on hardware (known as modem chips) and critical patented technologies.  Qualcomm is a successful company in these two distinct, yet related fields: modem chip manufacturing and cellular patent licensing.  Six years ago, the Federal Trade Commission brought an antitrust action against Qualcomm.  Not long after, Plaintiffs—a series of consumers—sued Qualcomm as well.  These separate suits raised similar objections.  Each alleged Qualcomm uses its position at the confluence between chip manufacturing and patent licensing to stifle competition.  Plaintiffs sought to represent millions of cellular device consumers who, they allege, overpaid due to Qualcomm's conduct.

The FTC action led the way.  After a bench trial, the district court found Qualcomm violated federal antitrust law.  The Ninth Circuit reversed that decision in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), and remanded Plaintiffs' parallel consumer action to this Court. *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021).  After remand, Plaintiffs filed an amended complaint, asserting only violations of California law and on behalf of only California consumers.  Qualcomm moves to dismiss.  The question before this Court is whether Plaintiffs' complaint survives *FTC v. Qualcomm* and states a claim under California law.

The answer is no, but only in part.  Plaintiffs' tying theory is not viable under current California law.  But California law and *stare decisis* do not require the Court to dismiss the exclusive dealing theory on a 12(b)(6) motion.  Plaintiffs' derivative unfair competition claim also survives in part.  So, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss.

# BACKGROUND

## I.    Complaint Allegations

### A.    Industry Background

#### 1.    Modem Chips

Every smartphone, tablet, and other cellular device contains a piece of equipment called a modem chip.  (Dkt. No. 899 ¶ 8.)[1]  The modem chip allows a device to connect and communicate with wireless cellular networks—such as those controlled by AT&T, Verizon and Sprint in the United States.  (*Id.*)  A device without a modem chip would be unable to make calls and could not send or receive data outside the presence of a Wi-Fi access point.  (*Id.* ¶ 32.)  In other words, a smartphone without a modem chip is not much of a phone at all.  (*Id.* ¶ 8.)

#### 2.    Cellular Network Standards and Standard Setting Organizations

Cellular network "standards" govern how data moves from device to device across the network.  To make those vital connections—between a device and a network—the device's modem chip must be compatible with a cellular network's particular technical standard.  (*Id.* ¶ 33.)

##### a.    Standard Setting Organizations

For decades, telecommunications industry participants and government agencies have negotiated, adopted, and implemented common "communications standards."  (*Id.* ¶ 9.)  By sharing common blueprints, the industry allowed device and network interoperability.  (*Id.*)  Thus, an average consumer can buy a phone from their preferred device manufacturer (like Apple or Samsung) and use the phone with their chosen network carrier (such as Verizon or Sprint) because many network carriers use a common communications standard and the device contains a modem chip that can communicate with the common standard.  (*Id.*)

"Standard setting organizations" or "SSOs" develop these standards.  (*Id.* ¶ 10.)  SSOs include telecommunications technology companies, device suppliers and manufacturers, and government agencies. (*Id*. ¶ 38.)  The Telecommunications Industry Association is the primary standard setting organization for wireless communications in the United States.  (*Id.*)  The

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

European Telecommunications Standards Institute, an organization based in France, focuses on producing global communication standards.  (*Id.*)  Over the past four decades, these and other SSOs developed three broad "generations" of communications standards relevant here—second-generation ("2G"), third-generation ("3G"), and fourth-generation ("4G") standards.  (*Id.*)

### b.   Particular Communications Standards

A "generation" can comprise multiple specific standards with similar capabilities.  (*Id.*)  For example, the industry developed 2G cellular standards in the early 1990s.  (*Id.* ¶ 39.)  2G communications standards support digital transmission of voice calls.  The leading 2G standards are the Global System for Mobile Communications ("GSM") and Code Division Multiple Access ("2G-CDMA").  (*Id.*)  AT&T and T-Mobile chose to operate GSM networks.  By contrast, Verizon and Sprint operated 2G-CDMA networks.  (*Id.*)

The 3G series, developed in the late 1990s, had two leading standards as well.  (*Id.* ¶ 40.)  GSM 2G networks like AT&T and T-Mobile implemented the Universal Mobile Telecommunications System ("UMTS"), which incorporated a technology known as wideband CDMA ("WCDMA").  (*Id.*)  The 2G-CDMA operators, such as Verizon and Sprint, migrated to the third-generation CDMA standard ("3G-CDMA").  (*Id.*)  Between 2000 and 2010, Verizon and Sprint invested over $57 billion in their CDMA-based networks.  (*Id.* ¶ 176.)

The 4G series of standards were first introduced in 2009.  (*Id.* ¶ 41.)  4G standards allow for higher data-transmission speeds than 3G standards.  (*Id.*)  Most major operators chose a 4G standard known as Long-Term-Evolution ("LTE").  (*Id.*)  When initially deployed, 4G-LTE covered data services in urban markets.  (*Id.* ¶ 178.)  But customers still required a chip compatible with 3G-CDMA or 3G-WCDMA to make voice calls.  (*Id.*)  Some individual chips, known as "multi-mode chips," operate with multiple standards to solve this dilemma. (*Id.* ¶ 33.)

### 3.   Standard Essential Patents

A "standard" is a collection of technologies.  Some technologies in the standard are patented, others are not. As the discussion above illustrates, each standard "generation" lasts for about a decade.  When a standard setting organization incorporates a new technology into a new standard, access to the technology becomes vital to the domestic and international

telecommunications infrastructure.  (*Id.* ¶ 11.) Thus, by creating a set of technologies to comprise a "standard," the standard setters effectively pick market winners and losers for a generation of cellular technology.  (*Id.* ¶ 10.)  The winners—patents protecting technologies vital to a communications standard—are known as standard essential patents ("SEPs").  (*Id.* ¶ 11.)

Standard essential patent holders reap large financial benefits because industry participants selling devices or technologies compliant with the relevant standard *must* pay the essential patent holder licensing and royalty fees—or risk suit for patent infringement.  (*Id.*)  If unchecked, a standard essential patent holder could demand excessive licensing and royalty fees once their protected technology is locked into the communications standard.  (*Id.*)  This maneuver is known as a "patent hold up." (*Id.* ¶ 43.)

Standard setting organizations established rules to prohibit patent hold ups.  (*Id.* ¶ 12.)  To participate in the standard setting process, industry participants must disclose all patents they hold on technologies under consideration for incorporation into a standard.  (*Id.* ¶ 45.)  Patent holders must agree—as an express condition for incorporation into the standard—to license the technology to other industry participants on fair, reasonable, and non-discriminatory ("FRAND") terms. (*Id.*)   Absent such a promise, the standard setters will design around the claimed "essential" patent at issue.  (*Id.*)

**B.   Qualcomm's Market Position**

Qualcomm, located in San Diego, California, develops, designs, licenses, and markets digital communications products and services through two wholly owned subsidiaries— Qualcomm Technology Licensing and Qualcomm CDMA Technologies.  (*Id.* ¶ 27.)  Qualcomm Technology Licensing licenses patents and other intellectual property rights from Qualcomm's intellectual portfolio.  (*Id.*)  Qualcomm CDMA Technologies handles equipment sales including the sale of modem chips to device manufacturers.  (*Id.*)

**1.      Qualcomm's Patent Licensing Business**

"As an early developer of cellular technology, Qualcomm holds patents on technologies that were incorporated into virtually every relevant cellular standard adopted during the period relevant to this litigation," including the CDMA, WCDMA/UMTS, and LTE standards.  (*Id.*

United States District Court
Northern District of California

4

¶¶ 13, 36.)  In the 2G era, Qualcomm's SEP portfolio comprised a significant portion of the overall 2G-CDMA standard.  (*Id.* ¶ 39.)  Qualcomm's SEP market-share diminished during the 3G era relative to the 2G era. (*Id.* ¶ 40.)  And Qualcomm's share of 4G-LTE SEPs is "roughly equivalent to that of other industry competitors."  (*Id.* ¶ 41.)  "One study of declared LTE SEPs found that Qualcomm had a 13% share of 'highly novel' essential LTE patents, compared to 19% for Nokia, 12% for Ericsson, and 12% for Samsung."  (*Id.*)

Qualcomm promised standard setting organizations it would license its cellular SEPs for 2G, 3G, and 4G standards on FRAND terms.  (*Id.* ¶ 50.)  For example, the European Telecommunications Standards Institute requires participants to declare any essential patents within a proposed standard and mandates a commitment to grant irrevocable patent licenses on FRAND terms.  (*Id.* ¶ 51.)  Qualcomm declared over 30,000 global assets as essential intellectual property rights, and told the European Telecommunications Standards Institute it was "prepared to grant irrevocable licenses" under its policies.  (*Id.*)  But, as discussed in more detail below, Plaintiffs allege Qualcomm broke its promises to the various SSOs and refused to license its SEPs to rival chip manufacturers.  (*Id.* ¶ 53.)

Instead, Qualcomm licensed its SEP portfolio to device manufacturers—also known as "original equipment manufacturers" or "OEMs."  (*Id.* ¶ 60.)  Qualcomm charged device manufacturers SEP royalties based on the price of an entire finished device.  (*Id.* ¶ 18.)  For example, an iPhone's price dictates Qualcomm's royalty for the SEP license Qualcomm granted to Apple.  (*Id.*)  Thus, Qualcomm's royalty increased as the device price went up, even if Apple charged more for an iPhone model based on features—like a superior camera or increased storage—unrelated to Qualcomm's protected technologies.  (*Id.*)

These licensing agreements were lucrative.  (*Id.* ¶ 57.)  During the class period, Qualcomm charged device manufactures up to a 5% royalty rate on the final device (also known as "handset") price.  (*Id.* ¶ 194.)  Thus, if Apple sold an iPhone for $600, Qualcomm received a $30 payment for each sale.  While license agreements comprised a smaller share of Qualcomm's gross revenue than chip sales, the licensing business accounts for most of Qualcomm's net profits.  (*Id.*)  In 2013 and 2014, Qualcomm collected licensing revenues of approximately $7.8 billion.

(*Id.* ¶ 196.)  Four companies with similar SEP portfolios—Alcatel-Lucent, Ericsson, InterDigital, and Nokia—combined for a total of $2.7 billion in licensing revenue over the same period.  (*Id.*)

### 2.    Qualcomm's Chip Business

Qualcomm's chip business manufactures modem chips compliant with 2G-CDMA, 3G-CDMA, UMTS, and LTE standards.  (*Id.* ¶ 54.)  During the class period, Qualcomm had monopoly power in two types of chips—CDMA chips and premium LTE chips.  (*Id.*)

#### a.    CDMA Chips

According to the complaint, Qualcomm controlled over 90% market share for CDMA chip sales between 2011 and 2018.  (*Id.* ¶ 185.)  By the end of the class period in 2018, Qualcomm held 99% CDMA chip market share.  (*Id.*)  As discussed above, carriers like Verizon and Sprint invested billions of dollars in CDMA networks between 2000 and 2010.  (*Id.* ¶ 176.)  But CDMA networks remain relevant even today—when the primary data service used is 4G-LTE—because customers require backwards compatible devices.  (*Id.* ¶ 180.)

#### b.    Premium LTE Chips

Qualcomm also has monopoly power in the manufacturing and sale of 4G-LTE chips.  (*Id.* ¶ 191.)  LTE chips are used in premium devices—those sold for over $300 through 2012 and over $400 from 2013 onwards.  (*Id.*)  From 2011 to 2015, Qualcomm had 90% or more of the market share in "Premium LTE."  (*Id.*)  From 2016 to 2018, "Intel slowly began to gain market share, but Qualcomm continued to hold a significant majority of the Premium LTE market share." (*Id.*)

#### c.    Modem Chip Competitors

Though Plaintiffs often refer to "competitors" or "rival chipmakers," the SAC never explicitly defines Qualcomm's chip-manufacturing competitors.  Intel is the primary chip-manufacturing competitor referenced in the SAC.  In 2017, Intel began supplying a portion of the chips Apple incorporates in the iPhone 7.  (*Id.* ¶ 145.)  To bolster its CDMA capabilities for the iPhone 7 deal, Intel acquired VIA Telecom—which, presumably had some CDMA capabilities.  (*Id.* ¶ 165.)   Intel announced it would no longer manufacture modem chipsets in 2019—after the class period ended.  (*Id.* ¶ 145.)  The SAC also references MediaTek, Samsung Electronics, and Broadcom.  (*Id.* ¶¶ 98, 101, 121.)

United States District Court
Northern District of California

### C.   Qualcomm's Business Practices

The interplay between Qualcomm's patent licensing business and Qualcomm's chip sale business is the crux of this case.  Plaintiffs allege Qualcomm engaged in three connected business practices: (1) Qualcomm refused to license its cellular SEPs to other chip manufacturers; (2) Qualcomm's "no license, no chips" policy denied OEMs access to chips unless the OEMs purchased Qualcomm's cellular SEP license for an unreasonably high price and gave up the right to challenge Qualcomm's SEPs; and (3) Qualcomm made "exclusive dealing" arrangements with OEMs to maintain its chip market monopoly.

### 1.   Qualcomm and Other Chip Manufacturers (Competitors)

Qualcomm refused to sell "exhaustive"[2] SEP licenses to competing modem chip manufacturers.  (*Id.* ¶ 120.)  Instead of licensing to rival chip manufacturers,[3] Qualcomm only licensed its SEPs at the OEM level (*e.g.*, to companies like Apple) or to OEMs' contract manufacturers (*e.g.*, Foxconn).  (*Id.* ¶¶ 68, 132.)  Plaintiffs argue Qualcomm's policy violated Qualcomm's FRAND obligations, which required Qualcomm to license its cellular SEPs to OEMs as well as competing chip suppliers on FRAND terms.[4]  (*Id.* ¶ 97.)

According to Qualcomm's rivals, Qualcomm's refusal to sell an exhaustive license for Qualcomm's SEPs put other industry players at a competitive disadvantage.  (*Id.* ¶ 97.)  For

---

[2] An "exhaustive" license refers to patent exhaustion.  If Qualcomm granted an "exhaustive" cellular SEP license to a competitor—for example, Intel—Intel could then sell a chip with that technology to Apple.  (*Id.* ¶ 119.)  That sale might "exhaust" Qualcomm's rights in the SEP, meaning Qualcomm could not sue Apple for patent infringement when Apple uses the Intel chip (and Qualcomm's SEP technology) in an Apple device.  (*Id.*) In that world, Apple would have no incentive to purchase an SEP license from Qualcomm or pay Qualcomm a royalty.

[3] While Qualcomm refused to grant its rivals exhaustive licenses, Qualcomm did allow its rivals to practice some of its SEPs. *See F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 984 (9th Cir. 2020).  These deals with competitors were known as "CDMA ASIC Agreements."  *Id.*  In short, Qualcomm promised not to assert its patents against its rivals.  *Id.*  In exchange, rivals agreed to sell chips only to OEMs that buy Qualcomm SEP licenses.  *Id.*  Thus, competitors could practice Qualcomm's patents royalty free but were forced to report details of chip supply agreements with OEMs.  *Id.* at 985.

[4] For example, if a chip a rival can sell a chip for $5.00, Qualcomm "couldn't charge a $10.00 royalty" for the SEP rights because it might be difficult to convince a court $10.00 is a fair royalty.  But, if the SEP license is sold only to OEMs for a 5% royalty on the entire price of the finished device, Qualcomm can obtain $30.00 on a $600 device. (Dkt. No. 899 ¶ 120.)

example, a Samsung employee stated "[i]f we didn't get the license I believe there would be the IP-related risk, meaning that Qualcomm could make an assertion relating to their IP to Samsung Electronics as well as customers of modem chips of Samsung Electronics."  (*Id.* ¶ 98.)  A MediaTek employee testified customers "were telling us that we needed a license from Qualcomm . . . Because I think there was this belief in the industry, that if they didn't – if we didn't have a license from Qualcomm, they wouldn't be able to procure and sell products with our chips in them."  (*Id.* ¶ 101.)

### 2. Qualcomm and OEMs (Customers)

Plaintiffs allege Qualcomm engaged in two related business practices with OEMs.  First, Qualcomm maintained a "no license, no chips" policy towards OEMs.  Second, Qualcomm offered OEMs vast financial "rebates" if OEMs agreed to purchase Qualcomm chips on an exclusive basis.

### a. "No License, No Chips"

Qualcomm's FRAND commitments required Qualcomm to license its cellular SEPs to OEMs on FRAND terms.  (*Id.* ¶ 52.)  But Plaintiffs allege Qualcomm violated this promise too. (*Id.* ¶ 60.)  Instead, Qualcomm "refused to supply cellular handset OEMs with CDMA and Premium LTE chips unless the OEM agrees to take out a separate license to all of Qualcomm's cellular SEPs on Qualcomm's preferred terms."  (*Id.* ¶ 59.)  According to Plaintiffs, those terms were highly prejudicial to licensees and inconsistent with Qualcomm's FRAND promises.  (*Id.*)

As discussed above, the SEP licenses were very profitable for Qualcomm.  OEMs paid a royalty based on the price of the entire finished device, rather than the price of the chip.  (*Id.* ¶ 60.) Thus, even if an OEM sold a device with a non-Qualcomm-manufactured chip, Qualcomm still collects a royalty payment for the SEP rights based on the price of the entire finished handset. (*Id.*) OEMs also agreed to forgo litigation regarding Qualcomm's patents or license terms.  (*Id.*)

This condition—known as "no license, no chips"—is "unique" in the industry.  (*Id.* ¶ 89.) According to Plaintiffs, OEMs faced a Hobson's choice.  OEMs need chips to sell mobile phones. (*Id.* ¶¶ 80–81.)  And Qualcomm has monopoly power in the vital CDMA and Premium LTE chip markets.  (*Id.*)  If OEMs refused to pay Qualcomm's SEP royalty rates—which exceeded the

FRAND rates—Qualcomm would put the OEMs chip supply in "peril." (*Id.* ¶ 81.)  Thus, Qualcomm had OEMs "over a barrel." (*Id.* ¶¶ 80–81.)  No license, no chips.  No chips, no business.  So, the OEMs acquiesced to SEP licensing rates they considered unfair.  (*Id.*)  And the OEMs agreed not to challenge those above-FRAND rates (or the SEPs validity) through litigation. (*Id.* ¶ 60.)  Plaintiffs call the difference between a FRAND SEP royalty rate and Qualcomm's royalty rate "an added surcharge" which the OEM must pay to ensure continued access to modem chips.  (*Id.* ¶ 199.)  Thus, Qualcomm's power in the chipset market protected its ability to charge above-FRAND rates on the SEP licenses.

Qualcomm explicitly acknowledged that its chip business monopoly protected its licensing profits.  (*Id.* ¶ 85.)  For example, Qualcomm's Vice President of Finance wrote that "there is a high correlation between our modem (chip) share and licensing compliance and royalty sustainability."  (*Id.*)  He called it "CRITICAL" that Qualcomm maintain its high market share in the modem chip business to protect the high-profit licensing business.  (*Id.*)

### b.     Exclusive Chip-Supply Deals

Qualcomm's efforts to protect that modem chip market share are the final piece of the puzzle.  Aside from refusing to grant competitors exhaustive licenses to cellular SEPs, Qualcomm also offered exclusive dealing arrangements to key OEM customers.  The SAC lists numerous OEMs that bought between 85% and 100% of their chipsets from Qualcomm in exchange for "incentives" or "reduced royalties."  (*Id.* ¶ 72.)  But the exclusive dealing allegations largely focus on Qualcomm's relationship with Apple.  (*See id.* ¶¶ 129–169.)

Apple sells multiple devices that use modem chips, such as iPhones and iPads. (*Id.* ¶ 129.) According to the complaint, Apple is one of the largest purchasers of modem chips in the world. (*Id.*)  "Apple is a particularly important OEM from the perspective of a nascent [chip] supplier" because working with Apple makes that supplier more competitive with other OEMs.  (*Id.* ¶ 143.) Apple employs contract manufacturers to assemble the iPhones and iPads.  (*Id.* ¶ 131.)  The contract manufacturers pay the SEP license royalties to Qualcomm and then pass that cost along to Apple. (*Id.*)

In 2007, Qualcomm and Apple entered a "Marketing Incentive Agreement."  (*Id.* ¶ 134.)

1    Under that agreement, Qualcomm paid Apple "marketing incentives" and Apple agreed not to

2    incorporate a proposed 4G WiMax Cellular standard that Intel advocated and Qualcomm opposed.

3    (*Id.*)  This led to widespread adoption of 4G LTE, which contains a higher percentage of

4    Qualcomm's patents and a lower percentage of Intel's patents than 4G WiMax.  (*Id.*)

5         In 2009, Apple and Qualcomm entered into a chip supply agreement.  (*Id.* ¶ 135.)  Under a

6    "Strategic Terms Agreement," Qualcomm supplied chips and software to Apple.  (*Id.*)  Qualcomm

7    also "capped its liability for failure to supply" chips and retained a unilateral right to terminate its

8    obligations to Apple and its contract manufacturers.  (*Id.*)

9         According to Plaintiffs, Qualcomm and Apple then entered into "de facto exclusive dealing

10   contracts" that foreclosed Qualcomm's competitors from gaining modem chip business with

11   Apple. (*Id.* ¶¶ 136, 143.)  For example, Apple and Qualcomm negotiated and agreed upon a

12   "Transition Agreement" in 2011. (*Id.* ¶ 137.)  Under that agreement, Qualcomm promised

13   substantial incentive payments to Apple.  (*Id.*)  In exchange, Apple agreed to use Qualcomm chips

14   exclusively in all new iPhone and iPad models.  (*Id.*)  Apple also promised not to challenge

15   Qualcomm over intellectual property disputes.  (*Id.*)

16        The First Amended Transition Agreement—effective 2013 to 2016—continued the

17   exclusivity arrangement and included a condition that Apple could not initiate or induce another to

18   initiate litigation based on Qualcomm's failure to offer licenses on FRAND terms.  (*Id.* ¶ 138.)

19   Qualcomm also agreed to make "separate substantial incentive payments to Apple so long as

20   Apple exclusively sourced chips from Qualcomm."  (*Id.*)  But if Apple violated that exclusivity

21   and used non-Qualcomm chips in a device, Apple would forfeit past and future incentive

22   payments.  (*Id.*)  The parties also formed a "Business Cooperation and Patent Agreement

23   ("BCPA") in 2013. (*Id.* ¶ 139.)   In the BCPA, Qualcomm agreed to continue the "marketing

24   incentive payments" first negotiated in 2009. (*Id.*)

25        According to Plaintiffs, the 2011 and 2013 agreements were "intended by Qualcomm to

26   be, *de facto* exclusive deals that were as effective as express purchase requirements and essentially

27   foreclosed Qualcomm's competitors from gaining chip business at Apple."  (*Id.* ¶ 141.)  Although

28   Apple had "interest in developing and working with additional suppliers of chips," the penalties

Apple would face under its agreements with Qualcomm allegedly deterred Apple from using other suppliers. (*Id.*) According to Plaintiffs, the penalties were sufficiently large such that—if they were attributed as discounts to the price of Qualcomm's chips—the resulting price for chips would be below Qualcomm's cost to produce the chips. (*Id.*)

As a result of these agreements, Apple sourced chips exclusively from Qualcomm for all new iPad and iPhone products launched between October 2011 and September 2016. (*Id.* ¶ 142.) According to the complaint, Qualcomm's exclusive deal with Apple "prevented Qualcomm's competitors from attaining [the benefits of working with Apple] and foreclosed a substantial share of the market for Premium LTE chips." (*Id.* ¶ 144.) Intel eventually won Apple's business in 2017 for the iPhone 7. (*Id.* ¶ 145.) But Plaintiffs allege Qualcomm's conduct "locked Intel out of Apple" for the four years prior to that agreement. (*Id.* ¶ 145.)

### 3.      Summary

Plaintiffs' allegations sit at the intersection of antitrust and patent law. Qualcomm had a monopoly in the market for CDMA and Premium-LTE Chips. And Qualcomm had critical SEPs necessary to participate in the cellular telecommunications industry. If an OEM wanted to use chips, that OEM had to buy a license from Qualcomm or risk patent litigation. Typically, SSOs require SEP holders to give licenses to rivals and customers at FRAND rates. But Qualcomm ignored those obligations.

Instead, Qualcomm refused to license its chip-manufacturing competitors outright and offered SEP licenses to OEMs for prices far greater than it could have charged rival chip makers. Then, under its "no license, no chips" policy, Qualcomm refused to sell OEMs chips unless the OEMs bought a separate (but related) product—the SEP license—at the inflated rate *and* agreed not to challenge those rates or patents via litigation.

OEMs faced a predicament—if they refused to pay what Qualcomm wanted, they could not buy chips—from Qualcomm (*or*, for practical purposes, from a competitor). To maintain chip supply and stay in business, OEMs paid Qualcomm what Qualcomm wanted for SEP rights and agreed not to sue Qualcomm over its intellectual property portfolio. This policy was chip-supplier neutral, meaning Qualcomm did not officially mandate that OEMs buy chips from Qualcomm.

But Qualcomm then offered OEMs a large rebate for exclusive chip-buying arrangements. Plaintiffs argue this rebate was a coercive disloyalty penalty, not a "discount." In other words, Plaintiffs allege that the combination of these practices inflated the "all-in" cost of modem chips for OEMs because OEMs paid for the modem chip itself, a FRAND royalty to access the SEP, *and* an added "surcharge" above that FRAND rate to ensure continued access to chips.  (*Id.* ¶ 199.)

Plaintiffs offer the following hypothetical to illustrate the harm to consumers and competitors.  (*Id.* ¶ 74.) In this imagined scenario, a FRAND royalty for Qualcomm's SEP license amounts to $5/chip. Qualcomm violates its FRAND obligations, and charges OEMs $15/chip for the SEP license.  OEMs still have a choice to purchase chips from either Qualcomm or "Chip Competitor"—the policy is chip supplier neutral. Chip Competitor offers the OEM a $16/chip price.  Qualcomm offers a $25/chip price *and* Qualcomm offers what amounts to $10/chip in "incentives" or "rebates" if the OEM buys 100% of its chips from Qualcomm.  The OEM thus has two offers on the table:

- **Option 1:** Buy from Chip Competitor for $31/chip "all in"
  - **SEP Price**: $15 to Qualcomm per SEP license per chip
  - **Chip Price**: $16 to Chip Competitor per chip

- **Option 2:** Buy 100% of chips from Qualcomm for $30/chip "all in"
  - **SEP Price**: $15 to Qualcomm per SEP license per chip
  - **Chip Price**: $25 to Qualcomm per chip
  - **Exclusivity Rebate**: $10 *from* Qualcomm to OEM

The rational OEM would, of course, buy from Qualcomm.  If, however, Qualcomm abided by its FRAND commitments ($5/SEP license/chip), the following scenarios would be available:

- **Option 1:** Buy from Chip Competitor for $21/chip "all in"
  - **SEP Price**: $5 to Qualcomm per SEP license per chip
  - **Chip Price**: $16 to Chip Competitor per chip

- **Option 2:** Buy from Qualcomm for $30/chip "all in"
  - **SEP Price**: $5 to Qualcomm per SEP license per chip
  - **Chip Price**: $25 to Qualcomm per chip
  - **Exclusivity Rebate**: (Non-existent because Qualcomm does not have the

United States District Court
Northern District of California

1        supra-FRAND $10/SEP license to rebate)[5]

2     In that scenario, the OEM would choose the $21/chip from Chip Competitor rather than the

3     $30/chip to Qualcomm.

4        Plaintiffs allege the first scenario occurred.  As a result, (1) chip competitors could not

5     break into the market because Qualcomm used the combination of SEP patent hold up, "no

6     license, no chips," and exclusive dealing to lock out competition, (2) OEMs overpaid because chip

7     competitors could not compete, and (3) OEMs passed along those harms to individual consumers.

8        **D.      Plaintiffs' Alleged Injury and the Putative Class**

9        Plaintiffs Sarah Key, Andrew Westley, Terese Russell, and Carra Abernathy reside in

10    California.  (*Id.* ¶¶ 23–26.)   They seek to represent the following class:

12           All natural persons and entities who purchased, paid for, and/or
          provided reimbursement for some or all of the purchase price for all
13        UMTS, CDMA (including CDMAone and CDMA2000) and/or LTE
          cellular devices ("Relevant Cellular Devices") for their own use and
14        not for resale from February 11, 2011, through September 27, 2018
          (the "Class Period") in California. This class excludes (a) Defendant,
15        its officers, directors, management, employees, subsidiaries, and
          affiliates; (b) all federal and state governmental entities; (c) all
16        persons or entities who purchased Relevant Cellular Devices for
          purposes of resale; and (d) any judges or justices involved in this
17        action and any members of their immediate families or their staff.

18    (*Id.* ¶ 224.)  Key bought an Apple iPhone 6 during the class period.  (*Id.* ¶ 23.)  Westley bought a

19    Samsung Galaxy Tab-E Tablet and an Android cellular phone during the class period.  (*Id.* ¶ 24.)

20    Russell bought an Apple iPad Mini, an Amazon Kindle Paperwhite, an Apple iPhone 6 Plus, and a

21    Samsung smartphone during the relevant period.  (*Id.* ¶ 25.)  And Abernathy bought an Apple

22    iPhone 7 Plus during the class period.

23        Based on the Qualcomm's business practices as detailed above, Plaintiffs estimate OEMs

24    overpaid by over $9 billion during the class period, (*id.* ¶ 198), and OEMs passed 93.2% of these

25    overcharges on to consumers, (*id.* ¶ 212.)

26    //

28    [5] (Dkt. No. 1 ¶ 74.)

United States District Court
Northern District of California

## II.      Procedural Background

In a separate action, initiated in January 2017, the Federal Trade Commission ("FTC") sued Qualcomm in the Northern District of California and alleged Qualcomm engaged in unfair methods of competition in violation of the Federal Trade Commission Act and the Sherman Act. *See*, *generally*, *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020).  Afterward, many consumers filed class action lawsuits against Qualcomm.  These lawsuits generally alleged that Qualcomm's conduct violated state and federal antitrust and consumer protection laws.

### A.      In Re: Qualcomm Antitrust Litigation

Plaintiffs in several of the class action lawsuits moved to centralize pretrial proceedings in a single judicial district, pursuant to 28 U.S.C. § 1407(a).  The Judicial Panel on Multidistrict Litigation issued a transfer order to this Court for "coordinated or consolidated pretrial proceedings" in the multidistrict litigation ("MDL") arising out of Qualcomm's allegedly anticompetitive conduct.  (*See* Dkt. No. 1 at 1–3.)

The MDL plaintiffs filed a Consolidated Class Action Complaint asserting two federal statutory claims and two state statutory claims: (1) a claim under the California Cartwright Act, (2) a claim under § 1 of the federal Sherman Act, (3) a claim under § 2 of the federal Sherman Act, and (4) a claim under the California Unfair Competition Law ("UCL").  (Dkt. No. 94.)

After Qualcomm filed a motion to dismiss all claims and strike Plaintiffs' nationwide class allegations, (Dkt. No. 110), the Court dismissed only the federal Sherman Act claims to the extent those claims sought damages, (Dkt. No. 175 at 45.)  Plaintiffs retained their California Cartwright Act and UCL claims, and their federal Sherman Act claims to the extent those sought non-monetary relief.  Plaintiffs filed a first amended complaint (the "FAC") and Qualcomm answered. (Dkt. Nos. 490, 495.)

Plaintiffs then moved for class certification on behalf of a nationwide class.  (Dkt. No. 524.)  The Court granted that motion, ruling that Plaintiffs could seek damages on behalf of a nationwide class under the Cartwright Act.  (Dkt No. 760.)  Qualcomm sought interlocutory review in the United States Court of Appeals for the Ninth Circuit.  *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021). While that interlocutory appeal was pending, the Ninth

14

United States District Court
Northern District of California

1    Circuit issued its opinion in *FTC v. Qualcomm*.

2         **B.    *FTC v. Qualcomm***

3         As noted above, the FTC also sued Qualcomm alleging Qualcomm's conduct violated the

4    Sherman Act, 15 U.S.C. §§ 1, 2, by unreasonably restraining trade in, and unlawfully

5    monopolizing the CDMA and premium LTE Markets.  After a 10-day bench trial, the district court

6    agreed.  *Fed. Trade Comm'n v. Qualcomm Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019), *rev'd and*

7    *vacated*, 969 F.3d 974 (9th Cir. 2020).  The district court entered judgment in favor of the FTC

8    and enjoined several of Qualcomm's business practices.  The Ninth Circuit stayed that injunction

9    pending appeal.  *FTC v. Qualcomm*, 935 F.3d 752 (9th Cir. 2019).  After considering briefing and

10   oral argument, the Ninth Circuit reversed the district court's decision and vacated the injunction in

11   *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020).

12        The Ninth Circuit differentiated between "anticompetitive" and "hypercompetitive"

13   behavior.  *Id.* at 1005.  Under federal antitrust law, anticompetitive behavior is illegal.  *Id.*  But

14   hypercompetitive behavior is not.  *Id.*  The Ninth Circuit determined the latter better describes

15   Qualcomm's business practices.  *Id.*  It held Qualcomm "asserted its economic muscle with vigor,

16   imagination, devotion, and ingenuity." *Id.* (cleaned up).  And acted with "sharp elbows."  *Id.*  But

17   the Ninth Circuit determined a court's role is not to condone or punish success, but rather to

18   determine whether Qualcomm's successful practices "crossed the line to 'conduct which tends to

19   destroy competition itself.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458

20   (1993)).  The FTC had the burden to show Qualcomm's conduct crossed that line under the

21   Sherman Act.  *Id.*  According to the Ninth Circuit, the FTC failed to meet that burden.  *Id.*

22             **1.        The Sherman Act**

23        The Ninth Circuit found the FTC failed to meet its burden to show Qualcomm's business

24   practices were unlawful under §§ 1 or 2 of the Sherman Act.  Section 1 prohibits "[e]very contract,

25   combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

26   among the several States." 15 U.S.C. § 1.  The Supreme Court "has long recognized that, in view

27   of the common law and the law in this country when the Sherman Act was passed, the phrase

28   'restraint of trade' is best read to mean 'undue restraint.'" *FTC v. Qualcomm*, 969 F.3d at 988

United States District Court
Northern District of California

(cleaned up).  To establish liability under § 1, "a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in *unreasonable* restraint of trade." *Id.* at 989.

"Restraints that are not unreasonable *per se* are judged under the rule of reason."  *Id.* (quoting *Ohio v. Am. Express Co.*,138 S. Ct. 2274, 2284 (2018)). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s *actual* effect' on competition."  *Id.*  Ultimately, "a plaintiff may prove that a restraint has anticompetitive effect either directly or indirectly." *Id.*  Direct evidence includes "proof of actual detrimental effects on competition . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (cleaned up).  Indirect evidence involves "proof of market power plus some evidence that the challenged restraint harms competition."  *Id.*

"While § 1 of the Sherman Act targets concerted anticompetitive conduct, § 2 targets independent anticompetitive conduct."  *Id.* at 989–990 (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010)). The statute makes it illegal to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To establish liability under § 2, a plaintiff must show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *FTC v. Qualcomm*, 969 F.3d at 988 (cleaned up).  "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not [itself] unlawful; [instead,] it is an important element of the free-market system." *Id.* (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).  Indeed, it is "[t]he opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Id.* Thus, under § 2, the possession of monopoly power will not be found unlawful unless it is "accompanied by an element of anticompetitive conduct."  *Id.*

"[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'—that is, it 'must harm the competitive *process* and thereby harm consumers.'" *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).  By contrast, "harm to one or more *competitors* will not suffice."  *Id.*  (emphasis in original).  And allegations that conduct "has

16

the effect of reducing consumers' choices or increasing prices to consumers do not sufficiently allege an injury to competition . . . because both effects are fully consistent with a free, competitive market." *Id.* (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)) (cleaned up).

### 2. *FTC v. Qualcomm*'s Analysis under the Sherman Act

As a "threshold step in any antitrust case," a court must define the relevant market—i.e. "the area of effective competition." *Id.* at 992. In *FTC v. Qualcomm*, the relevant markets were "the market for CDMA modem chips and the market for premium LTE modem chips." *Id.* The Ninth Circuit held the district court correctly identified those markets but analyzed anticompetitive behavior beyond those markets. *Id.* Specifically, the district court erred by focusing on economic harms to OEMs—who are Qualcomm's customers, not its competitors. *Id.* Thus, "even if Qualcomm's practices are interrelated, actual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law." *Id.* at 993. Instead, the court "reframe[d]" the issues to focus on the effect of Qualcomm's practices on the CDMA and premium LTE chip market. *Id.*

The decision in *FTC v. Qualcomm* rests on three premises. First, Qualcomm's practice of licensing SEPs exclusively to OEMs, and not to competitors, does not violate the Sherman Act. *Id.* at 1005. Second, Qualcomm's patent-licensing royalties and "no license, no chip" policy did not impose an anticompetitive surcharge on rivals' modem chip sales. *Id.* And third, based on the record in that case, Qualcomm's 2011 and 2013 agreements with Apple "have not had the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market." *Id.*

### a. Refusing to License Competitors

Qualcomm has no duty to license SEPs to rival chipmakers under federal antitrust law. *Id.* Because the Sherman Act protects competition, not competitors, there is no duty to deal under the terms and conditions preferred by a competitor's rivals. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)). Put another way: "Competitors are not required to engage in a lovefest." *Id.* The Supreme Court recognized that rule is not absolute in *Aspen Skiing Co. v.*

*Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).[6]  On appeal, however, the FTC conceded the

*Aspen Skiing* exception did not apply.  *FTC v. Qualcomm*, 969 F.3d at 995.  Nevertheless, the FTC

argued Qualcomm's conduct violated § 2 because Qualcomm broke its promise to license SEPs to

competitors on a FRAND basis.  *FTC v. Qualcomm*, 969 F.3d at 995.

The court disagreed and "decline[d] to hold that Qualcomm's alleged breach of its SSO

commitments to license its SEPs on FRAND terms, even assuming there was a breach, amount to

anticompetitive conduct in violation of § 2."  *Id.* at 997.  Assuming a contractual obligation

existed, "the FTC still [did] not satisfactorily explain how Qualcomm's alleged breach of this

contractual commitment *itself* impairs the opportunities of rivals."  *Id.* at 995 (emphasis in

original).

Under *FTC v. Qualcomm*, (1) licensing royalties are "a distinct business practice" from

chip sales; (2) that practice harms OEMs, not rival chipmakers; and (3) Qualcomm's OEM

licensing practice was "chip-supplier neutral" because Qualcomm collects royalties from all

OEMs that license its SEPs, not just rivals' customers.  *Id.* at 996.  The court emphasized that the

FTC did not identify a harm to competition—particularly because Qualcomm allowed rivals to

make chips without a license.  *Id.*[7]  Rivals (namely, Intel and MediaTek) *did* enter the competitive

marketplace.  *Id.*  And other comparable SEP holders copied Qualcomm's licensing practices.  *Id.*

Nor was there evidence that Qualcomm intentionally deceived the SSOs.  *Id.* (distinguishing

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3rd Cir. 2007), which found an antitrust

violation where Qualcomm intentionally deceived SSOs and charged discriminatorily higher

royalty rates to competitors and OEMs using non-Qualcomm chips).

Thus, the Ninth Circuit found Qualcomm's alleged contractual violations *did not* constitute

---

[6] Under *Aspen Skiing*, a competitor may not (1) unilaterally terminate a voluntary and profitable
course of dealing, where (2) the only conceivable rationale or purpose is to sacrifice short-term
benefits in order to obtain higher profits in the long run from the exclusion of competition, and (3)
the refusal to deal involves products the defendant already sells in the market to other similarly
situated customers.  *See FTC v. Qualcomm*, 969 F.3d at 993–994.

[7] The opinion describes these CDMA ASIC agreements as "no license, no problem" as to
Qualcomm's competitors.  More precisely, the agreements could be described as "no license, no
problem, *so long as you sell to licensed OEMs and report on those sales.*"

an antitrust violation. The court further cautioned against using antitrust law to remedy contractual disputes between parties "engaged in the pursuit of technological innovation." *Id.* at 997.

### b.    Surcharging and "no license no chips"

Next, the Ninth Circuit held the district court's "anticompetitive surcharge" theory failed "to state a cogent theory of anticompetitive harm." *Id.* at 998.  The district court had emphasized the "all in" price of chips sold by Qualcomm's rivals effectively includes two components: (1) the nominal chip price; and (2) Qualcomm's royalty surcharge (i.e. the difference between a FRAND rate and Qualcomm's SEP royalty rate).  The Ninth Circuit rejected this theory.

Even assuming Qualcomm's SEP royalty rates were unreasonable as a factual matter, the Ninth Circuit rejected the "surcharge" characterization.  *Id.* at 1000.  The district court primarily relied on *Caldera, Inc. v. Microsoft Corp.*, for its surcharging theory.  87 F. Supp. 2d 1244 (D. Utah 1999).  In that case, Microsoft required OEMs to pay a royalty on every machine shipped, regardless of whether the machine contained Microsoft's software or a competitors' software.  *Id.* at 1249–50.  Thus, OEMs paid two royalties per product (Microsoft's royalty and a competitor's royalty), *unless* the OEM chose to use Microsoft's software.  *Id.* at 1250.  This scheme was "a naked tax" that had the practical effect of exclusivity.  *Id.*  The Ninth Circuit found *Caldera* inapposite to the allegations in *FTC v. Qualcomm*.  *FTC v. Qualcomm*, 969 F.3d at 1000.  Qualcomm's royalties are "qualitatively different" from those at issue in *Caldera* because the SEPs have value whether the OEM uses Qualcomm's modem chips or a competitor's modem chips.  *Id.*  In either case, an OEM needs the SEP license.  Thus, unlike in *Caldera*, the OEM never pays twice for the same value—even if it uses a competitor's chip.

On appeal, the FTC pursued a different theory.  It argued Qualcomm used *high* licensing fees to finance anti-competitively *low* chip pricing.  "[T]o prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) the prices complained of are below an appropriate measure of its rival's costs; and (2) there is a dangerous probability that the defendant will be able to recoup its investment in below-cost prices." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (cleaned up).  The FTC argued that:

> Qualcomm's royalty rates impose an anticompetitive surcharge on its rivals' sales not for the reasons at play in *Caldera*, but rather because Qualcomm uses its licensing royalties to charge anticompetitive, ultralow prices on its own modem chips—pushing out rivals by squeezing their profit margins and preventing them from making necessary investments in research and development.

*FTC v. Qualcomm*, 969 F.3d at 1000–01.  This argument failed for two reasons.  First, the FTC offered "no evidence that Qualcomm engaged in predatory pricing," and second, "the district court's entire antitrust analysis [was] premised on the opposite conclusion: that Qualcomm 'charge[s] monopoly prices on modem chips.'" *Id.* at 1001.

The panel found Qualcomm's "no license, no chips" policy inoffensive for similar reasons.  High royalty rates may harm OEMs, but OEMs are Qualcomm's customers, not its competitors, and OEMs must buy the SEP license regardless of whether the OEM buys Qualcomm's chips or a competitors' chips.[8] *Id.* at 1001.  Qualcomm rivals' chips practice Qualcomm's SEPs.  And Qualcomm is entitled to collect a royalty on those SEPs.  Whether Qualcomm's pricing was reasonable is a question for patent law, not federal antitrust law.  *Id.*

### c.    Exclusive Dealing

Finally, the court addressed Qualcomm's alleged "exclusive dealing" arrangements with Apple.  *Id.* at 1003.  Qualcomm positioned these agreements not as exclusive deals, but as "volume discounts." *Id.*

Exclusive dealing involves an agreement between a vendor and a buyer to prevent the buyer from purchasing a good from another vendor.  *Id.* (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)).  These agreements are not per se illegal because such contracts can enhance competition.  *Allied Orthopedic*, 592 F.3d at 996.  Rather, an exclusive dealing arrangement violates the Sherman Act under the rule of reason only if "its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Id.*

---

[8] The court distinguished between "no license, no chips" and "no chips, no license."  Because a license is vital to use chips, the later policy may create an antitrust problem.  If a competitor refused to buy chips under a "no chips, no license" program, they could not use a competitors' chips either without risking infringement.  But under a no license, no chips program the opposite is true.  An OEM can use either a Qualcomm chip or a competitors' chip.  Because both chips leverage Qualcomm's SEPs, the OEM must pay (*once*) for the right to use that intellectual property.

United States District Court
Northern District of California

(quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)

The Ninth Circuit found "some merit in the district court's conclusion that the Apple agreements were structured more like exclusive dealing contracts than volume discount contracts," but did "not agree that these agreements had the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market." *FTC v. Qualcomm*, 969 F.3d at 1004. Specifically, the court emphasized Intel's success winning Apple's business undermined the FTC's theory of anticompetitive effect:

> During the relevant time period (2011–2015), the record suggests that the only serious competition Qualcomm faced with respect to the Apple contracts was from Intel, a company from whom Apple had considered purchasing modem chips prior to signing the 2013 agreement with Qualcomm. The district court made no finding that any other specific competitor or potential competitor was affected by either of Qualcomm's agreements with Apple, and it is undisputed that Intel won Apple's business the very next year, in 2014, when Apple's engineering team unanimously recommended that the company select Intel as an alternative supplier of modem chips. The district court found that "Qualcomm's exclusive deals . . . delayed Intel's ability to sell modem chips to Apple until September 2016." There is no indication in the record, however, that Intel was a viable competitor to Qualcomm prior to 2014–2015, or that the 2013 agreement delayed Apple's transition to Intel by any more than one year. Given these undisputed facts, we conclude that the 2011 and 2013 agreements did not have the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market.

*Id.* at 1004–05 (cleaned up).  Moreover, because Apple had already terminated these agreements, the court found injunctive relief unwarranted.  *Id.* at 1005.

\* \* \*

In sum, the court vacated the district Court's opinion because (1) Qualcomm's practice of licensing its SEPs exclusively to OEMs, and not to competitors, does not violate the Sherman Act; (2) Qualcomm's patent-licensing royalties and "no license, no chip" policy do not impose an anticompetitive surcharge on rivals' modem chip sales; and (3) the record failed to show that Qualcomm's 2011 and 2013 agreements with Apple "had the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market."  *Id.* at 1005.

1    **C.    Post-*FTC v. Qualcomm***

2        The district court's class certification order in this MDL was pending before the Ninth

3    Circuit when the panel issued its opinion in *FTC v. Qualcomm*.  *See Stromberg v. Qualcomm Inc.*,

4    14 F.4th 1059, 1066 (9th Cir. 2021).  The Ninth Circuit requested supplemental briefing from the

5    parties regarding *FTC v. Qualcomm*'s impact on the MDL.

6        After vacating the district court's class certification decision, the Ninth Circuit remanded

7    the MDL to this Court to "reconsider the viability of Plaintiffs' claims given *FTC v. Qualcomm*."

8    *Id.* at 1063.  At the time, Plaintiffs sought injunctive and monetary relief against Qualcomm,

9    asserting violations of Sherman Act §§ 1 and 2 as well as California's Cartwright Act and Unfair

10   Competition Law ("UCL").  *Id.* at 1064.  The Ninth Circuit wrote:

12           We concluded in *FTC v. Qualcomm* that Qualcomm's SEP licensing
             practices, the same practices complained of here, are lawful and not
13           anticompetitive. 969 F.3d at 1005. Because Plaintiffs' arguments in
             this case overlap with those brought in *FTC v. Qualcomm*, there
14           would have to be some extraordinary difference for Plaintiffs' claims
             here to not fail as a matter of law—for instance, differences between
15           Sherman Act claims brought by the government versus private
             parties, differences between Sherman Act analysis and other state
16           laws that might apply, or difference in Plaintiffs' ability to meet their
             burden of proof under the rule of reason. *See id.*

17   *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021).

18       After remand, Plaintiffs filed a second amended complaint ("SAC"). (Dkt. No. 899.)  The

19   SAC alleges only state-law claims under the Cartwright Act and the UCL.  Qualcomm's motion is

20   now pending before the court.

21                                   **DISCUSSION**

22       The Court must dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6)

23   "where the pleadings fail to state a claim upon which relief can be granted." *In re Webkinz*

24   *Antitrust Litig.*, 695 F. Supp. 2d 987, 992–93 (N.D. Cal. 2010).  The Court need not "accept legal

25   conclusions cast in the form of factual allegations, if those conclusions cannot reasonably be

26   drawn from the facts alleged." *Id.* at 993. Plaintiffs must allege "plausible" claims, meaning the

27   complaint must allege sufficient "fact[s] to raise a reasonable expectation that discovery will

28   reveal evidence of illegal" conduct.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "The task of a federal court in a diversity action is to approximate state law as closely as

2    possible in order to make sure that the vindication of the state right is without discrimination

3    because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). This Court

4    is "bound by the pronouncements of the state's highest court," and "[i]f the particular issue has not

5    been decided," must "predict how the state's highest court would resolve it." *Hemmings v.*

6    *Tidyman*'s, Inc., 285 F.3d 1174, 1203 (9th Cir. 2002) (citations omitted); *see also Dimidowich v.*

7    *Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (permitting federal court to "look[] for

8    'guidance' to decisions by intermediate appellate courts of the state" where the highest court has

9    not decided an issue). The Court considers "existing state law without predicting potential changes

10   in that law." *Hemmings*, 285 F.3d at 1203.

11        The Court first addresses Qualcomm's motion to dismiss Plaintiffs' Cartwright Act claims,

12   then turns to Plaintiffs' UCL claims.

**I.      Cartwright Act Claims**

14        The parties dispute the extent to which *FTC v. Qualcomm*'s antitrust analysis binds this

15   Court.  Both Plaintiffs and Qualcomm describe *FTC v. Qualcomm's* effect as (at most) *stare*

16   *decisis*, not res judicata or collateral estoppel.  (Dkt. No. 895 at 14; Dkt. No. 901 at 14.)  And the

17   parties agree *stare decisis* applies where a court has "furnished the rule for the determination of a

18   subsequent case involving identical or similar material facts and arising in the same court or a

19   lower court in the judicial hierarchy." (Dkt. No. 901 at 14 (quoting *In re Osborne*, 76 F.3d 306,

20   309 (9th Cir. 1996); Dkt. No. 906 at 7.)  But the parties dispute whether applying *FTC v.*

21   *Qualcomm* here necessarily dooms this lawsuit.

22        The Court takes the Ninth Circuit's remand instructions in *Stromberg* at face value. 14

23   F.4th at 1075.  The Ninth Circuit recognized "[t]his case and *FTC v. Qualcomm* have overlapping

24   facts and claims, and many of our conclusions in *FTC v. Qualcomm* were conclusions of law." *Id.*

25   at 1074.  Given *FTC v. Qualcomm*, the panel instructed this Court to consider whether Plaintiffs'

26   claims fail as a matter of law.  *Id.*  The court emphasized that "[b]ecause Plaintiffs' arguments in

27   this case overlap with those brought in *FTC v. Qualcomm*, there would have to be some

28   extraordinary difference for Plaintiffs' claims here to not fail as a matter of law—for instance . . .

differences between Sherman Act analysis and other state laws that might apply, or difference in Plaintiffs' ability to meet their burden of proof." *Id.* Thus, an "extraordinary difference" here means an applicable and potentially determinative difference in a legal claim or the factual basis for such a claim.

In simplest terms, Plaintiffs' complaint can survive *FTC v. Qualcomm* via two paths. Either the Cartwright and Sherman Acts differ in some way such that the SAC can survive under the Cartwright Act.  Or Plaintiffs can meet a factual burden where the FTC failed.  Qualcomm argues no distinction exists—in law or in fact—that commands a different outcome here.  At this stage, the Court agrees in part and disagrees in part.

### A.        The Cartwright Act

The California Legislature enacted the Cartwright Act "to rein in the burgeoning power of monopolies and cartels." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 136 (2015).  "The act's principal goal is the preservation of consumer welfare." *Id.*  Like antitrust law generally, the Cartwright Act "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." *Id.* (cleaned up).

The Cartwright Act "generally outlaws any combinations or agreements which restrain trade or competition, or which fix or control prices, and declares that, with certain exceptions, every trust is unlawful, against public policy and void." *Id.* (cleaned up).  *See also* Cal. Bus. & Prof. Code § 16726.  The "trust[s]" the act prohibits include any "combination . . . by two or more persons" to "create or carry out restrictions in trade or commerce," "to limit or reduce the production, or increase the price of merchandise or of any commodity," or "to prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity."  Cal. Bus. & Prof. Code § 16720.

As with the Sherman Act, not every agreement within "the four corners" of the Cartwright Act's prohibitions is illegal. *Cipro*, 61 Cal. 4th at 136.  Rather, the Cartwright Act draws "upon the common law prohibition against restraints of trade." *Id.*  Mirroring federal practice explicitly,

California law assumes "the broad prohibitions of the Cartwright Act are subject to an implied exception similar to the one that validates reasonable restraints of trade under the federal Sherman Antitrust Act." *Id.* at 137. But the Cartwright Act is "broader and deeper" than the Sherman Act.[9] *See id.* at 160–161. "Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *Id.* at 142. Thus, a claim dismissed under the Sherman Act can still survive under the Cartwright Act. *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014).

## B.   Plaintiffs' Theories of Anticompetitive Effect

At the threshold, the parties differ as to *how* the Court should analyze Plaintiffs' Cartwright Act claims. Plaintiffs argue California law requires all allegations be evaluated "as a whole." (*See* Dkt. No. 901 at 18–20 (citing *In re Automobile Antitrust Cases I & II*, 1 Cal. App. 5th 127 (2016).) According to Plaintiffs, Qualcomm improperly seeks to break apart Plaintiffs' claims into constituent pieces and "separately evaluate" each business practice in isolation. (*Id.*) Qualcomm agrees this Court should consider all Plaintiffs' factual allegations together. (Dkt. No. 906 at 12.) But, according to Qualcomm, Plaintiffs seek to "alchemize multiple non-violations into a violation" under "a new form of antitrust liability. (*Id.* at 13 (quoting *linkLine*, 555 U.S. at 457).) Instead, Qualcomm urges the Court to "analyze conduct under the same rule-of-reason approach to determine whether in the first instance, under some liability theory (*e.g.¸* exclusive dealing, tying, duty to deal, etc.) the conduct harms competition." *Id.*

The Court agrees with the latter approach.[10] At oral argument, Plaintiffs confirmed they

---

[9] For example, the Cartwright Act prohibits incipient conspiracy to violate its provisions. *See AT & T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110 (9th Cir. 2013). The Sherman Act does not. *Id.*

[10] Plaintiffs conflate theories of anticompetitive behavior with the factual bases underlying the elements within each theory. One theory could—and indeed often must—contain multiple factual bases to meet its elements. For example, Plaintiffs raise a theory of anticompetitive effect based on Qualcomm's choice to sell chips only to OEMs that bought the SEP license (the "tying" claim or "no license, no chips"). That Qualcomm *also* allegedly violated its FRAND obligations and refused to license rivals may have strengthened Qualcomm's tie between chips and licenses because OEMs could not buy chips from competitors and rely on the competitors' exhaustive SEP

rely on two theories of anticompetitive behavior: a "tying" claim and an "exclusive dealing" violation under the Cartwright Act.  (Dkt. No. 912 at 5:20–21); *see also Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1140 (9th Cir. 2022) ("The responsibility for framing the case lies with the parties.")  As the Court analyzes these two theories at the motion to dismiss phase, the Court considers whether the factual allegations in the SAC—considered as a whole—state a claim for anticompetitive tying or exclusive dealing.  *See, e.g., Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 314 (2003) (analyzing specific competitive restraint theories based on plaintiff's allegations viewed as a whole).

### 1.      Tying

"Tying is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 339 (2003) (cleaned up).  To plead an unlawful tying claim, Plaintiffs must allege (1) the defendant tied together the sale of two distinct products; (2) the defendant had sufficient economic power in the tying product's market to coerce the purchase of the tied product; (3) the arrangement affects a "not insubstantial volume of commerce" in the tied product market; and (4) the complaining party sustained a pecuniary loss as a consequence of this unlawful act.  *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008); *see also UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008).  Tying is anticompetitive because it allows a competitor to use market power in one area (the tying market) to restrain competition in a distinct, second market (the tied market).  *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 543 (1998).

### a.      Defining the Tie

Plaintiffs allege the "no license, no chips" policy was an unlawful tying agreement.  The tying products were Qualcomm's chips.  The tied products were the SEP licenses.  If a customer

---

licenses for protection in patent litigation.  The Court considers all of these factual allegations in the complaint a whole to determine whether Plaintiffs state a claim for anticompetitive behavior under the "tying" theory of liability.

United States District Court
Northern District of California

wanted to buy Qualcomm's chips, Qualcomm mandated the customer purchase the SEP licenses. The SEP licenses included a right to practice the SEP technologies in exchange for (1) the buyer's agreement to pay a supra-FRAND royalty (calculated as a percentage of the final handset price), and (2) an agreement to "forfeit the right to challenge Qualcomm's patents or license terms through litigation." (Dkt. No. 899 ¶ 60.)

### b.      Analysis of the Tying Claim

Plaintiffs plead the first two elements of a tying claim. First, Plaintiffs allege Qualcomm agreed to sell one product (chips) on the condition the OEM also purchased a second product (the SEP license). (*See* Dkt. No. 899 ¶¶ 58–66). Next, a tying claim requires Plaintiffs to show Qualcomm used its monopoly power in the chip market "to coerce" the OEMs to buy the tied SEP license. Plaintiffs also plead this element. The SAC alleges Qualcomm had monopoly power in the CDMA and LTE chip markets and Qualcomm threatened OEMs' chip supply if OEMS refused to buy the SEP licenses at supra-FRAND rates. (*Id.* ¶¶ 66–68, 171.)

The crux of the dispute, however, is the third element. The third element requires "a substantial amount of sale was effected" to "competitors" in the tied product market. *Misericordiae Hosp.*, 169 Cal. App. 4th at 369, 371 (emphasis added). Under this element, a plaintiff must allege "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie [in the tied product's market]." *Morrison*, 66 Cal. App. 4th at 543 (emphasis added). "A transaction cannot restrain trade when no competitor exists from whom to purchase the tied product." *Id.* Here, the parties dispute whether a second, tied market exists.

### i.      The Tied Market

In the SAC, Plaintiffs define the tied product market as follows:

> The relevant market for the tied product is the market for cellular SEPs. All four major U.S. cellphone networks operate on the cellular standards at issue (WCDMA/UMTS, CDMA2000, and LTE), and Qualcomm owns SEPs for all three types of cellular standards. The control of SEPs creates a potential to charge supracompetitve licensing fees. And Qualcomm's ability to charge a supra-FRAND royalty for its SEP licenses inherently demonstrates a market for the tied product of Qualcomm's SEPs.

(Dkt. No. 899 ¶ 172.)  But, from this description, it is not clear whether the tied market is "cellular SEPs" generally, or "Qualcomm's SEPs" in particular.  (*Id.*)  In other words, is the relevant area of competition the market to sell a right to practice Qualcomm's SEPs? Or is the relevant market the competition to establish and maintain an SEP generally?

No competitor exists to sell Qualcomm's SEPs.  SEPs are lawful monopolies—an OEM could not buy a license to practice Qualcomm's SEPs from a competitor.  Rather, whether the OEMs buy a Qualcomm chip or not, OEMs must purchase an SEP license from Qualcomm to practice the patented technologies.  Qualcomm allegedly charged unreasonable rates for those licenses.  But, as the Ninth Circuit explained, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not [itself] unlawful; [instead,] it is an important element of the free-market system." *FTC v. Qualcomm*, 969 F.3d at 988 (cleaned up) (quoting *Trinko*, 540 U.S. at 407).  Rather, the *FTC v. Qualcomm* court held Qualcomm's SEP royalty pricing is a question for patent law or contract law, not antitrust law.  The "no license, no chip" policy does not foreclose competition to buy Qualcomm's SEPs because there is no alternative seller.  And the "no license, no chips policy" was chip supplier neutral—i.e. Qualcomm required OEMs to buy licenses, regardless of who sold the chips to OEM.  So here, as in the FTC action, Qualcomm did not restrain competition to sell those SEPs through "no license, no chips" because there is no alternative seller for Qualcomm's SEPs.

Despite *FTC v. Qualcomm*, Plaintiffs argue there is, in fact, a tied market related to SEPs. (Dkt. No. 901 at 11, 22.)  Plaintiffs argue Qualcomm's tying conduct (conditioning the sale of modem chips on agreements not to challenge its intellectual property portfolio), harmed this SEP "market." They insist the Ninth Circuit did not consider this tied market because the FTC did not present a tying claim. (Dkt. No. 912 at 7:3–16.)  Plaintiffs allege that "but for" the tie to Qualcomm's chip-supply monopoly, customers would have challenged the validity of Qualcomm's SEPs and Qualcomm's excessive royalty rates.  (Dkt. No. 901 at 23.)  With the tie, however, OEMs did not challenge Qualcomm's SEPs or the SEP royalty rates because they feared losing Qualcomm as a chip supplier.

Put differently, Plaintiffs' tying theory relies on the existence of a tied market for

1   intellectual property in which Qualcomm restrains competition by disallowing customer

2   challenges to its patents or license agreements.  To establish this market, Plaintiffs rely on the

3   California Supreme Court's 2015 decision in *Cipro*, 61 Cal. 4th 116 (2015).  According to

4   Plaintiffs, the California Supreme Court's *Cipro* decision "makes clear that it would reject [(1)

5   that SEP royalty pricing is a problem for patent or contract law, not antitrust, and (2) that the no

6   license no chip tie does not harm competition in the relevant antitrust market] as a matter of law."

7   (Dkt. No. 901 at 26- 27.)  The Court disagrees.

### ii.      Cipro

9          *Cipro* concerned "reverse payment settlements under the Hatch-Waxman Act."  *Cipro*, 61

10  Cal. 4th at 134.  Hatch-Waxman incentivizes pharmaceutical companies to challenge competitors'

11  patents and attempt to make a "generic" version of a patented drug.  *See* 21 U.S.C. § 355.  The

12  first successful challenger gets an exclusivity period to market and sell the generic drug before

13  other competitors follow suit.  *Id.*  But subsequent challengers face significant burdens to

14  launching a product—regardless of the first challenger's success or failure in litigation.  *Cipro*, 61

15  Cal. 4th at 134–35.  This creates a perverse incentive.  Rather than litigate, the patent holder can

16  settle with the first challenger, continue to charge monopoly prices on the patented drug, and split

17  the profits with the first challenger.  *Id.*  Thus, the scheme allows a patent holder and the first

18  challenger to establish a "cartel" to delay other prospective patent challenges and split the profits

19  during the intervening period.  *Id.* at 135.

20         Prior to *Cipro*, California courts applied the "scope of the patent approach" to determine

21  whether a patent-action settlement violated the Cartwright Act.  *Id.* at 138–139.  Under that rule,

22  "a settlement of a lawsuit to enforce a patent [did] not violate the Cartwright Act if the settlement

23  restrains competition only within the scope of the patent, unless the patent was procured by fraud

24  or the suit for its enforcement was objectively baseless." *Id.* at 139.  In other words, patents were

25  presumptively viable and a contract that did not extend the monopoly beyond the patent's lifespan

26  or breadth did not create any additional injury to competition.  *Id.  Cipro* did away with the "scope

27  of the patent" test.  In doing so, the California Supreme Court explicitly mirrored the Supreme

28  Court's reasoning in in *Federal Trade Commission v. Actavis, Inc.*, which found Hatch-Waxman

United States District Court
Northern District of California

1    reverse patent settlements violated the Sherman Act.  570 U.S. 136 (2013).

2          Both cases recognized "patents are in a sense probabilistic, rather than ironclad: they grant

3    their holders a potential but not certain right to exclude."  *Cipro*, 61 Cal. 4th at 143.  Because a

4    challenger might succeed when challenging a patent, the patent's expected lifespan ends *before* the

5    patent's formal expiration date.  *Id.*  Thus, agreements to avoid patent litigation can violate

6    antitrust law if the patent holder is paying a competitor to *delay* a patent challenge because delay

7    expands the scope of the monopoly via contract.  *Id.* at 151 ("If the settlement contains no

8    component of delay and permits the generic to enter the market and compete fully and

9    immediately, there is no restraint of trade and no potential for antitrust concern.")

10                          **iii.      Plaintiffs' *Cipro* Tying Theory**

11          Plaintiffs argue *Cipro* stands for the proposition that "abuse of patent rights may also run

12   afoul of antitrust law."  *Id.* at 145 (quoting *Fruit Mach. Co. v. F. M. Ball & Co.*, 118 Cal. App. 2d

13   748 (1953)).  That is true.  *Cipro* applied a general antitrust violation— paying rivals not to

14   compete in exchange for a share of the monopoly profits—to the patent context.  But a *Cipro*

15   violation is not formally alleged here.  *Cipro* concerns horizontal restraints (between competitors)

16   in the patent context, not a vertical (seller-customer) agreement.  So here, unlike in *Cipro*,

17   competitors can challenge Qualcomm's SEPs because they are not parties to the license

18   agreements and the unique Hatch-Waxman provisions limiting such challenges do not apply.

19          Plaintiffs argue *Cipro* is evidence the California Supreme Court "would" find unlawful

20   tying where the "tied" product includes an agreement not to challenge an SEP.  Put differently,

21   *Cipro* recognizes a violation when a patent holder pays competitors to delay patent litigation.  By

22   tying chip sales (where Qualcomm holds monopoly power) to an agreement relinquishing

23   litigation over SEP licenses, Qualcomm defanged the customers' willingness to challenge its

24   patents and its royalties.  (Dkt. No. 901 at 23.)  Thus, according to this theory, requiring a

25   *customer* not to challenge patents and licensing rates (by withholding chip supply and refusing to

26   deal) restrains competition over the SEPs' validity and results in supra-FRAND royalty rates that

27   harm consumers.  Unlike in *FTC v. Qualcomm*, this theory does not require the Court to find the

28   supra-FRAND royalties are an antitrust violation.  Rather, the supra-FRAND royalties are a

United States District Court
Northern District of California

symptom of the unlawful tie between chip sales and a license requiring licensees to forgo the right to challenge the SEPs.

This novel theory expands tying claims to a new context.  Plaintiffs cite no case finding an antitrust tying violation where a "tied" product has, in their words, no "rival sellers."  (*Id.* at 22 n.12.)  But, Plaintiffs argue the California Supreme Court *would* find an antitrust violation because a key treatise "explains in detail why the conduct described in *FTC v. Qualcomm* demonstrates anticompetitive effects rather than 'zero foreclosure,'" (*id.* (citing AREEDA & HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1780c)), and *Cipro* cites a portion of an earlier edition of that treatise and other writings from its editor, *see Cipro*, 61 Cal. 4th at 135, 150.  That inferential chain fails to support Plaintiffs' novel tying theory.

\* \* \*

In sum, Plaintiffs ask this Court to strike a new path in tying jurisprudence under the Cartwright Act, just as *Cipro* did in the realm of horizontal restraint.  That is not this Court's prerogative.  When applying the Cartwright Act, this Court considers "existing state law without predicting potential changes in that law." *Hemmings*, 285 F.3d at 1203.  No cases support Plaintiffs' novel tying theory.  Under California law as it stands, a tying "transaction cannot restrain trade when no competitor exists from whom to *purchase* the tied product." *Morrison*, 66 Cal. App. 4th at 543 (emphasis added). Without any basis in caselaw, the Court cannot invent a novel tying violation here.  Plaintiffs' tying claim fails as a matter of law.

### 2.    Exclusive Dealing

Plaintiffs' second theory alleges Qualcomm made anticompetitive exclusive dealing agreements with OEMs that foreclosed a substantial share of the chipset market.  An exclusive dealing agreement is one in which a seller and a buyer agree the buyer will buy only the seller's product or agree the buyer will not buy the product of one of seller's competitors. *See Fisherman's Wharf*, 114 Cal. App. 4th at 335.  Such provisions are often a part of franchise agreements or distributorship contracts. *Id.*  In California (and under federal antitrust law), exclusive dealing arrangements are not illegal per se but may be illegal if they unreasonably

United States District Court
Northern District of California

1   restrict competition in a particular market.  *Id.*  To violate the Cartwright Act, an exclusive deal

2   must cause "significant foreclosure" of the market to competitors.  *Id.*

3       Qualcomm moves to dismiss solely on the grounds *FTC v. Qualcomm* precludes Plaintiffs'

4   exclusive dealing claim.  (Dkt. No. 895 at 18.)  The Court disagrees.  In *FTC v. Qualcomm*, the

5   Ninth Circuit assumed the Apple-Qualcomm deals were "exclusivity" agreements.  The panel

6   held—as a factual matter—the record failed to show the agreements substantially foreclosed

7   competition.  Specifically, the court wrote:

> During the relevant time period (2011–2015), **the record** suggests
> that the only serious competition Qualcomm faced with respect to the
> Apple contracts was from Intel, a company from whom Apple had
> considered purchasing modem chips prior to signing the 2013
> agreement with Qualcomm. The district court made no finding that
> any other specific competitor or potential competitor was affected by
> either of Qualcomm's agreements with Apple, and it is undisputed that
> Intel won Apple's business the very next year, in 2014, when Apple's
> engineering team unanimously recommended that the company select
> Intel as an alternative supplier of modem chips. The district court
> found that "Qualcomm's exclusive deals . . . delayed Intel's ability to
> sell modem chips to Apple until September 2016." **There is no
> indication in the record**, however, that Intel was a viable competitor
> to Qualcomm prior to 2014–2015, or that the 2013 agreement delayed
> Apple's transition to Intel by any more than one year. Given these
> undisputed facts, we conclude that the 2011 and 2013 agreements did
> not have the actual or practical effect of substantially foreclosing
> competition in the CDMA modem chip market.

18  *FTC v. Qualcomm*, 969 F.3d at 1004–05 (emphasis added).  Thus, the *FTC v. Qualcomm* decision

19  regarding exclusive dealing relied on the factual record in that case as to the Qualcomm-Apple

20  agreements.

21      Because the factual record presented at trial in *FTC v. Qualcomm* does not bind Plaintiffs

22  here, Qualcomm's sole argument to dismiss the exclusive dealing claim falls short.  Plaintiffs were

23  not parties in *FTC v. Qualcomm*.  So, Plaintiffs may show substantial market foreclosure where

24  the FTC failed.  *See Littlejohn v. United States*, 321 F.3d 915, 923-924 (9th Cir. 2003).  Here,

25  Plaintiffs allege both Apple and *other* component part suppliers and device makers also engaged

26  in such exclusive deals.  (Dkt. No. 899 ¶ 16.)  The SAC alleges numerous OEMs other than Apple

27  bought between 85% and 100% of their chipsets from Qualcomm in exchange for "incentives" or

28  "reduced royalties."  (*Id.* ¶ 72.)  And Plaintiffs provide testimony from an Intel executive alleging

the Qualcomm-Apple agreements delayed Intel for *two* years, not one.  (*Id.* ¶ 165.)  Because Plaintiffs allege a "difference in [their] ability to meet their burden of proof," s*tare decisis* does not require dismissal of the exclusive dealing claim at this stage.  *Stromberg*, 14 F.4th at 1075.

* * *

In sum, Plaintiffs' Cartwright Act claims survive in part.  Plaintiffs fail to state a claim under the Cartwright Act for tying.  But Plaintiffs' exclusive dealing claim remains because the factual determinations in *FTC v. Qualcomm* do not bind Plaintiffs here.

## II.      The Unfair Competition Law

Plaintiffs also bring claims under California's Unfair Competition Law. Cal. Bus. & Prof. Code § 17200.  That statute prohibits any "unlawful, unfair or fraudulent business act or practice."  *Id.*  Each of these descriptions provides a separate "variety" of unfair competition.  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1051 (N.D. Cal. 2021).  Plaintiffs allege Qualcomm's practices were unlawful, unfair, and fraudulent.  Qualcomm moves to dismiss each claim.

### A.      Unlawful

Under the "unlawful" prong of the UCL, Plaintiffs must show Qualcomm's conduct "can properly be called a business practice and that at the same time is forbidden by law." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) (cleaned up).  "Virtually any law . . . can serve as a predicate for an action under Business and Professions Code section 17200." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1361 (2010).  As Qualcomm's motion to dismiss Plaintiffs' Cartwright Act exclusive dealing claim fails, Plaintiffs' UCL claim under the "unlawful" prong survives to the same extent.[11]

### B.      Unfair

Next, Qualcomm moves to dismiss Plaintiffs' claim under the UCL's "unfair" prong. Plaintiffs' unfairness argument stems from the same basic business practices as Plaintiffs' Cartwright Act tying and exclusive dealing claims.  Plaintiffs allege Qualcomm coerced

---

[11] The Ninth Circuit's decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) may bear on the availability of equitable remedies for Plaintiffs' UCL claim.  Because the parties have not briefed this issue, the Court will not address whether, or to what extent, *Sonner* applies at this time.

purchasers to pay non-FRAND rates based on the finished price of cellular devices; violated its FRAND duty to deal with competitors; made false representations to SSOs; coerced purchasers to buy chips exclusively from Qualcomm via "kickbacks"; and used unfair threats such as the "no license, no chip" policy to maintain its dominant position in the modem chip market.  (Dkt. No. 899 ¶¶ 249-251.)  Plaintiffs further argue these practices are unfair under the UCL because Qualcomm's conduct "(a) threatens an incipient and/or imminent violation of the Cartwright Act, (b) has effects that are the same as or similar to a violation of the Cartwright Act, and (c) significantly threatens and harms competition in the relevant modem chip and cellular device markets." (*Id.* ¶ 250.)

### 1.     The *Chavez* Rule

The language "unlawful, unfair, *or* fraudulent" in the UCL "makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech Commcn's, Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999).  But, in *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001), a California appellate court held that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Id.; see also City of San Jose v. Off. of the Com'r of Baseball*, 776 F.3d 686, 691 (9th Cir. 2015) (finding the same and quoting *Chavez*); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (same).  In other words, "conduct alleged to be 'unfair' because it unreasonably restrains competition and harms consumers . . . is not 'unfair' if the conduct is deemed reasonable and condoned under the antitrust laws." *Chavez.*, 93 Cal. App. 4th at 375.

### 2.     Application of the *Chavez* Rule

Plaintiffs' "unfairness" claim survives in part and fails in part.  Following *Chavez*, *FTC v. Qualcomm* precludes an "unfairness" claim arising from Qualcomm's alleged FRAND violations, its failure to abide by its obligations to SSOs, its refusal to deal with competitors, and its "no license, no chip" policy.  *FTC v. Qualcomm*, 969 F.3d at 1005.  The Ninth Circuit called these

practices "hypercompetitive," finding Qualcomm had "no antitrust duty to license rival chip suppliers" and its "no license, no chips" policy did not undermine competition in the chipset markets.  *Id.*  Because the Ninth Circuit condoned those practices under antitrust law, this Court cannot find those practices were "'unfair' because [they] restrain[ed] competition and harm[ed] consumers." *Chavez*, 93 Cal. App. 4th at 375.

But *Chavez* does not preclude an "unfairness" claim based on Qualcomm's exclusive dealing practices.  The Ninth Circuit did not deem reasonable and condone Qualcomm's exclusive dealing arrangements.  Rather, *FTC v. Qualcomm* found the FTC failed to prove substantial market foreclosure.  Because Plaintiffs may prove different facts here, the "unfair" claim based on the exclusive dealing business practices survives *Chavez.  See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1053 n.631 (N.D. Cal. 2021) (differentiating between "condoned" behaviors and allegations failing to meet an antitrust standard of proof).

### 3.      The Unfairness Tests

Under the "unfair" prong, courts may not apply purely subjective notions of fairness.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999).  Rather, the courts have constructed two primary tests to determine unfairness: the "balancing test" and the "tethering test."  The balancing test finds "unfair conduct" where a practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886–87 (1999) (quotations omitted). Under this analysis, courts engage in a balancing test in which they "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim[.]" *Id.* at 886. Finding this test "too amorphous," the California Supreme Court developed a second definition of "unfair practices" as "conduct that threatens an incipient violation of an antitrust law[ ] or violates the policy or spirit of one of those laws" and required "any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). While the second test did not originally apply to consumer actions, *see id.* at n.12, "some courts have

1    extended the *Cel-Tech* definition to consumer actions, while others have applied the old balancing

2    test," *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

3          Plaintiffs rely on both the balancing test and the tethering test.  (Dkt. No. 899 ¶¶ 249–251.)

4    As to the balancing test, Plaintiffs rehash lengthy allegations regarding FRAND violations, SEP

5    patent hold up, the no license no chips policy, and—critically—the exclusive dealing practices as

6    discussed above.  (*Id.*) Plaintiffs claim there were no countervailing benefits to consumers or

7    competition from Qualcomm's exclusive dealing practices.  At this stage, such pleadings are

8    enough.  *See Brooks v. Bank of Am., N.A.*, No. 20-CV-01348-BAS-LL, 2021 WL 1541643, at *4

9    (S.D. Cal. Apr. 20, 2021) (finding that weighing of the parties' respective interests is not

10   appropriately resolved at the pleading stage" and collecting cases re: same).

11          Because the Court finds Plaintiff can maintain the UCL claim under this theory, the Court

12   need not reach the *Cel-Tech* tethering test. *See, e.g., In re Yahoo! Inc. Customer Data Sec. Breach

13   Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *24 (N.D. Cal. Aug. 30, 2017) (denying

14   motion to dismiss UCL claim for unfair practices because, "at a minimum," one test for unfairness

15   was met).

16          **C.      Fraudulent**

17          Plaintiffs allege Qualcomm pursued a complex scheme to deceive SSOs—obtaining SEPs

18   based on FRAND promises and then disregarding those promises at the consumers' expense.

19   Qualcomm moves to dismiss on two grounds.  First, Qualcomm argues Plaintiffs fail to plead any

20   specific instances of fraudulent representations, as required under Federal Rule of Civil Procedure

21   9(b).  Second, Qualcomm argues Plaintiffs never allege reliance on Qualcomm's statements.

22          The latter objection controls the outcome here.  "Proposition 64 requires that a plaintiff's

23   economic injury come 'as a result of' the unfair competition or a violation of the false advertising

24   law."  *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 326 (2011).  In *Kwikset*, the California

25   Supreme Court recognized that "reliance is the causal mechanism of fraud."  *Id.* (quoting *In re

26   Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009)).  Thus, a plaintiff "proceeding on a claim of

27   misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the

28   allegedly deceptive or misleading statements, in accordance with well-settled principles regarding

United States District Court
Northern District of California

36

United States District Court
Northern District of California

the element of reliance in ordinary fraud actions." *Id.* at 326–327 (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 306). "'Reliance' as used in the ordinary fraud context has always been understood to mean reliance on a statement for its truth and accuracy." *Id.* at 327 n.10. "Thus, a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." *Id.*

Plaintiffs do not allege any such reliance here. Rather, they argue only a "causal connection" between the fraudulent misrepresentation and Plaintiffs' harm is necessary. Not so. *Kwikset* is clear. Plaintiffs' cited authorities—two district court cases adopting a "minority view" that disclaims reliance *between competitors*—are not persuasive. *See Lona's Lil Eats, LLC v. DoorDash, Inc.*, No. 20-CV-06703-TSH, 2021 WL 151978, at *12 (N.D. Cal. Jan. 18, 2021); *Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 552 F. Supp. 3d 901, 915 (N.D. Cal. 2021). Plaintiffs are not Qualcomm's competitors. So, because Plaintiffs fail to allege reliance they lack standing to bring a UCL claim under the "fraud" prong.

## CONCLUSION

For the reasons stated above, Qualcomm's motion to dismiss in granted in part and denied in part. Plaintiffs' Cartwright Act claim survives as to Plaintiffs' exclusive dealing theory. Plaintiffs' derivative UCL claim also survives to the same extent as Plaintiffs' Cartwright Act claim. In all other respects the motion to dismiss is granted.

The Court will hold a further case management conference on February 23, 2023 at 1:30 p.m. via Zoom video. An updated joint case management conference statement is due one week in advance.

IT IS SO ORDERED.

Dated: January 6, 2023

*Jacqueline Scott Corley*

JACQUELINE SCOTT CORLEY
United States District Judge