1  *Counsel Listed on Signature Page*

2

3

4

5

6

7

8

9

10

11  UNITED STATES DISTRICT COURT

12  NORTHERN DISTRICT OF CALIFORNIA

13  SAN FRANCISCO DIVISION

14

| | |
|---|---|
| 15  IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 3:17-md-02773-JSC |
| 16 | **JOINT CASE MANAGEMENT STATEMENT** |
| 17 | |
| 18  This Document Relates To: | Date:      February 23, 2023 |
| 19  ALL ACTIONS | Time:      1:30 p.m. |
| 20 | Place:     Courtroom 8, 19th Floor<br>Judge:     Hon. Jacqueline Scott Corley |

21

22

23

24

25

26

27

28

Pursuant to the Court's January 6, 2023, Order Setting Case Management Conference, the MDL Plaintiffs ("Plaintiffs") and Defendant Qualcomm Incorporated ("Qualcomm") (collectively, the "Parties") hereby submit this Joint Case Management Statement.

## I.     INTRODUCTION

### A.     Plaintiffs' Statement

Multiple, substantive developments—both legal and factual—have occurred since the close of fact discovery in May 2018, the close of expert discovery in December 2018, and the stay of this case in January 2019. Those changes justify Plaintiffs conducting limited and carefully targeted additional factual discovery and expert reports tied to their surviving exclusive dealing claims and reflecting the 9th Circuit's ruling on class certification and in the FTC case.

Legal Developments: When Plaintiffs completed expert discovery in December 2018, they challenged three interrelated practices by Qualcomm: (1) its so-called "No License No Chips" ("NLNC") tie; (2) its refusal to license competing chipset manufacturers; and (3) its exclusive dealing arrangement with Apple and other OEMs. Plaintiffs' experts explained how these practices caused two types of anticompetitive harm: increased chipset prices and supra-FRAND royalties, both of which were passed on to consumers.[1] While Plaintiffs presented expert testimony from Professor Elhauge that Qualcomm's conduct increased chipset prices above competitive levels, they did not quantify the chipset overcharge as a measure of damage.[2] Instead, Plaintiffs estimated antitrust impact and calculated damages based on the supra-FRAND royalty component of the overcharge.

Intervening events in the FTC case—where the Ninth Circuit found in Qualcomm's favor on all of the FTC's federal law claims—dramatically impacted the scope of this case. The Ninth Circuit panel hearing Qualcomm's Rule 23(f) appeal vacated class certification granted across a nationwide class of consumers and remanded with instructions to consider the impact of the *FTC* decision. Plaintiffs subsequently amended their Complaint to modify their allegations in light of the 9th Circuit's

---

[1] For instance, Professor Elhauge opined that Qualcomm's exclusive deals with Apple not only elevated chipset prices, but also enhanced Qualcomm's ability to extract supra-FRAND royalties. *See* Expert Report of Professor Einer Elhauge ¶¶ 127-138.

[2] *See generally*, *id.*

ruling on certification and the FTC decision, with Qualcomm moving to dismiss. In ruling on Qualcomm's motion, the Court summarized the *FTC* decision as holding that under federal law, "Qualcomm's SEP royalty pricing is a question for patent or contract law, not antitrust law." Dkt. No. 914 at 28. The Court dismissed Plaintiffs' tying claim based on the NLNC policy and their failure to license chipset rivals, but allowed Plaintiffs' exclusive dealing claim relating to Apple and other OEMs to proceed. *Id.* at 32-33.

Factual Developments: In addition to these substantial legal developments, which will have a major impact on the expert analyses in this case, there also have been several factual developments in the chipset markets since the case was stayed in January 2019. *First*, in April 2019, Apple announced that it had reached a settlement agreement with Qualcomm that (1) "ends all ongoing litigation"; (2) reached a "global patent license agreement" for six years; and (3) included a "multiyear chipset supply agreement."[3] *Second*, in July 2019, Apple announced that it had reached a deal to "acquire the majority of Intel's smartphone modem business," as part of a multi-year plan to supply its own smartphone chipsets and end its dependence on Qualcomm.[4] *Third*, news reports suggest that Apple's planned launch dates for its own smartphone chips—built off of Intel's chipset business—then slipped from 2023, to 2024, to 2025.[5]

Result: In light of these substantial developments, Plaintiffs believe they need the opportunity to conduct limited, additional discovery related to their exclusive dealing claim and to submit expert reports, which will focus entirely on Plaintiffs' exclusive dealing claims and the antitrust impact those exclusive deals had on consumers.

As an initial matter, the factual developments above suggest that there is further corroborating evidence, which did not exist before January 2019, that Qualcomm's exclusive dealing had on Intel's

---

[3] *See* https://www.apple.com/newsroom/2019/04/qualcomm-and-apple-agree-to-drop-all-litigation/.

[4] *See* https://www.forbes.com/sites/jeanbaptiste/2019/07/26/confirmed-apple-buys-intels-smartphone-modem-business-for-1-billion-in-5g-bet/?sh=6dff05a5f676.

[5] *See* https://www.engadget.com/apple-wireless-chips-iphone-to-replace-broadcom-qualcomm-143010106.html.

chipset business (since acquired by Apple) by *more* than two years. Such evidence would be relevant to demonstrating that Qualcomm's exclusive dealing substantially foreclosed competition.

Moreover, now that the Ninth Circuit has rejected the FTC's challenge to Qualcomm's supra-FRAND royalty rate and this Court has dismissed Plaintiffs' tying theory related to such royalties, Plaintiffs must have an opportunity to quantify an overcharge not solely tied to the amount of the licensing royalties charged by Qualcomm but instead caused by Qualcomm's exclusive dealing arrangements. Specifically, Plaintiffs' experts are likely to focus on the *chipset* overcharge caused by Qualcomm's exclusive dealing, instead of the overcharge caused by Qualcomm's licensing practices, which heretofore had been the focus in both Plaintiffs' and the FTC's case. Plaintiffs' experts previously opined that Qualcomm's conduct *caused* a chipset overcharge. Based on the record that existed then, Plaintiffs did not *quantify* the amount of that overcharge because their damage model focused instead on quantifying the amount of the supra-FRAND royalties charged in Qualcomm's licensing agreement. Since the Court issued its January 6 Order, Plaintiffs have been busy consulting with their experts and wish to conduct further, targeted discovery that would help align the damages model with the exclusive dealing claim now in play in this litigation.

As described further below, Plaintiffs do not seek a wholesale reopening discovery. Instead, Plaintiffs respectfully ask for the opportunity to conduct targeted additional discovery that is relevant to isolating the damages caused by Qualcomm's exclusive dealing.

Qualcomm apparently agrees with Plaintiffs that this case has "changed dramatically" since its inception. It further agrees that additional expert analysis is warranted given this change in the litigation. Despite recognizing these realities, however, Qualcomm nevertheless argues that any additional discovery – even discovery bearing on the very expert analyses that Qualcomm admits is necessary – should be foreclosed. Qualcomm is wrong. First, it bears repeating that Plaintiffs are not seeking to wholesale reopen discovery. As set forth herein, Plaintiffs have proposed limited discovery topics that would permit their experts to isolate and quantify how Qualcomm's exclusive dealings restrained the market and hobbled potential chipset rivals, thereby impacting the chipset offerings that otherwise would have been available but for the exclusive deals. Qualcomm's arguments about the burden of re-deposing a multitude of already-deposed witnesses, and obtaining documents, emails, and

1    other communications from new document custodians is a red herring. This is not what Plaintiffs have

2    proposed.

3        Second, the Court's Order on the Motion to Dismiss permitted Plaintiffs' claims on the

4    exclusive dealings to proceed, recognizing that Qualcomm's efforts to protect their modem chip market

5    share are "the final piece of the puzzle." *See* ECF No. 914, Order on Motion to Dismiss ("Order"). The

6    Court's Order noted Plaintiffs' allegations that "Apple is a particularly important OEM from the

7    perspective of a nascent [chip] supplier" because working with Apple makes that supplier more

8    competitive with other OEMs. Order at 9. The effect of the exclusive deals "foreclosed Qualcomm's

9    competitors from gaining modem chip business with Apple" and other OEMs. Order at 10. The Court

10   concluded that "Plaintiffs may show substantial market foreclosure where the FTC failed." Order at

11   32. This is precisely what Plaintiffs have proposed to do through their targeted outline of necessary

12   discovery.

13       Third, Qualcomm is wrong that the previous record failed to demonstrate that its exclusive

14   dealings caused injury. Plaintiffs' expert Professor Einer Elhauge expressly found that Qualcomm's

15   exclusive deals "increased both chip prices and SEP royalty rates." Elhauge Report ¶ 5. He further

16   opined that these deals and the resulting foreclosure "had the anticompetitive effect of reducing,

17   delaying, and sometimes outright eliminating the ability of rival chipset makers to compete with and

18   restrain the monopoly power of Qualcomm in chipsets." *Id.* And the result of this dynamic "had the

19   effect[] of . . . increasing chipset prices throughout the market." *Id.* Contrary to Qualcomm's arguments

20   in this Statement, Plaintiffs' experts found that "[e]ven after the termination of the exclusivity

21   agreements and Intel's limited entry . . . chipset rivals remained delayed and stunted compared to

22   where they would have been without exclusivity, so these anticompetitive effects have persisted." *Id.*

23   Elhauge concluded that the evidence "directly" indicated that foreclosure "weakened rival chipmakers,

24   delayed Intel's entry into the chipset market, and drove Broadcom and Ericsson out of the market. This

25   reduction in the ability or existence of chipset rivals would naturally increase Qualcomm's monopoly

26   power in chipsets, which would increase Qualcomm's ability to raise chipset prices throughout the

27   market." *Id.* ¶ 149. Thus, Plaintiffs (and their experts) have *already* articulated a cognizable theory of

28   antitrust harm – elevated chipset prices as compared to the but-for world. Qualcomm knows this and,

therefore, resorts to distortions regarding Plaintiffs' Complaint. What Plaintiffs have not heretofore done (because they were not required to in light of the different posture of the case) is quantify damages arising out of a California-only class for the exclusive dealing conduct under California law alone. Qualcomm is well aware of this and the reference to chip discounts as part of the multi-pronged anticompetitive scheme in no way forecloses damages for exclusive dealing as a standalone claim.

Finally, Qualcomm is well aware of the foregoing and the expert and factual record on these issues (indeed it even cites relevant testimony in its own portions of this statement). But it insists on claiming it cannot find a basis for the exclusive dealing in Plaintiffs' SAC – which included the other theories now dismissed by the Court.  The Rule 12(c) motion proposed by Qualcomm encompasses the very issues already briefed to the Court on the motion to dismiss. Regardless, Qualcomm conflates the but for world with the actual world in arguing that Plaintiffs' complaint fails to identify a cognizable harm arising from its conduct. Qualcomm argues that the "discounts" offered to OEMs in the real world means that their conduct actually lowered prices for phones. In other words, according to Qualcomm's views, consumers were benefitted by its monopolistic practices. But this analysis and distortion of Plaintiffs' Complaint is wrong on several fronts. First, as explained by Plaintiffs' experts, the so-called "discounts" are really nothing more than "loyalty penalties." Elhauge Report ¶¶ 8 ("exclusivity was not induced by discounts but rather coerced by the threat of penalties . . . ."). The Complaint similarly characterizes them not as discounts but as penalties. Second Amended Complaint ¶ 73. Second, as noted above, the existence of discounts in the actual world does not in any way preclude a finding of overcharges when compared to the but for world. Qualcomm's exclusive deals precluded chipset rivals from challenging their monopoly position. In the absence of the exclusive deals, rival chipset manufacturers would have been able to source OEMs and further develop, thereby providing additional competition in the chipset market and driving down the market-wide prices of modem chips. This is a fundamental precept of antitrust economics: additional competitors and increased competition lead to reduced pricing and enhanced offerings – which must be calculated in the context of the but-for world.

To the extent the Court believes such a motion is the proper next course, the Plaintiffs should be permitted to amend the complaint and serve a Third Amended Complaint.  Plaintiffs do not believe

1   it is necessary given that Qualcomm's arguments about the exclusive dealing claim could have been

2   raised in its prior motion to dismiss and/or were the subject of the Court's extensive ruling already.

3       **B.**    **Qualcomm's Statement**

4       Both parties acknowledge that the litigation has changed dramatically as a result of this Court's

5   Order ("the Order") on Qualcomm's motion to dismiss. In its Order, the Court dismissed Plaintiffs'

6   attack on Qualcomm's supposed no-license no-chips "tie," as well as their challenge to Qualcomm's

7   decision to license at the OEM level only, concluding that they failed to state a claim under either the

8   Cartwright Act or the UCL. The Court further held that the question of "[w]hether Qualcomm's pricing

9   was reasonable is a question for patent law, not federal antitrust law." Order at 20. The Court, however,

10   allowed one facet of Plaintiffs' Cartwright Act and UCL claims to proceed: Plaintiffs' allegation that

11   Qualcomm offered marketing incentives, rebates, or discounts to various OEMs—most prominently

12   Apple—that agreed to use Qualcomm's chips exclusively or near-exclusively. Order at 9. The Court's

13   Order allowed Plaintiffs' exclusive dealing allegations to proceed, rejecting Qualcomm's argument

14   that *stare decisis* foreclosed that aspect of Plaintiffs' claim. *Id.* at 32.

15       As a result, Plaintiffs are left grasping for a cognizable theory of antitrust harm. Indeed,

16   Plaintiffs' statement here confirms only that Plaintiffs have pled themselves out of a claim. Plaintiffs

17   state that their allegations of antitrust injury will likely "focus on the chipset overcharge caused by

18   Qualcomm's exclusive dealing instead of the overcharge caused by Qualcomm's licensing practice."

19   This statement, however, directly contradicts the allegations in the Second Amended Complaint

20   ("SAC"). The SAC posits that Qualcomm overcharged OEMs on royalties but then offered some relief

21   from that overcharge in the form of ***chip discounts*** to OEMs who exclusively or near-exclusively

22   purchased Qualcomm's chips. Now that the royalty overcharge allegations have been dismissed, the

23   surviving allegations in the SAC are limited to the claim that Qualcomm's purported exclusive

24   arrangements provided ***discounts*** to OEMs, which were inevitably passed through to consumers,

25   resulting in the price of phones going ***down***, not up. In other words, Plaintiffs' remaining allegation is

26   that consumers were somehow harmed because Qualcomm's discounts ***lowered*** OEMs' chip costs by

27   "ensur[ing] that OEMs will pay a lower all-in chip price if they source their chips from Qualcomm."

28   SAC  ¶ 74. Plaintiffs attempt to argue that Qualcomm's discounted chip prices somehow led to

anticompetitive harm, by claiming that although Qualcomm allegedly gave discounts on its chips to encourage OEMs to buy them, those chips would have been priced even lower in the "but-for world." This theory is inconsistent with the allegations pled in the SAC. There, Plaintiffs allege that Qualcomm "destroy[ed] . . . competition," SAC ¶ 74, by charging *a lower* chip price to OEMs that bought Qualcomm chips exclusively or near-exclusively.  If those low prices were the method by which Qualcomm excluded its competitors, that supposed anti-competitive harm would obviously not have been rectified had Qualcomm charged even lower prices for its chips. Plaintiffs' own pleading therefore negates their lone remaining theory of antitrust injury.

Acknowledging this reality, Plaintiffs request to re-open fact discovery for nine months, followed by several months of expert reports and expert discovery, and eventually briefing on the certification of some class, in an attempt to manufacture a claim where none currently exists. Plaintiffs have already received substantial discovery from Qualcomm, Intel, Apple, and a number of other OEMs concerning Plaintiffs' exclusive dealing allegations. Plaintiffs' selective reliance on their expert reports similarly gets them nowhere. On the one hand they assert that their expert Mr. Elhauge has already opined that Qualcomm's exclusive dealing raised chip prices, while on the other hand they claim that more fact discovery is needed to demonstrate the effects of the alleged exclusive dealing arrangements. And although Plaintiffs characterize their request as "limited, tailored discovery," that description could hardly be further from the truth. What Plaintiffs describe is a nine-month-long fishing expedition from Qualcomm, Apple, Intel, and various unidentified OEMs, all of whom have already been subject to extensive discovery in this action, about issues untethered to the allegations made in the SAC. Further, Plaintiffs now seek to focus on conduct that occurred after their chosen class period. For example, Plaintiffs seek discovery concerning the 2019 agreements between Qualcomm and Apple and Apple's 2019 acquisition of Intel's smartphone chip business—all of which occurred after the class period and before Plaintiffs filed their SAC. *See* Section II.A, *infra*. Because their currently pled allegations fail to show antitrust injury to the putative class of consumers on whose behalf the SAC has been brought, Qualcomm, numerous non-parties, and the Court should not be required to expend resources in service of allegations that, if proven, would fail to state a claim.

Qualcomm therefore proposes to file a motion under Federal Rule of Civil Procedure 12(c), testing the adequacy of what remains of Plaintiffs' case. A motion for judgment on the pleadings under Rule 12(c) would raise at least the following three arguments:

**First**, to state a claim under the Cartwright Act, Plaintiffs must establish an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Cellular Plus, Inc. v. Super. Ct. of San Diego Cnty.*, 14 Cal. App. 4th 1224, 1234 (1993). With Plaintiffs' core allegations of alleged antitrust injury now dismissed, the SAC alleges no such injury.

The SAC posited a theory of alleged harm in the form of elevated patent royalty rates flowing from the combined effects of Qualcomm's challenged conduct allegedly passing through to the class. Other than a few stray conclusory allegations, no competitive harm or causal injury is alleged in the SAC based on the alleged exclusive dealing arrangements between Qualcomm and OEMs standing alone. Nor could it be. When viewed in the light most favorable to Plaintiffs, the SAC alleges that Plaintiffs were injured when Qualcomm provided **discounts** to its OEM customers who exclusively or near-exclusively purchased Qualcomm's chips. But the theory of harm pleaded in the SAC is that any "changes in component costs" "would be" passed along at a rate of more than 90% to class members. SAC ¶ 212. Thus, as pled, Qualcomm's discounts would have **reduced** the price paid by Plaintiffs for their cellular devices or resulted in them receiving better quality devices at the same price. Plaintiffs' own theory therefore fails to allege a cognizable injury against which the antitrust laws were designed to protect.

**Second**, Plaintiffs' UCL claim can no longer proceed. Because Plaintiffs' UCL claim is premised on the same set of allegations as their Cartwright Act claim, the UCL claims also must fall under the unlawful and unfair prongs. *See* Order at 34–35. Further, *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), bars Plaintiffs' UCL claim as a matter of law under the adequate remedy-at-law doctrine. Plaintiffs' complaint makes no attempt to explain why or how treble damages under the Cartwright Act would be inadequate. And their request for an injunction fares no better—courts within the Ninth Circuit routinely dismiss claims seeking injunctive relief when an adequate legal remedy is available in light of *Sonner*. *In re Macbook Keyboard Litig.*, 2020 WL 6047253, at *4 (N.D

Cal. Oct. 13, 2020); *In re Cal. Gasoline Spot Market Antitrust Litig.*, 2021 WL 1176645, at *7 (N.D. Cal. Mar. 29, 2021) (Corley, J.). That is clearly the case here, where the agreements alleged in Plaintiffs' SAC ceased in 2016.

**Third**, Plaintiffs fail to plead "enough factual matter (taken as true) to suggest that an [exclusive dealing] agreement was made" between Qualcomm and any OEM other than Apple. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Even though Plaintiffs fully participated in fact discovery alongside the FTC, Plaintiffs have failed to plead facts that would support a plausible inference that Qualcomm entered into an exclusive dealing arrangement with any OEM aside from their allegations related to Apple during the class period. The vague and conclusory allegations set forth in paragraph 72 of the SAC are insufficient. *See Twombly*, 550 U.S. at 564 (rejecting as implausible "a few stray statements speak[ing] directly of agreement" that are more fairly read as "mere[] legal conclusions resting on prior allegations."). Further, the documents Plaintiffs cite in support of these conclusory allegations (which are therefore incorporated into the SAC) on their face (1) are not agreements at all, (2) do not reference exclusivity in any way, or (3) expired before the class period began. In recognition of these facts, Plaintiffs apparently wish to take additional discovery into Qualcomm's dealings with OEMs other than Apple. But Plaintiffs are in no way entitled to go shopping for new claims just because the Ninth Circuit and this Court dismissed the core of their case—especially when doing so would burden not only Qualcomm, but also non-parties who have previously been subjected to intrusive subpoenas and provided documents in this case.

Plaintiffs also argue that Qualcomm's proposed Rule 12(c) motion would "encompass[] the very issues already briefed to the Court on the motion to dismiss." Not so. In response to the Ninth Circuit's mandate, Qualcomm's motion to dismiss attacked the antitrust theory that Plaintiffs asserted in the SAC, which is far different from the theory they hope to construct now that their core claims have been rejected. Plaintiffs pleaded that the alleged exclusive dealing arrangements served only to "reinforce" the now-dismissed tying claim, SAC ¶ 2, and their theory of harm was that Qualcomm charged chip prices that were too low, while extracting royalties that were too high. Qualcomm could not reasonably have attacked their new theory of harm, which appears to be that Qualcomm's chip prices were too high. Indeed, Plaintiffs admit in their portion of the Statement that

they had never before attempted to quantify the supposed harm flowing from the higher chip prices that the exclusive dealing arrangements allegedly caused. Of course, as explained here, higher chip prices can't cause competitive harm; it is lower chip prices that are the mechanism of exclusion of other chipmakers, and that caused the alleged competitive harm.  In any event, given that Plaintiffs admittedly never asserted that allegedly higher chip prices was a cause of harm, there was no reason for Qualcomm to move on that issue in its motion to dismiss.

Because Plaintiffs' remaining claims fail as a matter of law, the Court should dispose of them before the parties engage in expensive further proceedings. The Court should not allow Plaintiffs to amend their complaint yet again to attempt to change their theory. As Your Honor noted in the April 2022 Case Management Conference, the SAC was Plaintiffs' last attempt to state a claim.

## II.     FACT AND EXPERT

### A.     Plaintiffs' Statement

Plaintiffs wish to conduct limited, additional document and deposition discovery related to the issues outlined in Part I.A above. Plaintiffs then anticipate submitting expert reports concerning its exclusive dealing claim and chipset overcharge damages tied to that claim.

Qualcomm's 2019 Agreement with Apple: Plaintiffs request that Qualcomm produce its 2019 agreements with Apple (including its settlement agreement, license agreement, and chipset supply agreement). Among other things, based on the public statements describing this agreement, it appears relevant to showing the extent to which Intel was truly foreclosed by Qualcomm's prior exclusive dealing, thereby requiring Apple to return to Qualcomm for chipset supply even after initially awarding some of its chipset business to Intel.

Subsequent Qualcomm Data: Plaintiffs experts are evaluating a revised damages model based on the chipset overcharge caused by Qualcomm's exclusive dealing. Plaintiffs request that Qualcomm produce (1) more recent "royalty report" data, which lay out the chipset sales by competing OEMs (which Qualcomm's production cut-off in Q2 2018) and (2) more recent data concerning Qualcomm's cost and profit margins related to its production of chipsets (which Qualcomm's production cut off in fiscal year 2017). Plaintiffs request this data to fully understand the impact that Intel's entry had on

Qualcomm's profit margins, which may be relevant to quantifying the chipset overcharge resulting from Qualcomm's exclusive dealing.

Subsequent Intel/Apple Data: Similarly, Plaintiffs wish to seek subsequent data from Intel and/or Apple about their costs associated with modem chipsets. Plaintiffs do not believe that the data they previously received covers the entirety of the period in which Intel supplied Apple with chipsets (and it certainly does not include data concerning Apple's continued development of Intel's chipset business). This data, again, is likely relevant to quantifying the chipset overcharge resulting from Qualcomm's exclusive dealing.

Limited Additional Documents: Plaintiffs are still assessing whether they require any additional chipset data or documents from the other OEMs referenced with respect to Plaintiffs' amended exclusive dealing claims. In addition, Plaintiffs are considering whether there are limited categories of additional document discovery related to Apple's acquisition of Intel's chipset business—and apparent delays in launching its own chipset—that they may request.

Limited Additional Depositions: Plaintiffs may seek a limited number of additional depositions, to the extent it becomes necessary, concerning (1) updated data productions from Qualcomm, Intel, or Apple; (2) Qualcomm's 2019 agreement with Apple; and (3) Apple's acquisition of Intel's chipset business and subsequent delays in launching its own chips. Plaintiffs presently believe they would require no more than 5 depositions and perhaps fewer.[6]

Expert Reports: Following the completion of the foregoing targeted discovery, Plaintiffs anticipate serving expert reports on their exclusive dealing claims. Plaintiffs anticipate that their experts may supplement opinions concerning Qualcomm's exclusive dealing based on the discovery described above. And Plaintiffs anticipate that their experts may quantify Qualcomm's chipset overcharge and determine damages for purposes of seeking class certification of the new putative class of California consumers impacted by Qualcomm's exclusive dealing.

In its Statement, Qualcomm conflates issues related to the class period with information needed in discovery – the two are not necessarily coextensive, as many courts have found. *See, e.g., In re*

---

[6] For instance, Plaintiffs may be able to take a Qualcomm Rule 30(b)(6) deposition concerning questions, if any, about additional data, and one or two fact witnesses each from Intel and Apple.

*Coca-Cola Products Marketing & Sales Practices Litigation*, No. 14-md-02555-JSW (MEJ), 2016 U.S. Dist. LEXIS 148534, *23 (N.D. Cal. Oct. 16, 2016) (discovery "not limited to only the class period."); *In re Toyota Motor Corp. Securities Litigation*, No CV 10-922 DSF (AJWx), 2012 U.S. Dist. LEXIS 124438, *5 (C.D. Cal. March 12, 2012) ("It is also beyond dispute that discovery is  not limited to the class period.") For example, Qualcomm argues that any discovery or structured data post-dating the class period is irrelevant. *See infra*. Qualcomm provides no case law supporting that sweeping statement and the foregoing authorities demonstrate why it is incorrect as a matter of law. But it is also incorrect as a matter of logic: information post-dating the class period will demonstrate *how*, and the extent to which, Qualcomm's chipset rivals were hobbled by its exclusive dealing. Obtaining such data will also help Plaintiffs quantify damages by providing an "after-period" as a benchmark to compare to the damages period applicable in the litigation. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 602 (N.D. Cal. 2010) (discussing the use of after periods for purposes of quantify damages).

     **B.**    **Qualcomm's Statement**

          **1.**    Re-opening fact discovery is unwarranted

     Fact discovery in this case closed on March 30, 2018. Dkt. 645. Despite fully participating in coordinated fact discovery with the FTC, Apple, and Qualcomm, where the parties conducted ***over 100 depositions*** and collected millions of documents, including over ***4 million documents*** from Qualcomm and ***8 million documents*** from the OEMs Plaintiffs allege were parties to exclusive dealing arrangements, Plaintiffs seek to reopen fact discovery for an additional nine months in an effort to create a new case out of whole cloth now that their operative theory has been dismissed. Plaintiffs' request is an attempt to manufacture an entirely new antitrust theory, using post-class-period evidence about events that hadn't even occurred when the lawsuit was filed, and which appear nowhere in the SAC. Plaintiffs fail to show how re-opening fact discovery could produce ***relevant*** additional evidence, rather than be used solely to burden Qualcomm and its customers. As such, Plaintiffs fail to show "good cause for reopening discovery" here. *Foster v. Metro. Life Ins. Co.*, 2005 WL 1397512, at *1 (N.D. Cal. June 14, 2005).

     Courts analyze six factors for determining whether there is good cause to reopen fact discovery:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1526 (9th Cir.1995), *vacated on other grounds*, 520 U.S. 939 (1997). Each of these factors (other than the first, which is inapplicable) weighs against reopening fact discovery.

The second factor is satisfied: Qualcomm opposes Plaintiffs' request to re-open fact discovery.

The third factor, whether the non-moving party would be prejudiced, also weighs against reopening fact discovery as doing so would serve only to unduly burden Qualcomm. Courts are "not . . . inclined to favor requests for additional discovery that are duplicative of discovery already undertaken or which go beyond the new facts alleged in the SAC." *Ciampi v. City of Palo Alto*, 2010 WL 5174013, at *3 (N.D. Cal. Dec. 15, 2010). That is exactly what would happen here. Qualcomm would likely have to conduct duplicative document searches and submit the same individuals to be deposed again about the same conduct covered in the initial round of discovery, effectively granting Plaintiffs a second bite at the apple. While Plaintiffs argue that this new discovery would focus only on their "exclusive dealing" claim, they fail to explain why they did not obtain this information—which they admit was implicated by their initial consolidated class action complaint—over the course of discovery in 2017 and 2018. Exclusive dealing allegations *have always been in this case*, and plaintiffs have made no showing as to why discovery should be reopened simply because multiple appellate rulings and this Court's recent ruling has gutted large portions of their case.

And although Plaintiffs describe this request as "limited [and] tailored," it is anything but that: what they seek would be an enormously invasive imposition on both Qualcomm and third parties. Plaintiffs acknowledge that the litigation has changed dramatically. That is true. But the only result of that change is that broad swathes of prior discovery have become irrelevant.  Plaintiffs pleaded their exclusive dealing claim in their initial complaint and had every opportunity and incentive to take discovery on it in 2017 and 2018. This Court's Order gutting Plaintiffs' claims in no way creates a need for additional discovery. And further, Plaintiffs fail to show how the additional discovery they seek could cure the deficiencies of the pleaded claim in their SAC. Rather than further developing the

factual record, reopening fact discovery would only increase litigation costs, of which Qualcomm and non-parties would bear the lion's share.

The fourth factor—whether Plaintiffs were diligent in obtaining discovery—likewise weighs against re-opening discovery. Plaintiffs' request to re-open fact discovery is due to Plaintiffs' failure to develop the facts they now claim to need despite having already had extensive, full, and fair fact discovery alongside the FTC. Plaintiffs had ample opportunity to develop facts to support their claims in this case, including the details of Qualcomm's contractual dealings with various OEMs, as well as the extent to which Qualcomm's competitors were allegedly foreclosed during the class period. For example, to the extent that Plaintiffs allege that competing chipmakers such as Intel were foreclosed, those allegations have been in the case since the lawsuit's inception. Indeed, Intel executive Aicha Evans initially provided her testimony that Qualcomm's deal with Apple "delayed [Intel] by two years in . . . getting to the market," in a September 2016 FTC investigational hearing, which Plaintiffs obtained access to during the initial round of fact discovery. And near-identical trial testimony from Ms. Evans was cited in Judge Koh's May 2019 order, which the Ninth Circuit reversed. *FTC v. Qualcomm*, 411 F. Supp. 3d 658, 733 (N.D. Cal 2019) (quoting Ms. Evans' testimony that Qualcomm "set [Intel] back two years"). The parties also conducted substantial discovery on Qualcomm's agreements with various OEMs. Plaintiffs deposed multiple individuals from Apple, Samsung, Motorola, Blackberry, Huawei, and Lenovo (the OEMs Plaintiffs allege that Qualcomm had exclusivity agreements with) and received over 12 million documents covering the relationship between Qualcomm and these OEMs. Indeed, Plaintiffs' own statement confirms that their initial complaint alleged Qualcomm had exclusive dealing arrangements with OEMs. Yet, Plaintiffs now claim to need further discovery to obtain factual support for their exclusive dealing claims. In light of the extensive opportunity Plaintiffs had to conduct discovery and develop their case, there is no reason to give Plaintiffs a complete "do over" now.

For the same reasons discussed above, the final two factors (the foreseeability of the requested discovery and the likelihood that it will lead to relevant evidence) militate against re-opening fact discovery. Any alleged need for additional fact discovery "should have been obvious" during the initial round of fact discovery. *Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011) (finding the fifth

factor weighed against re-opening discovery where the need for additional discovery "should have been obvious" "before fact discovery closed"); *see also Bookhamer v. Sunbeam Prods., Inc.*, 2012 WL 5269677, at *8 (N.D. Cal. Oct. 23, 2012) (holding the "fifth factor weighs against re-opening discovery," as the need for additional discovery "was entirely foreseeable"). Plaintiffs sought discovery and deposed OEMs, chipset manufacturers, and Qualcomm over this course of conduct. They cannot claim to need discovery solely based on their failure to develop, or inability to find, the relevant facts.  Where, as here, plaintiffs decide to focus on one aspect of their case rather than another, they lack good cause to re-open discovery later in an effort to bolster their claims. *See Yeoman v. Ikea U.S.A. W., Inc.*, 2013 WL 3467410, at *8 (S.D. Cal. July 10, 2013) ("There is no doubt that the reason for the delay was completely in Plaintiffs' control. The only stated basis for the delay was a strategic decision by counsel not to spend the time and money pursuing this discovery while Plaintiffs focused on other aspects of the case."). And based on the breadth of the fact discovery already completed, it is implausible that additional fact discovery would produce relevant information on the lone surviving aspect of Plaintiffs' claims. Any argument that further fact discovery is warranted because fact discovery closed prior to the end of the class period selected by Plaintiffs is a red herring. The SAC includes no allegation that any relevant exclusive dealing arrangements were operative during that six-month window.

Further, Plaintiffs seek to reopen discovery in order to obtain discovery from **after** the class period closed. There is no reason why discovery from after the class period would be relevant here, and Plaintiffs fail to make any persuasive argument why this information is needed. Although "courts allow discovery to extend to events before and after the period of actual liability so as to provide context," even in cases where fact discovery remains open, courts routinely deny discovery requests where the party seeking discovery cannot persuasively explain why "post-Class Period discovery is relevant." *Hatamian v. Adv. Micro Devices, Inc.*, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015) (rejecting "half a year's worth of post-Class period discovery") (Corley, J.); *see also In re Bridgepoint Educ., Inc.*, No. 12CV1737 JM JLB, 2014 WL 3867495, at *3 (S.D. Cal. Aug. 6, 2014) (denying nine months of requested post-class discovery because "the substantial burden of producing documents from this time period outweighs the benefit of the additional discovery"). Here, Plaintiffs fail to allege

how conduct from 2019 is relevant when according to their own complaint, the agreements at issue expired in 2016 and any foreclosure of Intel ceased at that time. *See* SAC ¶ 142. That being so, Plaintiffs already have discovery from nearly two years after Qualcomm's allegedly unlawful conduct ceased, and have still come up short. In any event, none of the cases Plaintiffs cite hold that it is appropriate to ***re-open discovery*** to look into post-class period evidence. Thus, the fifth and sixth factors similarly weigh against re-opening fact discovery.

Accordingly, the Court should deny Plaintiffs' request to reopen fact discovery.

### 2.     Qualcomm agrees that expert discovery would be necessary

If this Court permits this case to proceed, Qualcomm agrees that further expert discovery will be required. Plaintiffs' prior expert reports focused on a nationwide class and many theories that have now been held to be meritless as a matter of law. But, as discussed below, any expert discovery should occur only ***after*** this Court has determined whether the SAC passes muster under Rule 12 and whether this case can proceed as a class action under Rule 23.

## III.   SCHEDULE

### A.     Plaintiffs' Statement

Fact and Expert Discovery: While Qualcomm's production of supplemental data and its agreements with Apple and other OEMs should be straightforward, Plaintiffs wish to ensure there is sufficient time to (1) engage with third-parties Apple and Intel; (2) file and resolve any motions to compel that may become necessary; and (3) provide their experts sufficient time, once this new evidence and data is produced, to analyze it and prepare their reports. Any schedule would then need to leave time for Qualcomm to submit responsive reports, Plaintiffs to provide reply reports, and the parties to take expert depositions. Plaintiffs therefore propose the following deadlines:

| Event | Deadline |
|---|---|
| Fact Discovery Cut-Off | November 17, 2023 |
| Plaintiffs' Expert Reports | January 19, 2024 |
| Qualcomm's Expert Reports | March 22, 2024 |
| Plaintiffs' Reply Expert Reports | May 10, 2024 |

1        Class Certification and Summary Judgment: Plaintiffs have conferred with Qualcomm to see

2   whether Qualcomm anticipates filing summary judgment motions before or after class certification.

3   Qualcomm declined to indicate its preference at this time. In light of that, Plaintiffs respectfully submit

4   that the Court may prefer to set deadlines for class certification and summary judgment motions at a

5   later Case Management Conference after the parties have had an opportunity to discuss these issues

6   with the Court at the upcoming Status Conference.

7        With respect to the sequencing of a litigation schedule, Qualcomm is incorrect that having

8   expert reports precede class certification is somehow "impractical." Indeed, recognizing the Supreme

9   Court's requirement that a district court's class certification analysis be "rigorous," many district courts

10   now structure expert reports to precede class certification. *See, e.g., In re Capacitors Antitrust*

11   *Litigation*, No. 14-cv-03264 (N.D. Cal. Nov. 22, 2016), ECF No. 1405 (setting exchange of expert

12   reports months in advance of class certification briefing), *In re Telescopes Litigation*, No. 20-cv-03639

13   (N.D. Cal. Sept. 30, 2022), ECF No. 276 (same), *In re Geisinger Health and Evangelical Community*

14   *Hospital Workers Antitrust Litigation*, No. 21-cv-00196-MWB (M.D. Pa. June 29, 2022) (same); *In re*

15   *Deere & Company Repair Services Litigation*, No. 22-cv-50188 (N.D. Ill. Jan. 31, 2023) ("*Deere*")

16   (same).[7]

17      **B.    Qualcomm's Statement**

18        As stated above, a determination whether the pleadings will permit this case to go forward

19   would prevent the parties and this Court from wasting substantial resources re-opening discovery and

20   litigating class certification on the lone portion of Plaintiffs' claim that remains. Qualcomm therefore

21

22   ―――――――――――――

[7] The following case schedules all have expert reports being exchanged in advance of class certification
23   or summary judgment briefing. *See, e.g.,* Case Management Order No. 1, *In re: Broiler Chicken*
     *Grower Antitrust Litig.*, No. 6:17-cv-00033-RJS-SPS (E.D. Okla. Apr. 13, 2020), ECF No. 312 (labor
24   market class action); Stipulated Order Regarding Amended Case Schedule As Modified, *Simon and*
     *Simon, PC, et al. v. Align Tech., Inc.*, No. 3:20-cv-03754-VC (N.D. Cal.); Further Amended
25   Scheduling Order, *In re Lipitor Antitrust Litig.*, No. 3:12-cv-02389-PGS-DEA (D.N.J. Oct. 1, 2019),
     ECF No. 899; Corrected Seventh Amended Scheduling Order, *In re: Niaspan Antitrust Litig.*, No. 13-
26   MD-2460 (E.D. Pa. Nov. 16, 2018), ECF No. 570; Scheduling Order at 1, *In re Dental Supplies*
     *Antitrust Litig.*, No. 16-cv-696 (BMC)(GRB) (E.D.N.Y. April 10, 2017), ECF No. 177; Discovery
27   Plan and Scheduling Order at 1, *Le v. Zuffa*, LLC, No. 2-15-cv-01045- RFB-(PAL) (D. Nev. Oct. 14,
     2016), ECF No. 311.

28

1    respectfully proposes to file a motion for judgment on the pleadings on March 20th. Qualcomm will

2    work with Plaintiffs to arrive at a suitable briefing schedule for both the parties and the Court.

3    Even in the absence of additional Rule 12 motion practice, Plaintiffs' proposed schedule would

4    prove unworkable given what remains in this case. Further fact discovery in this case is unwarranted,

5    and Plaintiffs' proposed schedule, which appears to set merits expert report deadlines in advance of

6    class certification proceedings, is impractical and would serve only to have the parties unnecessarily

7    expend resources before class certification briefing.  To the extent that Plaintiffs are suggesting a

8    schedule similar to *In re Capacitors Antitrust Litigation*, No. 14-cv-03264, ECF No. 1405 (N.D. Cal.

9    Nov. 22, 2016), in which formal expert reports relating to class certification precede class certification

10   and merits expert reports follow class certification, that may be practicable.  But to the extent that

11   Plaintiffs are proposing that expert reports on both class certification and merits issues be served prior

12   to class certification proceedings, Qualcomm believes that cannot sensibly be done in a case such as

13   this that features novel theories and uncertainty around the nature and scope of the class.

14   Accordingly, to the extent there would be any need to do so following an order on Qualcomm's

15   12(c) motion, Qualcomm respectfully submits that the Court may prefer to set deadlines for class

16   certification and summary judgment proceedings at a later Case Management Conference after the

17   parties have had an opportunity to discuss these issues with the Court.

18

19   Dated: February 16, 2023                      SUSMAN GODFREY LLP

20                                   By:   */s/ Kalpana Srinivasan*
                                           Kalpana Srinivasan
21                                         Marc M. Seltzer
                                           Steven G. Sklaver
22                                         Amanda Bonn
                                           Oleg Elkhunovich
23                                         Krysta Kauble Pachman
                                           SUSMAN GODFREY L.L.P.
24                                         1901 Avenue of the Stars, Suite 950
                                           Los Angeles, CA 90067
25                                         Telephone: (310) 789-3100
                                           Facsimile: (310) 789-3006
26                                         Email: ksrinivasan@susmangodfrey.com
                                           Email: mseltzer@susmangodfrey.com
27                                         Email: ssklaver@susmangodfrey.com
28

1

2

Email: abonn@susmangodfrey.com
Email: oelkhunovich@susmangodfrey.com
Email:  kpachman@susmangodfrey.com

3

4

5

6

7

Joseph Grinstein
SUSMAN GODFREY L.L.P.
1000 Louisiana Street # 5100
Houston, TX 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: jgrinstein@susmangodfrey.com

8

9

10

11

12

13

14

By: */s/Joseph W. Cotchett*
Joseph W. Cotchett
Adam J. Zapala
Brian Danitz
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: jcotchett@cpmlegal.com
Email: azapala@cpmlegal.com
Email: bdanitz@cpmlegal.com

15

***Plaintiffs' Interim Co-Lead Counsel***

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  February 16, 2023                                HAGENS BERMAN SOBOL SHAPIRO
                                                              LLP
2
                                                    By:      /s/ Steve W. Berman
3                                                            Steve W. Berman
                                                             HAGENS BERMAN SOBOL SHAPIRO
4                                                            LLP
                                                             1918 Eighth Avenue, Suite 3300
5                                                            Seattle, WA 98101
                                                             Telephone: (206) 268-9320
6                                                            Facsimile: (206) 623-0594
                                                             Email: steve@hbsslaw.com
7
8                                                            Jeff D. Friedman (173886)
                                                             Rio S. Pierce (298297)
9                                                            HAGENS BERMAN SOBOL SHAPIRO
                                                             LLP
10                                                           715 Hearst Avenue, Suite 202
                                                             Berkeley, CA 94710
11                                                           Telephone: (510) 725-3000
                                                             Facsimile: (510) 725-3001
12                                                           Email: jefff@hbsslaw.com
                                                             Email: riop@hbsslaw.com
13
14                                                           *Plaintiffs' Steering Committee*
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  February 16, 2023

KEKER, VAN NEST & PETERS LLP

By:   */s/ Robert A. Van Nest*

Robert A. Van Nest - # 84065
rvannest@keker.com
Eugene M. Paige - # 202849
epaige@keker.com
Cody S. Harris - # 255302
charris@keker.com
Matan Shacham - # 262348
mshacham@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Gary A. Bornstein *(pro hac vice)*
Yonatan Even *(pro hac vice)*
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Tel.: (212) 474-1000
Fax: (212) 474-3700
gbornstein@cravath.com
yeven@cravath.com

Richard S. Taffet *(pro hac vice)*
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Tel.: (212) 309-6000
Fax: (212) 309-6001
richard.taffet@morganlewis.com

Geoffrey T. Holtz (SBN 191370)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel.: (415) 442-1000
Fax: (415) 442-1001
gholtz@morganlewis.com

***Attorneys for Defendant Qualcomm
Incorporated***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I, Adam J. Zapala, am the ECF user whose identification and password are being used to file this Joint Case Management Conference Statement. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories on this document have concurred in this filing.

*/s/ Adam J. Zapala*
Adam J. Zapala