KEKER, VAN NEST & PETERS LLP
Robert A. Van Nest - # 84065
rvannest@keker.com
Eugene M. Paige - # 202849
epaige@keker.com
Cody S. Harris - #255302
charris@keker.com
Matan Shacham - # 262348
mshacham@keker.com
Kristin E. Hucek - # 321853
khucek@keker.com
Daniel B. Twomey - # 341488
dtwomey@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391 5400
Facsimile:    (415) 397 7188

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet *(pro hac vice)*
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Geoffrey T. Holtz (SBN 191370)
gholtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 3:17-md-02773-JSC<br><br>**DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT**<br>**REDACTED**<br><br>Date:       July 20, 2023<br>Time:      10:00 AM<br>Dept.:     Courtroom 8, 19th Floor<br>Judge:    Hon. Jacqueline Scott Corley<br><br>Trial Date:  Not Yet Set |

PLEASE TAKE NOTICE that on July 20, 2023 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8, United States Courthouse, 450 Golden Gate Avenue,  San Francisco, CA 94102, Defendant Qualcomm Incorporated ("Qualcomm"), will and hereby does move for an order, pursuant to Federal Rule of Civil Procedure 56, granting summary judgment in favor of Qualcomm on Plaintiffs' remaining claims. Qualcomm's motion is based on the authorities and argument set forth herein, the accompanying declarations and exhibits attached thereto, other pleadings filed in this matter, oral argument to be presented to the Court, and such other matters as the Court may consider.

### ISSUES TO BE DECIDED  (LOCAL RULE 7-4)

This motion raises the following issues:

Whether Plaintiffs have raised a genuine issue as to any material fact regarding whether Qualcomm had an exclusive dealing agreement with any Original Equipment Manufacturer ("OEM") that foreclosed competition in a substantial share of any alleged "relevant market" and also caused Plaintiffs to suffer an antitrust injury.

# **TABLE OF CONTENTS**

**Page**

ISSUES TO BE DECIDED  (LOCAL RULE 7-4) ............................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ..................................................................................... 1

II.     UNDISPUTED FACTS ............................................................................ 4

        A.      Plaintiffs' claims and sole theory of antitrust injury focused on Qualcomm
                charging supra-FRAND royalties. ........................................................... 4

                1.      Plaintiffs' liability expert nowhere explains how the alleged
                        exclusive dealing arrangements caused anticompetitive harm or
                        antitrust injury. ........................................................................ 6

                2.      Plaintiffs' other experts focused solely on alleged supra-FRAND
                        royalties. .................................................................................. 7

        B.      With their sole theory of antitrust injury out of the case, Plaintiffs
                unsuccessfully sought leave to find new facts and generate new expert
                reports to support an exclusive dealing claim. ......................................... 8

III.    LEGAL STANDARD ................................................................................ 9

IV.     ARGUMENT .......................................................................................... 10

        A.      Plaintiffs nowhere explain how Qualcomm's incentive agreements with
                Apple caused Plaintiffs to suffer antitrust injury. ................................... 11

        B.      Plaintiffs have not met their burden to show that Qualcomm's conduct
                foreclosed competition in a substantial share of the market. ................... 14

        C.      Plaintiffs provide no method for the jury to reasonably estimate damages. .......... 17

        D.      Plaintiffs cannot adduce evidence sufficient to show that Qualcomm's
                contracts with non-Apple OEMs were unlawful. .................................... 20

        E.      Plaintiffs' UCL claim fails. ................................................................. 21

V.      CONCLUSION ....................................................................................... 23

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4

5

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F. 3d 1171 (9th Cir. 2016) ...........................................................................3

6

*B&H Med., L.L.C. v. ABP Admin. Inc.*,
  526 F.3d 257 (6th Cir. 2008) .......................................................................10, 15

7

8

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)..............................................................................12

9

10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...........................................................................................10

11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)..............................................................................................2

12

13

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
  2021 WL 1176645 (N.D. Cal Mar. 29, 2021) (Corley, J.)...............................22

14

15

*Cave Consulting Grp., Inc. v. OptumInsight, Inc.*,
  2020 WL 127612 (N.D. Cal. Jan. 10, 2020) .....................................................18

16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..........................................................................................1, 9

17

18

*Chowning v. Kohl's Dep't Stores, Inc.*,
  733 F. App'x 404 (9th Cir. 2018) .....................................................................23

19

20

*City of San Jose v. Off. of the Comm'r of Baseball*,
  776 F.3d 686 (9th Cir. 2015) ............................................................................21

21

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) ...............................................................3, 18, 19

22

23

*Coleman Motor Co. v. Chrysler Corp.*,
  525 F.2d 1338 (3d Cir. 1975).............................................................................18

24

25

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ..........................................................................10

26

*D'Artiste v. Am. Int'l Grp., Inc.*,
  2021 WL 4707000 (C.D. Cal. May 12, 2021) ..................................................23

27

28

*Dealers Wholesale Supply, Inc. v. Pac. Steel & Supply Co.*,
  1984 WL 775 (N.D. Cal. July 6, 1984).............................................................19

*In re eBay Seller Antitrust Litig.*,
   2010 WL 760433 (N.D. Cal. Mar. 4, 2010)............................................................13, 14, 21

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust
   Litig.*,
   507 F. Supp. 3d 1289 (D. Kan. 2020), *aff'd*, 44 F.4th 959 (10th Cir. 2022) ..........................12

*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
   786 F.2d 1342 (9th Cir. 1985) ...................................................................................3, 17, 18

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................................10

*FTC v. Qualcomm*,
   969 F.3d 974 (9th Cir. 2020) ......................................................................1, 11, 12, 21

*Gerlinger v. Amazon.Com, Inc.*,
   311 F. Supp. 2d 838 (N.D. Cal. 2004) ...............................................................................17

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*,
   525 F. Supp. 3d 1145 (S.D. Cal. 2021)................................................................................9

*Hayes v. Douglas Dynamics, Inc.*,
   8 F.3d 88 (1st Cir. 1993)....................................................................................................10

*Healow v. Anesthesia Partners, Inc.*,
   92 F.3d 1192 (9th Cir. 1996) ............................................................................................21

*ILC Peripherals Leasing Corp. v. Int'l Bus. Machines Corp.*,
   458 F. Supp. 423 (N.D. Cal. 1978) ....................................................................................18

*Keating v. Nordstrom, Inc.*,
   2019 WL 7160384 (D. Alaska Nov. 8, 2019)....................................................................23

*In re Macbook Keyboard Litig.*,
   2020 WL 6047253 (N.D. Cal. Oct. 13, 2020).....................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)............................................................................................................9

*McGlinchy v. Shell Chemical Co.*,
   845 F.2d 802 (9th Cir. 1988) .............................................................................................18

*MCI Commc'ns Corp. v. AT&T Co.*,
   708 F.2d 1801 (7th Cir. 1983) ...........................................................................................18

*Momand v. Universal Film Exchanges*,
   172 F.2d 37 (1st Cir. 1948)...............................................................................13, 14, 18

2114504

*Moss v. Infinity Ins. Co.*,
   197 F. Supp. 3d 1191 (N.D. Cal. 2016) ..........................................................................22

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ....................................................................................9

*OJ Com., LLC v. KidKraft, Inc.*,
   34 F.4th 1232 (11th Cir. 2022) ................................................................................15

*Omega Env't, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ..................................................................10, 11, 15

*In re Optical Disk Drive Antitrust Litig.*,
   2017 WL 6451711 (N.D. Cal. Dec. 18, 2017) ........................................................12

*Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*,
   992 F.3d 893 (9th Cir. 2021) ......................................................................................9

*Rheumatology Diagnostics Lab'y Inc. v. Aetna, Inc.*,
   2013 WL 3242245 (N.D. Cal. June 25, 2013) ......................................................16

*Rhynes v. Stryker Corp.*,
   2011 WL 2149095 (N.D. Cal. May 31, 2011) ......................................................22

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ..............................................................................4, 22

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ..........................................................................................11, 15

*Thomas v. Christ Hosp. & Med. Ctr.*,
   328 F.3d 890 (7th Cir. 2003*)* ..............................................................................9, 13

*Toscano v. PGA Tour, Inc.*,
   201 F. Supp. 2d 1106 (E.D. Cal. 2002)................................................17, 18, 19

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
   964 F.2d 186 (2d Cir. 1992)....................................................................................21

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)..................................................................................15

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ............................................................................11, 12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..............................................................................................2, 12

*Zakaria v. Gerber Prods. Co.*,
   755 F. App'x 623 (9th Cir. 2018) ..........................................................................23

**State Cases**

*Acree v. Gen. Motors Acceptance Corp.*,
    92 Cal. App. 4th 385 (2001) ..................................................................................23

*Bert. G. Gianelli Distrib. Co. v. Beck & Co.*,
    172 Cal. App. 3d 1020 (1985) ...............................................................................15

*Cellular Plus, Inc. v. Super. Ct. of San Diego Cnty.*,
    14 Cal. App. 4th 1224 (1993) ...........................................................................2, 11

*Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*,
    52 Cal. App. 3d 1 (1975) ................................................................................10, 15

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of San Francisco*,
    114 Cal. App. 4th 309 (2003) ................................................................................15

*Flagship Theatres of Palm Desert, LLC v. Century Theaters, Inc.*,
    55 Cal. App. 5th 381 (2020) ..................................................................................10

*Kolling v. Dow Jones & Co.*,
    137 Cal. App. 3d 709 (1982) ...........................................................................11, 13

*Madrid v. Perot Sys. Corp.*,
    130 Cal. App. 4th 440 (2005) ................................................................................21

*Marsh v. Anesthesia Servs. Med. Grp.*,
    200 Cal. App. 4th 480 (2011) ................................................................................11

*Morrison v. Viacom, Inc.*,
    66 Cal. App. 4th 534 (1999) ..................................................................................11

*Redwood Theatres, Inc. v. Festival Enters., Inc.*,
    200 Cal. App. 3d 687 (1988) .................................................................................10

**Statutes**

California Unfair Competition Law............................................................................ *passim*

Cartwright Act ........................................................................................................... *passim*

Clayton Act ......................................................................................................................10

Sherman Act...........................................................................................................1, 9, 10

**Other Authorities**

FED. R. CIV. P. 56 .............................................................................................................9

2114504

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION[1]

In its Order on Qualcomm's motion to dismiss, the Court dismissed the core of Plaintiffs' antitrust claim, namely Plaintiffs' contention that Qualcomm's licensing practices are unlawful. Because Plaintiffs have no evidence supporting a standalone exclusive dealing claim—which is all that remains in the wake of the Court's Order—Qualcomm is now entitled to summary judgment. The linchpin of Plaintiffs' lawsuit has always been the theory that Qualcomm's licensing practices—the so-called "No-License-No-Chips tie," and Qualcomm's "refusal to provide exhaustive licenses to rival chip suppliers"—enabled Qualcomm to charge supra-FRAND royalties, which in turn allowed Qualcomm to undercut chip rivals by charging lower chip prices that it would then make up for through excess royalties. Dkt. 886-2, Second Am. Compl. ("SAC") ¶ 74. According to Plaintiffs, that alleged supra-FRAND royalty surcharge then flowed through the distribution chain to the indirect purchasers who comprise the putative class. That theory is no longer viable. The Ninth Circuit concluded in *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020) that Qualcomm's licensing practices do not violate the Sherman Act, and this Court reached the same conclusion with respect to California's Cartwright Act and Unfair Competition Law ("UCL"). Dkt. 914, Order Regarding Motion to Dismiss ("Order"), at 37.

The Court determined, however, that *stare decisis* did not bar Plaintiffs' ancillary allegations that Qualcomm provided rebates, discounts, and incentive payments to OEMs in order to incentivize them to purchase Qualcomm's chips exclusively, or near exclusively. But this case has moved beyond the pleadings, and the evidence—particularly the expert opinions Plaintiffs offered after extensive discovery—fails to establish "element[s] essential to [Plaintiffs' exclusive dealing] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Summary judgment is warranted for four reasons.

***First***, Plaintiffs can offer no competent evidence that would allow a reasonable jury to conclude that Qualcomm's alleged exclusive dealing arrangement with Apple caused an antitrust

---

[1] In all quotations included in this brief, all internal quotation marks and citations have been omitted, and all emphases added, unless otherwise noted.

injury—*i.e.*, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Cellular Plus, Inc. v. Super. Ct. of San Diego Cnty.,* 14 Cal. App. 4th 1224, 1234 (1993) (requiring same showing to prove a Cartwright Act violation). Here, Plaintiffs have not shown, and cannot show, that any alleged exclusive dealing agreement caused any antitrust injury to the class. Plaintiffs' liability expert, Einer Elhauge, opines that the alleged exclusive dealing arrangements merely buttressed Plaintiffs' now-dismissed tying claim: "the anticompetitive effect of" the allegedly "exclusionary agreements with Apple," was "the exacerbation of Qualcomm's No-License-No-Chips policy." Decl. of Cody S. Harris ("Harris Decl.") Ex. 1 ("Elhauge Report") ¶ 138. In fact, far from analyzing what anticompetitive effect and consequent antitrust injury, if any, that the alleged exclusive dealing arrangements caused, Mr. Elhauge repeatedly asserts that "a proper economic analysis of Qualcomm's challenged conduct **requires** one to evaluate the exclusionary effects **holistically**." Harris Decl., Ex. 2 ("Elhauge Reply Report")  ¶ 301. Mr. Elhauge's few stray conclusory statements that the agreements increased chip prices fall far short of the concrete evidence Plaintiffs must present to show the anticompetitive harm and consequent antitrust injury necessary to defeat summary judgment. Elhauge Report ¶ 134. And higher chip prices by themselves in no way connote antitrust injury. On the contrary, the ability to charge high prices "is not only not unlawful; it is an important element of the free market system." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). And not only that, higher chip prices would invite competition from rival chipmakers, which is precisely what happened.

**Second**, Plaintiffs cannot show that any alleged exclusive dealing arrangement foreclosed a substantial share of any relevant market. To the extent Mr. Elhauge attempts any analysis regarding foreclosure, he concludes that the agreements only "███████████████████████ ████████████████████" Elhauge Reply Report ¶ 236; *see also* Elhauge Report ¶ 143. There is no competent evidence that Qualcomm's supposed exclusion of ████████████ ██████████████████████[2]—even comes close to meeting the threshold for

---

[2] Elhauge Report ¶ 143.

establishing substantial foreclosure of either of Plaintiffs' alleged relevant markets—CDMA or so-called "premium LTE" baseband processor chipsets[3]— under California law.

**Third**, Plaintiffs have failed to provide any method by which the jury could arrive at "a just and reasonable estimate of the damage." *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1350 (9th Cir. 1985). Having based his analysis on antitrust theories that are no longer viable, Mr. Elhauge offers no way to disentangle the effects of lawful conduct from supposed damages caused by allegedly unlawful conduct. *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) (granting summary judgment where expert study failed to segregate alleged losses caused by acts which were not antitrust violations from those that were). Realizing their expert reports' insufficiency, Plaintiffs sought leave to conduct further discovery and produce new expert reports in order "to quantify an overcharge not solely tied to the amount of licensing revenues charged by Qualcomm but instead caused by Qualcomm's exclusive dealing," a request that this Court correctly denied. Dkt. 920 ("Joint CMC Statement") at 2.

**Fourth**, Plaintiffs can point to no competent evidence sufficient to raise a genuine issue of material fact that any alleged agreement between Qualcomm and any OEM other than Apple was exclusive, harmed competition, or caused Plaintiffs to suffer antitrust injury. Plaintiffs "cannot sustain [their] burden by offering broad allegations and complaints that are unhinged from any specific agreement." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F. 3d 1171, 1180–81 (9th Cir. 2016). Here, no expert for Plaintiffs has offered any opinion or analysis suggesting that an exclusive dealing agreement existed with respect to any OEM other than Apple, much less explained how the terms of any such agreement harmed competition or caused antitrust injury. In fact, Mr. Elhauge contrasted Qualcomm's agreements with non-Apple OEMs with the Apple agreements, stating that "Qualcomm did not make the same sort of exclusivity payments to these other OEM customers" that Qualcomm made to Apple. Elhauge Report ¶ 131. Plaintiffs further failed to show how any such agreements had the effect of foreclosing a substantial share of any

---

[3] See Harris Decl., Ex 3 ("Flamm Report") ¶¶ 42, 77 (defining what Plaintiffs claim to be the relevant markets).

DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-md-02773-JSC

2114504

1    alleged relevant market or how they caused Plaintiffs any antitrust injury.

2          Plaintiffs' UCL claim falls alongside their Cartwright Act claim. It rests on the same set of

3    facts, presents no valid claim for injunctive relief, and must be dismissed under *Sonner v. Premier*

4    *Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020).

5    **II.    UNDISPUTED FACTS**

6          **A.    Plaintiffs' claims and sole theory of antitrust injury focused on Qualcomm
              charging supra-FRAND royalties.**

7

8          Plaintiffs purport to represent a class of consumers who purchased a wide variety of

9    cellular devices in California between February 11, 2011 and September 27, 2018. SAC ¶ 224.

10   There are four named plaintiffs in this action, each of whom allegedly bought a cellular device

11   during the Class Period.[4] *Id.* ¶¶ 23–26. Plaintiffs assert claims under the Cartwright Act and UCL.

12         From this case's inception in 2017, Plaintiffs have pursued an antitrust theory centered on

13   Qualcomm's licensing practices. Like the Federal Trade Commission did in its failed civil action

14   against Qualcomm, Plaintiffs claimed that Qualcomm violated the antitrust laws through its so-

15   called "No-License-No-Chips" practice, which Plaintiffs characterized as an unlawful tie, and by

16   refusing to exhaustively license rival manufacturers of modem chips. SAC § IV.A–E, G–I.

17   Plaintiffs also alleged that Qualcomm entered into exclusive dealing arrangements with various

18   OEMs, most prominently Apple, and that these agreements had "exacerbated the anticompetitive

19   effects" of the tying and refusal-to-deal claims. *Id.* ¶ 129; Elhauge Report ¶ 138. According to

20   Plaintiffs, these three practices, ***taken together***, allowed Qualcomm to charge supra-FRAND

21   royalty rates, creating an overcharge that was passed through to Plaintiffs. Elhauge Report ¶ 138.

22   Throughout this protracted litigation, Plaintiffs' alleged damages have always centered on

23   Qualcomm's allegedly excessive SEP licensing royalties, and Plaintiffs have never asserted a

24   damages theory based on chip prices, independent of royalties, being too high.

25         Plaintiffs have never alleged or sought to prove a standalone exclusive dealing claim.

26   Rather, they have consistently argued that all of the challenged conduct must be evaluated as a

27

28   _____

     [4] Although four plaintiffs are named, only three are properly in the case. Named plaintiff Andrew
     Westley filed a notice of dismissal on January 30, 2018. Dkt. 311.

whole. For example, in opposing Qualcomm's motion to dismiss the SAC, Plaintiffs argued that one cannot "break Plaintiffs' claims up into constituent pieces and attack each one separately and in isolation from each other," and that "Qualcomm's restraints *operated together* to injure competition and consumers." Dkt. 901 at 10, 13 n.10; *see also id.* at 11 (rejecting "attempts to break these elements apart and judge each in isolation"). They further argued that "the *combination* of Qualcomm's NLNC tie and exclusive dealing arrangements raise rivals' costs, insulating Qualcomm from competition and increasing prices in both the tying and tied markets." *Id.* at 4 (emphasis in original). Plaintiffs' liability expert shares this view. According to Mr. Elhauge, "one must approach the evidence of exclusionary conduct holistically in this case," and "a proper economic analysis of Qualcomm's challenged conduct requires one to evaluate the exclusionary effects holistically." Elhauge Reply Report ¶¶ 258, 301, 311, 326. Plaintiffs relied on just that argument to defeat Qualcomm's motion to dismiss their initial consolidated class action complaint in 2017, in which Qualcomm argued that no injury flowed from the alleged exclusive dealing arrangements because the agreements included rebates that "would *lower* prices for finished [handsets] and therefore *benefit*, not harm, Plaintiffs." Dkt. 175 at 29 (emphasis in original). Rejecting that argument, the Court concluded that one had to consider "the overall nature of the arrangement," which resulted in a supra-FRAND royalty "surcharge that had to be borne by consumers like Plaintiffs." *Id.*

Now that this Court has dismissed everything but the exclusive dealing allegations, this motion attacks Plaintiffs' exclusive dealing allegations *as if* Plaintiffs had asserted them as a standalone claim. But because Plaintiffs never pleaded or pursued a standalone exclusive dealing claim, nothing in the long-closed record in this case affords Plaintiffs a basis to raise a material issue of fact, much less prove, that the alleged exclusive dealing arrangements caused anticompetitive harm, antitrust injury, or quantifiable damages to any Plaintiff, nor can they do so now. The only anticompetitive harm that Plaintiffs have ever alleged or attempted to prove in this case stems from the alleged supra-FRAND patent royalties that Qualcomm charged OEMs. Plaintiffs' expert reports make that clear.

2114504

1. **Plaintiffs' liability expert nowhere explains how the alleged exclusive dealing arrangements caused anticompetitive harm or antitrust injury.**

Plaintiffs provided a merits expert report from a law professor, Mr. Elhauge, their liability expert. Mr. Elhauge was asked to answer three questions: (1) "Does Qualcomm's No-License-No-Chips policy anticompetitively increase cellular device manufacturer costs for modem chips and/or cellular SEP licenses;" (2) "Does Qualcomm's refusal to license cellular SEPs to competing modem chip suppliers anticompetitively increase cellular device manufacturer costs for modem chips and/or cellular SEP licenses;" and (3) "Does Qualcomm's use of exclusivity agreements *with Apple* anticompetitively increased [*sic*] cellular device manufacturer costs for modem chips and/or cellular SEP licenses?" Elhauge Report ¶ 4. True to his assignment, Mr. Elhauge provided no analysis regarding Qualcomm's agreements with OEMs other than Apple. He provided no opinion regarding whether Qualcomm's agreements with any non-Apple OEMs were "exclusive dealing arrangements," or whether any such agreement foreclosed any portion of the market. If anything, he did the opposite, stating that "Qualcomm did not make the same sort of exclusivity payments to these other OEM customers" as it did with Apple. *Id.* ¶ 131.

With respect to Apple, Mr. Elhauge never provided any model for determining how any alleged exclusive dealing agreement caused Plaintiffs to pay higher prices for their devices. Although Mr. Elhauge included a few stray assertions that Qualcomm's alleged exclusive dealing arrangements with Apple led to increased prices for all chips, *see id.* ¶¶ 114, 134, Mr. Elhauge neither calculated a *but-for* price that he claims would have prevailed absent the alleged exclusive dealing arrangements, nor even offered a method for determining one. Mr. Elhauge's failure to perform these analyses is unsurprising because, in his opinion, the "anticompetitive effect of this exclusion [was] the exacerbation of Qualcomm's No-License-No-Chips policy," *id.* ¶ 138, which resulted in the only injury he did try to identify—the now-discredited injury of a royalty "surcharge." According to Mr. Elhauge, the "effects" and "impact" of these arrangements were intertwined with Plaintiffs' central tying claim. Elhauge Reply Report ¶¶ 301, 326.[5]

---

[5] Although Mr. Elhauge claimed that his analysis "does show specific anticompetitive harms linked to each individual type of exclusionary conduct," Elhauge Reply Report ¶ 311, in fact none of his analysis linked any cognizable antitrust injury to any plaintiff as a result of the alleged exclusive dealing arrangements alone. At most, he opined that "even though each type of

DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-md-02773-JSC

2114504

Plaintiffs' evidence also fails to show what amount of either the alleged CDMA or "premium LTE" chip markets, if any, was foreclosed as a result of the alleged exclusive dealing arrangements.  All Mr. Elhauge mentioned in his expert reports was that Qualcomm's "significant incentives" prevented "████████████████████████████████████" *Id.* ¶ 236; Elhauge Report ¶ 143. Mr. Elhauge, however, included no analysis explaining what share of either the CDMA or "premium LTE" chip markets ████████████████ represented. Mr. Elhauge speculated that this exclusion blocked Apple's "█████████████████████████████████ ████████████████ Elhauge Reply Report ¶ 236, but again, he failed to analyze what percentage of any alleged relevant market that would have represented. And Mr. Elhauge confirmed (as does the SAC at ¶ 145) that Intel became Apple's second supplier for the 2016 iPhone 7 the very next year. Elhauge Report ¶¶ 133–34. Mr. Elhauge also failed to explain how ████████████████████████████████████████ affected ██████ ability to compete with any other chipset manufacturer selling chips to non-Apple OEMs in the alleged relevant markets or discuss whether ██████ ever even sought to sell chips to other OEMs.

### 2.    Plaintiffs' other experts focused solely on alleged supra-FRAND royalties.

Plaintiffs also retained Dr. Kenneth Flamm to supply expert testimony. Like Mr. Elhauge, Dr. Flamm offered no opinion on the effects of any alleged exclusive dealing arrangements. Indeed, he expressly confirmed that he has no opinion about Qualcomm's chip prices. Harris Decl., Ex. 4 ("Flamm Dep") at 59:16-60:6. Instead, he "provide[d] an analysis of how the [allegedly] supra-FRAND royalty ('*the* overcharge') levied by Qualcomm would have affected the price and performance characteristics of mobile devices . . . and how those price and performance characteristics would in turn be reflected in the price and performance of mobile devices purchased by final consumers, the indirect purchasers making up the plaintiff class in this litigation." Flamm Report ¶ 14. Throughout his report, Dr. Flamm confirmed that "the amount of alleged overcharge[] relevant to the pass-through analysis" was the "overcharge base calculated

---

exclusionary conduct *can* independently harm a rival, the observed outcome of a rival reflects the *combined* harm from all three types of exclusionary conduct." *Id.*

2114504

by [Plaintiffs' expert] Mr. Lasinski[.]" Harris Decl., Ex. 6 ("Flamm Rebuttal Report") ¶¶ 30 n. 21,

¶ 246. Mr. Lasinski, in turn, focused solely on calculating an alleged overcharge based on what he

had determined was the FRAND royalty rate for a patent license to Qualcomm's SEPs. Harris

Decl., Ex. 5 ("Lasinski Report") ¶ 8.

**B.    With their sole theory of antitrust injury out of the case, Plaintiffs unsuccessfully sought leave to find new facts and generate new expert reports to support an exclusive dealing claim.**

Although Plaintiffs included an "exclusive dealing" claim from the outset, they never

pursued it on a standalone basis, electing instead to pursue it only as an ancillary theory that

"exacerbate[d]" the effects of Plaintiffs' other claims. *See* SAC at 32 & ¶ 129; Elhauge Report ¶

138. They made that choice even after they received millions of pages of discovery and took

dozens of depositions from Apple, other OEMs, and Qualcomm. After the Court dismissed

everything other than the exclusive dealing allegations, Plaintiffs sought to reopen discovery in an

effort to "align the[ir] damages model with the exclusive dealing claim now in play in this

litigation." Joint CMC Statement at 3. They also sought leave to submit new expert reports that

would "quantify an overcharge not solely tied to the amount of the licensing royalties charged by

Qualcomm but instead caused by Qualcomm's exclusive dealing arrangements." *Id.* Plaintiffs

were quite clear that the record as it currently stands lacks evidence of injury tied to the lone

remaining claim in the case. In the Joint CMC Statement, they told the Court that "their damages

model focused instead on quantifying the amount of the supra-FRAND royalties charged in

Qualcomm's licensing agreement." *Id.* And at the CMC itself, they renewed their request for new

expert reports, arguing that it would not "be fair" to force them to proceed based on the opinions

they had disclosed during expert discovery. Harris Decl., Ex. 7 ("CMC Tr.") at 8:2. The Court

rejected that argument:

> You could have pursued a separate exclusive dealing theory that was not dependent upon the FRAND, but maybe you chose not to. . . . That was just a strategic choice. . . . You could have developed alternative expert theories. You could have. You didn't have to put all your eggs into one basket, right?

*Id.* at 7:6-11, 8:1-5. As a result, the Court denied Plaintiffs' request to reopen discovery and

authorized Qualcomm to move for summary judgment. For their part, Plaintiffs would need to

oppose this motion based "on that record that [they] had" at the "discovery cutoff." *Id.* at 12:3-6.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322–23 (1986). In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* Where, as here, the defendant does not have the burden of proof at trial, summary judgment is appropriate where the defendant produces "evidence negating an essential element of the nonmoving party's claim" or "show[s] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The nonmovant's burden "is not a light one"—they "must show more than the mere existence of a scintilla of evidence or some 'metaphysical doubt' as to the material facts at issue." *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897–98 (9th Cir. 2021). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the Court should view facts in the light most favorable to the nonmovant, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Id.* at 588. Accordingly, conduct that is "as consistent with permissible competition as with illegal [conduct]" is insufficient to defeat summary judgment. *Id.* (discussing conspiracy cases under Section 1 of the Sherman Act).

In antitrust cases, Plaintiffs typically rely on experts to meet their burden of production. Yet, expert opinions that depend on "conclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003*); see also Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1201 (S.D. Cal.

2021) ("[E]xpert opinions on legal conclusions may not defeat summary judgment."). Instead, the expert "must at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment." *See Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993). Courts routinely grant summary judgment in antitrust cases where a plaintiff's expert fails to provide the requisite reasoning and analysis to establish a factual dispute about a material element of the plaintiff's claim. *See, e.g.*, *B&H Med., L.L.C. v. ABP Admin. Inc.*, 526 F.3d 257, 264 (6th Cir. 2008) (affirming summary judgment and sanctions where plaintiff's "expert failed to provide any tenable evidence or theory of substantial foreclosure in the relevant market"). An expert's opinion is insufficient to support antitrust liability where it fails to "separate lawful from unlawful conduct." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). When "the foundation of [an expert's] opinion" contains such "deficiencies," the "resulting conclusions [are] mere speculation." *Id.* In short, "[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

## IV.   ARGUMENT

Plaintiffs bring their exclusive dealing claim under California's Cartwright Act, Cal. Bus. & Prof. Code § 16727. *See* SAC ¶¶ 233–34. When interpreting exclusive dealing claims under the Cartwright Act, California courts rely on federal antitrust precedent interpreting the Clayton and Sherman Acts as persuasive authority. *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1032 (N.D. Cal. 2015); *Flagship Theatres of Palm Desert, LLC v. Century Theaters, Inc.*, 55 Cal. App. 5th 381, 404 (2020); *Redwood Theatres, Inc. v. Festival Enters., Inc.*, 200 Cal. App. 3d 687, 712 n. 13 (1988). Exclusive dealing arrangements are not per se unlawful under California or federal antitrust law; indeed, they often benefit consumers. *See, e.g.*, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("There are, however, well-recognized economic benefits to exclusive dealing arrangements[.]"); *Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 6 (1975) (noting that exclusive dealing arrangements may provide, among other benefits, "a guarantee of quality-control distribution").

To defeat summary judgment, Plaintiffs must adduce evidence showing (1) the existence

of contracts that either explicitly required, or had "the practical effect" of requiring, exclusivity; (2) the exclusive dealing agreements are likely to substantially foreclose competition in a substantial share of the "relevant market"; and (3) the exclusive dealing arrangements caused Plaintiffs to suffer injury to their business or property. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–27 (1961); *Omega*, 127 F.3d at 1163. Plaintiffs can make no such showing.

### A. Plaintiffs nowhere explain how Qualcomm's incentive agreements with Apple caused Plaintiffs to suffer antitrust injury.

Plaintiffs have not and cannot cite to any evidence showing that they suffered antitrust injury from any alleged exclusive dealing, *i.e.,* an injury "flow[ing] from the invidious conduct which renders [Qualcomm's] act[] unlawful." *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (1982); *accord Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 538 (1999); *Cellular Plus*, 14 Cal. App. 4th at 1234. That failure is clear for two reasons.

***First***, Plaintiffs provide no evidence that Qualcomm's incentive arrangements with Apple harmed the competitive process. "It can't be said often enough that the antitrust laws protect competition, *not* competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990); *see also FTC*, 969 F.3d at 993; *Marsh v. Anesthesia Servs. Med. Grp.*, 200 Cal. App. 4th 480, 495 (2011) ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws."). Plaintiffs allege that Intel suffered a delay in selling to Apple due to the agreements, but even if the evidence supported that claim (and it doesn't), that wouldn't establish harm to competition. Indeed, Plaintiffs have never attempted to explain how the Apple agreements, on their own, harmed competition. Rather, Mr. Elhauge "describe[d] the anticompetitive effect of" the alleged "exclusionary agreements with Apple," as "the exacerbation of Qualcomm's No-License-No-Chips policy." Elhauge Report ¶ 138. To be clear, none of Plaintiffs' expert witnesses ever opined in either their opening or reply reports that any alleged exclusive dealing agreement, by itself, harmed competition. That failure dooms their case.

Unable to rely on the "No-License-No-Chips policy" to prop up their antitrust injury and damages model, Plaintiffs have apparently reversed course, flipping from arguing that Qualcomm was *undercutting* competitors on chip prices to arguing that Qualcomm was overcharging OEMs

---

11

for chips. *Compare* SAC at ¶ 74 ("providing 'rebates' to OEMs that will result in a lower all-in price for the OEM but only if the OEM uses Qualcomm chips"), *with* Joint CMC Statement at 10 (seeking additional discovery "concerning its exclusive dealing claim and chipset overcharge damages tied to that claim"). This new argument—that Qualcomm's allegedly elevated chip prices caused antitrust injury—contradicts economic theory and antitrust jurisprudence. In fact, even if one were to credit this new and baseless position, "high prices, far from damaging competition, ***invite new competitors*** into the monopolized market." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274–75 n.12 (2d Cir. 1979); *see also Trinko*, 540 U.S. at 407; *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1364 (D. Kan. 2020) (applying *Berkey Photo* and granting summary judgment on the plaintiff's exclusive dealing claim), *aff'd*, 44 F.4th 959 (10th Cir. 2022). That principle holds true here; ███████████████████████████████████████████████████████ ███████████████████████████████████████████. *See* Elhauge Report ¶ 126; *FTC*, 969 F.3d at 1004 ("[I]t is undisputed that Intel won Apple's business *the very next year*, in 2014, when Apple's engineering team unanimously recommended that the company select Intel as an alternative supplier of modem chips."); *Syufy*, 903 F.2d at 663 (finding no antitrust liability where "market forces are likely to cure the perceived problem within a reasonable period of time").

**Second**, because Plaintiffs cannot point to any evidence that the Apple agreements caused Apple to pay supracompetitive chip prices, they cannot provide any evidence that Plaintiffs paid supracompetitive prices for their devices as a result. To be sure, Mr. Elhauge repeats the same conclusory statement that the incentive payments provided under the Apple agreements "increase[d] Qualcomm's] monopoly power," which "increased chipset prices throughout the market," Elhauge Report ¶ 114, yet he "offer[s] no underlying evidence showing that this actually occurred in reality." *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6451711, at *4 (N.D. Cal. Dec. 18, 2017). For example, Mr. Elhauge never calculates what the but-for price of chips would have been absent the agreements, another failure that justifies judgment in Qualcomm's favor. *See In re EpiPen*, 507 F. Supp. 3d at 1365 (granting summary judgment in part because the plaintiff's expert had failed to "quantify what the price of EpiPen would have been but-for [the

1    defendant's] anti-competitive conduct—*i.e.*, its exclusionary rebate contracts"). Nor does Mr.

2    Elhauge provide any method for determining whether (and if so, how) the Apple agreements

3    caused an increase in the prices Apple paid for chips, let alone the prices other OEMs paid,

4    because of a less competitive chip market. Indeed, when discussing the incentive payments

5    Qualcomm offered Apple, which he characterizes as "disloyalty penalties," he admittedly

6    "offer[ed] no opinion on the correct characterization of these payments or on whether their

7    economic incidence should be applied to royalties instead of chipsets." Elhauge Reply Report ¶

8    354. And Mr. Elhauge's failure to provide any method for calculating an overcharge resulting

9    from the Apple agreements explains why Dr. Flamm never developed an opinion on how

10    Qualcomm's alleged exclusive dealing arrangements affected the price Plaintiffs paid for their

11    phones. Instead, Dr. Flamm's pass-through damages theory relied solely on Mr. Lasinski's

12    royalty calculations. *See* Flamm dep. at 59:16-60:6.

13           In short, there are gaping voids where one would expect evidence of causation to be. All

14    that Plaintiffs can point to are Mr. Elhauge's conclusory statements. And "conclusory assertions

15    unsupported by specific facts made in affidavits opposing a motion for summary judgment, are

16    not sufficient to defeat a motion for summary judgment." *Thomas*, 328 F.3d at 894.

17           Even if Mr. Elhauge's conclusory statements were sufficient (they are not), Plaintiffs'

18    standalone exclusive dealing claim fails as they do not show how the alleged exclusive dealing

19    arrangements **on their own** excluded chip competition and also caused Plaintiffs to pay more for

20    their devices. Plaintiffs must show that the alleged injury "flows from the invidious conduct

21    which renders defendants' acts unlawful," and not from other causes. *Kolling*, 137 Cal. App. 3d at

22    723. A plaintiff cannot defeat summary judgment on causation where the plaintiff "does not

23    measure [the alleged anticompetitive overcharge] alone." *In re eBay Seller Antitrust Litig.*, 2010

24    WL 760433, at *14 (N.D. Cal. Mar. 4, 2010). For example, in *Momand v. Universal Film*

25    *Exchanges*, 172 F.2d 37 (1st Cir. 1948), the First Circuit affirmed the district court's directed

26    verdict for the defendant. There, the plaintiff had initially alleged an injury based on "twenty

27    business practices," but, as here, "it was decided in the earlier lawsuit that" most of the

28    challenged practices were lawful. *Id.* at 43. And, as is true here, the plaintiff's damages model

focused only on measuring damages holistically. The court held:

> the plaintiff is now in the position of ***having his shotgun replaced by a rifle***. He can no longer spread his fire over the whole range of the defendants' business practices. He must concentrate on two. And if the res judicata rulings are to be given full effect, the injury alleged must be allocated to the illegal practices in some manner that can be reasonably measured. To put it another way, if the plaintiff in his first lawsuit seeks to collect a total loss due to all of the allegedly illegal practices of the defendants, and the court in that case finds only two practices illegal, a verdict for the plaintiff in a second lawsuit on the same grounds ***cannot stand without proof that the two illegal practices caused the loss***.

*Id.*; *see also In re eBay*, 2010 WL 760433, at *13–14 (granting summary judgment on Sherman Act, Cartwright Act, and UCL claims where Plaintiffs' overcharge was based on multiple factors, of which only one was "of antitrust interest").

Plaintiffs' case suffers the same fatal flaw. The "overcharge" Plaintiffs have calculated relates solely to allegedly supra-FRAND royalties (*i.e.*, patent license overcharges), not any allegedly inflated chip prices caused by a harm to competition in the alleged markets for CDMA or "premium LTE" chips. In fact, none of Plaintiffs' experts offered an opinion regarding the existence of any overcharge based on the Apple agreements. Instead, Mr. Elhauge repeatedly emphasized that one should not even attempt such a calculation. He repeatedly asserted that the "exclusionary effects" of Qualcomm's conduct could only be analyzed and evaluated "holistically." Elhauge Reply Report ¶ 301; *see also, e.g.*, *id.* ¶ 326 ("A proper consideration of the impact on Intel ***must*** consider Qualcomm's anticompetitive practices holistically."); *id.* ¶ 344 ("[O]ne must approach the evidence of exclusionary conduct holistically in this case"). With the "No-License-No-Chips tie" and refusal-to-deal claims out of this case, that holistic approach cannot satisfy Plaintiffs' burden of establishing causation.

Accordingly, Plaintiffs can present no evidence sufficient to establish that they have suffered an antitrust injury attributable to exclusive dealing. Because that is a requisite element of their Cartwright Act claim, summary judgement dismissing that claim is warranted.

## B.   Plaintiffs have not met their burden to show that Qualcomm's conduct foreclosed competition in a substantial share of the market.

Plaintiffs' exclusive dealing claim also fails because they cannot demonstrate a genuine issue of material fact, as they must, that the alleged exclusive dealing arrangements "foreclose[d]

2114504

competition in a substantial share of the . . . line of commerce, the market area, and the affected share of the relevant market." *Dayton*, 52 Cal. App. 3d at 6; *see also Omega*, 127 F.3d at 1162; *Bert. G. Gianelli Distrib. Co. v. Beck & Co.*, 172 Cal. App. 3d 1020, 1049 (1985) (holding that a plaintiff must "evince a substantially adverse effect on competition in the relevant market to support a viable legal theory . . . and consequently to survive a summary judgment motion").

Plaintiffs must satisfy a three-step test to establish substantial foreclosure. First, they must identify the relevant product market, focusing on the particular line of commerce within which the competitive effects of the arrangement will be measured. *Tampa Elec. Co.*, 365 U.S. at 327. Second, they must identify the relevant geographic market. *Id.* Third, they must show that "the competition foreclosed" by the arrangement constitutes "a substantial share of the relevant market." *Id.* at 328. "[I]n all cases the plaintiff must both define the relevant market and prove the degree of foreclosure." *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001). And the degree of foreclosure must be significant: "an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition." *Id*.

In determining whether the foreclosure represents a substantial share of the relevant market, California courts, like their federal counterparts, do not require a set percentage of the market to be foreclosed. But California courts have generally set "20 percent as [the] floor for significant foreclosure[.]" *Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of San Francisco*, 114 Cal. App. 4th 309, 336 (2003); *see also OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1250 (11th Cir. 2022) (calling a 40% foreclosure percentage "a threshold for liability in exclusive dealing cases").

Here, Plaintiffs' "expert [has] failed to provide any tenable evidence or theory of **substantial** foreclosure in the relevant market." *B&H Medical L.L.C.*, 526 F.3d at 264 (affirming summary judgment). Nothing in Plaintiffs' expert reports shows what share of the market Qualcomm allegedly foreclosed, let alone that Qualcomm's agreements with Apple foreclosed at least 20% of either the alleged CDMA or "premium LTE" chip markets.[6] In fact, Mr. Elhauge

---

[6] Although Dr. Flamm provided market definitions, he failed to state what share of either market Apple represented.

makes no attempt to quantify the percentage of either market that the Apple agreements supposedly foreclosed. *Rheumatology Diagnostics Lab'y Inc. v. Aetna, Inc.*, 2013 WL 3242245, at *13 (N.D. Cal. June 25, 2013) (dismissing complaint because "Plaintiffs fail to quantify the actual market effect of this alleged activity—*i.e.*, the percentage of [competitors] . . . who are foreclosed from the market—even in gross terms.").

Even if the Court credited Mr. Elhauge's conclusory assertion that Intel was foreclosed, the qualitative evidence to which he refers only confirms that any such foreclosure was minimal. The undisputed facts establish that, even if Intel could have been a suitable candidate for Apple, ███████████████████████████████████████████████████████████ Elhauge Reply Report ¶ 236 ("███████████████████████████████████████████████████████

███████████████████████████████████████████████"); Elhauge Report ¶ 143 (████████████

████████████████████████████████████████████). Plaintiffs offer no analysis suggesting that Intel's temporary failure to obtain business relating to one product line belonging to a single OEM establishes substantial foreclosure in any relevant market. Nor does Mr. Elhauge provide evidence of how this single product fits into the alleged CDMA or "premium LTE" markets.

And Plaintiffs further fail to show how ██████████████████████████, even if it had occurred, prevented ████ from selling CDMA or "premium LTE" chips to OEMs other than Apple. Nor can they. Apple purchases "thin" modems whereas the other OEMs largely purchase a "system on a chip" or "SoC." Elhauge Report ¶ 150 n. 347.[7] And the evidence Mr. Elhauge relied on confirms ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

---

[7] Mr. Elhauge refers to thin modems as MDMs and SoCs as MSM products. Elhauge Report ¶ 150 n. 347.  A thin modem is a chip that contains only cellular modem technologies, whereas an SOC is chip that includes cellular modem technologies in addition to other technologies, such as CPUs, graphic processors, camera, and multimedia. *Id.*

16

1    It is therefore beyond implausible that the alleged foreclosure of █████████

2    caused substantial foreclosure in any allegedly relevant market, and Plaintiffs can provide no

3    evidence to bridge that gap. Where, as here, "the factual context renders plaintiff's claim

4    implausible if the claim is one that simply makes no economic sense—plaintiff must come

5    forward with more persuasive evidence to support his claim than would otherwise be necessary."

6    *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 844 (N.D. Cal. 2004). Neither Mr. Elhauge

7    nor any of Plaintiffs' other experts come forward with this sort of evidence, and none exists in the

8    record.

9    Accordingly, Plaintiffs fail to adduce evidence sufficient to establish an element of their

10    claim, namely that Qualcomm's agreements with Apple foreclosed a substantial share of a

11    relevant market.

12    **C.    Plaintiffs provide no method for the jury to reasonably estimate damages.**

13    Even if Plaintiffs could put forward evidence showing that the Apple agreements

14    foreclosed competition in a substantial portion of a relevant market and caused consequent

15    antitrust injury, they would still face an insurmountable problem requiring summary judgment.

16    Plaintiffs "must establish that [their] injuries were caused by reason of the defendants' *unlawful*

17    competition." *Farley*, 786 F.2d at 1348 (emphasis in original). Here, when developing their

18    damages model, Plaintiffs never distinguished between alleged injury attributable to exclusive

19    dealing as opposed to alleged injury attributable to their now-defunct tying theory. As the Court

20    put it, they "put all [their] eggs into one basket." CMC Tr. at 8:1–5. That being so, Plaintiffs have

21    "failed to present *any* evidence permitting the jury to parse out which damages are attributable to

22    the unlawful competition." *Farley*, 786 F.2d at 1351 (emphasis in original).

23    Plaintiffs cannot cure this failing. To defeat summary judgment, Plaintiffs must "provide

24    evidence to support a just and reasonable estimate of the damage." *Id.* at 1350. Although antitrust

25    plaintiffs are entitled to some "leeway in proving the amount of damages," that in no way allows

26    them "to shirk [their] responsibility to present competent and probative evidence from which a

27    jury can reasonably infer damages." *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124

28    (E.D. Cal. 2002). Summary judgment is therefore appropriate where  Plaintiffs' "evidence of

17

damages would require a jury to engage in speculation or guesswork." *Id.*

In antitrust cases like this one—where some of the alleged conduct is found lawful while other conduct remains in dispute—courts routinely grant summary judgment or overturn jury verdicts when a plaintiff's damages study fails to expressly separate out injury caused by the allegedly unlawful conduct from the effects of lawful competition. In *Farley*, for example, the court held that the plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme . . . requires reversal of the verdict." 786 F.2d at 1352. Similarly, in *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988), "[s]ome sort of study estimating the amount of damages was essential to [plaintiff's] case," but the district court had excluded the plaintiff's studies. *Id.* at 808. The court granted summary judgment given the lack of evidence from which the jury "could reasonably conclude that [the plaintiff] actually suffered damages, caused by [the] defendants, in any quantifiable amount." *Id.* at 808–09. In *City of Vernon*, the plaintiff's "study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were." 955 F.2d at 1372. And in *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, 2020 WL 127612 (N.D. Cal. Jan. 10, 2020), the court held that, after excluding the plaintiff's expert's damages opinions, there was no "sufficient basis for the jury to reach a reasonable estimate, without relying on speculation, of the market share and profits that [the plaintiff] would have captured in a hypothetical competitive market." *Id.* at *9. That being so, the court granted summary judgment *sua sponte*.[8]

These holdings apply fully here. The only "overcharge" that Plaintiffs' experts ever calculated, discussed, or presented was an alleged supra-FRAND ***royalty*** overcharge that was tied to Qualcomm's licensing practices, not an alleged ***chip*** price overcharge that was tied to exclusive

---

[8] Other, similar cases abound. *See, e.g.*, *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1801, 1161–62 (7th Cir. 1983) ("It is essential, however, that damages reflect only the losses directly attributable to *unlawful* competition." (emphasis in original)); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) ("The damage figures advanced by plaintiff's experts may be substantially attributable to lawful competition. . . . [W]e cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition."); *Momand*, 172 F.2d at 43; *ILC Peripherals Leasing Corp. v. Int'l Bus. Machines Corp.*, 458 F. Supp. 423, 434 (N.D. Cal. 1978) ("The way Memorex structured its damage claim there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful.").

DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-md-02773-JSC

2114504

dealing arrangements. *See, e.g.*, Elhauge Report ¶¶ 23, 72 & n.171, 73, 158; Flamm Report ¶ 14; Lasinski Report ¶8. Although Plaintiffs have suggested that they merely face a problem quantifying damages, the trouble runs far deeper than that. Plaintiffs have pointed to Mr. Elhauge's conclusory comments that the Apple agreements' discounts "were, in fact, penalties that ***would cause*** Qualcomm chipset prices for Apple devices to rise above but-for levels as a punishment for disloyalty to Qualcomm." Elhauge Report ¶ 114. He similarly opined that "using foreclosure to weaken, delay, or eliminate the ability of chipset rivals to compete ***would*** predictably increase Qualcomm's monopoly power in chipsets above but-for levels and thus increase chipset prices throughout the market above their but-for level." *Id.* ¶ 137. Such statements are nothing more than "bare allegations that a causal link exists between defendants' actions and harm suffered by plaintiff." *Dealers Wholesale Supply, Inc. v. Pac. Steel & Supply Co.*, 1984 WL 775, at *4 (N.D. Cal. July 6, 1984). Mr. Elhauge neither presents evidence that this overcharge occurred, nor provides any damages numbers flowing from that hypothetical increase. With nothing to go on, the jury would be left to "engage in speculation or guesswork" when asked to estimate damages resulting from the allegedly unlawful Apple agreements. *Toscano*, 201 F. Supp. 2d at 1124.

In short, Plaintiffs lumped their antitrust theories together, gambling that their core tying and refusal-to-deal claims would survive to trial, thereby obviating any need for them to even attempt to assess or analyze chip prices. They presented a damages theory based solely on alleged supra-FRAND royalties, rather than allegedly supra-competitive chip prices. As this Court noted, "that was just [their] strategic choice." CMC Tr. at 7:2–11. But that turned out to be a bad bet. And because their damages analysis rests on that erroneous premise, they are now left with damages studies that are fundamentally based on conduct that has been found ***not*** to violate state or federal antitrust law. As in *City of Vernon*, "the serious flaws in the only damage study which could be proffered to the jury" has placed Plaintiffs "in the position of having no proper proof of damages at all." 955 F.2d at 1373. Summary judgment is properly awarded "based upon this lack of evidence." *Id.*

**D.      Plaintiffs cannot adduce evidence sufficient to show that Qualcomm's contracts with non-Apple OEMs were unlawful.**

Because Plaintiffs' exclusive dealing claim focuses nearly entirely on Qualcomm's now-expired agreements with Apple, this motion has done the same. But Plaintiffs' SAC also alludes to alleged exclusive dealing arrangements with OEMs other than Apple. *See* SAC ¶ 72. Regardless, no evidence supports Plaintiffs' exclusive dealing claim based on those barebones allegations.

Indeed, Plaintiffs' experts failed to identify a single contract or agreement between Qualcomm and any OEM other than Apple from which to argue that Qualcomm foreclosed a substantial share of any relevant market by conditioning discounts or rebates based on OEMs buying Qualcomm chips exclusively or near-exclusively. If anything, Plaintiffs' expert evidence confirms that Qualcomm did ***not*** enter into the sort of arrangements with non-Apple OEMs that Plaintiffs assert to be problematic about the Apple agreements. Mr. Elhauge pointed out that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████       Indeed, Mr. Elhauge confirms

that ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████

Plaintiffs also cannot provide evidence for how any alleged exclusive dealing agreements with non-Apple OEMs foreclosed a substantial share of any relevant market. There is no analysis in Plaintiffs' expert reports regarding whether and how an alleged exclusive dealing agreement (and there are none) with Samsung, Huawei, Blackberry, or any other OEM mentioned in the SAC foreclosed competition.

Nor can Plaintiffs show how any such agreement caused Plaintiffs to suffer antitrust injury.[9] Plaintiffs cannot even point to any of their experts' opinions saying that any agreement

---

[9] Plaintiffs also cannot adduce evidence showing that any consumer who purchased a non-Apple device suffered antitrust injury as a result of Qualcomm's agreement with Apple. No expert opines that these consumers paid more for their devices because of the Apple agreements or why

with any non-Apple OEM caused device prices to rise throughout the market, let alone provide the required evidence for a reasonable juror to arrive at that conclusion or calculate damages resulting from it.

Without any analysis or evidence to establish a dispute of material fact over Qualcomm's chipset agreements with the non-Apple OEMs, Plaintiffs' claim with respect to other OEMs is "speculative, unreasonable, economically senseless, or do[es] not make practical sense." *Healow v. Anesthesia Partners, Inc.*, 92 F.3d 1192 (9th Cir. 1996); *see also Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (holding that motions for summary judgment "will not be defeated merely on the basis of conjecture or surmise"). Because no reasonable juror could find that Qualcomm's chipset agreements with non-Apple OEMs were unlawful or harmed Plaintiffs, summary judgment is warranted.

### E.  Plaintiffs' UCL claim fails.

Summary judgment on Plaintiffs' UCL claim is appropriate for four reasons.

***First***, Plaintiffs' UCL claim depends on the exact same set of facts as their Cartwright Act claim and, as such, should be dismissed alongside it. *City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 691 (9th Cir. 2015). Just as with Plaintiffs' Cartwright Act claim, Plaintiffs cannot establish that any agreement with Apple (or any other OEM) caused Plaintiffs to suffer an injury—*i.e.*, to pay more for their phone than they otherwise would have. *See In re eBay Seller Antitrust Litig.*, 2010 WL 760433, at *14 (granting summary judgment on the plaintiffs' UCL claim where the plaintiffs failed to establish antitrust injury). Because Plaintiffs have failed to adduce evidence that Qualcomm's chipset agreements caused these consumers harm, Plaintiffs' UCL claim falls with their Cartwright Act claim.

***Second***, an injunction is unavailable for the simple reason that the challenged conduct ceased in 2016, once Apple terminated its contract with Qualcomm. As the Ninth Circuit held in *FTC*, "past wrongs are not enough for the grant of an injunction; instead, an injunction will only issue if the wrongs are ongoing or likely to recur." *FTC*, 969 F.3d at 1005; *see also, e.g., Madrid*

---

that would be the case, let alone provide evidence that this occurred. And the record includes no evidence necessary to make such a showing.

DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-md-02773-JSC

2114504

*v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 465 (2005) (holding that, under the UCL, "[i]njunctive relief has no application to wrongs which have been completed absent a showing that past violations will probably recur"). Despite discovery ending in 2018, well after Apple terminated its deal with Qualcomm, Plaintiffs provide no facts showing that the challenged conduct is ongoing or likely to recur.

**Third**, Plaintiffs' UCL claim fails for an additional, independent reason—Plaintiffs do not establish how the treble damages they seek under the Cartwright Act would be inadequate. Under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA." *Id.* at 844. In other words, Plaintiffs must show "why those consumers could not sufficiently be made whole by monetary damages." *In re Macbook Keyboard Litig.*, 2020 WL 6047253, at *4 (N.D. Cal. Oct. 13, 2020). Here, as in *Sonner*, Plaintiffs' "operative complaint does not allege that [they] lack[] an adequate legal remedy." *Sonner*, 971 F.3d at 844. And, even after this Court's Order on the motion to dismiss, Plaintiffs have confirmed that they only seek damages on the alleged overcharge on cellular devices they purchased. Joint CMC Statement at 3. Courts routinely dismiss UCL actions in cases where, as here, the alleged harm is based on an "overcharge," because the "same amount of money for the exact same harm" is not inadequate. *Sonner,* 971 F.3d at 844; *see, e.g., In re Macbook Keyboard Litig.*, 2020 WL 6047253, at *4; *see also, e.g., In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2021 WL 1176645, at *7 (N.D. Cal Mar. 29, 2021) (dismissing UCL claim under *Sonner* in light of the plaintiffs' Cartwright Act claim) (Corley, J.).

The fact that Plaintiffs' Cartwright Act claim cannot proceed provides Plaintiffs no cover. As this Court has noted, the question is not whether "the Court ultimately deems inadequate the remedies at law," but rather whether "they **have** inadequate remedies at law." *In re Cal. Gasoline Spot Market Antitrust Litig.*, 2021 WL 1176645, at *7. Accordingly, courts dismiss UCL claims under this doctrine even after dismissing parallel legal claims. *See Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) (dismissing UCL claim after dismissing all of the plaintiffs' other claims); *Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1203 (N.D. Cal. 2016)

1  (finding plaintiff's UCL claim foreclosed "even if all of plaintiff's non-UCL claims ultimately

2  fail"). Thus, Plaintiffs' UCL claim is barred even if their Cartwright Act claim fails.

3       *Fourth*, and relatedly, Plaintiffs' UCL claim fails as they "introduced no competent

4  evidence" to show that restitution is appropriate. *Chowning v. Kohl's Dep't Stores, Inc.*, 733 F.

5  App'x 404, 406 (9th Cir. 2018) (affirming summary judgment). Courts routinely grant summary

6  judgment where, as here, Plaintiffs have "not come forward with *any* evidence of the difference

7  between the price paid and the value of the items received, much less proposed models with

8  expert support." *See Keating v. Nordstrom, Inc.*, 2019 WL 7160384, at *13 (D. Alaska Nov. 8,

9  2019); *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018) (affirming district

10  court's "grant of summary judgment . . . as well as its order decertifying a putative class of

11  purchasers" because the plaintiffs "failed to provide an adequate basis to calculate restitution

12  under California's Unfair Competition Law"); *see also D'Artiste v. Am. Int'l Grp., Inc.*, 2021 WL

13  4707000, at *3 (C.D. Cal. May 12, 2021) ("Because Plaintiff has failed to provide any evidence

14  from which the actual value received under Defendants' policy can be calculated, no reasonable

15  finder of fact could determine at trial that Plaintiff is entitled to restitution under the UCL.").

16  Instead, the law requires "some reasonable basis of computation" to survive summary judgment.

17  *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001). Here, Plaintiffs have

18  failed to provide any method to calculate the difference between the price paid and the value of

19  devices they purchased but-for Qualcomm's alleged exclusive dealing arrangements, much less a

20  proposed model with expert support.

21       For these reasons, Qualcomm is entitled to summary judgment on Plaintiffs' UCL claim.

22  **V.       CONCLUSION**

23       Plaintiffs filed this lawsuit in 2017, centering their complaint on antitrust theories that the

24  Ninth Circuit and this Court have since rejected under both federal and state law. Plaintiffs

25  neither pled nor pursued a standalone exclusive dealing claim and therefore never assembled the

26  evidence or expert analysis required to prove one. Qualcomm therefore respectfully requests that

27  this Court grant its motion for summary judgment.

28

2114504

1

2

Dated:  April 7, 2023                                    KEKER, VAN NEST & PETERS LLP

3

4                                                                By:    s/ Robert A. Van Nest
                                                                       Robert A. Van Nest
                                                                       Eugene M. Paige
5                                                                      Cody S. Harris
                                                                       Matan Shacham
6                                                                      Kristin E. Hucek
                                                                       Daniel B. Twomey

7

8                                                                      Gary A. Bornstein (pro hac vice)
                                                                       Yonatan Even (pro hac vice)
                                                                       CRAVATH, SWAINE & MOORE LLP
9                                                                      Worldwide Plaza
                                                                       825 Eighth Avenue
10                                                                     New York, NY 10019-7475
                                                                       Tel.:    (212) 474-1000
11                                                                     Fax:    (212) 474-3700
                                                                       gbornstein@cravath.com
12                                                                     yeven@cravath.com

13                                                                     Richard S. Taffet (pro hac vice)
                                                                       MORGAN, LEWIS & BOCKIUS LLP
14                                                                     101 Park Avenue
                                                                       New York, NY 10178-0060
15                                                                     Tel.:    (212) 309-6000
                                                                       Fax:    (212) 309-6001
16                                                                     richard.taffet@morganlewis.com

17                                                                     Geoffrey T. Holtz (SBN 191370)
                                                                       MORGAN, LEWIS & BOCKIUS LLP
18                                                                     One Market Plaza, Spear Street Tower
                                                                       San Francisco, CA 94105-1596
19                                                                     Tel.:    (415) 442-1000
                                                                       Fax:    (415) 442-1001
20                                                                     gholtz@morganlewis.com

21                                                                     Attorneys for Defendant
                                                                       QUALCOMM INCORPORATED

22

23

24

25

26

27

28

DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:17-md-02773-JSC

2114504