Kalpana Srinivasan (237460)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, 14th Floor
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
Email: ksrinivasan@susmangodfrey.com

Joseph W. Cotchett (36324)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: jcotchett@cpmlegal.com

***Plaintiffs' Interim Co-Lead Counsel***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 17-md-2773-JSC |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANT QUALCOMM INCORPORATED'S MOTION FOR SUMMARY JUDGMENT FILED UNDER SEAL** |
| This Document Relates To: | |
| ALL ACTIONS | Date: July 20, 2023 |
| | Time: 10:00 AM |
| | Dept.: Courtroom 8, 19th Floor |
| | Judge: Hon. Jacqueline Scott Corley |
| | Trial Date: TBD |

**[REDACTED]**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF UNDISPUTED FACTS .................................................... 2

        A.      Qualcomm's exclusive deals with Apple. ................................................. 2

        B.      Qualcomm's exclusive deals with Samsung. ............................................ 6

        C.      Qualcomm and chipset competitors confirm that Qualcomm's exclusive
                deals resulted in substantial market foreclosure. ..................................... 7

        D.      Plaintiffs' expert has shown anticompetitive effects from Qualcomm's
                exclusive deals. ......................................................................................... 9

III.    PROCEDURAL HISTORY ................................................................................ 10

IV.     LEGAL STANDARD .......................................................................................... 11

V.      ARGUMENT ......................................................................................................... 12

        A.      Plaintiffs Are Not Precluded from Presenting Evidence of Qualcomm's
                Anticompetitive Exclusive Deals. ............................................................ 12

        B.      Plaintiffs Have Raised Triable Issues of Fact as to Exclusive Dealing
                Under the Cartwright Act. ........................................................................ 14

                1.      Triable Issues as to Antitrust Injury ............................................. 14

                2.      Triable Issues as to Market Foreclosure ....................................... 18

        C.      Plaintiffs' UCL Claim May Proceed to Trial. .......................................... 20

                1.      The fate of Plaintiffs' UCL claim does not depend on Plaintiffs'
                        Cartwright Act claim. .................................................................... 20

                2.      Plaintiffs' request for an injunction is appropriate to prevent
                        future exclusive deals. ................................................................... 21

                3.      The *Sonner* test is inapplicable. .................................................... 22

                4.      Plaintiffs have a reasonable basis for calculating restitution. ....... 24

VI.     CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ................................................................................. 18

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
    191 Cal. App. 3d 1341 (1987) ................................................................................ 18

*Bank of the West v. Superior Court*,
    2 Cal. 4th 1254 (1992) ........................................................................................... 22

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ................................................................................... 17

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
    532 F.2d 674 (9th Cir. 1976) ................................................................................. 12

*Cave Consulting Group, Inc. v. OptumInsight, Inc.*,
    2020 WL 127612 (N.D. Cal. Jan. 10, 2020) ......................................................... 14

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ........................................................................................... 20

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) .................................................................................. 21

*Chowning v. Kohl's Department Stores, Inc.*,
    733 F. App'x 404 (9th Cir. 2018) ......................................................................... 24

*City of San Jose v. Office of the Commissioner of Baseball*,
    776 F.3d 686 (9th Cir. 2015) ................................................................................. 21

*City of Vernon v. Southern California Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992) ......................................................................... 13, 14

*Clayworth v. Pfizer, Inc.*,
    49 Cal. 4th 758 (2010) ........................................................................................... 23

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................................. 13

*Corbett v. Superior Court*,
    101 Cal. App. 4th 649 (2002) ................................................................................ 22

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*,
    4 Cal. 3d 842 (1971) .............................................................................................. 12

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
   773 F.2d 1506 (9th Cir.1985)......................................................................................... 13

*Dukes v. Wal-Mart Stores, Inc.*,
   2012 WL 4329009 (N.D. Cal. Sept. 12, 2002) ............................................................... 13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011)......................................................................................... 18

*Epic Games, Inc. v. Apple, Inc.*,
   Case Nos. 21-16506 & 21-16695, 2023 WL 3050076 (9th Cir. Apr. 24, 2023) ............ *passim*

*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
   786 F.2d 1342 (9th Cir. 1985)....................................................................................... 14

*Farrell v. City of Ontario*,
   39 Cal. App. 351 (1919)................................................................................................ 23

*Fisherman's Wharf Bay Cruise Co. v. Superior Court*,
   114 Cal. App. 4th 309 (2003) ........................................................................... 1, 11, 12, 18

*FTC v. D-Link Sys., Inc.*,
   2018 WL 6040192 (N.D. Cal. Nov. 5, 2018).................................................................. 12

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. Aug. 11, 2020).............................................................. 11, 13, 15, 21

*Glaberson v. Comcast Corp.*,
   295 F.R.D. 95 (E.D. Pa. 2013) ...................................................................................... 12

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
   485 U.S. 271 (1988)...................................................................................................... 12

*Harris v. McDonald's Corp.*,
   No. 20-cv-06533-RS, 2021 WL 2172833 (N.D. Cal. Mar. 24, 2021) .................................. 24

*In re California Gasoline Spot Market Antitrust Litigation*,
   2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ................................................................ 24

*In re Cipro Cases I & II*,
   121 Cal. App. 4th 402 (2004) ........................................................................................ 18

*In re eBay Seller Antitrust Litig.*,
   2010 WL 760433 (N.D. Cal. Mar. 4, 2010)..................................................................... 14

*In re EpiPen Marketing*,
   507 F. Supp. 3d 1289 (D. Kan. 2020), *aff'd* 44 F.4th 959 (10th Cir. 2022) ..................... 17

*In re Optical Disk Drive Antitrust Litig.*,
   2017 WL 6451711 (N.D. Cal. Dec. 18, 2017) ................................................................ 17

PLAINTIFFS' OPPOSITION TO DEF. QUALCOMM'S MOTION FOR SUMMARY JUDGMENT
Case No. 17-md-2773-JSC

*Marsh v. Anesthesia Servs. Med. Grp.*,
200 Cal. App. 4th 480 (2011) ......................................................................... 15

*McGlinchy v. Shell Chemical Co.*,
845 F.2d 802 (9th Cir. 1988) ........................................................................... 14

*Meijer Inc. v. Abbott Labs*,
251 F.R.D. 431 (N.D. Cal. 2008) .................................................................... 16

*Momand v. Universal Film Exchanges*,
172 F.2d 37 (1st Cir. 1948) ............................................................................. 14

*Norton v. LVNV Funding, LLC*,
396 F. Supp. 3d 901 (N.D. Cal. 2019) ........................................................... 21

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ........................................................................... 24

*Redwood Theatres Inc. v. Festival Enterprises, Inc.*,
200 Cal. App. 3d 687 (1998) ........................................................................... 12

*Roth v. Rhodes*,
25 Cal. App. 4th 530 (1994) ............................................................................ 11

*Snow v. Align Tech., Inc.*,
No. 21-CV-03269-VC, 2022 WL 468703 (N.D. Cal. Feb. 16, 2022) .............. 24

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........................................................... 22, 23, 24

*Stromberg v. Qualcomm, Inc.*,
14 F.4th 1059 (9th Cir. 2021) ......................................................................... 11

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016) .................................................................. 22, 23

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
546 F.3d 991 (9th Cir. 2008) ........................................................................... 16

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......................................................................... 18

*United States v. Syufy Enterps.*,
903 F.2d 659 (9th Cir. 1990) ........................................................................... 15

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ......................................................................................... 17

*Walton v. Walton*,
31 Cal. App. 4th 277 (1995) ............................................................................ 23

*Zakaria v. Gerber Prods. Co.*,
  755 F. App'x 623 (9th Cir. 2018) ........................................................................... 24

**Statutes**

California's Cartwright Act and Unfair Competition Law ..................................................... *passim*

**Rules**

Fed. R. Civ. P. 23(f) ........................................................................................... 11, 13

Fed. R. Civ. P. 56(d) ............................................................................................ 14

## I.    INTRODUCTION

Qualcomm turns a blind eye to the massive evidentiary record in this case that supports Plaintiffs' exclusive dealing claims – instead making the blanket claim that because the Court did not permit Plaintiffs to update their damages data at the case management conference, Plaintiffs have "no evidence supporting a standalone exclusive dealing claim." ECF No. 938-2 ("Mot.") at 1. As Plaintiffs explain in this opposition brief, the accompanying exhibits, and the updated declaration of Dr. Kenneth Flamm, there are triable issues of fact as to whether Qualcomm's exclusive dealing arrangements with Apple and Samsung—the two largest OEMs—foreclosed a "substantial share" of the relevant chipset markets to rival chipset manufacturers and prevented those competitors' entry into that market. *See Fisherman's Wharf Bay Cruise Co. v. Superior Court*, 114 Cal. App. 4th 309, 335 (2003) (proscribing exclusive dealing arrangements where "it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce").

Plaintiffs' evidence raises a genuine dispute of material fact that ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████[1] repeatedly coerced Apple and Samsung to drop (or not incorporate) chipsets from competing modem chip manufacturers, for the purpose of "stymieing" competition in the relevant chipset markets. In doing so, Qualcomm maintained and expanded its monopoly power. According to documentary and testimonial evidence from Apple itself and based on empirical expert analysis, Qualcomm's exclusive dealing allowed it to keep chipset prices artificially high, requiring California consumers to pay more for cellular devices than they otherwise would have in the absence of the unlawful exclusivity arrangements. This conduct foreclosed its closest competitors from a substantial share of the market.

Qualcomm's motion provides no basis for judgment as a matter of law. First, Qualcomm fails to address the compelling evidence in the record that its exclusive dealing arrangements with

---

[1] Supplemental Expert Report of Dr. Kenneth Flamm (hereinafter "Flamm Decl."), ¶¶ 18-21. This updated declaration amends Dr. Flamm's reports dated October 28, 2018, and December 7, 2018, which are attached as Exhibits 1 and 2 to the Srinivasan Declaration.

Apple and Samsung (and others, as more fully explained herein and in the accompanying expert declaration of Dr. Kenneth Flamm) foreclosed a substantial share of the CDMA and premium LTE chipset markets to competitors. Second, Qualcomm ignores California cases confirming that consumers suffer antitrust injury when purchasing goods in just such an anticompetitive market. Third, Qualcomm wrongly contends that Plaintiffs cannot "disentangle" the effects of Qualcomm's exclusive dealing arrangements. Plaintiffs have done so, as the updated Flamm Declaration demonstrates. *See* Declaration of Kalpana Srinivasan ("Srinivasan Decl."), Ex. 3 (hereinafter "Flamm Decl."). Fourth, Qualcomm incorrectly argues that Plaintiffs' UCL claim rises and falls with their Cartwright Act claim, particularly after last month's Ninth Circuit decision in *Epic Games, Inc. v. Apple, Inc.*, Case Nos. 21-16506 & 21-16695, 2023 WL 3050076 (9th Cir. Apr. 24, 2023).  There, the Ninth Circuit held that Epic's failure of proof on its antitrust claims did not preclude Epic's claim of unfairness under the UCL. *Id.* at *33.

## II.    STATEMENT OF UNDISPUTED FACTS

From 2011-2016, Qualcomm was the world's largest manufacturer of CDMA and premium LTE chipsets. Qualcomm sells CDMA and premium LTE chipsets that are incorporated by OEMs into cellular devices, which are then sold to California consumers ("the Class"). During the class period, Qualcomm intentionally extinguished competition from rivals like Intel, Ericsson, Broadcom, Marvell, and MediaTek through anticompetitive exclusive dealing arrangements with the two largest OEMs, Apple and Samsung. Qualcomm has a pattern and practice of attempting to forcing exclusivity arrangements on OEMs, even beyond just Apple and Samsung. *See* Flamm Decl. ¶¶ 25-71. Qualcomm's exclusivity agreements also precluded competition from Apple and Samsung as potential chip suppliers—both considered developing and, in Samsung's case, did develop in-house chip manufacturing capabilities in the relevant period.

### A.    Qualcomm's exclusive deals with Apple.

Qualcomm used its monopoly power in the CDMA chipset market to coerce Apple into dropping (or not incorporating) competitor chips in all its cellular devices.[2]

---

[2] Although Apple did not purchase chips directly from Qualcomm, which instead sold chips directly to the contract manufacturers that made cellular devices for Apple, Qualcomm's and Apple's

1

2

3    ECF No. 937-2 (Elhauge Report) ¶¶ 116-17.

4

5    . Ex. 4 at FTC-PROD-

6    0012102.

7

8    Ex. 5 at FTC-PROD-0003422.[3] A

9

10    *Id.*; *see also* Ex. 6 (

11

12    . Flamm Decl. ¶¶ 110, 143, 187, 190-195.

13

14

15    Ex. 7 at Q2017MDL1_01955666.

16

17    Flamm Decl. ¶ 113; *see also id.* ¶¶ 112-16

18    (                                                    s).

19

20

21    Ex. 8 at Q2017MDL1_02586349; *see also* Ex. 9 at 51

22

23

24        Qualcomm began to aggressively leverage its CDMA monopoly power to stifle the

25    competition that was gaining traction at Apple.

26

27    agreements governed the supply of chipsets that flowed to Apple's contract manufacturers and that
     were used in Apple cellular devices. ECF No. 937-2 (Elhauge Report) ¶ 113.

28    [3] All exhibits are to the Declaration of Kalpana Srinivasan in Support of Plaintiffs' Opposition to
     Defendant Qualcomm Incorporated's Motion for Summary Judgment.





[4]

Elhauge Report ¶ 117; Flamm Decl. ¶ 28.

. Flamm Decl. ¶ 31.

. Elhauge Report ¶ 117.

. *Id.* ¶ 117; Ex. 10 at APL-QC-FTC_00000024; *see also* Ex. 32 at 162:18-163:3.

. Flamm Decl. ¶ 110.

. Flamm Decl. ¶ 32.

.

Flamm Decl. ¶ 33-34, 37-38; *see also* Ex. 10 at APL-QC-FTC_00000021-25; Elhauge Rept. ¶ 118.

. Ex. 11 (FTC-Apple-0000080); Elhauge Report ¶¶ 119-21.

. Ex. 11 at 80-83.

---

[4] The terms and conditions of this agreement relate to Apple's "transition" to exclusively using Qualcomm chips in all Apple products.



. *Id.* at 81-84.

ent.   Ex. 12

(Apple Nov. 13, 2016 Response to CID Specification 4).

. Ex. 13 at AAPL-FTC-00081011

*see also* Ex. 14 at APL-QC-FTC_01552044

. These predictions were correct:

Ex. 32 at 190:15-191:22.

Ex. 5 at FTC-PROD-0003421.

Ex. 15 (Q2014FTC03651454); Ex. 16 (Q2014FTC03651453); *see also* Ex. 40 Constantine (Intel) Dep. at 10:12-20. Qualcomm now refers to these gargantuan rebates as "discounts" but conducting an empirical analysis, Professor Elhauge opines the rebates are, in fact, loyalty penalties designed to foreclose competition. Elhauge Report ¶¶ 8, 114, 127-135.

. Flamm Decl. ¶¶ 158-200.



. For example, Tony Blevins—Apple's Vice President for Procurement during the relevant period—testified that ████████████████████████████████████████████████. Ex. 33 at 105:15-106:5 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; *see also id.* at 108:8-109:21. Mr. Blevins' testimony was crystal clear: ████████████████████████████████.'' Ex. 33 at 116:15-117:4. Qualcomm's exclusive dealing with Apple—characterized by loyalty penalties and supra competitive, inflated chipset prices—were effectively payments so that Qualcomm could be a 100% monopolist over Apple's customers. Flamm Decl. ¶¶ 138, 158-200.

**B.      Qualcomm's exclusive deals with Samsung.**

After Apple told Qualcomm that it would no longer be exclusive, Qualcomm increased dramatically its exclusivity arrangements with Samsung (the other premium cellular device company). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 17 at Q2014FTC03824293 (emphasis added). ████████████████████████████████████████████████████████████████████████████████████. Flamm Decl. ¶¶ 41-54.



1

2 . *Id.*

3

4 . *Id.*

5

6

7 Ex. 18.

8 . Flamm Decl. ¶ 54.

9 *Id.*

10 **C.    Qualcomm and chipset competitors confirm that Qualcomm's exclusive deals resulted in substantial market foreclosure.**

11 Qualcomm's choice to focus on exclusive dealing arrangements with both Apple and

12 Samsung were not coincidences. Qualcomm offered these incentives to

13 according to Qualcomm's co-founder Irwin Jacobs. Ex

14 19 at Q2017MDL1_01167846.[5] Qualcomm understood that if these OEMs could be locked up

15 through exclusivity arrangements, Qualcomm could force competing chipset manufacturers out of

16 business. *See, e.g.*, Ex. 35 at 232:4-10

17 In August 2010, Qualcomm CEO Steve Mollenkopf

18 wrote:

19 Exs. 20, 21. A June 2012

20 Qualcomm strategic plan likewise states that

21

22 Ex. 22.

23 . Ex. 30 at 32:11-23.

24 Ex. 38 at

25 174:19-21,

26

27 [5] Although Apple and Samsung accounted for the most phone sales by far during the Class Period, Dr. Flamm has explained how Qualcomm's exclusive deals with other OEM foreclosed even more

28 of the market. Flamm Decl. ¶¶ 55-71.

7



Ex. 31 at 15:4–13.

Qualcomm's rival chipset manufacturers also recognized the critical importance of Apple and Samsung as customers. ▮. Ex. 23 (QNDCAL05898145). As Intel's Corporate Vice President Aichatou Evans testified,

Ex. 41 at 22:16-23:1. Ericsson and MediaTek—both rival chipset suppliers—testified that

▮. *See, e.g.*, Ex. 39 at 222:15-18

; Ex. 45 at 196:10-23

Intel's Corporate VP Aichatou Evans testified that

Ex. 42 at 347:20-348:5. ▮ Ex. 44 at 140:12-141:13. ▮. *Id.* at 143:23-144:13; *see also* Ex. 43 at 129:17–130:2. ▮ Ex. 36 at 121:23-122:5, ▮.

1   Numerous witnesses have testified that chipset sales to Apple or Samsung came with a "halo

2   effect" where other OEMs viewed Apple's decision to purchase as validation of the chipset

3   supplier's capabilities. Ex. 43 at 89:24-90:2 ███████████████████████████████

4   ████████████████████████████████ Winning a "socket" with a large

5   customer ███████████████████████████████████

6   ██████████████████████████████████████

7   ██████████████████████████████████████

8   ███████████████ Ex. 37 at 124:7–125:5; *see also* Ex. 43 at 101:10-17

9   ████████████ Ex. 44 at 51:21-52:13 ████████████

10  ██████████████████████████████████████

11  ██████████████████████████████████████

12  ██████████████████████████████████████

13  ██████████████████████████████████████

14  ████████████); *accord* Ex. 24 (INTEL-QCOM000573550); Ex. 46 at 399:2-17

15  ██████████████████████████████████████

16  ████████).

D.   **Plaintiffs' expert has shown anticompetitive effects from Qualcomm's
     exclusive deals.**

Plaintiffs' expert Dr. Flamm has provided an updated declaration to quantify the harm

arising solely from Qualcomm's exclusive dealing agreements. Qualcomm's exclusive dealing

harmed competition and Plaintiffs by (1) weakening Qualcomm's chipset rivals by precluding them

from working with Apple, thereby reducing competition in the market; and (2) by directly raising

prices to Apple's end users through deals that give Qualcomm the ability to charge Apple monopoly

prices which are then passed on to consumers. Flamm Decl. ¶¶ 158-200. Dr. Flamm has quantified

this harm by analyzing (1) the amount prices would have been lower but-for the effects of

Qualcomm's exclusive dealing with Apple on Qualcomm's rivals, *id.* ¶¶ 168-97, and (2) the amount

lower that Apple iPhone customers would have paid had Apple and Qualcomm not entered into an

exclusive dealing arrangement, *id.* ¶¶ 158-67.

9

With respect to the "direct" overcharge paid by Apple's customers, ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ *Id*. ¶¶ 158-67. ██████████

████████████████████████████████████████████████████████

██████████████████████████████ *Id*. Consistent with Dr. Flamm's prior opinions,

those overcharges were passed on to consumers. *Id*. ¶¶ 198-201.

Turning to the "indirect" harm caused by decreased competition, Dr. Flamm discusses the interaction between competition and prices, and uses these two lines of analysis to calculate the indirect chipset overcharge attributable to Qualcomm's exclusive dealing. *Id*. ¶¶ 168-197. He calculates that but-for Qualcomm's exclusive dealing arrangements' impact of competitors, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████. *Id*.   Using a channel-weighted pass-through analysis, Flamm calculates damages to the California indirect purchaser class to be $41 million to $70 million. *Id*. ¶¶ 198-202.

## III.   PROCEDURAL HISTORY

This case began in April 2017, when Plaintiffs filed suit on behalf of a nationwide class of consumers against Qualcomm, alleging violations of California's Cartwright Act and Unfair Competition Law ("UCL"), and Sections 1 and 2 of the Sherman Act. After substantially denying Qualcomm's original motion to dismiss in November 2017, this Court certified a nationwide class, relying in part on Dr. Kenneth Flamm's expert analysis demonstrating pass-through of an overcharge. ECF No. 641. At the same time, the Court denied a *Daubert* challenge to Dr. Flamm, finding that Dr. Flamm relied upon "extensive transactional data" that accounted for approximately 90 percent of total cell phone sales in the class period for purpose of his pass-through analysis. ECF No. 760.

Plaintiffs served merits expert reports on October 26, 2018; Qualcomm served rebuttal expert reports on November 16, 2018; and Plaintiffs served reply reports on December 7, 2018.

10

Days before the deadline to file dispositive motions, the Ninth Circuit granted Qualcomm's Fed. R. Civ. P. 23(f) petition to appeal the district court's class certification decision, and this Court granted Qualcomm's request to stay this case pending appeal.

Meanwhile, the FTC tried its case against Qualcomm. This Court found that Qualcomm violated federal antitrust law, but the Ninth Circuit reversed that decision in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. Aug. 11, 2020).

A separate three-judge panel at the Ninth Circuit considered Qualcomm's 23(f) appeal and the effect of *FTC v. Qualcomm* on this case. In September 2021, that panel vacated class certification and remanded the case "with instructions for the district court to reconsider certification of the entire class given *FTC v. Qualcomm.*" *Stromberg v. Qualcomm, Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021). The Ninth Circuit did not consider the merit of Plaintiffs' claims, which was not before the Court on the limited jurisdiction on the 23(f) appeal.

After remand, Plaintiffs filed an amended complaint, asserting only violations of California law and on behalf of only California consumers. ECF No. 899. Qualcomm moved to dismiss the complaint, and the Court denied the motion to the extent Plaintiffs' claim was premised solely upon exclusive dealing because "the Ninth Circuit did not deem reasonable and condone Qualcomm's exclusive dealing arrangements" and "Plaintiffs may prove different facts here" to establish an exclusive dealing claim. ECF No. 914 at 35.

## IV.   LEGAL STANDARD

In California, exclusive dealing arrangements are not deemed illegal per se. *Fisherman's Wharf*, 114 Cal. App. 4th at 335. "They are proscribed when it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce." *Id.* (quoting *Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 6 (1975)); *see also Roth v. Rhodes*, 25 Cal. App. 4th 530, 542 (1994) ("To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude.").

California courts have not settled on a "minimum percentage [] constituting significant foreclosure," opting instead for an "wide-ranging inquiry into the structure of the relevant market"

that has found substantial foreclosure even when defendant's shares make up only 15 percent of the relevant market. *Id.* at 337 (describing *Redwood Theatres Inc. v. Festival Enterprises, Inc.*, 200 Cal. App. 3d 687, 713 (1998)). "[A] determination of illegality is tested under a rule of reason and 'requires knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market.'" *Id.* (quoting *Dayton Time*, 52 Cal. App. 3d at 7).

"The resulting factual inquiry often makes summary judgment inappropriate." *Id.* (citing *Redwood Theatres*, 200 Cal. App. 3d at 713; *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 855 (1971) ("Whether a restraint of trade is reasonable is a question of fact to be determined at trial."); *see also id.* at 321 (citing *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962) ("We believe that summary procedures should be used sparingly in complex antitrust litigation."). The summary judgment standard becomes "even more strict in the antitrust context." *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 683 (9th Cir. 1976). "[T]rials are the best way to resolve legal disputes." *FTC v. D-Link Sys., Inc.*, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018).

## V.   ARGUMENT

### A.   Plaintiffs Are Not Precluded from Presenting Evidence of Qualcomm's Anticompetitive Exclusive Deals.

Qualcomm argues this case is "no longer viable" because the Court dismissed Plaintiffs' tying and refusal to deal claims. Mot. at 1. That argument is clearly erroneous. California courts have repeatedly found that exclusive dealing arrangements alone—without additional anticompetitive conduct—violate the Cartwright Act. *See, e.g.*, *Fisherman's Wharf*, 114 Cal. App. 4th at 335; *Redwood Theatres*, 200 Cal. App. 3d at 713. The exhibits accompanying this Opposition and the updated Flamm declaration create a triable issue as to Plaintiffs' exclusive dealing claims.

Plaintiffs have appropriately tailored their analysis to account for the Ninth Circuit's 23(f) decision and this Court's January 6, 2023 MTD Order. Such tailoring is not uncommon in class-action litigation where district courts must reassess and revise class certification orders in response to events "occurring in the ordinary course of litigation." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 277 (1988). In *Glaberson v. Comcast Corp.*, for example, the district court permitted plaintiffs to revise their antitrust impact analysis to account for the U.S.

1  Supreme Court's decision on an interlocutory appeal. 295 F.R.D. 95, 102-03 (E.D. Pa. 2013). The

2  Supreme Court had excluded plaintiffs' damages model because it was not tailored to the single

3  claim that had survived, and on remand, the district court permitted plaintiffs to adapt their expert's

4  analysis to address the Supreme Court's concerns.[6] Similarly, on remand after the U.S. Supreme

5  Court's decision in *Dukes v. Wal-Mart Stores, Inc.*, Judge Breyer found that plaintiffs were not

6  precluded as a matter of law from bringing a narrower class action claim, adding information about

7  Wal-Mart's corporation management structure, and alleging specific, additional examples of

8  discriminatory conduct. *Dukes v. Wal-Mart Stores, Inc.*, 2012 WL 4329009, at *3 (N.D. Cal. Sept.

9  12, 2002). Judge Breyer explained: "Plaintiffs cannot be faulted for failing to anticipate a significant

10  development in the Supreme Court's class-action jurisprudence, and so long as discovery might

11  permit them to meet the Rule 23 obligations clarified by the Supreme Court's ruling, this Court is

12  not prepared to deny them an opportunity to marshal and present evidence in support of their class

13  allegations." *Id.* Likewise, the Court should not prevent Plaintiffs from marshaling their evidence

14  to the remaining exclusive dealing claims, given the factual complexity of Plaintiffs' claims and

15  the Ninth Circuit's significant development of federal antitrust law in *FTC v. Qualcomm.*

16    As Qualcomm's own cited caselaw makes clear, Plaintiffs are not precluded as a matter of

17  law from updating their analysis. Specifically, Qualcomm cites *City of Vernon v. Southern*

18  *California Edison Co.,* 955 F.2d 1361, 1372 (9th Cir. 1992), Mot. at 18, as granting summary

19  judgment where the plaintiff's damage "study failed to segregate the losses, if any, caused by acts

20  which were not antitrust violations from those that were." but Qualcomm omits the very next

21  sentence: "***Nor did Vernon attempt or offer to make corrections***." *City of Vernon*, 955 F.2d at

22  1372 (emphasis added). Rather, the plaintiff "would not or could not do so." *Id.* The discussion

23  in that case of *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir.1985)—

24  in which the Ninth Circuit found that the damages report as it existed at summary judgment was

25

26  ───────────────
[6] Under Qualcomm's theory, the Supreme Court in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)

27  should have simply dismissed outright the one remaining theory of anticompetitive harm that
   survived from four interrelated theories because plaintiffs had not isolated the anticompetitive
   impact arising solely from its one remaining theory. But that is not at all what the Supreme Court

28  did, and it is not what this Court should do.

"flawed," but allowed the claim to proceed to trial because it "appeared that the data already existed even though it had not yet been placed in the proposed damage report," *Vernon*, 955 F.2d at 1372-73—confirms that the need to update an analysis—does not support summary judgment.[7] Qualcomm's cases standing for the proposition that a plaintiff's damages analysis must identify harm from unlawful conduct are inapposite.[8]  Plaintiffs' experts have done just that.

The Court's statements at the February 23, 2023, Case Management Conference are not to the contrary and do not prohibit Plaintiffs from relying on evidence and updating their expert's analysis to focus on the exclusive dealing claim remaining in this case. The Court anticipated that Plaintiffs would do just that, stating: "I have to accept that the evidence could be there. I want to decide it. You can make the same – whatever argument you want based on the evidence that's actually in the record." Ex. 47 (CMC Transcript) at 10:19-23. Qualcomm ignores this guidance and instead seeks summary judgment based on a stale record from a much different time in this case. The Court should reject this approach and instead require Qualcomm to address the evidence in the record—evidence that creates a triable issue of fact that should be resolved by a trial on the merits.

**B.      Plaintiffs Have Raised Triable Issues of Fact as to Exclusive Dealing Under the Cartwright Act.**

**1.      Triable Issues as to Antitrust Injury**

Qualcomm's challenge to antitrust injury fails because there are triable issues that Qualcomm's exclusive deals with Apple and Samsung artificially elevated cellular device prices in an anticompetitive market and led to consumer overcharges. The updated Flamm Report and the Elhauge Report demonstrate precisely how this occurred.

---

[7] To extent there's a question about the duration or extent of the harm, Plaintiffs concurrently submit a Rule 56(d) request seeking additional data to support their expert's analysis.

[8] *See In re eBay Seller Antitrust Litig.*, 2010 WL 760433, at *14 (N.D. Cal. Mar. 4, 2010) (granting summary judgment where plaintiffs lacked any probative evidence of classwide harm); *Momand v. Universal Film Exchanges*, 172 F.2d 37, 43 (1st Cir. 1948) (affirming dismissal where plaintiff did not show that defendant's unlawful acts substantially contributed to injury); *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988) (granting summary judgment where plaintiffs' expert excluded); *Cave Consulting Group, Inc. v. OptumInsight, Inc.*, 2020 WL 127612 (N.D. Cal. Jan. 10, 2020) (affirming summary judgment where expert provided no basis for reasonable estimate of damages); *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985) (remanding for new trial on damages where plaintiff failed to distinguish harm from lawful and unlawful conduct); and cases cited at Motion p.18 n.8.

1      Qualcomm is wrong that Plaintiffs have no evidence that Qualcomm's agreements with

2    Apple harmed the competitive process. The record is littered with examples and testimony about

3    how its exclusive deals impeded the competitive process for rival chipset manufacturers.  *See, e.g.,*

4    Ex. 33 Blevins Dep. I at 65:23-66:14; 105:15-106:5

5                                           ; 108:8-21; 108:23-109:4; 109:14-111:14 (

6

7    112:10-113:2 (

8                                                                              116:15-117:4 (

9

10

11                                                                                      ; *see also*

12    Ex. 35 Mahe II at 232:21-233:19; Ex. 25 PX356, APL-WC-FTC_02113566, Internal Apple email

13    dated Dec. 3, 2013; Ex. 35 Mahe II at 230:7-12; Ex. 25 PX356, APL-WC-FTC_02113566, Internal

14    Apple email dated Dec. 3, 2013

15                          ).

16      Qualcomm's exclusive dealing arrangements with Apple created an anticompetitive market

17    for modem chips: the deals delayed Intel's (and other chip manufacturers') ability to compete by at

18    least two years and effectively eliminated competition during that time. Qualcomm attempts to

19    frame this foreclosure as irrelevant on the basis that "antitrust laws protect competition, *not*

20    *competitors*," (p. 11), but this entirely misses the point: the case law Qualcomm cites stands only

21    for the proposition that high market share will not necessarily indicate an antitrust violation ***absent***

22    a defendant's ability "to control prices or exclude competitors." *United States v. Syufy Enterps.*,

23    903 F.2d 659, 664 (9th Cir. 1990) (citation omitted, emphasis added).[9]  Coercive activity that

24    forecloses competitors—including through exclusive dealing arrangements—gives rise to precisely

25    _____

26    [9] Qualcomm's citations to *FTC v. Qualcomm Inc.,* 969 F.3d 974, 993 (9th Cir. 2020) and *Marsh v. Anesthesia Servs. Med. Grp.*, 200 Cal. App. 4th 480, 495 (2011) are likewise inapposite: the latter states the unremarkable proposition that in the medical field, an antitrust claim requires some showing of, for instance, "negative impacts upon overall prices, quantity or quality of medical services"; and this Court has already determined that the former does not foreclose Plaintiffs' claim for Qualcomm's exclusive dealing arrangements, MTD Order at 32-33.

27

28

the sort of harm antitrust law seeks to prevent. *See, e.g., Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008). Qualcomm's exclusive deals further created an anticompetitive market by foreclosing rivals from receiving the additional revenue critical to funding research, development, and acquisitions; denying rivals exposure to Apple's superior engineering resources; denying rivals a foothold at Apple—one of the most important chipset customers; foreclosing business opportunities with other OEMs; denying rivals the opportunity to achieve enhanced standing in SSOs; and foreclosing opportunities to conduct early field testing and prototyping with network vendors and operators. Elhauge Report ¶¶ 136-56.

The updated Flamm Declaration also demonstrates antitrust standing and injury in its most basic and historically recognized form: the payment of elevated prices due to the alleged anticompetitive conduct. *See, e.g., Meijer Inc. v. Abbott Labs*, 251 F.R.D. 431, (N.D. Cal. 2008) (antitrust injury "occurs and is complete when the defendant sells at the illegally high price"); *see also* Ex. 3 Flamm Decl. ¶¶ 158-202. Qualcomm's argument that "high prices" are actually pro-competitive misses the mark. Mot. at 12. This Court has disagreed, recognizing that if a party uses coercive means to foreclose competition, it will lead to artificially inflated prices in the long run. Ex. 47 (CMC Transcript) at 10:12-16. As shown through the deposition testimony of Apple and other executives, record evidence demonstrates that this is precisely what happened. And empirical evidence, in the form of the updated Flamm Report, demonstrates what Apple executives already knew: that Qualcomm's coercive exclusive dealing caused chipset prices to be artificially inflated.

Qualcomm is also wrong that Plaintiffs cannot point to any evidence that they paid "supracompetitive prices for their devices." Mot. at 12. The accompanying Flamm Declaration shows that California consumers were overcharged by a conservative lower bound within the $41 million to $70 million range because of Qualcomm's exclusive deals with Apple during the Class Period. Ex. 3 Flamm Decl. ¶¶ 158-202. Qualcomm's exclusive deals with Apple prevented Intel and other chipset manufacturers from competition in the WCDMA and CDMA markets, and these anticompetitive practices in turn raised chipset and cellular device prices throughout the market. Elhauge Report ¶¶ 123-58; *see also generally* Flamm Decl. *et seq*. Relying upon record evidence, Plaintiffs' expert Dr. Flamm estimates that, had one competitor been able to sell chipsets to Apple,

16

Qualcomm would have lowered its chipset price. Flamm Decl ¶¶ 168-189. ██████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████. Ex. 3

Flamm Decl. ¶ 158-167; n. 247. Qualcomm admits that Apple started sourcing from Intel as soon

as it was no longer in the coercive exclusive relationship (Mot. at 12), but it fails to acknowledge

at all the role that Qualcomm's exclusive deals played in delaying Intel's and other manufacturer's

ability to compete in sales to Apple and in the broader baseband processor market.

Qualcomm's cases regarding price increases do not support finding a lack of harm here.

Rather, *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979), states merely that

high prices ***in and of themselves***— i.e., absent exclusionary conduct giving rise to those prices—

are not anticompetitive. *Id*. At 275 n.12. But there is nothing significant about that statement, as

that has long been the law. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,

540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging

of monopoly prices, is not [itself] unlawful; [instead,] it is an important element of the free-market

system."). And in *In re EpiPen Marketing*, 507 F. Supp. 3d 1289, 1365 (D. Kan. 2020), *aff'd* 44

F.4th 959 (10th Cir. 2022), the court granted summary judgment dismissing the plaintiff's exclusive

dealing claim because "no reasonable jury could conclude that Mylan's exclusive rebate

agreements increased EpiPen prices"—not, as Qualcomm suggests, because such an increase fails

to demonstrate harm (on the contrary, *EpiPen* underscores that such a showing was what the

Plaintiff needed). Qualcomm points to *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6451711,

at *4 (N.D. Cal. Dec. 18, 2017) as analogous, but there the plaintiffs failed to provide evidence

creating a genuine issue of fact regarding whether defendants charged supra-competitive rates.

Here, both the factual record and Plaintiffs' expert analysis do so. *See supra* §§ II.C&D; Ex. 3

Flamm Decl. ¶¶ 158-202. And Qualcomm's claim that Apple delayed sourcing from Intel due to

Intel's technical shortcomings rather than Qualcomm's exclusive dealing arrangement (Mot. at 12)

both ignores the impact of that coercive arrangement on Intel's ability to develop technology and

contravenes record evidence establishing that the TA and FATA prevented Apple from using

1    alternative chip suppliers that would have been viable absent Qualcomm's exclusive dealing. *See,*

2    *e.g.*, *supra*, §§ II.C-D.

3        Plaintiffs have demonstrated that because of Qualcomm's exclusive dealing, Plaintiffs

4    purchased cellular devices in an anticompetitive market at elevated prices. That is all that California

5    law requires. *See In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 413-14 (2004); *B.W.I. Custom*

6    *Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1350-51 (1987).

7                    **2.        Triable Issues as to Market Foreclosure**

8        Qualcomm is wrong that Plaintiffs cannot establish a triable issue of fact as to whether

9    Qualcomm's exclusive deals with Apple and Samsung foreclosed competition in a substantial share

10   of the market. In assessing the degree of market foreclosure necessary, "courts must consider any

11   other existing unique market factors which bear on the degree of residual competition between the

12   parties remaining after the exclusive arrangements." *Fisherman's Wharf*, 114 Cal. App. 4th at 336.

13   In that case, construing California law, the court found that 20 percent market foreclosure was

14   substantial enough to warrant denial of summary judgment. *Id.* at 339. The court also recognized

15   that exclusion from market share is not the sole means to show substantial foreclosure.  Rather, an

16   exclusive agreement may substantially lessen competition if the agreement "severely limit[s] . . .

17   competition for the most important customers." *E.I. du Pont de Nemours & Co. v. Kolon Indus.,*

18   *Inc.*, 637 F.3d 435, 452 (4th Cir. 2011).  In *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C.

19   Cir. 2001), for example, the court held that Microsoft's exclusive dealing harmed competition by

20   keeping "usage of [the rival's product] below the critical level necessary for Navigator or any other

21   rival to pose a real threat to Microsoft's monopoly." *Id.* at 71.  Indicia of anticompetitive exclusive

22   dealing contracts include "requirements terms, steep market-share requirements, [and] contract

23   duration."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016).

25   tors. Ex. 31 Mollenkopf FTC

26   IH Tr. at 15:4–13.

1 

2 .[10]

3 

4 

5 

6 

7 

8 Ex. 26 (Q2017MDL1_00477261).

9 

10 

11       Qualcomm's documents recognize that selling modem chips to Apple helps modem chip

12 suppliers become more competitive.

13                                                                          Ex. 27 QNDCAL01051173,

14 Ex. 28 QNDCAL01051174 at -199.

15 

16 

17 

18                                                                                                      .

19 *Id*. at -200. Intel's Stefan Wolff explained in an internal Intel email that

20 

21 

22                                                                          . Ex. 24 INTEL-

23 QCOM000573550.

24 _____

25 [10]

26             . *See* Ex. 33 at 173:1-174:15

27 

28

1    Qualcomm artificially limits that foreclosure to a single iPad chip socket for which Apple

2    expressly considered Intel. Mot. at 2-3. The Court should reject this false framing: the very nature

3    of Qualcomm's coercive exclusive dealing arrangements foreclosed Apple from considering

4    competitors in the first instance. ███████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████████████████████████

6    ██████████████████ Ex. 4 FTC-PROD-0012101 at pp. 3-4; *see also* Ex. 29 APL-QC-

7    FTC_17910720 ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    **C.      Plaintiffs' UCL Claim May Proceed to Trial.**

10       **1.      The fate of Plaintiffs' UCL claim does not depend on Plaintiffs'
             Cartwright Act claim.**

11    Qualcomm's contention that Plaintiffs' UCL claim must be dismissed because it relies on

12    the "same set of facts" as their Cartwright Act claim cannot be squared with *Epic Games, Inc. v.*

13    *Apple, Inc.*, Case Nos. 21-16506 & 21-16695, 2023 WL 3050076, at *33 (9th Cir. Apr. 24, 2023).

14    In *Epic Games*, the Ninth Circuit affirmed the district court's finding that Epic had not shown that

15    the "conditions under which Apple offers its app-transactions product are unreasonable" under the

16    Sherman Act, but it affirmed the district court's finding that Epic had proven a UCL violation under

17    the "unfair" prong. *Id.* at *33. In rejecting Apple's "proposed rule" that a failure of proof under the

18    Cartwright Act bars a finding of liability under the "unfair" prong of the UCL, the Court held:

19       *Apple's rule would convert any Rule of Reason shortcoming into a UCL defense*
         *and undermine the UCL's three-prong structure by collapsing the "unfair" and*
20       *"unlawful" prongs into each other. We reject Apple's proposed rule as foreclosed*
         *by California law.*

21    *Id.* at *33 (emphasis added). *Epic Games* on its face thus undermines Qualcomm's argument that

22    Plaintiffs cannot pursue both legal and equitable claims at the same time.

23    A separate UCL analysis is appropriate because the "unfair" prong balancing test is not the

24    same as the liability test under the Cartwright Act. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular*

25    *Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (holding that a business practice may be "unfair" and therefore

26    illegal under the UCL, "even if not proscribed by some other law"). The California Legislature

27    "intentionally framed" the UCL "unfair" prong in "broad, sweeping language," and California

28

20

1    courts have resisted any "inflexible rule [to] be laid down as to what conduct will constitute unfair

2    competition." *Id.* at *32, 33.

3          Qualcomm relies on *City of San Jose v. Office of the Commissioner of Baseball*, 776 F.3d

4    686, 691 (9th Cir. 2015) to seek dismissal of Plaintiffs' UCL claims. *See* Mot. at 21. *City of San*

5    *Jose* predates *Epic Games*. And Qualcomm's argument simply repackages its unsuccessful position

6    on its motion to dismiss. *City of San Jose* relies upon *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th

7    363 (2001), which held that "conduct alleged to be 'unfair' because it unreasonably restrains

8    competition and harms consumers . . . is not 'unfair' if the conduct is deemed reasonable and

9    condoned under the antitrust laws." *Chavez*, 93 Cal. App. 4th at 375. This Court already considered

10   the effect of *Chavez* on Plaintiffs' "unlawful" and "unfair" prong UCL claims after *FTC v.*

11   *Qualcomm* and concluded that *Chavez* does not bar Plaintiffs' UCL claims to the extent it is based

12   upon Qualcomm's exclusive dealing agreements. ECF No. 914 at 35. Plaintiffs' UCL claim cannot

13   be barred under *Chavez* absent a finding as a matter of law that Qualcomm's agreements with Apple

14   and Samsung are lawful, which Qualcomm has not and cannot demonstrate.

15          **2.      Plaintiffs' request for an injunction is appropriate to prevent future
                      exclusive deals.**

16          Qualcomm contends that Plaintiffs cannot obtain an injunction because "the challenged

17   conduct ceased in 2016, once Apple terminated its contract with Qualcomm." Mot. at 21. Although

18   Apple terminated its Qualcomm contract in 2016, there is a "reasonable probability" that

19   Qualcomm will agree to—and may have already agreed to—exclusivity agreements with Apple,

20   Samsung, and other major OEMs that continue to impede competition and harm consumers.

21   Injunctive relief is available under the UCL if, at the time of the order of the judgment, there is a

22   reasonable probability that the past acts complained of will recur. *See Norton v. LVNV Funding,*

23   *LLC*, 396 F. Supp. 3d 901, 920 (N.D. Cal. 2019). Plaintiffs' evidence shows that Qualcomm

24   executives understood that their agreements with Apple and Samsung would prevent competitors

25   from challenging Qualcomm's market dominance. There currently is no order preventing

26   Qualcomm from deploying this same anticompetitive tactic. Indeed, Qualcomm has not forsaken

27   or forsworn entering into exclusive dealing arrangements, and as Dr. Flamm opines, Qualcomm

28

PLAINTIFFS' OPPOSITION TO DEF. QUALCOMM'S MOTION FOR SUMMARY JUDGMENT
Case No. 17-md-2773-JSC

1 has a pattern of entering into, or attempting to enter into, coercive exclusive dealing arrangements.

2 If the Court finds that Qualcomm's agreements with Apple and Samsung violated the Cartwright

3 Act or the UCL, the Court should enjoin Qualcomm from structuring identical agreements with

4 OEMs and require Qualcomm to renegotiate any agreements with such provisions.

5 ### 3.      The *Sonner* test is inapplicable.

6 Qualcomm is also wrong that *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir.

7 2020), requires dismissal of Plaintiffs' UCL claims. Mot. at 23. *Sonner* does not prohibit Plaintiffs

8 from trying their legal and equitable claims together, as is routine in federal courts. *See, e.g.*,

9 *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (describing trial management when both

10 types of claims are tried together). In fact, the district court in *Sonner* was prepared to try plaintiff's

11 legal and equitable claims together until the plaintiff—on her own accord and against the court's

12 guidance—sought to amend the complaint to pursue only equitable claims two months ahead of the

13 scheduled jury trial. *Sonner*, 971 F.3d at 844.

14 Rather, *Sonner* stands for the far more limited proposition that equitable claims are subject

15 to dismissal under the adequate-remedy-at-law doctrine if the plaintiff (1) seeks "the same sum" in

16 equitable restitution and damages, and (2) obtains a benefit by choosing among the remedies

17 available to them. *Id.* at 844. Neither condition is present here. Plaintiffs do not seek the "same

18 sum" in equitable restitution as in damages, and Plaintiffs have not obtained an advantage over

19 Qualcomm by pursuing both legal and equitable claims in this action.  And, even if Plaintiffs were

20 seeking the same sums under the Cartwright Act and UCL, Plaintiffs may continue to pursue their

21 UCL claim because, as demonstrated in *Epic Games*, even if the Cartwright Act fails for one reason

22 or another, the UCL claim does not.

23 First, the amount of the equitable award available to Plaintiffs under the UCL is not equal

24 to the amount of damages available to Plaintiffs under the Cartwright Act. The UCL—unlike the

25 Cartwright Act—permits Plaintiffs to recover all profits that Qualcomm obtained from its unfair

26 exclusive dealing arrangements. *Corbett v. Superior Court*, 101 Cal. App. 4th 649, 667-68 (2002);

27 *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992) (permitting disgorgement to "to

28 foreclose retention by the violator of its ill-gotten gains"). The amount of disgorgement that

Plaintiffs may obtain under the UCL is necessarily different than the amount of consumer overcharges because it is not tied to what Qualcomm would have charged OEMs in a but-for world but to Qualcomm's profits.[11]

Second, Plaintiffs pursuit of both legal and equitable remedies in this case does not impede Qualcomm's right to jury trial or otherwise disadvantage Qualcomm to Plaintiffs' benefit. In *Sonner*, the plaintiff's attempt to avoid a jury trial animated the court's application of the adequate-remedy-at-law doctrine. 971 F.3d at 838. It was "obvious" to the *Sonner* court that the plaintiff amended her complaint solely to be able to "request that the district court judge award the class $32,000,000 as restitution, rather than having to persuade a jury to award this amount in damages." *Id.* Such gamesmanship "implicate[d] the well-established federal policy of safeguarding the constitutional right to trial by jury in federal court," and required dismissal of the equitable claim once the court concluded that the plaintiff sought the "same sum" in equitable restitution under the UCL as she had in damages under the CLRA. This concern is not present here. Plaintiffs continue to pursue both their legal and equitable claims. Trying both sets of claims together would not impinge on Qualcomm's right to a jury trial. *See Farrell v. City of Ontario*, 39 Cal. App. 351, 356 (1919) ("[P]arties are permitted to submit both their legal rights and their equitable rights to the same tribunal for adjudication at the same time, the right to a jury trial with respect to the former, which was adequately safeguarded under the old system [of separate courts of law and equity], should be equally respected under the new.").

*Sonner* did not reverse long-standing precedent that has allowed plaintiffs to plead inconsistent, mutually exclusive remedies in the same complaint, and to try inconsistent claims and remedies together in the same action. *See, e.g.*, *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (describing the role of judge and jury in a trial involving legal and equitable claims); *Walton v. Walton*, 31 Cal. App. 4th 277, 292 (1995). If Qualcomm's reading of *Sonner* were correct, a plaintiff could never plead a legal claim alongside an equitable claim, but that is not the law, as

---

[11] Qualcomm is wrong (at 22) that Plaintiffs "confirmed that they only seek damages on the alleged overcharge on cellular devices they purchased." Plaintiffs indicated they would consult their experts to align their damages model with the exclusive dealing claim. ECF No. 920 at 3.

*Epic Games* illustrated last month. *See, e.g., Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 790 (2010) (allowing plaintiffs to pursue UCL claim in tandem with antitrust claim based on allegations of overcharges passed on by defendants); *see also* 4 Witkin, Cal. Proc. (6th ed. 2023) §§ 145, 418. Qualcomm relies on this Court's decision in *In re California Gasoline Spot Market Antitrust Litigation*, 2021 WL 1176645, at *7 (N.D. Cal. Mar. 29, 2021), but that decision is not applicable here because plaintiffs in that case never argued that they were pursuing legal and equitable remedies in the alternative and the court did not consider the argument. Nor is the decision in *MacBook Keyboard* instructive because the plaintiffs there "acknowledge[d] that *Sonner* preclude[d] them from seeking restitution," 2002 WL 60472543, at *3 (N.D. Cal. Oct. 13, 2020), which Plaintiffs do not concede here.

The Court should join the post-*Sonner* decisions that permit plaintiffs to simultaneously pursue statutory claims for damages and equitable remedies under the UCL. *See, e.g.*, *Snow v. Align Tech., Inc*., No. 21-CV-03269-VC, 2022 WL 468703, at *2 (N.D. Cal. Feb. 16, 2022) ("since the plaintiffs have no adequate remedy at law because they cannot seek damages under the Sherman Act or the Cartwright Act, equitable relief under the UCL would be appropriate"); *Harris v. McDonald's Corp.*, No. 20-cv-06533-RS, 2021 WL 2172833, at *3 (N.D. Cal. Mar. 24, 2021).

### 4.    Plaintiffs have a reasonable basis for calculating restitution.

The UCL requires "only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 989 (9th Cir. 2015) (reversing denial of class certification). In addition to the disgorgement of profits available under the UCL, Plaintiffs' experts have provided an adequate basis to calculate restitution based upon the difference consumers would have paid had they purchased phones in a market free from Qualcomm's exclusive deals. Even Qualcomm's cases confirm that this is an adequate basis for computing an amount of restitution in a UCL case. *See, e.g, Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001) (affirming jury verdict based on expert's comparison of refunds owed to consumers in a but for world). This case is unlike Qualcomm's consumer protection labeling cases, *Chowning v. Kohl's Department Stores, Inc.*, 733 F. App'x 404, 406 (9th Cir. 2018), and *Zakaria v. Gerber Prods. Co.*,

24

755 F. App'x 623, 624 (9th Cir. 2018), because Plaintiffs' experts here have not failed to quantify

how much a consumer would have paid for a product absent a misrepresentation—a determination

not applicable to this case. Plaintiffs' experts have been able to show what consumers would have

paid for chips if one, two, or more competitors had challenged Qualcomm in the chipset market.

## VI.     CONCLUSION

For the foregoing reasons, the Court should deny Qualcomm's motion for summary

judgment.

Dated:  May 25, 2023

By:  /s/ *Kalpana Srinivasan*
Kalpana Srinivasan
Marc M. Seltzer
Steven G. Sklaver
Amanda Bonn
Oleg Elkhunovich
Krysta Kauble Pachman
Lora Krsulich
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
Email: ksrinivasan@susmangodfrey.com
Email: mseltzer@susmangodfrey.com
Email: ssklaver@susmangodfrey.com
Email: abonn@susmangodfrey.com
Email: oelkhunovich@susmangodfrey.com
Email: kpachman@susmangodfrey.com
Email : lkrsulich@susmangodfrey.com

Joseph Grinstein
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Email: jgrinstein@susmangodfrey.com

By:  /s/ *Joseph W. Cotchett*
Joseph W. Cotchett
Nanci E. Nishimura
Adam J. Zapala
Brian Danitz
James Dallal

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Andrew F. Kirtley
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: jcotchett@cpmlegal.com
Email: nnishimura@cpmlegal.com
Email: azapala@cpmlegal.com
Email: bdanitz@cpmlegal.com
Email: jdallal@cpmlegal.com
Email: akirtley@cpmlegal.com

*Plaintiffs' Co-Lead Counsel*

By:  /s/ *Steve W. Berman*
      Steve W. Berman
      Rio Pierce
      HAGENS BERMAN SOBOL SHAPIRO LLP
      1918 Eighth Avenue, Suite 3300
      Seattle, WA 98101
      Telephone: (206) 268-9320
      Facsimile: (206) 623-0594
      Email: steve@hbsslaw.com
      Email: riop@hbsslaw.com

*Plaintiffs' Steering Committee*