UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 17-md-02773-JSC |
| | **ORDER RE: MOTION FOR SUMMARY JUDGMENT** |
| | Re: Dkt. No. 936 |
| | **PUBLIC REDACTED VERSION** |

After carefully considering the briefing and conducting oral argument on August 3, 2023, the Court **GRANTS** Qualcomm's motion for summary judgment in its entirety.

## BACKGROUND

This multi-district litigation ("MDL") comprises a series of consolidated consumer lawsuits against Qualcomm. Initially, Plaintiffs alleged Qualcomm's conduct violated state and federal antitrust and consumer protection laws based on a blended theory of harm. In short, Plaintiffs alleged Qualcomm used its position at the confluence between chip manufacturing and patent licensing to stifle competition and raise prices for handheld device consumers. Fact and expert discovery closed in 2018. (Dkt. Nos. 403, 814.) In September 2019, the district court then-assigned to the MDL granted class certification. (Dkt. No. 760.) The Ninth Circuit granted Qualcomm permission to appeal the class certification ruling in January 2019, and the district court thereafter stayed further proceedings in the case. (Dkt. No. 838.) In the meantime, a parallel case brought by the Federal Trade Commission ("FTC") challenging the same Qualcomm conduct as Plaintiffs challenge here proceeded to bench trial. On appeal in that case, the Ninth Circuit rejected the FTC's claims. *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020).

The Ninth Circuit subsequently resolved Qualcomm's appeal of the class certification order in this case. It vacated the class certification grant on the grounds California law does not apply to the entire nationwide class. *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir.

United States District Court
Northern District of California

1    2021).  Qualcomm argued to the Ninth Circuit that it should remand with instructions to dismiss in

2    light of *FTC v. Qualcomm*.  *Id.* at 1066.  The Ninth Circuit declined because it was reviewing a

3    class certification order, not a dispositive motion ruling, and the parties' briefs did not address

4    how *FTC v. Qualcomm* affected the class certification analysis.  *Id.* at 1074.  However, the Ninth

5    Circuit also instructed:

7    > We concluded in *FTC v. Qualcomm* that Qualcomm's SEP licensing
     > practices, the same practices complained of here, are lawful and not
     > anticompetitive.  Because Plaintiffs' arguments in this case overlap
8    > with those brought in *FTC v. Qualcomm*, there would have to be some
     > extraordinary difference for Plaintiffs' claims here to not fail as a
9    > matter of law—for instance, differences between Sherman Act claims
     > brought by the government versus private parties, differences
10   > between Sherman Act analysis and other state laws that might apply,
     > or difference in Plaintiffs' ability to meet their burden of proof under
11   > the rule of reason.

12   *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021) (cleaned up).

13        Following remand, Plaintiffs filed a second amended class action complaint limiting the

14   case to a California class.  (Dkt. No. 887.)  Qualcomm moved to dismiss.  (Dkt. No. 895.)  For the

15   reasons explained in *In re Qualcomm Antitrust Litigation*, No. 17-MD-02773-JSC, 2023 WL

16   121983 (N.D. Cal. Jan. 6, 2023), only two claims remain: (1) Plaintiffs' allegations that

17   Qualcomm's exclusive chip supply contracts with device manufacturers violated California's

18   Cartwright Act, and (2) Plaintiffs' claim that those same contracts constituted unfair competition

19   under California's Unfair Competition Law ("UCL"), California Business and Professions Code §

20   17200.

21        These remaining allegations focus on Qualcomm's contractual dealings with device

22   manufacturers (namely, Samsung and Apple).  In short, Plaintiffs claim Qualcomm's contracts

23   required manufacturers buy chips exclusively (or practically exclusively) from Qualcomm.

24   Plaintiffs remaining theory is, but for Qualcomm's contracts with manufacturers, competitors

25   would have been able to compete with Qualcomm.  That competition, in turn, would have lowered

26   chip prices for manufacturers.  And manufacturers would have passed-through some of those

27   savings to class members.

28        Rather than proceed with renewed class certification proceedings, Qualcomm wanted to

United States District Court
Northern District of California

2

move for judgment on the pleadings.  The Court declined to rule, again, on the pleadings, and advised Qualcomm to bring a summary judgment motion instead.  It did so, and the Court heard oral argument on August 3, 2023.  (Dkt. No. 994.)

## DISCUSSION

Qualcomm moves for summary judgment as to both the Cartwright Act claim and the UCL claim.  The Court addresses each claim in turn.

## I.    The Cartwright Act

Plaintiffs' remaining Cartwright Act claim focuses on Qualcomm's chip-supply agreements with Apple and Samsung.  Plaintiffs allege these agreements were anti-competitive "exclusive deals," in violation of the Cartwright Act.  *See* Cal. Bus. & Prof. Code §§ 16720, 16727.[1]

An exclusive dealing agreement is one in which a seller and a buyer agree the buyer will buy only the seller's product or agree the buyer will not buy the product of one of the seller's competitors. *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 335-38 (2003). "In California, exclusive dealing arrangements are not deemed illegal per se." *Id.* at 335. "Consequently, a determination of illegality is tested under a rule of reason and requires knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market." *Id.* (cleaned up).

To survive Qualcomm's motion for summary judgment on the Cartwright Act claim, Plaintiffs must raise genuine disputes of material fact as to each of the following elements: (1) whether an exclusive deal occurred, (2) whether an exclusive deal caused "significant foreclosure" of the market to competitors, and (3) whether the "significant foreclosure" proximately caused

---

[1] Cal. Bus. & Prof. Code § 16727 states:

"It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

United States District Court
Northern District of California

United States District Court
Northern District of California

1    injury to Plaintiffs.  *Id.*; *see also Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (1982)

2    ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the

3    proximate cause of his injuries.")

A.    **The Supplemental Flamm Report is untimely.**

5    Before reaching the merits, the Court must decide whether Plaintiffs' "Supplemental

6    Expert Report of Dr. Kenneth Flamm dated May 25, 2023" can be considered.  (Dkt. No. 947-3 at

7    653-866.)   Defendants object this expert report should be excluded because discovery closed in

8    late 2018.  The Court agrees.[2]

9    When this case began, Plaintiffs focused on the relationship between Qualcomm's

10   licensing business and its chip supply business.  Dr. Flamm's initial expert report detailed a

11   blended theory of harm—accounting for the relationship between Qualcomm's patent licensing

12   practices and Qualcomm's exclusive chip-supply contracts together. As he stated in his initial

13   report:

> I understand Plaintiffs to further allege that Qualcomm's "no license
> no chips" policy and its refusal to license, in conjunction with an
> exclusive dealing arrangement with Apple, has reduced demand for
> competitors' chipsets and has allowed Qualcomm to achieve and
> maintain monopoly power in the market for CDMA baseband
> processors (or "chipsets") and premium LTE baseband processors.

17   (Dkt. No. 947-3 at 13-14.)  But Plaintiffs' licensing-based claims are no longer viable.  *In re*

18   *Qualcomm Antitrust Litigation*, No. 17-MD-02773-JSC, 2023 WL 121983 (N.D. Cal. Jan. 6,

19   2023).  So, much of the initial expert discovery—geared towards this blended theory of harm—is

20   not probative regarding Plaintiffs' exclusive dealing claim in isolation.

21   Given how the case developed, Plaintiffs requested to "refresh" Dr. Flamm's expert report

22   to isolate the harm to consumers from just the exclusive chip-supply deals based on the data

23   originally produced in discovery.  (Dkt. No. 936-8 at 7:1-4.)  The Court denied that request.  (*Id.*

24   at 5:16-18 ("That the theory that you pursued was then foreclosed by the Ninth Circuit is not a

25   reason to reopen discovery.").)  Nevertheless, Plaintiffs now submit a "supplemental" report from

26

27   _____

28   [2] Plaintiffs' motion for leave to file a sur-reply is granted.  (Dkt. No. 988.)  The Court has read and
     considered the arguments made in the sur-reply and Defendant's opposition to the sur-reply.  (Dkt.
     No. 993.)

United States District Court
Northern District of California

1   Dr. Flamm isolating just the effects of Qualcomm's exclusive dealing arrangements.

2       This supplemental merits opinion, written over four years after discovery closed, is

3   excluded.  Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires parties disclose "a complete

4   statement of all opinions the witness will express and the basis and reasons for them."  *Mariscal v.*

5   *Graco, Inc.*, 52 F. Supp. 3d 973, 983 (N.D. Cal. 2014) ("[U]nder Rule 26(a)(2)(B)(i), Defendant

6   was entitled to a *complete* disclosure of all opinions—not a sneak preview of a moving target.").

7   Plaintiffs argue Rule 26(e) allows supplementation here.  According to Plaintiffs, Dr. Flamm's

8   new opinions merely build upon Professor Einer R. Elhauge's original opinions.  (Dkt. No. 988 at

9   11.)  Plaintiffs argue "Dr. Flamm's Supplemental Expert Report simply takes these existing

10  conclusions and the evidence in the record to illustrate the anticompetitive effect and quantify the

11  damages from Qualcomm's exclusive deals alone, given the current status of the case.  This is

12  procedurally proper under the federal rule permitting supplementation."  (*Id.*)

13      The Court disagrees.  Plaintiffs' last remaining antitrust theory is not a new one.  Indeed,

14  Plaintiffs have alleged Qualcomm engaged in illegal exclusive dealing arrangements since this

15  lawsuit began.  (Dkt. No. 94 at 56 ¶ 186; Dkt. No. 490 at 56 ¶ 184 ("FAC") ("Qualcomm's *de*

16  *facto* exclusive dealing arrangement with Apple also violates Business and Professions Code §

17  16727").)  "Rule 26(e) creates a 'duty to supplement,' not a right."  *Luke v. Fam. Care & Urgent*

18  *Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009).  "Nor does Rule 26(e) create a loophole

19  through which a party who submits partial expert witness disclosures, or who wishes to revise her

20  disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add

21  to them to her advantage after the court's deadline for doing so has passed."  *Id.*  "Rather,

22  '[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an

23  incomplete report based on information *that was not available at the time of the initial*

24  *disclosure*.'"  *Id.* (quoting *Keener v. United States,* 181 F.R.D. 639, 640 (D. Mont. 1998))

25  (emphasis added).  As Plaintiffs admit, all information at issue now was in the record in 2018.

26  (Dkt. No. 988 at 11.)  So, this supplementation argument under Rule 26(e) fails.[3]

27  

28  _____

[3] Plaintiffs' motion under Rule 56(d) is also denied for the same reasons.  (Dkt. No. 950-6.)

United States District Court
Northern District of California

1      Plaintiffs' contrary arguments are unpersuasive.  In *Trujillo v. County of Los Angeles*, the

2   district court considered undisclosed expert reports at summary judgment after determining the

3   opposing party was not harmed and could have sought an extension to depose the experts.  751 F.

4   App'x 968, 971 (9th Cir. 2018).  Plaintiffs argue this case "instructs district courts to consider [an]

5   expert declaration at summary judgment," even "where parties fail to disclose experts at all."

6   (Dkt. No. 988 at 7.)  Incorrect.  The Ninth Circuit held "the district court could have precluded the

7   use of the witnesses' testimony."  751 F.App'x at 971.  It held the district court did not abuse its

8   discretion in considering them because the opposing party had not identified any harm due to the

9   belated disclosures.  *Id*.  Here, Defendants identify prejudice because Plaintiffs submitted this

10   belated opinion four years after the close of expert discovery.  (Dkt. No. 982 at 12.)  Thus, *Trujillo*

11   is not persuasive authority here.  To the contrary, were the Court to sanction Plaintiffs' belated

12   evidence here, the carefully calibrated procedures and sanctions in Rules 26 and 37 would become

13   meaningless.

14      Plaintiffs also argue supplementation of expert reports after remand is "consistent with

15   federal practice regarding the management of class action litigation on remand from an appellate

16   court." (Dkt. No. 988 at 10.)  The cases they cite are inapposite.  *City of Vernon v. S. California*

17   *Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992), did not hold a party has the right to redo merits

18   expert discovery after the deadline has passed; it merely recited the plaintiff's failure to request

19   supplemental expert discovery weighed against the plaintiff's appeal.  And *Dukes v. Wal-Mart*

20   *Stores, Inc.*, No. 01-02252, 2012 WL 4329009, at *3 (N.D. Cal. Sept. 12, 2012), and *Glaberson v.*

21   *Comcast Corp.*, 295 F.R.D. 95, 102-03 (E.D. Pa. 2013), involved revising class certification expert

22   reports to correspond with more narrowly defined classes following reversal of class certification.

23   These cases might be relevant if Plaintiffs sought to redo their class certification expert reports to

24   correspond to their narrowed California-only putative class.  But they do not.  Instead, they seek to

25   revise their merits expert reports long after the close of expert discovery to assert a different

26   liability opinion because of an adverse ruling in a related case.  Further, in *Dukes*, unlike here, the

27   discovery deadlines had not expired.  (Case No. 3:01-cv-2252-CRB, Dkt. No. 749 at 8.).  And the

28   *Glaberson* opinion does not reveal the merits discovery deadlines in that case.  Here, the deadlines

United States District Court
Northern District of California

1    for fact and expert merits discovery passed before the district court stayed the case pending

2    resolution of the class certification appeal.  No case Plaintiffs cite supports their request.

3            According to Plaintiffs, "[i]t simply cannot be the case . . . that expert analysis filed in

4    class action litigation involving multiple interrelated theories of anticompetitive harm must

5    anticipate every potential outcome on appeal." (Dkt. No. 988 at 10.)  Plaintiffs argue such a rule

6    would encourage "overly expensive expert discovery" if class plaintiffs were required to model

7    multiple variations of damages prior to appellate review.  (*Id.*)  That argument is unpersuasive.

8    Litigation requires choices.  That Plaintiffs chose to model damages based on a novel theory rather

9    than a traditional, longstanding antitrust theory pled in their complaint was a strategic choice that

10   ultimately proved unsuccessful.  Indeed, to accept Plaintiffs' argument, and give them a do-over,

11   would result in even more years of overly expensive litigation.  The Court will not allow Plaintiffs

12   to revisit that choice now, years after discovery closed.

13           The Court also rejects Plaintiffs' characterization of Defendant's Case Management

14   Statement as an agreement to reopen expert discovery.  At the time, Qualcomm's position was that

15   additional discovery could be warranted if the Court denied Qualcomm's proposed motion under

16   Federal Rule of Civil Procedure 12(c), that is, if the Court allowed the case to proceed on the

17   merits.  The Court told Qualcomm to bring a summary judgment motion rather than a 12(c)

18   motion since the merits record was settled.  (Dkt. No. 936-8 at 5.)  Thus, this summary judgment

19   proceeding is the proceeding *after* which Qualcomm suggested additional discovery might be

20   warranted.  Further, the Court expressly rejected Plaintiffs' request to reopen discovery.  (*Id.* at

21   8:8-11 ("[Plaintiffs] could have pursued a separate exclusive dealing theory that was not

22   dependent upon the FRAND, but maybe you chose not to. Okay.  That was just a strategic

23   choice."); *Id.* at 11:19-23 ("I don't want to get into that just on a judgment on the pleadings . . . I

24   want to decide it. [Qualcomm] can make the same – whatever argument you want based on the

25   evidence that's actually in the record."); *Id.* at 13:1-6 ("[T]here was a discovery cutoff, and the

26   case comes to an end and there has to be some finality.  And [Plaintiffs] were prepared to go to

27   trial on that record that you had based on what it is.")) Indeed, before unilaterally submitting the

28   new Flamm expert report Plaintiffs should have moved for reconsideration of the Court's earlier

7

ruling.  *See* N.D. Cal. Civ. L.R. 7-9.  Their failure to do so, and failure to satisfy the standard for reconsideration, is an additional reason the new expert report is excluded.

In sum, given the circumstances here, the belated report is not "substantially justified or [] harmless." Fed. R. Civ. P. 37(c)(1). so, the supplemental report is excluded.

## B.    Exclusive Dealing

As discussed above, exclusive dealing arrangements are not per se violations of the Cartwright Act.  Courts must carefully analyze such arrangements to determine whether the arrangements were (1) exclusive dealings; (2) that foreclose a substantial portion of the relevant market; and (3) injured Plaintiffs.

According to Plaintiffs, "[t]he relevant geographic market is worldwide," and the relevant product markets "are (1) modem chips that comply with CDMA standards ('CDMA chips') and (2) modem chips that comply with advanced LTE standards ('Premium LTE chips')."  (Dkt. No. 887 at 44 ¶¶ 170-71.)  Qualcomm argues Plaintiffs fail to identify evidence sufficient to support a finding an exclusive dealing arrangement foreclosed a substantial share of either relevant market. (Dkt. No. 937-1 at 9-10.)

### 1.    Exclusive Deals

Plaintiffs' opposition focuses on Qualcomm's relationship with two original equipment manufacturers: Apple and Samsung.  The Court addresses each relationship in turn.

#### a.    Apple

Plaintiffs raise a genuine dispute as to whether Qualcomm's chip-supply contracts with Apple were exclusive deals.  (*See* Dkt. No. 937-2 at 65 ¶ 115; Dkt. No. 947-4 at 16.)  Qualcomm does not contest this point in any depth in its motion. (Dkt. No. 981-2 at 15 ("Plaintiffs similarly fail to present competent evidence sufficient to raise a triable issue of fact as to whether the rebates Qualcomm paid Apple for modem chip purchases (*however characterized*) caused consumers to pay more for their phones") (emphasis added).)

#### b.    Samsung

Qualcomm does challenge whether Plaintiffs raise a genuine dispute as to exclusive dealing arrangements between Qualcomm and Samsung.  Plaintiffs' opposition largely cites to the

United States District Court
Northern District of California

8

1   inadmissible supplemental report from Dr. Flamm on this point.  (*See* Dkt. No. 947-2 at 12 citing

2   Dkt. No. 947-3 at 673 ¶¶ 41-54.)

3          Other than the supplemental report, Plaintiffs identify only three documents.  First,

4   Plaintiffs cite a 2014 email in which a Qualcomm sales employee ███████████████████

5   ████████████████████████████████████████████████████████████████████

6   ███████████████████████████  (Dkt. No. 947-4 at 64.)  Second, Plaintiffs

7   cite an email from Qualcomm's co-founder Irwin Jacobs to Samsung from 2003.  (Dkt. No. 947-4

8   at 72-74.) Qualcomm offered ██████████████████████████████████████

9   ██████████████████████████████████████████ (*Id.* at 73.)  The proposal ███

10  ███████████████████████████████████████████

11  ██████████████████████████ (*Id.*)  Third, Plaintiffs cite

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  (Dkt. No. 947-4 at 69.)  Plaintiffs cite this contract for the proposition "Qualcomm required

15  Samsung to purchase 100% of Samsung's premium modem chipsets (in addition to a certain

16  number of medium and high tier chipsets) from Qualcomm."  (Dkt. No. 947-2 at 13.)  But the

17  contract contains no provision to that effect.

18          Taken together, these documents fail to raise a genuine dispute regarding an exclusive

19  dealing relationship between Qualcomm and Samsung.  An exclusive dealing agreement is one in

20  which a seller and a buyer agree the buyer will buy only the seller's product or agree the buyer

21  will not buy the product of one of seller's competitors. *See Fisherman's Wharf*, 114 Cal. App. 4th

22  at 335-38.  De-facto exclusive deals can exist when a contract has the "practical effect of

23  exclusivity." *Id.* at 338 (collecting cases regarding implied exclusivity).  But neither Plaintiffs'

24  initial expert reports nor their briefing contain an explanation, let alone evidence, of these

25  documents' practical exclusive effects.  Indeed, Plaintiffs' other liability expert, Professor

26  Elhauge, explained that in contrast to Qualcomm's Apple dealings, ████████████████

27  ████████████████████████████████████████ (Dkt. No. 937-2

28  at 76 ¶ 131.)

9

Because Plaintiffs have not explained or cited any caselaw to support how these documents raise a genuine dispute as to de-facto exclusivity, the Court **GRANTS** Qualcomm's motion for summary judgment as it pertains to exclusive dealing arrangements with Samsung.

### 2. Substantial Market Foreclosure

"Even if exclusive dealing can be proved, it will not be actionable under section 16720 unless it forecloses competition in a substantial share of the affected market." *Fisherman's Wharf*, 114 Cal. App. 4th at 335 (collecting cases). "[C]ourts and commentators have not settled on a minimum percentage as constituting significant foreclosure." *Id.* at 336. In assessing whether a particular market foreclosure percentage is substantial under the Cartwright Act, "courts must consider any other existing unique market factors which bear on the degree of residual competition between the parties remaining after the exclusive arrangements." *Id.* Defendants argue summary judgment is warranted because Plaintiffs fail to quantify the percentage of market foreclosure here. (Dkt. No. 981-2 at 17 (citing *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, No. 12-CV-05847-JST, 2013 WL 3242245, at *13 (N.D. Cal. June 25, 2013) ("Plaintiffs fail to quantify the *actual* market effect of this alleged activity . . . even in gross terms.")))

The Court is not persuaded California courts would follow such a mechanical approach to market foreclosure when, as here, a reasonable juror could find Apple's business was critical to a competitor's economic viability. In *Fisherman's Wharf*, for example, the exclusive dealing arrangements foreclosed "a segment of the bay cruise market that plays a crucial role" for a cruise provider's economic viability. *Id.* at 338. The record here supports the same inference given Apple's unique position as a chipset consumer and device manufacturer. For example, Plaintiffs present ample evidence Apple is an important customer for an aspiring chip supplier. (*See, e.g*., Dkt. No. 952-1 at 223 ("Samsung, Apple for sure are the top two [most important customers for Qualcomm]"), 228 (same)). Both Apple and Qualcomm executives submitted testimony indicating Apple's business could be make or break for Qualcomm's rivals. Dkt. No. 952-1 at 263 ("Q: ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████ "); Dkt.

10

United States District Court
Northern District of California

1  No. 952-1 at 281 ("█████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████"))

4      Plaintiffs also provide evidence the Apple contracts delayed competitors' entrance into the

5  market. ████████████████████████████████████████████

6  ████████████████████████ (*See*, *e.g.*, Dkt. No. 952-1 at 240-41, 242-243 (████████

7  ████████████████████████████), 245 (██████████████

8  ████████████████████████████).)  And Professor Elhauge

9  describes how Qualcomm's exclusive deals with Apple prevented Intel and other chipset

10  manufacturers from competition in the market in general.  (Dkt. No. 937-2 at 88 ¶ 149.)  As he

11  explained: "In short, the evidence directly indicates that the foreclosure from Apple weakened

12  rival chipmakers, delayed Intel's entry into the chipset market, and drove Broadcom and Ericsson

13  out of the market."  (*Id.*)  Taken together, Plaintiffs raise a genuine dispute as to significant market

14  foreclosure for at least some period of time, given Apple's key status within the chipset industry in

15  general.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452 (4th Cir.

16  2011) (restricting access to key customers can have a substantial and adverse effect on

17  competition); *see also* (Dkt. No. 937-2 at 81 ¶ 139 ("Apple globally has the largest share of phone

18  sales.")).

19      Qualcomm also argues Plaintiffs' opposition fails to differentiate the effects of the Apple

20  agreements between the CDMA and "premium LTE" chipset markets. (Dkt. No. 981-2 at 17.)

21  *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) ("Though what is 'significant'

22  may vary depending upon the antitrust provision under which an exclusive deal is challenged, it is

23  clear that in all cases the plaintiff must both define the relevant market and prove the degree of

24  foreclosure.")  Although the Court has considered Plaintiffs' sur-reply, it does not address this

25  argument.  (Dkt. No. 988.)  Further, at oral argument the Court specifically asked Plaintiffs where

26  in the record there is expert testimony supporting a finding of substantial foreclosure for each

27  separate market. (Dkt. No. 997 at 15.)  Plaintiffs responded by identifying some unspecified

28  footnote in Dr. Flamm's now-excluded supplemental report.  (*Id.*)  It is not the Court's task to

11

United States District Court
Northern District of California

1 "scour the record" in search of evidence to support Plaintiffs' claims; instead, it is Plaintiffs'

2 burden to have their opposition identify the evidence that precludes summary judgment. *Keenan*

3 *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted).  On this issue, they have not met

4 their burden.

5 ### 3.   Injury to Consumers

6 Qualcomm also challenges whether Plaintiffs provide any evidence class members suffered

7 antitrust harm from the exclusive dealing arrangements.  Plaintiffs' evidence on this point largely

8 relies on Dr. Flamm's untimely report.  (Dkt. No. 947-2 at 22.)  Dr. Flamm's supplemental report

9 estimates damages to class members from only the exclusionary conduct.  (Dkt. No. 947-3 at 774-

10 75 ¶¶ 199-201.)  But, as discussed above, the Court declines to consider that evidence at this very

11 late stage in the litigation.

12 Aside from Dr. Flamm's report, Plaintiffs cite to Professor Elhauge's report.  (Dkt. No.

13 937-2 at 72-92 ¶¶ 123-58.)  Professor Elhauge describes how Intel's eventual entrance into the

14 market lowered Apple's per unit costs for chips.  (*Id.* at 77-78 ¶¶ 133-34.)  He also describes how

15 other potential rivals were excluded and explains:

16 > This reduction in the ability or existence of chipset rivals would
naturally increase Qualcomm's monopoly power in chipsets, **which
17 > would increase Qualcomm's ability to raise chipset prices
throughout the market.** This increase in monopoly power would
18 > also give Qualcomm greater ability to use its No-License-No-Chips
tie to impose above-FRAND rates on SEPs throughout the market.

19 (*Id.* at 88 ¶ 149 (emphasis added).)  And he describes how "intermediate buyers" (like Apple)

20 "might be able to externalize an even higher percentage of the harm by passing much or all of the

21 price increase on to downstream buyers," (like the class members).  (*Id.* at 78-79 ¶ 135.)  Finally,

22 Professor Elhauge explains: "The plaintiffs in this case are end-device purchasers, which means

23 that the anticompetitive effects of Qualcomm's conduct only cease once inflated chip prices and

24 supra-FRAND royalties cease to be passed through to those purchasers." (*Id.* at 92 ¶ 158.)

25 This evidence is insufficient to raise a genuine dispute regarding antitrust injury.  At most,

26 Professor Elhauge speculates a manufacturer like Apple "might" pass on increased chip prices to

27 downstream consumers.  But he conducts no pass-through analysis to calculate whether such a

28

pass-through actually occurred here.  His failure to do so is unsurprising given his opinion is that the anticompetitive effect of the exclusionary conduct is an "exacerbation of Qualcomm's No-License-No-Chips policy."  (*Id.* at 80-81 ¶ 138.)  Plaintiffs' belated reliance on Professor Elhauge's speculation—untethered from any admissible analysis of real-world impact—is insufficient to raise a genuine dispute regarding antitrust injury.  *See In re Optical Disk Drive Antitrust Litig.*, No. 10-MD-02143-RS, 2017 WL 6451711, at *4 (N.D. Cal. Dec. 18, 2017) ("[Plaintiffs' experts] show plausible theories as to how vertically integrated defendants could benefit from a conspiracy to charge supra-competitive rates with respect to products incorporating [optical disk drives], these plaintiffs offer no underlying evidence showing that this actually occurred in reality.").

Thus, the Court **GRANTS** Qualcomm's motion for summary judgment on the Cartwright Act claim because Plaintiffs fail to provide evidence of actual antitrust injury via a pass-through from Apple to class members based on the exclusive dealing.

## II.    Unfair Competition

Even when the UCL authorizes equitable relief pursuant to state law, a federal court must also ensure the relief comports with "the traditional principles governing equitable remedies in federal courts."  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  To issue an equitable remedy, the court must find: "(1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) [in the case of an injunction] that the public interest would not be disserved by a permanent injunction."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023) (quoting *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022)).

### A.    Injunctive Relief

"[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction." *In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009).  A private party seeking injunctive relief under the UCL may request "public injunctive relief," *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017), which is "relief that by and large

United States District Court
Northern District of California

1    benefits the general public and that benefits the plaintiff, if at all, only incidentally and/or as a

2    member of the general public," *id.* (cleaned up).

3            Although the Apple-Qualcomm agreements terminated before this litigation began,

4    Plaintiffs seek injunctive relief based on a "'reasonable probability' that Qualcomm will agree

5    to—and may have already agreed to—exclusivity agreements with Apple, Samsung, and other

6    major OEMs that continue to impede competition and harm consumers." (Dkt. No. 950 at 27.)

7    But Plaintiffs cite no evidence to support that claim. So, the Court rejects Plaintiffs' request for

8    prospective injunctive relief because "these [past] agreements do not pose any current or future

9    threat of anticompetitive harm." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th

10   Cir. 2020).

11           **B.      Restitution**

12           Plaintiffs also seek:

13                   [R]estitution (inclusive of restitutionary disgorgement of all
                     Qualcomm's earnings, profits, compensation, benefits, and other ill-
14                   gotten gains obtained by Qualcomm directly or indirectly from
                     consumers because of its unlawful, unfair, and fraudulent conduct
15                   and/or nonrestitutionary disgorgement of all Qualcomm's earnings,
                     profits, compensation, benefits, and other ill-gotten gains obtained by
16                   Qualcomm because of its unlawful, unfair, and fraudulent conduct);
                     Plaintiffs' reasonable attorneys' fees and costs of suit; and injunctive
17                   relief preventing and restraining Qualcomm's unlawful, unfair, and
                     fraudulent conduct alleged herein.
18
     (Dkt. No. 886-2 at 67-68 ¶ 259.)
19
             Qualcomm argues such relief is inappropriate because Plaintiffs have an adequate remedy
20
     at law under the Cartwright Act. The Court agrees. A UCL monetary claim might lie when
21
     conduct falls outside "the confines of traditional antitrust law." *See*, *e.g.*, *Epic Games, Inc. v.*
22
     *Apple Inc.*, 559 F. Supp. 3d 898, 1057 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*,
23
     67 F.4th 946 (9th Cir. 2023). But under *Sonner* and *Guzman v. Polaris Industries*, the failure to
24
     pursue, or to successfully pursue, an adequate remedy at law does not make that remedy
25
     inadequate. 49 F.4th 1308, 1313 (9th Cir. 2022). The same principle applies here. Plaintiffs have
26
     a Cartwright Act claim—they just failed to prove it. That failure of proof does not make the legal
27
     remedy inadequate. Because Plaintiffs fail to explain how the Cartwright Act is inadequate to
28

United States District Court
Northern District of California

14

remedy the harm alleged, Plaintiffs' Cartwright Act claim for restitution fails.

"Finally, Plaintiffs' citation to a pre-*Sonner* case for the proposition that they are permitted to plead alternative claims for relief is unavailing."  *In re California Gasoline Spot Mkt. Antitrust Litig.*, No. 20-CV-03131-JSC, 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021) (collecting cases rejecting this argument).  The Court is bound by *Sonner* and *Guzman*.  *See In re Apple Processor Litig.*, No. 22-16164, 2023 WL 5950622, at *2 (9th Cir. Sep. 13, 2023) (following *Sonner* and *Guzman*).

## CONCLUSION

Litigation often involves strategic choices.  This MDL proceeding is no different.  Plaintiffs made a strategic choice when they chose to litigate liability solely on the "no license, no chips" theory of antitrust injury, rather than also offering expert testimony establishing antitrust injury under an exclusive dealing theory alone.  They made another strategic choice when they chose to oppose summary judgment on the basis of a new expert report, even though the Court had expressly declined to reopen expert discovery.  To relieve Plaintiffs of their choices under the circumstances of this case would violate Federal Rules of Civil Procedure 1, and would open the flood gates to prolonged do-over litigation.  The Court, in its discretion, chooses not to do so.  So, for the reasons stated above, Qualcomm's motion for summary judgment is GRANTED.

To provide a public version of this Order upon its filing, the Court has been overinclusive in its redactions.  The parties shall identify proposed redactions, if any, to this Order within 14 days.

A separate judgment will follow.

**IT IS SO ORDERED.**

This Order resolves Docket Nos: 936, 988.

Dated: September 26, 2023

JACQUELINE SCOTT CORLEY
United States District Judge