# EXHIBIT 4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: QUALCOMM ANTITRUST LITIGATION | Case No. 17-md-2773-LHK |
| | **REPLY EXPERT REPORT OF EINER R. ELHAUGE** |
| This Document Relates To: | |
| ALL ACTIONS | |

*Einer Elhauge*

December 7, 2018

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

Brief Background ................................................................................1

Executive Summary ...........................................................................1

I. Professor Nevo's "Background" Contains Several Misconceptions.....................2

II. Professor Nevo's Incorrect Arguments about Qualcomm's No-License-No-Chips Policy.................................................................................6

    A. Professor Nevo is Incorrect That Deficiencies in Mr. Lasinski's FRAND Analysis Undermine My Analysis of the No-License-No-Chips Policy..............6

        1. Professor Nevo Does Not Actually Establish That Any "Deficiency" Exists ....................................................................................................7

        2. Professor Nevo's Attempt to Apply An "Ex Ante Framework" is Flawed...7

    B. Professor Nevo is Incorrect That I Fail to Explain Why Royalties Would Be Lower Absent Qualcomm's Anticompetitive Conduct ........................................13

    C. Professor Nevo is Incorrect That My Analysis is Incomplete or Inconsistent with Market Facts........................................................................16

        1. Professor Nevo Does Not Show OEMs Can Always Bring FRAND Challenges ............................................................................................16

        2. Professor Nevo Fails to Understand the Implication of the Non-Discrimination Component of FRAND and Most-Favored-Royalty-Rate Clauses ..................................................................................................19

        3. Professor Nevo Misconstrues the But-For Negotiation Process .................20

        4. Professor Nevo Fails to Demonstrate that Qualcomm Cannot Use its CDMA2000 Chipset Monopoly to Leverage Supra-FRAND WCDMA Royalties.................................................................................................25

    D. Professor Nevo Is Incorrect That My Findings Are Inconsistent with Market Outcomes .......................................................................................33

        1. Professor Nevo's "Tests" Are Incorrect and Irrelevant as He Applies Them to CDMA2000..................................................................................36

        2. Professor Nevo's "Tests" Are Incorrect and Irrelevant as He Applies Them to WCDMA......................................................................................40

        3. Professor Nevo's Comparison of WCDMA and CDMA Royalties is Irrelevant ...............................................................................................45

i

E. Professor Nevo's Discussion of Strategic and Marketing Funds is Not Relevant to My Analysis ..................................................................................46

F. Professor Nevo is Incorrect That the Evidence Fails to Support My Findings ....................................................................................................47

   1. Professor Nevo Arbitrarily Dismisses Evidence Concerning Licensing Negotiation Outcomes ...............................................................................47

   2. Professor Nevo Arbitrarily Dismisses Evidence from Qualcomm..............58

   3. Professor Nevo Misinterprets Mr. Lasinski's Role in My Analysis ..........62

III. Professor Nevo's Incorrect Arguments About Anticompetitive Harm .............64

A. Professor Nevo is Incorrect That "Healthy Competition and Innovation" Preclude A Finding of Anticompetitive Harm....................................................64

B. Professor Nevo is Incorrect That the No-License-No-Chips Policy is Not a Tie ....................................................................................................67

C. Professor Nevo Is Wrong That My Theory of Harm is Incorrect or Incomplete ....................................................................................................68

   1. Professor Nevo Simply Assumes the Single Monopoly Profit Theory Applies ....................................................................................................68

   2. Professor Nevo Misunderstands the Single Monopoly Profit Theory.........72

D. Professor Nevo Does Not Correctly Evaluate Anticompetitive Harm in the Short Run ....................................................................................................77

   1. Professor Nevo's Misunderstands Qualcomm's Rival Taxation................78

   2. Professor Nevo's Mistaken Claims About Overall Demand ......................80

   3. Professor Nevo's Mistaken Claims About Short-Run Harm ......................82

E. Professor Nevo Does Not Correctly Analyze Anticompetitive Harm in the Long Run ....................................................................................................83

   1. Professor Nevo's Mistaken Claims About Distinguishing "Other Factors" That Affect Market Outcomes ..................................................................84

   2. Professor Nevo's Mistaken Claims About Rival Profits, Innovation, And Entry....................................................................................................87

   3. Professor Nevo's Mistaken Claims About Lack of Long-Run Harm..........88

F. Professor Nevo's Claims About Harm in the Cellular SEP Market are Irrelevant ....................................................................................................88

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

IV. Professor Nevo's Incorrect Claims About Qualcomm's Refusal to License Rival Chipmakers ...................................................................................................89

   A. Professor Nevo Fails to Show that Rival Chipmakers Don't Need Licenses.89

   B. Professor Nevo's Mistaken Claims About Rival Chipmaker Successes ........94

   C. Professor Nevo's Irrelevant Claim About Sales to Unlicensed OEMs...........95

   D. Professor Nevo Ignores Qualcomm's Own Belief That Higher Royalties Result From Its Refusal to License Rival Chip Makers.................................................96

V. Professor Nevo's Incorrect Claims about Procompetitive Justifications ...........98

   A. Professor Nevo Fails to Present Valid Justifications for No-License-No-Chips ...................................................................................................................100

      1. Professor Nevo Cannot Justify No-License-No-Chips as Necessary for Earning Returns on Qualcomm's R&D Investments.....................................101

      2. Professor Nevo Cannot Justify No-License-No-Chips as Necessary to Avoid Discrimination................................................................................................103

   B. Professor Nevo Fails to Present Valid Justifications for Refusing Rival Licenses................................................................................................................104

      1. Offering Exhaustive Licenses to Rival Chipmakers Would Not Increase Transaction Costs.........................................................................................105

      2. Offering Exhaustive Licenses to Rivals Could Not Possibly Harm Rival Chipmakers' Competitiveness .....................................................................106

   C. Professor Nevo's Justifications Concerning the Royalty Base Are Irrelevant ...................................................................................................................107

   D. Professor Nevo's Justifications Concerning Strategic and Marketing Funds Are Not Relevant to My Analysis..............................................................................108

VI. Professor Snyder's Approach To Anticompetitive Harm ...............................108

VII. Professor Snyder's Claims About Industry Factors .......................................111

VIII. Professor Snyder's Claims About Supplier-OEM Relationships .................112

IX. Professor Snyder's Claims About Chip Supplier Performance.......................115

   A. Professor Snyder Fails to Show that Qualcomm's Exclusionary Conduct Did Not Affect Firm-Level Factors ........................................................................115

   B. Professor Snyder Fails to Show that Firm-Level Factors "Fully Explain" Qualcomm's Business Advantages Over Rivals ...............................................120

X. Professor Snyder's Claims About Industry Performance .................................122

iii

XI. Professor Snyder's Mistaken Criticisms of My Opinions ...............................123

   A. Professor Snyder's Criticisms of My Analysis of Samsung S-LSI, MediaTek, and Dragonfly are Incorrect ...............................124

      1. Samsung S-LSI ...............................125

      2. MediaTek ...............................126

      3. Dragonfly ...............................127

      4. Other Firms ...............................128

   B. Professor Snyder's Criticisms of My Analysis of Intel, Broadcom, Ericsson, and Apple are Incorrect ...............................130

      1. Intel ...............................131

      2. Broadcom ...............................132

      3. Ericsson ...............................133

      4. Apple's Sourcing Practices ...............................133

XII. Dr. Chipty's Claims About Competition and Innovation ...............................134

XIII. Dr. Chipty's Incorrect Claims About Business Justifications for Qualcomm's Apple Agreements...............................134

   A. Dr. Chipty's Overview of the Apple Agreements with Qualcomm .............135

   B. Dr. Chipty's General Description of Exclusivity Arrangements .................135

   C. Dr. Chipty's Mistaken Contentions About the Risk of Supplying Apple ....136

      1. Incentive Payments ...............................137

      2. Thin Modem R&D Investment ...............................138

      3. Timing of R&D Investments ...............................142

      4. Concentration of Sales Within Apple ...............................142

      5. Dr. Chipty's Conclusions on Risk are Flawed............................143

   D. Dr. Chipty Fails to Show That Qualcomm Requested Volume Commitments ...............................146

   E. Dr. Chipty Fails to Show that Apple Would Have Rejected Any Requests for Volume Commitments or Smaller Share Conditions .........................149

XIV. Dr. Chipty's Incorrect Arguments that Qualcomm's Apple Agreements Were Not Anticompetitive...............................150

   A. Dr. Chipty's Narrow Theory of Anticompetitive Harm ...............................151

iv

B. Dr. Chipty's Incorrect Claims About Competitive Pressure .........................152

C. Dr. Chipty's Mistaken Claims That Other Chip Suppliers Were Not Affected ...................................................................................................................................155

    1. Dr. Chipty's Flawed Approach to Evaluating Effects on Rival Chip Suppliers ...........................................................................................................................155

    2. Dr. Chipty's Flawed Arguments on Intel Supplying Apple Devices ........158

    3. Dr. Chipty's Mistaken Arguments About Other Rival Chipmakers .........160

    4. Dr. Chipty's Mistaken Inferences Regarding Infineon.............................161

    5. Dr. Chipty's Faulty Conclusions from Intel's Actual-World Performance ...........................................................................................................................161

D. Dr. Chipty's Mistaken Claims That Competition Was Not Harmed............162

E. Dr. Chipty's Mistaken Claims About Equally Efficient Rivals ....................163

F. Dr. Chipty Fails to Demonstrate That My Analysis of Penalties is Flawed .168

G. Dr. Chipty's Incorrect Claims About My Approach ....................................171

XV. Dr. Williams' Erroneous Analysis of Why Apple Selected Qualcomm .......172

XVI. Miscellaneous Mischaracterizations .............................................................176

Exhibit D: Update to Statement Of Publications, Prior Trial And Deposition Testimony, & Compensation ..................................................................................177

Exhibit E: Update to Materials Relied Upon ........................................................178

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## BRIEF BACKGROUND

1.    Plaintiffs submitted several expert reports in this case on October 26, 2018, including reports from Dr. Kenneth Flamm (the "Flamm Report"), Mr. Michael Lasinski (the "Lasinski Report"), and myself (the "Elhauge Report").[1] Defendant Qualcomm filed 11 expert reports in response on November 11, 2016. In this Reply Report, I address the mistaken claims from several of these defense reports as they pertain to the opinions in the Elhauge Report.

## EXECUTIVE SUMMARY

2.    Professor Aviv Nevo makes a number of mistaken arguments. I can highlight just some of his more salient errors in this summary. First, he argues that the claim that the No-License-No-Chips tie increased royalty rates conflicts with historically-observed royalty rates, but he bases this argument on a number of mistaken conclusions. The primary errors are that he assumes historical royalty rates are probative of current FRAND rates (whereas that is not necessarily the case), that he believes Qualcomm did not tie WCDMA royalty rates to CDMA2000 chips and did not ever exercise leverage in WCDMA chips in the past (neither of which he establishes), and that he mistakenly believes it is proper to disregard a plethora of documents and deposition testimony from both Qualcomm and affected buyers demonstrating that No-License-No-Chips tie increased royalty rates. Second, Professor Nevo also incorrectly argues that there was no anticompetitive harm, which is based in part on his failure to apply the correct but-for baseline, his failure to understand the tying theory at issue and to correctly analyze the single monopoly profit theory, and his failure to understand how the No-License-No-Chips policy creates an anticompetitive tax on rival chip sales. Third, Professor Nevo makes a number of mistaken arguments about why Qualcomm's refusal to provide exhaustive licenses to rival chipmakers was not exclusionary, but these arguments fail to account for Qualcomm's FRAND obligation to provide such licenses, the efficiency considerations for doing so, and how the refusal to do so bolsters the No-License-No-Chips tie. Professor Nevo then offers a number of "business justifications", none of which are procompetitive efficiencies and all of which can be addressed through less-restrictive alternatives.

---

[1] Expert Report of Dr. Kenneth Flamm (October 26, 2018); Expert Report of Michael J. Lasinski (October 26, 2018); Expert Report of Einer R. Elhauge (October 26, 2018).

1

3.      Professor Edward Snyder also makes a number of mistaken arguments. I can highlight just some of his more salient errors in this summary.  First, he incorrectly uses the past as a baseline for measuring harm to the market/industry as a whole, whereas the relevant question is whether the exclusionary conduct created harm relative to the but-for world.  Second, Professor Snyder claims to demonstrate how industry factors unrelated to Qualcomm's exclusionary conduct "fully explain" the observed market and firm outcomes in the modem chip industry, but he never actually establishes that any industry factors "fully explain" outcomes or that any industry factors have not been directly influenced by Qualcomm's exclusionary conduct.  He thus never correctly applies the but-for baseline, but rather repeatedly assumes without support that any industry factors and market outcomes that existed in the actual world would have equally existed in the but-for world.

4.      Dr. Tasneem Chipty makes a number of mistaken arguments about Qualcomm's *de facto* exclusive dealing with Apple.  I can highlight just some of her more salient errors in this summary.  First, she fails to coherently establish any relationship-specific investments that Qualcomm makes with Apple that would justify the need for exclusivity conditions.  Second, she also fails to consider the exclusionary effect of the *de facto* exclusive dealing on chip rivals, arguing that no chip rivals could have met Apple's technical and scheduling needs, but ignoring evidence that exclusion from Apple hampered rival technical prowess and timeliness.  This second error is also persistent throughout Dr. Tim Williams' expert report, which fails to consider any of the exclusionary conduct in its analysis of whether chip rivals could technically serve Apple's needs.  Thus, like Professor Nevo and Professor Snyder, Dr. Chipty and Dr. Williams never correctly apply the but-for baseline, but rather repeatedly assume without support that any alleged shortcoming in rival technical ability that existed in the actual world would have been the same in the but-for world.

## I. PROFESSOR NEVO'S "BACKGROUND" CONTAINS SEVERAL MISCONCEPTIONS

5.      Professor Nevo begins his report by offering "a brief history of cellular standards and an overview of Qualcomm's history and licensing and chip-supply practices."[2]   In later parts of this Reply Report, I will explain why attempts by defense experts to justify Qualcomm's anticompetitive behavior based on the background of cellular technology (e.g. by claiming advances in cellular technology

---

[2] Nevo Report ¶21.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

preclude the possibility of anticompetitive effects) fundamentally misconstrue antitrust economics.  In this part of my report, I simply offer a few comments on and corrections of Professor Nevo's history and overview.

6.     Professor Nevo singles out and lauds Qualcomm's contributions when he describes the development of 3G and 4G cellular technologies, but it is important to remember that Qualcomm is not the sole innovator behind cellular standards. Professor Nevo states that "The WCDMA standard relies on CDMA technology originally developed and patented by Qualcomm as well as significant additional innovations that Qualcomm contributed to subsequent releases of the WCDMA standard" and that "the CDMA2000 standard relies upon Qualcomm's earlier 2G CDMA technology as well as many additional innovations and improvements developed by Qualcomm."[3]  He similarly states that "Qualcomm was a major contributor to the 4G LTE standard" and "many of the foundational innovations in LTE rely upon patented Qualcomm technology."[4]  I do not dispute that Qualcomm has made significant contributions to these cellular standards, but one must keep in perspective that other companies have also made key contributions.  Indeed, Dr. Akl explains that Qualcomm holds 11% of UMTS SEPs, 9% of LTE SEPs, and 53% of CDMA2000 SEPs.[5]  Without diminishing Qualcomm's contributions, it should be clear that Qualcomm does not have some unique claim upon cellular standards.

7.     Professor Nevo also asserts that Qualcomm's "incentive to invest in R&D therefore depends on its ability to enter license agreements and other contracts that ensure that it is fairly compensated for its IP."[6]  Although any profit-maximizing firm's incentive to invest in R&D is based on the ability to be compensated for that research, the need for compensation does not override other contractual and legal commitments made by the firm.  Professor Nevo's own report acknowledges that the standard-setting process was a key element of Qualcomm's monetization strategy for CDMA technology: Professor Nevo states that "Qualcomm's business model has been to invest heavily in R&D and then to monetize that investment by sharing the resulting IP with the cellular industry, as opposed to keeping the benefits of its R&D proprietary."[7]  For this proposition, Professor Nevo cites to testimony from Irwin Jacobs, Co-Founder, Former Chief Executive Officer, and Former

---

[3] Nevo Report ¶32.
[4] Nevo Report ¶37.
[5] Expert Report of Dr. Robert Akl, D.Sc. at ¶¶76-78 (October 26, 2018).
[6] Nevo Report ¶40.
[7] Nevo Report ¶22.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Chairman of Qualcomm, who states that Qualcomm rejected "retaining CDMA as a proprietary standard" because

> we wanted to make sure this was going to be a technology available worldwide. Communications had to be international. And, therefore, that it would be important to have other manufacturers in various countries be able to manufacture product in CDMA to do that. There had to be a standard. And so, although we thought about the fact, we decided to go…to a standards body.[8]

Professor Nevo's own analysis thus confirms that Qualcomm needed the benefits of the standard-setting process to monetize CDMA. But Qualcomm obviously could not have pursued this strategy without FRAND commitments: I explained in the Elhauge Report that standard-setting organizations require FRAND commitments from patent-holders and will not include patented technologies in their standards without such commitments.[9] Professor Nevo similarly notes that standard-setting organizations "typically require that holders of patents essential to a standard license these patents on a 'fair, reasonable and non-discriminatory' basis" which helps to "ensure[] that standard essential technologies can be used throughout the industry."[10] Thus, Qualcomm's desire to be "fairly compensated" for its IP must be bounded by the FRAND commitments Qualcomm has entered into (and must also be limited to behavior that is not anticompetitive).

8.    Professor Nevo also claims "that licensing at the device level remains a typical practice in the industry as the industry has adopted 3G and 4G standards."[11] I have two comments on this claim. First, chip-level licensing does occur in the industry: I explained in the Elhauge Report that "other SEP-holders do provide exhaustive licenses at a component level with chip suppliers".[12] Second, what is "a typical practice in the industry" does not bear on whether that practice is economically anticompetitive behavior.

9.    Professor Nevo also claims to "understand that Qualcomm has never brought a patent infringement action against a licensed OEM in good standing for

---

[8] Nevo Report ¶22 n.20 (quoting Irwin Mark Jacobs (Co-Founder, Former Chief Executive Officer, and Former Chairman of Qualcomm) 2018 Dep. at 22:24–23:21).
[9] Elhauge Report ¶14.
[10] Nevo Report ¶25.
[11] Nevo Report ¶43.
[12] Elhauge Report ¶112.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

practicing non-SEPs that were not covered by the OEM's license."[13]   He cites nothing for this proposition, so it's entirely unclear what he means by it.  For example, he does not explain what he means by "in good standing".  The "licensed" and "in good standing" qualifiers to this statement render it entirely conclusory and meaningless.  Qualcomm has, for example, been seeking an exclusion order from the ITC against Apple based on Qualcomm's non-SEPs.[14]  So the simple fact is that Qualcomm can and has used its non-SEPs as a sword when it wants to.

10.     Professor Nevo also states that Qualcomm requiring OEMs to have a license prior to Qualcomm selling them chips is intended "to ensure a level playing field among OEMs, to avoid assisting in the infringement of its own patents, and to prevent OEMs from opportunistically claiming patent exhaustion from the sale of a chip".[15]  This is a conclusory assertion of Qualcomm's purported justifications for its No-License-No-Chips policy.  I explained in Section III.C of the Elhauge Report why these are not procompetitive justifications, and I further respond to Professor Nevo's mistaken arguments to the contrary below in Section V.

11.     Professor Nevo also makes the sweeping claim—without citing to any evidence—that Qualcomm's ability to terminate chip supply for non-compliance with a license is standard-specific.  He introduces this argument by first noting the undisputed point that Qualcomm's Component Supply Agreements allow Qualcomm to "terminate the CSA if the OEM or CM is in default under a relevant license agreement."[16]  But Professor Nevo then goes on to claim that

> I understand that this clause would only allow Qualcomm to terminate chip supply if the OEM or CM were to default under an existing license agreement. For example, consider an OEM with a license agreement that covers CDMA but not WCDMA. As long as that OEM is in compliance with its existing CDMA license, Qualcomm would not be able to terminate the supply of CDMA chips to that OEM. Thus, I understand that if the OEM refused to enter into a new license covering WCDMA technology and subsequently infringed Qualcomm's SEPs

---

[13] Nevo Report ¶45.
[14] Qualcomm's ITC Complaint against Apple at ¶18 (July 7, 2017) ("All six Asserted Patents are NSEPs"), *available at* https://www.qualcomm.com/media/documents/files/qualcomm-apple-complaint-with-the-u-s-itc.pdf (accessed 11/25/2018).
[15] Nevo Report ¶51.
[16] Nevo Report ¶53.

5

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

> covering WCDMA, Qualcomm would not be relieved of its obligation
> to continue shipping CDMA chips to that OEM.[17]

There are no citations in the Nevo Report for any of these propositions. Professor Nevo's claim that Qualcomm can only terminate WCDMA chip supply upon default of a WCDMA license and only terminate CDMA chip supply upon default of a CDMA license is incorrect for reasons I describe in detail below in Section II.C.4.

## II. PROFESSOR NEVO'S INCORRECT ARGUMENTS ABOUT QUALCOMM'S NO-LICENSE-NO-CHIPS POLICY

### A. Professor Nevo is Incorrect That Deficiencies in Mr. Lasinski's FRAND Analysis Undermine My Analysis of the No-License-No-Chips Policy

12.    Professor Nevo claims in Section 5.1 of his report that I rely on Mr. Lasinski's conclusion that Qualcomm's rates are above FRAND and that "Mr. Lasinski's conclusion is unreliable and therefore undermines Professor Elhauge's conclusions."[18] Professor Nevo's complaint is that Mr. Lasinski

> has failed to explain how Qualcomm's rates can be inconsistent with an
> *ex ante* FRAND framework when (1) Qualcomm's licensing practices
> have been relatively constant for two decades, including both before
> and after the standardization of various technologies, and (2) there is
> evidence that industry participants were aware of Qualcomm's royalty
> terms prior to the adoption of specific standards.[19]

Professor Nevo elaborates by claiming that there are two alternative definitions of FRAND: the first interprets "FRAND terms as those that would result from hypothetical negotiations over licensing terms before the intellectual property is incorporated into a standard (a so-called *ex ante* negotiation framework)", whereas the second also "consider[s] the long-run incentives of the technology developer to develop technology and to allow it to choose whether to be part of the standard."[20] Professor Nevo claims that "Professor Elhauge has failed to explain how Qualcomm's royalty terms are inconsistent with either of these definitions of FRAND."[21] Professor Nevo's argument is mistaken for several reasons, as I explain further below.

---

[17] Nevo Report ¶53.
[18] Nevo Report ¶81.
[19] Nevo Report ¶81.
[20] Nevo Report ¶82.
[21] Nevo Report ¶82.

6

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*1. Professor Nevo Does Not Actually Establish That Any "Deficiency" Exists*

13.    I clearly state in the Elhauge Report that "I assume that Qualcomm is charging supra-FRAND royalties to OEMs for licenses to Qualcomm's SEPs. I understand that Qualcomm has committed to licensing its SEPs for these technologies on FRAND terms, but that Mr. Lasinski finds Qualcomm's running royalty percentages to exceed FRAND rates."[22]   It therefore makes no sense for Professor Nevo to accuse me of failing to explain why Qualcomm's royalty rates fail to meet Qualcomm's FRAND obligations when Mr. Lasinski is the one offering that explanation. Mr. Lasinski explains that his "analysis indicates that the running rates historically charged by Qualcomm in the U.S. have materially exceeded its FRAND rates".[23]   Even assuming that the "*ex ante* negotiation framework" is the correct approach to interpreting Qualcomm's FRAND commitment in principle (a matter on which I offer no opinion), Professor Nevo has not explained why Mr. Lasinski's analysis and findings fail to accord with the principles underlying this framework.

*2. Professor Nevo's Attempt to Apply An "Ex Ante Framework" is Flawed*

14.    There are significant shortcomings in Professor Nevo's evidence and arguments for why the "*ex ante* negotiation framework" is satisfied by Qualcomm's actual licensing agreements during the relevant time period. Professor Nevo's first argument is that Qualcomm's CDMA license agreements with major OEMs that were entered prior to the adoption of the CDMA standard satisfy the *ex ante* framework.[24]   Read in conjunction with his earlier statement that "Qualcomm's licensing practices have been relatively constant for two decades, including both before and after the standardization of various technologies",[25] this first argument appears to suggest that the royalties offered in earlier agreements represent the FRAND rate for the SEPs at issue in this case. Professor Nevo's second argument is based on his claim that "there are several facts that suggest that industry participants were aware of Qualcomm's licensing terms for WCDMA, LTE, and 5G prior to adoption of these standards",[26] meaning Professor Nevo believes such

---

[22] Elhauge Report ¶23.
[23] Lasinski Report ¶28.
[24] Nevo Report ¶83.
[25] Nevo Report ¶81.
[26] Nevo Report ¶83.

7

"awareness" to signify the FRAND nature of the licensing terms.  I address each of these arguments in turn.

### a. Professor Nevo fails to show that earlier agreements signify Qualcomm's current licensing terms are FRAND.

15.    Professor Nevo's first argument is flawed for several reasons.  First, Professor Nevo appears to be arguing that the royalties agreed upon for 2G CDMA prior to its standardization in 1993[27] somehow represent reasonable royalties for 3G CDMA2000, 3G UMTS/WCDMA, and 4G LTE cellular technologies in 2011 and beyond, even though they apply to different technological standards.  There is no explanation of why the licensing terms for one technological standard should be applicable to a different standard.  Any such claim is especially suspect when, as here, the extent of Qualcomm's SEP contributions vary among the different standards.  For example, 2016 Boston Consulting Group presentation for Qualcomm states that "Qualcomm SEP share has declined with successive standards" from 2G CDMA to CDMA2000 to LTE.[28]  Professor Nevo does not explain why Qualcomm's 2G CDMA royalties are an appropriate FRAND benchmark in light of this variance.

16.    Moreover, even if one technology (2G CDMA) could qualify as a benchmark for FRAND rates of different technologies (3G and 4G), Professor Nevo does not actually provide any evidence for his claim that "Qualcomm's royalty rates have stayed relatively constant since it began licensing its technology in the early 1990s"; he offers no citations for this proposition.[29]  Professor Nevo would have to show that current agreements actually have the same royalties as (or lower royalties than) older agreements.  However, Qualcomm's ███████████████████████ █████████████████████████████,[30] whereas Nevo admits that "Qualcomm's typical royalty rate for a full-portfolio license agreement covering devices complying with any CDMA-based technology (WCDMA or CDMA) is 5 percent."[31]  Professor Nevo has thus failed to show how Qualcomm's 2G CDMA agreements satisfy the "*ex ante* negotiation framework" he put forth.

---

[27] Professor Nevo states 2G CDMA was standardized in 1993.  Nevo Report ¶29.
[28] QNDCAL00711881 at Slide 10; QNDCAL00711879 (March 2016 email attaching presentation).
[29] *See* Nevo Report ¶83.
[30] AT&T CDMA Technology Agreement, Q2017MDL5_04724160 at 78 (July 1990); ████████████████████████████, Q2017MDL 1_02928410 at 29 (███████████); ████████████████, Q2017MDL 1_03041982 at 86 (███████████).
[31] Nevo Report ¶47.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

17.    Even if one counterfactually assumes that older licensing agreements all had the same running royalty rate of 5% as newer licensing agreements, Professor Nevo further fails to explain why this would mean that Qualcomm's *current* licensing terms are FRAND.  Even if a 5% running royalty for Qualcomm's cellular SEPs in 1993 were considered FRAND (which Professor Nevo does not actually establish anywhere in his report), it does not automatically follow that a 5% running royalty is FRAND in 2011 and beyond; Professor Nevo needs to actually supply an argument for such a proposition, but he has not.  By contrast, there are several reasons why much older licensing agreements are a poor benchmark for whether current licensing terms are FRAND.  One reason is that mobile phones have evolved greatly over time: Mr. Lasinski explains that "Through the 1990s, such devices were primarily used for making voice calls and had few other features."[32]  He further explains that over the decades phones have evolved to include many non-cellular functionalities such as cameras, email, and internet access, and even in recent years more and more data is being transmitted over Wi-Fi networks instead of cellular networks.[33]  Mr. Lasinski's analysis shows that these factors support a lower aggregate royalty attributable to the cellular functionality of phones sold during the relevant period of analysis for this case.[34]  In short, because cellular functionality provides a smaller percentage of the value of a modern smart phone than it provides for older phones, royalty rates that are based on a percentage of phone prices should be lower for modern smart phones than they were for older phones.

18.    Another reason why past licensing agreements may not be useful as a benchmark for whether current licensing terms are FRAND is that Qualcomm's cellular SEP portfolio changes in strength over time.  For example, Dr. Akl's analysis shows that many Qualcomm patents that are essential to WCDMA/UMTS (both as-claimed to be essential by Qualcomm and as-determined to be essential by Dr. Akl) have been expiring over time, especially since 2011.[35]  Mr. Lasinski similarly notes many expiries from 2007 to 2017 of Qualcomm patents that are alleged by Qualcomm to be "fundamental" to cdmaOne, CDMA2000, and WCDMA.[36]  Simple logic suggests that the FRAND rate for a set of valid cellular SEPs cannot be as high as the FRAND rate once they expire, and Mr. Lasinski's

---

[32] Lasinski Report ¶33.
[33] Lasinski Report ¶¶33, 35.
[34] Lasinski Report ¶127.
[35] Akl Report ¶¶97-98.
[36] Lasinski Report ¶70.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

analysis reflects this logic by factoring patent expirations into his FRAND rate determination.[37]

## b. Professor Nevo fails to show that industry awareness of Qualcomm's licensing terms prior to standard adoption means those terms are FRAND.

19.     Professor Nevo's second argument is also flawed for several reasons. He attempts to point to four "facts that suggest that industry participants were aware of Qualcomm's licensing terms for WCDMA, LTE, and 5G prior to adoption of these standards."[38]  Professor Nevo is wrong that any of these "facts" establish the awareness of Qualcomm's current licensing terms by industry participants.  He also fails to establish that awareness of Qualcomm's earlier licensing terms or attempts by Qualcomm to publicize specific licensing terms justifies them as FRAND.

20.     Professor Nevo's first "fact" allegedly showing industry participant awareness of Qualcomm's current licensing terms is that "Qualcomm's royalty rates have stayed relatively constant since it began licensing its technology in the early 1990s and did not increase after the adoption of the relevant standards."[39]  I already explained in the previous section of this Reply Report how Professor Nevo fails to actually show that Qualcomm's royalty rates have stayed relatively constant and how, even if they have stayed relatively constant, Professor Nevo also fails to establish that older licensing agreements show that Qualcomm's current licensing terms are FRAND.

21.     Professor Nevo's second "fact" allegedly showing industry participant awareness of Qualcomm's current licensing terms is that Qualcomm stated in a September 1999 investor presentation that a number of companies had "licensed Qualcomm patents for Third Generation CDMA Systems" and that the royalty rates for the third generation technologies were equal to the royalty rates for the second

---

[37] *See* Lasinski Report ¶108 ("In my analysis, I have adjusted each SEP holder's portfolio strength by the percentage of SEP families for which the representative member included in the Akl Study was unexpired as of the beginning of the relevant period (February 11, 2011)."). Mr. Lasinski also focuses his analysis on recent agreements because "courts and policymakers around the world have provided substantial additional guidance concerning SEP and FRAND licensing" in recent years (*id.* at ¶148), suggesting this is an additional reason why older agreements are a poor benchmark.

[38] Nevo Report ¶83.

[39] Nevo Report ¶83.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

generation.[40]   Professor Nevo also claims that "many of the participants in the development of WCDMA (including Nokia, Ericsson, Motorola, AT&T, Samsung, LG and many others) were aware of Qualcomm's CDMA royalty rates because they signed CDMA license agreements with Qualcomm prior to 1999."[41]   But Professor Nevo fails to explain why these participants in the development of WCDMA should have expected Qualcomm's WCDMA licensing terms to be the same as Qualcomm's CDMA terms, or why Qualcomm's licensing terms in 1999 bear on whether Qualcomm's royalty rates are FRAND in later years. As I already explained in the previous section of this Reply Report, a particular technology's nominal running royalty rate could be FRAND in the past but become supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength. This is even more likely if the past nominal royalty rate was for a different cellular technology.

22.   Professor Nevo's third "fact" allegedly showing industry participant awareness of Qualcomm's current licensing terms is that "Prior to the launch of LTE as a 4G protocol Qualcomm announced its standard rates and practices to the industry."[42]   For this proposition he cites to a September 2010 article, which he says makes reference to Qualcomm's LTE/WiMax Patent License Statement from December 2008.[43]   A custom Google search for this statement suggests that this statement was added to Qualcomm's website on December 20, 2008.[44]   However, the technical specifications for the first release of LTE were already finalized on December 19, 2008.[45]   So the available evidence indicates that the statement did not come prior to the adoption of LTE, and Professor Nevo provides no evidence for his assertion to the contrary.[46]

---

[40] Nevo Report ¶83.

[41] Nevo Report ¶83.

[42] Nevo Report ¶83.

[43] Nevo Report ¶83 n.184.

[44] The search term "Qualcomm 'Patent Licensing Statement'" with the date range filtered to 2008 shows the date as "Dec 20, 2008". Google Search, *available at* https://www.google.com/search?q=Qualcomm+%22Patent+Licensing+Statement%22&source=l nt&tbs=cdr%3A1%2Ccd_min%3A2008%2Ccd_max%3A2008&tbm= (accessed 12/1/2018).

[45] Phonenews.com, "3GPP Freezes Final Version of LTE as Release 8, Ratification in March 2009" *available at* https://phone.news/3gpp-ratifies-final-version-of-lte-as-release-8-5911/ (accessed 12/1/2018) (announcement dated December 19, 2008).

[46] Even if one does not take the date indexed by Google as the date the document was uploaded to Qualcomm's website, it nevertheless shows that Qualcomm at best made the statement immediately leading up to the finalization of LTE, which would hardly support any contention by

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

23.     Professor Nevo's fourth "fact" allegedly showing industry participant awareness of Qualcomm's current licensing terms is that "Qualcomm announced licensing terms for its 5G SEPs in November 2017."[47]  Qualcomm's licensing terms for 5G patents are not at issue in this case, and this "fact" has no bearing on any issues related to Qualcomm's 3G and 4G SEPs, so it is entirely irrelevant.

24.     More fundamentally, even if Professor Nevo could show that industry participants were made aware of Qualcomm's licensing terms for 3G and 4G SEPs "prior to adoption" of those standards, he fails to explain why such awareness would justify the licensing terms as FRAND.  For example, Professor Nevo offers no authority for the proposition that a public announcement of a royalty rate by Qualcomm supersedes the FRAND commitments Qualcomm made to SSOs.  Aside from the FRAND commitment, the standard-setting process is otherwise divorced from the process of determining royalty rates,[48] and so Professor Nevo's attempt to portray Qualcomm's licensing practices as intrinsic to the standard-setting process is misguided.  Professor Nevo offers no reason to believe that industry participants should not or would not rely on Qualcomm's FRAND commitment in their royalty rate expectations.   Furthermore,  not only will  industry participants  expect Qualcomm to honor its FRAND commitments, but they will also expect Qualcomm to abide by the antitrust laws of the United States.  It is entirely reasonable for industry participants to assume that Qualcomm's FRAND commitment would prohibit anticompetitive practices designed to evade FRAND limitations, such as the No-License-No-Chips policy.[49]

---

Professor Nevo that industry participants could take Qualcomm's LTE announcement into account when planning the standard.

[47] Nevo Report ¶83.

[48] Anne Layne-Farrar, Jorge Padilla & Richard Schmalensee, *Pricing Patents for Licensing in Standard-Setting Organizations: Making Sense of FRAND Commitments*, 7 ANTITRUST L.J. 671, 678 (2007) ("Aside from… demanding that the patents disclosed as essential be licensed on FRAND terms, SSOs generally do not venture to define, request, or even advise on any specific licensing terms.").

[49] Professor Nevo claims that Mr. Lasinski "has failed to explain why [SSOs] would have continued to incorporate Qualcomm's technology into standards if Qualcomm's standard royalty terms, which have been widely known and relatively constant for over two decades, were supra-FRAND."  Nevo Report ¶84.  I already explained in the previous section of this Reply Report that there are reasons why licensing terms from earlier years or different technologies do not necessarily serve as a FRAND benchmark for later licensing terms or licensing terms for different

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

25.     Professor Nevo concludes this section of his analysis by pivoting to completely unrelated topics, stating that "Professor Elhauge has failed to explain how Qualcomm could have used its policy of not selling chips to unlicensed chip makers to obtain supra-FRAND royalties before a standard was adopted and before any OEMs had a near-term requirement for Qualcomm's chipsets."[50]  The first part of this sentence attacks a straw man: nowhere does the Elhauge Report claim that Qualcomm used No-License-No-Chips to obtain supra-FRAND royalties "before a standard was adopted".[51]   I address Professor Nevo's claims regarding OEMs without "near-term requirements" for Qualcomm's chips below in Sections II.C and II.D.

## B. Professor Nevo is Incorrect That I Fail to Explain Why Royalties Would Be Lower Absent Qualcomm's Anticompetitive Conduct

26.     Professor Nevo argues in Section 5.2 of his report that I have "not demonstrated that a different licensing regime would necessarily result in a different royalty rate".[52]  He claims that

> Professor Elhauge relies on the purely theoretical argument that Qualcomm's practice of selling chips only to licensed OEMs necessarily creates a tie that "coerces" OEMs into accepting supra-FRAND rates. He also assumes that chip makers would necessarily be able to negotiate better terms than OEMs in their license agreements with Qualcomm.[53]

As I noted above in Section II.A.1, the Elhauge Report made clear that I rely on Mr. Lasinski's finding that Qualcomm is charging a supra-FRAND royalty rate for its cellular SEPs.  The Elhauge Report provided a plethora of evidence—not just theoretical argument, as Professor Nevo incorrectly claims—that this supra-FRAND rate is caused by the No-License-No-Chips Tie, including evidence from multiple OEMs about their negotiations with Qualcomm and confirmation from Qualcomm's

---

cellular technologies.  And I have just explained that standard-setting organizations do not endorse licensing terms, and rather will assume compliance with antitrust laws.

[50] Nevo Report ¶84.

[51] Nevo cites to Elhauge Report ¶44, but that paragraph contains no such claim.

[52] Nevo Report ¶85.

[53] Nevo Report ¶85.

13

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

own documents.[54]   This alone proves that "a different licensing regime would necessarily result in a different royalty rate", because a licensing regime where Qualcomm does not engage in anti-competitive behavior will not result in supra-FRAND royalties.[55]   Professor Nevo's argument to the contrary is nonsensical: he is arguing that proving an anticompetitive practice causes supra-FRAND royalties does not prove that royalties would be lower without the anticompetitive practice.

27.    Professor Nevo's argument similarly fails as applied to my analysis of Qualcomm's refusal to license rival chipmakers.[56]   Contrary to Professor Nevo's claim that my report simply "assumes that chip makers would necessarily be able to negotiate better terms than OEMs in their license agreements with Qualcomm", I provided evidence from Qualcomm's own documents and executives that Qualcomm "expressly recognized that exhaustively licensing rival chip suppliers would have adversely impacted Qualcomm's ability to procure high royalty rates in its business of licensing device manufacturers".[57]   Professor Nevo's response is to grossly mischaracterize this evidence and my presentation of it in a lengthy footnote to the Nevo Report.  Professor Nevo first claims that the Elhauge Report

> references a single document that he claims demonstrates that if Qualcomm were to license chip makers its per-unit royalties would be lower. He claims that a chip maker would obtain a lower per-unit royalty than an OEM, because it would be unwilling to pay a per-unit royalty that was greater than the cost of its chip.[58]

This claim is incorrect on both counts.  First, I do not reference "a single document".  Rather, I use multiple emails and a lengthy transcript to establish that direct statements from four Qualcomm executives show

---

[54] Elhauge Report at § III.B.1.

[55] The Elhauge Report even notes (without opining on the legality of such a practice) that Qualcomm could, as a less restrictive alternative, maintain its No-License-No-Chips policy but only impose FRAND rates upon OEMs.  Elhauge Report ¶83.

[56] Professor Nevo's report parrots the same argument two more times.  He states that "Professor Elhauge protests Qualcomm's current licensing regime without fully articulating the details of his proposed alternative or how such a licensing regime would result in lower royalties."  Nevo Report ¶86.  He then again claims in a footnote that I fail "to explain how a different licensing regime that required Qualcomm to offer rival chip makers exhaustive licenses to its SEPs that are practiced by rival chip makers would result in different royalty rates".  Nevo Report ¶86 n.193.  He is wrong for all of the reasons I describe here.

[57] Elhauge Report ¶¶104-105.

[58] Nevo Report ¶85 n.191.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

both an understanding that the refusal to license competing chip suppliers is calculated to enjoy a higher royalty base from downstream licensing on the end-user device, and an understanding that Qualcomm would not be able to charge the same royalty at the chip level because the unfairness of the royalty would become readily apparent.[59]

Second, contrary to Professor Nevo's claim, I make no specific statement about whether a chipmaker "would be unwilling to pay a per-unit royalty that was greater than the cost of its chip"; I simply point to evidence that Qualcomm executives believed they would earn lower royalties if licensing at the chip level.[60]

28.    Professor Nevo next claims that "in order to license rival chip makers, Qualcomm's patent portfolio, which is currently fully licensed to device makers, would have to be split into patents and claims that are fully infringed by the chip to be licensed to chip makers, and other patents and claims which would continue to be licensed to device makers."[61]  The Elhauge Report already explained why it is not necessarily the case that such multi-level licensing would be required, and that it would not affect the anticompetitive nature of Qualcomm's refusal to license rival chipmakers even if the alternative were multi-level licensing.[62]

---

[59] Elhauge Report ¶¶104-105.

[60] Given that Professor Nevo mischaracterized my presentation of the evidence, his remaining arguments are largely irrelevant, but for thoroughness I respond to them anyway.  Professor Nevo first states that "the claim that a lower royalty base results in lower per unit royalties is unrelated to whether Qualcomm is earning supra-FRAND royalties. That is, if Professor Elhauge were correct that a lower royalty base necessarily leads to a lower per-unit royalty, this would not demonstrate that Qualcomm's current royalties are supra-FRAND. Rather, if correct, it could mean that the alternative will force Qualcomm to earn below FRAND royalties, which could negatively affect its investment decisions."  Nevo Report ¶85 n.191.  The fact that Qualcomm licensing rival chipmakers would lower Qualcomm's royalties is sufficient to make my point given Mr. Lasinski's findings that Qualcomm is charging supra-FRAND royalties.  Professor Nevo next states that "given that Qualcomm would likely still license its SEPs and non-SEPs that are not practiced on the chip at the device level, even if it were true that the royalty on the chip would be lower as a result of the lower base, this would not imply that the entire royalty would be lower." Nevo Report ¶85 n.191.  This simply ignores all of the evidence and arguments I presented in Elhauge Report § IV.B demonstrating that Qualcomm's refusal to license rival chipmakers bolsters the No-License-No-Chips policy and that Qualcomm believes such refusal raises Qualcomm's total royalty revenues.  Finally, Professor Nevo claims that he will later show that "Professor Elhauge's claim that a larger royalty base necessarily leads to a higher per-unit royalty is speculative." Nevo Report ¶85 n.191.  I response to his claim *infra* at Section IV.D.

[61] Nevo Report ¶86.

[62] Elhauge Report § IV.C.

15

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

29.    Professor Nevo's final argument in this section of his report is that Plaintiffs "have failed to demonstrate that any such (incompletely specified) alternative licensing regime would result in quantitatively meaningfully different royalty and licensing terms" or that "even if the royalty and licensing terms were quantitatively different, the difference would be large enough to have the competitive impact that Plaintiffs claim."[63]  This is an *ipse dixit* assertion provided with no elaboration or analysis; Professor Nevo is simply ignoring multiple expert reports that establish these facts.  For example, Mr. Lasinski's analysis shows that Qualcomm's supra-FRAND royalty overcharge amounts to billions of dollars.[64]

### C. Professor Nevo is Incorrect That My Analysis is Incomplete or Inconsistent with Market Facts

30.    Professor Nevo claims in Section 5.3 of his report that there are a "number of deficiencies" in my analysis of Qualcomm's anticompetitive practices.[65] I address these arguments below.

### 1. Professor Nevo Does Not Show OEMs Can Always Bring FRAND Challenges

31.    Professor Nevo claims that "Professor Elhauge assumes that OEMs have 'no option' but to accept agreements that include supra-FRAND royalty terms. His analysis is incomplete because he ignores the option of an OEM to bring a FRAND challenge if it views Qualcomm's licensing terms to be inconsistent with Qualcomm's FRAND obligation."[66]  Professor Nevo is incorrect that I "assume" OEMs were coerced by Qualcomm's No-License-No-Chips tie when in fact I established it based on economic analysis of evidence from multiple OEMs and confirmation from Qualcomm's own documents.[67]  He is also incorrect that my analysis ignores OEM options to bring a FRAND challenge.  The evidence I describe for how the No-License-No-Chips policy coerces OEMs shows that these OEMs cannot afford a chipset supply disruption; the whole point is that Qualcomm's tying

---

[63] Nevo Report ¶87.
[64] Lasinski Report ¶30.
[65] Nevo Report ¶88.
[66] Nevo Report ¶89.
[67] Elhauge Report at § III.A.1.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

scheme prevents OEMs from seeking a FRAND rate.[68]  Moreover, I also explained why Qualcomm's rivals may rationally choose not to bring FRAND challenges, showing that there are rational incentives to wait for the legal landscape to develop (with the first appellate court ruling on RAND/SEP licensing having not arrived until 2015), that a FRAND challenge between Motorola and Microsoft took over four years to reach that appellate decision, that there are ongoing regulatory actions against Qualcomm that rivals such as Samsung can wait out, that litigation is extremely costly, that such litigation invites retaliatory measures, and that the outcome of such litigation is uncertain.[69]  Every single one of these factors also affects OEMs' incentives and ability to bring a FRAND challenge against Qualcomm.  The fact that an OEM fails to bring a FRAND challenge neither endorses Qualcomm's licensing terms as FRAND nor endorses Qualcomm's licensing practices as legally compliant.

32.    Professor Nevo next claims that my finding that OEMs must accept Qualcomm's supra-FRAND terms is inconsistent with numerical examples in my report because those numerical examples posit the existence of a competitor and "the existence of these competitors implies that Qualcomm could not obtain supra-FRAND royalties by threatening to withhold chips" because the OEM in my example would just purchase from the rival and pursue a FRAND challenge against Qualcomm.[70]  His argument rests on a premise that the existence of any competitor precludes the possibility that a firm has monopoly power, which is clearly untrue.  If one thought otherwise, then one would be concluding that no firm can have monopoly power unless its market share is literally 100%, which is clearly contrary to antitrust economics, which routinely finds monopoly power to exist for firms with less than 100% market share.  Moreover, Professor Nevo fails to explain why my illustration of one particular mechanism in a hypothetical means I have described the entire market to always operate exactly like in the hypothetical; Professor Nevo's logic would allow one to also claim that I am offering an economic opinion that all chips always cost $15 just because that's what they cost in my hypothetical, which is obviously not what the hypothetical establishes.

33.    Professor Nevo further claims that my hypothetical example shows that "in order for Qualcomm's refusal to sell chips to unlicensed OEMs to potentially

---

[68] *See* Elhauge Report at § III.A.1. As just one example, I noted that Samsung feared a chipset supply disruption would have a staggering impact on Samsung's business.  Elhauge Report ¶45.
[69] Elhauge Report ¶106.
[70] Nevo Report ¶¶90-91.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

have any effect it has to be the case that an OEM has a *near-term* requirement for Qualcomm's chips (and that there are no significant substitutes for Qualcomm's chips)."[71]  Professor Nevo is incorrect that such a "*near-term* requirement" is a *necessary* condition for Qualcomm to impose supra-FRAND royalties, because the Elhauge Report explains that OEMs that do not need Qualcomm's CDMA or premium-LTE chips nevertheless could not pay less for WCDMA licenses than other OEMs that rely on Qualcomm chips.[72]  Moreover, as I just explained, there are plenty of other reasons why an OEM may not pursue a FRAND challenge against Qualcomm.  As one example, the Elhauge Report notes that a lawsuit between Microsoft and Motorola took over four years to reach an appellate determination.[73]  Professor Nevo himself claims that "FRAND challenges typically take anywhere between two to three years".[74]  This means that a lack of "a *near-term* requirement for Qualcomm's chips" cannot be established unless an OEM knows with reasonable certainty that it will not need Qualcomm chips for many years.

34.    A key takeaway is that Professor Nevo's statement that "in order for Qualcomm's refusal to sell chips to unlicensed OEMs to potentially have any effect it has to be the case that an OEM has a *near-term* requirement for Qualcomm's chips (and that there are no significant substitutes for Qualcomm's chips)" means Professor Nevo acknowledges that at least a "*near-term* requirement" for Qualcomm's chips could potentially prevent an OEM from obtaining a FRAND royalty from Qualcomm.  He even states that "it is the near-term requirement for Qualcomm's chips that supposedly makes any chip 'threat' relevant".[75]  Professor Nevo may incorrectly dispute that this has in fact occurred, but he does not dispute the theoretical possibility that a monopolist could leverage monopoly power in this way.  Even though he is wrong about this being a necessary condition, this

---

[71] Nevo Report ¶91

[72] Elhauge Report ¶39.

[73] Elhauge Report ¶106.

[74] Nevo Report ¶91 n.198.

[75] Nevo Report ¶91.  Professor Nevo states in a footnote that "Professor Elhauge's claims with respect to Qualcomm's WCDMA licenses are flawed because he does not clearly articulate the mechanism through which Qualcomm could obtain supra-FRAND WCDMA royalties prior to Qualcomm allegedly obtaining monopoly power in 'premium' LTE chips.  Moreover, even ignoring this lack of a mechanism, he fails to consider an OEM's option and incentive to bring a FRAND challenge if it views Qualcomm's WCDMA royalty terms to be inconsistent with its FRAND commitment."  Nevo Report ¶89 n.194.  These are both repetitions of arguments Professor Nevo makes elsewhere in his report.  I explain *infra* in Section II.C.4 why Professor Nevo is wrong that my analysis does not apply to WCDMA royalties.

18

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

acknowledgement will nevertheless provide useful guidance for my analysis of Professor Nevo's arguments in later sections, many of which attempt to argue that this "*near-term* requirement" is not met.

### 2. Professor Nevo Fails to Understand the Implication of the Non-Discrimination Component of FRAND and Most-Favored-Royalty-Rate Clauses

35.    Professor Nevo claims that the Elhauge Report "appears to acknowledge that some OEMs may not have a near-term requirement for the chips in which he assumes Qualcomm has monopoly power."[76]  This is misleading; what I say in the Elhauge report is that "even if there were any examples of WCDMA-only negotiations relevant to the class period, OEMs seeking such licenses could not pay less for WCDMA licenses than other OEMs that rely more heavily on Qualcomm's CDMA chipset supply."[77]  I do not actually opine that any licensing negotiations occurred with OEMs who did not need (or expect to need) Qualcomm CDMA/premium-LTE chips; I am merely offering an explanation for any that may have.  As I will explain further below, Professor Nevo also fails to establish that any such negotiations occurred.

36.    As Professor Nevo puts it, my logic is that "if Qualcomm is able to leverage its alleged monopoly power in CDMA and 'premium' LTE chips to obtain supra-FRAND royalties from some OEMs, it will use the ND and MFRR terms to obtain supra-FRAND royalties from OEMs that do not have a near-term requirement for Qualcomm's chips."[78]  Professor Nevo claims that this is incorrect because

> There is no reason why the shadow of litigation would not be hanging over Qualcomm's negotiations with these OEMs that do not have a near-term requirement for Qualcomm chips.  Thus, [Professor Elhauge] has failed to explain why these OEMs would be unable to obtain FRAND rates.  Furthermore, given his claims about the ND component of FRAND and MFRR clauses, combined with the existence of OEMs that do not have a near-term requirement for Qualcomm's chips,

---

[76] Nevo Report ¶92.
[77] Elhauge Report ¶39.
[78] Nevo Report ¶92.  As with many of my opinions, Professor Nevo refers to this as something I "assume" in my report, whereas the Elhauge Report has offered an explanation, not an assumption.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Professor Elhauge has failed to explain why any OEMs would pay supra-FRAND rates.[79]

Professor Nevo concludes that "given Professor Elhauge's claims about ND and MFRR and evidence that certain OEMs did not have near-term requirements for Qualcomm chips, a lack of variation in royalty rates indicates that Qualcomm's refusal to sell chips to unlicensed OEMs has not affected its royalty terms."[80] Professor Nevo's argument has two necessary premises: (a) the existence of OEMs that did not have "near-term requirements" for Qualcomm chips, and (b) that any OEM without a near-term requirement for Qualcomm chips would obtain a FRAND rate with certainty. Neither premise is correct, as I explain further below.

37.    First, Professor Nevo fails to actually establish the existence of any OEMs that were free to negotiate FRAND rates outside the shadow of Qualcomm's chipset market power. As I will explain in Sections II.C.4 and II.D below, his proffered examples are all incorrect for various reasons (e.g., he includes many negotiations that may have been tainted by Qualcomm's ability to leverage WCDMA chip sales prior to the relevant time period for this case).

38.    Second, given that Professor Nevo fails to establish that any OEM without a near-term need for Qualcomm chips even exists, he *a fortiori* fails to establish that any OEM would have incentives to pursue FRAND litigation against Qualcomm for refusing to budge from its uniform supra-FRAND royalty rate. As I explain elsewhere, there is a plethora of reasons why an OEM might lack incentives to pursue a FRAND challenge against Qualcomm.[81] Indeed, Professor Nevo does not point to a single OEM that he claims had no near-term need for Qualcomm chips and that actually pursued FRAND litigation. Given the absence of litigated cases establishing the FRAND rate, the supra-FRAND rate that Qualcomm was able to achieve through its tie would necessarily apply to all its licenses.

### 3. Professor Nevo Misconstrues the But-For Negotiation Process

39.    Professor Nevo states that "the outcome of a bargaining process depends on many factors" and describes these factors at length (e.g., "the relative

---

[79] Nevo Report ¶93.
[80] Nevo Report ¶94.
[81] *See infra* Section II.C.1 & IV.A; Elhauge Report ¶106.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

size of the parties").[82]  He then incorrectly claims that the Elhauge Report "appears to assume that Qualcomm's supposed chip leverage is the only important, or determining, factor in Qualcomm's negotiations with OEMs while ignoring other factors that affect negotiation outcomes."[83]  I do not assume that the No-License-No-Chips tie is the only important/determining factor in Qualcomm's negotiations with OEMs.  Rather, I focus my analysis on the relevant question for this case, which is the effect of the No-License-No-Chips tie specifically.  A proper but-for analysis must take into account that all the other factors that affect negotiation would be the same in the but-for world.[84]  Accordingly, the only difference between the actual and but-for worlds would be the additional leverage created by the tie, which could only increase Qualcomm's ability to impose supra-FRAND rates compared to a world where everything was the same except that additional leverage.  Professor Nevo similarly claims that I "failed to analyze whether factors other than chip leverage affected negotiation outcomes"[85] but the answer is the same: "factors other than chip leverage" are not being challenged in this case, so those factors would also exist in the but-for world.  Accordingly, the relevant question is the impact of Qualcomm's chip leverage.

40.    Professor Nevo claims that I do not show that supra-FRAND rates were caused by the No-License-No-Chips tie.  He claims that my analysis

> assumes Qualcomm's rates are supra-FRAND and, without proof, that this alleged deviation from FRAND was caused by Qualcomm's practice of only selling chips to licensed OEMs.  [Professor Elhauge] has not provided the empirical analysis necessary to demonstrate that Qualcomm's refusal to sell chips to unlicensed OEMs resulted in actual royalties deviating from FRAND royalties.[86]

The Elhauge Report provided a plethora of evidence and analysis—not just assumptions, as Nevo incorrectly claims—that this supra-FRAND rate is caused by the No-License-No-Chips tie, including evidence from multiple OEMs about their negotiations and confirmation from Qualcomm's own documents.[87]  For this same

---

[82] Nevo Report ¶95.
[83] Nevo Report ¶96.
[84] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 54-55 (2d ed. 2010) ("To isolate the effect of the violation . . . it is important to modify the defendants' conduct in the but-for world only to the extent necessary to comply with the law.")
[85] Nevo Report ¶96.
[86] Nevo Report ¶96.
[87] Elhauge Report at § III.A.1.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

reason, while Professor Nevo is correct that Mr. Lasinski "does not provide an opinion that the rates are higher as a result of Qualcomm's at-issue conduct",[88] this fact is irrelevant because I am not relying on any such opinion. Mr. Lasinski's analysis confirms that Qualcomm successfully obtained supra-FRAND rates, and the Elhauge Report shows that the No-License-No-Chips tie caused these rates.[89]

41.    Professor Nevo also claims that "there is evidence that certain OEMs expect to and are able to negotiate and pay below-FRAND rates."[90]  To establish this, he describes a ███████████████████████████████ ████████████████████████████ and claims that Apple's statements that a FRAND ruling would not legally bar Apple from negotiating lower rates mean that Apple must believe it can extract below-FRAND royalties from Motorola and Qualcomm.[91]  As an initial matter, whether any firm can negotiate below-FRAND rates from Motorola is entirely irrelevant to the question at hand, which is whether Qualcomm has been able to extract supra-FRAND royalties through the No-License-No-Chips tie.  Nor does Professor Nevo provide any independent analysis of whether Samsung or Apple ever actually paid a below-FRAND royalty rate to Motorola, so his evidence does not even support this proposition.  Professor Nevo is also wrong that Apple's statements that a FRAND ruling would not bar it from negotiating below-FRAND rates mean that Apple must believe that factually it would be able to extract below-FRAND rates from either Motorola or Qualcomm.  The quoted statements merely show Apple taking a legal position that would keep the option open: not any economic prediction about its ability to actually obtain a below-FRAND rate.  Indeed, Professor Nevo is obviously wrong that Apple believes it is actually able to negotiate below-FRAND royalties from Qualcomm, given that Apple has been forced to sue Qualcomm to obtain a FRAND rate.[92]

---

[88] Nevo Report ¶96.

[89] Professor Nevo repeats in a footnote that I "assume" that Qualcomm's alleged chip leverage necessarily led to above FRAND royalty terms (Nevo Report ¶97 n.210) but I have already explained this is false; rather than assume it, I have demonstrated it. Elhauge Report at § III.A.1.

[90] Nevo Report ¶96.

[91] Nevo Report ¶97.

[92] Redacted Complaint For Damages, Declaratory Judgment And Injunctive Relief, Case 3:17-cv-00108-GPC-NLS (January 20, 2017).  In a footnote, Professor Nevo claims that "given the evidence that large OEMs are able to use their leverage and power to obtain below-FRAND rates, Qualcomm's assumed use of chip leverage could simply push royalties closer to the FRAND level, as opposed to resulting in supra-FRAND royalties."  Nevo Report ¶97 n.210. However, Mr. Lasinski's analysis establishes that Qualcomm's royalties are supra-FRAND.  Thus, the only

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

42.    Professor Nevo further argues that Qualcomm's threat to withhold chips also **hurts** Qualcomm's bargaining position because it might cost Qualcomm to withhold the chips:

> Qualcomm's supposed threat also makes the disagreement point more painful for Qualcomm: if negotiations break down (and Qualcomm follows through with the threat), Qualcomm would lose at least some of the rents associated with the sales of the chips it otherwise would have sold and the royalties it could have obtained for the sale of handsets incorporating those chips.[93]

Professor Nevo similarly claims that there is a "negative impact that withholding chips from an existing customer could have on Qualcomm's future sales and design wins."[94]  This argument by Professor Nevo simply assumes away the existence of monopoly power or the ability for any monopolist to theoretically engage in tying. Obviously, the reason Qualcomm's chipset threat is effective is because (as demonstrated by Dr. Flamm) Qualcomm is a chipset monopolist.[95]  Professor Nevo would have one believe that no monopolist can engage in tying because withholding the tying product hurts the monopolist, but such an argument flies in the face of basic antitrust economics.  Furthermore, this argument also conflicts with the evidence presented in the Elhauge Report showing that Qualcomm's threat was deemed credible, did affect negotiations, and that Qualcomm's own documents show it deemed it advantageous to impose the tie.[96]  Thus, any risk to Qualcomm was clearly outweighed by the benefits it gained in licensing negotiations.  Professor Nevo's argument also ignores the theoretical points that, even when disadvantageous to carry out, threats to withhold a product can be credible when, for example, either: (a) a powerful seller faces many buyers who thus have a collective action problem in responding; (b) the threat can be carried out in stages (e.g., withholding chips for

---

possible operation of Qualcomm's chip leverage is to push royalties upward in a supra-FRAND direction.

[93] Nevo Report ¶98.

[94] Nevo Report ¶98.  In a footnote, Professor Nevo also repeats his mistaken claim that "Qualcomm's chip-supply practices are standard-specific" and that "Qualcomm will sell a chip to an OEM that is licensed for handsets that are compatible with that chip."  Nevo Report ¶98 n.211. I explain why this is false *infra* in Section II.C.4.

[95] Flamm Report at §§ II.E, II.F.

[96] Elhauge Report at § III.A.1.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

short periods to induce compliance); or (c) carrying out the threat creates a reputation for carrying out similar threats to other buyers or in future negotiations.[97]

43.    Professor Nevo notes that the No-License-No-Chips policy also applies to Qualcomm's sales of WCDMA-only and non-premium LTE chips, and claims that the potential loss of these chip sales creates greater risks for Qualcomm than for OEMs.[98]  He goes so far as to argue that the potential loss of WCDMA chip sales provides OEMs with significant leverage against Qualcomm:

> An OEM could counter Qualcomm's alleged threat to withhold CDMA and "premium" LTE chips with threats to refuse to purchase WCDMA and non-"premium" LTE chips from Qualcomm and/or to minimize its purchases of CDMA and "premium" LTE chips from Qualcomm unless Qualcomm agrees to the OEM's preferred licensing terms. Such threats could impose significant costs on Qualcomm—and thus give the OEM significant leverage—because worldwide sales of WCDMA modem chips greatly exceed those of CDMA modem chips.[99]

Professor Nevo is arguing that a firm with monopoly power in one market (CDMA2000 chips) cannot leverage that monopoly power against a customer that is purchasing some *other product* in a *different* (allegedly competitive) market (WCDMA chips) because the threat by the customer to withhold purchases in the allegedly competitive market negates the monopoly power in the monopoly market. Such an argument would turn the entire concept of antitrust market definition on its head, because it would require that monopoly power be assessed based on all of a company's lines of business.  There is no economic logic that supports Professor Nevo's attempt to upend established antitrust economics in this way.  Furthermore, Professor Nevo's argument assumes that an OEM purchasing Qualcomm's WCDMA and non-premium LTE chips has been doing so out of generosity to Qualcomm, and that the OEM could switch to a different chipmaker for WCDMA and non-premium LTE as a way to punish Qualcomm.  But if the OEM were indifferent about its choice of WCDMA and non-premium LTE chipmaker, then it could switch those chipset purchases away from Qualcomm regardless of whether Qualcomm imposes a No-License-No-Chips tie.  On the other hand, if the OEM prefers Qualcomm's WCDMA and non-premium LTE chips, then the OEM will be

---

[97] *See* Elhauge, *Contrived Threats v. Uncontrived Warnings: A General Solution to the Puzzles of Contractual Duress, Unconstitutional Conditions, and Blackmail,* 83 U. CHICAGO LAW REVIEW 503, 531-33 (2016).
[98] Nevo Report ¶99.
[99] Nevo Report ¶100.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

hurting itself by switching away from Qualcomm. This demonstrates that Professor Nevo has simply invented, without any evidence, the ability for a customer to use purchases in an allegedly competitive market as a strategic negotiation tool.[100]

### 4. Professor Nevo Fails to Demonstrate that Qualcomm Cannot Use its CDMA2000 Chipset Monopoly to Leverage Supra-FRAND WCDMA Royalties

44.    As an initial matter, Professor Nevo admits that "Professor Elhauge could claim that Qualcomm used monopoly power in 'premium' LTE chips to obtain supra-FRAND WCDMA royalties" because "Qualcomm requires OEMs to be licensed for WCDMA technology to purchase multimode WCDMA/LTE chips."[101] Thus, any and all of Professor Nevo's analysis here is limited (by his own admission) to "Qualcomm's WCDMA licenses that were signed prior to Qualcomm allegedly obtaining monopoly power in 'premium' LTE chips."[102] This is important because Dr. Flamm shows that, during all relevant time periods for this case (i.e. 2011 and beyond), Qualcomm did in fact possess premium-LTE monopoly power.[103] This establishes that Qualcomm had monopoly power to leverage to maintain its WCDMA royalties at supra-FRAND rates during the relevant time period. The fact that Qualcomm may have leveraged some other monopoly power to initially enter those licensing terms before 2011 (e.g., perhaps Qualcomm had WCDMA monopoly power prior to 2011) could be relevant to show that the No-License-No-Chips tie is effective in elevating Qualcomm's royalty rate. But this does not mean that those initial factors must still exist to explain why Qualcomm's royalties are *currently* elevated, which is instead due to its monopoly power in CDMA2000 and premium-LTE chipsets during 2011 and beyond. Although this moots Professor Nevo's entire line of argument, I show below that his claims are mistaken regardless.

### a. Professor Nevo fails to show that No-License-No-Chips is standard-specific.

45.    Professor Nevo first argues that "Qualcomm's challenged chip-supply practice is standard-specific: Qualcomm will only sell a chip that is compatible with a given standard to any OEM that is licensed for that standard" and on this basis he

---

[100] The Nevo Report ¶101 simply repeats the arguments Professor Nevo has already put forward, which I have already responded to in detail.
[101] Nevo Report ¶102.
[102] Nevo Report ¶102.
[103] Expert Report of Dr. Kenneth Flamm at § II.F.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

claims that "an OEM that did not have a near-term requirement for Qualcomm's CDMA chips would still have no reason to enter a WCDMA license that had supra-FRAND terms."[104]  Professor Nevo is simply wrong on this point: the Elhauge Report shows that the No-License-No-Chips tie is not standard-specific, and Qualcomm will not sell CDMA chips to an OEM that breaches a WCDMA license or attempts to make unlicensed WCDMA device sales.  The Elhauge Report explains that Qualcomm's chip sales are made pursuant to component supply agreements that state, for example, that

> either party may terminate this Agreement if the other party is in default under the License Agreement and such default is not cured within the cure period specified therein[105]

The plain language of this kind of component supply agreement is not standard-specific.  If an OEM breaches a WCDMA License Agreement, Qualcomm has the right to terminate the component supply agreement; the termination right is not specific to the family of chipsets corresponding to the license breach.  This appears to be consistent with Qualcomm's own interpretation of its component supply agreements.  Qualcomm Executive VP Cristiano Amon wrote in a 2012 email regarding licensed TD-SCDMA customers refusing to pay Qualcomm royalties that "[Component Supply Agreement] restrictions are not technology specific for customers licensed on TDCDMA".[106]  This shows that Amon believed a breach of a license agreement in one standard to impact the entire component supply agreement.

46.     Based on the preceding paragraph, Professor Nevo's claim that Qualcomm could not terminate CDMA chip supply to OEMs unlicensed for WCDMA is limited to OEMs that already use Qualcomm CDMA chips but do not have a WCDMA license; Professor Nevo is arguing that Qualcomm will sell CDMA chips to OEMs licensed for CDMA but unlicensed for WCDMA.[107]  Although I will explain momentarily why this, too, is incorrect (i.e., Qualcomm would not actually sell CDMA chips to an unlicensed WCDMA OEM), I first note that there is no evidence that any OEMs meeting this condition actually exist during the relevant time period.  That is to say, Professor Nevo does not show that there are any relevant

---

[104] Nevo Report ¶102.

[105] Elhauge Report ¶33.

[106] Q2017MDL1_02914771 at 72.

[107] Nevo Report ¶104.  Similarly, Professor Nevo claims that even if Qualcomm stops supplying chips to an OEM in default of a license agreement, this would not imply that Qualcomm will stop CDMA sales to an OEM that was licensed for and paying royalties on CDMA devices, but unlicensed for WCDMA devices. Nevo Report ¶102 n.216.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

OEMs that, as of 2011, had a CDMA licensing agreement but not a WCDMA licensing agreement (except for Sony, which I address below). Professor Nevo acknowledges and does not dispute my showing that Qualcomm imposes a uniform royalty rate for WCDMA and CDMA2000 and that "Qualcomm insists that OEMs enter into a single license agreement with the same terms for CDMA and WCDMA units."[108] This means that only an OEM not already selling phones for both standards in 2011 could possibly qualify for Professor Nevo's claimed exception to No-License-No-Chips, but Professor Nevo does not show that any such OEMs exist (again, except for Sony, which I address below).[109]

47.    Professor Nevo's claimed exception to the applicability of No-License-No-Chips for OEMs without WCDMA license agreements is especially narrowed by the fact that Qualcomm has claimed in a submission to the Japanese FTC that the ████████████████████████████████████████████████████████████ █████████████████████████.[110] In fact, a 2004 Qualcomm letter shows that when LG claimed "that it is not licensed by QUALCOMM to manufacture, sell or use any products implementing the WCDMA air interface standard", Qualcomm responded that ████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████.[111] Thus, as a general matter Qualcomm interprets its ████████████████████████████ ████████████████████████████.

---

[108] Nevo Report ¶103.

[109] In the Elhauge Report, I provide an example where Qualcomm ████████████ ██████████████████████████████████████ Elhauge Report ¶38. This negotiation took place in 2010, before the relevant period, and therefore does not necessarily bear on whether Qualcomm had chipset leverage to maintain ████████████████ ████████████████████. Professor Nevo claims that this specific ████████████████ ████████████████. Nevo Report ¶103 n.219; Nevo Report ¶104 n.220. Nowhere did I claim that the ████████████████████ ; these facts are instead explained by the other evidence I discuss throughout this section of this Reply Report.

[110] Q2017MDL8_00007277 at 84.

[111] Q2017MDL1_01495692. Qualcomm did not say that the component supply agreement was breached only as to WCDMA components, which reinforces my earlier point that the obligations in the component supply agreements are not standard-specific.

27

48.    The evidence also shows that for Sony—the only example Professor Nevo provides of an OEM licensed for CDMA but unlicensed for WCDMA—Qualcomm did actually cut off CDMA chip supply.  Professor Nevo flatly denies this: he claims both that "Qualcomm continued to ship CDMA chips (and incidentally also WCDMA chips) while the parties were in a dispute over WCDMA license terms" and that "Sony became unlicensed for WCDMA and Qualcomm considered withholding WCDMA shipments. I have seen no evidence indicating that Qualcomm withheld or threatened to withhold CDMA chips."[112]  Professor Nevo is wrong on both counts because Qualcomm did in fact cut off chip supply, and this cutoff was not standard specific.  The Elhauge Report notes that a Qualcomm employee emailed Sony to say that "our operations team has been advised to hold all component shipments to SEMC/Sony Mobile."[113]  A separate email from a Sony employee to Qualcomm also states that:

> QC legal team ordered to your sales [sic] to hold any shipment to SOMC due to non existence of QTL license agreement with SOMC after we became 100% subsidiary of Sony. Are you aware of that? We have an individual talking to your legal team diligently to agree on the licensing terms so it was a surprise that your legal team stopped the shipment. Please let me know what you/we can do on this.[114]

Both of these emails unequivocally show that shipment to Sony was in fact stopped (and this stoppage was communicated to Sony) and that the stoppage was not specific to any one standard.  Thus, Professor Nevo is simply wrong that an OEM unlicensed in WCDMA can continue to receive CDMA chips.[115]

## b. Professor Nevo fails to establish any examples of OEMs entering supra-FRAND agreements despite a lack of Qualcomm chipset leverage.

49.    Professor Nevo next argues that, even if it were true that the No-License-No-Chips threat extended to cutting off CDMA chip supply over the lack of a WCDMA license, there are OEMs for whom such a threat would not have been

---

[112] Nevo Report ¶105 & n.221.

[113] Elhauge Report ¶30.

[114] Q2014FTC04497009 at 10.

[115] This also means that Professor Nevo is wrong when he claims that the No-License-No-Chips ties do not explain why an OEM that viewed Qualcomm's WCDMA licensing terms to be non-FRAND would not elect to bring a FRAND challenge.  Nevo Report ¶104.  Moreover, I explained in Section II.C.1 of this Reply Report that there is a plethora of other reasons why an OEM might decline to pursue a FRAND challenge against Qualcomm.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

effective. Professor Nevo claims that there are "several OEMs that purchase little or no CDMA chips from Qualcomm" for whom "the threat of withholding CDMA chips would have little to no impact on these OEMs' incentive to challenge Qualcomm's WCDMA rates, assuming they were inconsistent with Qualcomm's FRAND commitment."[116] He further claims that

> This option of bringing a FRAND challenge implies that an OEM would only potentially agree to supra-FRAND WCDMA royalty terms if its losses from losing access to Qualcomm's CDMA chips during the period of a FRAND challenge were greater than the losses it would experience from paying supra-FRAND WCDMA royalties over the life of its WCDMA license agreement.[117]

Professor Nevo claims to have unearthed OEMs that pay WCDMA royalties but had little-to-no CDMA or premium LTE device revenue from Qualcomm chips during the first few years of the WCDMA licensing agreement, and he posits that because these OEMs would have seen much greater gains from obtaining a FRAND rate compared to losing access to Qualcomm's CDMA or premium LTE chips, these OEMs would have either refused to enter into supra-FRAND WCDMA agreements or would have brought FRAND challenges against Qualcomm's WCDMA royalties.[118] Professor Nevo's analysis is flawed for several reasons.

50.    First, Professor Nevo's analysis is doomed from the outset due to his own admission that the No-License-No-Chips tie can theoretically apply to WCDMA royalties earned after Qualcomm gained monopoly power in premium-LTE chips.[119] For this reason, he chooses to "limit [his] analysis to WCDMA licenses that OEMs signed to gain the right to use Qualcomm's WCDMA technology, as opposed to its LTE technology" by looking only at "license agreements with effective date before March 1, 2009."[120] This alone renders his analysis fatally deficient, because he is examining OEM incentives outside of the relevant period of analysis to establish a lack of CDMA or premium-LTE chip leverage. However, my analysis does not require that Qualcomm used CDMA or premium-LTE chip leverage to induce every single license agreement existing in 2011 and beyond *at the time of signing*. Rather, it is sufficient that Qualcomm

---

[116] Nevo Report ¶106.
[117] Nevo Report ¶107.
[118] Nevo Report ¶¶106-113.
[119] Nevo Report ¶102.
[120] Nevo Report at Exhibit 1.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

maintained its supra-FRAND royalties through the use of CDMA or premium-LTE chip leverage in 2011 and beyond.[121]

51.    Second, Professor Nevo chooses the March 2009 date based on the fact that "LTE standard (3.5G) corresponds to Release 8, which became stable in March 2009."[122]  However, OEMs were clearly anticipating LTE much earlier than 2009. An Ericsson press release shows that 3GPP had actually anticipated the release of LTE as early as 2007.[123]  Out of the 13 examples that Professor Nevo provides of OEMs entering WCDMA agreements, 5 were signed in 2007 or later, and thus should be excluded by Professor Nevo's own methodology.

52.    Third, Professor Nevo's argument and analysis are uninformative because the WCDMA licensing terms may have been FRAND when they were first entered into, but may then have become supra-FRAND by the time an OEM became subject to Qualcomm's chipset power (and thus unable to challenge the newly-supra-FRAND royalty terms).  I already explained in Section II.A.2.a above that the same running royalty rate can change from FRAND to supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength.  Five of Professor Nevo's thirteen examples are for licenses signed in 2000, but these five OEMs would have had no reason to challenge Qualcomm's WCDMA royalty rates at that time if they believed the royalty rate was FRAND in 2000, regardless of whether Qualcomm's CDMA chip leverage was lacking at that time.

53.    Fourth, Professor Nevo simply assumes that Qualcomm did not have the ability to leverage its WCDMA chipset sales during these earlier years.  The fact that I do not rely upon any finding of Qualcomm market power in WCDMA chips for the relevant period of my analysis (post-2011) does not mean that my analysis is deficient if Qualcomm was using WCDMA chipset leverage *before* 2011 to coerce OEMs into supra-FRAND licensing terms at the time of signing (and is now using CDMA/premium-LTE chipset leverage *after* 2011 to maintain those supra-FRAND

---

[121] Thus, Professor Nevo's claim that I fail "to show that this condition holds for any OEM, much less all OEMs" (Nevo Report ¶107) is irrelevant; it is not a necessary part of my analysis.  The Elhauge Report does discuss negotiations from before 2011 because these are nevertheless generally probative of how No-License-No-Chips coerces OEMs into supra-FRAND terms.

[122] Nevo Report at Exhibit 1.

[123]    "Ericsson    demonstrates    live    LTE    at    144Mbps",    *available    at* https://www.ericsson.com/en/press-releases/2007/2/ericsson-demonstrates-live-lte-at-144mbps (accessed 11/28/2018).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

licensing terms).[124]  Professor Nevo does later claim, with respect to earlier years, that "Qualcomm had only a small share of WCDMA sales at the time (if any)".[125] However, his own Exhibit 16 shows Qualcomm's WCDMA market share in 2009 was 37%, which is large enough to be consistent with market power.[126]  Nor does Professor Nevo address contrary evidence from Qualcomm's own internal calculations, which show that its WCDMA market share was "dominant" and over 50%, its share in certain segments of the market was 68%, and that Qualcomm had a 100% share at many OEMs.[127]  This evidence from Qualcomm's own internal calculations is certainly consistent with Qualcomm having marketwide WCDMA market power, or at least significant WCDMA power over certain market segments or OEMs.  Because my analysis does not rely on any affirmative finding that Qualcomm had WCDMA monopoly power or market power prior to 2011, I offer no opinion on that topic.  By contrast, Professor Nevo's analyses of pre-2011 periods rely crucially on his assumption that Qualcomm lacked WCDMA chipset leverage over the particular OEMs, requiring him to affirmatively establish this fact.  But he makes no effort to confirm that his own 37% WCMDA market share figure is inconsistent with market power, no effort to explain why his WCMDA market share calculation differs from Qualcomm's own internal calculations, and no effort to assess whether Qualcomm may have had particular power over certain segments or

---

[124] The same is true if, for example, Qualcomm used any market power in the past in cdmaOne (i.e. 2G CDMA) chipsets to coerce higher royalty rates.

[125] Nevo Report ¶141.

[126] Nevo Report p. 138.

[127] *See, e.g.*, Q2017MDL1_00351908 at Slide 4 (Feb. 2007 draft presentation titled "3G 2006 UMTS Competitive Review" states "Within the merchant chipset competitive landscape, QCT has a dominant, leadership position"); *id.* at Slide 6 (showing Qualcomm with a 51% share of "CY06 Merchant Supplier Share"); QNDCAL01086760 at Slide 63 (Aug. 25, 2005 presentation titled "QCT Strategic Plan 2006-2008" in a section on UMTS shows QCT estimated to have ████████████████████████████████████████, in 2005); *id.* at Slide 65 (QCT estimated to have ████████████████).  A Qualcomm presentation titled "QCT Strategic Plan 2008" also shows QCT as the source for approximately ██████████████████████████████, with these two segments accounting for half of the market.  Q2017MDL1_02933093 at Slide 18 (showing Horizontals as ████ of market, Japan as ████ of market, and Qualcomm's combined share of these two segments to be ████ of the full market, which is ████ of the two segments).  This presentation shows remaining 50% of the market to be ████.  *Id.*  Texas Instruments could not serve as a rival chipset supplier for most other OEMs.  *See* Snyder Report n.1127 (quoting a 2009 report that "TI doesn't have a W-CDMA baseband design of its own unlike GSM/GPRS/EDGE basebands. The company only plays a foundry role to manufacture W-CDMA baseband ASICs for Nokia, Motorola and EMP's in-house designs").

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

OEMs in the WCDMA market.  He thus does not establish that Qualcomm lacked WCMDA market power before March 2009, which was the crucial premise on which his whole analysis of this topic hinges.  Thus, while I offer no affirmative opinion on WCMDA market power before 2011, which is not necessary to my analysis, it is clear that Professor Nevo has not provided sufficient evidence to support his premise that such market power was lacking, which is necessary for his analysis.

54.    Fifth, at least two of Professor Nevo's examples (Foxconn and Flextronics) are contract manufacturers.  Contract manufacturers that pass through their royalty obligations will not face the tradeoff between device profits and royalty payments posited by Professor Nevo.  For example, Foxconn was a contract manufacturer for Apple, and I noted in the Elhauge Report that Apple reimburses its contract manufacturers for royalties and considers them to be a "pure pass-through cost" for those manufacturers.[128]

55.    Sixth, Professor Nevo does not correctly analyze the potential "threat" to the OEMs of Qualcomm "withholding CDMA chip supply".  He defines this threat as the "expected lost profits from lost sales of CDMA-compatible handsets"[129] in the two years following the execution of a licensing agreement, and he also presents the same analysis for three years and four years.[130]  This means that Professor Nevo believes the *only* detriment to an OEM from *completely forgoing a line of device business for two to four years* is the *lost profits of those years alone*.  This completely fails to consider that a delay of two to four or more years will prevent an OEM from gaining engineering experience and brand recognition, which will continue to have effects in the short term and possibly even the long term.[131]  This is true even if the OEM would not have actually entered the device market during that delay, so long as the OEM would have taken steps towards entering the device market; the delay limits the OEM regardless of whether it is the planning stage or the execution stage that is delayed, because both stages can be delayed.  By

---

[128] Elhauge Report at n.89.

[129] Nevo Report ¶109.

[130] Nevo Report at Exhibits 1, E1, E2.

[131] "[F]irms that succeed in building durable first-mover advantages tend to dominate their product categories for many years, from a market's infancy until well into its maturity. . . . By starting earliest, first movers have more time than later entrants to accumulate and master technical knowledge."  Fernando Suarez and Gianvito Lanzolla, *The Half-Truth of First-Mover Advantage*, HARVARD BUSINESS REVIEW 121, 122 (April 2005).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

contrast, under Professor Nevo's logic, in an alternative world in which Apple launched its first iPhone in 2011 instead of 2007, Apple would not have suffered any detrimental effects from the four-year delay other than the profits from those four years. Professor Nevo thinks that in such an alternative world Apple would have *immediately* reached its actual-world level of success in 2011 despite not having four earlier years of engineering expertise and brand recognition under its belt. This is in sharp contrast to defense expert Dr. Williams' statement that "It is critical for Apple to meet its product launch dates because 'delaying an iPhone launch for a month, even a month would be a catastrophic financial loss.'"[132]

56.     For all of these reasons, Professor Nevo is either wrong that "the threat of withholding CDMA chips would be empty" as Professor Nevo claims for his listed examples,[133] or he fails to consider that my No-License-No-Chips theory is not based on any requirement that Qualcomm's royalties were supra-FRAND in the 1990s and early 2000s, or he fails to consider that Qualcomm may have had alternate sources of leverage to initially coerce supra-FRAND royalties that are not inconsistent with my No-License-No-Chips theory for 2011 and beyond. Professor Nevo therefore fails to establish any examples of OEMs that do not fit my No-License-No-Chips theory of anticompetitive harm (that Qualcomm leveraged its chipset monopoly power in 2011 and beyond to impose supra-FRAND royalty rates).[134]

### D. Professor Nevo Is Incorrect That My Findings Are Inconsistent with Market Outcomes

57.     Professor Nevo argues in Section 5.4 of his report that he has evidence of OEMs to which the No-License-No-Chips theory does not apply "because they do not have a near-term requirement for Qualcomm's chips" and could therefore

---

[132] Williams Report ¶163.

[133] Nevo Report ¶112.

[134] Professor Nevo also claims in a footnote that "the incentive to challenge Qualcomm's rates would even be greater for OEMs that simultaneously entered CDMA and WCDMA license agreements" because "forgoing the profits on devices that use Qualcomm's CDMA chips for a limited period of time would allow them to avoid paying the supposedly supra-FRAND WCDMA and CDMA royalty rates." Nevo Report ¶109 n.224. Professor Nevo provides no evidence to support his assertion that an OEM could profitably choose to remain out of the 3G device market entirely for up to a four-year FRAND litigation.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

bring a FRAND challenge against Qualcomm.[135]  He first gives the example that "OEMs that signed license agreements before a given standard was commercialized could not have had a near-term requirement for Qualcomm's chips" and also claims to have examples of OEMs that signed CDMA and/or WCDMA license agreements before they had any need for Qualcomm chips.[136]  I already explained in Section II.A.2 above why the terms of older licensing agreements cannot be used to justify Qualcomm's licensing practices in 2011 and beyond.[137]  I also explained in Section II.C.4 above that Professor Nevo's methodology for determining whether an OEM has a "near-term requirement" for Qualcomm chips is incorrect.

58.     Professor Nevo next repeats his argument that the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts will operate to force Qualcomm to provide a FRAND rate to all other OEMs,[138] but I have already explained in Section II.C.2 of this report why that is incorrect.  He then repeats his claim that if the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts *don't* operate to force Qualcomm to provide similar rates to all other OEMs, then "one would expect that an OEM that had no near-term requirement for Qualcomm's chips would only agree to FRAND rates while an OEM that had a near-term requirement might, in theory, agree to an above above-FRAND rate."[139]  Because he is wrong about the operation of the non-discriminatory and most-favored-royalty-rate provisions, this claim is entirely irrelevant.

59.     Professor Nevo next claims that he has tested the prediction that there should be a "meaningful difference in royalty rates between OEMs with a potential near-term requirement and those without" and that his inability to find such a difference is inconsistent with my No-License-No-Chips theory.[140]  He introduces his testing methodology and claims he will show the application of these tests to CDMA and WCDMA licenses.[141]  Below, I will specifically explain why each of his

---

[135] Nevo Report ¶¶114-115.

[136] Nevo Report ¶115.

[137] Professor Nevo also spends much of Section 5.4 repeating his arguments from Section 5.3 of his report.  Nevo Report ¶¶114-116.  I addressed these arguments *supra* in Section II.C.

[138] Nevo Report ¶116.

[139] Nevo Report ¶116.

[140] Nevo Report ¶117.

[141] Nevo Report ¶¶118-122.  Professor Nevo states he does not "conduct similar analyses for LTE-only licenses because Plaintiffs' theory does not apply to LTE-only licenses".  Nevo Report ¶122.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

tests fails to illustrate any inconsistencies between my No-License-No-Chips theory and market outcomes. The key general points are as follows:

- Professor Nevo's entire testing paradigm rests on his mistaken assumption that there should be a difference in royalty rates between OEMs with a potential near-term requirement for Qualcomm chips and those without. He is wrong because the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts require Qualcomm to provide similar royalty rates to all OEMs.[142]

- Professor Nevo's testing methodology requires him to correctly identify OEMs that did not have a near-term requirement for Qualcomm chips during certain periods (so that he can allegedly identify a difference between a period when a chipset threat would be effective and when a threat would be ineffective). He fails to do so for at least three reasons: (1) he is wrong that Qualcomm's threat to withhold chips was standard-specific,[143] (2) he mistakenly assumes that Qualcomm could not have used WCDMA chipset sales to leverage supra-FRAND royalty rates prior to 2011,[144] and (3) the actual threat to OEMs of losing Qualcomm chip supply during a FRAND challenge (the delay of all device business for two to four or more years, which would permanently cripple the business) was much greater than just the lost profits on device sales in the two years following a licensing agreement.[145]

- Professor Nevo's testing methodology is based on his mistaken assumption that my No-License-No-Chips theory requires Qualcomm's rates to have been supra-FRAND since the 1990s, but my No-License-No-Chips theory is not based on such a requirement. It would be unsurprising for Qualcomm's running royalty rate for an OEM to not meaningfully differ between a past when there was allegedly no chipset leverage and a present when there is chipset leverage (even assuming Professor Nevo can correctly establish this premise, which he does not) if that royalty rate would not have been considered supra-FRAND in the past but would be considered supra-FRAND now.[146]

---

This is correct because, as I explained in the Elhauge Report and acknowledged by Professor Nevo, single-mode LTE phones have not been sold in the US. Elhauge Report ¶38.

[142] Elhauge Report ¶39; *see also supra* Section II.C.2.

[143] Elhauge Report ¶¶28-33, 38; *see also supra* Section II.C.4.a.

[144] *See also supra* Section II.C.4.b.

[145] *See also supra* Section II.C.4.b.

[146] *See also supra* Section II.C.4.b.

35

*1. Professor Nevo's "Tests" Are Incorrect and Irrelevant as He Applies Them to CDMA2000*

60.    Professor Nevo first repeats an earlier claim that "Qualcomm entered into CDMA agreements with nearly all then-major OEMs before CDMA was commercialized and before Qualcomm sold a single chip, and in many cases before the CDMA standard was even adopted, and so before Qualcomm could have withheld CDMA chips from the OEMs" and that this makes those agreements satisfy his ex-ante FRAND framework.[147]    He points to examples of CDMA license agreements executed between OEMs and Qualcomm prior to the first commercial release of CDMA2000 and claims that "all of these OEMs could have challenged Qualcomm's royalties if they viewed them to be unfair or unreasonable."[148]    But Professor Nevo is incorrect to assume that my No-License-No-Chips theory—that Qualcomm is using its CDMA2000 and premium-LTE chipset monopoly power since 2011 to coerce and maintain supra-FRAND royalty rates for Qualcomm's cellular SEPs during the relevant time period of 2011 onward—requires Qualcomm's royalty rates to have been challenged by OEMs in the 1990s.  I already explained in Section II.A.2.a above that the same nominal running royalty rate could be FRAND in the past but become supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength.    Thus, Professor Nevo's observations about OEMs that did not challenge Qualcomm's royalty rates in the 1990s are irrelevant.

61.    Professor Nevo next presents a chart that he claims shows "the running royalty rates specified in each OEM's initial CDMA license agreement" from January 1990 to December 2017.[149]    He uses this data for his "CDMA Test 1" and claims that "Professor Elhauge has failed to explain why license agreements that were signed before Qualcomm allegedly had market power are not FRAND."[150]    His flawed logic underlying his test is as follows:

> for Qualcomm's royalty rates to possibly be supra-FRAND, the royalty rates should have increased at the point at which it obtained monopoly power or over the period over which it gained that monopoly power. That is, if Qualcomm's original license agreements are FRAND (because they were either signed ex ante or they were signed before

---

[147] Nevo Report ¶123.
[148] Nevo Report ¶¶124-125.
[149] Nevo Report ¶¶126-127.
[150] Nevo Report ¶128.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Qualcomm had monopoly power), then in order for the more recent ones to be supra-FRAND one would expect to see a jump, or break, in the royalty rates Qualcomm obtained, or a slower upward trend in Qualcomm's royalty rates if the monopoly power took effect gradually.[151]

Professor Nevo concludes that neither his visual depiction of the data in Exhibit 3 nor a regression analysis finds that contractual royalty rates rose at some point. Aside from the empirical issues with this test (which render it wholly unreliable),[152] this analysis does not test any necessary implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue.  Professor Nevo's Test 1 is based on his mistaken assumption that my No-License-No-Chips theory requires Qualcomm's contractual (i.e. nominally listed in the contract) CDMA royalty rates to have increased at some point when Qualcomm gained CDMA2000 chipset monopoly power.  But my No-License-No-Chips theory is not based on such a requirement.  It would be unsurprising for Qualcomm's contractual royalty rate for an OEM to not meaningfully differ between a past when there was allegedly no chipset leverage and a present when there is chipset leverage (even assuming Professor Nevo can correctly establish this premise, which he does not) if that royalty rate would not have been considered supra-FRAND in the past but would be considered supra-FRAND now due to changes in device features, device usage, and patent portfolio strength.[153]

---

[151] Nevo Report ¶129.

[152] There are at least three issues with Professor Nevo's analysis, any of which alone renders it unreliable.  First, Professor Nevo's analysis inexplicably includes OEMs with no sales within the United States (*see* Elhauge Backup), whereas I explain in the Elhauge Report that "whether Qualcomm used [its] global monopoly power to anticompetitively restrain competition outside of the United States does not necessarily determine whether Qualcomm did so within the United States."  Elhauge Report ¶26.  Second, Professor Nevo inexplicably used the *nominal* royalty rate stated in the license agreements (*see* Nevo Report at Exhibit 3 & Appendix E4), rather than the effective supra-FRAND overcharge paid by the OEM, which is what his mistaken theory actually suggests should change in response to a change in monopoly power.  And third, he excludes Nokia's 2008 Agreement from the analysis because it includes a large upfront royalty payment (*see* Nevo Report at Exhibit 3 & Appendix E4), but he fails to consider that many other OEMs' licensing agreements also contain lump-sum payments.  Elhauge Report n.82.  Although Professor Nevo claims that Nokia's $2.5 billion upfront royalty payment was in part "used to cover unpaid royalties on units purchased before license signing" (Nevo Report at Appendix E4), he does not explain why this justifies his failure to consider the amount and extent to which the lump-sum fees in Qualcomm's other license agreements served to offset various obligations or provide incentives.

[153] *See also supra* Section II.C.4.b.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

62.    Professor Nevo next presents his "CDMA Test 2", in which he purports to measure the upfront payment specified in each OEM's CDMA license agreement and find that "[t]here is no economically meaningful difference between upfront payments before and after the launch of the first commercial networks (cdmaOne or CDMA2000) or after the beginning of the class period."[154]  This analysis does not test any necessary implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue.  The No-License-No-Chips theory does not rely on any finding that Qualcomm has used its chipset leverage to increase upfront payments from OEMs.

63.    Professor Nevo next presents his "CDMA Test 3", in which he purports to "analyze the relationship between the effective royalty rate that each OEM paid on CDMA licenses and the share of its CDMA chip purchases that it made from Qualcomm in the years immediately following the date of the agreement."[155]  He claims that the share of CDMA chip purchases from Qualcomm allows him to

> analyze the extent to which an OEM sources chips from Qualcomm that are relevant to the license and on which Professor Flamm claims Qualcomm had monopoly power. . . .  Since this analysis analyzes the potential threat, or lack thereof, that Qualcomm had on an OEM during license negotiations, zero chip purchases from Qualcomm reflect no potential threat whether or not the OEM purchased chips from another source.[156]

Professor Nevo claims that "an analysis of the relationship between the effective royalty rate and Qualcomm's share does not show an economically meaningfully relationship between the royalty rate and share of chips purchased from Qualcomm", and he also claims that any observations where an OEM did rely 100% on Qualcomm for CDMA chips and also pay a higher effective royalty rate are just outliers based on very low CDMA device sales.[157]  Aside from the empirical issues with this test (which render it wholly unreliable),[158] this analysis does not test any

---

[154] Nevo Report ¶130.

[155] Nevo Report ¶131.

[156] Nevo Report ¶132.

[157] Nevo Report ¶¶134-135.

[158] There are at least two issues with Professor Nevo's analysis, either of which alone renders it unreliable.  First, Professor Nevo's analysis inexplicably includes OEMs with no sales within the United States (*see* Elhauge Backup), whereas I explain in the Elhauge Report that "whether Qualcomm used [its] global monopoly power to anticompetitively restrain competition outside of the United States does not necessarily determine whether Qualcomm did so within the United

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

necessary implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue, as I explain further next.

64.    First, Professor Nevo's Test 3 is based on his mistaken assumption that my No-License-No-Chips theory requires Qualcomm's effective royalty rates to be higher for those OEMs which face a greater potential "threat" from loss of Qualcomm chip supply (based on Nevo's measure). But, I have explained that the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts require Qualcomm to provide similar royalty rates to all OEMs.[159] Furthermore, ties often inflate the price of the tied product, but there is no evidence that those inflated tied product prices usually vary with the buyers' needs for the tying product. Usually the same inflated tied price is imposed throughout the market. For example, printers are generally tied to cartridges sold at inflated prices, but those inflated cartridge prices are the same for all buyers. Nor, more generally, does using exclusionary conduct to increase monopoly power usually or necessarily mean that the monopolist will be able to exercise that power in a discriminatory fashion by charging more to some buyers than others.

65.    Second, Professor Nevo tests royalty rates as far back as the 1990s. For example, he measures Samsung's royalty rates only from 1993 to 2004.[160] He is

---

States." Elhauge Report ¶26. Second, Professor Nevo's definition of effective royalty rate fails to account for consideration provided by the OEMs to Qualcomm, especially in the form of cross-licenses. He defines the effective royalty rate as "the total running royalties the OEM reported over the period by the total net revenue base" and the gross effective royalty rate as "the total running royalties the OEM reported over the period by the total gross revenue." Nevo Report ¶131. However, Professor Nevo also acknowledges, "As part of its license agreements, Qualcomm generally receives a nonexclusive cross-grant for the licensee's SEPs and non-SEPs". Nevo Report ¶50. Professor Nevo's analysis purports to test the relationship between an OEM's dependence upon Qualcomm and the consideration paid by that OEM to Qualcomm, but this test is obviously incomplete if a significant proportion of that consideration—the cross-license granted by the OEM to Qualcomm—is missing from the analysis. Although Mr. Lasinski's supra-FRAND calculations also do not account for cross-licenses, this is conservative with respect to his objective (which is to measure the supra-FRAND portion of the running royalty as a lower bound for damages, *see* Lasinski Report ¶31), whereas Professor Nevo is improperly attempting to model an empirical relationship without correctly measuring his variables.

[159] Elhauge Report ¶39; *see also supra* Section II.C.2.

[160] Nevo Report ¶134 n.256.

39

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

thus testing royalties in time periods that are irrelevant to my analysis of the effects of Qualcomm's No-License-No-Chips policy in 2011 and beyond.[161]

66.    Third, Professor Nevo arbitrarily assumes that the "threat" in my No-License-No-Chips theory can be measured as the share of an OEM's CDMA chip purchases from Qualcomm in the two years immediately following the execution of an agreement.  He claims that

> This measure assumes that OEMs make chip sourcing decisions up to two years before paying royalties. Analyzing the first two years after an OEM signed a license overstates the degree to which the OEM's negotiations with Qualcomm could have been affected by any "threat" of withholding chip supply because most OEMs likely were aware of the need for a Qualcomm license significantly before signing the license agreement.[162]

I already explain above in Section II.C.4 that any "threat" to OEMs of losing Qualcomm chip supply during a FRAND challenge (which includes the delay of all device business for two to four or more years, permanently crippling the business) is much greater than just the lost profits on device sales in the two years following a licensing agreement.  And although Professor Nevo implies that Qualcomm's threat of withholding chip supply would be even weaker because OEMs would be "aware" of needing Qualcomm chips prior to signing an agreement, he fails to consider that an OEM would have no incentive or need to bring a FRAND challenge until it became aware it would not get a FRAND rate through negotiation.

## 2. Professor Nevo's "Tests" Are Incorrect and Irrelevant as He Applies Them to WCDMA

67.    Professor Nevo first repeats his claim that "Professor Elhauge has not offered a mechanism through which Qualcomm could tie its CDMA chips to WCDMA license agreements."[163]   I have already explained why this is incorrect above in Section II.C.4.  I show there that during the relevant time period for my

---

[161] As I have previously explained, a royalty rate may not have been considered supra-FRAND in the past but could be considered supra-FRAND now due to changes in device features, device usage, and patent portfolio strength. *See also supra* Section II.C.4.b.  Moreover, Professor Nevo fails to show that Qualcomm could not have used WCDMA chipset power to leverage supra-FRAND royalty rates prior to 2011.  *See supra* Section II.C.4.b.

[162] Nevo Report ¶133.

[163] Nevo Report ¶136.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

analysis (which is 2011 and beyond), Qualcomm did condition the supply of CDMA2000 chips on WCDMA licenses. I further show there that even Professor Nevo acknowledges the theory that Qualcomm could use premium-LTE monopoly power to coerce supra-FRAND WCDMA royalties (he acknowledges this only for 2009 onward, but this is sufficient to support my No-License-No-Chips analysis for the relevant time period).

68.    Professor Nevo next purports to "analyze the relationship between OEMs near-term requirements for LTE chips at the time they signed WCDMA licenses and their WCDMA royalty terms" but "not find any economically meaningful relationship."[164] He limits his analysis to "WCDMA license agreements or amendments that were not signed coincident with the OEM obtaining a CDMA license", but this is again based on his entirely mistaken belief that Qualcomm's No-License-No-Chips tie was standard-specific (and that therefore, according to him, any OEM needing both technologies would sign a CDMA license and bring a FRAND challenge against the WCDMA license).[165] This mistaken belief renders all of Professor Nevo's WCDMA "tests" fatally deficient.[166] Similarly, Professor Nevo's "tests" fail to consider that the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts require Qualcomm to provide similar royalty rates to all OEMs.[167]

---

[164] Nevo Report ¶136.

[165] Nevo Report ¶137.

[166] Professor Nevo also parrots his arguments from earlier sections of his report. Nevo Report ¶137 nn.258,260. I have already addressed these arguments.

[167] Elhauge Report ¶39; *see also supra* Section II.C.2. Furthermore, even if one were to counterfactually believe there is merit in examining WCDMA-only licenses, Professor Nevo's designation of WCDMA-only agreements appears to have flaws. Professor Nevo claims that "A license agreement is a WCDMA-Only license if it introduces WCDMA royalty rate without introducing CDMA royalty rate on the same day." Nevo Report at Exhibit 8. However, he fails to consider Qualcomm's position (made clear in a Qualcomm submission to the Japanese FTC) that the "broad grant language" of many older cdmaOne an CDMA2000 licensing agreements covered WCDMA technology. Q2017MDL8 00007277 at 84. For example, Professor Nevo includes in his analysis as ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, even though Qualcomm has explicitly stated that ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛ from its inception, *id.*, which means it actually fails Professor Nevo's definition of WCDMA-only. *See* "7_WCDMA Licensee Timeline.xlsx" and "8 WCDMA Contractual Rates Timeline.xlsx" from the Nevo Backup (including MOT-04810, the ⬛⬛⬛⬛⬛⬛⬛⬛).

41

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

69.     Professor Nevo points to the existence of WCDMA-only license agreements starting from January 2000 that were signed "prior to Qualcomm selling any LTE chipsets" or "to the LTE standard becoming stable in March 2009."[168]  He presents a timeline "of WCDMA-only license agreements in relation to the adoption of the WCDMA standard and Qualcomm's first sales of WCDMA and LTE chips" and claims that

> Qualcomm signed 17 WCDMA-only license agreements before the commercial launch of the first WCDMA network and an additional 51 WCDMA-only license agreements before it sold any LTE chips. There is no reason that any supposed monopoly power Qualcomm eventually gained in Plaintiffs' claimed "premium" LTE chip market would have affected the negotiation process for these license agreements.[169]

Professor Nevo is incorrect to assume that my No-License-No-Chips theory—which is that Qualcomm is using its CDMA2000 and premium-LTE chipset monopoly power since 2011 to coerce and maintain supra-FRAND royalty rates for Qualcomm's cellular SEPs during the relevant time period of 2011 onward—requires Qualcomm's WCDMA royalty rate negotiations to have been affected by CDMA2000 or premium-LTE chipset leverage in the early 2000s.  I already explained in Section II.A.2.a above that the same nominal running royalty rate could be FRAND in the past but become supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength.  Moreover, I explained in Section II.C.4.b above that Professor Nevo fails to establish that any pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales.  Thus, Professor Nevo's observations about WCDMA licenses signed in the early 2000s are irrelevant.

70.     Professor Nevo next presents a chart that he claims to show the contractual royalty rates specified in the WCDMA-only license agreements.[170]  He uses this data for his "WCDMA Test 1" and claims to show (both visually and through regression analysis) that "There is no economically meaningful difference between the running royalty terms in WCDMA-only licenses that were signed prior to Qualcomm selling LTE chips."[171]  Aside from the empirical issues with this test

---

[168] Nevo Report ¶138.
[169] Nevo Report ¶139.
[170] Nevo Report ¶140.
[171] Nevo Report ¶141.

42

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

(which render it wholly unreliable),[172] this analysis does not test any necessary implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue. Professor Nevo's WCDMA Test 1 is based on his mistaken assumption that my No-License-No-Chips theory requires Qualcomm's nominal CDMA royalty rates to have increased when Qualcomm started selling premium-LTE chips. But my No-License-No-Chips theory is not based on such a requirement. As I have already explained in this section, the earlier observed royalty rates may be due to the fact that the same nominal royalty rates previously were not supra-FRAND, or due to the fact that non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts required Qualcomm to offer similar royalty rates, or due to the fact that Qualcomm had WCDMA chipset leverage prior to 2011, or due to the fact that Qualcomm did use CDMA2000 chipset leverage for WCDMA licensing terms.

71.     Professor Nevo next presents his "WCDMA Test 2", in which he purports to measure the upfront payment specified in each WCDMA-only license agreement and find that there is "no significant increase in upfront payment terms after Qualcomm began selling LTE chips."[173]   This analysis does not test any necessarily implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue. The No-License-No-Chips theory does not rely on any finding that Qualcomm has used its chipset leverage to increase upfront payments from OEMs.

72.     Professor Nevo next presents his "WCDMA Test 3", in which he purports to analyze "the relationship between the effective royalty rate (and gross effective royalty rate) that each OEM paid on WCDMA-only licenses and the OEM's reliance on Qualcomm's LTE chips in the first few years of the license agreement."[174] Professor Nevo claims to "find no support for Plaintiffs' theory that

---

[172] There are at least two issues with Professor Nevo's analysis, either of which alone renders it unreliable. First, Professor Nevo's analysis inexplicably includes OEMs with no sales within the United States (*see* Elhauge Backup), whereas I explain in the Elhauge Report that "whether Qualcomm used [its] global monopoly power to anticompetitively restrain competition outside of the United States does not necessarily determine whether Qualcomm did so within the United States." Elhauge Report ¶26. Second, Professor Nevo inexplicably used the *nominal* royalty rate stated in the license agreements (*see* Nevo Report at Exhibit 8 & Appendix E8) rather than the effective supra-FRAND overcharge paid by the OEM, which is what his mistaken theory actually suggests should be affected by whether Qualcomm is selling premium-LTE chips.

[173] Nevo Report ¶142.

[174] Nevo Report ¶143.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

predicts a positive relationship between effective royalty rates paid pursuant to WCDMA licenses and OEMs' shares of LTE-compatible chip purchases from Qualcomm."[175]  Aside from the empirical issues with this test (which render it wholly unreliable),[176] it does not test any necessary implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue.

73.    First, Professor Nevo's WCDMA Test 3 wrongly assumes without explanation that if Qualcomm used its tie to impose a supra-FRAND overcharge on SEP licenses to OEMs, that the level of overcharge would vary with the percentage of LTE-compatible chips the OEM bought from Qualcomm.  There is no reason to think that is true in theory or in fact.  As I explained above in Section II.D.1 (when Professor Nevo performed this same "test" for CDMA), neither economic theory nor empirical evidence indicates that inflated tied product prices usually vary with the buyers' needs for the tying product.  Nor, more generally, does using exclusionary conduct to increase monopoly power usually or necessarily mean that the monopolist will be able to exercise that power in a discriminatory fashion by charging more to some buyers than others.

74.    Second, even if tying generally led to tied product prices that varied with buyer need for the tying product, the ability to engage in such price discrimination on the tied royalties is particularly implausible here because even if Qualcomm could dispute the level of royalty required by its FRAND commitment, the FRAND commitment clearly required nondiscriminatory royalties, as did the most-favored-royalty-rate provisions of Qualcomm's contracts.  Thus, even if the tie increased the level of Qualcomm's royalty rates, these undisputed features of the

---

[175] Nevo Report ¶144.

[176] There are at least two issues with Professor Nevo's analysis, either of which alone renders it unreliable.  First, Professor Nevo's analysis inexplicably includes OEMs with no sales within the United States (*see* Elhauge Backup), whereas I explain in the Elhauge Report that "whether Qualcomm used [its] global monopoly power to anticompetitively restrain competition outside of the United States does not necessarily determine whether Qualcomm did so within the United States."  Elhauge Report ¶26.  Second, Professor Nevo's definition of effective royalty rate fails to account for consideration provided by the OEMs to Qualcomm, especially in the form of cross-licenses.  He defines the effective royalty rate as "as the total running royalties the OEM reported over the period divided by the total net revenue base over this period."  Nevo Report ¶143.  For the same reasons I explain *supra* in Section II.D.2 with respect to the same test Professor Nevo performs for CDMA, his analysis obviously incomplete if a significant proportion of that consideration—the cross-license granted by the OEM to Qualcomm—is missing from the analysis.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

FRAND commitment and Qualcomm's contracts would prevent precisely the sort of variation in royalty rates that Professor Nevo finds missing, as I have explained.[177]

75.    Third, Professor Nevo's WCDMA Test 3 arbitrarily assumes that the "threat" in my No-License-No-Chips theory can be measured as the share of an OEM's premium-LTE chip purchases from Qualcomm in the two years immediately following the execution of an agreement.  I already explain above in Section II.C.4 that any "threat" to OEMs of losing Qualcomm chip supply during a FRAND challenge (which includes the delay of all device business for two to four or more years, permanently crippling the business) is much greater than just the lost profits on device sales in the two years following a licensing agreement.

76.    For all of the reasons in Sections II.D.1 and II.D.2 of this report, Professor Nevo is wrong to claim both that he has demonstrated "that there is no evidence of relationship between OEMs' royalty terms (and royalty reports) and their near-term demand for Qualcomm chips" and that any such finding (if it were to be made) "is inconsistent with Professor Elhauge's claim that Qualcomm's licensing and business practices allowed it to obtain supra-FRAND royalties by leveraging its alleged chips power."[178]

### 3. Professor Nevo's Comparison of WCDMA and CDMA Royalties is Irrelevant

77.    Professor Nevo claims that because I "failed to offer a mechanism through which Qualcomm could have tied its CDMA chips to WCDMA licenses" and because Mr. Lasinski opines that the FRAND rate for Qualcomm's CDMA portfolio exceeds that of Qualcomm's WCDMA portfolio, that the implication of these two facts is that one should observe Qualcomm having higher CDMA royalty rates than WCDMA-only royalty rates prior to 2010 (when Qualcomm started selling LTE chips).[179]  Professor Nevo then claims to empirically demonstrate that this is not true based on a comparison of Qualcomm's contractual CDMA and WCDMA-only royalty rates.[180]  Aside from the empirical issues with this analysis (which render it wholly unreliable),[181] this analysis does not test any necessary

---

[177] Elhauge Report ¶39; *see also supra* Section II.C.2.

[178] Nevo Report ¶145.

[179] Nevo Report ¶146.

[180] Nevo Report ¶147.

[181] There are at least two issues with Professor Nevo's analysis, either of which alone renders it unreliable.  First, Professor Nevo's analysis inexplicably includes OEMs with no sales within the

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

implication of my No-License-No-Chips theory, and is therefore uninformative of any relevant issue. This analysis rests entirely on Professor Nevo's assumption that there is no "mechanism through which Qualcomm could obtain supra-FRAND WCDMA-only royalty rates prior to 2010",[182] but I explained in Section II.C.4 above that this Professor Nevo assumption is mistaken, which renders his analysis moot.

### E. Professor Nevo's Discussion of Strategic and Marketing Funds is Not Relevant to My Analysis

78.     In Section 5.5 of his report, Professor Nevo makes various claims about Qualcomm's use of strategic and marketing funds. The Elhauge Report explains that Qualcomm counsel have represented that Qualcomm's chipset data includes "all types of incentives Qualcomm has provided its customers… There are no types of incentives provided to customers that are excluded from the [chipset data]."[183] Thus, any analysis of Qualcomm's data already accounts for any strategic and marketing funds. Professor Nevo explicitly leaves the analysis of Qualcomm's Apple payments to Dr. Chipty, and I respond to Dr. Chipty's incorrect arguments below in Sections XIII and XIV. Therefore, Professor Nevo's Section 5.5 is irrelevant to my analysis of Qualcomm's No-License-No-Chips tie. I offer no opinion on whether Qualcomm's use of strategic and marketing funds is anticompetitive, nor on whether any arguments or factual premises limited to Section 5.5 of Professor Nevo's report are correct.

---

United States (*see* Elhauge Backup), whereas I explain in the Elhauge Report that "whether Qualcomm used [its] global monopoly power to anticompetitively restrain competition outside of the United States does not necessarily determine whether Qualcomm did so within the United States." Elhauge Report ¶26. Second, Professor Nevo inexplicably used the *nominal* royalty rate stated in the license agreements (*see* Nevo Report at Exhibit 11 & Appendix E14), rather than the effective supra-FRAND overcharge paid by the OEM, which is what his mistaken theory actually suggests should differ between CDMA2000 and WCDMA-only licenses.

[182] Nevo Report ¶147.
[183] Elhauge Report n.290.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### F. Professor Nevo is Incorrect That the Evidence Fails to Support My Findings

79.     Professor Nevo argues in Section 5.6 of his report that my report presents only "indirect evidence" to support my No-License-No-Chips analysis.[184] He is incorrect that OEMs testifying that in their negotiations Qualcomm's threat to withhold chipset supply raised Qualcomm's royalty rates to supra-FRAND levels is "indirect" evidence.  Rather, this evidence, in conjunction with Mr. Lasinski's finding of supra-FRAND royalty rates, directly establishes that the chipset leverage causes a supra-FRAND royalty rate.   Professor Nevo is similarly wrong that Qualcomm business planning documents that state Qualcomm succeeded in raising royalties through the use of chipset leverage are "indirect" evidence, when they in fact directly prove (in conjunction with Mr. Lasinski's finding of supra-FRAND royalty rates) that Qualcomm found its No-License-No-Chips tie to have the effect of raising Qualcomm's royalty rates.

80.     Professor Nevo claims to disagree with my analysis of deposition testimony and business planning documents, disagree with my review of Qualcomm documents, and also claims that Mr. Lasinski's analysis does not support my No-License-No-Chips analysis.[185]  I respond to his mistaken contentions below.

### 1. Professor Nevo Arbitrarily Dismisses Evidence Concerning Licensing Negotiation Outcomes

81.     Professor Nevo first repeats his mistaken claim that the existence of a myriad of negotiation factors counters my findings,[186] but I explain above in Section II.C.3 why this is incorrect.  Professor Nevo next asserts that it is important to analyze outcomes "rather than documents and communications".[187]   Although I agree with Professor Nevo that it is good to focus on outcomes, I disagree with his implicit claim that "documents and communications" cannot serve as evidence of outcomes.  By Professor Nevo's logic, a Qualcomm e-mail that communicates "we have succeeded in raising royalties to supra-FRAND levels by using our leverage in

---

[184] Nevo Report ¶158.  Professor Nevo claims he has tested the No-License-No-Chips tie "directly" through his "empirical analysis" but I have explained in Section II.D above why all of his tests are deeply flawed and misguided.
[185] Nevo Report ¶159.
[186] Nevo Report ¶161.
[187] Nevo Report ¶161.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

CDMA2000 chipsets" would not be evidence of an outcome, because it is a document or communication.  Professor Nevo purports to cite to the writing of Professors Kaplow and Shapiro for his proposition that one should not examine "documents and communications", but the quote he cites says no such thing.[188]  The quote actually says that there can be pitfalls in analyzing a defendant's internal *decision-making* or *intent* because *aggressive rhetoric* may confuse juries.[189]  None of my conclusions are based on an analysis of Qualcomm's rhetoric.

82.     After attempting to blanket dismiss "documents and communications" as valid evidence, Professor Nevo next tries to respond to the specific evidence on negotiations.  I address his mistaken contentions below.

## a. Professor Nevo incorrectly claims that analyzing negotiations cannot support my No-License-No-Chips analysis.

83.     Professor Nevo attempts to generally denigrate my analysis of negotiations by claiming that, instead of analyzing outcomes, this approach can only "analyze what factors may have affected negotiation outcomes."[190]  He also claims that this only provides "subjective information" about what participants thought during negotiations.[191]  These claims appear to be linked to the mistaken contentions by Professor Nevo above that "documents and communications" cannot serve as evidence of outcomes, but I explained at the start of this Section II.F why he was mistaken and that he only even tries to support this claim for evidence of aggressive rhetoric in decision-making or intent.  By contrast, the evidence and documents I analyze pertaining to negotiations are direct evidence of how OEMs were threatened by Qualcomm's potential chipset supply disruption and how these threats coerced higher royalty rate concessions during negotiations.  Professor Nevo's related argument that this evidence only shows what participants "might have subjectively thought" about the negotiation process is flawed because *any* deposition testimony involves the deponent recalling and interpreting documents and communications, which means Professor Nevo has simply defined all deposition testimony as "subjective" and can arbitrarily dismiss any deposition testimony that does not fit his own narrative.

---

[188] Nevo Report ¶161.
[189] Nevo Report ¶161.
[190] Nevo Report ¶¶162-163.
[191] Nevo Report ¶163.

48

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

84.    Moreover, Professor Nevo's position on testimony is internally inconsistent because he himself draws conclusions about negotiations from deposition testimony.    For example, he asserts that Samsung's 2018 license amendment was negotiated "in the absence of any concern over a threat of a disruption of chip supply" and he bases this contention on depositions from two Samsung employees in which they testified that they believed there was no coercion or threat to stop chip supply.[192]  Professor Nevo does not explain why he does not dismiss these statements as improper evidence of what participants "might have subjectively thought" about the negotiation process, when he dismisses my use of the same type of deposition testimony for the same purpose.

85.    Furthermore, Professor Nevo attacks a straw man by belittling the evidence on negotiations in isolation, when my review of this evidence and any conclusions I draw from this evidence are also supported by all of the *other* evidence in this case, including on how (according to Mr. Lasinski) Qualcomm's rates were in fact supra-FRAND and how Qualcomm documents confirm that Qualcomm's No-License-No-Chips policy drove this outcome.[193]  Professor Nevo may also disagree with the implications of the other evidence (which I show to be incorrect below in Section II.F.2) but his attempts to attack individual categories of evidence and then completely dismiss them one-by-one is misguided because my opinions are based on a holistic review of the evidence.

86.    Professor Nevo separately contends that the evidence is limited because it describes only "instances in which OEMs are renegotiating (or hoping to renegotiate) existing license agreements, negotiating new license agreements following the expiration (or termination) of an existing license agreement, or general testimony of OEMs' representatives regarding their view of Qualcomm's chip-supply leverage."[194]  His objection to any of these categories of evidence makes no sense because Professor Nevo seems to be implying that how OEMs viewed Qualcomm's chip-supply leverage is not probative; this is obviously wrong because it is directly relevant in an investigation of how Qualcomm used its chip-supply leverage against OEMs.  Professor Nevo argues that my analysis is "limited" in focusing on renegotiations or renewals of existing licenses because negotiations can also involve agreements on a new license, which he argues cannot be affected by chip supply leverage.[195]  But as I explain in Sections II.A-D, Professor Nevo has

---

[192] Nevo Report ¶209 & n.359.
[193] Elhauge Report § III.B.1.
[194] Nevo Report ¶164-166.
[195] Nevo Report ¶165.

49

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

neither shown that such initial licenses were not affected by chip leverage, nor explained why, even if those initial nominal royalty rates were FRAND, they would remain a FRAND rate even though in later years Qualcomm's patents provided a much smaller percentage of phone value given changes in device features, device usage, and the strength of Qualcomm's patent portfolio.[196]  His arguments about renegotiated or renewed licenses suffer from the same errors because they assume the initial license was reasonable or that Qualcomm lacks chip leverage over the OEM.[197]

## b. Professor Nevo analyzes the outcomes selectively and arbitrarily, dismissing key evidence showing the results of Qualcomm's No-License-No-Chips tie.

87.    Professor Nevo first repeats his contention that the Elhauge Report "simply looks at the negotiation process and then assumes that the outcomes must have been affected by Qualcomm's use of chip-supply leverage"[198] but I explain above in Section II.F.1.a why he is incorrect on this point.  He then claims that he will show that actual negotiation outcomes are inconsistent with my analysis for all of my examples.[199]  I respond to his individual contentions below.

88.    _Apple:_ Professor Nevo claims my analysis of how Apple witnesses state they pay higher royalties to Qualcomm because of Qualcomm's chipset leverage is wrong "because it ignores the fact that Apple produced iPhones and indirectly paid Qualcomm's royalties for four years before it sold a single iPhone with a Qualcomm chip."[200]  Professor Nevo argues that because Apple produced iPhones from 2007 to 2011 without using Qualcomm chips, it could have challenged Qualcomm's royalties anytime up to 2011, including as early as 2005 "when it began negotiations with Qualcomm".[201]  This is incorrect for several reasons.

---

[196] _See supra_ Section II.A.2.a.
[197] Nevo Report ¶165
[198] Nevo Report ¶167.
[199] Nevo Report ¶¶167-169.
[200] Nevo Report ¶170.  Professor Nevo also states that "More generally, market facts do not support a claim that Qualcomm used the threat of withholding chip supply to 'force' Apple to pay supra-FRAND royalties (directly or indirectly) or that this threat prevented Apple from challenging Qualcomm's royalty terms prior to 2017." _Id._  But he does not point to any additional market facts in his discussion of Apple, other than his claim that Apple could have challenged Qualcomm's royalty terms prior to 2011, when it first started using Qualcomm chips.  Thus, this does not appear to be an independent argument.
[201] Nevo Report ¶¶170-171.

50

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

89.    First, Professor Nevo's assumption that Apple could have challenged Qualcomm's royalties in 2005 when negotiations first began is entirely unfounded, because it assumes that Apple should have sued Qualcomm immediately upon initiating, or shortly after initiating, negotiations.  Professor Nevo provides no sound reason to think that Apple would have had an incentive or need to sue Qualcomm before Apple became aware that Qualcomm would not provide a license on FRAND terms through negotiation.

90.    Second, Professor Nevo ignores the evidence in the Elhauge report describing Apple testimony that "all of our CMs are licensees. And all of our CMs need those chips. And so they acquiesced to license terms that I think each must feel are unfair and exorbitant."[202]  Professor Nevo does not explain how Apple could have avoided royalties that its CMs needed to pay if those CMs had requirements for Qualcomm chips.

91.    Third, Professor Nevo fails to consider that Apple's need for Qualcomm chips arose long before 2011.  Bruce Sewell (Apple's former GC) testified that Apple could not have challenged Qualcomm's FRAND rates in 2009 or 2010 without great risk to Apple because even if Apple wasn't currently buying Qualcomm chips "that doesn't mean that we weren't working with Qualcomm on future generations of chips that we were anticipating in 2011 and that that business might have been at risk."[203]  For example, Apple was requesting samples of Qualcomm's chips as early as August 2009.[204]

92.    *BlackBerry:*  Professor Nevo claims my analysis of BlackBerry is inconsistent with the circumstances of the negotiations and their outcomes because "BlackBerry signed its original patent license agreement with Qualcomm for CDMA technology in March 2000, two years before BlackBerry reported royalties to

---

[202] Elhauge Report ¶48.

[203] Bruce Sewell (Apple former GC) Dep. at 83:8-84:5 ("Q. You didn't demand arbitration against Qualcomm in 2009 to set a FRAND rate as far as you know? A. We did not. Q. And you didn't demand arbitration against Qualcomm in 2010 to set a FRAND rate, did you? A. We didn't. Q. You could have done those things in 2009 and 2010.... [A.] Not without great risk to the company. ... Q. At what risk? A. Loss of chips. Q. In 2009 and 2010? A. Certainly. Q. I am going to represent to you again that Apple had never purchased a Qualcomm chip in 2009 and 2010.  A. But that doesn't mean that we weren't working with Qualcomm on future generations of chips that we were anticipating in 2011 and that that business might have been at risk.").

[204] AAPL-FTC-00012040.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Qualcomm on handsets using CDMA technology" and "BlackBerry's license agreement was amended effective March 21, 2001, to include WCDMA technology, nine years before Qualcomm launched LTE-compatible Chips."[205] Professor Nevo claims that as a result, "Qualcomm could not have used the chip-supply leverage described by Professor Elhauge to affect either negotiation" and that BlackBerry's subsequent October 2010 renegotiation could only have been on better terms than the previous ones.[206] Professor Nevo's contentions here suffer from the same flawed assumptions I have already disproven, that (1) BlackBerry could not have been affected by chipset leverage in 2000 or 2001, when Professor Nevo has not established this fact,[207] and (2) BlackBerry's royalty rates should be considered reasonable in 2011 onward if the same nominal royalty rate was reasonable in the early 2000s, even though in 2011 and later years Qualcomm's patents provide a much smaller percentage of phone value given changes in device features, device usage, and the strength of Qualcomm's patent portfolio.[208]

93.     *LG Electronics:* Professor Nevo claims my analysis of LG Electronics is inconsistent with the terms in LG's license agreements.[209] Professor Nevo first claims that LG's 1993 license agreement "conformed to the structure of the model license agreement prepared by the Korean government" and "this agreement came several years before Qualcomm began selling CDMA chips, so Qualcomm could not have used chip-supply leverage to obtain supra-FRAND royalty rates."[210] He also claims that subsequent amendments could not have been any worse than these initial license terms.[211] Professor Nevo does not cite any authority for his claim that a license agreement prepared by the Korean government means that agreement is FRAND and means that anticompetitive conduct could not have affected the agreement. Professor Nevo's contentions also suffer from the same flawed assumptions I have already disproven that LG's royalty rate should be considered reasonable in later years if the same nominal rate was reasonable in 1993, even though in later years Qualcomm's patents provide a much smaller percentage of

---

[205] Nevo Report ¶¶172-173.
[206] Nevo Report ¶¶173-174.
[207] I explained in Section II.C.4.b above that Professor Nevo fails to establish that pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales.
[208] *See supra* Section II.A.2.a.
[209] Nevo Report ¶175.
[210] Nevo Report ¶176.
[211] Nevo Report ¶¶177, 179.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

phone value given changes in device features, device usage, and the strength of Qualcomm's patent portfolio.[212]

94.    Professor Nevo also claims that in a July 2004 negotiation, Qualcomm only threatened to cut off supply of LG's WCDMA chips, and that "Professor Elhauge does not identify any documents that suggest that Qualcomm ever threatened to or actually cut off supply of CDMA modem chips."[213]    I have already explained why he is incorrect that WCDMA/UMTS chipsets were not tied to CDMA royalties above in Section II.C.4.  In fact, evidence on this specific negotiation shows that in a 2004 Qualcomm letter, when LG refused to report or pay royalties on WCDMA devices (based on LG's claim "that it is not licensed by QUALCOMM to manufacture, sell or use any products implementing the WCDMA air interface standard"), Qualcomm's GC (Mr. Lupin) responded to say that LG was in breach of its component supply agreement with Qualcomm.[214]    This component supply agreement covered both CDMA and WCDMA chips,[215] and an LG witness also understood the threat to cover CDMA chips.[216]  Furthermore, even if LG were not subject to a threat in CDMA chips (which it clearly was), I explained in Section II.C.4.b above that Professor Nevo fails to establish that pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales.

95.    *Samsung:*  Professor Nevo claims my analysis of Samsung is inconsistent with the terms in Samsung's license agreements.[217]  Professor Nevo first claims that (as with LG) Samsung's 1993 license agreement followed a model license agreement prepared by the Korean government and "Qualcomm had not yet started selling CDMA chips at the time, so these royalty rates could not have been affected by any chip-supply leverage."[218]    He also claims that subsequent

---

[212] *See supra* Section II.A.2.a.

[213] Nevo Report ¶178.

[214] Q2017MDL1_01495692.

[215] ASICS Supply Agreement between LG and Qualcomm, Q2017MDL1_02930610 at 615, 616 (September 1, 2000) ("'Chipset' means QUALCOMM's CDMA digital baseband ASIC (whether or not based on IS-95, cdma2000, W-CDMA, TD-SCDMA or any other CDMA standard and irrespective of frequency band)").

[216] Hwi-Jae Cho (LG Electronics, Inc.'s employee designated with knowledge of LGE's Patent License Negotiations with Qualcomm), Responses to Witness Examination Questionnaire, Response to Annex B, No. 67.

[217] Nevo Report ¶180.

[218] Nevo Report ¶181.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

amendments could not have been any worse than these initial license terms.[219] Professor Nevo does not cite any authority for his claim that a license agreement prepared by the Korean government means that agreement is FRAND and means that anticompetitive conduct could not have affected the agreement. Professor Nevo's contentions also suffer from the same flawed assumptions I have already disproven that if Samsung's royalty rate was reasonable in 1993, the same nominal rate should be considered reasonable in later years, even though in later years Qualcomm's patents provide a much smaller percentage of phone value given changes in device features, device usage, and the strength of Qualcomm's patent portfolio.[220]

96.     Professor Nevo also claims that I ignore a 2018 amendment of the Samsung licensing agreement in which Professor Nevo claims that "Samsung's witnesses acknowledged to have been negotiated by Qualcomm in good faith and without any coercion or threat related to chip supply."[221]  However, I did not ignore this: the Elhauge Report specifically references Samsung's 2018 agreements and states that "My opinion does not address these amendments because 2018 is ongoing, and I do not yet have sufficient evidence to evaluate the implications, if any, of these amendments."[222]  Professor Nevo states the 2018 agreement has "reduced the royalty base cap for certain subscriber units to $400 but otherwise maintained existing royalty terms."[223]  His own description thus indicates that, although the 2018 agreement maintained the same nominal royalty rate, it lowered the effective royalty rate by capping the device price against which that nominal rate was applied.  Thus, even his own description indicates that without the chip supply threat, Samsung paid lower royalties, thus providing affirmative evidence that the chip supply threat does affect the royalties paid.

97.     In any event, the royalty rate in Samsung's 2018 agreement cannot be attributed just to the alleged absence of the chip supply threat, for two reasons.  First, by 2018, Samsung knew that Qualcomm was subject to three lawsuits (by the FTC, Apple, and the present plaintiffs) that were likely to establish what the FRAND rate was.  Samsung thus had incentives not to risk disruption by trying to bargain hard on royalty rates, knowing that if it agreed to supra-FRAND rates, those lawsuits

---

[219] Nevo Report ¶¶182-183.
[220] *See supra* Section II.A.2.a.
[221] Nevo Report ¶184.
[222] Elhauge Report n.65.
[223] Nevo Report ¶184.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

would later likely lower those rates down to FRAND levels. Second, the 2018 amendment was part of a broader settlement between the two companies, including Samsung withdrawing regulatory filings against Qualcomm and agreeing to work with Qualcomm on 5G.[224]  This means that the agreement terms may well have been affected by factors other than the alleged absence of a chip supply threat.  Professor Nevo does not consider this possibility, even though Professor Nevo himself argues that a 1996 Ericsson license is not a valid point of comparison because it involved other business consideration and a settlement,[225] which is inconsistent with his argument here that the Samsung agreement is a valid point of comparison even though it likewise involved other business consideration and a settlement.

98.    _Huawei:_ Professor Nevo claims my analysis of Huawei is inconsistent with the terms in Huawei's license agreements.[226]  Professor Nevo first claims that ███████████████████████████████████████████████████████████ and that my analysis "has nothing to say about royalty terms governed by ███████████████████████████."[227]  However, he himself admits that the ███████████████████████████████████████████████████████████ ████████████.[228]  Moreover, Professor Nevo is the one that fails to establish why Huawei could not have been affected by chipset leverage in 2003, and why the involvement of a government makes an agreement FRAND or precludes the possibility of anticompetitive conduct.[229]  He also does not explain why Huawei's royalty rate in 2011 onward should be considered reasonable if the same nominal

---

[224] SAMMOBILE, "Qualcomm and Samsung amend cross-license agreement, team up for 5G", _available at_ https://www.sammobile.com/news/qualcomm-and-samsung-amend-cross-license-agreement-team-up-for-5g/ (accessed 12/2/2018).

[225] "[A] comparison of the rates in Sony Corporation's and Ericsson's license agreements is not valid, because Ericsson received these lower rates as part of a larger agreement that included the sale of Qualcomm's infrastructure business to Ericsson and other consideration." Nevo Report ¶6 & n.11 (also quoting a Qualcomm employee describing the Ericsson agreement as "a very complicated, multifaceted deal that involved the settlement of a lot of litigation between the companies that included the sale of Qualcomm's infrastructure business to Ericsson, that included an agreement by Ericsson to withdraw its opposition to the inclusion of CDMA into certain industry standards and included a subscriber unit license agreement and maybe other things that I don't remember.").

[226] Nevo Report ¶185.

[227] Nevo Report ¶186.

[228] Nevo Report ¶186.

[229] I explained in Section II.C.4.b above that Professor Nevo fails to establish that pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

rate was reasonable in 2003, even though in 2011 and later years Qualcomm's patents provide a much smaller percentage of phone value given changes in device features, device usage, and the strength of Qualcomm's patent portfolio.[230]

99.     Professor Nevo next claims that "Huawei and Qualcomm negotiated over the extension of Huawei's CDMA license in 2013" and that "Professor Elhauge has failed to explain how Huawei did not know in advance that its license agreement was due to expire. If it was aware of the need for a new license, it could then have launched a FRAND challenge against Qualcomm while still paying royalties (and purchasing chips from Qualcomm) under its existing license."[231]  Professor Nevo does not explain how Huawei would have sued Qualcomm for a FRAND license extension without even trying to negotiate a new license first.  He also fails to appreciate that Huawei would have rational incentives to bide its time before suing, as I explain above in Section II.C.1, but this does not mean the chip leverage failed to coerce a higher royalty rate at the time of negotiation.

100.     Professor Nevo then claims that Huawei's 2004 UMTS agreement could not have been affected by a chipset supply threat because Qualcomm was not yet supplying premium LTE chips, and that because of this, Huawei's 2014 renegotiation of that agreement could not have been affected because Huawei would not have agreed to it unless its terms left it better off than its 2004 agreement.[232] However, both his premise and inference from it are mistaken.  As I explain in Section II.C.4.b, Professor Nevo fails to establish that pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales, which means Nevo has not actually established the absence of a chipset supply threat in 2004.[233]  Even if his premise were valid, his inference is flawed because, as I explain in Section II.A.2.a,  the same nominal royalty rate can change from FRAND to supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength.

101.     _Motorola:_ Regarding Motorola, Professor Nevo claims that I fail to evaluate whether "the circumstances of this negotiation and its outcomes are

---

[230] See supra Section II.A.2.a.
[231] Nevo Report ¶187.
[232] Nevo Report ¶¶188-189.
[233] Moreover, the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts require Qualcomm to provide similar royalty rates to all OEMs. Elhauge Report ¶39; see also supra Section II.C.2.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

consistent" with the No-License-No-Chips theory.[234]  He first claims that Motorola's 1990 agreement satisfies the "*ex ante*" definition of FRAND,[235] but I showed above in Section II.A.2 that this is not necessarily true.  Professor Nevo also claims without elaboration that I have not explained why Motorola's running royalty increasing from ████████████ is consistent with my theory.[236]  But my theory concerns 2011 onward and makes no affirmative claims about what happened to Motorola in 2000.  I am happy to respond to Professor Nevo's faulty attempts to draw comparisons between earlier and later years, but he has not articulated any argument at all about the implications of Motorola's rate ████████████████████████, so there does not appear to be a contention to which I can respond.

102.  Professor Nevo next claims that a ████████████████████████ could not have been affected by a chip supply threat.[237]  However, Qualcomm has explicitly stated that Motorola's ████████████████████████████ from its inception, so his claim that ████████████████████ is inconsistent with Qualcomm's position on this matter.[238]  I also explained in Section II.C.4.b above that Professor Nevo fails to establish that pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales.  Moreover, the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts require Qualcomm to provide similar royalty rates to all OEMs.[239]  And, I also explained in Section II.A.2.a above that the same nominal royalty rate can change from FRAND to supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength.  These three points all rebut Professor Nevo's claim that, because Motorola's June 2011 amendment had the same nominal royalty rate as the 2000 agreement, it could not have been supra-FRAND.[240]

103.  *HTC:* Professor Nevo claims that my discussion of HTC does not consider that HTC's agreement was signed in 2000 but HTC did not produce CDMA

---

[234] Nevo Report ¶190.
[235] Nevo Report ¶191.
[236] Nevo Report ¶192.
[237] Nevo Report ¶193.
[238] Q2017MDL8_00007277 at 84.
[239] Elhauge Report ¶39; *see also supra* Section II.C.2.
[240] Nevo Report ¶194.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

phones until 2003 or LTE phones until 2014.[241]   But, as I explained in Section II.C.4.b above, Professor Nevo fails to establish that pre-2011 supra-FRAND royalty rates could not have been sustained by leverage from Qualcomm's WCDMA chipset sales.   Moreover, the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts required Qualcomm to provide similar royalty rates to all OEMs.[242]   Finally as I explained in Section II.A.2.a, the same nominal royalty rate can change from FRAND to supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength.

### 2. Professor Nevo Arbitrarily Dismisses Evidence from Qualcomm

104.   In Section 5.6.2 of his Report, Professor Nevo claims that my analysis of Qualcomm's own business documents is flawed because it bases its conclusions on an interpretation of these documents and neither analyzes the actual effects of these policies nor considers alternative reasons for Qualcomm's chip supply practices or Qualcomm's decision not to separate its chip-supply and licensing businesses.[243]   He also repeats his incorrect claim that Professors Kaplow and Shapiro penned an article eschewing the use of "documents and communications" as evidence,[244] whereas I explained above that these Professors only cautioned against using expressions of aggression in decision-making or intent as evidence of anticompetitive design.   Professor Nevo also repeats his mistaken contention that "market evidence is inconsistent with Professor Elhauge's theoretical predictions", which I demonstrate to be false above in Section II.D.

105.   Professor Nevo's objections are inapposite because my analysis of these documents shows that they are *stating the effects and outcomes of Qualcomm's policies*, and therefore, they are direct evidence of the effects and outcomes.   These documents are not stating what Qualcomm *intends* to be the outcomes, nor am I employing any evidence of what Qualcomm is *deciding*.   Rather, the Elhauge Report lists a multitude of statements by Qualcomm employees noting that its chip business helps Qualcomm attain higher royalties, which is a statement of effect/outcome.[245]   As just one example, one of the documents I analyze is an email in which

---

[241] Nevo Report ¶¶195-196.
[242] Elhauge Report ¶39; *see also supra* Section II.C.2.
[243] Nevo Report ¶197.
[244] Nevo Report ¶198.
[245] Elhauge Report ¶¶57-59.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Qualcomm's VP of Finance states that "there is a high correlation between our modem (chip) share and licensing compliance and royalty rate sustainability."[246] This is not stating the author's intent or decision-making process or motivation; it is recounting an effect that has occurred (and continues to occur): that Qualcomm's modem chip shares sustain its royalty rates.  Moreover, in its contemporaneous business documents, Qualcomm has every incentive to accurately assess such effects since such assessments form the basis for making business decisions such as whether to continue its tie of chips and licensing and whether to separate its chip and licensing businesses in a way that would make continued tying impossible.

106.    Professor Nevo claims that I take these documents out of context and ignore potential business justifications for Qualcomm's chip-supply practices described in the documents.[247]  I respond to Professor Nevo's mistaken contentions about justifications generally below in Section V.  The argument Professor Nevo makes specifically regarding the evidence at issue here about my supposed failure to distinguish "the anticompetitive motivations for Qualcomm's chip-supply practices from procompetitive business justifications" is that some of the documents I cite discuss the collection of royalties in countries with weaker royalty payment compliance such as China.[248]  He elaborates that "Compliance by licensees in countries with limited protection of intellectual property rights represents a significant problem for many holders of SEPs in the cellular industry, including Ericsson, Nokia, and Interdigital" and that "selling chips to Chinese OEMs makes it harder for these OEMs to underreport their sales to Qualcomm" which helps "ensur[e] that Qualcomm can be compensated for its intellectual property."[249]  On this basis he concludes that I failed to acknowledge "that these documents provide a legitimate justification for Qualcomm's chip-supply Practices."   I have three comments on this argument by Professor Nevo.

107.    First, Professor Nevo's repeated contention that I am providing evidence of "anticompetitive motivations" (rather than evidence of *effect*) is incorrect as I have already explained, and is further belied by his own description of the "justification".  He states that these documents show Qualcomm's chip supply policy is justified because it allows Qualcomm to enforce royalty compliance in countries like China.  But this is an *effect*: even Professor Nevo's proposed interpretation of some of the documents shows that they are concluding that the

---

[246] Elhauge Report ¶58.
[247] Nevo Report ¶199.
[248] Nevo Report ¶199.
[249] Nevo Report ¶200.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*outcome* of Qualcomm's leveraged chip supply is improved compliance, rather than making any statement about Qualcomm's motivations.

108.  Second, Professor Nevo's contention is limited to saying that "several of the documents" focus on royalty compliance because many of the documents also explicitly discuss Qualcomm's royalty *rate*, a fact Professor Nevo does not address. For example, the Elhauge report cites to an internal Qualcomm email stating:

> Notably, we are seeing in the market today that there is a high correlation between our modem (chip) share and licensing compliance ***and royalty rate sustainability***.[250]

Similarly, a 2015 Qualcomm document quoted in the Elhauge Report states the following points:[251]

- That ""QTL, on its own, lacks an ongoing 'give/get' relationship with licensees that creates ongoing dependence on QTL", in part because "In a dispute with OEMs over ***royalty rates (pricing)*** we cannot pull access to the technology back"
- "To date, QCT has helped maintain the 'give/get' necessary to defend the ***royalty rate***"
- "we see today a high correlation between our modem (chip) share and licensing compliance ***and royalty rates***."

Thus, it is quite clear from the documents I have cited that Qualcomm's employees believe that its No-License-No-Chips policy results in higher royalty rates.

109.  Third, Professor Nevo's contention about enforcing royalty compliance is not a justification for any of the challenged practices in this case.  Professor Nevo describes the compliance mechanism as one where Qualcomm can better count how many chips an OEM is using if Qualcomm is the one selling the chips: "each chip an OEM buys from QCT means one more handset that the OEM cannot hide from QTL."[252]  This may well be a justification for Qualcomm to try selling chips to OEMs generally, but the plaintiffs in this case are not challenging Qualcomm's right to sell chips.  Rather, they are challenging Qualcomm's refusal to sell chips without a supra-FRAND license, which has no bearing on whether Qualcomm can properly count royalties on the chips it does sell.  To put it another way, the less restrictive alternative for furthering this supposed procompetitive justification would be to either tie its chips to FRAND licenses (which would provide the same counting

---

[250] Elhauge Report ¶58 (quoting QNDCAL02273815).
[251] Elhauge Report ¶58 (quoting QNDCAL02260676).
[252] Nevo Report n.347.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

benefit) or to provide exhaustive licenses to rival chipmakers (which would make the counting benefit irrelevant because Qualcomm would collect royalties whether or not it made the chips).

110. This third problem also infects Professor Nevo's next claim that I fail to "consider other procompetitive synergies that provide alternative explanations as to why Qualcomm chose not to separate its chip and licensing businesses in 2008 and 2015."[253] This should be clear on its face: plaintiffs are not alleging that Qualcomm's decision to keep QCT and QTL under one company is anticompetitive. Professor Nevo's claim that I "ignore[] the benefits that Qualcomm itself expressed for keeping together QCT and QTL"[254] is thus entirely irrelevant because at no point has anyone in this case claimed that the ability to leverage chipset supply into higher royalties was the *only* reason Qualcomm chose to keep QTL and QCT together. Establishing this fact would be completely unnecessary to any point made by plaintiffs or in my report. But the fact remains that the existence of "alternative explanations" for why Qualcomm kept QCT and QTL together does not change the fact that one of these explanations was Qualcomm's own recognition that doing so allowed it to maintain higher royalty rates through the use of chip supply threats. This is not an interpretation of intention or motivation: Qualcomm employees identified the existence of an effect where its chipset business allows it to extract higher royalty rates (which is all I am pointing out) and they were then using that as a reason to keep QTL and QCT together (which is factual context for what I am pointing out, but why QTL and QCT were actually kept together is irrelevant).

111. Professor Nevo also claims that my presentation of a Qualcomm presentation on its proposed 5G policies is flawed because I am basing this opinion on the "review and interpretation of a single document."[255] It is unclear how Professor Nevo reaches this conclusion after himself quoting multiple documents I cited in the preceding paragraphs of his report, so my simple response is that my opinions are based on a holistic review of the evidence in this case. Professor Nevo also complains that I do not analyze whether the strategy in the 5G presentation was implemented, and claims that it was not.[256] This again misses the point: I am not claiming that Qualcomm implemented a No-License-No-Infrastructure policy for 5G. Rather, I point out that in a presentation discussing the potential implementation

---

[253] Nevo Report ¶201.
[254] Nevo Report ¶201.
[255] Nevo Report ¶¶202-203.
[256] Nevo Report ¶203.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

of such a policy for 5G, a Qualcomm employee discussed strategies for pursuing



[257]    Although this presentation may be evidence of motivation and intent in a hypothetical case about whether ████████████████████████, it is evidence of effect in the present case because it describes what Qualcomm concluded was the effect of the No-License-No-Chips policy being challenged in this case.

### 3. Professor Nevo Misinterprets Mr. Lasinski's Role in My Analysis

112.    In section 5.6.3 of his report, Professor Nevo attacks Mr. Lasinski's methodology, claiming that "his comparable license analysis cannot separate the supposed effects of Qualcomm's alleged use of chip leverage from the myriad of other factors that could affect negotiation outcomes."[258]    I understand that Mr. Lasinski will be responding to contentions about his methodology in a reply report. Therefore, I only address a few of the misconceptions Professor Nevo raises in this section.

113.    Professor Nevo repeats his misguided contention that "Mr. Lasinski does not provide an opinion as to why Qualcomm's rates are higher. As I explain in this section, his comparable license analysis cannot separate the supposed effects of Qualcomm's alleged use of chip leverage from the myriad of other factors that could affect negotiation outcomes. Thus, his results are not a test of Professor Elhauge's theoretical arguments."[259]    As I explain above in Section II.C.3, this fact is irrelevant because I am not relying on any such opinion from Mr. Lasinski.  Mr. Lasinski's analysis confirms that Qualcomm successfully obtained supra-FRAND rates, and the Elhauge Report shows that the No-License-No-Chips tie caused these rates.

114.    Professor Nevo contends that Mr. Lasinski's analysis fails to account for the fact that Apple's royalties to Qualcomm "could not have been affected by a threat of withholding chip supply" prior to Apple sourcing Qualcomm chips.[260]    I have already rebutted Professor Nevo's premise that the No-License-No-Chips threat could not have affected Apple during this time in Section II.F.1.b.

---

[257] Elhauge Report ¶59.
[258] Nevo Report ¶204.
[259] Nevo Report ¶204.
[260] Nevo Report ¶208.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

115.    Professor Nevo contends that Mr. Lasinski's analysis fails to consider that Samsung supposedly negotiated the same rate as its prior 2009 agreement in 2018, but without the threat of a chipset supply disruption.[261]  I have already rebutted Professor Nevo's contentions about the significance of the 2018 agreement above in Section II.F.1.b.

116.    Professor Nevo contends that Mr. Lasinski's analysis fails to consider Qualcomm agreements that "could not even arguably be tainted by any threat of chip supply."[262]  In Section II.D above, I showed that Professor Nevo did not actually provide any examples of relevant contracts that were unaffected by the risk that chip supply might be disrupted.

117.    Professor Nevo contends that Mr. Lasinski's analysis showing a higher supra-FRAND overcharge for WCDMA contradicts my analysis because I failed to offer any mechanism through which Qualcomm could leverage its alleged monopoly power in CDMA chips into supra-FRAND WCDMA royalty rates.[263]  This is incorrect because I have explained that the non-discriminatory and most-favored-royalty-rate provisions of Qualcomm's commitments and contracts require Qualcomm to provide similar royalty rates to all OEMs.[264]  I have also explained that Qualcomm's threat to withhold chips was not standard-specific,[265] that Professor Nevo fails to show that Qualcomm could not have used WCDMA chipset sales to leverage supra-FRAND royalty rates prior to 2011,[266] and that the actual threat to OEMs of losing Qualcomm chip supply during a FRAND challenge (the delay of all device business for two to four or more years, which would permanently cripple the business) was much greater than just the lost profits on device sales in the two years following a licensing agreement.[267]

---

[261] Nevo Report ¶209.

[262] Nevo Report ¶210.  Dr. Evans makes a similar claim in his report.  Evans Report ¶119 ("Mr. Lasinski completely ignores contracts that Qualcomm has entered into with OEMs, including ones for which Plaintiffs' 'chip leverage' theory cannot hold, as I understand Professor Nevo will show").

[263] Nevo Report ¶211.

[264] Elhauge Report ¶39; *see also supra* Section II.C.2.

[265] Elhauge Report ¶¶28-33, 38; *see also supra* Section II.C.4.a.

[266] *See also supra* Section II.C.4.b.

[267] *See also supra* Section II.C.4.b.

63

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

118.    Finally, Professor Nevo repeats his mistaken claim that I have not shown how Qualcomm used its chipset power to raise Qualcomm's royalties.[268]  In reality, this is the subject matter of almost the entirety of the Elhauge Report and this Reply Report, which show that all of Professor Nevo's contentions to the contrary are mistaken.

## III. PROFESSOR NEVO'S INCORRECT ARGUMENTS ABOUT ANTICOMPETITIVE HARM

119.    Professor Nevo claims that in Section 6 of his report, he "will explain why, even if Qualcomm's royalty rates were supra-FRAND, they did not lead to anticompetitive harm."[269]  He claims that "it is difficult to separate competitive behavior from anticompetitive exclusionary conduct" and that Professors Kaplow and Shapiro believe that one should therefore focus on consumer welfare, short-term profit sacrifice, whether a practice makes no economic sense but for its effect of excluding a rival, and whether more efficient rivals are excluded.[270]  Although these may be potential areas of focus for an inquiry into anticompetitive effects, they are not the only means by which one can determine the anticompetitive nature of exclusionary conduct; Professor Nevo is attempting to arbitrarily narrow the inquiry.[271]  Professor Nevo then claims to offer six types of analysis demonstrating a lack of anticompetitive harm.[272]  I explain below why his contentions are incorrect.

### A. Professor Nevo is Incorrect That "Healthy Competition and Innovation" Preclude A Finding of Anticompetitive Harm

120.    Professor Nevo argues in Section 6.1 of his report that "the cellular industry is thriving", that "handset prices have fallen while sales and quality have increased dramatically", that "There has been significant entry and expansion among OEMs and modem chip makers", and that all of this is somehow inconsistent with a

---

[268] Nevo Report ¶21.

[269] Nevo Report ¶¶213-214.  Professor Nevo also introduces the claims he makes in Sections 7 and 8 of his report (Nevo Report ¶¶218-219), which will I respond to in Parts IV and V of this Reply Report.

[270] Nevo Report ¶¶215-216.

[271] See Elhauge Report nn.163, 303, 305 (citing sources on economics of exclusionary conduct).

[272] Nevo Report ¶217.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

finding of anticompetitive effects.[273]   Professor Nevo is grossly mistaken that evidence of increasing consumer welfare automatically disproves anticompetitive effects, because this incorrectly measures effects by using a past baseline, rather than the correct but-for baseline.  Professor Snyder makes the same error.[274]

121.   As a matter of antitrust economics, "[T]he correct baseline to determine whether exclusionary conduct causes an increase in monopoly power is *not* how high prices, profits, or shares were in the *past*.  Instead, the correct baseline compares the actual extent of monopoly power to the degree of power the defendant would have had *without* the exclusionary conduct."[275]  Thus the correct question is not whether prices and defendant market shares have risen over time, nor whether quality and output have worsened over time.  The correct question instead is whether the anticompetitive restraint has made prices, shares, quality, or output worse than they would have been in a world without that anticompetitive restraint.

122.   The relevant issue is determining how the chipset and device markets would have fared in the absence of Qualcomm's No-License-No-Chips policy. None of Professor Nevo's claims of purported evidence of healthy competition and innovation addresses this issue, so it is unnecessary to respond to it.  However, for illustrative purposes, I note one example of Professor Nevo's fallacious reasoning.

---

[273]  Nevo Report ¶¶221-248.  I offer no opinion on whether Professor Nevo has correctly characterized the evidence he presents to support these findings. My failure to specifically address a given fact or claim from Professor Nevo's Section 6.1 here is not agreement with such fact or claim.  Rather, I am illustrating a general flaw that infects all of Professor Nevo's analysis in his Section 6.1.

[274] *See infra* Section X.

[275] *See* Einer R. Elhauge, *Defining Better Monopolization Standards*, 56 Stan. L. Rev. 253, 338 (2003) (emphasis added); *see also* AREEDA & HOVENKAMP, IIA ANTITRUST LAW ¶ 394 (3d ed. 2007) (to determine injury, "the plaintiff's actual profits are compared to what they would have been *but for* the antitrust violation") (emphasis added); AREEDA & HOVENKAMP, XI ANTITRUST LAW ¶1802c (3d ed. 2011) ("suppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival.  A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth."); DANIEL L. RUBINFELD, QUANTITATIVE METHODS IN ANTITRUST, ISSUES IN COMPETITION POLICY, ABA ANTITRUST SECTION (2008) ("Consider a hypothetical collusive price-fixing case. The impact-damages question can be answered by comparing actual prices during the period in which wrongful conduct has occurred . . . to the *but-for* prices that would arise in a world in which there had been no illegal conduct.") (emphasis added).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

He claims that "from the first quarter of 2008 to the fourth quarter of 2013, average worldwide nominal prices of CDMA modem chips fell by approximately 22 percent."[276] But even if he has correctly shown this to be true (an issue on which I offer no opinion), the relevant question is whether modem chip prices would have fallen *further* in the absence of anticompetitive conduct. To illustrate the problem, consider the fact that from 2008 to 2013, hard disk prices fell by over 73% and flash storage prices fell by over 81%.[277] Suppose that instead anticompetitive conduct had restrained those competitive price declines, resulting in hard drive and flash storage prices dropping by only 22%. The anticompetitive impact in this hypothetical would be vast: an anticompetitive overcharge of more than 50% above competitive price levels. Yet Professor Nevo's improper methodology would produce the erroneous conclusion that because there was a 22% price drop in this hypothetical, there could not have been any anticompetitive effect.

123. I also note that Professor Nevo's rosy portrayal of chipset competition fails to account for the fact that Qualcomm's anticompetitive conduct with Apple has harmed competition from at least Intel, Ericsson, and Broadcom.[278] Moreover, other defense experts argue that Qualcomm was the only chip supplier capable of meeting Apple's chipset needs from 2011 to 2017,[279] which cannot be reconciled with Professor Nevo's assertions of healthy chipset competition. Professor Nevo also conveniently ignores that chipset output has fallen in recent years, showing that he has cherry-picked facts to fit his narrative: Exhibit 1 of Dr. Chipty's report shows that "Annual Worldwide Unit Sales of Modem Chips for Handsets and Non-Handsets" declined from 2015 to 2017.[280]

---

[276] Nevo Report ¶234. Professor Snyder makes the similar claim that "average selling prices of modem chips have declined considerably over time." Snyder Report ¶489.

[277] R. Fontana, G. Decad, "A Ten Year (2008-2017) Storage Landscape LTO Tape Media, HDD, NAND", IBM Presentation (May 15, 2018), *available at* http://storageconference.us/2018/Presentations/Fontana.pdf (accessed 12/2/2018).

[278] Elhauge Report § V.B.

[279] Williams Report § IX (titled "Apple Selected Qualcomm Because Other Modem Chipset Manufacturers Were Not Viable Suppliers"). I respond to Williams' claims *infra* in Section XV.

[280] Chipty Report at Exhibit 1.

66

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**B. Professor Nevo is Incorrect That the No-License-No-Chips Policy is Not a Tie**

124.    Professor Nevo argues in Section 6.2 of his report that my characterization of the No-License-No-Chips policy as a tie "is incorrect as a matter of economics".[281]   He defines tying as when "a firm requires customers who are purchasing product A also to purchase product B."[282]  This definition is not incorrect, it is just a form of the more general definition of tying:

> Tying occurs when a seller refuses to sell a product that a buyer desires unless the buyer also agrees to purchase a second product, which the buyer would not otherwise want from this seller *on the offered terms*.[283]

The fact of the matter is that Qualcomm is using its power in chipsets to require OEMs to agree to supra-FRAND royalty rates, which are not desired by the OEMs.

125.    Professor Nevo's objection is that a tie requires "the purchase of two products together when they could be sold independently" and he argues that this cannot be possible in the present case because "In order to use chips to make and sell devices that use Qualcomm's technology without incurring liability, the OEM must obtain a license."[284]   As an initial matter, Professor Nevo is wrong that tying cannot happen when two separate products must be used together; this is like claiming that printers and cartridges cannot be tied together because you cannot run a printer without a cartridge.  But even if one were to incorrectly assume Professor Nevo's framing, No-License-No-Chips is still demonstrably a tie.  This is because Qualcomm's FRAND commitments mean that OEMs *already* have a right to Qualcomm's SEPs on FRAND terms.  OEMs only need *a license with FRAND terms* to "sell devices that use Qualcomm's technology without incurring liability"; OEMs do not need to pay *supra-FRAND royalty rates* to sell devices without incurring liability.

126.    Professor Nevo's argument that No-License-No-Chips is a not a tie also conflicts with his December 13, 2016 economist white paper submission to the FTC, which argued that the Single Monopoly Profit theory (which he calls the "one-monopoly-rent theory") is derived from the economics of tying and applies to the

---

[281] Nevo Report ¶249.
[282] Nevo Report ¶250.
[283] 17 Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶1700a (Wolters Kluwer IntelliConnect CCH) (2015).
[284] Nevo Report ¶251.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

No-License-No-Chips policy.[285]   Although he is wrong that the single monopoly profit theory applies, for reasons I detail below in Section III.C, his argument for its application rested on his premise that No-License-No-Chips is a tie, which conflicts with his claim here that it is not a tie.

127.   Professor Nevo next introduces various contentions he will make throughout the remainder of Section 6 of his report,[286] which I respond to below.

## C. Professor Nevo Is Wrong That My Theory of Harm is Incorrect or Incomplete

128.   Professor Nevo argues in Section 6.3 of his report that, even if he were to regard the No-License-No-Chips policy as a tie, he would still find that I failed to establish a theory of anticompetitive harm.[287]  He is wrong for the reasons I discuss below.

### 1. Professor Nevo Simply Assumes the Single Monopoly Profit Theory Applies

129.   Professor Nevo opens Section 6.3.1 of his report with a mischaracterization of my report.  He claims that "Professor Elhauge asserts that OEMs consider the 'all-in' cost of a chip and a license."[288]  For this proposition, he cites to a simplified *hypothetical* I presented in the Elhauge Report comparing different "all-in costs" LG may consider *in the hypothetical situation*, to illustrate how the supra-FRAND royalty taxes rivals.[289]   Nowhere did this hypothetical purport to be a complete illustration of the chipset market, nor did it claim that I was opining that the "all-in" cost is the only thing that matters to OEMs. This is quite apparent from the fact that the Elhauge Report *explicitly states the opposite*: "an OEM's purchasing considerations are not limited to the all-in price of chipsets and royalties."[290]

---

[285] Submission of Qualcomm Incorporated to the Federal Trade Commission Regarding Staff's Tax Theory of Harm, 6 (Dec. 13, 2016).
[286] Nevo Report ¶¶251-253.
[287] Nevo Report ¶¶254-255.
[288] Nevo Report ¶256.
[289] Nevo Report ¶256 (citing Elhauge Report ¶62).
[290] Elhauge Report ¶72.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

130.    The remainder of Professor Nevo's analysis of this example is incoherent due to his attempt to twist what it was presenting. Professor Nevo repeatedly rests on his straw man premise, stating that "Given Professor Elhauge's 'all-in' cost theory",[291] he responds with an argument that "rests on Professor Elhauge's own theory",[292] "consider[s] Professor Elhauge's "all-in" cost theory",[293] and applies "under Professor Elhauge's 'all-in' cost theory".[294] Professor Nevo is responding to a straw man because he is unable to grapple with the actual implications of my theory and hypothetical. My hypothetical posits a *premised* pricing condition (a $15 chipset price and a $5 supra-FRAND royalty), and then demonstrates that *applying the Single Monopoly Profit theory to this premise—i.e. keeping Qualcomm's all-in price constant when royalties go down—generates a contradiction with the premise*.[295] My hypothetical even concludes with the following: "Thus, given the structure of the tie here, the single monopoly profit theory would have to assume that Qualcomm irrationally charged either actual or but-for prices that were not profit maximizing."[296] This is how the hypothetical illustrates that non-single-monopoly-profit forces are at work: if the single monopoly profit theory were true, one would not observe the resulting contradiction. By contrast, Professor Nevo has misinterpreted my hypothetical to take *a fixed "all-in cost" as the premise* – i.e. the correctness of the Single Monopoly Profit theory is the assumed premise in Professor Nevo's misinterpretation of my hypothetical. He then uses this misinterpreted premise to generate a contradiction with my actual premise (the initial pricing condition).[297] This is quite clear, for example, when he makes the following statement at the very start of his discussion of my hypothetical:

> Using Professor Elhauge's example, if Qualcomm fully utilized its alleged monopoly power when it charged $15 for the chip and a royalty rate of $1, *it has demonstrated that its profit-maximizing "all-in" price is $16.* This is the "all-in" price the OEM is willing to pay. Now, if Qualcomm were instead to set a supra-FRAND royalty rate of $5, *it would want to lower its chip price to $11 in order to once again charge the optimal "all-in" price of $16.*[298]

---

[291] Nevo Report ¶256.
[292] Nevo Report ¶257.
[293] Nevo Report ¶258.
[294] Nevo Report ¶260.
[295] *See* Elhauge Report ¶73.
[296] *Id.*
[297] Nevo Report ¶¶258-262
[298] Nevo Report ¶259 (emphasis added).

69

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Assuming that the single monopoly profit theory is true is not a valid way to approach testing whether it is true, but Professor Nevo has modified my premise to fit the single-monopoly profit theory: he is re-writing my hypothetical to assume the truth of his conclusion, and then claiming on this basis that the actual result of my hypothetical presented in the Elhauge Report (disproving that conclusion) cannot be true.[299]  Professor Nevo later states that "Were Qualcomm able to get the OEM to agree at the starting point to a price of $15 per chip and a $5 royalty, *it must be the case* that when the chip price is $15 and the royalty is $1 Qualcomm is not fully utilizing its alleged market power."[300]  This again simply assumes that the Single Monopoly Profit theory is affecting the prices in the hypothetical, rather than trying to actually illustrate how the hypothetical requires the Single Monopoly Profit theory to be true or false.

131.  Professor Nevo further claims my error arises because I apply the wrong theory and that "The economic forces that are relevant here are indeed a variant of those found in the theory of 'one monopoly rent' or 'single monopoly profit:' the theory that a monopolist cannot reap its full monopoly rent in the market it monopolizes and simultaneously reap even more rents in some other market(s). . . . A firm cannot use its market (or monopoly) power twice: it needs to keep the customers indifferent."[301]  Here, Professor Nevo has again just assumed the truth of the Single Monopoly Profit theory before even turning to any discussion of the required conditions for the theory to hold.   The Elhauge Report explains in detail, based on an examination of both the theory and actual evidence of pricing and sales, why the Single Monopoly Profit does not hold in this case.[302]  By contrast, Professor

---

[299] Similarly, Professor Nevo incorrectly interprets the hypothetical as suggesting that Qualcomm lacked market power, when the hypothetical did no such thing.  He claims that "Professor Elhauge's claim that the rival's chip pricing would constrain Qualcomm's ability to raise chip prices implies that Qualcomm does not have any market power in chips" (Nevo Report ¶263; *see also* Nevo Report ¶61 n.465), but this is not an implication of the hypothetical at all.  Rather, it is his result when he takes the single monopoly profit theory as given and tests the hypothetical under this assumed truth.

[300] Nevo Report ¶262.

[301] Nevo Report ¶264.  In a footnote, Professor Nevo claims that tying theory requires Qualcomm to commit to lower chipset prices at the time of signing a licensing agreement. Nevo Report ¶264 n.468.  Here, Professor Nevo is both (1) assuming that the No-License-No-Chips policy is a bundle instead of a tie, where Qualcomm changes chipset prices based on FRAND rates (instead of what the policy actually is, which is a threat to terminate all chip supply) and (2) assuming the truth of the single monopoly profit theory.

[302] Elhauge Report at § III.B.3.

70

Nevo has simply asserted that "A firm cannot use its market (or monopoly) power twice" as a universal fact with a citation to one article on tying that states it applies in one hypothesized set of conditions,[303] while ignoring the limitations on this theory, one of which is established in the very article he cites.[304]

132.    Especially problematic in Professor Nevo's *unqualified* statement that "A firm cannot use its market (or monopoly) power twice" is that it assumes away the very possibility of anticompetitive behavior.  If it were always true that "A firm cannot use its market (or monopoly) power twice" then how could there ever be an economically anticompetitive tie; wouldn't the fact that "A firm cannot use its market (or monopoly) power twice" apply to every single tie?  Moreover, wouldn't the fact that "A firm cannot use its market (or monopoly) power twice" mean that no monopolist can engage in exclusionary conduct, because *any* exercise of monopoly power to engage in exclusionary conduct could be replaced by exercising that power to raise prices?  These rhetorical issues show that Professor Nevo either believes exclusionary conduct is impossible, or he has failed to evaluate conditions under which "A firm cannot use its market (or monopoly) power twice".[305]

---

[303] Nevo Report ¶264 (citing Michael D. Whinston, *Tying, Foreclosure, and Exclusion*, 80 THE AMERICAN ECONOMIC REVIEW 4 (1990))

[304] *See* Michael D. Whinston, Tying Foreclosure, and Exclusion, 80 AM. ECON. REV. 837, 840, 846 (1990) (showing that the single monopoly profit theory does not apply if the tie can lower the efficiency of tied market rivals in a way that increases the defendants market power in the tied product.); EINER R. ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 410-17 (3rd ed. 2018) (detailing how the single-monopoly profit theory depends on five assumptions and that Whinston's article is one of the articles that showed how relaxing one of those assumptions (constant tied market power) negated the theory).

[305] Professor Nevo also claims that the FTC has "implie[d] that Qualcomm used its market power in chips to obtain the allegedly supra-FRAND 'tax' by decreasing its chip prices" in a different case relating to the same general theories.  Nevo Report ¶265.  I cannot comment on his characterization of the FTC expert's analysis and whether it is accurate at all.  As to Qualcomm's response to this purported opinion, I note *infra* in Section III.C.2.b that, although Professor Nevo disagrees with the reason why there is no link between chip prices and Qualcomm's royalty rates, he does not disagree that there is no such link.  Put differently, he incorrectly thinks the absence of a link is due to the fact that Qualcomm has not successfully leveraged any chipset monopoly power in the first place, but it would be a complete contradiction for him to both believe this and believe that higher royalties have caused lower chip prices.

71

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*2. Professor Nevo Misunderstands the Single Monopoly Profit Theory*

133.    Professor Nevo's claims in Section 6.3.2 of his report suffer from the same fatal flaws as earlier parts of Section 6.  He first repeats his arguments that the No-License-No-Chips policy is not a tie and that the policy's "economics are based on considering OEMs' willingness to pay, and not on any constraint that Qualcomm has a 'Single Monopoly Profit' that it earns."[306]  I show above in Section III.B that it is a tie and in Section III.C.1 that Professor Nevo simply assumes that the single monopoly profit theory is true, and uses this assumption to reject the possibility that any conditions could invalidate this theory.  Professor Nevo next claims that he will demonstrate that my analysis of the theoretical conditions and actual pricing evidence do not establish the failure of the single monopoly profit theory.[307]  I explain further below why these contentions are incorrect.

**a. Professor Nevo misunderstands my analysis of the necessary conditions for the Single Monopoly Profit theory.**

134.    Professor Nevo begins by claiming that the first two necessary conditions for the single monopoly profit theory that I discuss—a fixed product ratio and strong positive demand correlation—are irrelevant.  His argument is that: (1) the absence of these two conditions can increase profits only if it allows the tie to create intraproduct or interproduct price discrimination; (2) that my only theory of anticompetitive harm is that supra-FRAND royalties are exclusionary; and (3) that intraproduct or interproduct price discrimination require no foreclosure; and (4) that therefore it is irrelevant whether intraproduct or interproduct price discrimination undermines the single monopoly profit theory.[308]  He is wrong on all four points.

135.    First, it is not true that the absence of these two conditions can increase profits only if it allows the tie to create intraproduct or interproduct price discrimination.  The absence of these two conditions can also increase profits by extracting consumer surplus in the tying product or enhancing tied market power, as my scholarship has shown.[309]  Professor Nevo offers no explanation of why he ignores those possibilities and those parts of my scholarship.  Nor does he explain

---

[306] Nevo Report ¶266.

[307] Nevo Report ¶¶266-267.

[308] Nevo Report ¶268-69.

[309] EINER R. ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 414, 416, 418 (3rd ed. 2018); Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 407, 416 (2009).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

why he thinks one can leap from the fact I showed that relaxing these two conditions can create intraproduct or interproduct price discrimination to an assertion that it cannot increase profits in other anticompetitive ways.

136.    Indeed, my report explicitly explained how the lack of a fixed ratio in this case allowed the tie to increase profits in a way that did ***not*** depend on either intraproduct or interproduct price discrimination, stating:

> Qualcomm is leveraging its monopoly power in CDMA chipsets and premium-LTE chipsets to also elevate royalties across devices that implement WCDMA/UMTS and non-premium-LTE chipsets. Moreover, it is leveraging this monopoly power to elevate royalties across all devices, including those that do not use Qualcomm chipsets. Thus, the ratio of the tying chipsets is not 1:1 with the tied supra-FRAND licenses, making the single monopoly profit theory inapplicable.

> Any CDMA or premium-LTE chipset price increase would thus affect only a subset of an OEM's cellular device sales, whereas the royalty rate increase affects all types of cellular devices sold by all OEMs. Raising the royalty rate therefore leads to an overcharge that affects all cellular device sales in the United States, which makes it possible for OEMs to pass on most of the overcharge. This means an OEM's purchasing considerations are not limited to the all-in price of chipsets and royalties, because the OEM could partially externalize the impact of a marketwide royalty increase onto its customers. This would allow Qualcomm to gain much more from raising royalty rates than from raising only CDMA and premium-LTE chipset prices.[310]

Rather than address my explicit showing that relaxing the condition of a fixed ratio can increase profits (contrary to the single monopoly profit theory) in ways that do not involve intraproduct price discrimination, Professor Nevo simply asserts falsely that I instead claim that relaxing this condition can only increase profits by allowing intraproduct price discrimination.[311]

137.    Second, it is not true that my only theory of anticompetitive harm is that supra-FRAND royalties are exclusionary.  In support of his contrary assertion, Professor Nevo cites one paragraph of my report, which is in the section that does

---

[310] Elhauge Report ¶¶ 71-72.
[311] Nevo Report ¶268

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

discuss how the tie increased the costs of Qualcomm's rivals in a way that is exclusionary.[312]  But the preceding 16 paragraphs in the prior section discuss how the tie also created the anticompetitive effect of inflating SEP royalty rates to supra-FRAND levels.[313]    That anticompetitive effect on royalty rates is itself an anticompetitive harm, and it would be so even if it did not also raise rivals' costs in a way that was exclusionary.  The fact that here I showed the tie has both types of anticompetitive effects does not somehow mean that only the second type matters.

138.    Third, it is not true that intraproduct or interproduct price discrimination require no foreclosure.  Neither anticompetitive harm is possible unless the rival has been foreclosed (i.e., restrained) from making tied product sales to the buyers that are subject to the tie.  What my scholarship showed was that neither intraproduct nor interproduct price discrimination (or for that matter extracting consumer surplus in the tying product) requires evidence that the tie foreclosed a substantial *share* of the tied market.  Indeed, in his footnotes Professor Nevo himself correctly quotes me as saying only that neither is a "foreclosure *share* effect."[314]  Yet in his text he omits the word "share" and claims that these quotes support his false assertion that I said these harms involve no "foreclosure effect."[315]    Contrary to his false characterization, my scholarship explicitly states that while neither effect requires a substantial foreclosure share, both effects require foreclosing a substantial *amount* of tied sales.[316]  Moreover, even if (contrary to reality) Professor Nevo were right in his premise that a foreclosure effect is not necessary for intraproduct or interproduct price discrimination, that would hardly justify his leap to the conclusion that therefore a tie that creates intraproduct or interproduct price discrimination cannot have a foreclosure effect.  A tie can have both effects.

---

[312] Nevo Report ¶268 n.477 (citing Elhauge Report ¶61).

[313] Elhauge Report ¶44-60.

[314] Nevo Report ¶268 n.476 & ¶269 n.480 (quoting Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 400 (2009).) (emphasis added).

[315] Nevo Report ¶268-269.

[316] EINER R. ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 412 (3rd ed. 2018) ("Tying that produces intra-product price discrimination . . . causes significant effects only if the tie forecloses a substantial *amount* of tied sales, but it does not require a substantial foreclosure *share*."); *id.* ("*Interproduct Price Discrimination*…. can increase profits without any substantial tied foreclosure share, but … it cannot have significant effects unless it forecloses a substantial amount of sales.")

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

139.   Fourth, even if (contrary to reality) the only theory of harm in this case was that exclusionary effects raised rivals' costs, it would not be irrelevant whether intraproduct or interproduct price discrimination undermines the single monopoly profit theory.  The possibilities of intraproduct or interproduct price discrimination would still rebut Professor Nevo's claim that any royalty rate increase caused by the exclusionary effects must be offset by a decrease in chip prices, because those possibilities would still mean that the necessary conditions for his single monopoly profit theory premise do not apply.  Moreover, the exclusionary effects on rivals are actually "reinforced by the extraction and price discrimination effects, which prove that a foreclosing tie need not require any short-term profit sacrifice by the tying firm."[317]   The fact that intraproduct or interproduct price discrimination increases profits thus makes tying profitable in the short-run and makes it easier to use tying to inflict exclusionary effects.

140.   Professor Nevo also claims that I am factually incorrect in my conclusions that three necessary conditions for the single monopoly profit theory do not hold.  On the absence of a fixed product ratio, he argues that WCDMA/UMTS and non-premium-LTE chipsets were not tied to CDMA and premium-LTE royalties,[318] but I already explained why he is wrong about this above in Section II.C.4.  He also repeats his error (just discussed above) of assuming that disproving this condition is only relevant if it causes intraproduct price discrimination, arguing that I have "not established how the alleged tie between chips and licenses allowed Qualcomm to price discriminate among its CDMA and 'premium' LTE chip customers beyond what it could achieve simply varying the price of its chips to different customers, which it does."[319]

141.   Second, Professor Nevo claims that I have not actually shown the absence of strong demand correlation between CDMA and WCDMA.  His first argument is that even if there is a low correlation between unit sales (as I demonstrate in the Elhauge Report), "The negative correlation over time merely shows that sales of phones supporting one technology were higher at times when the sales of phones supporting the other technology were lower. It does not imply anything about the correlation in OEMs' valuations."[320]   Professor Nevo seems to be suggesting that

---

[317] *Id.* at 418; Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 404, 415-16 (2009).
[318] Nevo Report ¶270.
[319] Nevo Report ¶270.
[320] Nevo Report ¶271.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

OEMs may more highly value technologies that have lower sales, and vice versa, but that would make no sense: OEMs are obviously going to find chips more valuable if they are part of a more highly-demanded technological standard, and if that changes over time, then so will OEMs' demand.[321]

142.    Professor Nevo then claims that my empirical finding of negative correlation is reversed if one (a) uses a longer time period than 2011 to 2017, and/or (b) accounts for "the fact that many handsets are multimode devices that are both CDMA and WCDMA-compatible."[322]    Professor Nevo is wrong that there is any reason to consider the full period of data (1996 to 2018Q2) because the relevant question is whether the Single Monopoly Profit theory applies during the period of this case, which is 2011 onward.    It is unclear why Professor Nevo thinks one needs to consider whether the Single Monopoly Profit theory might have applied in (for example) 2002, in order to establish the conditions for harm in 2011.    Professor Nevo does not show why adjusting for multimode devices is necessary, and in any event his effort to adjust for the fact that many handsets are multimode devices is also done incorrectly, with the effect that he measures sales of the same handsets against themselves, which obviously grossly inflates the correlation that he finds.[323]

---

[321] Professor Snyder's analysis seems to support this, which notes that "the wireless standard or standards implemented" is one of the "characteristics of modem chips… important to OEMs." Snyder Report ¶127.

[322] Nevo Report ¶272 & n.487.    Incidentally, although he claims I only measure correlations through 2017, I do measure a quarterly correlation through 2018Q2. Elhauge Report at n.172.

[323] Professor Nevo states that he uses the "Tech_Flavor" field in the data (whereas my analysis used the "Tech_Family" field) to determine when a product is CDMA or WCDMA because, according to him, that field will capture when the product is multi-mode. Nevo Report ¶272 n.487. But it is easy to demonstrate that the Tech_Flavor field is *not* capturing devices that are sold to operate as both WCDMA and CDMA.    For example, if one takes the 2016 royalty data (QNDCAL04878273), filters the "Marketed_Model" to exactly "iPhone 6S", and filters the "Region" to "North America", then there are two versions of "Model_Name" that emerge: the "iPhone 6S WCDMA" and the "iPhone 6S CDMA".    However, *both versions* of this iPhone 6S are listed in the "Tech_Flavor" field as *both* CDMA (EV-DO) *and* WCDMA (HSPA).    This is despite the fact that Apple was not paying for CDMA functionality on the WCDMA phones (FTC-PROD-0003442 at Row 11 shows that Apple paid a ▮▮▮▮▮ for CDMA").    Professor Nevo's approach (using the "Tech_Flavor" field) counts the "iPhone 6S WCDMA" as both a CDMA device and a WCDMA device, and then counts the "iPhone 6S CDMA" as both a CDMA and WCDMA device.    Thus, his correlation is measuring units of the same phones against themselves, which obviously grossly inflates the correlation that he finds.    By contrast, my approach (using the "Tech_Family" field) correctly categorizes the "iPhone 6S WCDMA" as only WCDMA and the "iPhone 6S CDMA" as only CDMA2000.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

143.    Third, Professor Nevo claims that I have not shown that the tying market competitiveness is not fixed.[324]  His claim here depends on his claim that I have not shown any anticompetitive harm in the chip markets, which I rebut in Sections III.D and III.E below.

**b. Professor Nevo effectively admits that real-world evidence shows the Single Monopoly Profit theory does not hold.**

144.    Professor Nevo notes that I identify several real-world examples where royalty rates did not change with chipset prices, and claims that this is actually evidence that "Qualcomm has not used its alleged market power in chips to impose supra-FRAND royalty rates."[325]  Thus, Professor Nevo does not actually dispute this evidence, only its interpretation; it is undisputed that when Qualcomm's royalty rate goes down, Qualcomm's chipset prices do not go up.  Nevo claims that the reason one does not see this tradeoff between royalty rates and chipset prices is that Qualcomm is not exercising market power in chips to raise its royalty rates in the first place.  But crucially, if one accepts the premise that Qualcomm is leveraging its chipset market power to raise royalty rates, which I have shown to be the case,[326] then Professor Nevo has admitted that the single-monopoly-profit theory does not hold.

### D. Professor Nevo Does Not Correctly Evaluate Anticompetitive Harm in the Short Run

145.    Professor Nevo begins Section 6.4 of his report by arguing it is "not clear" whether I am alleging any short-run anticompetitive harm because "Professor Elhauge is not claiming that rivals' margins would be affected in the short run; he specifically claims that the alleged imposition of supra-FRAND royalties would not be accompanied by any offsetting reduction in chip prices."[327]  For this proposition, he cites to my analysis of the Single Monopoly Profit theory, where I explained that Qualcomm would not lower its chipset prices to offset its higher royalties.[328]

---

[324] Nevo Report ¶273.
[325] Nevo Report ¶¶274-276.
[326] Elhauge Report § III.B.1.
[327] Nevo Report ¶277.
[328] Nevo Report ¶277 (citing Elhauge Report § III.B.3).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Although it is true that I make this argument about Qualcomm, it is not true that I am alleging that this is not *equivalent* to an impact on rivals' margins. Nevo claims to recognize that the Elhauge Report explains that supra-FRAND royalty rates would impose a tax on sales by Qualcomm's chipset rivals, but he purports to be unsure about whether I am alleging any short-run harm.[329] He claims he will show that "that the alleged supra-FRAND royalty is not exclusionary in the short run."[330] I respond to his mistaken contentions below.

### 1. Professor Nevo's Misunderstands Qualcomm's Rival Taxation

146.    Professor Nevo claims the tax theory of harm, whereby Qualcomm's supra-FRAND royalty effectively raises the cost to OEMs of buying chips from rival chip suppliers, "is flawed because any alleged supra-FRAND royalty would not disproportionately affect the demand for Qualcomm's rivals' chips relative to the demand for Qualcomm's chips."[331] His contention is that, because OEMs can purchase chips freely form any rival, and because Qualcomm's licensing terms are agnostic as to whether a chip is being purchased from Qualcomm or a rival, that "OEMs generally do not derive a royalty-based benefit from using Qualcomm's chips rather than any competitor's chips."[332]    These arguments simply ignore the point that the tax is *not* agnostic as to the chip supplier, because Qualcomm will collect the tax on sales of its own chips and also collect the tax on sales of rivals chips: *Qualcomm is paying the supra-FRAND royalty to itself, so it is not taxed*.

147.    Professor Nevo responds to the fact that Qualcomm pays itself the tax by claiming that "because the 'tax' is nondiscriminatory, from the perspective of the OEM making the chip purchase decision it does not give Qualcomm a competitive advantage in the short run."[333]    Professor Nevo's argument misunderstands how taxation works.  The Elhauge Report notes the economic principle that the incidence of a tax does not depend on which side of the market it is being levied.[334]    This economic principle means that the effect of a tax is the same whether a customer is paying the tax or a supplier is paying the tax.  The necessary implication of this principle of taxation is that Professor Nevo *cannot* be correct that the supra-FRAND royalty is nondiscriminatory in its effect on the OEM unless it is *also* true that the

---

[329] Nevo Report ¶¶277-278.
[330] Nevo Report ¶279.
[331] Nevo Report ¶280.
[332] Nevo Report ¶281.
[333] Nevo Report ¶282.
[334] Elhauge Report n.164.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

supra-FRAND royalty is nondiscriminatory from the perspective of the suppliers. But because Qualcomm is paying itself the supra-FRAND royalty, Qualcomm obviously is not going to experience the supra-FRAND royalty payment the same way as a rival.  Therefore, the supra-FRAND royalty payment *only* has the effect of a tax when the OEM is paying it to the rival, i.e., buying a chip from a rival.

148.    It then follows that because there is an anticompetitive tax being imposed on (and only on) the transaction between an OEM and a rival chip supplier, the supra-FRAND royalty is equivalent to the rival experiencing a cost increase relative to Qualcomm because of Qualcomm, which is exclusionary conduct.[335]  An increase in a rival's cost is will have both short-run and long-run effects.[336]  Professor Nevo's error is in part due to his consideration of the tax theory in isolation, whereas Qualcomm is *also* refusing to exhaustively license its rivals.  Section IV of the Elhauge Report explains how Qualcomm's refusal to exhaustively license rivals exacerbates the effect of the No-License-No-Chips tie (and I respond to Professor Nevo's mistaken contentions to the contrary below in Section IV of this Reply Report) because, if Qualcomm were to provide rivals with such licenses, OEMs could avoid the supra-FRAND portion of the tax by purchasing from rivals instead of from Qualcomm.[337]

149.    Professor Nevo also argues that "market facts are inconsistent with this perspective that OEMs base their chip-sourcing decision on an 'all-in' price that includes the chip price plus the royalty."[338]  Professor Nevo claims that "negotiations over license agreements are often done prior to chip sourcing negotiations" and that whereas licenses have lengthy terms, chip sourcing is done annually.[339]  He states that this means "chip-sourcing decisions are often made with royalty terms already set (including any 'tax'), and if they are invariant to the choice of chip, economic theory would dictate that they will not affect the chip purchase decision."[340]  His

---

[335] Elhauge Report ¶¶61-65.

[336] *See* Elhauge Report nn.163, 303, 305 (citing sources on economics of exclusionary conduct).

[337] Elhauge Report ¶97.

[338] Nevo Report ¶283.

[339] Nevo Report ¶283.

[340] Nevo Report ¶283.  Professor Nevo cites to two examples that he claims are OEM employees testifying that they do not consider royalties in their chip purchase decisions.  Nevo Report n.507. I explain *infra* at n.536 that the Motorola example, which Professor Snyder quotes for the same proposition, does not support this contention.  The Samsung example is Samsung's Director of Procurement stating that he did not personally consider royalties in chip procurement, but the

79

claim is faulty for two reasons.  One, he ignores the possibility that OEMs could seek to renegotiate their license agreements were it not for the Qualcomm chip supply threat.[341]  Two, I already explained in this section that the fact that an OEM has to pay the supra-FRAND royalty regardless of whose chipset it uses does not contradict that the economic *effect* of the supra-FRAND royalty is to anticompetitively tax rival sales.

150.   Moreover, even incorrectly assuming that a Qualcomm royalty is fixed and the effect is neutral, the fact remains that a supra-FRAND royalty is only invariant to the choice of chip if Qualcomm is refusing to exhaustively license rivals.  By contrast, if Qualcomm were to provide rivals with such licenses, OEMs could avoid the supra-FRAND portion of the tax by purchasing from rivals instead of from Qualcomm.[342]  Thus, part of the reason Professor Nevo's reasoning is faulty is that he fails to consider Qualcomm's anticompetitive practices holistically.

### 2. Professor Nevo's Mistaken Claims About Overall Demand

151.   Professor Nevo claims that a potential short-term harm is through "a reduction in the overall demand for chips" and that "Without such a reduction, let alone a meaningful reduction, there is no short-run anticompetitive harm."[343]  Professor Nevo is wrong that an output reduction is necessary to demonstrate short-term harm.  In this case, Qualcomm's conduct has raised OEMs' costs through the supra-FRAND royalty, an effect which Professor Flamm shows to be passed through as higher prices to phone users.[344]  This immediate price effect is short-term harm.  Such a price effect will predictably cause a corresponding output reduction (given the textbook economics that higher prices reduce demand), but measuring this output reduction in order to demonstrate the existence of that harm is not necessary.

---

testimony Professor Nevo quotes also shows that this employee added "I can only speak for myself.  I didn't, but whether others did or didn't, I don't know."  Nevo Report n.507.

[341] Professor Nevo himself describes some of my evidence on Qualcomm's negotiations with OEMs as "instances in which OEMs are renegotiating (or hoping to renegotiate) existing license agreements", so he clearly believes that OEMs can attempt to renegotiate.  Nevo Report ¶164.

[342] Elhauge Report ¶97.

[343] Nevo Report ¶284.

[344] Professor Flamm's updated pass-through analysis shows that the pass-through rate is 86.5%.  Flamm Rebuttal Report ¶ 30.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

152.   Professor Nevo claims that one reason there would not be an output reduction is that prices would not rise in the first place, which he claims he will show in Section 6.4.3 of his report.[345]  I respond in Section III.D.3 below that Professor Nevo is simply applying the Single Monopoly Profit theory to reach this conclusion, when he has failed to demonstrate that the conditions for the theory hold in this case.

153.   Professor Nevo next claims that any higher all-in prices might not get passed through to phone users.[346]  He bases this claim in part on criticisms other experts make of Professor Flamm's methodology, but I understand that Professor Flamm has responded to these contentions and maintains his opinion that there would be significant pass-through.[347]  The only additional statement from Professor Nevo seems to be that "economic theory tells us that profit-maximizing firms do not (and should not) pass through a cost increase one-to-one into their final price", that "the exact amount that a firm should pass through depends on the details of the industry at question", and that "pass-through rates are determined by firms engaging in different business and pricing strategies, and can be as low as zero."[348]  These generic statements do not actually evaluate any factors to determine what the pass-through would be in this case, and so they fail to establish any independent criticism of Professor Flamm.  Moreover, I explain in the Elhauge Report that the tie in this case creates a mechanism to raise prices *market-wide for all OEMs*, which increases the possibility of pass-through.[349]

154.   Professor Nevo next claims that even if chip price were to rise and be passed on to consumers, "it would still be unlikely to lead to a meaningful decline in the demand for phones."[350]  But Professor Nevo does not address the fact that if one has found consumers to be paying higher prices for phones, then anticompetitive harm has already been established.  His specific reasoning for why there would not be a reduction in demand is that global handset sales have been rising and that smartphone demand is not very price-sensitive.[351]  His observation about global handset sales incorrectly uses the past as a baseline, whereas the correct measure for

---

[345] Nevo Report ¶285.
[346] Nevo Report ¶¶286, 288.
[347] Flamm Rebuttal Report ¶¶23, 30.
[348] Nevo Report ¶286.
[349] Elhauge Report ¶72.
[350] Nevo Report ¶287.
[351] Nevo Report ¶287.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

anticompetitive harm is whether output has fallen compared to the but-for world.[352] The claim about price-insensitivity also fails to support Professor Nevo's argument because he cites to a study that estimates a price elasticity of -0.4,[353] and so his own claim supports a conclusion that there would be significant change in quantity in response to a price increase. Specifically, that elasticity means that the percentage change of quantity would be 40% of the percentage change in price.

155. Finally, Professor Nevo claims that "any change in overall demand, even if one were to occur, would be unlikely to translate to a meaningful change in demand for any given rival chip maker because its share of the market is small."[354] Professor Nevo cannot be seriously contending that a reduction in a market's output does not harm small rivals because they are small; to assume this would do away with the possibility of excluding small rivals. Moreover, the small market share of the rivals itself reflects the anticompetitive exclusionary conduct. In the but-for world, rivals would have a larger market share in a market with higher output.

### 3. Professor Nevo's Mistaken Claims About Short-Run Harm

156. Professor Nevo next claims that "any alleged increase in royalties due to a 'tax' would be expected to be accompanied by a proportional decrease in the price of chips" because:

> Qualcomm charges the "all-in" price that is determined by Qualcomm's alleged monopoly, or market, power and the OEM's willingness to pay. This is invariant to how the "all-in" price is split between the royalty rate and the chip price, and whether the royalty rate contains a "tax."[355]

Professor Nevo also makes the similar claim that "Qualcomm's 'all-in' price would likely fall when a 'tax' is implemented" because "Qualcomm would basically have to 'eat' the 'tax' by lowering its chip prices for the OEM to remain indifferent" between Qualcomm and a competitor.[356] Both of these claims are variants of the

---

[352] *See supra* Section III.A.
[353] Nevo Report ¶287 n.513.
[354] Nevo Report ¶287.
[355] Nevo Report ¶289.
[356] Nevo Report ¶290. In the next paragraph of his report, Professor Nevo also claims that "A full analysis also requires a consideration of how rival chip makers would respond. Even if rivals' 'all-in' prices rose upon the imposition of an alleged 'tax,' the impact would be offset by the lower

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Single Monopoly Profit theory and simply repeat Professor Nevo's arguments from his discussion of that topic. I explained in Section III.C above that Professor Nevo has simply assumed that the Single Monopoly Profit theory to hold and that he is mistaken in all of his arguments for why the conditions for this theory do not hold. Crucially, Professor Nevo has not disputed that the actual evidence on Qualcomm's pricing shows that there is no link between chip prices and royalty rates.[357] This means that it is undisputed that *in practice* one does not observe, for example, Qualcomm lowering its chip price when Qualcomm raises its royalties, which means Professor Nevo is wrong that Qualcomm's all-in price would likely fall when the supra-FRAND tax is implemented.

### E. Professor Nevo Does Not Correctly Analyze Anticompetitive Harm in the Long Run

157. In Section 6.5 of his report, Professor Nevo argues that "claims of long-run effects are not supported by economic theory or market facts."[358] His three primary arguments are that my theory cannot distinguish between the alleged conduct and other market factors, that rival chip makers were able to operate profitably, and that market outcomes are inconsistent with claims of anticompetitive harm. I will address these specific contentions below, but before he turns to his discussion of these three arguments, Professor Nevo makes two general claims I address here. First, he claims that I am wrong to find that any anticompetitive harms have persisted, but this claim is derivative of his arguments in Sections 6.4 and 6.5 that I have not shown harm in the first place;[359] he does not offer any independent reason for why my analysis fails to show the persistence of effects once anticompetitive harm is established in the first place. Second, he claims to have shown in Section 5 of his report that Qualcomm did not use the No-License-No-Chips policy to elevate royalty rates in the first place,[360] but I have shown above in Section II of this report that Professor Nevo's findings on this matter are incorrect.

---

Qualcomm 'all-in' price." Nevo Report ¶291. Although presented as a separate point, this is merely repeating the point he just made in the previous paragraph.

[357] *See supra* Section III.C.2.b.

[358] Nevo Report ¶292.

[359] Nevo Report ¶293.

[360] Nevo Report ¶294.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### 1. Professor Nevo's Mistaken Claims About Distinguishing "Other Factors" That Affect Market Outcomes

158.    Professor Nevo claims that my analysis "is insufficient to isolate the effect of Qualcomm's conduct from competing explanations" and fails "to establish that Qualcomm's challenged conduct is exclusionary or that it led to anticompetitive harm."[361]  I respond to his specific claims below.  Before I do, as an initial matter I note that the Elhauge Report states that in the long run, Qualcomm's taxation of rivals inefficiently makes them less able to invest in innovation relative to Qualcomm.[362]  Lower rival margins predictably lead to lower investment, less entry, and more exit.  Although this is straightforward, defense expert Professor Snyder's analysis provides further detail on this mechanism.  Snyder notes that in the chip industry, "R&D… plays a crucial role in shaping the trajectories of modem chip suppliers. Not only does R&D require large investments… it also requires significant lead time."[363]  He also notes that:

> the realized R&D spending is the result of a modem chip supplier's strategic decisions… In order to gauge a modem chip supplier's actual ability to invest in R&D, one would have to consider other factors such as the supplier's profitability, cash flows, and access to capital markets.[364]

Thus, neither the importance of heavy R&D nor the need to support such R&D through profitability appears to be disputed.  Thus, the predictable result of both lower sales and lower profitability in chipset markets will be to restrain existing rivals, discourage rival entry, and encourage rival exit.  Although this is a standard economic assumption, evidence also shows that as Broadcom, ST-Ericsson, Nvidia, and Marvell exited the modem chip business from 2012 to 2015, high R&D expenses coupled with insufficient volume to achieve enough scale for recoupment were cited as factors in the exit decisions.[365]

---

[361] Nevo Report ¶295.

[362] Elhauge Report ¶65.

[363] Snyder Report ¶149.

[364] Snyder Report ¶168. Similarly, Professor Snyder notes for OEMs that "Designing innovative, customized, high-end devices requires *large R&D investments*, and a firm will be willing to supply these products only if it *expects to recover its costs by capturing a large proportion of sales*." Snyder Report ¶207 (emphasis added).

[365] *See*, *e.g.*, "Rising Competition Forces Broadcom to Exit the Baseband Market," *available at* https://www.forbes.com/sites/greatspeculations/2014/06/04/rising-competition-forces-broadcom-to-exit-the-baseband-market/#2b6d87792d83 (accessed 12/4/2018) (Broadcom "expects the sale or wind-down of its cellular baseband business to result in a $700 million reduction in annualized

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## a. Professor Nevo is wrong that my findings cannot be distinguished from barriers to entry.

159.    Professor Nevo notes that Plaintiffs and Professor Flamm have found the relevant chipset markets to be protected by barriers to entry, including the need to heavily invest in R&D, obtain IP rights, achieve scale, Qualcomm's exclusionary conduct, ongoing customer relationships, and network certification requirements.[366] He then claims that my analysis does "not quantify, or otherwise determine, the importance of the various barriers to entry that they posit in yielding Qualcomm's alleged market, or monopoly, power", that my analysis cannot show any exit or lack of entry was caused by exclusion and would not have been caused by barriers to entry in the but-for world.[367]   However, Professor Nevo also claims that there has, in fact, been entry into the market.[368]   Thus, Professor Nevo's own contentions establish that, although Plaintiffs allege barriers to entry, those barriers alone are not high enough to prevent entry into the market.  This means that artificially raising

---

GAAP research and development (R&D) and selling, general and administrative (SG&A) expenses[.] […] A substantial increase in R&D expenses for developing cellular baseband products has lowered Broadcom's mobile and wireless operating income in the last two years. The baseband market is quite R&D intensive, and Broadcom has spent over $3 billion on cellular baseband related R&D since 2007 without earning any profit."); "Ericsson to exit wireless-modem market, cut 1,000 jobs," *available at* https://www.fiercewireless.com/wireless/ericsson-to-exit-wireless-modem-market-cut-1-000-jobs (accessed 12/4/2018) (Ericsson CEO Hans Vestberg stated that "In order to have the next generation of modems you would need to pour in even more R&D spending[.] […] We came to the conclusion that we're going to have a tough time to really see that we are going to succeed in the modems business."); "NVidia to Sell its Icera Business &amp;    Exit    the    Mobile    Chip    Market,"    *available    at* https://www.forbes.com/sites/greatspeculations/2015/05/07/nvidia-to-sell-its-icera-business-exit-the-mobile-chip-market/#77c96d776e91 (accessed 12/4/2018) ("Mobile computing is an R&D intensive business, and [Nvidia] has struggled to compete against the likes of Qualcomm and Samsung."); "Marvell is latest casualty of mobile modem meltdown," *available at* http://rethinkresearch.biz/articles/marvell-is-latest-casualty-of-mobile-modem-meltdown/ (accessed 12/4/2018) ("it seems that [Marvell] struggled to achieve the volumes that are needed to stay afloat in a business which is, nowadays, all about scale.  Companies have to perform the difficult double act of investing huge sums in ensuring they are at the cutting edge of modem design […] while also ramping up to high volume and low cost very quickly.").

[366] Nevo Report ¶296.
[367] Nevo Report ¶¶296-297.
[368] Nevo Report ¶298.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

those barriers to entry will raise them along a range relevant to entry and exit decisions, and thus cause less entry and more exit. Given that the Elhauge Report shows how Qualcomm's anticompetitive conduct raises rivals' costs (by taxing rival sales), reduces incentives to invest in innovation, and makes it harder to obtain Qualcomm's IP rights (due to the refusal to license exhaustively,[369] Qualcomm's exclusionary conduct is artificially inflating many of the barriers to entry at issue. The predictable result of this will be to deter entry relative to a but-for world without anticompetitively-raised barriers to entry. Moreover, Professor Nevo does not provide any examples of chip suppliers he believes would not have overcome barriers to entry in a but-for world.

## b. Professor Nevo is wrong that my findings cannot be distinguished from any supposed "Technological Leadership" by Qualcomm.

160.  Professor Nevo claims that my analysis cannot distinguish whether Qualcomm's maintenance of its monopoly power was "the result of Qualcomm's challenged conduct or the result of Qualcomm's innovation, product differentiation and technological leadership, and its determination to compete for sales" rather than the result of exclusionary conduct, and also claims that my analysis "cannot establish that in a but-for world in which Qualcomm would continue to be a technological leader, Qualcomm's share of sales of any chip would be lower."[370] To support his contention, Professor Nevo merely points to evidence that Qualcomm gained and maintains its share by innovating in the field of cellular technology.[371] To the extent he is contending that Qualcomm's recent innovations fully explain Qualcomm's monopoly shares, Professor Nevo does not explain or support this contention, whereas I have shown that Qualcomm's conduct raises rivals' costs (by taxing rival sales), reduces incentives to invest in innovation, and makes it harder to obtain Qualcomm's IP rights (due to the refusal to license exhaustively.[372] The predictable result of these effects will be to increase Qualcomm's share relative to a but-for world without such exclusionary conduct, and none of the harms I have identified are inconsistent with Qualcomm having won some sales through its own innovation.

---

[369] Elhauge Report §§ III.B.2, IV.B.
[370] Nevo Report ¶299.
[371] Nevo Report ¶¶300-301.
[372] Elhauge Report §§ III.B.2, IV.B.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### 2. Professor Nevo's Mistaken Claims About Rival Profits, Innovation, And Entry

161.    Professor Nevo claims that my analysis does not disprove that "an equally efficient competitor could operate profitably" or supported "any allegation that Qualcomm lowered its short-run chip prices below its cost with the intention to exclude competitors."[373]  This is a red herring because none of the theories of anticompetitive harm I have articulated require a finding that Qualcomm prices its chips below cost, which is not a necessary condition for establishing that an exclusionary condition raises rivals costs and restrains their sales in a way that is likely to have anticompetitive effects.[374]  Moreover, the anticompetitive harm at issue here is based on Qualcomm *elevating* its royalties above FRAND rates without any offsetting decrease to chip prices.  There is no reason why one would need a test to distinguish potentially procompetitive supra-FRAND royalty rates from potentially anticompetitive supra-FRAND royalty rates, because supra-FRAND royalty rates are, by definition, unreasonable.

162.    Professor Nevo next claims that I have not provided any evidence that actual and potential competitors lacked the resources needed to enter the market or finance investments,[375] but no aspect of my analysis relies on such a finding.  His complementary claim is that no taxation of rival profits has occurred in the first place, but I demonstrated that his arguments supporting this contention are false above in Section III.D.

163.    Professor Nevo next claims that the supra-FRAND tax could not serve as a barrier to entry or expansion through innovation.  He reasons: "Because the chip market is dynamic and adopts new standards and technologies rapidly, a successful investment in R&D could win a new entrant (or an existing competitor) a technological leadership position and eliminate Qualcomm's alleged market power in chips."[376]  Professor Nevo provides no support for this *ipse dixit* assertion. Professor Nevo states that 3G WCDMA and CDMA2000 were both commercially released in 1999, that 4G LTE was commercially released in March 2009, and that 5G development is ongoing.[377]  While these standards have undergone revisions,

---

[373] Nevo Report ¶302.
[374] EINER R. ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 414, 416, 418 (3rd ed. 2018); Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 456-59, 471-74 (2009).
[375] Nevo Report ¶303.
[376] Nevo Report ¶304.
[377] Nevo Report ¶¶33-34, 38-39.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Professor Nevo does not explain or give any example of any chip entrant having been able to shift the entire telecommunications industry to a new standard, let alone able to do so on less than 9.5 years' notice.

### 3. Professor Nevo's Mistaken Claims About Lack of Long-Run Harm

164.   Professor Nevo claims that "Market outcomes are inconsistent with a conclusion that Qualcomm's challenged conduct has led to long-run harm", citing to evidence that Qualcomm's LTE share has fallen relative to the past, that R&D spending has increased relative to the past, and that chip makers have developed new types of chips.[378]   All of this analysis makes the mistake of using the past as a baseline, whereas the relevant baseline is the but-for world (where the timing of these effects would have been sooner and/or the magnitude greater), as I explain above in Section III.A.

## F. Professor Nevo's Claims About Harm in the Cellular SEP Market are Irrelevant

165.   Professor Nevo claims in Section 6.6 of his report that "Professor Elhauge has failed to provide any framework to analyze any competitive effect of the tie on the tied market."[379]   But Professor Nevo admits that I explain that the tie "coerced OEMs into accepting higher license royalty rates than the FRAND rates to which they were contractually entitled"[380]   That effect on royalty rates is itself and anticompetitive harm, and it would be so even if it did not also raise rivals' costs in a way that was exclusionary.   The fact that here I showed the tie has both types of anticompetitive effects (price inflating and exclusionary) does not somehow mean that only the second type matters.

---

[378] Nevo Report ¶¶305-308.
[379] Nevo Report ¶309.
[380] Nevo Report ¶309 (citing Elhauge Report ¶44).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## IV. PROFESSOR NEVO'S INCORRECT CLAIMS ABOUT QUALCOMM'S REFUSAL TO LICENSE RIVAL CHIPMAKERS

166.   As an initial matter, I understand that the District Court has ruled in the parallel FTC action that "two industry agreements obligate Qualcomm to license its essential patents to competing modem chip suppliers."[381] These two agreements are "Qualcomm's FRAND obligations under the IPR policies of two SSOs, TIA and ATIS."[382] Thus, it appears to be the case that Qualcomm's FRAND commitments do obligate Qualcomm to license rivals.

167.   Professor Nevo claims that in Section 7 of his report he will explain "that rival chip makers do not need a license from Qualcomm in order to operate", "that Qualcomm's competitors have successfully entered, designed, and sold chips", "that certain OEMs viewed royalty evasion as a competitive benefit", and that Qualcomm's use of the handset as the royalty base does not support competitive harm.[383]  I respond to these contentions below.

### A. Professor Nevo Fails to Show that Rival Chipmakers Don't Need Licenses

168.   Professor Nevo claims that I do not "clearly articulate why rival chip makers need exhaustive licenses to Qualcomm's intellectual property" and that I do not "analyze whether a lack of exhaustive licenses did deter entry."[384]  This is incorrect.  Although I will not repeat the full length of my opinions here (which are all available in the Elhauge Report), I note that I stated, for example, that:

> Qualcomm's refusal to provide exhaustive licenses to its chipset rivals, in breach of its FRAND duty to do so, anticompetitively harmed competition by exacerbating the exclusion of these rivals from the market and increasing Qualcomm's ability to impose supra-FRAND rates across the market.[385]

Similarly, one example I gave (among others) in my initial report is that Qualcomm's refusal to provide a license was the main reason for a proposed chip supply joint

---

[381] Order Granting FTC's Motion for Partial Summary Judgment, *Federal Trade Comm'n v. Qualcomm Inc.*, Case No. 17-cv-00220, ECF No. 931 at 1 (N.D. Cal. Nov 6, 2018).

[382] *Id.* at 4.

[383] Nevo Report ¶¶310-311.

[384] Nevo Report ¶312.

[385] Elhauge Report § IV.B.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

venture failing.[386]  Professor Nevo is wrong to claim that I do not even articulate these points.

169.   Professor Nevo next claims several flaws in my analysis of how the refusal to license chipmakers restricts competition.  First, he claims that my observation that the need for a rival license would be diminished if Qualcomm were licensing OEMs on FRAND terms is evidence that "There is no inherent need for rival chip makers to have an exhaustive license from Qualcomm."[387]  Professor Nevo's claim is incoherent: he is saying there is no "inherent need" because I have identified a condition that creates the need (Qualcomm's supra-FRAND tax).  But the point is that because the condition holds, the need arises.  It is unclear what point Professor Nevo is even trying to make to the contrary here.

170.   Second, Professor Nevo states that he "understand[s]" that "Qualcomm does *not* sue chip makers" but rather only seeks to recover royalties from OEMs, which he says means that any OEM buying from a rival chipmaker would not face any "risk of chip-supply disruption" from a suit against a rival chipmaker.[388]  This argument simply ignores the reality that it is precisely Qualcomm's imposition of supra-FRAND royalties at the OEM level that means a rival chip supplier's chips would far be more attractive to OEMs if the rival had an exhaustive license. Moreover, both premises for this argument are mistaken.  I have already thoroughly rebutted the premise of this argument that OEMs sourcing from a rival could avoid the No-License-No-Chips tie, both in Section III of the Elhauge Report and Section II of this Reply Report.  As to Professor Nevo's premise that "Qualcomm does *not* sue chip makers," and that this eliminated any "risk" of disruption,[389] that premise conflicts with the 2011 statement of Marvin Blecker (President of Qualcomm's licensing division at the time) that, recounting a discussion he had with VIA on licensing, stated:

> I said we are in discussions with other chip suppliers, some of which have actually approached us for an agreement. I said they apparently see value in having an agreement with Qualcomm to provide them certain freedom of action without concern that Qualcomm will assert patents against them. ***As to other chip companies, depending upon the circumstances we may or may not take legal action against them***

---

[386] Elhauge Report ¶99.
[387] Nevo Report ¶313.
[388] Nevo Report ¶314.
[389] Nevo Report ¶314.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

> ***and/or their customers****. It is our decision as to how to proceed if they
> do not enter into an agreement with us; they face that uncertainty.[390]*

In this statement, Qualcomm's own head of licensing admits that Qualcomm was communicating to a chip maker that Qualcomm's actual policy was that it might sue rival chipmakers who were not licensed, and that Qualcomm communicated this to create sufficient "uncertainty" about this litigation threat that the risk of it would induce rival chip makers to agree to Qualcomm's terms. Professor Nevo does not explain the basis for his contrary "understanding" that Qualcomm had a firm policy of never suing rival chipmakers that eliminated any risk of disruption from such a suit, let alone explain how he squares that understanding with this statement by Qualcomm's own head of licensing.

171. Third, Professor Nevo claims I "fail[] to explain why chip makers do not sue Qualcomm in order to demand a license" and further claims that because "none of Qualcomm's current competitors has sought such recourse against Qualcomm" it must mean "that rival chip makers do not share Professor Elhauge's views as to the benefits of an exhaustive license, Qualcomm's contractual obligation to offer such a license, or both."[391] However, the Elhauge Report explains how Broadcom did have to bring exactly such a suit against Qualcomm, and that Qualcomm's conduct helped exclude Broadcom from the market.[392] Moreover, I did explain at length why other rival chipmakers may have rationally chosen not to sue, including because:[393]

- Rivals had rational incentives to wait for the legal landscape to develop, especially because a major court ruling on FRAND did not occur until 2015.
- A rival can find it prudent to await the conclusion of ongoing cases, especially when Qualcomm has also been under investigation from Asian antitrust regulators since at least 2013 and is currently being sued by others, including the FTC, Apple, and the present plaintiffs.
- These factors are exacerbated because litigation is extremely costly, invites retaliatory measures, and outcomes are uncertain.

Professor Nevo does not even respond to these first two contentions. Nor could he; Professor Nevo would have to explain why a rival chipmaker (e.g., MediaTek) would choose to sue Qualcomm over *exactly the same issue* that the FTC has *already* sued Qualcomm about. This would obviously be irrational, as is especially apparent

---

[390] Q2017MDL1_00414492 at 93 (emphasis added).
[391] Nevo Report ¶315.
[392] Elhauge Report ¶¶95, 106, 149.
[393] Elhauge Report ¶106.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

from the fact that (as I explained above) the Court has ruled in the FTC case that Qualcomm's FRAND commitments do obligate Qualcomm to license rivals.

172.     Professor Nevo does purport to respond to my third point about litigation being extremely costly, inviting retaliatory measures, and outcomes being uncertain.[394]  He claims that my illustration of rival hesitancy to sue Qualcomm is inconsistent with my claim that OEMs could litigate FRAND rates in the absence of the No-License-No-Chips tie,[395] but what I actually said was that rivals are *especially* incentivized to wait out existing lawsuits because of these litigation factors (and not that these factors alone will always prevent rivals from suing).[396]  Professor Nevo also claims I only have "a single example" of Qualcomm embroiling a rival (Broadcom) in costly litigation,[397] but he does not explain why this one example would not serve as a warning to others, and there are other examples anyway.[398]

173.     Fourth, Professor Nevo claims that I ignore evidence contradicting my theory, and he cites to evidence that Samsung did not believe there was a material risk that Qualcomm would sue Samsung over Samsung's chip business.[399]  There are several problems with Nevo's contention.  For one, it misinterprets the theory of harm, which is that the refusal to license chipmakers works in conjunction with the anticompetitive tax from No-License-No-Chips (and does not directly rely on the argument that chipmakers fear being sued directly).  Two, the observation that Samsung is not afraid of a lawsuit is endogenous to the actual world in which Qualcomm has weakened rivals through exclusionary conduct, whereas in a but-for world with stronger rivals Qualcomm may be more inclined to sue.  Three, his argument ignores the statement by Qualcomm's own head of licensing that Qualcomm communicated to rival chipmakers that it might sue them if they were not licensed.[400]

---

[394] Nevo Report ¶316.

[395] Nevo Report ¶316.

[396] Elhauge Report ¶106. ("A rival such as Samsung may very well find it prudent to await the conclusion of ongoing cases in order to best determine how to enforce its rights. *This is especially true because* litigation is extremely costly, invites retaliatory measures, and outcomes are uncertain.") (emphasis added).

[397] Nevo Report ¶316.

[398] *See supra* Section II.C.2 (showing that Qualcomm sought an ITC exclusion order against Apple after Apple sued Qualcomm).  Although Apple is not a chipmaker, this still shows Qualcomm's retaliatory nature.

[399] Nevo Report ¶317.

[400] *See supra* ¶170.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

174.    Professor Nevo next purports to refute my claim that the Dragonfly joint venture was affected by Qualcomm's refusal to provide a license.[401]   He is incorrect for the reasons I explain when I respond to Professor Snyder's near-identical claims below in Section XI.B.3.

175.    Professor Nevo next suggests that the failure of chip suppliers to obtain licenses from other cellular SEP holders must mean there is no restraining effect.[402] This argument fails to consider the No-License-No-Chips supra-FRAND tax; if other cellular SEP holders are licensing their patents on FRAND terms, then a rival chip supplier is not being taxed by them, and thus has less reason to seek its own exhaustive license.[403]

176.    Professor Nevo also repeats his claim that "it is an industry practice to license cellular SEPs at the device level to handset makers."[404]   But Professor Nevo does not explain how he squares this claim of a uniform industry practice with the fact that Qualcomm's own chipset business does obtain exhaustive licenses from other SEP holders.[405]   For other SEP licensors, the industry practice may (as just explained) simply reflect the fact that, because they license to device makers on FRAND terms, there is little motivation for chip makers to seek exhaustive licenses.[406]   Accordingly, it is economically erroneous for Professor Nevo to conflate a practice of component makers not taking exhaustive licenses from other SEP holders (which may reflect a lack of demand for them if they offered FRAND rates to device makers) with Qualcomm's refusal to sell exhaustive licenses to chipmakers who affirmatively wanted such licenses, a refusal that Intel VP Dana Hayter testified was unique to Qualcomm.[407]   In any event, I explained above that notwithstanding Qualcomm's claims that their policy just reflects a valid industry practice, the Court has already ruled in the FTC case that Qualcomm is obligated to provide licenses to willing chip suppliers due to its FRAND commitments.

---

[401] Nevo Report ¶318.
[402] Nevo Report ¶319.
[403] *See* Elhauge Report ¶111; *see also infra* Section XI.B.4 (responding to Professor Snyder's near-identical claim).
[404] Nevo Report ¶319.
[405] *See* Elhauge Report ¶¶ 101, 112.
[406] *See* Elhauge Report ¶111.
[407] Elhauge Report ¶112.

93

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### B. Professor Nevo's Mistaken Claims About Rival Chipmaker Successes

177.   In Section 7.2 of his report, Professor Nevo claims that "Market outcomes" show that rivals do sell chips without exhaustive licenses, and gives examples of how Intel, Samsung, and MediaTek are succeeding in CDMA and WCDMA chips.[408]  He further claims that because the refusal to exhaustively license also applies to WCDMA and non-premium LTE, my theories are inconsistent with how "rival chip makers have thrived and are thriving and successfully competing" in these segments.[409]  Professor Nevo is attacking a straw man.  Nowhere do I claim that every rival chipmaker will be unable to supply the market without an exhaustive license to Qualcomm's patents.  Rather, I show that the combination of the No-License-No-Chips policy and the refusal to license rivals creates an inescapable supra-FRAND tax on rival chips that restrains competition.  Professor Nevo is also repeating his fundamental error of failing to apply the correct but-for baseline. Instead, he argues that the mere existence of some competition and improvements from the past negate the possibility of anticompetitive harm, a contention I show to be incorrect above in Section III.A.  Under the correct baseline, the issue is not whether rival chipmakers exist or even grew relative to the past.  The issue is whether rival chipmakers were restrained from growing as much as they would have without the anticompetitive restraint.  Here, the evidence indicates that rival chipmakers have been less successful in the actual world than they would have been in the but-for world, regardless of whatever their level of success may have been in the actual world.

178.   Professor Nevo also ignores a plethora of additional evidence on how the refusal to exhaustively license rival deprives rivals of a valuable competitive tool.  First, the Elhauge Report shows that at least ██ rival chip suppliers, including ███████████████████████████████████, have sought exhaustive licenses from Qualcomm.[410]  These chip suppliers must have believed there was value in such a license, or they would not have sought it.  Second, Qualcomm has touted the fact that its chipset sales can pass through licensing rights granted to Qualcomm by third parties; as a chipset component supplier, Qualcomm is therefore benefitting from exhaustive chipset-level licenses but denying the same benefits to

---

[408] Nevo Report ¶320.
[409] Nevo Report ¶320.
[410] Elhauge Report ¶¶94-95.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

its rivals.[411]  Third, the Elhauge Report presents evidence that Qualcomm expressly recognized that exhaustively licensing chip rivals would adversely impact Qualcomm's ability to procure high royalty rates from OEMs.[412]  Professor Nevo does not appear to respond to this evidence.

179.  The remainder of Professor Nevo's Section 7.2 raises various claims that the actual world performance of Samsung and MediaTek disprove anticompetitive effects.[413]  His analysis here again suffers from his fundamental error of failing to apply the correct but-for baseline.  I also offer more detailed responses regarding his analysis of these examples in Section XI.B when discussing Professor Snyder's near-identical claims.  The only objection Professor Nevo raises is that "Mr. Moynihan could not recall a single individual from any actual or potential MediaTek customer who raised the concern that MediaTek needed a license from Qualcomm in order to sell its chips to that customer."[414]  Professor Nevo does not have a valid basis for disregarding Moynihan's general recollection of his customers' needs just because Moynihan cannot recall specific conversations with customers that occurred almost 10 years prior to his deposition.[415]

### C. Professor Nevo's Irrelevant Claim About Sales to Unlicensed OEMs

180.  Professor Nevo claims that testimony from MediaTek shows that some unlicensed OEMs may prefer to buy from chipset suppliers who do not have a license with Qualcomm, because such OEMs could then evade Qualcomm's royalties (and therefore avoid any supra-FRAND overcharge from Qualcomm).[416]  Professor Nevo claims this serves as an "advantage" for unlicensed OEMs.[417]  This claim is both incomplete and irrelevant.  It is incomplete because Professor Nevo fails to establish that unlicensed OEMs who want to dodge royalties are a significant portion of the addressable market for unlicensed chip suppliers.  It is also irrelevant because

---

[411] Elhauge Report ¶¶101-102.  In fact, in a September 2005 presentation, Qualcomm even noted

"                                                                                    "  Q2014FTC03371612 at Slide 14.

[412] Elhauge Report ¶104.

[413] Nevo Report ¶¶321-327.

[414] Nevo Report ¶326.

[415] Nevo Report ¶326 n. 597 (quoting Moynihan as unable to remember specific individuals from 2008-2009).

[416] Nevo Report ¶328.

[417] Nevo Report ¶328.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Qualcomm's refusal to license rivals harms *those suppliers who sought such a license from Qualcomm* or who would have sought a license but for Qualcomm's well-known policy of refusing to license rival chipmakers. A change in Qualcomm's practices to follow its FRAND commitment and license rivals would not mean that a rival preferring to sell to unlicensed OEMs would *necessarily* lose whatever "advantage" Professor Nevo thinks is conveyed by selling to unlicensed OEMs, because such a rival could keep its advantage by simply not asking Qualcomm for a license.

### D. Professor Nevo Ignores Qualcomm's Own Belief That Higher Royalties Result From Its Refusal to License Rival Chip Makers

181. Professor Nevo claims that arguments in the Elhauge Report that Qualcomm enjoys a higher royalty base from downstream licensing on the end-user device and that "Qualcomm would not be able to charge the same royalty at the chip level because the unfairness of the royalty would become readily apparent" are "speculative".[418]  His first objection is that I rely:

> on a single document—a transcript of a meeting between Qualcomm executives and the IRS—where Qualcomm employees mentioned that it may be more difficult to charge the same amount of royalties, or to convince a court that a certain level of royalties is "fair," when the royalty base is smaller. Professor Elhauge has not presented any evidence that the royalty base in fact had any effect on Qualcomm's royalties.[419]

In fact, my report did not cite only a single document.  The preceding paragraph of my report cited two other documents in which Qualcomm's former President of Qualcomm licensing and former President of Qualcomm each indicated that licensing rival chipmakers would lower Qualcomm's royalty rates.[420]  Further, the "single document" referenced by Professor Nevo actually involves a conversation among at least three Qualcomm executives (again the former President of Qualcomm licensing, as well as a former Qualcomm GM of Qualcomm's licensing division, and Qualcomm Chief Lawyer) all agreeing on the point in statements made to the IRS.[421]  Professor Nevo does not explain why he finds this unconvincing. Moreover, the Elhauge Report does not purport to analyze Qualcomm's royalty base

---

[418] Nevo Report ¶329-330 (citing Elhauge Report ¶105).
[419] Nevo Report ¶330.
[420] Elhauge Report ¶104.
[421] Elhauge Report ¶105 (quoting Q2017MDL1_02161041).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

empirically, it only states that in combination the documents cited in these two paragraphs mean that: "direct statements from four Qualcomm executives—show both an understanding that the refusal to license competing chip suppliers is calculated to enjoy a higher royalty base from downstream licensing on the end-user device, and an understanding that Qualcomm would not be able to charge the same royalty at the chip level because the unfairness of the royalty would become readily apparent."[422] There is nothing speculative about my noting what Qualcomm's own apparent beliefs are.

182.    Professor Nevo next argues that any argument that Qualcomm could not charge as high a royalty on exhaustive licenses to chipmakers relies on a controversial argument of behavioral economics.[423] However, my analysis is not based on any proposition of behavioral economics. It is based simply on Qualcomm's own assessment that the effects of its policy meant that with the tie it could charge a higher royalty rate on licenses to device makers than it could charge with an exhaustive license to chipmakers.[424] It does not matter for my analysis whether Qualcomm's conclusion is based on its assessment of the adverse effects of its tie, its assessment of the different demand elasticities of chipmakers and phonemakers, its assessment of behavioral economic effects, or its assessment of the legal implications of setting license fees that would have the non-FRAND rate more obvious, or some combination of all four assessments, as the statements made by Qualcomm executives indicate.[425] To the extent Qualcomm's assessment was based on behavioral economics, Professor Nevo's argument that framing effects could work in both directions[426] is irrelevant because Qualcomm's assessment would mean that it had concluded that here the direction worked to mean it could not charge as high a royalty rate on an exhaustive license to chipmakers. Further, even if Qualcomm were mistaken about this behavioral economics effects, its other assessments would still indicate that it thought the effects of the tie, the demand elasticities, and the legal implications would allow Qualcomm to charge higher royalty rates by tying phonemaker licenses to Qualcomm chips than Qualcomm could make by selling exhaustive licenses to rival chipmakers.

---

[422] Elhauge Report ¶105.
[423] Nevo Report ¶331.
[424] Elhauge Report ¶104-105.
[425] Elhauge Report ¶104-105.
[426] Nevo Report ¶331.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

183.    Professor Nevo also argues that using the handset price as a royalty base is industry practice and began before Qualcomm had any alleged chip market power, and therefore cannot be anticompetitive.[427]    However, as I explained in Section II.A.2.a, using the same nominal royalty rate can change from FRAND to supra-FRAND over time due to changes in device features, device usage, and patent portfolio strength; this same logic also means that the FRAND-ness of the royalty base may also be affected over time.    Moreover, my findings on anticompetitive harm do not rely on any requirement that Qualcomm's practice of charging royalties with the handset price as the base is inherently or necessarily anticompetitive.    The Elhauge Report notes Qualcomm's own belief that its current licensing regime allows it to use a handset-based royalty rate to charge higher royalties and to avoid detection of the unfairness of it royalties, but the Elhauge Report does not assert that a handset-based royalty is itself anticompetitive conduct.

## V. PROFESSOR NEVO'S INCORRECT CLAIMS ABOUT PROCOMPETITIVE JUSTIFICATIONS

184.    In the Elhauge Report, I showed that Qualcomm's anticompetitive conduct (such as its supra-FRAND No-License-No-Chips policy, its refusal to provide exhaustive licenses to rival chipmakers, and its exclusivity agreement with Apple) did not have any procompetitive justifications that might offset their significant anticompetitive effects.[428]    Among other things, I showed that this conduct was not necessary to produce any of the purported procompetitive justifications Qualcomm has put forth, because other less-restrictive alternatives would have equally (or better) achieved those same purported procompetitive effects without causing anticompetitive harm.    Consequently, prohibiting Qualcomm from engaging in the anticompetitive conduct would not eliminate any of the conduct's purported procompetitive effects, given that Qualcomm could switch to alternative less-restrictive alternative conduct that would provide all of the benefits to consumers without any of the anticompetitive harm.

185.    In Section 8 of his report, Professor Nevo takes aim at my analysis showing that Qualcomm's No-License-No-Chips Policy and its refusal to provide

---

[427] Nevo Report ¶332.
[428] Elhauge Report § III.C; Elhauge Report § IV.C; Elhauge Report § V.C.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

licenses to rival chipmakers have no procompetitive effects.[429]  I explain below that each of Professor Nevo's criticisms my procompetitive efficiencies analyses are mistaken, both factually and as a matter of economic logic.  For example, Professor Nevo's claims that Qualcomm's conduct is procompetitive depend on the extreme (and incorrect) stances that anything that increases Qualcomm's profits is procompetitive, and that it is irrelevant whether there are less restrictive alternatives to Qualcomm's conduct.

186.  Before addressing each of Professor Nevo's individual mistaken arguments about procompetitive efficiencies, I discuss two initial points.  First, Professor Nevo provides no quantitative estimate of purported procompetitive effects.  Professor Nevo never even *attempts* to calculate the extent to which the purported procompetitive effects would benefit consumers, which stands in stark contrast to Professor Flamm's quantitative analysis showing that Qualcomm's challenged conduct has caused customers to suffer over $5.6 billion in anticompetitive overcharges.[430]  Thus, even if one wrongly accepted any or even all of Professor Nevo's *theoretical* arguments about procompetitive effects, he still would not have shown that the conduct benefits consumers on net because he has not provided any quantitative estimate of the purported procompetitive benefits to consumers that one could compare to the enormous anticompetitive effects measured by Professor Flamm.

187.  Second, Professor Nevo prefaces his discussion of purported efficiencies with an argument that Qualcomm's "practice of licensing OEMs using the handset as a royalty base (device-level licensing) . . . . could not have been related to any misuse of market power or to any exclusionary motives" based on the premises that (a) Qualcomm engaged in device-level licensing (using the handset as the royalty base) before Qualcomm had market power and (b) other SEP-holders who do not sell chips engage in device-level licensing.[431]  I explain in Section IV.D above that these contentions have no bearing on whether Qualcomm's current use of the practice is anticompetitive, and these contentions anyway do not directly bear on my analysis of anticompetitive effects, which does not rely on a finding that Qualcomm is using the wrong royalty base.

---

[429] Professor Nevo does not attempt to justify Qualcomm's chip exclusivity agreement with Apple. Dr. Chipty does argue that the chip exclusivity agreement with Apple has procompetitive effects, and I address those arguments *infra* at Section XIII..

[430] Flamm Rebuttal Report ¶30.

[431] Nevo Report ¶336.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## A. Professor Nevo Fails to Present Valid Justifications for No-License-No-Chips

188.   Professor Nevo begins Section 8.1 of his report by stating three purported justifications for Qualcomm's No-License-No-Chips policy: (1) to "ensure a level playing field among OEMs"; (2) to "avoid assisting in the infringement of its own patents"; and (3) to "prevent OEMs from opportunistically claiming patent exhaustion from the sale of a chip."[432]   None of these are valid justifications.

189.   His second procompetitive justification can be dismissed quickly because Professor Nevo never offers any explanation or support for it. Although Professor Nevo notes twice in his report that Qualcomm's counsel have argued to the FTC that Qualcomm's No-License-No-Chips policy is necessary to "avoid assisting in the infringement of its own patents," he never actually attempts to explain why that would be true, let alone provide any supporting evidence.[433]   It thus appears that Professor Nevo is merely reciting that Qualcomm's counsel has asserted this.   Professor Nevo also never responds to my point that "Qualcomm is fully capable of seeking remedies for patent infringement under patent law," which means the No-License-No-Chips policy was not necessary to protect Qualcomm from losses due to the infringement of its cellular SEPs.[434]   Nor does he respond to my point that a less-restrictive-alternative to the No-License-No-Chips policy "would be for Qualcomm to use No-License-No-Chips to make OEMs sign *FRAND* licensing agreements" instead of *supra-FRAND* licensing agreements, which would equally protect Qualcomm's cellular SEPs but would not impose the supra-FRAND rate.[435]

190.   I also explained in the Elhauge Report that the third claimed justification is not a valid procompetitive efficiency because there were multiple less restrictive alternatives that could have achieved the same goal, such as: (i) conditioning the sale of a chip on a FRAND (instead of supra-FRAND) SEP license; or (ii) pricing Qualcomm's chipsets to "reflect both the chipset price and the IP conveyed by the chipset sale, i.e. by incorporating its cellular SEP royalties directly into the chipset price."[436]   Professor Nevo's attempt to defend this business

---

[432] Nevo Report ¶337.
[433] Nevo Report ¶337; Nevo Report ¶103.
[434] Elhauge Report ¶83.
[435] Elhauge Report ¶83.
[436] Elhauge Report ¶84.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

justification focuses on criticizing these proposed less-restrictive alternatives. I explain the errors in his critiques below in the next section (Section V.A.1).

191.   Professor Nevo's first claimed justification rests on a contention that the absence of No-License-No-Chips would cause discriminatory pricing. This is incorrect for similar reasons explained below in the section after that one (Section V.A.2).

### *1. Professor Nevo Cannot Justify No-License-No-Chips as Necessary for Earning Returns on Qualcomm's R&D Investments*

192.   Professor Nevo claims that "forcing sales to unlicensed OEMs would not allow Qualcomm to earn returns from its investments in R&D"[437] and that "because Qualcomm does not price its IP into the price of its chips, when selling to an unlicensed OEM, Qualcomm would earn no returns for the investment it made to develop the IP inherent in any SEPs substantially embodied in the chips" (due to patent exhaustion arguments).[438] This argument fails for multiple reasons.

193.   Taken literally, Professor Nevo's argument that Qualcomm cannot earn ***any*** return on its SEP R&D investments without the supra-FRAND No-License-No-Chips policy is obviously false. Qualcomm would still receive revenue based on its cellular SEPs if it used less-restrictive alternatives, such as using the No-License-No-Chips policy to sign FRAND licenses, or by incorporating a FRAND royalty for the cellular SEPs into the chip.

194.   Even if one gives Professor Nevo the benefit of the doubt that he meant to say that the supra-FRAND No-License-No-Chip policy is necessary for Qualcomm to achieve *reasonable* returns on its SEP investments, his argument still fails because less restrictive alternatives could also provide reasonable return on investments. Indeed, the "R" in "FRAND" stands for "reasonable," so a FRAND No-License-No-Chip policy or incorporating a FRAND price into the price of the chip would necessarily provide a "reasonable" return on Qualcomm's SEP investments under Qualcomm's own contractual FRAND commitment.

---

[437] Nevo Report ¶338.
[438] Nevo Report ¶339.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

195.   To be sure, Qualcomm would make *less* profit with one of the less-restrictive alternatives than with its current No-License-No-Chips policy, but only because the tie has inflated Qualcomm's royalties to supra-FRAND levels.  The fact that the No-License-No-Chips policy increases Qualcomm's profits does not represent a valid procompetitive efficiency.  After all, any anticompetitive conduct is designed to increase the profits of the firm who engages in such conduct.  If anticompetitive conduct was not expected to increase profits, no firm would engage in it.

196.   Professor Nevo's argument appears to stem from a belief that less restrictive alternatives ("LRAs") are irrelevant.  He specifically claims that the relevant question is not whether there are less-restrictive alternatives that achieve the same "business objectives" of the No-License-No-Chips policy, but rather whether there are any "justifications for the practice at issue that do not involve exclusionary motives."[439]   Professor Nevo does not provide any explanation supporting his remarkable claim that LRAs are irrelevant.  Professor Nevo similarly does not explain the remarkable claim that as long as the motive for a practice is not exclusionary, it must be procompetitive.

197.   Logically, considering less restrictive alternatives is necessary to determine whether prohibiting the challenged conduct would benefit consumers (indicating that the conduct is anticompetitive) or harm consumers (indicating that the conduct is procompetitive).  If there is a less-restrictive alternative that achieves all of the same legitimate business goals as the challenged conduct (if there are any), but does not have any of the anticompetitive effects, then prohibiting the challenged conduct will unequivocally benefit consumers.  Moreover, the existence of a less restrictive alternative means that the effect of choosing the actual anticompetitive conduct rather than the alternative is purely anticompetitive.

198.   Here, Professor Nevo never establishes that Qualcomm's supra-FRAND No-License-No-Chips policy provides any additional benefits to consumers that are not provided by less-restrictive alternatives, such as a FRAND No-License-No-Chips policy or incorporating a FRAND royalty for the SEPs into the price of the chips.  Professor Nevo therefore never establishes that the challenged conduct is necessary to achieve any effects that benefit consumers.  Thus, Qualcomm's No-License-No-Chips is on net anticompetitive and harmful to consumers if it has any

---

[439] Nevo Report ¶340.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

anticompetitive effects. Professor Nevo's unsupported assumption that less-restrictive alternatives are irrelevant does not change this.

### 2. Professor Nevo Cannot Justify No-License-No-Chips as Necessary to Avoid Discrimination

199.    Professor Nevo's next attempt at defending Qualcomm's No-License-No-Chips policy is to claim that: "Qualcomm's practice of selling chips only to licensed customers is procompetitive relative to Professor Elhauge's alternative of Qualcomm pricing its IP into its chips" because such pricing "may lead to a licensing regime in which Qualcomm charges OEMs different royalties depending on whether a Qualcomm or a competitor's chip is used. This discriminatory licensing regime may also raise competitive concerns."[440]  Professor Nevo's explanation of this is as follows: because pricing the IP into Qualcomm's chips would only convey the IP on Qualcomm's chips, "Qualcomm would still have to find a way to charge royalties on handsets containing competitors' chips."[441]  He states that licensing such handsets (those containing competitors chips) requires either "licensing OEMs who utilize competitors' chips" or "offer[ing] rival chip makers exhaustive licenses".[442]

200.    With respect to the former claim about OEMs,[443] Professor Nevo argues that OEMs "would have to have different royalty structures based on whether a handset used Qualcomm's chips or used a competitor's chips" because "When a competitor chip is used the royalties will be based on the handset price, but when a Qualcomm chip is used the royalty will be contained within the chip price."[444] Professor Nevo claims this could raise discriminatory or competitive concerns.[445] Professor Nevo is attacking a straw man because my explained LRA, that "Qualcomm could simply price its chipsets to reflect both the chipset price and the IP conveyed by the chipset sale",[446] does not require the price to be a percentage of

---

[440] Nevo Report ¶341.
[441] Nevo Report ¶342.
[442] Nevo Report ¶342.
[443] Professor Nevo discusses the latter claim about licensing rivals in Section 8.2 of his report, and I respond to his contentions below in Section V.B.
[444] Nevo Report ¶343.
[445] Nevo Report ¶343.
[446] Elhauge Report ¶84.

103

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

the chip price; Qualcomm could still charge the royalty as a percentage of the ultimate handset price.[447]

201.   Even if Qualcomm used the chipset price as the royalty base for its own chips and the handset price as the royalty base for competitor chips, Professor Nevo merely speculates that licensees or rivals "may" raise claims of discrimination or anticompetitive behavior.   Such speculative concerns do not justify an anticompetitive practice.  Moreover, even if one were to agree with Professor Nevo that Qualcomm pricing its IP into its chips is not an LRA (despite my showing that is incorrect), he still fails to address the other LRA of Qualcomm implementing No-License-No-Chips with a FRAND rate.

## B. Professor Nevo Fails to Present Valid Justifications for Refusing Rival Licenses

202.   Since Professor Nevo and I have submitted our opening merits reports, the Court in the parallel FTC case has ruled that Qualcomm's contractual FRAND commitments require it to provide exhaustive licenses to rival chipmakers.[448] Qualcomm's refusal to provide exhaustive licenses to rival chipmakers violates Qualcomm's FRAND commitments and thus cannot possibly be procompetitive. This development alone moots all of Professor Nevo's arguments that Qualcomm's refusal to provide exhaustive licenses to chipmakers is procompetitive. Nonetheless, below I rebut Professor Nevo's incorrect arguments that requiring Qualcomm to offer exhaustive licenses to rival chipmakers would increase transaction costs and that requiring Qualcomm to offer exhaustive licenses to rival chipmakers would harm rival chipmakers by increasing their costs.[449]

---

[447] As I explain in Section IV.D above, my findings on anticompetitive harm do not rely on any requirement that Qualcomm's practice of charging royalties with the handset price as the base is inherently or necessarily anticompetitive.  The Elhauge Report notes Qualcomm's own belief that its current licensing regime allows it to use a handset-based royalty rate to avoid detection of the unfairness of the rate, but the Elhauge Report does not assert that a handset-based royalty is anticompetitive conduct.

[448] See supra Section IV.

[449] Nevo Report ¶344.  Professor Nevo incorrectly suggests that "Professor Elhauge suggests that if it were to license chip makers, Qualcomm would stop using the handset price as the royalty base, and instead use the chip price as the royalty base."  Nevo Report ¶345.  I never make this claim. The Elhauge Report merely notes Qualcomm's own belief that its current licensing regime allows it to use a handset-based royalty rate to charge higher royalties and avoid detection of the

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### 1. Offering Exhaustive Licenses to Rival Chipmakers Would Not Increase Transaction Costs

203.   Professor Nevo argues that requiring Qualcomm to offer exhaustive licenses to rival chipmakers would "require Qualcomm and potential licensees to incur substantial transaction costs."[450]  Professor Nevo's argument is based on the premise that Qualcomm's FRAND commitment does not obligate Qualcomm to offer exhaustive licenses to rival chipmakers.  But because the FRAND commitment does obligate Qualcomm to offer exhaustive licenses to rival chipmakers, there is no validity to Professor Nevo's arguments.  Given the FRAND commitment, refusing to provide exhaustive licenses would actually *increase* Qualcomm and licensees' transaction costs by forcing licensees to sue Qualcomm in order to obtain the FRAND licenses to which they are entitled.

204.   Professor Nevo's claims about increasing transaction costs are that "were Qualcomm to exhaustively license at the modem chip level, it would still also likely need license device makers" and that such multi-level licensing would require a costly transition from the current licensing scheme, would be costly to maintain, might require costly determinations of which patents are infringed at which level and by which rivals, and that establishing the royalty rate at each level would be long and costly.[451]   However, avoiding the cost of transitioning away from an anticompetitive practice obviously cannot be a procompetitive justification. Qualcomm's arguments boil down to not wanting to make FRAND determinations for its patent portfolio and subsets of its portfolio, but if that were the case, then Qualcomm should not have made FRAND commitments.

205.   Nor does Professor Nevo offer any response to the Elhauge Report's explanations of why this procompetitive justification is invalid.  He does not respond to the point that any claimed inefficiency would be a result of Qualcomm's own FRAND commitment to license chipmakers.[452]   He does not respond to the observation that expert analysis showing that all the SEP is substantially embodied

---

unfairness of the rate, but the Elhauge Report does not assert that licensing to rival chipmakers requires a royalty based on the chipset price. *See* Elhauge Report ¶105.

[450] Nevo Report ¶348.

[451] Nevo Report ¶¶348-354.

[452] Elhauge Report ¶109.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

in the chips suggest that the inefficient aspect of Qualcomm's licensing is its insistence on licensing at the device level at all, rather than at the chipset level."[453] He does not respond to the point that any transaction costs could hardly be material compared to the billions of dollars in SEP royalties at issue.[454]  Nor does he respond to the point that, if Qualcomm charged FRAND rates to OEMs, then Qualcomm would not be imposing the tax that can be avoided only if rival chipmakers had a license and rivals would have no incentive to seek licenses from Qualcomm if those licenses materially increased transaction costs.[455]  Finally, he offers no response to the observation that the claimed inefficiency of licensing at the component level conflicts with the fact that Qualcomm itself obtains licenses from others for its own chips and that Intel VP Dana Hayter testified that Qualcomm was the only SEP holder that refused to provide licenses to chipmakers who requested them.[456]

### 2. Offering Exhaustive Licenses to Rivals Could Not Possibly Harm Rival Chipmakers' Competitiveness

206.  Professor Nevo argues that offering exhaustive licenses to rival chipmakers would actually *lessen* those rivals' competitiveness and introduce competitive concerns not currently present because such offers would increase rival costs if they (instead of the device holders) were paying royalties on Qualcomm's SEPs.[457]  His argument fails for several reasons.

207.  First, Professor Nevo's argument that the refusal to license rivals somehow decreases rival costs is based on his premise that chip rivals do not need a license to Qualcomm's IP.[458]  I refute that premise above in Section IV.A.

208.  Second, Professor Nevo is necessarily wrong for the simple reason that rival chipmakers are always free to *refuse* an offer for an exhaustive license, and therefore rival chipmakers would accept the offer only if doing so increased their profits relative to not having an exhaustive license.  Many chipmakers asked for exhaustive licenses, which indicates that they believed such licenses would increase

---

[453] Elhauge Report ¶109.
[454] Elhauge Report ¶110.
[455] Elhauge Report ¶111.
[456] Elhauge Report ¶112.
[457] Nevo Report ¶¶355-56.
[458] Nevo Report ¶346.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

their profits.[459]   Qualcomm would also be contractually obligated to offer the exhaustive licenses to chipmakers at FRAND rates, which are necessarily lower than the supra-FRAND rate that Qualcomm currently charges OEMs and that already taxes these rival chipmakers.

209.   Third, Professor Nevo's claimed procompetitive justification simply ignores my showing that refusing to offer exhaustive licenses to rival chipmakers raised their costs by preventing them from avoiding the supra-FRAND tax on SEP licenses that was created by the No-License-No-Chips tie.[460]   Nor does he respond to my point that if Qualcomm did license its SEPs to OEMs on FRAND terms, then there would be no anticompetitive tax to avoid, which would give chipset rivals far less incentives to seek an exhaustive license, in which case they would not have to pay Qualcomm any royalties.[461]

## C. Professor Nevo's Justifications Concerning the Royalty Base Are Irrelevant

210.   In Section 8.3 of his report, Professor Nevo offers a number of justifications for Qualcomm's use of the handset price as the royalty base.  This appears to be in response to his believe that: "Professor Elhauge's proposed alternative is that Qualcomm will be forced to use the baseband processor chip price as the royalty base."[462]   However, I never make such a claim.  The Elhauge Report merely notes Qualcomm's own belief that its current licensing regime allows it to use a handset-based royalty rate to charge higher royalties and avoid detection of the unfairness of the rate, but the Elhauge Report does not assert that licensing to rival chipmakers requires a royalty based on the chipset price.[463]   Therefore, I offer no opinion on what the correct royalty base is for Qualcomm's royalties, nor on whether any arguments or factual premises limited to Section 8.3 of Professor Nevo's report are correct (because all of his arguments are irrelevant to assessing procompetitive efficiencies, given that my findings on anticompetitive harm do not rely on any requirement that Qualcomm's practice of charging royalties with the handset price as the base is inherently or necessarily anticompetitive).

---

[459] Elhauge Report ¶95.
[460] Elhauge Report ¶61-66, 97.
[461] Elhauge Report ¶111.
[462] Nevo Report ¶¶355-56.
[463] *See* Elhauge Report ¶105.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### D. Professor Nevo's Justifications Concerning Strategic and Marketing Funds Are Not Relevant to My Analysis

211.   In Section 8.4 of his report, Professor Nevo claims that Qualcomm's use of strategic and marketing funds is justified.  I explain in Section II.E above that my analysis already accounted for any strategic and marketing funds.  I offer no opinion on whether Qualcomm's use of strategic and marketing funds is anticompetitive, nor on whether any arguments or factual premises limited to Section 8.4 of Professor Nevo's report are correct.

## VI. PROFESSOR SNYDER'S APPROACH TO ANTICOMPETITIVE HARM

212.  Professor Snyder claims he will "evaluat[e] Plaintiffs' claims of anticompetitive harm to the modem chip industry by analyzing two alternative hypotheses": he defines the "Industry Factors Hypothesis" as corresponding to "the but-for world in which the at-issue conduct is removed, but industrial organization principles apply and industry factors are present", and defines the "Plaintiffs' Hypothesis" as corresponding to "the actual world in which the at-issue conduct is present along with other relevant factors."[464]   His initial framing is analytically confused because he calls one hypothesis the but-for world and the other hypothesis the actual world, and then presents them as "alternative" hypotheses.  But there can be no alternative hypotheses of what occurred in the actual world – it is observable.  Nor do plaintiffs offer just a hypothesis about the actual world: they offer a hypothesis about how the but-for world would have differed from the actual world.  And defendants do not just offer an abstract hypothesis about the but-for world; they offer an argument that it would not have differed from the actual world.  The alternative hypotheses of plaintiffs and defendants are thus clearly instead alternative hypotheses about the extent to which the but-for world would have differed from the actual world.

213.   Indeed, notwithstanding his initial analytical confusion, Professor Snyder's subsequent descriptions of his analysis make clear that he is discussing two alternate hypotheses about how the but-for world would have differed from the actual world.  I describe his approach in detail below, and note some general flaws that are present in his implementation of the approach throughout later sections of his report.  The general problem with his approach is that in applying his industry

---

[464] Snyder Report ¶20.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

factors hypothesis, he fails to live up to the but-for standard he himself acknowledges should apply. Instead, he repeatedly just assumes (1) that any industry factors that are present in the actual world would have been the same in the but-for world and (2) that they would have produced the same outcomes without the anticompetitive conduct, without providing evidence that would establish the accuracy of either assumption.

214.    Professor Snyder first elaborates that his Industry Factors Hypothesis "identifies relevant principles and factors that are expected to exert a strong influence on the structure and development of the modem chip industry", such as economics of scale/scope, learning, specific investments, research and development, and supplier efforts in product differentiation.[465]  Under this hypothesis, "relevant industry factors that are unaffected by the at-issue conduct and would have been present in the but-for world without that conduct explain the structure of the industry at any point in time, the success and failure of modem chip suppliers, industry changes, and observed entry and exit decisions."[466]  In this hypothesis "the success and failure of firms depend on their foresight, their investments, and their ability to execute".[467]  Foresight, investment, and execution are key concepts that Professor Snyder repeatedly invokes throughout his analysis.

215.    Professor Snyder next elaborates that his understanding of Plaintiffs' Hypothesis is that Qualcomm's anticompetitive conduct "caused various anticompetitive outcomes and allowed Qualcomm to become more successful than it otherwise would have been" and that as a result, "Qualcomm faced less competition as rival chip suppliers could not gain sales, or sufficient sales to reach efficient scale, were denied learning benefits, and were denied certification benefits from selling to Apple and other major OEMs."[468]  He claims these effects "would be indicated by (a) reduced investment by Qualcomm's competitors, (b) exit from the modem chip industry, (c) deterred entry by potential competitors, and (d) limited success of Qualcomm's actual competitors."[469]

216.    Thus, Professor Snyder's "Industry Factors Hypothesis" is that industry factors would have made the but-for world the same as the actual world even if the alleged anticompetitive conduct was absent, whereas his "Plaintiff's Hypothesis" is

---

[465] Snyder Report ¶21.
[466] Snyder Report ¶22.
[467] Snyder Report ¶22.
[468] Snyder Report ¶23.
[469] Snyder Report ¶23.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

that the but-for world would have been different (and more competitive than) the actual world.  He then claims that:

> distinguishing the two hypotheses is crucial to the issue of causality i.e., whether, as claimed by Plaintiffs, the at-issue conduct caused a reduction in competition in the modem chip industry, or whether standard industrial organization factors in high-tech industries explain both the overall industry structure and the success and failure of individual modem chip suppliers.[470]

Professor Snyder claims to "conduct[] a systematic, in-depth analysis of the types of economic activity that occur in the modem chip industry" in order to "identify the demand-side and supply-side industry factors that, independent of the at-issue conduct, are expected to drive the economic activity in the industry, and to develop insights regarding industry structure and firm-level factors that influence firms' success and failure."[471]  Based on the factors he identifies, he claims to study how they influence market outcomes for 14 chip suppliers and how they influence the relationships between OEMs and modem chip suppliers.[472]  He also claims to complement this analysis by examining whether "the longer-run performance of the industry" evinces "impairment in the industry's performance".[473]

217.   Professor Snyder purports to also consider the importance of "whether the relevant firm-level industry factors that explain those outcomes may themselves have been influenced by the alleged exclusionary conduct".[474]  The alternative is that if "all of the analyzed industry and supplier outcomes were found to be fully explained by the Industry Factors Hypothesis, i.e., they would also have occurred in a but-for world without the at-issue conduct but with the relevant industry factors, it would not be necessary to conduct any additional testing of Plaintiffs' Hypothesis."[475]

218.   The preceding paragraph contains the most crucial insights for evaluating Professor Snyder's analysis.  Professor Snyder's framework recognizes that he must show that that market outcomes are ***fully explained*** by industry factors.  However, his analysis (as I will explain below in Sections VII-XI) often simply assumes that just because certain industry factors ***can*** influence outcomes, that they

---

[470] Snyder Report ¶24.
[471] Snyder Report ¶24.
[472] Snyder Report ¶24.
[473] Snyder Report ¶24.
[474] Snyder Report ¶25.
[475] Snyder Report ¶27 (emphasis added).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

must ***fully explain*** the outcome, but he offers no evidence that would establish the accuracy of such an inference. Similarly, Professor Snyder's framework recognizes that he must consider whether the industry factors themselves were influenced by Qualcomm's exclusionary conduct, but his analysis (as I will explain below in Sections VII-XI) often fails to explore this possibility. If Qualcomm's conduct weakened rivals' abilities to foresee, invest, execute, and obtain economies of scale, then one cannot just point to those rivals' weaknesses in planning, investing, executing, or obtaining economies of scale as evidence that there is no anticompetitive effect. However, Professor Snyder simply assumes that none of these types of weaknesses was influenced by Qualcomm's anticompetitive conduct, without providing evidence that would establish the accuracy of that assumption.

219.    Thus, despite articulating a but-for framework that purports to consider these factors, Professor Snyder doesn't actually consider them in practice. A complementary problem in his analyses is that, contrary to his own but-for framework, Professor Snyder often incorrectly infers that an improvement from the past is the same as an improvement from the but-for world. As I explain in Section III.A, the past is not the relevant baseline for determining anticompetitive effects and differs entirely from using the correct but-for baseline.

## VII. PROFESSOR SNYDER'S CLAIMS ABOUT INDUSTRY FACTORS

220.    In Section III of his report, Professor Snyder claims to "review fundamental industrial organization principles and then frame their relevance to the modem chip industry" and then "conduct an in-depth analysis of the modem chip industry".[476] He claims that his analysis "underscores the importance of (a) foresight, (b) efficient investment in technologies, and (c) execution of strategies."[477] I offer no opinion on whether Professor Snyder has correctly characterized the evidence he presents to support this conclusion, but I note that the conclusion itself— as a broad general principle—is uncontroversial: that all else being equal, a firm that has better foresight, better investment, and/or better execution is likely to do better in any market, including the chipset market.[478] But that proposition provides no support either for any inference that exclusionary conduct did not impair the ability of rivals on any of these dimensions or for any conclusion that firms with those same

---

[476] Snyder Report ¶¶43-44.

[477] Snyder Report ¶44.

[478] My failure to specifically address a given fact or claim from Professor Snyder's Section IIII here is not agreement with such fact or claim; I refer only to the broad general conclusion.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

abilities would not have been more effective if their sales were not being restrained and taxed by Qualcomm's conduct.

## VIII. PROFESSOR SNYDER'S CLAIMS ABOUT SUPPLIER-OEM RELATIONSHIPS

221.    In Section IV of his report, Professor Snyder claims that "evidence related to modem chip supplier–OEM relationships" is "relevant for distinguishing between the Industry Factors Hypothesis and Plaintiffs' Hypothesis."[479]  He claims that Section III of his report establishes that "the Industry Factors Hypothesis supports an array of modem chip supplier–OEM relationships in terms of (a) the number of modem chip suppliers an OEM purchases from at a point in time and (b) changes in the number and identities of those modem chip suppliers over time" because "OEMs face trade-offs. . . in making such sourcing decisions."[480]

222.    However, Professor Snyder does not ever actually explain why any of his findings on supplier-OEM relationships in Section IV of his report are at all inconsistent with the possibility that Qualcomm's anticompetitive conduct influences those relationships and/or the factors that he claims to determine those relationships.  Put differently, although he lists a number of industry factors that influence outcomes in supplier-OEM relationships, he does not explain why these industry factors support the Industry Factors Hypothesis because he neither establishes that they fully explain observed outcomes, nor establishes that Qualcomm's exclusionary practices fail to influence those industry factors.

223.    To illustrate the general flaws, I observe that Professor Snyder's claimed findings in Section IV.A of his report (on "Number of modem chip supplier relationships by OEM")[481] include that:
- "an OEM typically sources modem chips from more than one supplier at the same time" and that "OEMs tend to use multiple suppliers for LTE-compatible modem chips as well".[482]

---

[479] Snyder Report ¶195.
[480] Snyder Report ¶195.
[481] I offer no opinion on whether Professor Snyder has correctly characterized the evidence he presents to support these findings.  My failure to specifically address a given fact or claim from Professor Snyder's Section IV.A here is not agreement with such fact or claim.  Rather, I am illustrating a general flaw that infects all of Professor Snyder's analysis in his Section IV.A.
[482] Snyder Report ¶197.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

- "OEMs with fewer device models use fewer chip suppliers" (e.g., Apple) and "Samsung appears to have used two modem chip suppliers for [the flagship Galaxy S] line at any given time".[483]

But Professor Snyder does not actually explain why these claimed findings preclude what he calls Plaintiffs' Hypothesis. For example, Professor Snyder does not explain why OEMs' typically sourcing from more than one chip supplier precludes the possibility that, but-for exclusionary conduct, OEMs may nevertheless have chosen additional or different suppliers.

224.   As another illustration of the general flaws, Professor Snyder's claimed findings in Section IV.B of his report (on "Changes in modem chip supplier–OEM relationships over time")[484] include that:

- "The patterns of changes in modem chip supplier–OEM relationships over time are consistent with ongoing competition among suppliers to gain supply relationships with OEMs."[485]
- "sales of modem chips for high-end devices are likely to be more concentrated among suppliers than sales of modem chips for low-end devices."[486]

But Professor Snyder does not actually explain why these claimed findings preclude what he calls Plaintiffs' Hypothesis. The fact that in the actual world there is some "ongoing competition" hardly shows that in the but-for world competition would not be more vigorous because it would not be restrained by Qualcomm's exclusionary conduct. Likewise, the fact that in the actual world we see concentration of high-end modem chip suppliers hardly precludes the possibility that, in a but-for world without the exclusionary conduct, high-end OEMs would have chosen additional or different suppliers.

225.   As another illustration of the general flaws, Professor Snyder's claimed findings in Section IV.C of his report (on "Increasing vertical integration among high-end OEMs and their modem chip suppliers")[487] includes that:

---

[483] Snyder Report ¶¶197-198.

[484] I offer no opinion on whether Professor Snyder has correctly characterized the evidence he presents to support these findings. My failure to specifically address a given fact or claim from Professor Snyder's Section IV.B here is not agreement with such fact or claim. Rather, I am illustrating a general flaw that infects all of Professor Snyder's analysis in his Section IV.B.

[485] Snyder Report ¶205.

[486] Snyder Report ¶212.

[487] I offer no opinion on whether Professor Snyder has correctly characterized the evidence he presents to support these findings. My failure to specifically address a given fact or claim from

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

- increased vertical integration of modem chip supply by Samsung and Huawei may "naturally limit opportunities for non-integrated modem chip suppliers to find OEM customers for their modem chips. Put differently, as Samsung and Huawei source more modem chips from their respective captive chipmakers (i.e., shift their demand from external suppliers to self-supply), the aggregate demand for chips made by independent modem chip suppliers such as Qualcomm, Intel, and MediaTek will be reduced."[488]

But Professor Snyder does not consider whether Qualcomm's exclusionary conduct might have affected Samsung and Huawei's decisions to vertically integrate, especially given that employees from both of these OEMs testified that Qualcomm's chip supply threat affected them.[489]  In other words, he fails to consider whether the level of vertical integration we see in the actual world would have been lower in a but-for world without Qualcomm's exclusionary conduct.  Further, even if one assumed Professor Snyder were right in his unsupported assumption that the level of vertical integration would have been the same in the but-for world, Professor Snyder fails to establish that this means the exclusionary conduct did not affect market outcomes.  Even if such vertical integration would have taken some sales from rival standalone chipmakers in the but-for world, Qualcomm's exclusionary conduct would take away *additional* sales and thus impair those rivals relative to the but-for world.  Further, Samsung and Huawei themselves would have been able to compete more effectively with Qualcomm if Qualcomm did not engage in the exclusionary conduct of withholding an exhaustive license from Samsung and Huawei.[490]  But Professor fails to even consider these possible reasons why vertical integration might not "fully explain" the market outcomes that we see and why, despite vertical integration, the but-for world might be more competitive.

---

Professor Snyder's Section IV.C here is not agreement with such fact or claim.  Rather, I am illustrating a general flaw that infects all of Professor Snyder's analysis in his Section IV.C.

[488] Snyder Report ¶216.

[489] Elhauge Report ¶¶45, 56.

[490] *See* Elhauge Report § IV.B.  The Elhauge Report notes that "In an interrogatory response, Qualcomm identifies 26 instances since 2002 where one of 17 different chipset manufacturers sought an exhaustive license that would have included Qualcomm's SEPs to use those chipsets." Elhauge Report ¶94 (citing Qualcomm Inc.'s Objections and Supplemental Responses to Apple Inc.'s Special Interrogatory Nos. 9, 12, 13 and 15 and Interrogatory Nos. 19, 20 and 31).  Two of these instances were attempts by HiSilicon (Huawei's subsidiary chip maker) to negotiate a license from Qualcomm in 2002 and 2017.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## IX. PROFESSOR SNYDER'S CLAIMS ABOUT CHIP SUPPLIER PERFORMANCE

226.   In Section V of his report, Professor Snyder claims to "assess whether observed outcomes are contrary to those predicted by the Industry Factors Hypothesis, which is necessary to support Plaintiffs' Hypothesis."[491]  He claims to reach two conclusions: (1) that "Qualcomm is a successful modem chip supplier because of its competitive advantages and engineering prowess" and (2) "that successes and failures of other modem chip suppliers are also fully explained by industry and firm-level factors that are unrelated to Qualcomm's alleged exclusionary conduct, which thus contradicts Plaintiffs' Hypothesis."[492]  In Section A below, I show that Professor Snyder fails to establish that those firm-level factors would have been the same in the but-for world.  To the contrary, all those firm-level factors would predictably be affected by Qualcomm's exclusionary conduct.  In Section B below, I show that Professor Snyder fails to establish that those firm-level factors "fully explain" actual market outcomes: i.e., he fails to show that those firm-level factors would have led to the same market outcomes in the but-for world.  To the contrary, even if we assumed all those firm-level factors would be unchanged in the but-for world, Qualcomm's exclusionary conduct would still affect market outcomes.

### A. Professor Snyder Fails to Show that Qualcomm's Exclusionary Conduct Did Not Affect Firm-Level Factors

227.   I noted above in Section VI that Professor Snyder recognized the need for his approach to consider whether the relevant factors that explain outcomes may themselves have been influenced by the alleged exclusionary conduct, and I also noted that he recognized the need to establish that industry factors "fully explain" outcomes in order to support his Industry Factors Hypothesis.  Professor Snyder also reiterates his belief that the three main factors contributing to modem chip suppliers' successes and failures "at the innovative forefront of the industry are: (i) foresight, or the ability to predict and align with demand; (ii) efficient and strategic investment in developing modem chip technologies; and (iii) execution, as demonstrated by timely, reliable delivery of products."[493]  I explain below that Qualcomm's conduct can affect each of these factors.

---

[491] Snyder Report ¶220.
[492] Snyder Report ¶221.
[493] Snyder Report ¶218.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

228.   I explain in Sections III.B and IV.B of the Elhauge Report, as well as in Section III.D above, that Qualcomm's No-License-No-Chips policy and refusal to exhaustively license rival chipmakers together serve to raise rival costs by imposing the supra-FRAND royalty as a tax on the transaction between an OEM and a rival chip supplier.  I also explain in Section III.E.1 that (according to Professor Snyder's own report) profitability and margins are an important component of strategic R&D decisions, such that Qualcomm's taxation of rivals inefficiently makes them less able to invest in innovation relative to Qualcomm.  Thus, the "investment" factor in Professor Snyder's framework is directly affected by the exclusionary conduct at issue in this case.  The economic effect of such a tax will also be equivalent to higher prices than a but-for world, which will also affect the "execution" factor (Professor Snyder notes in one of his sections on "Execution" that "The 'aggressive pricing' of VIA Telecom's CDMA2000 1xEV-DO modem chips was one of the primary reasons for their success").[494]   Furthermore, a rival chip supplier's ability to "align with demand" is also affected by its inability to get a license from Qualcomm.  For example. if a rival foresaw the benefit of CDMA2000 and would have "aligned with demand" for CDMA2000 if it could get an exhaustive license from Qualcomm, but the lack of such a license deterred the rival, then the failure to "align with demand" is the result of Qualcomm's conduct.  Thus, the refusal to exhaustively license affects the "foresight" factor as well.

229.   I explain in Section V.B.2 of the Elhauge Report that Qualcomm's exclusivity arrangement with Apple denied rival chipmakers sales at Apple, as well as the attendant engineering support.  I also explain in that section how a modem supplier serving Apple can "fund R&D to maintain leadership."[495]  Thus, foreclosure from Apple also affects both the "execution" factor (which Professor Snyder defines to includes "gaining relevant experience needed to develop new products"[496]) and the "investment" factor.

230.   In sum, Professor Snyder's analysis assesses only modem chip suppliers' "foresight", "investment" an "execution" in the actual world.  Professor Snyder provides no evidence to establish that these companies would not have invested more, executed better, and gained more foresight in a but-for world that

---

[494] Snyder Report ¶444.
[495] Elhauge Report ¶140.
[496] Snyder Report ¶177.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

was not restrained by Qualcomm's exclusionary conduct.  Instead, he ignores the above evidence to the contrary.

231.    Furthermore, to the extent Professor Snyder wishes to develop evidence on foresight, investment, and execution prior to 2011, he must also establish that exclusionary conduct was not driving firm-level factors prior to 2011.  My analysis of anticompetitive harm focuses on effects in 2011 onward, and does not necessarily require Plaintiffs to establish the presence or absence of anticompetitive harm in earlier years.  By contrast, Professor Snyder's attempt to link post-2011 market outcomes to pre-2011 industry factors requires him to demonstrate the absence of anticompetitive harm in the pre-2011 industry factors.  As an illustration of this point, consider a hypothetical where a chipset monopolist, Kwalchip, engages in illegal predatory pricing in 2004 and drives all other chipset manufacturers out of the market.  Suppose further that in 2012 Kwalchip imposes a tying scheme that prevents any rivals from being able to re-enter the market.  If one were analyzing the effects of the Kwalchip tying scheme, one could establish anticompetitive harm by demonstrating that the tying scheme has an exclusionary effect in 2012.  This does not require one to prove the existence or absence of harm in 2004.  However, if one were to instead claim that the tying scheme was not exclusionary in 2012 because no rival chip supplier had shown "foresight" or "investment" or "execution" in 2004, such an affirmative showing would require one to rule out that the predatory pricing caused the exits in 2004.  This is because one can only claim that chip supplier actions in 2004 are evidence of exogenous industry factors if those chip supplier actions are, in fact, exogenous, and not the result of an older anticompetitive scheme that existed in 2004.

232.    I do not intend to suggest in the preceding paragraph that Professor Snyder cannot demonstrate industry factors without a complete review of every Qualcomm practice since 1990.  But he must at least consider whether potentially exclusionary practices for which there is *some* evidence will weigh on the development of industry factors.  For example, Qualcomm's own contention is that it has always implemented the No-License-No-Chips policy and it has always refused to exhaustively license chip rivals.[497]  This means that Professor Snyder's attempt to affirmatively establish that an industry factor drove an outcome before 2011 must affirmatively establish that the outcome was not an anticompetitive effect

---

[497] Nevo Report ¶52 ("Since Qualcomm began selling chips, it has maintained a practice of not selling them to customers who do not have a license for devices that implement at least one of the standards the chip"); *id.* at ¶43 ("Qualcomm's practice of licensing exhaustively exclusively at the device level has remained constant from 1990 to the present.").

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

of these policies before 2011. As a hypothetical example, it would be disingenuous for Professor Snyder to point to a chip rival's unwillingness to invest in chips in 2007 as evidence that the lack of investment excluded the rival, if Qualcomm had in fact used monopoly power to drive that rival out of the market in 2007 (and was now using that power in the same way to keep the rival from re-entering).

233.    The takeaway of the previous two paragraphs is that Professor Snyder must consider the possibility that evidence of rival foresight, execution, and investment from before 2011 might be endogenous to anticompetitive conduct (especially the challenged conduct in this case, because Qualcomm maintained those same practices prior to 2011). As a concrete illustration of this issue, consider that Professor Snyder claims that Infineon was affected by foresight because it made a "decision not to pursue leading-edge technology" and "never released a CDMA-compatible chip."[498]    However, Infineon had actually sought a license from Qualcomm in 2002 but only received a non-exhaustive one.[499] Yet Professor Snyder fails to consider whether the failure to obtain a license is what endogenously drove Infineon's "foresight" in chip technology decisions, instead of some exogenous "foresight" factor.

234.    There are also additional types of Qualcomm conduct that Professor Snyder would need to separate from industry factors in any pre-2011 evidence. One example is that Professor Snyder claims that "Intel's prolonged focus on WiMAX was partly responsible for its delayed LTE development" is evidence of foresight affecting Intel.[500] He makes a similar claim for Broadcom and WiMAX.[501] Yet he fails to consider that Professor Nevo explains that a 2007 agreement between Qualcomm and Apple involved Qualcomm paying Apple marketing funds to incentivize Apple to develop and sell WCDMA iPhones instead of WiMAX iPhones and to announce publicly that Apple had "chosen GSM technology for its phone and that GSM provide[d] the best global solution for its customers today and into the future with 3G and beyond."[502] Although my analysis of harm in 2011 does not rely on any finding or assumption that Qualcomm's payment to Apple to undermine WiMAX was exclusionary, Professor Snyder's analysis of how "foresight" affected Intel and Broadcom *does* rely on an assumption that this "foresight" was exogenous

---

[498] Snyder Report ¶¶294-295.
[499] Qualcomm Inc.'s Objections and Supplemental Responses to Apple Inc.'s Special Interrogatory Nos. 9, 12, 13 and 15 and Interrogatory Nos. 19, 20 and 31.
[500] Snyder Report ¶329.
[501] Snyder Report ¶409.
[502] Nevo Report ¶69 & n.152.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

to exclusionary conduct by Qualcomm.  Yet he provides no evidence to support his assumption.

235.    A similar example is Samsung's 2004 component supply agreement with Qualcomm, which contained a condition whereby Samsung would ███████ purchased from Qualcomm, including additional incentives for purchasing ████ or more of its requirements from Qualcomm.[503]    Professor Snyder does not consider whether this agreement foreclosed rivals in a way that affected their foresight, investment and execution decisions.

236.    The present discussion also fully applies to the analysis of Apple's exclusivity agreements with Qualcomm.[504]    The Elhauge Report explains the role of these agreements in preventing Apple from awarding Intel one of the iPad chip sockets.[505] Professor Snyder's report generally states that, "potential learning and knowhow realized from prior development efforts and production may influence what economic activities are undertaken by individual firms."[506] He also specifically notes for the modem chip industry that "learning in production, whereby costs decline with cumulative output" can "exert downward pressures on prices."[507]  Thus each of foresight, investment, and execution will be affected by experience too, which means Qualcomm's denying Intel that kind of experience at Apple is both an immediate harm and a harm that will continue to resonate throughout Intel's history. Professor Nevo's background description reinforces this point about the importance of early design wins: he states that "Qualcomm started selling WCDMA chips in October 2001, relying upon its earlier experience developing CDMA chips"[508] and he also notes "Qualcomm's experience in developing chipsets for the WCDMA, CDMA, and GSM standards" as one factor contributing to why "Qualcomm had a time advantage in supplying LTE chipsets."[509]  This exact logic is applicable to my explanation of how Apple's intent to use Intel for the 2014 iPad was to further "the follow-on goal of bringing up Intel as a second supplier for 2015 iPhones",[510]

---

[503] SFT-0000221 at 23.
[504] Elhauge Report § V.
[505] Elhauge Report ¶143.
[506] Snyder Report ¶46.
[507] Snyder Report ¶52.
[508] Nevo Report ¶59.
[509] Nevo Report ¶60.
[510] Elhauge Report ¶143.

119

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

underscoring the value of experience. A similar example is that Professor Snyder notes "economies of scale" as a factor in chip supplier successes.[511] Martin Zander (Ericsson Head of Strategic Initiatives) testified that "if you had Apple you would be able to have a critical mass of volumes; without Apple you would be subscale, so leaving very little left on the table,"[512] showing again the value of these outcomes.

### B. Professor Snyder Fails to Show that Firm-Level Factors "Fully Explain" Qualcomm's Business Advantages Over Rivals

237.   With a few exceptions, I mostly offer no opinion on whether Professor Snyder has correctly characterized the evidence presented or whether Professor Snyder has established the specific facts that he purports to support these conclusions. This is because, even if Professor Snyder did show that Qualcomm had business advantages over rivals that would have been the same in the but-for world, he still provides no evidence to establish that those business advantages *fully explain* actual market outcomes.[513] To be sure, if in the but-for world Qualcomm would have had the same business advantages over rivals, those advantages would have gained it a certain amount of sales on the merits. But Qualcomm's exclusionary conduct would predictably take additional sales away from rivals, thus impairing market outcomes relative to the but-for baseline with unrestrained competition, and Professor Snyder's analysis does nothing to rebut that prediction.

238.  To illustrate this error, which infects all of his claims about Qualcomm's business advantages,[514] consider Professor Snyder's claim that "Qualcomm's success with CDMA cellular technology was the result of a risky, but ultimately successful, R&D strategy that began in the late 1980s."[515] The facts he examines for this proposition describe Qualcomm's early support for and investment

---

[511] Snyder Report ¶52.

[512] Martin Zander (Ericsson Head of Strategic Initiatives) Dep. at 144:4-15.

[513] My not responding to any specific alleged fact or claim in Professor Snyder's report is not an indication that I agree with such fact or claim. There are also aspects of Professor Snyder's factual descriptions that are addressed in more detail elsewhere in my report. For example, Professor Snyder makes various claims about Apple's considerations of Intel chipsets, which I address *infra* Section XI.B.1.

[514] Snyder Report § V.B.

[515] Snyder Report ¶223.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

in CDMA from the 1980s to the early 2000s,[516] and these facts are part of the support for his purported conclusion that:

> The experience gained in the initial stages of the process, from designing the technology and building prototypes of modem chips and mobile devices to manufacturing infrastructure equipment and supporting carriers during the deployment of their networks, gave Qualcomm an early advantage and positioned it well to outperform competitors in the future.[517]

All Professor Snyder has really done here is describe **_how_** Qualcomm acquired monopoly power in CDMA chips prior to 2011. Although I offer no opinion on whether he is actually right, suppose hypothetically that Snyder is correct that these factors helped Qualcomm increase its market power to monopoly levels. Professor Snyder never actually explains how this would "fully explain" Qualcomm's current monopoly share; he does not explain why his claimed predicate facts preclude the possibility that Qualcomm **_further_** enhanced or preserved its monopoly position through exclusionary conduct.

239. Likewise, consider Professor Snyder's arguments that various rivals did not have the right "foresight", "investment" and "execution" to have greater success in the relevant markets in this case.[518] Even if this were true, and even if we grant his unsupported assumption that rivals would have had the same deficiencies in the but-for world,[519] that does not show that Qualcomm's exclusionary conduct did not affect market outcomes. In every market, some firms are better than other firms at some things, and worse than other firms at other things. Some rivals may thus have net disadvantages that limit their market share. But that does not alter the fact that exclusionary conduct will predictably lower their market share even further and thus lessen competition relative to the but-for world.

240. To illustrate a few examples of this error (which infects all of his claims), consider Professor Snyder's analysis of rival chip suppliers. Professor Snyder claims that "despite certain Intel executives advocating for acquiring VIA Telecom's CDMA technology, in 2011 Intel decided to delay CDMA development."[520] Although Professor Snyder suggests there may have been some

---

[516] Snyder Report ¶¶225-234.
[517] Snyder Report ¶253.
[518] Snyder Report § V.C.
[519] _But see supra_ Part IX.A (showing that his unsupported assumption is contrary to the evidence).
[520] Snyder Report ¶333.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

influence from factors such as "ambiguity as to whether Verizon would continue to maintain its CDMA networks",[521] he fails to consider that Intel requested an exhaustive license for Qualcomm's CDMA SEPs in 2004 (and was rebuffed)[522] and that if Intel had been able to win Apple's business earlier (were it not for Qualcomm's exclusive dealing with Apple), Intel would have acquired VIA's CDMA technology sooner.[523]   Similarly, Professor Snyder claims that "Broadcom demonstrated incorrect foresight, made poor investment decisions, and struggled with execution related to LTE chip development,"[524] but his discussion of Broadcom fails to mention that Broadcom sought a license for chipsets from Qualcomm in the early 2000s and was denied.[525]  He thus does not consider whether, in a but-for world where Broadcom had a license, it would have made better investments and been better able to execute its chip development.  Nor does he consider the evidence that Broadcom's investments and chip development were affected by Qualcomm's exclusive dealing agreement with Apple.[526]  I also explain in Section XI.A.2 below why Professor Snyder's conclusions regarding MediaTek similarly fail to consider the relevant but-for baseline.

## X. PROFESSOR SNYDER'S CLAIMS ABOUT INDUSTRY PERFORMANCE

241.   In Section VI of his report, Professor Snyder claims that "Plaintiffs' Hypothesis predicts that Qualcomm's alleged exclusionary conduct has inhibited competition and driven modem chip suppliers out of the industry, which I would expect to lead to poor performance in the modem chip industry overall."[527]   He claims to instead find "impressive performance" across several "measures of performance",[528] including that:

---

[521] Snyder Report ¶332.

[522] Elhauge Report ¶104.

[523] Elhauge Report ¶147.

[524] Snyder Report ¶408.

[525] Elhauge Report ¶95.

[526] Elhauge Report ¶145, 149.

[527] Snyder Report ¶479.

[528] Snyder Report ¶480.  I offer no opinion on whether Professor Snyder has correctly characterized the evidence he presents to support these findings.  My failure to specifically address a given fact or claim from Professor Snyder's Section VI here is not agreement with such fact or claim.  Rather, I am illustrating a general flaw that infects all of Professor Snyder's analysis in his Section VI.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

- "the rapid pace of innovation observed in the modem chip industry with two groups of metrics: investments of modem chip designers in innovation, as measured by their R&D spending; and the resulting improvements in modem chip quality and efficiency."[529]
- "average selling prices of modem chips have declined considerably over time".[530]
- "the modem chip industry has contributed to increased levels of consumer surplus."[531]

242.   Professor Snyder's analysis here makes two errors.  First, he assumes that anticompetitive harm can only exist in an industry that has "poor performance." However, under the but-for baseline that he himself acknowledges is correct, the relevant economic issue is not whether the market has some particular target level of performance.  The relevant question is whether the market performance would have been more competitive in a but-for world without the anticompetitive conduct. Professor Snyder does not address this question.

243.   Second, Professor Snyder assumes that if prices and quality have improved relative to *past* baselines, that somehow means there was no anticompetitive harm.  However, as I explain in Section III.A, the relevant baseline is not whether the market prices or quality are better than sometime in the past.  The relevant question is whether market prices or quality are worse than they would have been in a but-for world without the anticompetitive conduct.  Professor Snyder does not address this question.

## XI. PROFESSOR SNYDER'S MISTAKEN CRITICISMS OF MY OPINIONS

244.   In Section VII of his report, Professor Snyder claims that my attributions of competitive harm to Qualcomm are incorrect because "each is fully explained by industry factors."[532]  However, as I explained in Section IX, Professor Snyder does not actually establish that industry factors "fully explain" the evidence I present, because he fails to properly consider that the exclusionary conduct has

---

[529] Snyder Report ¶481.
[530] Snyder Report ¶489.
[531] Snyder Report ¶501.
[532] Snyder Report ¶503.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

affected what he considers to be firm-level factors (foresight, investment, and execution) and would also affect market outcomes even if we held firm-level factors constant.[533] He also claims that I fail to take into account "insight from industrial organization economics that firms operating in such industry contexts will succeed and fail based on their foresight, investment, and execution".[534] However, as I also explained in Section IX, I properly considered the fact that Qualcomm's exclusionary conduct would affect all those firm-level factors and would affect market outcomes even if we held firm-level factors constant. It is Professor Snyder who uses an incorrect analytical framework by failing to consider the impact of Qualcomm's exclusionary conduct on firm-level factors and the ability to compete given any state of firm-level factors.

245. Below I further respond to Professor Snyder's critique of my assessment of the anticompetitive impact of Qualcomm's exclusionary conduct on specific firms. Section A discusses the anticompetitive impact on Samsung S-LSI, MediaTek, and the Dragonfly. Section B discusses the anticompetitive impact on Intel, Broadcom, Ericsson, and Apple.

### A. Professor Snyder's Criticisms of My Analysis of Samsung S-LSI, MediaTek, and Dragonfly are Incorrect

246. In Section VII.B of his report, Professor Snyder claims he will show that my analysis of harm to Samsung S-LSI, MediaTek, and the Dragonfly joint venture is incorrect because "industry factors unrelated to Qualcomm's at-issue conduct influence outcomes."[535] I respond to his specific claims below.[536]

---

[533] Professor Snyder's conclusions at the end this Section VII of his report (Snyder Report ¶¶551-553) are incorrect for all of the reasons I describe below.

[534] Snyder Report ¶¶505-506.

[535] Snyder Report ¶507.

[536] Professor Snyder also claims that my analysis "ignores testimony by Motorola's Todd Madderom that ███████████████████████████████████████████████████ " Snyder Report n.1473. However, the testimony Snyder cites to for this proposition is a March 2018 deposition in which Motorola's Director of Procurement, describing to a ███████████████████████ – i.e. Madderom testifies that ███████████████████. When asked whether the royalty paid to Qualcomm factors into procurement decisions, Madderom testifies ██████████████████████████. So, it is clear from this Madderom testimony (all of which is quoted by Snyder) that Madderom is (a) ████████████████████████████████████████████████████████ and (b)

124

*1. Samsung S-LSI*

247.    Professor Snyder first claims that his analysis shows that Samsung's "sales to external OEMs, unlike its internal sales, were likely limited due to OEMs' concerns over sourcing from a competitor."[537]  But whether other OEMs would have some hesitation in sourcing from Samsung due to Samsung also being an OEM does not mean exclusionary conduct is incapable of making other OEMs ***even less likely*** to pursue a relationship with Samsung (and vice versa).  My analysis shows not only the specific impact of Qualcomm's conduct on Samsung, but also that Qualcomm employees acknowledged that the refusal to provide exhaustive licenses to rival chipmakers reduced their ability to compete with Qualcomm for chipset sales.[538]  But because Professor Snyder has managed to allege that an industry factor also affects supplier-OEM relationships (whether the supplier is an OEM), he believes he can now disregard any other impact stemming from Qualcomm's anticompetitive conduct.  Ironically, Professor Snyder also claims that I ignore "that Samsung S-LSI has recently pursued efforts to expand its customer pool for SoCs, including via ongoing discussions with ZTE."[539]  This is ironic because the fact that Samsung is having "ongoing discussions with ZTE" does nothing to allay my analysis of anticompetitive harm (because "ongoing discussions" are not a relevant indicator of economic success), but this fact does show that Professor Snyder's concerns about OEMs' willingness to *consider* chip purchases from another OEM is overblown.

248.    Moreover, even assuming hypothetically that OEMs' hesitance to procure chips from other vertically-integrated OEMs is a significant factor in OEMs' procurement decisions, Professor Snyder does not consider that this hesitance is at least in part driven by Qualcomm's conduct.  As Professor Snyder notes, I show that Samsung believes Qualcomm's refusal to license to exhaustively license and "IP risk" are factors in its modem chip sales, and I also give the example of Qualcomm

testifying that, █████████████████████████████████████. However, even the testimony that that ███████████████████████████████ is irrelevant because Motorola ██████████████████████████████████████████████████. This fact does not contradict that the *effect* of the supra-FRAND royalty is to anticompetitively tax rival sales.

[537] Snyder Report ¶508.
[538] Elhauge Report § IV.B.
[539] Snyder Report ¶508.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

suing Samsung chipset customer Meizu.[540]  Professor Snyder's response to this is to claim that Meizu is still purchasing chips from Samsung.[541]  But the point is **not** necessarily that Meizu was specifically deterred from buying Samsung chips (though Professor Snyder nevertheless fails to establish that Meizu is buying as many chips as it would have without the Qualcomm suit).  The point is that Qualcomm suing Samsung chip customers could make other OEMs fearful of being a Samsung chip customer, because they will fear Qualcomm will sue them if they try to evade Qualcomm's supra-FRAND royalties.  Thus, the fear other OEMs will have of dealing with rival OEMs like Samsung is at least partially endogenous to Qualcomm's No-License-No-Chips policy (which taxes sales of Samsung chips) and the refusal to exhaustively license other chip suppliers (which makes it impossible to escape the tax on Samsung chips without fearing a Qualcomm lawsuit).

249.   Professor Snyder next claims that I do not consider that Samsung has "been a successful modem chip supplier" and "the importance of internal modem chip sales."[542]   These claims are entirely irrelevant to the question of whether Samsung would have been a more successful competitor in a but-for world without Qualcomm's exclusionary conduct (Professor Snyder is failing to use the correct but-for baseline).  Moreover, these generic statements do not focus on the relevant chipset markets (CDMA2000 chips and premium-LTE chips), which also makes them lack any probative value for issues in this case.

## 2. MediaTek

250.   Professor Snyder incorrectly claims that I do not establish that Qualcomm's licensing practices restrained MediaTek's modem chip sales.[543]   For example, he claims that "MediaTek has been a successful modem chip supplier", that MediaTek's "WCDMA sales grew rapidly" after introducing a WCDMA chip, that "MediaTek has been the second largest supplier of modem chips in the world since 2011", that MediaTek has had "recent successes and ongoing efforts to develop modem chips for higher-end mobile devices", that MediaTek believes it "has closed the gap with Qualcomm on modem chip technologies since 2010", that "Apple has considered MediaTek as a potential supplier of thin modems for its iPhones since

---

[540] Snyder Report ¶508 (citing Elhauge Report ¶98).
[541] Snyder Report ¶508.
[542] Snyder Report ¶¶509-510.
[543] Snyder Report ¶511.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

2015 and especially since 2017", that "MediaTek continues to pursue new modem chip technology and, in 2017, began developing 5G modem chips."[544]  These claims are entirely irrelevant to the question of whether MediaTek would have been a more successful competitor in a but-for world without Qualcomm's exclusionary conduct. For example, had MediaTek not been anticompetitively restrained, it could have had even more success as a modem chip supplier and closed any gap with Qualcomm sooner and further; a MediaTek employee even testified that the lack of a license from Qualcomm deterred potential MediaTek customers.[545]  Moreover, some of these generic statements do not focus on the relevant chipset markets (CDMA2000 chips and premium-LTE chips), e.g. his claims about 5G chips, which also makes them lack any probative value for issues in this case.

### 3. Dragonfly

251.   Professor Snyder claims that I fail "to consider evidence that the joint venture likely would have been terminated" even if it had obtained an exhaustive license from Qualcomm, and also claims that some of the partners in the joint venture anyway invested in chip development.[546]  For the first claim, he argues that I should have considered whether the joint venture "sought licenses from other cellular SEP holders" and whether other potential reasons for the venture's failure would have tanked it even in a but-for world where Qualcomm provided exhaustive licenses.[547] However, I did show that ███████████████████████████████ ███████████████████████ and Yooseok Kim (VP of the IP Center at Samsung) testified that the "main reason" ████████████████████████████████ ███████████.[548]  Moreover, Professor Snyder is simply assuming that in a but-for world where Qualcomm provided exhaustive licenses, licensees would not have made greater efforts to overcome other obstacles to chipset development.  He is effectively claiming that so long as at least some barriers to entry to a market exist, a monopolist's exclusionary conduct can never be anticompetitive, which ignores the possibility that the exclusionary conduct can raise the level of those barriers to entry.

---

[544] Snyder Report ¶¶511-513.
[545] Snyder Report ¶98.
[546] Snyder Report ¶514.
[547] Snyder Report ¶517-518.
[548] Elhauge Report ¶99.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

252.   For the second claim, Professor Snyder argues that potential members of the original joint venture went on to separately form a different joint venture (that he says eventually failed due to a lack of customers) and that Samsung was able to successfully develop its own chipset business (S-LSI).[549]  This argument is highly problematic: he is pointing to the failure of a smaller joint venture without Samsung and the success of Samsung as evidence that there was no harm from excluding the larger joint venture that would have included Samsung.  But the relevant question is whether the larger joint venture would have resulted in a more competitive market (including having the competition start sooner) in the but-for world, which is actually *supported* by his finding that a more successful partner (Samsung) would have been able to combine its resources with smaller partners (e.g., NTT DoCoMo) needing customers, instead of the smaller partners wasting their resources on a smaller venture that failed.[550]

### 4. Other Firms

253.   Professor Snyder claims that "Professor Elhauge ignores that there are many cellular SEP holders other than Qualcomm, and that these other cellular patent holders do not typically offer exhaustive component-level licenses to modem chip suppliers."[551]  He further claims that even though Via Licensing offers an LTE patent pool, modem chip suppliers like MediaTek have not sought to take a license from this pool, and questions why this would be the case "if MediaTek considers exhaustive SEP licenses to provide it any advantage."[552]  There are two flaws with these claims.

254.   First, Professor Snyder's claim that other licensors "do not typically offer" exhaustive component-level licenses does not establish that these licensors would not provide such a license if asked by a chip supplier for one.  As I pointed

---

[549] Snyder Report ¶519-521.

[550] Professor Snyder also claims that Samsung's investment in the joint venture would have been "minimal" at █ of the potential venture.  Snyder Report ¶522.  He offers no explanation for why this means the joint venture could not have succeeded in the but-for world.  His complementary argument that █████████ was █████ of Samsung's R&D is completely irrelevant, unless Professor Snyder is claiming that the loss of ████████ in R&D is not anticompetitive harm, in which case he is completely wrong.

[551] Snyder Report ¶523.

[552] Snyder Report ¶524.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

out in the Elhauge Report, if Qualcomm had actually licensed its SEPs to OEMs on FRAND terms, there may be no demand by chip rivals for exhaustive licenses.[553] Likewise, if other SEP licensors did license to device makers at FRAND levels, then chipmakers may prefer not to buy exhaustive licenses. Thus, it is incorrect to conflate a practice of not using exhaustive licenses (which may reflect a lack of demand for them if FRAND rates are offered) with Qualcomm's refusal to sell exhaustive licenses to chipmakers who wanted them, which Intel VP Dana Hayter testified was unique to Qualcomm.[554]   In fact, Professor Snyder's subsequent statement that Via Licensing would provide licenses to chip suppliers appears to contradict any claim that component-level licensing does not occur. Moreover, Professor Snyder also does not consider that what other licensors do or do not "typically" offer is irrelevant, given that Qualcomm has an obligation to provide component-level licensing pursuant to its FRAND commitments.[555]

255.   Second, Professor Snyder is erroneously considering the refusal to exhaustively license in isolation, without also considering the problem that Qualcomm has leveraged its chip supply to coerce supra-FRAND royalties from OEMs, which anticompetitively taxes rival sales. If another licensor, such as the InterDigital example given by Snyder, is providing FRAND licenses at the OEM level, then there is less cause for a chip supplier to be concerned about not obtaining that license at the chip level (because there is no anticompetitive tax).

256.   Professor Snyder also claims that my analysis "ignores the advantages that a modem chip supplier has in terms of the range of mobile device inputs it offers OEMs" independent of that chip supplier's ability to convey rights to Qualcomm's SEPs.[556]  He gives the example that some suppliers are "broadliners" who "compete by developing and selling multiple mobile device components",[557] but he fails to consider that broadliners could be even more successful in the chipset segment of their business without Qualcomm's exclusionary conduct. Professor Snyder claims that broadliners' performance in other device components (i.e. not in the baseband processor; GPS chips are one example) might affect their decisions on whether to invest in cellular chipsets or other components.[558]  This claim similarly fails to

---

[553] Elhauge Report ¶111.
[554] Elhauge Report ¶112.
[555] See supra Section IV.
[556] Snyder Report ¶525.
[557] Snyder Report ¶525.
[558] Snyder Report ¶525.

129

consider that Qualcomm's conduct affects the profitability of selling chipsets, which means it necessarily affects the relative profitability considerations of a broadliner.

257.   Professor Snyder also claims that my analysis fails to account for his claim that "numerous modem chip suppliers have succeeded despite not having an exhaustive component-level license to Qualcomm's SEPs" and lists a number of examples that purportedly illustrate this point.[559]  He fails to consider that these chip suppliers could have been even more successful without Qualcomm's exclusionary conduct, and that the existence of some competition does not preclude a finding of anticompetitive effects.

## B. Professor Snyder's Criticisms of My Analysis of Intel, Broadcom, Ericsson, and Apple are Incorrect

258.   Professor Snyder mistakenly claims that "industry factors unaffected by Qualcomm's at-issue conduct fully account" for the harm I identify to Intel, Broadcom, and Ericsson.[560]  I already explained above in Section IX.A above that Professor Snyder's analysis assesses only modem chip suppliers' "foresight", "investment" and "execution" in the actual world.  Professor Snyder fails to actually show that industry factors were unaffected by Qualcomm's exclusionary conduct, whereas there is substantial evidence to the contrary.  Nor does he consider whether, even with the same foresight and investment, rival chipmakers could nevertheless have done better if they were not restrained by Qualcomm's exclusionary conduct. Therefore, his analysis of Intel, Broadcom, and Ericsson is littered with the same errors I have identified throughout his report.  A key general point is that one must approach the evidence of exclusionary conduct holistically in this case.  Qualcomm has implemented a No-License-No-Chips policy, has refused to exhaustively license rivals (violating its FRAND commitment) and used exclusivity conditions with Apple to engage in *de facto* exclusive dealing.  None of Professor Snyder's analysis considers the exclusionary conduct holistically.

---

[559] Snyder Report ¶526.
[560] Snyder Report ¶527.

130

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## 1. Intel

259.    Professor Snyder claims that "Intel had a number of problems with foresight, inefficient investment, and execution" and that "These factors would also have been present in a counterfactual world where Qualcomm's agreements with Apple were not in place, and were not themselves influenced by Qualcomm's alleged exclusionary conduct."[561]    However, despite claiming that any factors affecting Intel were exogenous to Qualcomm's exclusionary conduct, he never actually lists an exogenous factor or even tries to explain why his suggested factors would have remained the same in a but-for world.  With respect to Intel failing to win any chipset business for Apple's 2013-2015 devices, Professor Snyder blames such failures on Intel's chips being released too late and having weaker features.[562] However, as I explain generally above in Section IX, and as I explain in greater detail when responding to Dr. Chipty's near-identical claims in Sections XIV.C-D below, Professor Snyder fails to consider my showing how Intel would have had better engineering and timing in a but-for world without Qualcomm's exclusionary conduct.

260.    Professor Snyder also claims that the only benefit I identify of Intel winning Apple business is that it would attract interest from other OEMs,[563] which is incorrect because I list a number of benefits related to creditability, engineering, innovation, and time-to-market.[564]  He then speculates that, in a but-for world, other OEMs would still have had concerns about using Intel, Intel's SoCs would have remained inferior, Intel would have still tried to move its business away from SoCs, and Intel would have benefitted from engaging Apple even without selling to Apple.[565]    All of these assertions simply assume away the benefits related to creditability, engineering, innovation, and time-to-market that Intel would have enjoyed by actually selling to Apple.  Professor Snyder also claims that I "provide[] no support for a claim that modem chip sales to Apple were necessary for Intel to "support investments in R&D and improve product offerings",[566] which is both incorrect (because the Elhauge Report explains, and this Reply Report further

---

[561] Snyder Report ¶528.
[562] Snyder Report ¶¶529-533.
[563] Snyder Report ¶534.
[564] Elhauge Report ¶¶139-140, 147-148.
[565] Snyder Report ¶¶534-536.
[566] Snyder Report ¶537.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

explains, the benefits to a supplier from achieving greater scale through Apple[567]) and is also at odds with Dr. Chipty's contention that "The evidence shows that Qualcomm invested significantly more in its thin modem line because of Apple."[568]

261.    Professor Snyder also claims that Intel's willingness to invest in chips may have also been affected by uncertainty surrounding the adoption of CDMA,[569] but this ignores the fact (as explained above in Section IX) that Intel was denied a license to CDMA SEPs by Qualcomm in 2004 (in violation of Qualcomm's FRAND commitment to license rivals).  Professor Snyder also claims that Intel prioritized strategic objectives other than its financials, showing a willingness to sacrifice margins.[570]  Professor Snyder's attempt to conclude, from Intel's strategic behavior in the actual world, that Intel would have failed to make enough money in the but-for world makes no sense because the whole point was for Intel to position itself for future success once it started gaining modem share.  This is apparent from Professor Snyder's own description, which recognizes that Intel's goal in deprioritizing financials was "establishing the premium modem category and capability for Intel and the ecosystem around that".[571]

262.    Even to the extent that any factors affecting Intel were exogenous to Qualcomm's exclusionary conduct (which Professor Snyder has not shown), Professor Snyder never actually establishes how such an exogenous factor would "fully explain" the outcomes observed for Intel.

## 2. Broadcom

263.    Professor Snyder first claims that Broadcom's exit from the chipset industry was caused by poor foresight,[572] but he neither explains why such lack of foresight is exogenous to Qualcomm's exclusionary conduct, nor explains why any such exogenous factor would "fully explain" Broadcom's exit.  By contrast, I explain in Section IX above that Qualcomm prevented Broadcom from obtaining a license to Qualcomm's chipset SEPs (in violation of Qualcomm's FRAND commitment to

---

[567] Elhauge Report ¶¶139-140, 147-148; *see also supra* Section IX; *infra* Sections XIV.C-D.
[568] Chipty Report ¶240.
[569] Snyder Report ¶538.
[570] Snyder Report ¶539.
[571] Snyder Report ¶539.
[572] Snyder Report ¶¶540-541.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

license rivals). Professor Snyder similarly claims that Broadcom's product offerings would not have met Apple's needs,[573] but I also explain above in Section IX how a chip supplier's ability to invest and execute is directly influenced by Qualcomm's exclusionary conduct. Professor Snyder simply assumes that such factors were not influenced by Qualcomm's exclusionary conduct, and also never establishes how these factors would "fully explain" Broadcom's exit.

### 3. Ericsson

264.    Professor Snyder claims that Ericsson's exit from the modem chip industry was caused by poor foresight, "uncompetitive R&D", and failure to meet development schedules,[574] but I explain above in Section IX how a chip supplier's ability to foresee, invest and execute is directly influenced by Qualcomm's exclusionary conduct. By contrast, Professor Snyder simply assumes that such factors were not influenced by Qualcomm's exclusionary conduct, and also never establishes how these factors would "fully explain" Ericsson's exit.

### 4. Apple's Sourcing Practices

265.    Professor Snyder claims that, because Apple "sources modem chips from one or two suppliers", and "Assuming that Qualcomm would not have been eliminated as a supplier", this means that only one of Intel, Broadcom, or Ericsson would have survived (with the rest remaining foreclosed) in the but-for world.[575] Professor Snyder does not explain why he has simply assumed Qualcomm would have remained one of the two suppliers in the but-for world. If it is because Apple would need a CDMA chipset either way, Professor Snyder is simply assuming his conclusion by holding that Qualcomm would have remained a CDMA chipset monopolist in the but-for world. Moreover, Professor Snyder fails to consider that the various rival chip suppliers could have won Apple designs in *different* years in the but-for world, whereas the guarantee of exclusivity with Qualcomm foreclosed any rivals from Apple for multiple years in the actual world.

---

[573] Snyder Report ¶¶542-543.
[574] Snyder Report ¶¶544-548.
[575] Snyder Report ¶¶549-550.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## XII. Dr. Chipty's Claims About Competition and Innovation

266.   In Section IV of her report, Dr. Chipty claims to "evaluate direct evidence of competition to shed light on" whether Qualcomm's conduct has suppressed innovation or restrained rivals.[576] But in her attempt to do so, she makes the same fundamental errors made by Professors Nevo and Snyder in using the past as a baseline instead of the but-for world, and assuming that the existence of some competition negates the possibility of anticompetitive harm.  This is apparent, for example, in her claim that "Both the historical patterns and the current competitive landscape reflect the substantial technological gains in capabilities made by Qualcomm and its rivals"[577], which fails to consider that a but-for world can have further technologies gains in capabilities.  I have discussed this error above in Sections III.A and X, and my reasoning in those sections applies to Dr. Chipty's conclusions.

## XIII. Dr. Chipty's Incorrect Claims About Business Justifications for Qualcomm's Apple Agreements

267.   Dr. Chipty opens her analysis of Qualcomm's agreements with Apple by claiming that they "neither required exclusivity nor did they ensure it" and that "even if the agreements could be described as 'exclusive deals,'… the fact is that exclusivity is often efficient and pro-competitive, particularly in the face of certain types of business risk."[578]  She then introduces her arguments for these contentions, before turning to them in more detail.[579]  I address her full arguments below.

---

[576] Chipty Report ¶54.  I offer no opinion on whether Dr. Chipty has correctly characterized the evidence she presents to support her findings in this section of her report.  My failure to specifically address a given fact or claim from Dr. Chipty's Section IV here is not agreement with such fact or claim.  Rather, I am illustrating a general flaw that infects all of Dr. Chipty's analysis in her Section IV.

[577] Chipty Report ¶57.

[578] Chipty Report ¶213.

[579] Chipty Report ¶¶214-216.

134

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### A. Dr. Chipty's Overview of the Apple Agreements with Qualcomm

268.    Dr. Chipty's overview of Apple's 2011 "Transition Agreement" (TA) with Qualcomm appears consistent with my descriptions.[580]    Dr. Chipty's overview of Apple's 2013 "Amended Transition Agreement" (FATA) with Qualcomm also appears consistent with my descriptions.[581]    Dr. Chipty also creates a schedule of payments due annually by Qualcomm to Apple under the various clauses of these agreements.[582]    Her calculations are similar to Apple estimates of these payments that Apple provided in a 2016 response to an FTC Civil Investigative Demand, except that Dr. Chipty calculates her own estimate of how much Apple would have received for the Marketing Fund under the FATA in 2016 (but forfeited due to the launch of an Intel chip in certain iPhone 7 models in September 2016) based on "the number of cellular-enabled iPhones and iPads sold in that year."[583]    Her value of the forfeited payment is $574 million, compared to Apple's estimate of $440 million.[584]    The difference is likely attributable to the fact that Apple was estimating the value of the payment in November 2016, whereas Dr. Chipty has access to more complete data on 2016 sales.

### B. Dr. Chipty's General Description of Exclusivity Arrangements

269.    Dr. Chipty suggests that her description of the agreements shows that "the at-issue Agreements did not require Apple to source modem chipsets exclusively from Qualcomm, nor did Apple source exclusively from Qualcomm over the term of the ATA".[585]    I respond to her mistaken claims that the TA and FATA were not exclusive dealing arrangements below at the start of Section XIV.

---

[580] Chipty Report ¶¶217-222; Elhauge Report § V.A.3.

[581] Chipty Report ¶¶223-226; Elhauge Report § V.A.4.  Dr. Chipty does note that the condition for termination was Apple's launch of a product with a non-Qualcomm chipset that sold more than 1000 units.  The Elhauge Report does not specifically quote the 1000-unit part of the condition because it is immaterial, given that an Apple product "launch" will entail millions of units.

[582] Chipty Report ¶¶223-226

[583] Chipty Report Exhibit 35.

[584] Chipty Report Exhibit 35; Apple Nov. 13, 2016 Response to CID Specification 4 at *Specification4.xlsx*.

[585] Chipty Report ¶229.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

270.   Dr. Chipty states that "An extensive academic literature recognizes that exclusive arrangements can be and often are efficiency-enhancing" and notes situations where this may be true, such as relationship-specific investments (which she defines as arising "when the investment is not as valuable outside of a specific buyer-seller transaction" and states could lead to ex-post opportunism).[586]   She further states that "exclusive relationship[s] between the buyer and the seller under certain circumstances can be pro-competitive" and that in a situation where a "supplier makes relationship-specific investments" then for "agreements are designed to protect the seller from ex-post hold up and other opportunistic behavior, it is often more meaningful to focus attention on ex-ante competitive conditions."[587]

271.   These statements are correct about the *possibility* of efficient exclusive dealing, but they establish only very general principles. Dr. Chipty claims she will show the risks of relationship-specific investment were present in Qualcomm's dealings with Apple, but I explain in Section XIII.C below that she fails to reliably do so.[588]   Moreover, Dr. Chipty herself also notes that other solutions to the problem of relationship specific investments and lock-in can be vertical integration, long-term prices, volume commitments, and volume discounts.[589]   As I explain in Sections XIII.D-E below, Dr. Chipty claims that Apple refused to agree to a volume commitment, but her evidence does not actually establish that Qualcomm sought or could not have obtained a volume commitment or a less restrictive share agreement.

## C. Dr. Chipty's Mistaken Contentions About the Risk of Supplying Apple

272.   In Section VI.C of her report, Dr. Chipty claims that the "legitimate business justifications for the terms of the TA and ATA" were to "provide[] Qualcomm some protection against Apple walking away after Qualcomm had sunk incentive payments and R&D investments into the Apple relationship."[590]   I address each of these claimed relationship-specific investments below.[591]   Based largely on

---

[586] Chipty Report ¶230.
[587] Chipty Report ¶¶233-234.
[588] Chipty Report ¶231.
[589] Chipty Report ¶232.
[590] Chipty Report ¶235.
[591] Throughout this Section XIII.C of my Reply Report, unless stated otherwise, I offer no opinion on whether Dr. Chipty's factual allegations or empirical results are correct or properly calculated. Rather, I simply note that, even if takes her factual allegations and results as given, she fails to

136

her own findings, I find that she fails to justify a specific need for the *exclusivity condition* in the TA and FATA.

### 1. Incentive Payments

273.    Dr. Chipty claims that "Apple demanded large incentive payments from Qualcomm that were to be rendered early in the engagement, without giving any commitments on whether and which devices Apple would launch with Qualcomm modem chipsets."[592]  I explain in Section XIII.E below that Dr. Chipty's evidence does not actually establish that Qualcomm could not have obtained a volume commitment or a less restrictive share agreement.[593]  Nevertheless, even assuming that Apple would not provide a volume commitment or agree to a share-based condition, Dr. Chipty fails to consider that the vast majority of the payments in the TA and FATA were already conditioned on volume, separate and apart from any exclusivity.  I more fully describe this in Section XIII.D, but as an example consider that Dr. Chipty states that the "Additional Variable Incentive Fund" in the FATA had "payments ranging from ███████████████████████████████████████████ ████████████████.[594]  These payments being ████████████████████████████ meant that Qualcomm would only be obligated to make these payments ██████████████████████ ███████████████████████; there was no relationship-specific investment where ████████████████████████████████████████████████████████████████.  Thus, the additional exclusivity condition was not actually necessary to preserve any investment in most of these incentives.[595]

---

support her conclusion that exclusivity conditions were necessary to support Qualcomm's investments in thin modem R&D.

[592] Chipty Report ¶¶236-237.

[593] I also explain XIII.C.5 that Dr. Chipty's claim that Apple "demanded" these payments is a mischaracterization.

[594] Chipty Report ¶225.

[595] Dr. Chipty does claim that not all of the Marketing Fund in the FATA was tied to a guarantee of future volume.  Chipty Report ¶238.  Her logic is that Qualcomm agreed to give a ████ ████████████████████, including iPhones and iPads that had *already* been developed with Qualcomm chips.  This means that the FATA could have, in theory, required Qualcomm to pay out ████████████ Marketing Funds (according to Dr. Chipty's calculations in Exhibit 36) even if Apple failed to make any further Qualcomm purchases after signing the FATA than it would already have to make under already-designed devices. Chipty Report ¶238.  However, Chipty's own calculation of the total incentives under the TA and ATA is ████████, which means she has no explanation or justification for why exclusivity was required for over ████

137

## 2. Thin Modem R&D Investment

274.    Dr. Chipty claims that "Qualcomm invested significantly more in its thin modem line because of Apple."[596]  She first argues that Apple's use of thin modems is unusual among OEMs because most of them use chipsets paired with an applications processor (i.e. a system-on-chip or SoC) and that "Prior to supplying Apple, Qualcomm's thin modems were largely sold at low volume, in non-handset applications such as data cards and dongles.[597]  She then claims that the evidence shows "Apple's importance to Qualcomm measured in terms of thin modem units,"[598] but she fails to explain why the *unit* share of Qualcomm thin modems purchased by Apple is at all relevant to whether Qualcomm would have incentives to invest in thin modems.  She next claims that ██████████████████████████ ████████████████████████[99]  But Dr. Chipty's own statistics indicate that from ████████████, which is when these exclusivity conditions were adopted and when her own analysis indicates most of the Qualcomm investments to develop thin modems were made, ███████████████ ██████████████████████.[600]  Thus, when Qualcomm was making the bulk of its thin-modem investments and deciding to pay Apple for exclusivity, its decisions could not have been based on Apple's actual share of thin modem purchases at the time.  Nor were the exclusivity-based payments conditioned on any Apple commitment to purchase enough volume to generate a high share of thin modem purchases in the future.  Thus, at the time the Qualcomm entered into the exclusivity agreements or incurred most of the thin-modem investment cost, making those investments was not relationship-specific but rather constituted investments in a market in which most sales went to non-Apple customers.  Further, even from ██████ ██████, her own figures show that non-Apple customers constituted █████ of Qualcomm's thin modem revenues, which means that a significant proportion of Qualcomm's thin modem sales did not come from Apple.[601]  Thus, even over the

---

████████████ of these payments.  She also does not explain why the Marketing Funds could not have been conditioned upon future volume (i.e. volume unrelated to prior design wins).

[596] Chipty Report ¶240.
[597] Chipty Report ¶241.
[598] Chipty Report ¶242.
[599] Chipty Report ¶243.
[600] Chipty Report Exhibits 38, 41A.
[601] Chipty Report Backup for Exhibit 38 ("Thin Modem Sales.xlsx", sheet "all thin modems").

138

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

█████ period, the investment was not relationship-specific but resulted in sales that went ████ to non-Apple customers.  Standing alone, this split of Qualcomm's revenues for thin modem sales at Apple compared to non-Apple customers does not establish whether and the extent to which Qualcomm would have invested in thin modem R&D had it been unable to obtain exclusivity at Apple.

275.    Thus, as I pointed out in the Elhauge Report, Qualcomm could have recovered any investment in thin modems in at least substantial part by making sales to other OEMs.[602]  Nor does Dr. Chipty provide any response to my point that: "Further, Qualcomm surely would have sold some chips to Apple regardless of exclusivity, so it could have [also] recouped any such investments through such sales to Apple even without exclusivity. I am unaware of any evidence to show that the incremental increase in Qualcomm sales to Apple caused by exclusivity was necessary to induce any investments specific to developing chips for Apple."[603]  Dr. Chipty provides no such evidence, even though it is necessary to establish her claimed efficiency.

276.    Moreover, none of this evidence establishes that Qualcomm could not have obtained significant unit or revenue sales at Apple with the less restrictive alternatives of volume-based rebates, volume-based commitments, or a smaller share-based condition instead of an exclusivity condition.  Volume-based rebates would be more closely tied to the need for investment because they would reward Apple based on the volume of its purchases, rather than based on an exclusivity that could just reflect 100% of a low volume that would not cover much of the investment.  And volume-based rebates were clearly feasible since they were in fact used, and Dr. Chipty offers no evidence that they did not suffice to induce enough volume to cover any relationship-specific investments.  Even if the existing volume-based rebates were insufficient, more volume-based rebates could have been added.  A volume commitment would be a far more effective way of addressing the issue because it would assure enough sales to cover any investment, whereas the exclusivity conditions provided no assurance that Apple would purchase any thin modems, let alone any particular volume of thin-modems, and thus provided no assurance that Qualcomm would recoup any investment in developing thin modems.  Finally, as discussed below, Dr. Chipty's own analysis indicates that a 50% share-based condition would have sufficed to assure enough sales to cover the requisite investments.

---

[602] Elhauge Report ¶ 150.
[603] *Id.*

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

277.   Dr. Chipty next argues that "Qualcomm increased its R&D spending on thin modem development because the Apple account represented a significant business opportunity for Qualcomm" and that there are multiple reasons why Qualcomm supposedly incurs "specific R&D expenses" for Apple.[604]   She also claims that Dr. James Thompson (Qualcomm's Executive Vice President of Engineering and Chief Technology Officer) explained to her in an interview that "without Apple, Qualcomm would have slowed the cadence at which it developed and released new thin modem models, from one new thin modem model per year to one new thin modem model approximately every three years."[605]  She claims this is consistent with his testimony that "if Qualcomm's share of Apple's thin modem purchases had fallen below 50 percent, Qualcomm would have 'really needed to look very carefully at whether to continue with the thin modem business,' because the financial return and opportunity cost may not have justified the investment."[606]  Even assuming these factual allegations are correct, they do not explain why Qualcomm could not have obtained an expectation of 50% of Apple's business through the use of volume commitments or conditions based on sales forecasts.  The answer cannot be that Qualcomm would not have known what volume to forecast for the commitment, because the entirety of Dr. Chipty's logic in this section is based on Qualcomm making its thin modem R&D investment decisions before it knows how many units Apple will sell.

278.   Moreover, Dr. Chipty's description of evidence from Dr. Thompson directly shows that Qualcomm could have maintained its level of thin modem R&D with a 50% share condition to Apple's business.  A 50% share condition is a clear less restrictive alternative to the 100% exclusivity condition that was actually used. Thus, her own analysis affirmatively establishes that the less restrictive alternative of a 50% share condition would have fully achieved this claimed efficiency.

279.   Dr. Chipty further claims to apply a financial analysis of "payback ratio" (defined as "the product's gross margin divided by R&D expense associated with that product") to "find that but-for the expectation of selling to Apple, the thin modem line would not have been profitable enough to justify Qualcomm developing a new model every year."[607]   She claims that "Qualcomm uses an average target

---

[604] Chipty Report ¶244.
[605] Chipty Report ¶245.
[606] Chipty Report ¶245.
[607] Chipty Report ¶246.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

payback ratio of three", that for some projects it might be higher than three, and that projects with a ratio less than three receive additional scrutiny.[608]  She purports to calculate payback ratios for "the three highest-selling thin modem families that Qualcomm customized for Apple" and claims that "without Apple, Qualcomm would not have found investments in either the MDM9x25 and MDM9x35 to be justifiable from a financial perspective."[609]  Although I offer no opinion on (a) whether using payback ratios in this way is sensible, (b) whether she has correctly calculated her ratios, or (c) whether she has correctly determined the thresholds and resulting decision-making that stems from payback ratios, I note that nothing even in her own results establishes the need for exclusivity.  She fails to explain why Qualcomm could not have achieved target payback ratios over three through the use of volume commitments or conditions.  Moreover, her results explicitly show that a 50% share condition at Apple would have sufficed to meet the payback ratio target for all three thin modem models.[610]  Thus, her own analysis again affirmatively shows that that the less restrictive alternative of a 50% share condition would have fully achieved the claimed efficiency.

280.  Dr. Chipty next claims, based on Dr. Thompson's "judgment" that Qualcomm would save $250 million in R&D expenses for each thin modem model that it decided not to develop, that Qualcomm would have saved at least $750 million in R&D expenses had it not invested in as many thin modems (due to a lack of business from Apple).[611]  She notes this is at least ¾ "of the incentive payments stipulated under the TA".[612]  She does not explain the relevance of her absolute R&D savings figure or why comparing the R&D savings to the incentive payments is a relevant measure of significance.

---

[608] Chipty Report ¶246.

[609] Chipty Report ¶¶247-248.

[610] If one removes half of the payback ratio stemming from "Sales to Apple" from each bar in Exhibit 39 of the Chipty Report, all three bars remain above 3.0.

[611] Chipty Report ¶249.  Dr. Chipty also claims there would be "substantial additional cost savings for Qualcomm in areas such as IT infrastructure, selling, general, and administrative functions, as well as equity-based compensation" from less thin modem development. Chipty Report n.599.

[612] Chipty Report ¶249.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### 3. Timing of R&D Investments

281.   Dr. Chipty claims that Qualcomm incurs much of its R&D expenses before Apple actually sources thin modems from Qualcomm and that "Because of the time in advance that Qualcomm sunk R&D investments and the high degree of required customization, the modem chipsets developed for Apple differed from Qualcomm's other thin modem products."[613]   She purports to empirically demonstrate the timing of Qualcomm's R&D expenses against the timing of Apple purchases, finding that "a significant portion of Qualcomm's R&D expenses were incurred before Apple made any purchases."[614]   She further claims that Apple cancellations of allegedly Apple-specific functionality or modems illustrate the risk to Qualcomm of such front-loaded R&D.[615]   She does not explain why this timing feature of R&D risk could only be mitigated by an exclusivity condition.   More crucially, she does not explain why volume-based rebates, volume commitments, or share condition (e.g., a 50% condition) would not address such risks.   Indeed, as noted above, either volume-based rebates or volume commitments would be a far more effective way of addressing such a risk, given that the exclusivity conditions provided no assurance that Apple would purchase any thin-modems let alone any particular volume of thin-modems or any particular share of all thin-modem purchases.   Given the absence of such Apple assurances of future sales, the timing of Qualcomm's thin-modem R&D investments has the opposite implication: it suggests that those investments were based on sales at the time and that most were incurred from 2011-2013, when most thin-modem sales were to non-Apple customers and thus were not relationship-specific to Apple at all.[616]

### 4. Concentration of Sales Within Apple

282.   Dr. Chipty claims that "Qualcomm's sales of thin modems customized for Apple are highly concentrated in a single buyer (Apple), because other OEMs generally do not use for their handsets the product that Apple sources from Qualcomm."[617]   She notes this is partly driven by the fact that Apple uses MDM

---

[613] Chipty Report ¶250.
[614] Chipty Report ¶¶251-253.
[615] Chipty Report ¶254.
[616] Chipty Report Exhibits 38, 41A.
[617] Chipty Report ¶255.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

modems whereas most other OEMs use MSM modems.[618]   She purports to demonstrate this by showing how, out of roughly ▮▮▮▮▮ units of "Thin Modem Chipset Families Customized for Apple", ▮▮▮▮ were purchased by Apple, and how such concentration does not exist in allegedly non-customized market segments.[619]

283.    However, Dr. Chipty offers no evidence about what the costs of customizing thin modems for Apple was, let alone that those costs were large enough to require an exclusivity condition to recoup.  Even if Dr. Chipty had evidence that significant investment costs were required to customize thin modems for Apple and that those investments would not also benefit its sales of other modems, Dr. Chipty offers no explanation (let alone evidence) as to why recouping this investment required an exclusivity condition.  Even without an exclusivity condition, Apple would likely have focused its purchases on modems that had been customized for its unique needs and would have been motivated by the volume-based rebates that were in the agreement.  Dr. Chipty provides no evidence that the exclusivity condition increased Apple's purchase of customized modems relative to the but-for purchases Apple would have made without an exclusivity condition, let alone that the induced increase in those modem sales was necessary to cover the costs of customization. Nor does Dr. Chipty offer any explanation of why a volume commitment or share condition (e.g., a 50% condition) would not have equally addressed the issue.  As noted above, a volume commitment would be a more effective way of assuring any investment costs were recouped, and her own analysis indicates that a 50% share condition would have sufficed to cover any relationship-specific investment.

### 5. Dr. Chipty's Conclusions on Risk are Flawed

284.    Dr. Chipty claims that all of the risks she has identified through Section VI.C of her report (discussed throughout this Section XIII.C of my Reply Report) "represent legitimate business justifications for the contractual terms in the TA and ATA, as these terms provided Qualcomm some assurance against Apple walking away after Qualcomm made significant incentive payments and investments."[620] Even assuming that she has correctly illustrated the risks she purports to illustrate, I have explained throughout this Section XIII.C that Dr. Chipty's argument is incomplete.  That is, although she claims to identify numerous risks, she never

---

[618] Chipty Report ¶255-57.
[619] Chipty Report ¶¶256-257.
[620] Chipty Report ¶258.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

actually explains why an exclusivity condition is necessary to mitigate them, and why a different contract structure would fail to accomplish such mitigation.

285.   Dr. Chipty also completely disregards the existence of *any* synergies between Qualcomm's development of thin modems and SoCs. That is, her analysis treats thin modem development as *completely distinct* to SoC development, whereas there are obvious areas of overlap that need to be considered in any risk/reward tradeoff of thin modem development.[621]   Indeed, Qualcomm's own Senior-Vice President of Engineering Baaziz Achour testified that the "modem IP" is the same for MDM and MSM/SoC products, which indicates that Qualcomm investments in its MDM line would provide at least some benefit to its more widely-adopted MSM/Soc line of chipsets.[622]  Dr. Chipty claims that Achour's testimony is limited to describing how a modem subsystem within a broader chipset product may not need customization between the MDM and MSM lines, and that other areas outside of his responsibility (such as interface and stacked memory) are outside of Achour's expertise.[623]  But even if some aspects of a chipset product require customization, the point remains that there are *also* some aspects of a chipset product (like the modems about which Achour testifies) which do not require customization.  Dr. Chipty's analysis treats them as completely distinct, which is erroneous, and thus she never considers the extent to which investments in thin modems or customized thin modems might also benefit sales of other sorts of modems and thus reduce any relationship-specific nature of the investment.  Furthermore, a May 2015 Qualcomm presentation titled "QCT Core Strategic Plan" states that ████████████████████████████████████████████████████████████████████████████████████████████████████████[624]  This presentation recognizes a great deal of synergy between thin modems and SoCs that Dr. Chipty simply ignores.  I also understand that Dr. Akl is opining that "the large bulk of research and development investment into new innovative features, chip design, software architecture, and implementation would be applicable to both thin modems and modems in SOCs."[625]

---

[621] Elhauge Report ¶150.
[622] Elhauge Report n.347.
[623] Chipty Report ¶258 & n.615.
[624]  Q2014FTC04332011 at Slide 15.
[625]  Akl Rebuttal Report ¶119.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

286.  By contrast, I explain in Sections XIII.B and XIII.D of this Reply Report that Dr. Chipty does not seem to dispute that non-exclusive means (such as volume commitments) can theoretically accomplish the goal of protecting any relationship-specific investments.  Dr. Chipty fails to explain why such less-restrictive commitments or conditions would not have sufficed to mitigate any supposed risk to Qualcomm of supplying Apple.  Indeed, aspects of her analysis affirmatively show that a volume commitment and/or 50% share condition would have sufficed to support Qualcomm's investments in thin modem R&D.[626]  Another potential less restrictive alternative is to have Apple co-fund investments with Qualcomm, which more directly corrects the alleged potential ex-post opportunism by Apple.[627]  Dr. Chipty's only response seems to be that:

> Professor Elhauge's suggestion that the risks that Qualcomm faced serving Apple could be resolved by having Apple pay Qualcomm is overly simplistic. The fact is that Apple demanded large, front-loaded incentive payments, and Apple drove the deal terms.[628]

For the proposition that "Apple drove the deal terms", Dr. Chipty cites to Apple COO Jeff Williams recalling that Qualcomm "wanted to pay" less than the $1 billion in TA incentives and that "Qualcomm would always want to pay us less for something".[629]  The fact that one party to a deal wants to pay less for something hardly establishes that the counterparty "drove the deal terms".  In fact, I explain in Section XIII.C that Jeff Williams' testimony also shows that Apple's concession of exclusivity was driven by Qualcomm and a unique concession by Apple at the time.[630]  And there is evidence that Apple offered to pay incentives to Ericsson for meeting Apple requirements for chip development which, although ultimately never executed, illustrate that Apple can engage in exactly the kind of co-funding just discussed.[631]

287.  Moreover, Dr. Chipty notes elsewhere in her report that "Qualcomm began competing for Apple's thin modem business as early as 2006",[632] that "Apple

---

[626] *See, e.g.*, *supra* Section XIII.C.2.
[627] Elhauge Report ¶151.
[628] Chipty Report ¶260.
[629] Chipty Report n.616.
[630] Dr. Chipty also claims that volume-based discounts (as opposed to volume commitments) cannot fully solve the problem of ex-post opportunism.  Chipty Report ¶261.  I explain *supra* Section XIII.C.2 how volume-based rebates would be more closely tied to the need for investment.
[631] Martin Zander (Ericsson Head of Strategic Initiatives) Dep. at 194:15–195:10.
[632] Chipty Report ¶217.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

and Qualcomm first began to negotiate the terms of the supply relationship described below in the 2008-2009 timeframe",[633] and that Qualcomm began selling its first set of chipsets to Apple prior to the period of the TA.[634]   These facts show that Qualcomm did not, in fact, necessarily require exclusivity at Apple to achieve Apple sales.  Dr. Chipty never explains why the need for such exclusivity only first arose in 2011.

### D. Dr. Chipty Fails to Show That Qualcomm Requested Volume Commitments

288.    Dr. Chipty notes that "there are many ways willing buyers and willing sellers structure terms of trades to address concerns over seller risk" including that "a buyer can simply commit to purchase a pre-specified volume" (in which case the buyer—here, Apple—bears the risk).[635]  She notes that alternatively, "the buyer and the seller can agree upon an exclusive relationship" which would spread the risk.[636]  Crucially, Dr. Chipty never actually disagrees that a volume commitment would have been able to mitigate the risks of relationship-specific investments.

289.    Dr. Chipty argues that Qualcomm wanted volume commitments but that Apple refused to make them.[637]  But she provides no evidence that Qualcomm every actually asked Apple for volume commitments nor that Qualcomm had such a request rejected by Apple.

290.    Regarding the TA, Dr. Chipty quotes evidence that she claims to show "Qualcomm wanted to condition the TA incentive payments on Apple volume".[638]  But this doesn't say that Qualcomm sought a volume *commitment* (as opposed to seeking to condition the funds upon volume).  Nor were Qualcomm's requests for volume conditions rejected by Apple.  In fact, the funds within the TA are actually

---

[633] Chipty Report ¶217.
[634] "Apple launched the CDMA iPhone 4 with a Qualcomm modem chipset in February 2011". Chipty n.750.  This necessarily means that Qualcomm sold chips to Apple before February 2011.
[635] Chipty Report ¶262.
[636] Chipty Report ¶262.
[637] Chipty Report ¶262-67.
[638] Chipty Report ¶263.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

conditional on both volume and exclusivity. That is to say, *separate and apart from the exclusivity conditions in the TA*:[639]

- The Transition Fund is *also* conditioned "upon Apple meeting certain volume targets for chipset purchases".[640]
- The Marketing and Development Fund is *also* contingent upon Apple launching a product with Qualcomm chips on a UMTS carrier.[641] This (on its own) is a volume condition, not an exclusivity condition, because it does not preclude the use of competitor chips.
- The Variable Incentive Fund was *also* based on Apple's total unit purchase volume of Qualcomm chipsets.[642]

Thus, Qualcomm did receive the volume conditions it sought. However, the volume conditions are not the challenged aspect of the TA. Dr. Chipty provides no evidence that the volume conditions in the TA were insufficient to achieve any efficiencies, let alone evidence that additional volume-based conditions could not have achieved any additional efficiencies claimed to result from the exclusivity condition.

291. In short, Dr. Chipty's evidence fails to show that Qualcomm ever sought a volume *commitment* for the TA, let alone that Qualcomm proposed using a volume commitment rather than seeking an exclusivity condition as part of the TA. In fact, Apple COO Jeff Williams testified that Qualcomm was the one who requested the exclusivity conditions because Apple doesn't offer exclusivity.[643] What Dr. Chipty shows is that, in addition to requesting and obtained an exclusivity condition, Qualcomm requested and obtained volume conditions, but that is not the same thing as requesting a volume commitment, and anyway she provides no evidence that volume conditions would not have sufficed to further any efficiencies.

292. Regarding the FATA, Dr. Chipty claims that "internal Qualcomm communications in the lead-up to the signing of the ATA show that Qualcomm wanted to condition the ATA incentive payments on a commitment from Apple to use Qualcomm modem chipsets in Apple's 2015 products."[644] But all she is able to

---

[639] The TA includes a further exclusivity condition on top of the volume conditions, that terminates the agreement and allows clawbacks if Apple launches any new product using a non-Qualcomm modem chip. Elhauge Report ¶118.

[640] Elhauge Report ¶118.

[641] Elhauge Report ¶118.

[642] Elhauge Report ¶118.

[643] Jeff Williams 2016 FTC IH Transcript at 81:14-82:13.

[644] Chipty Report ¶264.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

say about the evidence she cites is that Qualcomm's CEO "debated whether the [2013] deal with Apple would be worth it if Qualcomm could not get assurances for purchases of MDM9x35 in 2015".[645]  The CEO's musing in an internal exchange about possibly asking for a commitment that Apple would make at least some purchases hardly shows Qualcomm ever asked for such a commitment, let alone that Qualcomm ever sought a commitment that Apple purchase any particular volume level.  As with the TA, funds within the FATA are actually *conditioned* on volume (in addition to exclusivity):

- The Marketing Fund in the FATA was a per-iPhone and per-iPad payment.[646]
- The Additional Variable Incentive Fund was "based on the volume of modem chips sourced".[647]

The existence of such volume conditions shows that Qualcomm sought and successfully obtained volume conditions, but provides no evidence that Qualcomm sought a volume commitment nor any evidence that volume conditions could not have sufficed to achieve any claimed efficiencies.  Moreover, as I just noted in the previous paragraph, Apple COO Jeff Williams testified that Qualcomm was the one who requested the exclusivity conditions in the TA and FATA.

293.   In sum, Section VI.D of Dr. Chipty's report only establishes that Dr. Chipty is not even claiming that exclusivity was *necessary* to protect any relationship-specific investments, because she notes that alternative forms of commitment can accomplish the same goals.   But she fails to provide any actual evidence that Qualcomm sought volume commitments for the funds within the TA and FATA.  Her evidence only shows that Qualcomm wanted to condition its funds upon volume, which it did, and she provides no evidence that the volume conditions that either were or could have been obtained or could not have equally achieved any efficiencies.

---

[645] Chipty Report ¶264.
[646] Chipty Report ¶224.
[647] Chipty Report ¶225.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### E. Dr. Chipty Fails to Show that Apple Would Have Rejected Any Requests for Volume Commitments or Smaller Share Conditions

294.   In Section VI.E of her report, Dr. Chipty claims that "Apple refused to give a volume commitment".[648]   To support this proposition, she cites to two Qualcomm executives who testified that "Apple had a practice to never make volume commitments" and that when negotiating the TA, "Apple 'gave us no commitment to launching next devices. Gave us no commitment to launch at any volume levels.'"[649]   What Dr. Chipty fails to consider is that Apple *also* does not agree to exclusivity conditions: Apple COO Jeff Williams testified that "It's unusual for us to have stipulations where we lose something in the event of exclusivity, and so that's in this agreement and *may have been a first for Apple*."[650]   Thus, even if it were true that Qualcomm's only options for protecting any purported relationship-specific investments were either an exclusivity condition or a volume commitment, it is also true that Qualcomm was asking Apple either way to agree to something that Apple did not usually do.

295.   In fact, whereas Jeff Williams testified that an exclusivity condition may be a first for Apple, he also testified that, although rare, Apple may have previously made minimum volume commitments.[651]   He further testified that "Apple, from time to time, will make share commitments… in limited cases" and when asked whether Apple proposed (when negotiating the TA) a less restrictive share condition than the 100 percent condition, he said "Yeah, our starting position in the discussion is what we do with everybody we're going to give a big piece of business and say the exciting part is we're going to award business to you…".[652]   Thus, Dr. Chipty fails to show any of (1) Apple never makes volume commitments, (2) Apple's usual practice of not giving volume commitments would have prevented Apple from giving one to Qualcomm as preferable to making an exclusivity condition (especially because Apple either way made a concession to Qualcomm that it never makes), or (3) Apple would not have agreed to a share condition of less than 100%.   Rather, Jeff Williams' testimony establishes the opposite on all three points.

---

[648] Chipty Report ¶265.
[649] Chipty Report ¶265.
[650] Jeff Williams 2016 FTC IH Transcript at 85:11-23.
[651] Jeff Williams 2016 FTC IH Transcript at 86:24-87:8.
[652] Jeff Williams 2016 FTC IH Transcript at 87:9-88:6.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

296.   Even if Apple would have rejected volume commitments, Dr. Chipty provides no evidence that the existing volume conditions could not have equally achieved any efficiencies or that, if they could not, Apple would have rejected additional volume conditions that could have achieved those efficiencies.  Given that Apple accepted the actual volume conditions, Apple clearly had no practice of rejecting such volume conditions.  Moreover, Apple COO Jeff Williams testified that Qualcomm never even raised to Apple the issue of Qualcomm risking relationship-specific investments to invest in serving Apple,[653] further belying any claim by Dr. Chipty that the TA and ATA were designed to "align incentives"[654] between the parties.

297.   The remainder of Dr. Chipty's claims in Section VI.E of her report are that "negotiations leading up to the ATA revolved around a combination of incentive payments and conditional rebate provisions" and that "without the assurance of Apple sourcing" a Qualcomm chip in each of 2014 and 2015, "the terms of the ATA would not make financial sense for Qualcomm."[655]  None of this evidence concerns whether Apple would have rejected a volume commitment or a share condition.  Nor does it show that the actual (or perhaps enhanced) volume conditions could not have equally achieved any efficiencies.

## XIV. Dr. Chipty's Incorrect Arguments that Qualcomm's Apple Agreements Were Not Anticompetitive

298.   In Section VII of her report, Dr. Chipty first summarily claims that, despite the exclusivity conditions:

> the at-issue Agreements did not require Apple to be exclusive with Qualcomm, nor did Apple remain exclusive with Qualcomm over the term of the ATA.  Further, Qualcomm did not condition its supply to Apple on Apple sole-sourcing modem chipsets from Qualcomm, nor did Apple contractually commit to sole-sourcing modem chipsets from Qualcomm.  Consistent with these facts, Qualcomm continued to supply modem chipsets to Apple after Apple began to dual-source with Intel.[656]

---

[653] Jeff Williams 2016 FTC IH Transcript at 89:14-23.
[654] Chipty Report ¶267.
[655] Chipty Report ¶266.
[656] Chipty Report ¶269.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Her first statement, that the TA and FATA did not literally "require" Apple to be exclusive, is misguided because I explain in the Elhauge Report that the *economic effect* of the exclusivity conditions—the use of steep penalties—means that the agreement is *de facto* exclusive dealing.[657]   Dr. Chipty's observation of the semantic labelling of the conditions within the TA and FATA is therefore conclusory and fails to account for the relevant economic incentives.  The same applies to her claims that Qualcomm did not condition *supply* on Apple sole-sourcing and that Apple did not commit to Apple sole-sourcing; the fact that the exclusivity conditions were not literally exclusivity commitments does not mean they did not have the economic effect as such commitments.  I also explain below in Section XIV.E that Dr. Chipty's other claim that "nor did Apple remain exclusive with Qualcomm over the term of the ATA" does not conflict with my analysis of the TA and ATA as *de facto* exclusive dealing through 2016.

299.   Dr. Chipty next summarizes the findings she claims to make throughout the remainder of Section VII of her report.[658]   I respond to her more detailed contentions below.

### A. Dr. Chipty's Narrow Theory of Anticompetitive Harm

300.   Dr. Chipty claims that exclusive dealing arrangements "are often procompetitive" and "may be anticompetitive, but only under certain conditions".[659] She lists the following conditions:[660]

- "the seller ha[s] market power over the buyer in the relevant market, at the time the exclusivity is obtained"
- "the agreement must prevent competitors from access to a sufficient volume of sales, that they would have otherwise achieved and needed in order to compete successfully"
- "the exclusive arrangement must generate negative externalities—that is, deny other buyers supply options that would have otherwise existed"

She further elaborates on economic theory that "Where a single buyer enters into an exclusive contract with the seller, there may be a negative externality for other

---

[657] Elhauge Report § V.B.1.
[658] Chipty Report ¶¶270-272.
[659] Chipty Report ¶273.
[660] Chipty Report ¶274.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

buyers only if the arrangement reduces the likelihood of entry by a potential entrant that could viably serve those other buyers."[661]

301.  I have two comments on the very general framework Dr. Chipty has laid out.  First, as I will explain further below, she fails to demonstrate that any of these conditions to do not hold.  That is, it is true that Qualcomm has monopoly power, it is true that Qualcomm's exclusive dealing with Apple foreclosed Intel and other rivals from sales at Apple that they would otherwise have achieved and needed to compete successfully, and it is true that this hampered rival competitiveness in the relevant chipset markets in a way that generated negative externalities for other buyers.  Second, her focused description of exclusive dealing does not account for the fact that Plaintiffs have alleged a range of anticompetitive conduct by Qualcomm in this case, including the exclusion of rival chip suppliers through the No-License-No-Chips policy and the refusal to exhaustively license those rivals.[662]  Although I do demonstrate that Qualcomm's exclusive dealing with Apple was alone anticompetitive, a proper economic analysis of Qualcomm's challenged conduct requires one to evaluate the exclusionary effects holistically.  Thus, even if one were to mistakenly conclude that Qualcomm's exclusive dealing alone did not exclude rival chip suppliers, it is nevertheless possible it did compound the exclusionary effects of Qualcomm's other policies.

### B. Dr. Chipty's Incorrect Claims About Competitive Pressure

302.  Dr. Chipty claims that "Qualcomm understood that Apple was soliciting bids from rival chipmakers, and Qualcomm felt competitive pressure to lower the per-unit prices it offered to Apple."[663]  She further claims that "Qualcomm also recognized that this competition, coupled with the risks it faced in serving the Apple account (including the timing of the incentive payments Apple demanded), exposed Qualcomm to hold-up by Apple."[664]  To support her argument about competitive pressures, Dr. Chipty cites to a litany of correspondence over the TA that she claims to show Apple soliciting multiple bids for its chip business and driving the deal terms, with Qualcomm responding to the competitive pressure

---

[661] Chipty Report ¶275.
[662] Elhauge Report §§ III.B.2, IV.B.
[663] Chipty Report ¶276.
[664] Chipty Report ¶277.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

arising from these rival bids and offering concessions through the use of discounts.[665] She similarly cites to a litany of correspondence over the FATA and claims to show Apple soliciting multiple bids for its chip business, sharing information selectively with Qualcomm, with Qualcomm staff trying to assess the financial implications of agreeing to provide additional incentive payments to Apple.[666]   I have several responses to these arguments.

303.   First, even assuming that Dr. Chipty correctly describes the dynamics of the negotiations, the idea that one party to a deal has to make some concessions to a counterparty does not somehow negate the concepts of market power and monopoly power.   Indeed, to believe otherwise would mean that an economist should always conclude that a seller lacks monopoly power or market power over a buyer anytime the seller has to make any price reductions.   That would clearly be an incorrect application of antitrust economics, which shows that the assumptions underlying Dr. Chipty's analysis of the TA and FATA negotiations are inherently flawed.

304.   Second, any claim that Qualcomm made significant concessions to Apple is demonstrably false.   Later in her report, Dr. Chipty claims to measure the volumes, prices, and costs for various Qualcomm chipsets purchased by Apple, in order to determine whether an "equally efficient rival" could win Apple's business.[667]   I respond to this analysis more fully in Section XIV.E below, but for present purposes I note that her own calculations suggest that Qualcomm's margin over direct costs and R&D expenses for 2014, 2015, and 2016 chipsets sold to Apple was almost $9 billion.[668]   Thus, her own analysis shows that the $2.5 billion in "incentives" offered by the FATA were less than 30% of the profit margins Qualcomm would be earning from Apple's business.

---

[665] Chipty Report ¶¶277-283.

[666] Chipty Report ¶¶284-289.

[667] Chipty Report ¶331.

[668] Chipty Report Exhibit 47 shows the "Qualcomm Price" (based on price projections), the "EER Direct Cost" (which is Qualcomm's projected direct costs and Dr. Chipty's estimate of Qualcomm's avoidable R&D costs) and projected volumes of Apple device sales for four chipset models from 2014-2016.  This exhibit then calculates the direct margin for 50% of the Apple business as $4.923 billion and the indirect R&D cost as $500 million, for a net margin of $4.423 billion.  This means that 100% of the Apple business will be worth double these numbers to Qualcomm based on Dr. Chipty's projections, or $8.846 billion.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

305. Third, I explain in the Elhauge Report that the payments in the TA and FATA were actually penalties, not discounts.[669]  The implication of this is that if Qualcomm had not conditioned the TA and FATA payments upon exclusivity, then Qualcomm would have had to make equal or greater "concessions" through price or non-exclusivity-based discounts anyways.  Thus, Qualcomm did not really make any concessions at all relative to a but-for world without the exclusivity conditions.

306. Fourth, her claim that "Apple drove the deal terms" is also mistaken because, as I explain above in Section XIII.C.5, she supports this claim only with Apple COO Jeff Williams' belief that Qualcomm "wanted to pay" less than it did, yet the fact that one party to a deal wants to pay less for something hardly establishes that the counterparty "drove the deal terms".

307. Fifth, I already explain above in Sections XIII.C.1 and XIII.D that the concerns expressed by Qualcomm over offering the incentive payments themselves were fully mitigated by volume conditions applicable to those payments.  Thus, Qualcomm never actually had any risk of making payments to Apple without Apple needing to purchase Qualcomm chipsets in order to earn those payments.  Qualcomm sought volume conditions to mitigate any risks, and got them.

308. Sixth, Dr. Chipty appears to employ misleading facts.  As one example, she points to an April 2013 PowerPoint in which she claims:

> Qualcomm presented analyses that summarized the "no deal" outcome as one in which Apple procured from non-Qualcomm suppliers ██ percent of its thin modem needs in 2014, ██ percent of its thin modem needs in 2015, and ██ percent of its thin modem needs in 2016. [670]

However, the FATA was signed in February 2013.  Thus, this presentation does not actually reflect the parties' beliefs at the time of negotiation.  A presentation attached to a January 20, 2013 email shows that Qualcomm was modelling multiple scenarios of no FATA deal, including one where Apple retained ████ of the QCT business and another where Apple's share fell to ███ in 2016 (as opposed to the ███ shown in Dr. Chipty's evidence).[671]

309. Based on the foregoing analysis, Dr. Chipty's claim that "Qualcomm did not 'coerce' Apple into signing the at-issue Agreements" [672] is entirely

---

[669] Elhauge Report § V.B.1.
[670] Chipty Report ¶289.
[671] QAPPCMSD00712430 at Slides 2, 4, 5; QAPPCMSD00712424 (email attaching presentation).
[672] Chipty Report ¶276.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

unwarranted because she has not actually supported any of the facts she purports to establish.

## C. Dr. Chipty's Mistaken Claims That Other Chip Suppliers Were Not Affected

310.  Dr. Chipty argues that I fail to show that foreclosure from Apple weakened rival chipmakers because "Intel's, Broadcom's, and ST-Ericsson's proposed modem chipsets did not meet Apple's technical and scheduling requirements."[673]  Professors Snyder and Williams have made similar claims about how purported weaknesses in these companies is what denied them success in the chipset markets, and not Qualcomm's exclusionary conduct.[674]  Before I turn to the more specific contentions, I provide an overview of the flawed assumption underlying these arguments.

### 1. Dr. Chipty's Flawed Approach to Evaluating Effects on Rival Chip Suppliers

311.  As an initial matter, I note that one must approach the evidence of exclusionary conduct holistically in this case.  Qualcomm has implemented a No-License-No-Chips policy, has refused to exhaustively license rivals (violating its FRAND commitment) and used exclusivity conditions with Apple to engage in *de facto* exclusive dealing.  Although the analysis in the Elhauge Report does show specific anticompetitive harms linked to each individual type of exclusionary conduct, the combination of all three types of exclusionary conduct will have cumulative effects on rival chip suppliers.  Put differently, even though each type of exclusionary conduct can independently harm a rival, the observed outcome of a rival reflects the combined harm from all three types of exclusionary conduct.

312.  As I also explain in detail throughout Sections IX and XI above, Qualcomm's exclusionary conduct has affected rival chip suppliers' foresight, investment incentives, and execution, for many years.  Thus, most—if not all—of the individual outcomes observed for these chip suppliers are endogenous to that conduct.  I give the examples in Section XI.A above of how Qualcomm's exclusionary conduct makes rivals less able to invest in R&D because it suppresses their margins, less able to exercise "foresight" because it denies them the IP (i.e. a

---

[673] Chipty Report ¶291.
[674] *See supra* Section XI.B; *see also infra* Section XV.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

license to Qualcomm's cellular SEPs) needed to align with demand, and less able to execute because it limits their ability to aggressively price. I further explain in Section XI.A that denying a rival experience can exacerbate these effects, because exclusion is both an immediate harm and a harm that will continue to resonate throughout a supplier's history. By contrast, all of Dr. Chipty's analysis simply assumes that, even in a but-for world without the *de facto* exclusive dealing, Qualcomm's chip rivals would not have been stronger competitors.

313.    When Dr. Chipty attempts to demonstrate that a rival supplier could not have achieved Apple's business because they did not meet Apple's technical and scheduling requirements, she employs the same faulty reasoning I describe throughout Sections VI, VIII, IX, and XI above: she is simply assuming that any "technical and scheduling" problems she purportedly identifies would also exist even if Qualcomm had not engaged in exclusionary conduct. This assumption fails to employ the correct but-for baseline in evaluating Qualcomm's conduct. This assumption is especially unwarranted in light of extensive evidence, presented in Section V.B.2.a of the Elhauge Report, that both Qualcomm and other suppliers perceived enormous benefits of being able to secure Apple's business and that the failure to secure such business is particularly detrimental given Apple's unique status among OEMs. As Apple COO Jeff Williams put it:

> Apple pushes the envelope with every single supplier, and by virtue of working with us, we usually are pushing suppliers to do their leading edge work, and that collaboration is very beneficial to suppliers as they -- ***because together we push their technology forward***.[675]

Dr. Chipty's contentions therefore not only make an unfounded assumption, but the assumption is directly contradicted by evidence presented in the Elhauge Report and additional evidence presented in this Reply Report.

314.    Additionally, some of the various defense experts' own contentions further illustrate how Apple's business can be a key driver of success in product development and scheduling. For example, Dr. Chipty argues that "The evidence shows that Qualcomm invested significantly more in its thin modem line because of Apple."[676] Although I explain above in Section XIII.C.2 that she is wrong about Qualcomm needing exclusivity conditions to justify these investments, the general principle underlying this argument—that business with Apple encourages investment—contradicts her unfounded assumption that other chip suppliers would

---

[675] Jeff Williams 2016 FTC IH Transcript at 22:14-24.
[676] Chipty Report ¶240.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

not have been similarly encouraged to invest. Indeed, the Elhauge Report notes (as just one example among many pieces of evidence) testimony from Martin Zander (Ericsson Head of Strategic Initiatives) concerning R&D investments: Ericsson winning Apple thin modem business would have been "an important factor weighing into a decision to increase the business".[677]

315. Similarly, Dr. Chipty argues that "without Apple, Qualcomm would have slowed the cadence at which it developed and released new thin modem models".[678] Although I explain above in Section XIII.C.2 that she is wrong about Qualcomm needing exclusivity conditions to justify this cadence, the general principle underlying her assumption—that business with Apple accelerates development—contradicts her unfounded assumption that other chip suppliers would not have experienced similarly accelerated timelines. Indeed, Dr. Chipty herself describes an example where

> in March 2011, Apple requested that Qualcomm execute a "'man on the moon' challenge" (as described by Apple's Jeff Williams) to accelerate the development of the MDM9x15 thin modem by a year, to meet Apple's scheduling demand that MDM9x15 be ready for a mid-2012 device launch.[679]

When asked about this "man on the moon" challenge, Apple COO Jeff Williams testified that:

> The "man on the moon" came from -- we had a meeting with Qualcomm, and Qualcomm said, "Well, here's" -- "here's a schedule." And we said, "Well, it's" – "you have to pull in some things." And they said, "Well, that would be difficult." And we said -- I think our reference was, "lots of difficult things. It was difficult to put a man on the moon, and we need you guys to come up with a plan, and *we'll work together and make it happen*.[680]

Jeff Williams' testimony makes clear that Apple would work collaboratively with Qualcomm to help meet the aggressive timeline Apple laid out. Yet despite crediting Qualcomm with the ability to meet aggressive timelines for Apple, Dr. Chipty appears to entirely dismiss the likelihood that Apple would have (in a but-for world without Qualcomm exclusivity) worked with Intel, Broadcom, ST-Ericsson, or other chip rivals to realize faster timelines.

---

[677] Elhauge Report n.312.
[678] Chipty Report ¶245.
[679] Chipty Report ¶244.
[680] Jeff Williams (Apple COO) Dep. at 150:21-151:7.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### 2. Dr. Chipty's Flawed Arguments on Intel Supplying Apple Devices

316. Dr. Chipty first claims that "Documentary evidence over this time period raises doubt about whether Apple could have sourced modem chipsets from any of Qualcomm's rivals for devices launched between 2011 to 2015."[681] For "Apple's 2011 and 2012 Devices", she claims that "Apple selected Qualcomm's modem chipsets for 2011 and 2012 devices because its chipsets were better" and she reviews evidence that she claims to show the failure of Infineon and ST-Ericsson to supply certain cellular technologies.[682] As I explain in Section IX above, a supplier's ability to supply a given technology is endogenous to Qualcomm's No-License-No-Chips policy and refusals to provide exhaustive licenses to its rivals. Moreover, because chipset procurement decisions are usually made over a year in advance of a product launch, product launches in 2011 and 2012 are not directly relevant to evaluating Apple's exclusivity agreements, which began in 2011. Consistent with this, the Elhauge Report focuses on rival exclusion from Apple's product launches for 2013, 2014, and 2015 (and evidence that effects persisted beyond these years as a result of the exclusion).[683]

317. Dr. Chipty's claim about "Apple's 2013 Devices" is that Apple did "consider" rival chips but that "rival chipmakers did not offer solutions that met Apple's requirements for its 2013 devices" (e.g., "Apple disqualified ST-Ericsson for 2013 devices because they failed to meet Apple's supply timeline").[684] This fails to answer the relevant question of whether Apple was *serious* about these considerations (which it was not[685]) and whether working with Apple in a but-for world would have improved the engineering and scheduling capabilities of one or more of these rivals (as discussed in Sections IX and XIV.C.1 above).

318. Dr. Chipty similarly claims that evidence concerning "Apple's 2014 Devices" shows Apple considered using an Intel chip but that "Apple did not ultimately do so because of unrelated business decisions made by Apple and limitations of Intel's modem chipsets", citing evidence that timing and capabilities were challenges being faced by Apple with using Intel's 7160 chip.[686] Dr. Chipty

---

[681] Chipty Report ¶292.
[682] Chipty Report ¶293.
[683] Elhauge Report ¶¶141-149.
[684] Chipty Report ¶294.
[685] Elhauge Report ¶142.
[686] Chipty Report ¶¶295-296.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

fails to consider that without Apple's exclusive dealing, Apple would have improved the engineering and scheduling capabilities of Intel through their engagement (which was the likely outcome in the but-for world as discussed in Sections IX and XIV.C.1 above).

319.    Dr. Chipty's claim about "Apple's 2015 Devices" is that Intel's chips at the time were not capable of supplying Apple's needs.[687]  This fails to consider the evidence I presented that Apple did not even issue an RFI or RFP to rival chipset vendors due to the exclusivity conditions Apple faced.[688]  Moreover, Dr. Chipty fails to consider that working with Apple in a but-for world would have improved the engineering and scheduling capabilities of Intel (as discussed in Sections IX and XIV.C.1 above).[689]

320.    Dr. Chipty claims that Intel's supplying modem chips to Apple starting in 2016, and continuing at least through the present, shows that "Intel developed the capability to satisfy Apple's engineering requirements and production timeline, during the term of the ATA, without first supplying Apple iPads" and that she is "aware of no ordinary-course evidence to suppose that Intel could have been ready any faster, nor has Professor Elhauge provided any."[690]  This simply ignores all of the evidence presented in the Elhauge Report and this Reply Report for how engagement with Apple in the absence of Qualcomm's exclusivity provisions would have allowed Intel to improve both its engineering and its timelines to supply Apple sooner.[691]

---

[687] Chipty Report ¶297.

[688] Elhauge Report ¶144.

[689] Dr. Chipty states that, consistent with the claims she has made, "Dr. Tim Williams, an electrical engineer retained as an expert by Qualcomm, has concluded that Qualcomm was the only chipmaker technically capable of meeting Apple's design and scheduling needs for LTE modem chipsets prior to 2016".  Chipty Report ¶298.  Dr. Williams' findings all suffer from the same flaw that they fail to consider what rival technical capabilities **would have been in a but-for world** free of Qualcomm's exclusionary conduct.  *See also infra* Section XV.

[690] Chipty Report ¶299.

[691] Elhauge Report § V.B.2; *see also supra* Section IX.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### 3. Dr. Chipty's Mistaken Arguments About Other Rival Chipmakers

321.   Dr. Chipty next purports to show that "other rival chipmakers (in addition to Intel) developed technologically advanced modem chipsets and displaced Qualcomm's sales of LTE and CDMA chipsets, without supplying Apple" which she claims to show that "there were nevertheless sufficient opportunities for these rivals to develop into viable competitors".[692]  Her claims include that Apple's share of CDMA devices never exceeded 33%, and that other less-premium handset providers nevertheless provide opportunities for less-capable chip suppliers to develop advanced cellular offerings.[693]  However, Dr. Chipty is incorrect to interpret these supposed findings[694] as evidence that rivals could not have been foreclosed by the loss of Apple's business, as I explain further.

322.   First, Dr. Chipty's contention appears to ignore all of the evidence and explanations in Sections V.B.2 of the Elhauge Report showing how access to Apple's business was uniquely advantageous to a chip supplier and how failing to win Apple's business did in practice weaken rival chip competitiveness.  Second, this contention also ignores all of the evidence and explanations in Sections IX and XIV.C.1 above that working with Apple in a but-for world would have improved the engineering and scheduling capabilities of Intel and other rival chip suppliers.  Thus, even if it were true that some rival chip suppliers have had some success growing their businesses, this would not demonstrate the lack of an anticompetitive effect. Dr. Chipty is incorrectly measuring effects against a past baseline, rather than the correct but-for baseline that must determine whether such rivals could have improved their competitiveness sooner and/or to a greater degree.[695]  Third, Dr. Chipty's contention that other rival chipmakers have developed technologically advanced modem chipsets contrasts sharply with her claims that no other chip supplier could possibly have met Apple's technical and scheduling needs from 2011 to 2015,[696] and defense expert Dr. Williams' similar claims that other modem chipset manufacturers were not viable suppliers for Apple.[697]  These defense experts take the position that competition is thriving when trying to claim a lack of harm, but

---

[692] Chipty Report ¶300.

[693] Chipty Report ¶¶301-305.

[694] I offer no opinion on whether Dr. Chipty's factual allegations or empirical results for these claims are correct or properly calculated.

[695] *See also supra* Sections III.A, XII.

[696] Chipty Report § VII.C.1.

[697] Williams Report § IX.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

when trying to argue why there was no effect on Apple, they claim that competition for Apple's chipset business was not possible.

### 4. Dr. Chipty's Mistaken Inferences Regarding Infineon

323.    Dr. Chipty claims the notion that "had Intel sold modem chipsets to Apple earlier, it would have been able to compete sooner and more effectively in Plaintiffs' asserted markets" is "at odds with the experience of Infineon."[698]  She claims that Infineon should reflect any "developmental benefits that a chipmaker might expect to achieve because of supplying Apple" because it did supply Apple from 2007 to 2010, but she also claims that Infineon nevertheless failed to maintain its LTE innovation, failed to achieve a leadership position in chips, and failed to impress Samsung with its SoCs.[699]  Dr. Chipty's assumption that Infineon should reflect any developmental benefits that a chipmaker might expect to achieve because of supplying Apple is a straw man: my analysis is not that foreclosing sales to Apple *prior to 2011* would have *necessarily* had a similar foreclosing effect.  Apple comprised less than 16% of Global Handset Revenue prior to 2011, but its annual share has exceeded 25% every year since 2011,[700] which is the period my analysis focuses on.  Moreover, Qualcomm's No-License-No-Chips tie and refusal to license rivals also have exclusionary effects, including on Infineon,[701] and so Infineon is hardly a study of the but-for world.

### 5. Dr. Chipty's Faulty Conclusions from Intel's Actual-World Performance

324.    Dr. Chipty claims that "Intel's sales of modem chipsets for handset use to OEMs other than Apple have not increased since Intel began to supply thin modems to Apple in 2016", that "Intel's unit sales of modem chipsets to handset OEMs other than Apple declined from 2016 to Q2 2018", and that an Intel employee could not identify any business Intel has won since Intel began supplying thin modems for the iPhone.[702]  Dr. Chipty is once again failing to use the *but-for* world as a benchmark.  The past foreclosure of Intel at Apple delayed and stunted the development of Intel's chipset business, and so Intel is a less effective competitor

---

[698] Chipty Report ¶306.
[699] Chipty Report ¶¶306-307.
[700] QNDCAL05898145.
[701] *See supra* Section IX.A.
[702] Chipty Report ¶¶308-310.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

than it would have been in the but-for world, even after finally getting access to Apple's business in the actual world.  Moreover, Qualcomm's other exclusionary practices—No-License-No-Chips and refusing to license rivals—continue to have exclusionary effects.

### D. Dr. Chipty's Mistaken Claims That Competition Was Not Harmed

325.   In Section VII.D of her report, Dr. Chipty claims that my conclusions of harm to competition and harm to customers of modem chipsets are "contradicted by multiple facts".[703]   She first argues that "Apple is the only major OEM that exclusively uses thin modems for its handsets.  Other OEMs predominantly use SoCs for their handsets"[704]  She adds that:

> Even if Intel had supplied thin modems for Apple devices sooner, as Professor Elhauge asserts they might have, and even if that might have accelerated Intel's technical proficiency in thin modem chipsets, there is no basis to suppose that working with Apple would have enhanced Intel's technical proficiency in SoCs.  Successful development of SoCs requires a broader array of capabilities than Intel would have honed working with Apple.[705]

Dr. Chipty also cites to two Qualcomm employees' testimony that Qualcomm's thin modem experience serving Apple did not provide benefits for Qualcomm's SoCs. This argument by Dr. Chipty is mistaken for several reasons.  First, she is incorrect to suggest that there couldn't be anticompetitive harm even just within thin modems, given her own finding that non-Apple customers comprise 42.8% of thin modem sales.[706]   Second, the deposition testimony of the two Qualcomm employees are contradicted by testimony from Qualcomm employee Baaziz Achour and a 2015 Qualcomm presentation that both suggest synergies between thin modems and SoCs, as explained above in Section XIII.C.5.   Third, the Elhauge Report describes extensive evidence that working with Apple is beneficial for a chip supplier's reputation and engineering prowess.[707]  Dr. Chipty's claim that being a thin modem supplier to Apple can *only* benefit a chip supplier's thin modem products is not supported by the full set of evidence.

---

[703] Chipty Report ¶311.
[704] Chipty Report ¶312.
[705] Chipty Report ¶313.
[706] *See supra* Section XIII.C.2.
[707] Elhauge Report § V.B.2.a.

162

326.   Dr. Chipty next argues that the testimony from Intel employee Evans about Intel wanting to leverage thin modem IP into SoCs is outdated, because Intel has now abandoned its SoC efforts.[708]  She further argues that Intel has failed to win business from additional OEMs and that Intel has lower returns on R&D and trouble with engineering.[709]  Dr. Chipty bases her claims in part on a July 2015 Bain presentation, whereas the Intel-based iPhone did not launch until the fall of 2016, so the Bain presentation can't possibility speak to Intel's performance after lifting the exclusivity condition allowed it to make chip sales to Apple.   But even if one were to accept that, even after it was allowed to supply Apple, Intel's performance has remained mediocre, that is entirely explained by (and does not contradict) my analysis.   One reason is that Intel has *also* been excluded by Qualcomm's No-License-No-Chips policy and refusal to exhaustively license.[710]   A proper consideration of the impact on Intel must consider Qualcomm's anticompetitive practices holistically.   Another reason is that, as noted in the Elhauge Report, Intel's CDMA chipset business was underdeveloped by two years as a result of Qualcomm's exclusivity agreements with Apple.[711]  Dr. Chipty continues to make the error of assuming the actual world is the same as the but-for world, whereas the fact that Intel was able to win Apple's business starting in 2016 does not mean that Intel magically accelerated its development by two years.   Put differently, given that the past foreclosure of Intel at Apple delayed and stunted the development of Intel's chipset business, Intel *remains* a less effective competitor than it would have been in the but-for world, even after finally getting access to Apple's business.   But that is an illustration of the anticompetitive harm, not evidence that there was no harm. Dr. Chipty errs in assuming that, because Intel chose to exit SoCs *after* having its competitiveness hampered by Qualcomm's restraints, this means Intel would have exited SoCs *anyways* even if it had never been hampered in the first place.

### E. Dr. Chipty's Mistaken Claims About Equally Efficient Rivals

327.   Dr. Chipty claims to "find that an equally efficient rival could have profitably competed to supply the contestable portion of Apple's business for its

---

[708] Chipty Report ¶314.
[709] Chipty Report ¶315.
[710] *See supra* Section IX.
[711] Elhauge Report ¶153.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

2014, 2015, and 2016 devices.".[712]  However, I explain in the Elhauge Report that the payments in the TA and FATA were actually penalties, not discounts.[713]  Thus, any equally-efficient-rival test is a red herring, because none of the theories of anticompetitive harm I have articulated require a finding that Qualcomm prices its chips below cost, which is not a necessary condition for establishing that an exclusionary condition raises rivals costs and restrains their sales in a way that is likely to have anticompetitive effects.[714]  Although the irrelevance of the test to the situation at hand makes a detailed evaluation of Dr. Chipty's methodology unnecessary, I offer a few notes below.

328.    Dr. Chipty claims to first describe a profitability calculation performed by Apple, in the ordinary course of business, of switching part of its chip purchasing away from Qualcomm.[715]  She notes that in early 2014 an Apple employee (Aaron Schafer) compared "the gain to Apple of purchasing a portion of its thin modem needs from Intel for Apple's 2016 product launches, against the loss of certain Qualcomm incentives set forth in the ATA."[716]  The key problem with Dr. Chipty's attempt to evaluate Apple's 2014 analysis is that, after nominally describing it, she presents her own "Interpretations" of deposition testimony from Apple concerning the 2014 analysis.  Dr. Chipty notes that Schafer answered a question about the analysis, based on which she first claims "There are two ways that Mr. Schafer may have been attempting to answer this question", then claims "These are not the comparisons Mr. Schafer appears to have made" and then tries to evaluate each way "Mr. Schafer intended to answer this question".[717]  To be clear, Dr. Chipty is *assuming* Mr. Schafer intended to analyze something different, concluding from her assumption that Schafer performed his analysis incorrectly, and then imposing her own calculation  based on what she thinks Schaefer "should have" done.  This is not a reliable way to interpret Apple's analysis of profitability in 2014.

329.    Dr. Chipty's misguided attempt to re-write Apple's 2014 analysis is also entirely unnecessary because Apple described it in detail in a Questionnaire

---

[712] Chipty Report ¶317.
[713] Elhauge Report § V.B.1.
[714] Einer R. Elhauge, United States Antitrust Law And Economics 414-18, 471-74 (3rd ed. 2018); Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harvard Law Review 397, 456-59, 461-64 (2009).
[715] Chipty Report ¶¶318-321.
[716] Chipty Report ¶318.
[717] Chipty Report ¶¶322-326.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Response to the European Commission: Apple stated that "An early 2014 analysis by Apple's procurement team… demonstrated that the financial benefits of purchasing significantly cheaper IMC chipsets for both iPhone and iPad in 2015 was outweighed by the financial penalties… in Apple's agreements with Qualcomm."[718] The Questionnaire Response further states that "The model demonstrated that even under an unrealistically aggressive assumption that it could switch 80% of its volumes for non-CDMA SKUs to Intel in 2015, it would still lose money if it chose Intel."[719]   Thus, one need not consider Dr. Chipty's speculations (which, for example, fail to mention that Apple was performing an extremely conservative analysis using an "unrealistically aggressive assumption" about switching).

330.   Dr. Chipty next claims to "evaluate whether an EER [Equally Efficient Rival] could profitably compete for Apple's business".[720]   She presents a model to show the relevant inputs for the analysis, describes the inputs to her model, claims to show "that the EER could have profitably competed for Apple's business, provided that it was capable of supplying about half of Apple's business for each year from 2014 to 2016", and also claims to show that "contestable sales volume was large enough to satisfy the potential thresholds".[721]   Part of her analysis includes an alternate "stepping stone" scenario, whereby a rival first supplies 5% of Apple's needs in 2014, and then supplies 50% in 2015 and 2016 (instead of 50% all three years).[722]   As I previously noted, the payments in the Apple-Qualcomm agreement were penalties, not discounts, making an evaluation of this claim unnecessary.[723]

331.   Nevertheless, even if one were to consider Dr. Chipty's EER test necessary, there is an error in her implementation that must be corrected in order to calculate a realistic result.  Dr. Chipty performs the EER test from Qualcomm's ex-ante perspective, as is apparent from the following descriptions:

- "In this case, an equally efficient rival (or "EER") would be a rival chipmaker that has the same cost structure as Qualcomm."[724]

---

[718] FTC-PROD-0012101 at 104.

[719] FTC-PROD-0012101 at 104.

[720] Chipty Report ¶327.

[721] Chipty Report ¶¶327-345.

[722] Chipty Report ¶¶334-336.

[723] I offer no opinion on whether Dr. Chipty's model, factual allegations, or empirical results are properly specified, or correct or properly calculated.

[724] Chipty Report ¶327.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

- "I identify contestable sales based on Qualcomm's beliefs about rivals' capabilities at the time of the ATA negotiations."[725]
- From the perspective of an EER, competing in 2013 (or even earlier) for Apple's business in advance of device launches, the appropriate inputs (sales, prices, costs, foregone incentive payments) should be the predicted or projected values, not the realized values for those inputs"[726]

For chipset costs, she "uses Qualcomm's projected direct costs and an estimate of Qualcomm's avoidable R&D costs".[727] However, her cost estimate ignores additional avoidable Qualcomm costs that were indicated by her own analysis, which is inconsistent with her own prior cost analysis in a way that lowers her cost estimate and thus biases her analysis toward passing the EER test.[728]

332. Further, for projected chipset prices and volumes, Dr. Chipty uses a January 2014 internal *Apple* projection.[729] Her use of Apple's projections to proxy Qualcomm's beliefs about Qualcomm's own prices and volumes could be proper when there are no Qualcomm-specific sources of information for these variables. However, Qualcomm's own projections during 2013 and 2014 are a superior proxy for Qualcomm's expectations, compared to Apple's projections. Dr. Chipty claims to use information from a February 2014 Qualcomm presentation and a March 2014 Qualcomm presentation to form her direct per-unit costs estimates.[730] The accuracy and consistency of the "Savings" calculation in her EER Test (which is the margin between prices and direct costs, multiplied by the volume of contestable demand) can be improved by using information on Qualcomm's thin modem gross margins from around the same time, instead of using Apple's internal pricing estimates. A May 2014 Qualcomm presentation slide titled "Gross Margin Expansion" notes that the base case for Qualcomm's Gross Margin in the "Thin Modem – Premium"

---

[725] Chipty Report ¶329.

[726] Chipty Report ¶331.

[727] Chipty Report ¶331.

[728] Dr. Chipty claims earlier in her report that "slowing the cadence of thin modem development would have generated substantial additional cost savings for Qualcomm in areas such as IT infrastructure, selling, general, and administrative functions, as well as equity-based compensation." Chipty Report n.599. Her claim means that making thin modems at the pace Qualcomm made them thus imposed significant additional avoidable costs on top of the ███ ████ in R&D costs per thin modem, but (inconsistent with her own prior cost analysis) she only uses the ██████ in R&D costs, biasing her analysis toward passing the EER test.

[729] Chipty Report ¶331.

[730] Chipty Report n.745.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

segment is ▮ with a target of ▮ in FY2019.[731]  Thus, one can extrapolate Qualcomm's target gross margins between 2014 and 2019,[732] and then use these target gross margin numbers (which are conservatively higher than Qualcomm's actual margin in 2014) instead of Apple's price estimates in Dr. Chipty's calculations.[733]

333.    Improving the accuracy and consistency of Dr. Chipty's EER test in this way shows that the EER test is failed under both an assumption of 50% contestability for 2014-2016 (showing that Apple would lose $164 million if it switched 50% to an EER in 2014) and for an assumption of 5% contestability in 2014 followed by 50% in 2015-2016 (showing that Apple would lose $964 million if it switched 5% to an EER in 2014).[734]  Moreover, Dr. Chipty's second EER test (with fewer contestable sales in 2014) is the only even potentially defensible approach to the EER test in this case because there is evidence that Qualcomm clearly did not expect Intel to win more than an iPad's worth of business in 2014 around the time of signing the ATA, which is a relevant Qualcomm expectation that must be accounted for.[735]

---

[731] Q2017MDL1_03357230 at Slide 17.

[732] I extrapolate from a ▮ margin in 2014 to ▮ in 2015 and ▮ in 2016.  This linear extrapolation reaches ▮ in 2019.  Because the MDM9625 was a two-year-old modem by 2016 (having already been used by Apple in 2014), I apply the "Thin Modem – High" margin instead of the "Thin Modem – Premium" margin for the second MDM9625 device (which is consistent with Dr. Chipty's own finding that the second MDM9625 device in 2016 had ▮ than the first launch in 2014).  Chipty Exhibit 47.  The extrapolated "Thin Modem – High" target margin is ▮ in 2016.  See Q2017MDL1_03357230 at Slide 17 (change from ▮ Gross Margin "Base Case" to ▮ target).

[733] This is because (Price – Cost)/Price = Gross Margin.  The use of Qualcomm's expected margins allows one to calculate Price as Cost/(1 – Gross Margin).

[734] See Elhauge Backup ("EER Analyses (Elhauge Update).xlsx").  I update only the sheet titled "Illustrative" to calculate the price from Dr. Chipty's Qualcomm cost estimates and my Qualcomm margin estimates (as opposed to implementing Dr. Chipty's Apple's price estimates).

[735] Dr. Chipty claims that" Qualcomm perceived many Apple devices to be contestable" based on evidence that Apple "told" Qualcomm it had competing offers, and that Qualcomm executive "feared" losing business and "responded" by offering incentive payments.  Chipty Report ¶343.  I respond to Dr. Chipty's mischaracterizations of the negotiations as Apple-driven above in Sections XIII.D-E.  Qualcomm is a sophisticated party that would not simply take what Apple "told" it as given.  For example, a Qualcomm employee states in a November 2012 email that any threat from Intel "would start in the tablet space".  Q2017MDL1_01955666.  See also Q2017MDL1_01986612 (December 2012 Qualcomm email chain with multiple employees discussing competitive intelligence on Apple's procurement plants.  For example, one email states

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

334.   Dr. Chipty also notes that "Apple did source from Intel during the term of the at-issue Agreements, by launching the iPhone 7/7 Plus with an Intel modem chipset.  Intel was able to win a share of Apple's business, despite being a less efficient competitor than Qualcomm" and recites various weaknesses in Intel's modem offerings relative to Qualcomm's.[736]  I noted the iPhone 7 launch in the Elhauge Report, stating that the iPhone 7 was launched with an Intel chip in late 2016 after the clawback provisions of the ATA expired and the penalties were significantly less than before.[737]  But this 2016 launch is not proof that the TA and ATA were not *de facto* exclusive dealing agreements.  Rather, it shows that the structure of penalties in the agreement was such that the incentives underlying the *de facto* exclusive dealing expired for phone launches in 2016.  Put differently, the TA and ATA are *de facto* exclusive dealing agreements from the period of signing through to the final Apple launches of 2015 because they have the same economic effect as exclusive dealing *for that period*.

### F. Dr. Chipty Fails to Demonstrate That My Analysis of Penalties is Flawed

335.   In the Elhauge Report, I demonstrate that the payments and clawbacks under the TA and ATA are actually penalties for violating an exclusivity condition, as opposed to discounts from Qualcomm's but-for chipset prices.[738]  Dr. Chipty's initial response to this analysis is to claim that I fail to assess "whether and to what extent the at-issue Agreements prevented rival suppliers from selling to Apple",[739] which is incorrect because I do describe the direct evidence of anticompetitive effects as well.[740]  Dr. Chipty then claims to find two further flaws in my analysis, but I explain below why she is mistaken on both points.

336.   The Elhauge Report first shows the exclusivity payments from Qualcomm were penalties because during the exclusivity period (from signing the

---

"I have reached out to Eddie Chang, our customer engineering leads, and other contacts tonight to verify/validate the rumor of Maverick's plan to roll out a low end non-QC modem phone product in the 1H 2013.").

[736] Chipty Report ¶346.
[737] Elhauge Report ¶146.
[738] Elhauge Report § V.B.1.
[739] Chipty Report ¶348.
[740] Elhauge Report § V.B.2.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TA to when Apple first forfeited payments under the FATA) Qualcomm's margin at Apple was comparable to Qualcomm's margin at five benchmark OEMs, and fell by less at Apple than at those benchmark OEMs when compared to the year before the TA (the "before" period).[741]    This shows Qualcomm did not reduce Apple prices compared to other (non-exclusive) OEMs' prices during the exclusivity period.

337.    Dr. Chipty claims this analysis is flawed because Qualcomm sold a different type of modem (the MDM thin modems) to Apple than it did to the benchmark OEMs, and that the differential mix of products spans different antitrust markets alleged by plaintiffs in this case.[742]    To address this issue, Dr. Chipty performs the same test but only for MDM modems, which she claims shows the opposite result as my original findings.[743]    Her criticism is inapt because the comparison of margins from before exclusivity to margins during exclusivity occurs **within** each group (Apple or the benchmarks).  This means that the differential mix of products between the two groups cannot affect the comparison unless there is a significant shift in mix, which she does not claim.  Because my methodology avoids discarding the entirety of non-MDM purchasing data and because there is no reason to think the before-and-during comparison is affected by product mix, there is no error in my findings.

338.    Nevertheless, to account for the possibility that product mix played a role in my results, I modify my analysis to control for the product mix.  Specifically, for Apple I test what the margin is during the exclusivity period for the products that were also purchased in the before period, and for both periods I weight the margins by Apple's purchase mix from the before period.[744]    I do the same thing for the benchmark group.  Qualcomm's margin at Apple actually **rises** from ███ during the before period to ███ during the exclusivity period, suggesting that Qualcomm was earning more from Apple on the same products that Apple purchased prior to

---

[741] Elhauge Report ¶¶130-132.

[742] Chipty Report ¶¶352-353.

[743] Chipty Report ¶¶354-355.  Dr. Chipty claims that the dataset for my analysis is component-level, whereas her dataset is chipset-level, but she also finds that the difference in these margin results is less than 0.2% between the two datasets.  Chipty Report n.784.

[744] For example, suppose in the before period, Apple purchases $1 of Chipset A and $2 of Chipset B.  Suppose in the exclusivity period, Apple purchases $5 of Chipset A, $1 of Chipset B, and $2 of Chipset C.  I calculate the margin for the before period using actual sales.  However, I calculate the margin for the after period that Apple would have earned had 33% of its purchases been Chipset A and 67% been Chipset B.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

exclusivity.[745]  By contrast, Qualcomm's margin at the five benchmark OEMs falls from ██████ to ██████.

339.   Dr. Chipty purports to levy three additional criticisms at my margin comparison, but they are all functionally the same criticism.  She first complains that my analysis fails to adjust for the unique risk that Qualcomm faced in selling to Apple, and her second complaint is that I failed to factor in R&D costs for Apple (which she says I should have because Qualcomm made modems specifically for Apple and at a faster pace for Apple).[746]  These are actually the same complaint, because the unique risk she purports to identify *is* that Qualcomm may not have recovered the R&D it spent on purportedly Apple-specific thin modems.  Dr. Chipty is thus engaging in erroneous double-counting when she argues that I should both adjust for the risk of Qualcomm's added R&D *and also* factor in the R&D costs to the analysis a second time.  Similarly, her third complaint is that I should have factored in Qualcomm's fixed costs in Apple-specific customization,[747] which is again just saying I should include R&D costs in my analysis.  However, I showed above in Section XIII.C that Dr. Chipty is wrong to claim that Qualcomm was uniquely dependent upon Apple for thin modem sales (with 42.8% of thin modem sales coming from non-Apple customers and with the percentage above 50% in the years when most of the R&D investments were made) and was wrong to claim that Qualcomm's development of purportedly Apple-specific chipsets doesn't also benefit other lines of products.

340.   The Elhauge Report also shows that, when Apple moved from single-sourcing to dual-sourcing in 2016, Qualcomm was forced to lower its pricing by an amount greater than the exclusivity payments that Apple forfeited.[748]  Dr. Chipty entirely misunderstands this analysis.  She first responds that "contrary to Professor Elhauge's theory, the evidence shows that Qualcomm lowered (not raised) the unit price of the MDM9x45 in response to Apple breaking its 'loyalty condition.'"[749] But that is precisely the point: once Qualcomm could no longer employ the payments coercively (because the savings to Apple of dual-sourcing finally exceeded the penalty), Qualcomm had to lower its prices *anyway*, meaning those payments never

---

[745] *See* Elhauge Backup. For the purposes of this calculation, I use the same dataset that Dr. Chipty did.
[746] Chipty Report ¶356.
[747] Chipty Report ¶356.
[748] Elhauge Report ¶¶133-134.
[749] Chipty Report ¶358.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

represented any discount. Put differently, consider the following: my example shows that if Apple had remained exclusive to Qualcomm in 2016, Apple would have paid Qualcomm ██ per modem and received ████████ in exclusivity payments.[750] The question at hand is whether the exclusivity payment is a true discount or a disloyalty penalty. My example next shows that, even though Apple became disloyal—and therefore forfeited the ████████ payment—Qualcomm was forced to lower its prices in response to competition, such that Apple saved money anyway.[751] This shows that *in a but-for world without the exclusivity payment*, Qualcomm would have been forced to offer lower prices anyway, meaning the ████████ payment cannot be a discount relative to the but-for world.

341. Dr. Chipty's additional criticisms that the disloyalty example both demonstrates a lack of coercion (because Apple did switch in 2016) and demonstrates Apple acted irrationally by signing the 2013 FATA (because, according to her, if the payments were disloyalty penalties then Apple should have known it could reject the payments and instead receive lower prices)[752] are similarly mistaken. Apple *was* coerced from 2013 to 2015 under the FATA because it could not have avoided the penalty, but the exclusivity condition stopped coercing Apple in 2016 when the size of the penalty went down and a weakened competitor—Intel—presented itself as an alternative after years of anticompetitive exclusion, which is why it was able to break exclusivity and avoid the penalty.[753]

### G. Dr. Chipty's Incorrect Claims About My Approach

342. In Section VII.G of her report, Dr. Chipty simply repeats her arguments that she does not agree the TA and FATA caused rival exits and that there is "evidence that the modem chipset industry is characterized by intense dynamic

---

[750] Elhauge Report ¶133.

[751] Elhauge Report ¶134. Dr. Chipty calculates the forfeiture payments in 2016 differently than I do, *see supra* XIII.A, but that is because she uses an ex-post calculation.

[752] Chipty Report ¶¶358-359.

[753] Chipty also repeats her mistaken claims that no other chip supplier could serve Apple's needs, that Apple could not have been affected because only Apple bought thin modems, that Apple was the one demanding the incentive payments, and that Apple did in fact use Intel in 2016, during the term of the FATA. Chipty Report ¶¶360-361. I have responded to all of these claims throughout Sections XIII-XIV of this Reply Report. Dr. Chipty also states that the TA and FATA incentives were small relative to iPhone revenues, but she fails to explain what the significance of this observation is.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

competition".[754]  I have responded to these claims above in Sections XII and XIV.C-D of this reply report.

## XV. DR. WILLIAMS' ERRONEOUS ANALYSIS OF WHY APPLE SELECTED QUALCOMM

343.    Defense expert Dr. Williams presents a number of analyses concerning Apple's chipset decisions during the period of Apple's exclusivity agreements with Qualcomm.   Although he devotes nearly 100 pages of analysis to the topic, the simple fact is that he fails to address the relevant question, which is *what would Apple's procurement decisions have been in a but-for world free of Qualcomm's exclusionary conduct*?  This is apparent in his description of his assignment on the matter, which states that he has been asked to

> Analyze the design, development, and availability of Intel, MediaTek, ST-Ericsson, and Broadcom modem chipsets in the 2011-2016 timeframe ("the relevant timeframe") and provide opinions as to whether those modem chipsets were viable options for use in Apple Inc.'s ("Apple") iPhones and cellular-enabled iPads during that timeframe in view of Apple's expressed requirements.[755]

He also lists another task as "Determine whether Intel's modem chipsets were viable candidates for iPads that Apple released during the 2014/2015 timeframe."[756]  These questions only ask about the actual world, and so Dr. Williams is not even trying to answer the relevant question for determining effects in this case.   Nevertheless, I discuss some of his opinions briefly below, and note especially that my discussion of the opinions of Professor Nevo, Professor Snyder, and Dr. Chipty throughout this Reply Report largely cover Dr. Williams' contentions about Apple's procurement.[757]

344.    As an initial matter, one must approach the evidence of exclusionary conduct holistically in this case.  Qualcomm has implemented a No-License-No-Chips policy (taxing rival chipset sales), has refused to exhaustively license its cellular SEPs to rival chipset suppliers (violating its FRAND commitment), and has used exclusivity conditions with Apple to implement *de facto* exclusive dealing.  Yet

---

[754] Chipty Report ¶361.

[755] Williams Report ¶1.

[756] Williams Report ¶1.

[757] Throughout this Section XI.V of my Reply Report, unless stated otherwise, I offer no opinion on whether Dr. Williams' factual allegations or technical findings are correct.  Rather, I simply note that, even if takes these factual allegations as given, he fails to address the relevant question of harm relative to the correct **but-for** baseline.

172

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Dr. Williams' report focuses solely on the ***actual-world*** capabilities of rival chipset suppliers and actual-world decision-making by Apple. I have responded to the near-identical claims (that share the same fallacious focus) in my discussions of the opinions of Professor Snyder and Dr. Chipty. I provide evidence and explanations in Sections IX, XI, and XIV.C.1 above (in addition to the Elhauge Report Section V.B) to show that, in a but-for world free of Qualcomm's exclusionary conduct, engaging with Apple would have elevated the engineering capabilities and timeliness of Intel and other rival chip suppliers. These rivals would have been more competitive, would have been competitive sooner, and as a result could have competed for Apple's chipset business (and the chipset business of other OEMs) more effectively.

345.  In Section IX.A of his report, Dr. Williams claims to demonstrate the importance to Apple of deadlines and milestones,[758] Apple's "Global SKU strategy" of a single global chipset and support for on-demand carriers,[759] and Apple's discretion in using a thin modem (instead of a SoC) and setting features and functionality.[760] Next, in Section IX.B of his report, Dr. Williams argues that only Qualcomm could have supplied Apple's 2012 lineup:

> Apple has stated in discovery responses that a clawback provision in the Transition Agreement between Apple and Qualcomm 'was among the considerations that drove Apple to select Qualcomm' as its modem chip supplier for 2012 products. My analysis of Apple's decision demonstrates that Qualcomm offered modem chips that were technologically superior to ST-E's [i.e. Ericsson's] modem chips and came to market sooner. For these reasons, it is likely that Apple would have chosen Qualcomm as its supplier for 2012 products even without executing the Transition Agreement.[761]

Dr. Williams then purports to show that Apple considered but rejected ST-Ericsson modems because ST-Ericsson was unable to meet Apple's scheduling demands, and that consequently "no supplier but Qualcomm met Apple's needs to have an LTE modem chip available in time for the iPad 3, iPad 4, iPhone 5, or iPad Mini".[762] His analysis again shows how he is not even ***claiming*** to answer the relevant question. He observes an allegation of anticompetitive conduct (the use of clawbacks), and simply asserts in response that Qualcomm's chips were superior and came to market

---

[758] Williams Report § IX.A.1.
[759] Williams Report § IX.A.2.
[760] Williams Report § IX.A.3.
[761] Williams Report ¶185.
[762] Williams Report § IX.B; *id.* at ¶189.

173

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

sooner. His inquiry thus fails to address whether Apple's engagement with ST-Ericsson would have elevated ST-Ericsson were it not for the effects of the clawbacks, which is relevant to understanding whether Qualcomm's exclusivity agreements had an influence on Apple's decisions. Dr. Williams' inquiry also fails to address whether the exclusionary effects of No-License-No-Chips played a role.

346.    In Section IX.A of his report, Dr. Williams claims that only Qualcomm was capable of supplying chipsets for Apple's 2011 RFP (for Apple devices in 2013 and 2014), which he argues shows the inferior nature of rival chips in this timeframe.[763]  The only part of his analysis that even purports to actually consider the influence of the exclusionary conduct is his argument that

> Apple has stated in discovery responses that it "did not seriously consider adopting any other chipsets for 2013" besides Qualcomm "because the exclusivity-based Transition Agreement" between the companies would be triggered by bringing on a second supplier. But the evidence demonstrates that Apple seriously considered Intel, Broadcom, and ST-Ericsson as potential suppliers for the 2011 RFP for 2013 products and ultimately selected Qualcomm's  MDM9615M for its entire product line because of Qualcomm's superior ability to meet Apple's technical requirements in time for its product releases.[764]

This passage shows that, despite raising the question of the TA, Dr. Williams offers only a conclusory dismissal; he does not even consider whether avoiding billions of dollars in penalties would have made Apple more willing to engage with a rival chip supplier. The remainder of his analysis suffers from the same flaws I have described in Sections IX, XI, and XIV.C.1 above.

347.    In Section IX.D of his report, Dr. Williams claims that Intel could not offer the required technical features on schedule for Apple's 2012 RFP (for 2014 and 2015 devices).[765]  His analysis suffers from the same flaws I have described in Sections IX, XI, and XIV.C.1 above. In Section IX.E of his report, Dr. Williams claims that Intel could not offer the required technical features for Apple's iPhone SE.[766]  His analysis suffers from the same flaws I have described in Sections IX, XI, and XIV.C.1 above.

---

[763] Williams Report § IX.C.
[764] Williams Report ¶192.
[765] Williams Report § IX.D.
[766] Williams Report § IX.E.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

348.   In Section IX.F of his report, Dr. Williams claims that Apple never considered Intel for CDMA and that thus Intel's lack of CDMA capability was not a factor in Apple's decisions not to use Intel.[767]   This fails to address the relevant question of whether, if Qualcomm had followed its FRAND commitment and provided Intel with an exhaustive license in 2004, Intel would have been more likely to build a CDMA business by 2011 that would have demanded Apple's attention. Dr. Williams' analysis suffers from the same flaws I have described in Sections IX, XI, and XIV.C.1 above.

349.   In Section IX.G of his report, Dr. Williams claims that MediaTek perceived its offerings as lagging behind Qualcomm, and did not perceive itself as a viable option for Apple.[768]   In Sections IX.H and IX.I of his report, Dr. Williams claims that ST- Ericsson and Broadcom could not have met the requirements for Apple's 2011 and 2012 RFPs.  Dr. Williams' analysis suffers from the same flaws I have described in Sections IX, XI, and XIV.C.1 above, where I specifically address these kinds of claims about each of MediaTek, Broadcom, and ST-Ericsson.

350.   In Section X of his report, Dr. Williams again discusses the example of Intel's exclusion from Apple's 2014 iPad and 2015 products.[769]   Dr. Williams' analysis suffers from the same flaws I have described earlier in this section of my Reply Report and also in Sections IX, XI, and XIV.C.1 above.  The only argument he offers unrelated to technology or scheduling is that:

> Apple is not using an Intel modem chipset for its current iPads. If Apple had truly considered including an Intel modem chipset in its 2014/2015 iPads, then it presumably would have selected an Intel modem chipset for one or more of its iPads after 2015.[770]

Dr. Williams is mistaken because the exclusionary conduct at issue in this case was ongoing before 2014/2015 and remains ongoing beyond 2014/2015.  The fact that Intel came close to not being excluded by Qualcomm in 2014 has no bearing on whether Intel should have won Apple's business for 2015 devices.  This is especially true because the No-License-No-Chips tax, the refusal to license, and the *de facto* exclusive dealing all remained in effect.

---

[767] Williams Report § IX.F.
[768] Williams Report § IX.G.
[769] Williams Report § X.
[770] Williams Report ¶300.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

351.   In Section XI of his report, Dr. Williams claims to physically test certain modem chipsets as empirical demonstrations of their capabilities.[771]  I am not aware of any claim that he constructed and then tested the physical chip Intel would have engineered in the but-for world without Qualcomm's exclusionary conduct. His physical testing of anticompetitively weakened products is irrelevant to any of the material economic issues in this case.

## XVI. MISCELLANEOUS MISCHARACTERIZATIONS

352.   Below, I discuss additional instances (not addressed elsewhere in this Reply Report) where defense experts make remarks that mischaracterize statements in the Elhauge Report.

353.   Professor Chipty claims that the costs that appear in Qualcomm's chipset data "do not reflect any fixed costs, something Professor Elhauge himself recognizes in his analysis."[772]  This is a mischaracterization of my analysis.  While I noted that Qualcomm claimed in an interrogatory response that this data did not include fixed costs, I did not rely on or validate that claim, but simply relied on the fact that "Because none of [the omitted] costs are tracked on a per-product basis, they cannot affect a margin comparison between different products."[773]

354.   Dr. Johnson claims that I described Apple's agreements with Qualcomm as including payments that effectively reduced Apple's per-device royalty payment.[774]  This is a mischaracterization of the Elhauge Report, which merely recites the contract terms within these agreements and offers no opinion on the correct characterization of these payments or on whether their economic incidence should be applied to royalties instead of chipsets.[775]

---

[771] Williams Report § XI.

[772] Chipty Report ¶180 & n.427 (citing Elhauge Report n.290).

[773] Elhauge Report n.290.

[774] Johnson Report ¶14.

[775] *See* Elhauge Report § V.A.

176

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

### EXHIBIT D: UPDATE TO STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION TESTIMONY, & COMPENSATION

A "Statement of Publications, Prior Trial and Deposition Testimony, & Compensation" was attached as Exhibit B to the Elhauge Report.

I have made the following publications since the filing of the Elhauge Report:

- Elhauge, *How Horizontal Shareholding Harms Our Economy—And Why Antitrust Law Can Fix It* (Dec. 3, 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3293822

I have provided the following testimony since the filing of the Elhauge Report:

- I provided deposition testimony in *Garrett Sitts, et al. v. Dairy Farmers of America, Inc., and Dairy Marketing Services, LLC* on November 6, 2018

My compensation remains unchanged.

177

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## EXHIBIT E: UPDATE TO MATERIALS RELIED UPON

A list of "Materials Relied Upon" was attached as Exhibit C to the Elhauge Report. The following are additional materials I am relying upon.

**Academic and Industry Literature:**

17 Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶1700a (Wolters Kluwer IntelliConnect CCH) (2015).

ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 54-55 (2d ed. 2010).

Anne Layne-Farrar, Jorge Padilla & Richard Schmalensee, *Pricing Patents for Licensing in*
*Standard-Setting Organizations: Making Sense of FRAND Commitments*, 7 ANTITRUST L.J. 671, 678 (2007).

Areeda & Hovenkamp, XI ANTITRUST LAW ¶1802c (3d ed. 2011).

Daniel L. Rubinfeld, *Quantitative methods in antitrust, Issues in Competition Policy*, ABA ANTITRUST SECTION (2008).

Einer R. Elhauge, UNITED STATES ANTITRUST LAW AND ECONOMICS 410-19, 471-74 (3rd ed. 2018).

Elhauge, Tying, *Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD L. REV. 397, 404, 407, 415-416, 456-59, 461-64, 471-74 (2009).

Elhauge, *Contrived Threats v. Uncontrived Warnings: A General Solution to the Puzzles of Contractual Duress, Unconstitutional Conditions, and Blackmail*, 83 U. CHICAGO L. REV. 503, 531-33 (2016).

Fernando Suarez and Gianvito Lanzolla, *The Half-Truth of First-Mover Advantage*, HARVARD BUSINESS REVIEW 121, 122 (April 2005).

178

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Michael D. Whinston, *Tying Foreclosure, and Exclusion*, 80 AM. ECON. REV. 837, 840, 846 (1990).

**Depositions:**

Bruce Sewell Deposition (4/4/2018-4/5/2018)

**Expert Reports:**

Rebuttal Expert Report of Dr. Robert Akl, D.Sc. (December 7, 2018)

Expert Rebuttal Report of Dr. Kenneth Flamm (December 7, 2018)

Rebuttal Expert Report of Michael J. Lasinski (December 7, 2018)

Rebuttal Report of Dr. Tasneem Chipty (November 16, 2018)

Expert Report of David S. Evans (November 16, 2018)

Expert Report of Dr. John H. Johnson, IV (November 16, 2018)

Expert Report of Professor Aviv Nevo, Ph.D. (November 16, 2018)

Expert Report of Edward A. Snyder Ph.D. (November 16, 2018)

Rebuttal Expert Report of Dr. Tim A. Williams, Ph.D. (November 16, 2018)

**Bates Numbered Documents:**

AAPL-FTC-00012040.

FTC-PROD-0003442

Q2014FTC03371612
Q2014FTC04332011
Q2014FTC04497009

Q2017MDL 1_02928410
Q2017MDL 1_03041982

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Q2017MDL1_00351908
Q2017MDL1_00414492
Q2017MDL1_01495692
Q2017MDL1_01955666
Q2017MDL1_01986612
Q2017MDL1_02914771
Q2017MDL1_02930610
Q2017MDL1_02933093
Q2017MDL1_03357230
Q2017MDL5_04724160
Q2017MDL8_00007277

QAPPCMSD00712424
QAPPCMSD00712430

QNDCAL00711879
QNDCAL00711881
QNDCAL01086760
QNDCAL04878273
QNDCAL05898145

**Data:**

Chipty Report Backup for Exhibit 38 ("Thin Modem Sales.xlsx", sheet "all thin modems").

Nevo Report Backup ("7_WCDMA Licensee Timeline.xlsx" and "8_WCDMA_Contractual Rates Timeline.xlsx" including MOT-04810, the 1990 Motorola agreement).

**Online Materials:**

"Ericsson demonstrates live LTE at 144Mbps", *available at* https://www.ericsson.com/en/press-releases/2007/2/ericsson-demonstrates-live-lte-at-144mbps (accessed 11/28/2018).

"Ericsson to exit wireless-modem market, cut 1,000 jobs," available at https://www.fiercewireless.com/wireless/ericsson-to-exit-wireless-modem-market-cut-1-000-jobs (accessed 12/4/2018).

180

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

"Marvell is latest casualty of mobile modem meltdown," *available at* http://rethinkresearch.biz/articles/marvell-is-latest-casualty-of-mobile-modem-meltdown/ (accessed 12/4/2018).

"NVidia to Sell its Icera Business &amp; Exit the Mobile Chip Market," *available at* https://www.forbes.com/sites/greatspeculations/2015/05/07/nvidia-to-sell-its-icera-business-exit-the-mobile-chip-market/#77c96d776e91 (accessed 12/4/2018).

Phonenews.com, "3GPP Freezes Final Version of LTE as Release 8, Ratification in March 2009" *available at* https://phone.news/3gpp-ratifies-final-version-of-lte-as-release-8-5911/ (accessed 12/1/2018) (announcement dated December 19, 2008).

R. Fontana, G. Decad, "A Ten Year (2008-2017) Storage Landscape LTO Tape Media, HDD, NAND", IBM Presentation (May 15, 2018), *available at* http://storageconference.us/2018/Presentations/Fontana.pdf (accessed 12/2/2018).

"Rising Competition Forces Broadcom to Exit the Baseband Market," *available at* https://www.forbes.com/sites/greatspeculations/2014/06/04/rising-competition-forces-broadcom-to-exit-the-baseband-market/#2b6d87792d83 (accessed 12/4/2018).

SAMMOBILE, "Qualcomm and Samsung amend cross-license agreement, team up for 5G", *available at* https://www.sammobile.com/news/qualcomm-and-samsung-amend-cross-license-agreement-team-up-for-5g/ (accessed 12/2/2018).

**Misc:**

Hwi-Jae Cho (LG Electronics, Inc.'s employee designated with knowledge of LGE's Patent License Negotiations with Qualcomm), Responses to Witness Examination Questionnaire, Response to Annex B, No. 67.

Order Granting FTC's Motion for Partial Summary Judgment, Federal Trade Comm'n v. Qualcomm Inc., Case No. 17-cv-00220, ECF No. 931 at 1 (N.D. Cal. Nov 6, 2018).

Qualcomm's ITC Complaint against Apple (July 7, 2017) *available at* https://www.qualcomm.com/media/documents/files/qualcomm-apple-complaint-with-the-u-s-itc.pdf (accessed 11/25/2018).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Redacted Complaint For Damages, Declaratory Judgment And Injunctive Relief, Case 3:17-cv-00108-GPC-NLS (January 20, 2017).

Submission of Qualcomm Incorporated to the Federal Trade Commission Regarding Staff's Tax Theory of Harm, 6 (Dec. 13, 2016).

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY